1  **BROOKE WEITZMAN** SBN 301037
2  **WILLIAM WISE** SBN 109468
   **ELDER LAW AND DISABILITY RIGHTS CENTER**
3  1535 E 17th Street
4  Santa Ana, California 92705
   t. 714-617–5353
5  e. bweitzman@eldrcenter.org
6  e. bwise@eldrcenter.org

7  **CAROL A. SOBEL** SBN 84483
8  **MONIQUE ALARCON** SBN 311650
   **AVNEET CHATTHA** SBN 316545
9  **LAW OFFICE OF CAROL A. SOBEL**
10 725 Arizona Avenue, Suite 300
   Santa Monica, California 90401
11 t. 310-393-3055
12 e. carolsobellaw@gmail.com
13 e. monique.alarcon8@gmail.com
   e. avneet.chattha7@gmail.com
14
15 [Additional Counsel on Next Page]
   Attorneys for Plaintiffs
16

17         UNITED STATES DISTRICT COURT
18 FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

19 ORANGE COUNTY CATHOLIC            Case No.:
   WORKER, an unincorporated
20 association; Lisa Bell, Shawn Carroll,   Civil Rights Complaint
21 Melissa Fields, Larry Ford, Cameron
   Ralston, Kathy Schuler, Gloria        42 U.S.C. § 1983:First, Fourth, Fifth,
22 Shoemake, as individuals;             Eighth and Fourteenth Amendments;
                                         Cal. Const. Article I, Sections 7 and 13;
23                                       Cal. Civ. Code § 52.1.
24             Plaintiffs,
25         v.
   ORANGE COUNTY, the City of
26 Anaheim, the City of Costa Mesa, and
27 the City of Orange,
28             Defendants.

                            1

**PAUL L. HOFFMAN** SBN 71244
**CATHERINE SWEETSER** SBN 271142
**COLLEEN M. MULLEN** SBN 299059
SCHONBRUN, SEPLOW, HARRIS & HOFFMAN
11543 W. Olympic Blvd.
Los Angeles, California 90064
t. 310-396-0731
e. hoffpaul@aol.com
e. csweetser@sshhlaw.com
e. cmullen@sshhlaw.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURISDICTION AND VENUE

1. This is an action for injunctive and declaratory relief and damages pursuant to 42 U.S.C. § 1983 based upon the violations of Plaintiffs' rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. Jurisdiction exists pursuant to 28 U.S.C. § 1331 and 1343 based on 42 U.S.C. §1983 and questions of federal constitutional law.  Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.  The Court has jurisdiction over Plaintiffs' supplemental state law claims for declaratory and injunctive relief pursuant to 28 U.S.C. § 1367(a).

2. Venue is proper in the Southern Division of the Central District in that the events and conduct complained of herein all occurred in Orange County.

## PRELIMINARY STATEMENT

3. Over the past year, Orange County, Anaheim, Orange, and Costa Mesa, have taken actions to force unhoused people into the area of the Santa Ana Riverbed between the Santa Ana Freeway and Ball Road.  Now, the County is taking steps to push those people back into the surrounding cities without a plan for housing or shelter.  The failure, if not the outright refusal, of Orange County and its cities to adopt positive measures to address the housing crisis and the willingness to criminalize the mere act of existing in public spaces takes a toll on the County's most vulnerable people. At every opportunity the County and its cities have invested in enforcement instead of housing, blaming other entities for the problem, and leaving unhoused people nowhere to turn, nowhere to live, and nowhere to sleep.

4. The consequences of the county and municipal governments' abdication of responsibility are significant.  Deaths of homeless people in Orange

County reached an all-time annual high of 210 in 2017.[1]  These deaths come after a decade of indifference by government officials. In 2008, Orange County recognized the desperate need to address these issues and formed the Orange County Ten-Year Plan to End Homelessness Working Group "to serve and protect the homeless . . ."[2] With no serious effort to implement an actual plan, the homeless population in the County continued to grow.  In the 2017 Point-in-Time Count, the County estimated that there were 4,792 homeless people, 2,584 of whom were unsheltered and could find no shelter space.  This number included 357 veterans.[2]  More than half of the 2017 sheltered population was in emergency shelters with the remainder in "transitional shelter."  By the county's own estimates, the homeless population has increased between 5 and 7 percent annually over the last five years.  On information and belief, Plaintiffs allege that the current homeless population exceeds 5,000 individuals.

5.     In 2017, with an increasing homeless population and no investment in solutions, the County renamed the Commission to End Homelessness and ended all reference to ending homelessness by 2020. As a part of that change, critical stakeholders, including homeless people and service providers, were removed from the Commission.

6.     This re-focus away from ending homelessness came at a time when affordable housing in Orange County was increasingly rapidly disappearing. According to the homeless assessment completed in October 2016 by Susan Price,

---

[1] https://www.ocregister.com/2017/12/19/210-homeless-people-who-died-in-orange-county-the-past-year-will-be-remembered-at-an-interfaith-service-here-are-their-names/

[2] http://ochmis.org/wp-content/uploads/2012/10/PIT-Final-Report-2017-07.24.17.pdf

the Orange County Care Coordinator, 64% of jobs available in Orange County in 2016 did not pay enough for a person to afford a one-bedroom apartment, rents increased dramatically in 2016, and the Orange County affordable housing stock declined in the face of gentrification in formerly low-income neighborhoods across Orange County. The report issued by the federal Housing and Urban Development ("HUD") department on June 1, 2017, found that the vacancy rate in Anaheim, Santa Ana, and Irvine declined from 2010 to 2017 from 5.9 % to 3.6%, and average rents rose 3% in May 2017.[3] With almost 90,000 people on the housing authority waiting lists hoping for access to affordable housing[4], the housing resources remain woefully insufficient.

7.     These conclusions were recently reinforced in a 2017 report issued by United Way, prepared in coordination with the University of California Irvine and the Association of California Cities.   The report, "Homelessness in Orange County: The Costs to Our Community," found that 75 percent of the homeless individuals surveyed lived in Orange County for at least six years, with most more than 10 years.[5]  Cutting against the usual stereotypes that homeless individuals are substance abusers or mentally ill, the United Way report found that the single greatest factor leading to homelessness in Orange County, by far, is "the gap between the availability of affordable housing and work that pays a wage sufficient to enable the economically marginal to access that housing."[6]

---

[3] U.S. Dept. of Housing and Urban Development, Office of Policy Development and Research, *Comprehensive Housing Market Analysis Anaheim-Santa Ana- Irvine, California*, https://www.huduser.gov/portal/publications/pdf/AnaheimCA-comp-17.
[4] Susan Price, An Assessment of Homeless Services in Orange County, http://bos.ocgov.com/ceo/care/HOMELESS%20ASSESSMENT%20DCC%20REPORT_10.18.2016.pdf, pg. 21
[5] Homelessness in Orange County: The Costs to Our Community, *available at* unitedwayoc.org/wp-content/uploads/2017/08/united-way, p. 31.
[6] *Id.*, p. 34.

8.      Both the Price Report for the County and the United Way report agree that economic disparity is the primary cause of homelessness in the region. Despite the fact that the vast majority of the unhoused population in the County is in this situation through no fault of their own, the response of the government entities has been to punish poverty.  Nearly every City in the County criminalizes homelessness through ordinances that make it unlawful to be present, sit or sleep in a public place even if a person is without a home. To avoid harassment and incarceration for violating these and similar laws criminalizing the basic necessities of living, many people move to locations such as the Santa Ana Riverbed, hoping that law enforcement will not interfere or harass them while they try to survive.

9.      In addition to the Riverbed encampment, another 200 people are unsheltered at the Santa Ana Civic Center.  The unhoused population at this location was nearly 500 people until late 2016 when the joint city and County authorities incrementally evicted each smaller encampment in the Civic Center. This action followed Santa Ana and Orange County blaming each other for the failure to address this crisis and calling for the County's first year round emergency shelter[7].  In the meantime, more than half of the people who occupied the Civic Center in 2016 moved to the Santa Ana Riverbed.  While the County did open the Courtyard, an emergency shelter in Santa Ana, it was inadequate to meet the needs of the unhoused population and quickly filled to double the approved capacity nightly, with people dropped off there by hospitals, various cities' police, social workers, and others with nowhere else to bring homeless people.

10.      The need to respond to the increasing numbers of unsheltered individuals in Orange County is hardly new and neither is the approach of

---

[7] https://www.ocregister.com/2016/09/08/santa-ana-declares-homeless-camp-at-civic-center-a-public-health-crisis-wants-more-security/

criminalizing - rather than housing - people who are homeless.  More than a decade ago, the Orange County Grand Jury issued a report on "The Homeless Crisis in Orange County."  The report noted then that "[h]omelessness is on the rise, often misunderstood, and is inextricably linked to poverty."  From 1990 to 2005 the homeless population increased at a far greater rate than the overall increase in population in the County.  The Grand Jury report concluded that addressing the problem "does not appear to be a priority with the Board of Supervisors."   The Grand Jury listed a series of measures to address the crisis then being considered by various municipal entities in the County, including plans to add housing for homeless individuals at the former El Toro Marine Air Station; shelters in San Clemente, Buena Park, Westminster, La Habra and Cypress, and a very "humanistic" outreach approach by the Santa Ana Police Department and Orange County Sheriff's Department.  A dozen years later, few, if any, of these intentions have been realized.

11.     The 2005 Grand Jury Report also reviewed the history of recommendations in similar reports, going back to 1988.  The 2005 Report concluded that few of the earlier recommendations had been implemented. The Grand Jury report demonstrates that, over the past 25 years, the primary response of the County and the Cities has been to invest in approaches that address the visible presence of homeless people as a blight, without significantly reducing the number of residents on the street each night.  These approaches include criminalizing homelessness by arresting homeless individuals for loitering, making it illegal to sleep in public places at night, seizing and destroying homeless people's property, and engaging in a pattern of warrantless stops and interrogations.  The identical practices have been repeatedly challenged and enjoined by judges of the Central District in Los Angeles and the Ninth Circuit, uniformly rejecting these practices criminalizing homelessness as a violation of the First, Fourth, Eighth and Fourteenth Amendments.  There is no credible reason

why Orange County and local cities' officials would not be aware of the judicial rulings on these issues because they have been highly publicized throughout the region, if not the nation, and discussed at public meetings of these entities.

12.     The County and Cities' approach is even more indefensible when viewed against the directives issued by the United States Interagency Council on Homelessness ("USICH"), composed of nineteen federal cabinet and agency heads to organize federal efforts to end homelessness. The most recent USICH report, "Ending Homelessness for People Living in Encampments," is directly on point and counter to the approach taken by the County to the Plaintiffs and other homeless individuals forced to live along the river in large part because of the government's failures over decades.

13.     Specifically, the USICH underscored that "forced dispersal" of homeless encampments is inappropriate and undermines the goal of providing services to homeless individuals.  While the USICH underscored the importance of "intensive and persistent outreach and engagement," the County has instead opted to disperse the encampment by telling homeless people that they are no longer permitted to camp in the riverbed and will be cited or arrested for trespass if they remain, forcing them to move out into the streets of nearby cities including Anaheim, Orange, and Costa Mesa.  Similarly, the Cities have dispersed encampments, telling people that they are not welcome in the city, their mere presence is a crime, and they will be ticketed or arrested if they remain.  Until now, the Cities have coupled their threats with a direction to relocate to the area along the river.

## FACTS

14.     In February 2017, an action was filed in the U.S. District Court concerning the County's earlier enforcement actions against approximately 1,000 individuals living in the Riverbed. *See Schuler v. County of Orange*, No. 8:17-cv-00259 DOC KES, (C.D. Ca. 2017) [Dkt. #1].  On March 7, 2017, the parties

8

stipulated to, and the Court granted, a preliminary injunction to prevent the County from violating individuals' constitutional rights in a designated area of the Riverbed just north of the Santa Ana Freeway and south of Ball Road ("the Injunction Area."). [Dkt. #30] The area designated in the preliminary injunction and in the settlement subsequently reached by the parties is the same area at issue in this action.

15.     After the settlement in *Schuler*, the County contracted with City Net to provide services to people in the Injunction Area. In July 2017, City Net surveyed 422 people of those then living there. Of those interviewed, 81.2% were interested in having City Net become their case managers and seek housing and services for them. When asked where they lived previously, 25% reported they were from Anaheim, approximately 11% were from Santa Ana, and 9.7% were from Orange. Since this survey was done, the population in the Santa Ana Riverbed has increased, as people have been moved from other areas into the Injunction Area at the direction of the County.

16.     In the year since the injunction issued, the County failed to take steps to provide a safe environment for the unsheltered population in the Riverbed or to find alternative locations. The public discussions of the Board of Supervisors underscore that the County's preferred approach was criminalization.

17.     In June 2017, the County began to discuss providing basic necessities in the Injunction Area of drinking water, mobile showers, and even night access to the one public restroom in the area. Ultimately, the County determined not to provide most of these facilities and did not provide nighttime access to the restroom. In addition, although the County agreed to provide plastic bags to assist with trash pick-up in the Injunction Area, this was done in an inconsistent and insufficient manner.

18.     In August 2017, Orange County Public Works made public a plan to change the topography of the Riverbed in order to make it "less desirable for

occupation."  The Public Works presentation showed how the use of rocks in the Santa Ana Riverbed effectively made the area impossible for a person to lie down and sleep.  Again, the County chose to invest in harassment instead of solutions.[8] The County made clear that the primary reason for the Riverbed project was to use rocks and large boulders to exclude the flat land from use by homeless persons.

19.   In September 2017, Supervisor Nelson drafted a plan to use County land in Irvine as a temporary shelter.  The Board of Supervisors rejected that plan and instead voted to develop that land into a massive new project containing luxury condominiums and upscale retail shops.[9]

20.   While the County rejected measures to address homelessness, the Cities were taking similar actions.  In August 2017, Anaheim City Council considered community requests to install restrooms near the Santa Ana Riverbed and offers of organizers to provide and maintain those restrooms.  Anaheim rejected the proposal and stated that the County should take responsibility for the needs of the people sleeping on County property.[10]

21.   In September 2017, the Anaheim City Council passed "Operation Home Safe," put forward as a comprehensive program to address homelessness along the Santa Ana Riverbed.  A main goal of the program was to identify locations for at least 500 shelter beds or other housing options. Additionally, the City of Anaheim committed to expediting the availability of 100 more beds at the Bridges shelter. To date, neither of those things has happened. The only part of the

_____

[8] https://voiceofoc.org/2017/08/county-used-rock-riprap-sand-to-make-santa-ana-riverbank-less-desirable-for-occupation/
[9] https://www.ocregister.com/2017/11/06/orange-county-to-finalize-plan-for-great-park-condo-retail-development-as-irvine-threatens-lawsuit/
https://www.youtube.com/watch?v=lx3CSQnIJsM
[10] http://www.scpr.org/news/2017/08/29/75117/anaheim-to-consider-portable-toilets-for-homeless/

plan that was implemented over the last four months involved significantly increased police enforcement.[11]

22.    In September 2017, Orange Council Member Alvarez announced that the City would be reviewing its loitering, vagrancy, and panhandling laws to strengthen them to provide the police with more tools to combat homelessness.[12]

23.    There is no question that the Defendants, along with other Cities, have coordinated enforcement actions against unhoused individuals living in the Riverbed.  On September 5, 2017, Anaheim Police Chief Quezada met with command staff from the Fountain Valley, Orange and Santa Ana Police Departments, along with the Orange County Sheriff's Department. Representatives from these law enforcement groups met again a few days later to discuss coordination of deployment schedules for enforcement in the Riverbed.  As part of this plan, the Anaheim Police Department implemented bike patrols on the Riverbed and assigned additional officers to patrol in the Injunction Area.  On information and belief, the Orange County Sheriff's Department is the lead agency for this coordinated enforcement action.

24.    On October 26, 2017, the County Flood Control District announced that restricted hours for bike trail access in Fountain Valley and complete closure of public access to the west side of the Riverbed in Fountain Valley.  More than 100 unhoused residents of Fountain Valley were living along the West bank of the Riverbed at the time as the area was next to a public storage facility and an area where they would not be impeding traffic.  It was a location where they thought

---

[11] https://www.ocregister.com/2017/09/13/after-anaheim-declares-a-state-of-emergency-homeless-along-river-bed-ponder-whats-next/
[12] https://www.ocregister.com/2017/09/13/after-anaheim-declares-a-state-of-emergency-homeless-along-river-bed-ponder-whats-next/

they would avoid harassment by law enforcement. The majority of this community came to the Riverbed after being forced out of nearby cities including Costa Mesa, and then slowly moved north in the Riverbed as the County closed parts of the Riverbed for a series of maintenance projects.[13]

25. The Orange County Sheriff and Public Works employees began clearing the Fountain Valley area on November 3, 2017 by announcing to people that they would not be allowed to remain, and threatening people with citation. The County employees told people that the Injunction Area would not be impacted by the change in hours or closure.

26. In fact, at that time, one of the Public Works employees told a local activist to hurry and move the people residing in the Fountain Valley Riverbed to the Injunction Area. He stated that the Fountain Valley bike trail was now closed to the public at night, but that people could continue to reside in the Injunction Area.

27. A large group of people from Fountain Valley relocated and reconstituted their community near Katella Road by the bike trail.

28. The relocation of persons from Fountain Valley and other areas of the Riverbed systematically closed by Defendants increased the number present in the Injunction Area significantly. There are an estimated 800 to 1,200 people living in the Riverbed now.

29. At about the same time, the County contracted with private security to prevent homeless people from entering the Santa Ana Riverbed during the newly-restricted hours outside the Injunction Area.[14] At about the same time, the City of

---

[13] https://voiceofoc.org/wp-content/uploads/2017/10/County-Announces-Active-Enforcement-of-Public-Hours-Along-Santa-Ana-River-Trail-FINAL.pdf

[14] https://www.ocregister.com/2017/11/14/orange-county-to-hire-private-guards-to-help-enforce-riverbed-curfew-that-displaced-homeless/

Orange hired private security to patrol its parks in the evenings to prevent homeless individuals from sleeping at those locations. By January 2018, Anaheim also hired private security to police the homeless.[15]

30.     On January 8, 2018, two months after Public Works relocated approximately 100 homeless individuals from the Fountain Valley area to the Injunction Area, the agency announced that it would clear the Injunction Area as well.[16] The County decided on this plan long before January; however, less than two weeks' notice was given for people to relocate.

31.     The "Work Notice" posted by the Orange County Public Works Department on January 8th during the years first rain, stated that the bike trail would be closed to public access beginning January 22, 2018 at 6:00 a.m.  It warned that unauthorized persons remaining in the "Work Area" would be "subject to citation and prosecution for trespass."

32.     The Work Area, as explained by the Notice, encompasses the entire "Injunction Area" agreed to in *Schuler*.  Area #1 includes the West Bank of the Santa Ana River Channel, between the Santa Ana Freeway (the 5 Freeway) and Katella Avenue.  Area #2 includes the East Bank of the Santa Ana River Channel, between Katella Avenue and Ball Road/Taft Avenue.

33.     County memoranda make clear that after the work in the Riverbed is complete, homeless people will not be allowed to return, even if they could find a flat piece of ground. The new hours for the bike path, as set by the Director of the Flood Control District, will be 7:00 AM to 6:00 PM in the winter and 7:00 AM to

---

[15] https://www.ocregister.com/2018/01/23/anaheim-adds-security-as-officials-brace-for-homeless-exodus/

[16] https://www.ocregister.com/2018/01/04/orange-county-plans-to-clear-entire-riverbed-homeless-encampment-within-weeks-officials-say/

9:00 PM in the summer. There has been no public comment or hearing on this change.

34.     After the County announced in January that it would close the Injunction Area, several surrounding cities took steps to prevent homeless individuals from coming into their communities.  The City of Orange quickly distributed flyers and visited local housing and business facilities to request that they notify law enforcement if they see homeless individuals in the City. The City of Anaheim similarly announced that people currently in the Santa Ana Riverbed cannot move into their city. [17]

35.     As of January 19, 2018, City Net has 171 people in the Riverbed who are actively seeking services from City Net but who are not yet placed in any housing or shelter.[18]

**THE LACK OF ADEQUATE SHELTER**

36.     The available shelter spaces in the County are woefully inadequate both in number and accessibility to meet the needs of the unsheltered population. By the County's own estimates, more than 2,500 people lacked any shelter in the 2017 Point-in-Time Count.  The first year-round emergency shelter is at nearly double its original intended capacity, making it extremely crowded and creating barriers for disabled individuals. On a typical night, over 400 people sleep in very close quarters in the repurposed bus terminal without walls. The first year-round

---

[17] https://www.ocregister.com/2018/01/21/orange-county-is-ready-to-clear-out-the-santa-ana-riverbed-homeless-encampment-but-where-and-exactly-when-will-they-go/ ("In Anaheim, officials bracing for an influx of homeless people have reiterated that their city – like 32 others in Orange County – . . .  has an anti-camping ordinance that forbids pitching tents on sidewalks or in public parks.")

[18] http://www.ocgov.com/civicax/filebank/blobdload.aspx?BlobID=71640 pg. 5

transitional shelter was scheduled to start operating by September 2016 with plans for 200 beds by the end of 2017.[19] Under immense pressure with the growing homeless population, the County opened the first 100 beds months earlier in open warehouse in May 2017.  To date, the second hundred beds have not been realized.

37.    The two emergency shelters are similarly inadequate and only operate during winter months.  This season, the Santa Ana Armory is open from October 30, 2017 until April 15, 2018 and the. Fullerton Armory Shelter is only open from December 1, 2017 until April 15, 2018.  There is not enough room in these two temporary shelters for the nearly 1000 people that live at the Riverbed.  In little more than two months, the Armories will not be available at all.

38.    The Fullerton Armory has only 237 total spots, while the Santa Ana Armory has only 200 spots.  On information and belief, these two shelters were at about half capacity prior to the beginning of the Riverbed clearance.  Sleeping facilities are limited to thin mats on the floor which are inaccessible for people with wheelchairs or other mobility challenges because of the very close quarters in most shelters that make it difficult, if not impossible, for people with mobility challenges to sleep in this space, especially if the shelter rules prevent their partners from helping them. Both of the emergency winter shelters prohibit couples from staying together, do not allow support animals, and limit possessions to small bags of belongings without a storage option for other property.  Additionally, the Armories only accept people who are able to come and go at the required hours. For people who work, have to attend court or meet with service providers, the restricted hours impose an additional hurdle to staying at the emergency shelters.

39.    In 2017, the County opened the Bridges shelter in Anaheim.  In order to get into Bridges, a person must be referred by a non-profit partner social

_____

[19] https://www.ocregister.com/2016/09/15/mercy-house-to-operate-year-round-anaheim-homeless-shelter/

services agency and the individual must be staying within the northern cities of Orange County, which include Anaheim and Orange, but not Costa Mesa.  The admission process for Bridges is daunting: a person must call a number to start the intake process.  That telephone number is usually busy and it can take hours, if not days, to get through to the shelter.  The first step is to provide information for a background check that must be completed before admission.  The homeless individual must wait to receive a call back if they are approved and meet at a pickup location at a specific time. The admission process is often so discouraging that people give up after a few days of calling.  If a person gains admission, they can only stay at the Bridges shelter for a limited amount of time.  If they are unable to find regular housing at the end of six months, they are usually required to leave.

40.    In 2016, the County opened the Courtyard – a converted bus terminal that was initially approved for 200-250 people and now houses about 400 people per night. This shelter is typically at or near double capacity and the only way to get in is to show up and request entry.  Because it is not near any other shelter, this means that a person who shows up and is told that the Courtyard is full will likely have no choice but to sleep outside because it is too late to find transportation and get to any other shelter before it closes for the night.

41.    In addition to the public shelters, there are a few private facilities in the County.  The Salvation Army runs the Hospitality House in Santa Ana with 25 beds for transitional housing and 25 beds for emergency shelter, all for men.  A requirement of staying in the Hospitality House is attendance at a meeting before dinner during which a religious service with prayer is held.  Clients must arrive between 3:30 and 5:00 p.m.  On almost all nights, the Hospitality House is at capacity. To enter this shelter, a man must arrive by 3:30 in the afternoon to put his name into a lottery. If he is not selected, he can wait until 5:00 to see if another man misses curfew. There are almost always more applicants than beds. In January 2018, there were only between 2 and 12 beds available for the lottery each night.

42.     Significantly, to stay at the Hospitality House you must be able-bodied and employable. Service animals will only be admitted with federal paperwork at the Hospitality House.  No support animals are permitted.

43.     Another shelter, Colette's House, is open only to women and children. In this six-month transitional program, women are required to have a job and work 32 hours per week.  No animals are allowed.  Colette's House is usually at capacity.

44.     A further complication is that the plans the County has made for storage make it difficult for people to accept shelter.  Rather than transporting property to storage near the shelters, the County is storing property near the Riverbed.  In order to accept shelter, the persons going to the Armory must leave any excess property behind.  The Fullerton Armory is two bus rides away and takes more than an hour to reach without a car.  Thus, it will be difficult for persons in the Fullerton Armory to access their property at the Riverbed.  Most of the shelters in the County are a considerable distance from the Riverbed planned storage.

## PARTIES

**PLAINTIFFS:**

**Orange County Catholic Worker**

45.     Plaintiff Orange County Catholic Worker operates a community at Isaiah House in Santa Ana.  In furtherance of its mission, Isaiah House of the Orange County Catholic Worker has served poor people with dignity since 1987, providing meals for the homeless, shelter, bags of food and clothing, showers, and emergency assistance. Jordan Hoiberg is a member of the Orange County Catholic Worker.  Since joining the Catholic Worker, Mr. Hoiberg has gone to encampments almost every day. He engages with each person he meets and helps them connect with available resources. On some days he delivers food and on others he brings books or tents.

46.     Through his work in the Santa Ana Riverbed over the last year, he has observed that an estimated 800 to 1200 people are currently in the area that will be displaced by the planned action to close the Injunction Area. While providing service in the riverbed, Mr. Hoiberg observed that the trash has not been removed by the County on a regular and frequent basis. Homeless people regularly ask Mr. Hoiberg if he can help them to get trash bags so they might clean.  On some occasions, Mr. Hoiberg has organized volunteers and purchased bags to help clean the area.

47.     Over the past year, Mr. Hoiberg has attended a number of local city and county meetings where he observed decisions made to approve funds for increases in law enforcement in the Riverbed. He has been present for council meetings of the named Defendant governments where the agenda included discussions of the homelessness crisis and the need for housing.

48.     Carrying out the mission of the Catholic Worker, each time the County decides to relocate the homeless population, Mr. Hoiberg organizes volunteers and resources to help people move their belongings.  In recent months, he has been present and observed County employees direct people in other areas of the Riverbed to move into the Injunction Area.  With other volunteers, he has then assisted these individuals to move their property to the Injunction Area.  As each adverse action is taken by the government, the Catholic Worker has had to shift priorities to respond to these measures and provide additional resources for homeless individuals targeted.

49.     In 2017, he observed actions taken by the cities and county to exclude homeless people from their jurisdictions, including removal of benches that homeless individuals could lawfully sit on, restricting hours of parking to prevent homeless individuals living in their vehicles in the area, increasing police and private security presence, and other tactics to encourage people to leave the county. Mr. Hoiberg is familiar with the area and available social services and does not

know of any place homeless individuals can relocate without violating laws against camping on public places, placing property on public places, loitering and similar ordinances.   Part of Mr. Hoiberg's job with the Catholic Worker is to help at Isaiah House. In that role, he has assisted women who came to Isaiah House from the Bridges shelter and the Courtyard shelter.  Based on his experience, he is aware that there is a time limit for those in the transitional shelter at Bridges and that once that time limit is reached, if the individual had not found other housing, she must leave Bridges.

**Lisa Bell**

50.     Plaintiff LISA BELL is homeless and physically disabled.  In August 2007, she sustained severe nerve damage in her arms and hand, which developed into a medical condition known as Complex Regional Pain Syndrome.  She lost her job and her sole source of income became Social Security Disability Insurance (SSDI).  With limited income, Ms. Bell could not afford her rent.  She spent her savings to cover her living expenses, still hoping that she would be well enough to return to work soon.

51.     Ms. Bell ultimately ran out of money, lost her home, and began living in her vehicle in the City of Anaheim.  While living in her vehicle, she had approximately 30 interactions with Anaheim Police Officers who eventually forced her out of the City of Anaheim.  She was consistently told that she could not reside in her vehicle and that she "better not be seen in Anaheim again."  One day, her vehicle was towed for allegedly having been parked on a public street for 72 hours. In fact, her vehicle had been parked in one location for only four hours, but Ms. Bell did not have the money to pay the towing and impound fee, nor the resources to challenge the seizure of her vehicle.

52.     Having no alternative, Ms. Bell now resides in a tent in the Riverbed.  When the cold-weather Armory in Fullerton opened, Ms. Bell attempted

to stay there, but the setting and the overwhelming crowd exacerbated her agoraphobia and caused her to have a severe panic attack. Because of her disabilities, she is unable to return.

53.     Since returning to the Riverbed, Ms. Bell has been actively working with City Net to secure affordable housing.  She has completed the City Net assessment and provided the necessary paperwork to confirm she has been homeless for more than one year. Ms. Bell is doing everything she can to secure affordable housing.  Meanwhile, she fears that she will be cited and arrested for violating local ordinances barring sleeping in public spaces even though she has no viable alternative space to sleep.

**Shawn Carroll**

54.     Plaintiff SHAWN CARROLL is homeless and suffers from a serious medical condition that requires him to wear a life-saving medical alert device at all times.  He worked in the automotive industry until 2006. At that time, he had to care full-time for his aging and mentally disabled parents. In 2015, after his parents passed and their home was sold, Mr. Carroll began living in his vehicle.  His efforts to secure a trucking license and regain employment were unsuccessful.

55.     While living in his vehicle, Mr. Carroll was repeatedly questioned and told to move along by law enforcement officers in Anaheim and Garden Grove. Mr. Carroll would often go days at a time without sleeping because he could not find a place to park without harassment by the police.  In April 2016, after his vehicle was impounded, and unable to afford to recover the car, Mr. Carroll began sleeping on the streets.  He arrived at the Riverbed, where he thought law enforcement was less likely to harass him, with only the clothes he was wearing and a backpack with a few belongings.

56.     In December 2016, Mr. Carroll's medical providers discovered that he was at risk of sudden cardiac arrest.  Now, he must use a wearable defibrillator at

all times.  The device digitally sends data to his medical providers who can administer a treatment shock if an abnormal heart rhythm is detected.  This device must remain powered at all times.  For months, Mr. Carroll would walk to the UCI Medical Center lobby to charge the battery packs and wireless hotspot that power his defibrillator.  Then, a Huntington Beach church group donated a small generator to Mr. Carroll.

57.     Mr. Carroll has tried going to the Orange County Courtyard Shelter in Santa Ana, but it is always at capacity and people are often sleeping outside waiting to get in.  Mr. Carroll's income is limited to General Relief in the amount of $355.  He has no viable alternative but to sleep in the Riverbed.

58.     Mr. Carroll has routinely been stopped by law enforcement for unavoidable or lawful behavior.  On July 7, 2017, Mr. Carroll was exiting the Riverbed, when the Orange Police Department cited him for allegedly riding his bicycle in the opposite direction of traffic, even though Mr. Carroll was riding on the sidewalk at the time he was cited.  During the stop, the Orange police officer explained that he was informed by his superiors to have "zero tolerance for the homeless."

59.     On at least four occasions, Orange County Sheriff's Deputies have stopped Mr. Carroll in the Riverbed and asked for his identification, social security number, and what plans he had to leave the Riverbed.  The Orange County Sherriff's Deputies have repeatedly told Mr. Carroll that camping is prohibited in the Riverbed and he is fearful that he will be cited and convicted for violating such laws in the future because he has no alternative place to go.

60.     If he stays in the Riverbed, he will be faces a citation by the County of Orange for trespass.  If he leaves and goes back to Anaheim or Orange, he will be cited for camping. While trying to ensure he does not miss any medical appointments and reduce stress to manage a life threatening medical condition, Mr.

Carroll is left with nowhere to sleep that does not put him at risk of citation and arrest.

**Melissa Fields**

61.    Plaintiff Melissa Fields has been homeless since January, 2017.  She is employed in Costa Mesa.  She works between 25 and 30 hours a week at a minimum wage job and does not make enough to afford an apartment in Orange County.

62.    Before Ms. Fields moved to the Santa Ana Riverbed bike trail, she attempted to sleep on the streets of Costa Mesa, in order to be close to her workplace.  She slept in a sleeping bag on the ground with no tent or structure and with a backpack full of clothing. Ms. Fields does not have a car and uses the bike path to get to and from her job.

63.    In the months before she moved to the Riverbed, Ms. Fields was stopped and cited by the Costa Mesa police multiple times for being unhoused. Some, but not all, of these tickets were dismissed when she went to court.  In February and March 2017, Ms. Fields received at least two tickets for camping in a public area or parking lot and one ticket for camping in a park. She was informed that if she continued to sleep outside in Costa Mesa, she would continue to receive citations.

64.    After receiving those tickets, Ms. Fields moved to the Fountain Valley section of the Riverbed to avoid arrest in Costa Mesa. She did so because she feared that she would be ticketed in the middle of the night or arrested if she stayed in public places in Costa Mesa.  If arrested, she feared losing her job, She remained in the Fountain Valley section of the Riverbed until the first week of November when the County forced people out of the area.   Ms. Fields then moved to the Anaheim/Orange section of the Riverbed to maintain the support of the community she had gotten to know. As a woman alone and unhoused, she feels unsafe without

a nearby community of people she knows. She commutes daily from Anaheim to her workplace in Costa Mesa.

65.     Ms. Fields is currently working with a Community Outreach Worker to try and find housing.  She also engaged with County Health Care Workers during her time in the Fountain Valley Riverbed.  To date, social service agencies have not found suitable housing for her. Because of her work schedule, she is unable to meet the curfew at the emergency shelters.

66.     After receiving those tickets, Ms. Fields moved to the Fountain Valley section of the Riverbed to avoid arrest in Costa Mesa. She did so because she feared that she would be ticketed in the middle of the night or arrested if she stayed in public places in Costa Mesa.  If arrested, she feared losing her job, She remained in the Fountain Valley section of the Riverbed until the first week of November when the County forced people out of the area.   She commutes daily from Anaheim to her workplace in Costa Mesa.

67.     If forced to relocate again, Ms. Fields would return to the area of Costa Mesa she used to sleep in to be closer to her work. However, she is informed and believes that if she does that, the Costa Mesa police officers will continue to cite her and threaten her with arrest until she leaves the city.

**Larry Ford**

68.     Plaintiff LARRY FORD is an Army Veteran. He served honorably and joined the reserves upon his discharge. Mr. Ford suffers from service-related disabilities that limit his ability to be in loud and crowded spaces.  He receives treatment at the Long Beach VA Hospital.

69.     About four years ago, Mr. Ford was laid off from his construction job when the company needed to reduce the staff.  Around the same time, he incurred an injury that required surgery. At first he received unemployment but during the

long wait for surgery at the VA hospital he was unable to find additional employment. Soon he could no longer pay rent and he became homeless.

70.     At first, he stayed in his car but eventually his car was towed and he was left with no alternative to sleeping outside. Because the car held his work tools and all his personal belongings he tried to get it back. However, it was sold before he could get the funds to reclaim it. He tried to stay in the seasonal shelter at the Armory.  He could not tolerate the crowded environment because of his disabilities and left before the morning. While living outside with nowhere else to go, Mr. Ford has had to move many times when different Riverbed maintenance projects were announced. He moved a little north each time finally ending up just above Katella with others from the former Fountain Valley area. Each time, he lost more of his meager possessions and the stress of moving exacerbated his medical conditions.

71.     If forced to relocate outside the Riverbed, Mr. Ford would have nowhere to go other than the nearby city sidewalks.  Mr. Ford has observed homeless individuals cited for violations of the law when they are in public places outside of the Riverbed.  He is fearful that he, too, will be cited for violations of ordinances based on unavoidable life necessities resulting from his homelessness.

**Cameron Ralston**

72.     Plaintiff CAMERON RALSTON has been sleeping outside for the past year.  He is currently staying in the Injunction Area.  Approximately three years ago, Mr. Ralston was hit by a car and became physically disabled. He continued to experience trauma that led to his current and ongoing struggles with mental health. Because of these conditions, Mr. Ralston requires an emotional support animal. He is unable to work and his only income is General Relief and CalFresh. Over the past year, Mr. Ralston has tried to stay in Orange but was

repeatedly stopped and detained by the Orange Police Department based on his status as a homeless individual.

73.     On January 24, 2018, as the City of Orange increased its enforcement in preparation for the County closure of the Riverbed, Mr. Ralston moved to the city sidewalks of Orange, near the Riverbed.  Mr. Ralston was again cited for blocking the sidewalk.  At the time, his belongings were packed and stacked off to the side on a strip of grass so as not to block the walkway, leaving a clearance of more than three feet. After he received the ticket for blocking the sidewalk, Mr. Ralston left his neatly packed property briefly.  When he returned, he observed a notice of abandoned property from the Orange Police Department stating if it was not moved within 24 hours it would be seized.   Mr. Ralston fears that he will continue to be stopped, detained, searched, and cited in Orange or any of the other surrounding cities simply for being homeless if he is forced to leave the Riverbed.

**Kathy Schuler**

74.     Plaintiff KATHY SCHULER is homeless and currently sleeping in a makeshift shelter in the Riverbed.  Ms. Schuler and her deceased partner became homeless in the months before his death in 2015.  Because her partner was the sole wage earner throughout their life, Ms. Schuler had limited work experience and could not secure gainful employment when her partner became ill.  When the two could no longer afford to live in their Anaheim rental, they became homeless and began staying at various shelters.  During that time, they began to care for their then four-year-old grandson who also lived with them at shelters.

75.     Initially, Ms. Schuler and her family tried the Fullerton Armory. They were referred by the Fullerton Armory to the Santa Ana Armory.  The Armory is only open a few months a year.  Ms. Schuler stayed there until it closed and she was referred to a shelter in Anaheim Hills, an area she could not travel to by bike because of the distance and terrain.  Following her partner's death in July 2015,

she finally relocated to the Riverbed with her grandson.  Her grandson lived with her in the Riverbed until he was placed in a foster home.

76.     In the Riverbed, Ms. Schuler regularly cleans the area where she stays and helps others to do the same. However, her efforts have been stymied by the failure of the County often to provide trash bags despite the existing injunction.

77.     Since moving to the Riverbed, she has been subjected to citations and threats of arrest by the City of Orange and the County.  On August 20, 2015, the Orange Police Department cited Ms. Schuler in the Riverbed for allegedly violating Orange County Ordinance, Section 2-5-95, unlawful camping upon land owned by the County.  Ms. Schuler was in the Riverbed at the time.

78.     Despite the threats of citation and arrest by Orange County Sheriff's Deputies and the Orange Police Department, Ms. Schuler has no alternative but to live in the Riverbed.  Her adult children and granddaughter have since fallen into a similar plight and they are also living in the Riverbed.  The Schulers have been on a subsidized housing waitlist for approximately four months.  Until they can secure affordable housing, Ms. Schuler fears that she will be arrested and convicted for behavior that violates the Orange County and City of Orange ordinances.

**Gloria Shoemake**

79.     Plaintiff GLORIA SHOEMAKE has been homeless in Orange County since October 2014. She has lived in different parts of the Riverbed during that time. She has multiple disabilities that affect her ability to focus and complete tasks. To help with this disability, she has emotional support animals.   Despite engaging with County outreach workers for approximately a year, Ms. Shoemake has not been placed in housing.

80.     Ms. Shoemake tries hard to keep her belongings cleaned and organized. However, many times she finds there are no trash bags available. She

has noticed that when trash is picked up and bags are distributed the area gets much cleaner but often the County fails to pick up all the trash.

81.　　If the maintenance project proceeds, she has no choice but to move out into the City of Orange. She has close ties to Mary's Kitchen, a service provider in Orange. However, she is informed and believes based on conversations with the Orange City law enforcement that if she tries to sleep outside in Orange or brings her belongings to Orange she will be ticketed or arrested to force her to leave the city.

82.　　Ms. Shoemake experiences increasing harm as the stress and fear of where to sleep without risk of being detained or arrested exacerbate her medical conditions.

**DEFENDANTS:**

83.　　Defendant ORANGE COUNTY is a government entity with the capacity to sue and be sued.  The departments of the COUNTY include the Public Works, the Orange County Sheriff, and other departments.  Employees of the COUNTY have engaged in the acts complained of herein pursuant to the policies, practices and customs of the COUNTY.

84.　　Defendant ANAHEIM is a government entity with the capacity to sue and be sued.  The departments of ANAHEIM include the Anaheim Police Department.  Employees of ANAHEIM have engaged in the acts complained of herein pursuant to the policies, practices and customs of ANAHEIM.

85.　　Defendant CITY OF ORANGE is a government entity with the capacity to sue and be sued.  The departments of the CITY OF ORANGE include the Orange Police Department.  Employees of the ORANGE have engaged in the acts complained of herein pursuant to the policies, practices and customs of the CITY OF ORANGE.

86.     Defendant COSTA MESA is a government entity with the capacity to sue and be sued.  The departments of the CITY OF COSTA MESA include the Costa Mesa Police Department.  Employees of COSTA MESA have engaged in the acts complained of herein pursuant to the policies, practices and customs of the CITY OF COSTA MESA.

87.     The Defendants, its employees and agents, participated personally in the unlawful conduct challenged herein and, to the extent that they did not personally participate, authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and the harm suffered by Plaintiffs.  Each acted in concert with each other.  The Defendants developed and implemented a coordinated plan to increase enforcement actions against the homeless community in the Riverbed and surrounding cities.  The challenged acts caused the violation of Plaintiffs' rights.

88.     The identities and capacities of defendants DOES 1 through 10 are presently unknown to plaintiffs, and on this basis, Plaintiffs sue these defendants by fictitious names.  Plaintiffs will amend the Complaint to substitute the true names and capacities of the DOE defendants when ascertained.  Plaintiffs are informed, believe, and thereon allege that DOES 1 through 10 are, and were at all times relevant herein, employees and/or agents of the Defendant COUNTY and Defendant CITIES and are responsible for the acts and omissions complained of herein.  Defendants DOES 1 through 10 are sued in both their official and individual capacities.

## FACTS RELATING TO COUNTY OF ORANGE

89.     County of Orange Ordinance 2-5-95 makes it "unlawful for any person to camp, occupy camp facilities, use camp paraphernalia, or store personal property upon any lands or easements owned or managed by the County of Orange."

90.     "Camp" is defined as "to pitch or occupy camp facilities; to use camp paraphernalia".  Ordinance 2-5-2.

91.     "Camp facilities include but are not limited to, tents, huts or temporary shelters".  Ordinance 2-5-2.

92.     "Camp paraphernalia [i]ncludes, but is not limited to, tarpaulins, cots, beds, sleeping bags, hammocks, or non-County designated cooking facilities and similar equipment."

93.     The Orange Police Department has been issuing tickets over the past two years under this County ordinance to persons living in the Riverbed.

94.     The Orange County Sheriffs have also threatened people with citation under this ordinance as well as under trespassing laws.

95.     The "Work notice" posted by the County indicates that persons remaining in the "Work Area"— the Injunction Area—will be subject to citation and prosecution for trespass under California Penal Code Sections 603 and 555.

96.      It further indicates that people who deposit personal property in the Work Area may be subject to citation and prosecution for nuisance under Penal Code Sections 370 and 372.

## FACTS RELATING TO ANAHEIM

97.     Anaheim Municipal Code §11.10 makes it "unlawful and a public nuisance for any person to Camp in any Public Area."  § 11.10.030.  The ordinance was enacted in 2013 in response to the rising homelessness community in the city.

98.     Anaheim Municipal Code 11.10 makes it a crime to camp, defined as "residing in or using any Public Area for living accommodation or lodging purposes with one's Personal Property or while storing one's Personal Property" and/or "constructing, maintaining, occupying, inhabiting or using Camping Facilities" and/or "constructing, using, or maintaining Camping Paraphenalia."

The only exception is "sleeping outside in a park . . . during the time the park is open to the public." § 11.10.020.

99.    Camping Facilities are defined as "Tents, huts, or other temporary physical shelters." § 11.10.020.

100.    Camping paraphernalia is defined as "tarpaulins, cots, beds, sleeping bags, bedrolls, bedding, luggage, hammocks, cooking equipment, and/or other similar articles of equipment or items that are accessory to Camping Facilities." § 11.10.020.

101.    Public places include "any public streets, alleys, public parking lots, public parks, public rights-of-way, parkways, public sidewalks, recreational areas or other publicly-owned or controlled property." In other words, it is prohibited to be in *any* public place with luggage, bedrolls, or other "camping paraphernalia" that one is "maintaining".

102.    Anaheim acknowledges that there are more than 900 people currently living on the streets within its jurisdiction.

103.    Of the people living on County property in the Santa Ana Riverbed, 25% of them are from Anaheim, according to one member of the Board of Supervisors[20] and City Net.[21]

104.    Plaintiff Lisa Bell used to live in Anaheim.  She was repeatedly stopped by police officers who told her she would have to leave Anaheim and that she could not sleep on vehicle there at least 30 times in the six months immediately preceding October 2017.  She was threatened on multiple occasions with citation under the anti-camping ordinance.

---

[20] http://beta.latimes.com/local/lanow/la-me-ln-anaheim-homeless-emergency-20170913-story.html

[21] http://citynet.org/wp-content/uploads/2017/06/FCC-Data-Summary-FINAL_8.23.17.pdf

105.   Anaheim also has a separate provision criminalizing camping in parks.  Anaheim Municipal Code §13.08.020.080.  It further makes it a crime to "remain, stay, or loiter in any public park between 10:30 PM and 5:00 AM."  Anaheim Municipal Code §13.08.020.190.  Violations of these two provisions may be charged as an infraction or as a misdemeanor.  Anaheim Municipal Code §13.08.020.220.

106.   Anaheim also has an anti-loitering ordinance, §7.28.010.  On information and belief, the City of Anaheim disproportionately uses the loitering ordinance against persons who appear to be homeless by detaining and interrogating them without reasonable suspicion or probable cause based solely on their presence and perceived homelessness.

107.   Anaheim's loitering ordinance reads in full:  "Any person who loiters, stands or sits in or upon any public highway, alley, sidewalk or crosswalk so as to in any manner hinder or obstruct the free passage therein or thereon of persons or vehicles passing along the same, or so as in any manner to annoy or molest persons passing along the same, is guilty of a misdemeanor."  §7.28.010.

108.   The Anaheim loitering ordinance is unconstitutionally overbroad and vague in violation of a long-line of Ninth Circuit and Supreme Court precedents.

## FACTS RELATING TO THE CITY OF ORANGE

109.   Orange Municipal Code §12.66.030 prohibits "encampments and camping on public streets and public property."  In particular, it provides that "no person shall:  A.. . . maintain, erect, or permit the erection of any hut, shanty, tent, tarpaulin, or any other type of temporary structure under his control upon any public street or public property.  B.  Use public street or public property for the purpose of camping . . . ."

110.   Public streets are defined as "streets, roads, highways, alleys, sidewalks, parkways, bridges . . . and all other facilities and areas necessary for the construction, improvement, and maintenance of streets and roads." §12.66.020.

111.   Public property is defined as "the exterior of any building or structure, parking lot, plaza, or square, owned or controlled by the city of Orange." §12.66.020.

112.   Camping is defined of "the use of public streets or public property for living accommodation or habitation purposes such as sleeping activities, or making preparations to sleep, including the laying down of bedding for purposes of sleeping or using or storing personal belongings such as non-designated City cooking equipment, camping stoves, portable barbecues, sleeping bags, cots, beds, hammocks, extra clothing, or personal items when it reasonably appears, in light of all the circumstances, that the participants, in conducting these activities, are, in fact, using the public street or public property for living accommodation or habitation purposes."

113.   In other words, using "personal items" or "extra clothing" on the public streets can be a crime in Orange if it "reasonably appears" that the person using those items or using that clothing is living on the street.

114.   Camping is also prohibited in parks under § 12.48.045.  The same definition as above is laid out again in § 12.48.015.

115.   The City of Orange has a history of giving Citations using the County anti-camping ordinance after pushing residents into areas of the Santa Ana Riverbed.

116.   Plaintiff Kathy Schuler was cited for violating the Orange County ordinance against camping.  At the time, she was in the portion of the Riverbed that abuts Orange and that has concurrent jurisdiction with the Orange police.  It was the Orange Police Department who cited Ms. Schuler.

117.    After the Work Notice was issued in the Orange County Riverbed, the Orange Police Department issued a notice of their own.  The "Neighborhood Advisory" stated that "All occupants currently living in the Riverbed will be vacating the area."  It then states that "the City of Orange Police Department asks if you see a suspicious person or activity to please call 714-744-7444 for non-emergency matters."

118.    On January 24, 2018, officers in the City of Orange ticketed Cameron Ralston for blocking the sidewalk while he was stopped at a sidewalk near the Riverbed. At the time, Mr. Ralston's property was neatly packed and placed to the side of the sidewalk leaving a clearance of three feet.

119.    Over the past year, Mr. Ralston has been regularly threatened with arrest and asked when he will leave the city by Orange Police Department.  Mr. Ralston has not been ticketed for camping but has been threatened with citation under the City of Orange camping ordinance.

120.    Mr. Ralston also left his property briefly to secure food after receiving the obstruction ticket.  When he returned, a notice had been posted near his property indicating that the City of Orange considered it to be abandoned and he had 24 hours to move it.  City of Orange police officers had that same day seen him with the property and seen that it was his.  They did not have an objectively reasonable belief that the property was abandoned.

121.    Plaintiff Shawn Carroll was also cited by Orange Police Department officers when leaving the Riverbed, ostensibly for a bicycle offense.  On information and belief, Plaintiffs allege that the City of Orange has instituted a specific plan to stop homeless individuals as they leave the Riverbed and cite them for any purported violation of even a minor violation of the law under a policy of "zero tolerance for the homeless" aimed at forcing homeless individuals to leave the City.

# FACTS RELATING TO COSTA MESA

122.    Costa Mesa Municipal Code §11-304 makes it illegal for any person to "camp, occupy camp facilities or use camp paraphernalia" in "(1) Any street or alley; (2) Any public parking lot or public area, improved or unimproved; (3) Any park."

123.    The Municipal Code further defines "camp" as "to pitch or occupy camp facilities; to use camp paraphernalia." §11-302.

124.    Camp Paraphernalia "includes, but is not limited to, tarpaulins, cots, beds, sleeping bags, hammocks or non-city designated cooking facilities and similar equipment." §11-302.

125.    Thus, under the Costa Mesa Municipal Code, any homeless person using a sleeping bag to stay warm is "camping" and is breaking the law.

126.    None of the homeless shelters listed by Behavioral and Health Services in the memorandum accompanying the notice of closure are located in Costa Mesa.  On information and belief, there are no homeless shelters available to the general public in Costa Mesa.

127.    Plaintiff Melissa Fields was repeatedly cited for camping while attempting to sleep on the sidewalk in Costa Mesa.  Ms. Fields was not using a tent, but was using a sleeping bag to stay warm.  She had a backpack and a bicycle with her as well.

# FIRST CAUSE OF ACTION
## Violation of Eighth and Fourteenth Amendments (42 U.S.C. §1983)
## Art. 7, §17 California Constitution (Cruel and Unusual Punishment)
## (Against All Defendants)

128.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

129.    The acts and omissions of Defendants, and each of them, as described herein, violate the constitutional rights of Plaintiffs to be free from actual or

threatened cruel and unusual punishment.  By virtue of their status as homeless and disabled, and the absence and insufficiency of shelter or housing in the region, including the cities of Anaheim, Orange, and Costa Mesa, the Plaintiffs have no way to comply with the laws Defendants have sought and continue to seek to enforce against them.

130.   Orange County has told persons present in the Riverbed that they will be cited for trespassing if they remain on County-controlled land in the area.

131.   The Anaheim Police Department has a policy and practice of citing individuals who sleep in public places or exhibit other behaviors which Anaheim considers "camping" under Anaheim Municipal Code 11.10, the Anaheim anti-camping ordinance.

132.   The Orange Police Department has a policy and practice of citing individuals who sleep in public places or exhibit other behaviors which Orange considers "camping" under Orange Municipal Code §12.66.030 and under County of Orange Ordinance §2-5-95.  The Orange Police Department also has informed its officers that they should have "zero tolerance" for the homeless.

133.   The Costa Mesa Police Department has a policy and practice of citing individuals who sleep in public places or exhibit other behaviors which Costa Mesa considers "camping" under Costa Mesa Municipal Code §11-302 to §11-304.

134.   Plaintiffs further allege that it violates their substantive due process rights to threaten them with citation and arrest for being present on County property.  The County has not provided any other County land on which Plaintiffs can reside without trespassing.  Instead, it intends to enforce County anti-camping ordinances and expects Plaintiffs and others to move out into surrounding cities such as Anaheim, Orange, and Costa Mesa, in which anti-camping ordinances prevent them from lawfully residing without shelter and loitering laws prohibit even their presence in these cities.

135.     The citation and threats of citation for behavior such as "the use of public streets or public property for living accommodation or habitation purposes" when there is inadequate shelter available violates the Eighth and Fourteenth Amendments of the United States Constitution and Article 7, §17 of the California Constitution.

136.     Each Defendant has a custom, policy, and/or practice of encouraging its officers to issue tickets to homeless persons for the unavoidable behavior of sleeping or having property in public based on their unhoused status.

137.     There is an actual controversy between Plaintiffs and the County of Orange concerning the threat of citation if Plaintiffs remain on County property near the Santa Ana River, whether or not it is within the area marked on the notice. Plaintiffs have been informed by the County that the bike trail will now close at 6:00 PM and that persons can be cited for remaining within the bike trail area after that time.  Plaintiffs desire a judicial determination of their rights and duties and a declaration as to Defendant County of Orange's constitutional obligations.

## SECOND CAUSE OF ACTION
### Violation of First and Fourth Amendment; 42 U.S.C. 1983
### (Against All Defendants)

138.     Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

139.     Each of the Defendants has repeatedly and consistently stopped, detained, interrogated and ordered individuals who appear to law enforcement to be homeless to move along from public places where they have a right to be pursuant to the First Amendment.  The stops and subsequent detentions and interrogations constitute an unlawful seizure as they were done without reasonable suspicion or probable cause to believe that the individual had or was about to commit a crime other than a purported violation of a law necessitated by their status as homeless individuals plus the lack of available shelter.

140.   Plaintiffs, as everyone else, have a First Amendment right to be present in a public space, to "loiter" in a public space for no reason and to not be excluded from that space by threat, intimidation or coercion because they are homeless.

141.   As a direct consequence of Defendants' past and threatened future actions, Plaintiffs have suffered and will continue to suffer a violation of their constitutional rights.   Plaintiffs have suffered damages in the form of pain and suffering as a result of Defendants' policies, practices and customs.

**THIRD CAUSE OF ACTION**
**Right To Due Process Of Law; 42 U.S.C. § 1983**
**Fourteenth Amendment**
**(Against All Defendants)**

142.   Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

143.   The ordinance by the County which prohibits camping is unconstitutionally vague.  It does not adequately define "camp facilities" or "camp paraphernalia".  It explicitly states that officers are not limited to the list provided in those provisions.

144.   The laws listed above used by the City of Anaheim violate the Fourteenth Amendment because they are so vague as to be impossible to comply with.  The unlawful orders to the homeless to move along or be subject to arrest for camping or loitering were directed toward intimidating plaintiffs.

145.   The anti-camping ordinances listed above are unconstitutionally vague.

146.    Anaheim Municipal Code §11.10 is extraordinarily vague in banning the use or maintenance of "camp paraphernalia".  For example, it criminalizes the having luggage in any public area.  The simple possession of a suitcase would appear to be a crime in Anaheim.

37

147.    Similarly, under Orange Municipal Code §12.66.020, using "extra clothing" is a crime if the person using that clothing appears to be living outside. The statute does not provide guidance as to what "extra clothing" is or what it means to reasonably appear to be living outside.

148.    Costa Mesa lists various types of items and states that the use of such items constitutes camping, but insists that its statute is "not limited to" the use of such items. It is unclear whether the use of blankets or cardboard are included.

149.    The loitering ordinances listed above are similarly unconstitutionally vague.

150.    The Anaheim loitering ordinance makes it a crime to "annoy or molest" any person.  But it is not clear what "annoy or molest" means.  Such provisions have been repeatedly found unconstitutional in the past.

151.    The acts and omissions of Orange County, Anaheim, Orange, and Costa Mesa, as described herein, violate the constitutional rights of Plaintiffs under the Due Process Clause of the United States Constitution.

### FOURTH CAUSE OF ACTION
### Violation of California Civil Code § 52.1
### (Against All Defendants)

152.    Plaintiffs reallege and incorporate the allegations set forth in the proceeding paragraphs as through fully set forth hereat.

153.    The Defendants' conduct, as described herein, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise and enjoyment of Plaintiffs' rights as secured by the First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution or laws of the United States, and of the rights secured by the Constitution or laws of the state of California.

154.    Defendants have engaged in concerted and repeated conduct to cite and arrest Plaintiffs under unconstitutional ordinances, on their face and as applied,

and threatened to cite and arrest them repeatedly.  Defendants engaged in coercive and intimidating tactics by conducting unwarranted stops and collecting information on Plaintiffs to push them out of Defendants' respective jurisdictions.

## INJUNCTIVE RELIEF

155.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

**WHEREFORE**, Plaintiffs pray as follows:

1.    For a temporary restraining order, preliminary and permanent injunction, enjoining and restraining Defendant Orange County from limiting the hours or otherwise closing the Santa Ana Riverbed bike path for any purpose, including maintenance, until an alternative location is provided for the 800-1200 homeless people currently there.

2.    For a temporary restraining order, preliminary and permanent injunction, enjoining and restraining Defendant Orange County from citing individuals for trespassing or nuisance in the Santa Ana Riverbed under Penal Code Sections 602 & 555, for nuisance based on the presence of themselves and/or their property under Penal Code Sections 370 and 372 and absent an actual obstruction of the Riverbed or the trail, and from enforcing County of Orange Ordinance §2-5-95.

3.    For a temporary restraining order, preliminary and permanent injunction, enjoining and restraining Defendants City of Anaheim, City of Costa Mesa, and City of Orange from citing or arresting individuals for violations of camping laws, including Anaheim Municipal Code 11.10, Orange Municipal Code §12.66.030, Costa Mesa Municipal Code §11-304, and/or County of Orange Ordinance §2-5-95.

4.      For a temporary restraining order, preliminary and permanent injunction, enjoining and restraining Defendant City of Anaheim from enforcing its loitering ordinance, §7.28.010.

5.      For a temporary restraining order, preliminary and permanent injunction, enjoining and restraining Defendants City of Anaheim, City of Costa Mesa, and City of Orange from stopping and detaining homeless individuals without probable cause and from threatening homeless persons with tickets or citations if they continue to be present in public space in that city.

6.      For a declaratory judgment that Defendant's policies, practices and conduct as alleged herein violate Plaintiffs' rights under the United States and California constitutions and the laws of California;

7.      For damages to the individual plaintiffs in an amount to be determined according to proof based on their federal claims only;

8.      For costs of suit and attorney fees as provided by law;

9.      For such other relief as the Court deems just and proper.


Dated: January 29, 2018            Respectfully submitted,

LAW OFFICE OF CAROL A. SOBEL
ELDER LAW & DISABILITY RIGHTS CENTER
SCHONBRUN SEPLOW HARRIS & HOFFMAN


_____/s/ Catherine Sweetser_____
By: CATHERINE SWEETSER
Attorneys for Plaintiffs