1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BROOKE WEITZMAN** SBN 301037
**WILLIAM WISE** SBN 109468
**ELDER LAW AND DISABILITY RIGHTS CENTER**
1535 E 17th Street, Suite 104
Santa Ana, California 92705
t. 714 617–5353
e. bweitzman@eldrcenter.org
e. bwise@eldrcenter.org


**CAROL A. SOBEL** SBN 84483
**MONIQUE ALARCON** SBN 311650
**AVNEET CHATTHA** SBN 316545
**LAW OFFICE OF CAROL A. SOBEL**
725 Arizona Avenue, Suite 300
Santa Monica, California 90401
t. 310-393-3055
e. carolsobellaw@gmail.com
e. monique.alarcon8@gmail.com
e. avneet.chattha7@gmail.com

ATTORNEYS FOR PLAINTIFFS
[ADDITIONAL COUNSEL ON NEXT PAGE]

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| Orange County Catholic Worker, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>County of Orange, et al.,<br><br>Defendants. | Case No.:  18-CV-00155-DOC-KES<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER<br><br>Date: TBD<br>Time: None<br>Ctrm: SA 9D |

1

**PAUL L. HOFFMAN** SBN  71244
2
**CATHERINE SWEETSER** SBN 271142
3
**COLLEEN M. MULLEN** SBN 299059
SCHONBRUN, SEPLOW, HARRIS & HOFFMAN
4
11543 W. Olympic Blvd.
5
Los Angeles, California   90064
t.  310-396-0731
6
e. hoffpaul@aol.com
7
e. csweetser@sshhlaw.com
e. cmullen@sshhlaw.com
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................. 1

II.  STATEMENT OF FACTS ................................................................... 2

    A.  There is a Homelessness Crisis in Orange County that Cannot
        be Addressed by the Threat of Citation and/or Arrest ............... 2
        1.  Homelessness has been steadily increasing in recent years ..... 2
        2.  The population in the Santa Ana Riverbed has been
            increasing because of the County and the Cities' actions ...... 3
        3.  Defendants have now created an imminent threat of
            Citation and arrest in the Riverbed ......................................... 4

    B.  There is a Severe Lack of Housing Available in Orange County,
        Including in Anaheim, Orange and Costa Mesa ........................... 5

    C.  Plaintiffs Have Been Shuffled Between City and County Property  7

    D.  The Criminalization of Homeless People in the Cities and County
        1.  The County of Orange ............................................................... 9
        2.  The City of Orange ................................................................... 9
        3.  The City of Anaheim ................................................................ 10
        4.  The Costa Mesa Ordinance ..................................................... 12

III.  PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR CLAIM ......... 12
     OF AN EIGHTH AMENDMENT VIOLATION

    A.  Plaintiffs Have Standing to Bring This Challenge ....................... 12

    B.  Plaintiffs Have a Likelihood of Prevailing Based on Their ......... 15
        Status as Homeless Individuals Plus the Lack of Adequate
        Shelter

IV.  PLAINTIFFS HAVE MET THE REQUIRED SHOWING FOR A ......... 19
     TEMPORARY RESTRAINING ORDER TO DELAY CLOSURE
     OF THE RIVERBED AND SUSPEND ENFORCEMENT OF
     DEFENDANTS' SLEEPING AND LOITERING BANS

    A.  The Standard for a Temporary Restraining Order ....................... 19

**B.**      **Plaintiffs Have Shown a Likelihood of Success on the Merits**      **20**

**C.**      **Plaintiffs Have Shown that They Will Suffer Irreparable Harm Absent the Requested Relief**      **20**

**D.**      **The Balance of Equities Tips Sharply in Plaintiffs' Favor**      **21**

**E.**      **A Temporary Restraining Order is in the Public Interest**      **22**

**V.      CONCLUSION**      **22**

**TABLE OF AUTHORITIES**

*CASES:*

*Allen v. City of Lake,* 71 F.Supp.3d 1044 (ND Ca. 2014)                                    **21**

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011)          **20,22**

*Armstrong v. Mazurek*, 94 F.3d 852 (9th Cir. 2001)                                          **19**

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979)                  **14,15**

*Bell v. City of Boise*, 834 F.Supp.2d 1103 (D. Idaho 2011), *rv'd on other*          **20**
grounds, 709 F.3d 890 (9th Cir. 2013)

*Bell v. City of Boise*, 993 F.Supp.2d 1237 (D. Idaho 2014)                                 **13**

*Carrico v. City and Cty. of San Francisco*, 656 F.3d 1002, 1006 (9th Cir.2011) **14**

*City of Chicago v. Morales*, 527 U.S. 41 (1999)                                              **11**

*Coates v. Cincinnati,* 402 U.S. 611 (1971)                                                    **11**

*Cobine v. City of Eureka*, 250 F.Supp.3d 424 (N.D. Ca. 2017)                          **20**

*Cole v. Oroville Union High School Dist.*, 228 F.3d 1092 (9th Cir. 2000)           **6**

*DHX, Inc. v. Allianz AGF MAT, Ltd.*, 425 F.3d 1169 (9th Cir. 2005)               **13**

*Dickey v. Florida*, 398 U.S. 30 (1970)                                                         **15**

*Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996)       **19**

*Honig v. Doe*, 484 U.S. 305 (1988)                                                            **14**

*Inouye v. Kemna*, 504 F.3d 705 (9th Cir. 2007)                                             **6**

*Jones v. City of Los Angeles*, 444 F.3d 1118 (9th Cir. 2006),                      *passim*
vacatur on settlement, 505 F.3d 1006 (9th Cir. 2007)

*Justin v. City of Los Angeles*, 2000 WL 1808426 (C.D. Ca. 2002)                     **19**

*Lareau v. Manson*, 651 F.2d 96 (2d Cir. 1981)                                             **13**

*League of Wilderness Defenders/Blue Mountains Biodiversity Project*               **22**
*v. Cannaughton*, 752 F.3d 755 (9th Cir. 2014)

*Lehr v. City of Sacramento*, 624 F.Supp.2d 1218 (E.D. Cal. 2009)                   **13**

*Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011)                                    **19**

*Los Padres Forestwatch v. U.S. Forest Service*, 776 F.Supp.2d 1042              **21**
(N.D. Ca. 2011)

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)                                    **13,15**

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012)                                      **22**

*Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997)                         **21**

*Nelson v. Nat'l Aeronautics & Space Admin*, 530 F.3d 865 (9th Cir. 2008),     **21**
*rv'd on other grounds and remanded*, 562 U.S. 134 (2011)

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972)                             **11**

*Powell v. Texas*, 392 U.S. 514 (1968)                                                         **16**

*Robinson v. California*, 370 U.S. 660 (1962)                                                **16**

*Rosenbloom v. Pyott*, 765 F.3d 1137 (9th Cir. 2014)                                    **13**

*Schuler v. County of Orange*, 17-cv-00259 DOC-KES (SACD CA 3/17/17)         **4**

iii

*Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281 (9th Cir. 2013)     **20**

*Siera On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d (9th Cir. 1984)     **20**

*Steffel v. Thompson*, 415 U.S. 452 (1974)     **20**

*Stuhlberg Int'l Sales Co v. John D. Brush Co.*, 240 F.3d 852 (9th Cir. 2001)     **19**

*Sturgeon v. Masica*, 768 F.3dd 1066 (9th Cir. 2014), *vacated and remanded*     **15**
*on other grounds, Sturgeon v. Frost*, 136 S.Ct. 1061 (2014)     **16**

*Susan B. Anthony List v. Driehaus,* 134 S.Ct. 2334 (2014)     **14,15**

*Thomas v. Baca*, 515 F.Supp.2d 1201 (CD Cal. 2007)     **13**

*Vivid Entm't, LLC v. Fielding*, 774 F.3d 566 (9th Cir. 2014)     **19**

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)     **19**

*CONSTITUTIONAL PROVISIONS:*

**First Amendment, United States Constitution**     **6**
**Eighth Amendment, United States Constitution**     *passim*

*STATUTES AND ORDINANCES:*

**Anaheim Municipal Code §7.28.010**     **11**
**Anaheim Municipal Code §11.10**     **10**
**Anaheim Municipal Code §11.10.020**     **10**
**Anaheim Municipal Code §11.10.030**     **10**
**Anaheim Municipal Code §13.08.080**     **11**
**Anaheim Municipal Code §13.08.0**

**California Penal Code §555**     **9**
**California Penal Code §603**     **9**

**Costa Mesa Municipal Code §11-304**     **12**
**Costa Mesa Municipal Code §11-302**     **12**

**County of Orange Ordinance 2-5-95**     **9**
**County of Orange Ordinance 2-5-2**     **9**

**Orange Municipal Ordinance §12.66.030**     **10**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    INTRODUCTION

Each of the Defendants has enacted laws aimed at preventing people from sleeping in public places, whether on public property or in their vehicles, and even barring people from being present in their communities if Plaintiffs have no sheltered place to lay their heads at night.  These laws are unconstitutional under the Eighth Amendment because they punish the homeless Plaintiffs for unavoidable behaviors such as using sleeping bags, tents and sleeping outside.  *Jones v. City of Los Angeles*, 444 F.3d 1118, 1126 (9th Cir. 2006), *vacatur* on settlement, 505 F.3d 1006 (9th Cir. 2007).

In January 2018, the County announced it would begin clearing the Riverbed and would issuing citations to those continuing to sleep in the Riverbed.  Plaintiffs came to the Riverbed because they received, and were threatened by police officers in Anaheim, Costa Mesa, and Orange with. citations and were told by officers in these cities that they risked arrest if they continued to sleep in public in these cities.  Plaintiffs are afraid they will be cited and threatened with citation or arrest again if they leave Orange County property, but now risk arrest or citation if they stay there.

Plaintiffs now seek a temporary restraining order to delay closure of the Riverbed and to suspend enforcement of the various "anti-camping," trespass, and loitering laws Defendants apply to criminalize their very existence.[1]  If the temporary restraining order is not granted, Plaintiffs will suffer immediate irreparable injury from the deprivation of a place to sleep where they will not be disturbed by the police, as well as from the infringement on their constitutional rights.  As discussed below, Plaintiffs have a strong likelihood of success on the merits of their Eighth Amendment claim.  The vagueness and breadth of the statutes mean that Defendants criminalize conduct that is a fundamental necessity for the homeless Plaintiffs–namely sleeping and possessing

---

[1] For the purposes of the Temporary Restraining Order application only, Plaintiffs have limited their request for injunctive relief on the various ordinances to the unconstitutional anti-camping and anti-loitering ordinances.

1

1  property in a public place.

2  **II.     STATEMENT OF FACTS**

3  **A.     There Is A Homelessness Crisis in Orange County that Cannot be**
4         **Addressed by The Threat of Citation and/or Arrest**
         **1.  Homelessness has been steadily increasing in recent years**

5      For decades, Defendants have neglected the homelessness crisis they face.[2]  The
6  Cities blame the County; the County blames the Cities for blocking the delivery of
7  services in their jurisdictions.  Meanwhile, the homeless population in the County has
8  continued to grow, reaching nearly 4,800 in 2017.  In the 2017 Point-in-Time Count,
9  the County estimated that there were 4,792 homeless people, 2,584 of whom were
10  unsheltered and could find no shelter space.  This number included 357 veterans.[3]
11  More than half of the 2017 sheltered population was in emergency shelters with the
12  remainder in "transitional shelters."

13      By the County's own estimates, the homeless population has increased between
14  5 and 7 percent annually over the last five years.  At this rate, the current homeless
15  population likely exceeds 5,000 individuals. The County's 2017 Point in Time Count
16  includes only 2,300 shelter beds.  The vast majority of shelters in the county are at full
17  capacity, with the sole exception of the Emergency Winter Shelters that are open only
18  until April.  These Emergency Winter shelters, located in Santa Ana and Fullerton, have
19  roughly 200 beds at each location, of which approximately half are available.

20      According to the October 2016 homeless assessment issued by Susan Price, the
21  Orange County Care Coordinator, 64% of jobs available in Orange County in 2016 did
22  not pay enough for a person to afford a one-bedroom apartment, rents increased

23  ────────────────

24  [2]  *See* 2005 Orange County Grand Jury Report, "The Homeless Crisis in Orange
25  County," finding that addressing the problem "does not appear to be a priority with the
   Board of Supervisors" and detailing abandoned plans to add housing for homeless
26  individuals at the former El Toro Marine Air Station and shelters in several cities.
27  Exhibit 16.

28  [3] http://ochmis.org/wp-content/uploads/2012/10/PIT-Final-Report-2017-07.24.17.pdf

dramatically in 2016, and the County's affordable housing stock declined in the face of gentrification in formerly low-income neighborhoods in the region. Ex. 2, p. 20. The report issued by the federal government Housing and Urban Development ("HUD") Department on June 1, 2017, found that the vacancy rate in Anaheim, Santa Ana, and Irvine declined from 2010 to 2017 from 5.9 % to 3.6%, and average rents rose 3% in May 2017. With almost 90,000 people on the County housing authority waiting lists hoping for access to affordable housing,[4] the resources remain woefully insufficient.

**2.    The population in the santa ana riverbed has been increasing because of the county and the cities' actions.**

Several cities in Orange County, including Anaheim, Orange, and Costa Mesa have been consistently telling homeless people in their jurisdiction to leave and move to the Santa Ana Riverbed. Decl. of Bell, ¶6; Decl. of Carroll, ¶¶4-5; Decl. of Fields, ¶14; Decl. of Ford, ¶3; Decl. of Ralston, ¶9. As a result, the population in the Riverbed quickly rose to around 1,000 individuals. Decl. of Hoiberg, ¶17.

On October 26, 2017, the County Flood Control District announced restricted hours for bike trail access in Fountain Valley and complete closure of public access to the west side of the Riverbed in Fountain Valley. More than 100 unhoused residents of Fountain Valley were living along the West bank of the Riverbed at the time. At that time, outreach workers understood that no action would be taken in the injunction area and helped people relocate residents in the area between the Santa Ana Freeway and Ball Rd. Decl. of Hoiberg, ¶17. The relocation of persons from Fountain Valley and other areas of the Riverbed systematically closed by Defendants increased the number of homeless persons present in the Injunction Area significantly.

In 2017, the County contracted with City Net to provide services to people in the Injunction Area. Exhibit 5. In July 2017, City Net surveyed 422 people of those then living there. Of this number, 81.2% were interested in having City Net become their

---

[4] Exhibit 2, p. 21 (combined wait lists for Public Housing Authorities for the County, and the cities of Anaheim, Santa Ana and Garden Grove of almost 90,000 voucher holders). Vouchers must be used in 120 days or they expire. *Id.*

3

case managers and seek housing and services for them.  Exhibit 6.  When asked where they lived previously, 25% reported they were from Anaheim, a nearly equal number were from Santa Ana, and 9.7% were from Orange. *Id*.  As of January 19, 2018, City Net has 171 people in the Riverbed who are actively engaged in case management, but who are not yet placed in appropriate housing or shelter. **Exhibit 20.**

      **3.**      **Defendants have now created an imminent threat of citation and arrest in the riverbed.**

On January 8, 2018, two months after Public Works relocated nearly 100 homeless individuals from the Fountain Valley area to the Area between Ball and Chapman Road, the agency announced that it would clear the Injunction Area as well. Exhibit 7.  The "Work Notice" posted by the Orange County Public Works Department on January 8th stated that the bike trail would be closed to public access beginning January 22, 2018, at 6:00 a.m.  It warned that unauthorized persons remaining in the "Work Area" would be "subject to citation and prosecution for trespass." *Id.*

As explained by the Notice, the "Work Area" encompasses the entire "Injunction Area" agreed to in *Schuler v. County of Orange*, 17-cv-00259 DOC-KES (SACD CA 3/17/17) [Dkt # 28].  Area #1 includes the West Bank of the Santa Ana River Channel, between the Santa Ana Freeway,  north to (the 5 Freeway) and Katella Avenue.  Area #2 includes the East Bank of the Santa Ana River Channel, between Katella Avenue, and north to Ball Road/Taft Avenue.  Exhibit 7.  County memoranda make clear that after the work in the Riverbed is complete, homeless people will not be allowed to return, even if they could find a flat piece of ground.  The new hours for the bike path, as set by the Director of the Flood Control District, will be 7:00 a.m. to 6:00 p.m. in the winter and 7:00 a.m. to 8:00 p.m. in the summer. Exhibit 4. There has been no public comment or hearing on this change.

After the County announced in January that it would close the Injunction Area, several surrounding cities took steps to prevent homeless individuals from coming into their communities.  The City of Orange quickly distributed flyers and visited local housing and business facilities to request that they notify law enforcement if they see

homeless individuals in the City.  Exhibit 8.  The City of Anaheim similarly announced that people currently in the Santa Ana Riverbed cannot move into their city.  Exhibit 21. ("In Anaheim, officials bracing for an influx of homeless people have reiterated that their city – like 32 others in Orange County – . . .  has an anti-camping ordinance that forbids pitching tents on sidewalks or in public parks.")

### B.   There is a Severe Lack of Shelter and Housing Available in Orange County, Including in Anaheim, Orange, or Costa Mesa.

By the County's own estimates, more than half of the homeless population in the County - approximately 2,500 people - lacked any shelter in the 2017 Point-in-Time Count. Exhibit 1.  The majority of shelters in the County accept only homeless families, single mothers, pregnant women, or "subpopulations such as victims of domestic violence, those with HIV/AIDS and veterans."[5]   Single men and women, like Plaintiffs, are left out in the cold.

The first year-round emergency shelter, the Courtyard, is at nearly double its original intended capacity, making it extremely crowded and creating barriers for disabled individuals. On a typical night, over 400 people sleep in very close quarters in the re-purposed bus terminal without walls. Exhibits 18, 19.

The first year-round transitional shelter, Bridges, was scheduled to start operating in Anaheim by September 2016 with plans for 200 beds by the end of 2017.  Exhibit 9.  Under immense pressure with the growing homeless population, the County finally opened the first 100 beds months later in an open warehouse in May 2017.  Exhibit 10. To date, the second hundred beds have not been realized.

In order to get into Bridges, a person must be referred by a non-profit partner social service agency or by law enforcement and the individual must be found within the northern cities of Orange County, which include Anaheim and Orange, but not Costa Mesa.  Decl. of Christie, ¶4; Exhibit 10.  The shelter is usually at full capacity, with a high volume of demand to get into the Bridges shelter. Decl. of Christie, ¶9.

---

[5] Exhibit 2, Price Report, at p.23.

In September 2017, the Anaheim City Council passed "Operation Home Safe," and touted this as a comprehensive program to address homelessness along the Santa Ana Riverbed.  Exhibit 12.  A main goal of the program was to identify locations for at least 500 shelter beds or other housing options.  *Id.*  Additionally, Anaheim committed to expediting the availability of 100 more beds at the Bridges shelter.  *Id*. To date, neither has happened. The only part of the plan implemented over the last four months involved significantly increased police enforcement.  Exhibit 13.

In addition to the public shelters, there are a few private facilities in the County. The Salvation Army runs the Hospitality House in Santa Ana with 25 beds for transitional housing and 25 beds for emergency shelter, all for men.  A requirement of staying there is attendance at a religious service before dinner.[6]  Decl. of Byrne, ¶3.  On almost all nights, the shelter is at full capacity. *Id.*

Another shelter, Colette's House, is open only to women and children.   To participate in this six-month transitional program, women are required to have a job and work 32 hours per week.  No animals are allowed.  Colette's House is usually at capacity as well.  Decl. of Byrne*, ¶*4.  In late January, H.I.S. House, located in Placentia, had only one available room for a family and required both payment of $340 to stay there and employment for every adult in the family within 30 days of entry. Decl. of Wendel, ¶4.  Similarly, Micah's Way. identified by the County as a shelter resource, provides only food and assistance navigating other social services but does not provide any shelter.  *Id.,* ¶3.

The only shelter facilities in Orange County that are not at full capacity are the emergency winter shelters in Fullerton and Santa Ana.  This season, the Santa Ana

---

[6] The First Amendment Establishment Clause prohibits the government from subjecting anyone to a particular religion through coercive measures. *See, e.g.*, *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007) (prisoners cannot be forced to attend Alcoholics Anonymous, a religiously-based substance abuse program).  It matters not that a person is not compelled to participate in prayer itself. *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1104 (9th Cir. 2000) (proselytizing speech at a graduation ceremony would be state coercion of attendance and participation in religious practices).

Armory, with 200 spots, is open from October 30, 2017 until April 15, 2018 and the Fullerton Armory Shelter, with 237 spots, is only open from December 1, 2017 until April 15, 2018.  Decl. of Berezin, ¶3. Although there is room at the two Armory shelters, both require everyone to leave the facilities by 6 a.m.  Decl. of Berezin, ¶5.  Even if there were not other deterrents to staying at these shelters, there is not enough room in these two facilities for the 800 to 1000 people currently living at the Riverbed.

The Armory facilities do not accommodate the needs of many homeless individuals with disabilities. *See* Decl. of Berezin, ¶¶5-8.  The sleeping facilities at the Armories are limited to thin  mats on the floor, which are inaccessible for people with wheelchairs or other mobility challenges.  Decl. of Berezin, ¶6.  The close quarters in most shelters make it difficult, if not impossible, for people with mobility challenges to sleep in these spaces.  Decl. of Berezin, ¶¶7-8.  Both emergency winter shelters prohibit opposite-sex couples from staying together, do not allow support animals, and limit possessions to small bags of belongings without a storage option for other property.  Decl. of Berezin, ¶¶5-6. Additionally, the Armories only accept people who are able to come and go at the required hours.  Decl. of Berezin, ¶5. For people who work, have to attend court, or meet with service providers, the restricted hours impose an additional hurdle to staying at these shelters.  Decl. of Berezin, ¶5;

The Fullerton Armory is approximately 11 miles from the Santa Ana Civic Center, where the courts and other services are located.  By bus, the trip takes an hour and half.  By foot, it takes approximately four hours for, presumably, an able-bodied person.[7]  Finally, the crowded conditions at the Armories also can exacerbate mental health conditions for survivors of trauma or persons suffering from other types of mental disabilities.  Decl. of Berezin, ¶7; Decl. of Bell, ¶8; Decl. of Ford, ¶6.

**C.    Plaintiffs Have Been Shuffled Between City and County Property**

Plaintiffs in this action are seven individuals who reside at the Riverbed and an organizational Plaintiff that has served the homeless community in Orange County for

_____

[7]Exhibit 24 (Google Maps directions showing distance between Fullerton Armory and the Santa Ana Civic Center).

nearly four decades.  The individual Plaintiffs are all people who were pushed out of the Defendant cities earlier to the Riverbed, only to be told they now have to leave that area.  Plaintiffs Lisa Bell, Shawn Carroll, Cameron Ralston and Kathy Schuler were all housed in Anaheim prior to becoming homeless.  Decl. of Bell, ¶5; Decl. of Carroll, ¶3; Decl. of Ralston, ¶2.  Decl. of Schuler, ¶2.  Bell, Carroll and Ralston lived in their vehicles after they lost their housing; Bell and Carroll were then forced out of the City by Anaheim Police.  Bell, ¶¶5-6; Carroll, ¶¶4-5; Ralston, ¶¶3-4. Ralston moved to Orange and stayed there after his vehicle stopped working, but he  experienced severe harassment by the Orange Police Department for living on the sidewalk. Ralston, ¶¶ 10-16. After Schuler could no longer afford her rental in Anaheim, she tried staying at various shelters before moving to the Riverbed.  Decl. of Schuler, ¶2.

Plaintiff Melissa Fields works at a low-wage job in Costa Mesa. Decl. of Fields, ¶3. After she could no longer afford her apartment there and moved to the streets, she received multiple citations, including for sleeping in public.  Decl. of Fields, ¶¶10-15. Fields was threatened with additional citations if she continued to live in public places in the City and fears that she will again be cited if she returns to sleeping in Costa Mesa. *Id.*, ¶15. Although she has a case worker in Costa Mesa, her efforts to find shelter space in Costa Mesa so she can get to her job have been unsuccessful.  *Id.*, ¶¶5-7.

Plaintiff Larry Ford is a veteran who came to the Riverbed after threat of citation by Huntington Beach police for living in public spaces. Decl. of Ford, ¶3. He became homeless after he lost his construction job and soon after became ill.  As a result of these two events, he could not afford to pay his rent. *Id.*

Plaintiff Gloria Shoemake utilizes many of the social services in the City of Orange.  She is unable to stay at shelters because of her disabilities.  She was threatened with citations by officers in the City of Orange when she stayed on sidewalks and fears she will again be cited. Decl. of Shoemake, ¶¶3-15.

**D.    The Criminalization of Homeless People in the Cities and the County**

Rather than provide sufficient appropriate shelter for the homeless people in their jurisdictions, the County and the Cities of Anaheim, Orange, and Costa Mesa have

chosen to make the status of being unhoused a crime for anyone who stays in a public space to sleep and live.  The vague and overbroad camping ordinances passed by the County of Orange and the various Cities make it a crime to sleep or possess property in public – the unavoidable behavior of everyday life for a homeless person.

### 1.      The County of Orange

County of Orange Ordinance 2-5-95 makes it "unlawful for any person to camp, occupy camp facilities, use camp paraphernalia, or store personal property upon any lands or easements owned or managed by the County of Orange."  The term "camp" is defined as "to pitch or occupy camp facilities; to use camp paraphernalia." Ord. 2-5-2. "Camp facilities include but are not limited to, tents, huts or temporary shelters." *Id.* "Camp paraphernalia" includes sleeping bags. *Id.* The Orange Police Department has issued tickets over the past two years under this County ordinance to persons living in the Riverbed and the Orange County Sheriff's Department has threatened citation under the County Ordinance as well as state Penal Codes §§ 603 and 555, punishing trespass. Exhibit 7 ("Work Notice").

Plaintiff Kathy Schuler was cited for violating the Orange County ordinance against camping. Decl. of Schuler, ¶5. All Plaintiffs are now threatened with a violation of the ordinance if they remain in the Riverbed.  If they leave and go to other County property, they face the same threat.

### 2.      The City of Orange

In September 2017, Orange Council Member Alvarez announced that the City would be reviewing its loitering, vagrancy, and panhandling laws to strengthen them to provide the police with more tools to combat homelessness.  He posted a detailed recitation of the City's criminalization plan on his official Facebook page.  In January 2017, he further posted a statement saying that the City would take steps to stop the "migration" of homeless people from the County Riverbed to Orange.  Exhibits 22, 23.

Orange Municipal Code § 12.66.030 prohibits "encampments and camping on public streets and public property."  In particular, it provides that "no person shall: A.. . . maintain, erect, or permit the erection of any hut, shanty, tent, tarpaulin, or any other

type of temporary structure under his control upon any public street or public property.

B.  Use public street or public property for the purpose of camping . . . .”

Camping is defined of “the use of public streets or public property for living accommodation or habitation purposes such as sleeping activities, or making preparations to sleep, including the laying down of bedding for purposes of sleeping or using or storing personal belongings such as non-designated City cooking equipment, camping stoves, portable barbecues, sleeping bags, cots, beds, hammocks, extra clothing, or personal items when it reasonably appears, in light of all the circumstances, that the participants, in conducting these activities, are, in fact, using the public street or public property for living accommodation or habitation purposes.” *Id.*

### 3.  The City of Anaheim

Anaheim Municipal Code  § 11.10 makes it “unlawful and a public nuisance for any person to Camp in any Public Area.” § 11.10.030.  The ordinance was enacted in 2013 in response to the rising homelessness community in the city.  “Camp” is defined as “residing in or using any Public Area for living accommodation or lodging purposes with one’s Personal Property or while storing one’s Personal Property” and/or “constructing, maintaining, occupying, inhabiting or using Camping Facilities” and/or “constructing, using, or maintaining Camping Paraphernalia.” Anaheim Municipal Code § 11.10.  The only exception is “sleeping outside in a park . . . during the time the park is open to the public.” § 11.10.020.  The parks are not open at night.  Anaheim Municipal Code § 13.08.080.  Both the terms “Camping Facilities” and “Camping Paraphernalia” include tents, “temporary physical shelters” and sleeping bags.  Anaheim Municipal Code § 11.10.020.

The Anaheim ordinance applies to all “public streets, alleys, public parking lots, public parks, public rights-of-way, parkways, public sidewalks, recreational areas or other publicly-owned or controlled property.” Anaheim Municipal Code § 11.10.020(l).

Anaheim Municipal Code § 13.08.020.080 makes it a crime to “remain, stay, or loiter in any public park between 10:30 PM and 5:00 AM.” Anaheim Municipal Code § 7.28.010 criminalizes “loitering.”  It provides that “Any person who loiters, stands or

sits in or upon any public highway, alley, sidewalk or crosswalk so as to in any manner hinder or obstruct the free passage therein or thereon of persons or vehicles passing along the same, or so as in any manner to annoy or molest persons passing along the same, is guilty of a misdemeanor." *Id.*

The Anaheim "loitering" ordinance is unconstitutionally vague and overbroad under established Supreme Court precedent because it subjects the exercise of the right of to be present in public fora "to an unascertainable standard, and unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct." *Coates v. Cincinnatti,* 402 U.S. 611, 614 (1971) (striking ordinance that made it unlawful to "loiter" with intent to "annoy" passersby). Like the ordinance invalidated in *Coates,* Anaheim's law "is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Id.*

The right to be in public places by oneself or to associate with others is fundamental. *See*, *e.g., City of Chicago v. Morales*, 527 U.S. 41 (1999).

> The freedom to loiter for innocent purposes . . . [and] `to remove from one place to another according to inclination' [i]s `an attribute of personal liberty' protected by the Constitution. [Citations.] Indeed, it is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is `a part of our heritage' [citation], or the right to move `whatsoever place one's own inclination may direct . . . .' [Citation.]

*Id.* at 53-54. *Accord*, *Papachristou v. City of Jacksonville,* 405 U.S. 156 (1972) (general anti-loitering statute directed at "vagrants" is unconstitutional).

Almost 20 percent of the homeless individuals in Orange County are in Anaheim and 25 percent of those in the Riverbed are from Anaheim.[8]  Prior to moving to the Riverbed in October 2017, Plaintiff Lisa Bell lived in Anaheim in her vehicle. Decl. of Bell, ¶5.  Over the course of six months, she was stopped approximately 30 times by police officers who told her she would have to leave Anaheim and that she could not

---

[8] Ex. 14, (approximately 900 homeless individuals living in Anaheim); Ex. 6 (City Net survey of Riverbed community).

sleep in her vehicle in Anaheim.  Bell, ¶6.  She was threatened on multiple occasions with citations under the Anaheim ordinances and she now fears that she will be cited or threatened with citations again if she cannot find accessible and adequate shelter and, instead, has to sleep on public property in Anaheim. *Id.*, ¶¶ 6,12.

Plaintiff Shawn Carroll has also been threatened with citations in Anaheim for sleeping in public places  and faces a credible threat that he will again be threatened and cited if he has no shelter or housing that accommodates his severe cardiac disability. Decl. of Carroll, ¶¶ 4,15.

### 4.     The Costa Mesa Ordinance

Costa Mesa Municipal Code §11-304 makes it illegal for any person to "camp, occupy camp facilities or use camp paraphernalia" in "(1) Any street or alley; (2) Any public parking  lot or public area, improved or unimproved; (3) Any park."  The Municipal Code further defines "camp" as "to pitch or occupy camp facilities; to use camp paraphernalia." § 11-302. Camp Paraphernalia "includes, but is not limited to, tarpaulins, cots, beds, sleeping bags, hammocks or non-city designated cooking facilities and similar equipment."  Costa Mesa Municipal § 11-302.  Thus, under the Costa Mesa Municipal Code, any homeless person using a sleeping bag to stay warm is "camping" and is breaking the law.

Plaintiff Melissa Fields was repeatedly cited, and threatened with citation, for camping while attempting to sleep on the sidewalk in Costa Mesa.  Ms. Fields was not using a tent, but was using a sleeping bag to stay warm.  Decl. of Fields, ¶¶ 11-14.

## III.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR CLAIM OF AN EIGHTH AMENDMENT VIOLATION

### A.     Plaintiffs Have Standing to Bring This Challenge

The Eighth Amendment, made applicable to Defendants by the Fourteenth Amendment, provides that no person shall be subject to "cruel and unusual" punishment.  Plaintiffs allege that the various laws used to punish them for sleeping in public places and exclude them from Defendants' boundaries violate the Eighth Amendment. These laws criminalize Plaintiffs' status as homeless individuals coupled

with the lack of adequate shelter in the Defendant jurisdictions and throughout Orange County.[9]  Plaintiffs have standing because Defendants enforced, or made a credible threat of enforcement of these ordinances against Plaintiffs in the past.

Article III standing requires a plaintiff to show (1) an "injury in fact," (2) a sufficient "causal connection between the injury and the conduct complained of," and (3) a likelihood that the injury "will be redressed by a favorable decision." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).   To prevail on an Eighth Amendment claim, Plaintiffs need only show "some actual or threatened injury." *Jones,* 444 F.3d at 1126[10]  There is no requirement of a conviction, only a credible threat

---

[9] Defendants will likely argue that there are currently beds available nightly at the two emergency winter shelters in the Santa Ana and Fulllerton armories.  Setting aside other impediments at these facilities identified in Plaintiffs' declarations, the guests at these two locations are only provided mats on the floor, not beds or cots.  In the context of jail conditions, courts have recognized that "access to a bed is an integral part of the 'adequate shelter' mandated by the Eighth Amendment." *See Thomas v. Baca*, 514 F. Supp. 2d 1201, 1216 (C.D. Cal. 2007); *see also Lareau v. Manson*, 651 F.2d 96, 107 (2d Cir. 1981) (forcing individuals to sleep on mattresses on floor "do[es] not provide minimum decent housing" necessary to "pass constitutional muster").  If these conditions cannot survive constitutional scrutiny in the jail context, they necessarily cannot do so for persons whose only crime is being poor and unhoused.

[10] The Circuit directed entry of a preliminary injunction in *Jones*, suspending night time enforcement of a sweeping Los Angeles ordinance that prohibited sitting, lying, or sleeping on all public streets and sidewalks at all hours and locations. *Jones*, 444 F.3d at 1136–1138. The injunction was to remain in effect so long as there was inadequate shelter available for unhoused persons. *Id.* Although the Circuit opinion in *Jones* was vacated on settlement for reasons unrelated to the merits and, therefore, is not binding precedent, it remains "highly persuasive." *See DHX, Inc. v. Allianz AGF MAT, Ltd.,* 425 F.3d 1169, 1175–1176 (9th Cir. 2005) (Beezer, J., concurring) ("until contrary authority is decided," a vacated opinion is "likely to be viewed as persuasive authority if not the governing law of the ... Circuit." (citations omitted); *Rosenbloom v. Pyott*, 765 F.3d 1137, 1154 (9th Cir. 2014) (following as persuasive authority a decision vacated on collateral estoppel grounds). Several lower courts in the Circuit have followed this principle and applied *Jones*. *See Lehr v. City of Sacramento*, 624 F.Supp.2d 1218, 1225–1226 (E.D. Cal. 2009) (finding *Jones* "highly persuasive" on the issue of standing); *Bell v. City of Boise*, 993 F.Supp.2d 1237, 1242

that the Plaintiff will be subject to enforcement of a criminal statute. *Id.*  In other words, "[t]he plaintiff need only establish that there is a reasonable expectation that his conduct will recur, triggering the alleged harm; he need not show that such recurrence is probable."  *Id.*, at 1127, citing *Honig v. Doe*, 484 U.S. 305, 318 & n.6 (1988).  *See also, Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2345 (2014) (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974))*; Carrico v. City and Cty. of San Francisco*, 656 F.3d 1002, 1006 (9th Cir.2011) (credible threat of enforcement sufficient for a void-for-vagueness challenge), citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

Plaintiffs challenge laws that criminalize conduct that is central to, and an unavoidable result of, their status.  Standing depends on their ability to "avoid engaging in the illegal conduct in the future" that would result in the enforcement of the challenged ordinances. *See Jones*, 444 F.3d at 1126. A plaintiff need only show that there is a "reasonable expectation" that his actions will put him at risk of the alleged harm; "he need not show that such recurrence is probable." *Id.* at 1127.

In *Jones*, the Ninth Circuit found that the Plaintiffs had standing to challenge the Los Angeles anti-sleeping ordinance because they had shown "some direct injury" from being "subject to the criminal process." *Id.* at 1129.  An injury in fact must be "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List*, 134 S. Ct. at 2341 (quoting *Lujan*, 504 U.S. at 560) (internal quotation marks omitted). This requirement is met if the plaintiff alleges "an inten[t] to engage in a course of conduct arguably affected with a constitutional interest, but proscribed

---

n.9 (D. Idaho 2014) (*Jones* is persuasive authority because it "shed[s] light on how the Ninth Circuit might approach such challenges in the future.").  The United States Department of Justice also supported the continued application of *Jones* in its Statement of Interest for *Bell v. City of Boise*. *See* Statement of Interest of the United States, *Bell v. City of Boise*, No. 1:09-cv-540 (D. Idaho Aug. 6, 2015) (*Jones* teaches that "enforcement of anticamping ordinances may violate the Eighth Amendment on nights where there is inadequate shelter space available for all of a city's homeless individuals."). Ex. 17.

by a statute" and "there exists a credible threat of prosecution thereunder."*Id.*, 134 S.Ct.at 2343 (citing *Babbitt*, 442 U.S. at 298).  In this instance, the record establishes multiple actual threats of enforcement and "past enforcement against the same conduct," which support a well-founded fear of enforcement. *Id*. at 2345.  *See* Decl. of Bell*,* ¶4,12; Decl. of Carroll, ¶¶ 11-14; Decl. of Fields, ¶¶11-12, 14, 18; Decl. of Ford, ¶¶3, 9-10; Decl. of Ralston, ¶¶10-16; Decl. of Schuler, ¶5; Decl. of Shoemake, ¶¶14-17.  Moreover, Plaintiffs need not wait to be cited or arrested: a direct injury may occur "even earlier" in the criminal process. *Jones*, 444 F.3d at 1129 (citing *Dickey v. Florida*, 398 U.S. 30, 43 (1970)).

In *Jones*, as here, pre-citation law enforcement activities included being "ordered to move," 444 F.3d at 1125.  The Eighth Amendment protects against being hreatened with arrest if one does not comply with an order to move along. *Lehr*, 624 F.Supp. At 1220.  This principle was recently reaffirmed in *Sturgeon v. Masica,* challenging a law creating a hovercraft ban over the Alaska river. The Court held that the Plaintiff satisfied the injury-in-fact requirement because he was (1) verbally warned by a National Park Service ranger not to use his hovercraft, (2) asked to leave, and (3) told he "[might] be subject to criminal liability" if he was caught doing it again.  768 F.3d 1066, 1072 (9th Cir. 2014) (relying on *Susan B. Anthony List*, 134 S. Ct. at 2342), *vacated and remanded on other grounds, Sturgeon v. Frost*, 136 S.Ct. 1061 (2014)).

Plaintiffs satisfy the other prongs of the standing test as well.  Their injuries are "fairly traceable" to the threatened and actual enforcement actions of the Defendants, whether of their own ordinances against trespass or camping in public or the state penal code, as now threatened in the County's notices posted at the Riverbed, and Plaintiffs' injuries would be redressable by a favorable decision.  *See Sturgeon*, 768 F.3d at 1072.

**B.      Plaintiffs Have a Likelihood of Prevailing Based on Their Status as Homeless Individuals Plus the Lack of Adequate Shelter**

For homeless individuals, the "conduct" of sitting, lying, or sleeping outside was "involuntary and inseparable from status—they are one and the same, given that human beings are biologically compelled to rest." *Jones,* 444 F.3d at 1136. Thus, by

criminalizing the acts of sitting down, lying down, or sleeping in public spaces when there is no adequate shelter, Defendants are "in fact criminalizing [people's] status as homeless individuals." *Id.* at 1137.

The factors that made the ordinance at issue in *Jones* unconstitutional are equally compelling here.  First, Defendants' anti-camping ordinances criminalize an innocent and unavoidable human need, sleeping, when it is done on public property.[11]  Second, these ordinances were enforced against homeless individuals who lacked access to shelter and had no choice but to sleep in public.  *Jones*. at 1136.  Finally, as in *Jones*, Defendants' ordinances prohibit this conduct at all times, in all public spaces, without any exception and without consideration of the unavoidable circumstances facing unhoused persons who lack alternatives for adequate shelter. *Id*. at 1132.

The *Jones* decision rested on two United States Supreme Court decisions.  In *Robinson v. California*, 370 U.S. 660 (1962), the Supreme Court invalidated a California statute as an Eighth Amendment violation because the law criminalized the "'status' of narcotic addiction." *Jones*, 444 F.3d at 1131–1138 (citing *Robinson*, 370 U.S. at 666–667).  In *Powell v. Texas,* 392 U.S. 514 (1968), the Court upheld a prohibition against public drunkenness because the statute criminalized the *act* of being intoxicated in public.  *Jones*, 444 F.3d at 1131–1138 (citing *Powell*, 392 U.S. at 522–26, 532–33).  Justice White, who supplied the decisive fifth vote in *Powell*, expressly suggested that if a homeless person were to bring an as-applied challenge to Texas's prohibition against public drunkenness, he would likely prevail under *Robinson* "because, drunk or sober, they have no place else to go and no place else to be." *Powell*, 392 U.S at 551 (White, J., concurring).  That is the same situation Plaintiffs face: they have no place to go or be.

---

[11] A federal government report notes a growing realization that criminalization of homelessness violates the First, Fourth, Eighth and Fourteenth Amendments. *See, e.g.*, U.S. Interagency Council on Homelessness, *Searching out Solutions: Constructive Alternatives to he Criminalization of Homelessness* 2,7-8 (2012), https://www.usich.gov/resources/uploads/asset_library/RPT_SoS_March2012.pdfp.

As Plaintiffs' narratives demonstrate, "an individual may become homeless based on factors beyond his immediate control, especially in consideration of the composition of the homeless as a group: the mentally ill, addicts, victims of domestic violence, the unemployed, and the unemployable." *Jones*, 444 F.3d at 1137. Regardless of how they came to this state, each unhoused person shares the unavoidable need to sleep.

Sleeping is a "universal and unavoidable consequence [] of being human," and "these Plaintiffs face criminal punishment for criminal acts that can only be done in public." *Id.*, (edit supplied). Sleeping cannot be criminalized consistent with the Eighth Amendment because people are "biologically compelled to rest." *Jones*, 444 F.3d at 1137.

The challenged anti-camping ordinances in this instance are extremely broad and sweep within their ambit sleeping in all public places. They produce the exact result as the Los Angeles ordinance suspended against nighttime enforcement in *Jones*. By their plain language, the ordinances completely ban sleeping outside unless an individual foregoes even the most basic means of staying warm in the cold or dry in the rain and, in the case of Defendant Orange, without "extra clothing," however that term is defined.

Enforcing such a ban when the Defendants have nowhere near the space needed to provide adequate and appropriate shelter for all of the homeless is unconstitutional. The County's 2017 Point-in-Time results listed fewer than 2,300 shelter beds available, not even enough for half of the homeless population in the County. Exhibit 1. These shelters have many restrictions. *See* Decl. of Berezin, ¶10-15; Decl. of Hoiberg, ¶¶ 6, 8-9; Decl. of Bryne, ¶¶3-4; Exhibit 25. At the present time, nearly all of these shelters are at full capacity and those that are not restrict admission to particular categories of persons, such as women and families, or impose conditions, such as steep fees, that make them inaccessible for one reason or another. As discussed above, the Armories are not a viable option for the Plaintiffs and many other homeless individuals because

these facilities do not accommodate their mental and physical disabilities[12] and, in the case of Fullerton, is in a location that is a considerable distance from the courts and social services centered in Santa Ana.

Moreover, because the Armories are closed at 6 a.m., Plaintiffs would still have no place to rest with their property during the day. The Armories also impose strict limitations on what people can bring with them each night.  For Plaintiff Shawn Carroll, who requires the use of a generator to maintain a charge on the battery pack and wireless hotspot for his portable defibrillator, it becomes a choice between the generator and other essential property.  Decl. of Carroll, ¶¶6,8.  Even then, he would be required to wheel his generator around from 6 a.m. to 7 p.m and risk citation under City ordinances that categorize his generator as evidence of unlawful "camping paraphernalia."

For others, including Ms. Bell and Ms. Shoemake, who have physical disabilities and medical conditions that restrict their ability to travel a significant distance on foot,[13]  it would be an enormous stress to wander the streets during the day with their belongings until they could return to the shelter at night.  They would risk citation for "camping" in public if they are in public with their possessions, including a sleeping bag or, in some cities, luggage.  *See* Section II (C), p. 9-13, *supra*.

The Armories also separate couples and families by gender.  No animals are permitted in the Armories.  Decl. of Berezin, ¶¶5-6.

Even assuming that Plaintiffs could overcome the many obstacles the Armories present, this is only a short-term seasonal option.  In a few months, the cold-weather season will end and Plaintiffs will have no alternative but to sleep on the sidewalks and in the parks once more.

---

[12] *See* Decl. of Ford, ¶¶5-6; Decl. of Ralston, ¶5; Decl. of Bell, ¶8; Decl. of Shoemake, ¶3.

[13] Decl. of Bell, ¶9; Decl. of Shoemake, ¶3.

The bottom line is that here, as in *Jones*, it violates the Eighth Amendment to enforce these ordinances against homeless individuals who cannot obtain appropriate shelter because of the extreme lack of available and appropriate facilities in the Defendant County and Cities. *Jones*, 444 F.2d at 1136.

## IV.   PLAINTIFFS HAVE MET THE REQUIRED SHOWING FOR A TEMPORARY RESTRAINING ORDER  TO DELAY CLOSURE OF THE RIVERBED AND SUSPEND DEFENDANTS' SLEEPING BANS

Plaintiffs seek relief from the Court on behalf of the more than 800 people currently residing in the Riverbed.  An injunction may extend beyond the named plaintiffs "if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501–02 (9th Cir. 1996) (internal citation and emphasis omitted).

### A.      The Standard for a Temporary Restraining Order

The standard for issuing a temporary restraining order is the same as for a preliminary injunction. *Stuhlbarg International Sales Co. v. John D. Brush Co.,* 240 F.3d 852, 839 n.7 (9th Cir. 2001). A court considering an application for a preliminary injunction must identify the harm that an injunction might cause a defendant and weigh it against the injury to a plaintiff.  *Justin v. City of Los Angeles*, Case No. CV-0012352 LGB - AIJx, 2000 WL 1808426 (CD CA 2002), at *11 (citing *Armstrong v. Mazurek*, 94 F.3d 566, 568 (9th Cir. 1996)).

The court "must consider four factors: (1) whether the plaintiff has shown a likelihood of success on the merits; (2) whether the plaintiff has shown a likelihood of irreparable harm in the absence of preliminary relief; (3) whether the balance of equities tips in the plaintiff's favor; and (4) whether preliminary relief is in the public interest." *Vivid Entm't, LLC v. Fielding*, 774 F.3d 566, 577 (9th Cir. 2014).

Plaintiffs need not show that they will prevail at trial, but only that they are "likely" to prevail. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011).  Alternatively, Plaintiffs must show that they have raised "serious questions going to the merits[,]" that the "balance of hardships tips sharply in [their] favor, and the other two *Winter*

factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (internal quotation marks omitted).  *See also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (same). A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).  In this instance, all four factors support an injunction and there is, at a minimum, a "serious question" on which Plaintiffs have more than a "fair chance" to succeed on the merits.

## B.     Plaintiffs Have Shown A Likelihood of Success on the Merits

For the reasons set forth above, Plaintiffs have shown a likelihood of prevailing on their Eighth Amendment claims.  Under the Circuit's analysis in *Jones*, when "the number of homeless persons in [a city] far exceeds the number of available shelter beds[,]" it violates the Eighth Amendment to enforce ordinances like Defendants'. 444 F.3d at 1132. The Eighth Amendment prohibits Defendants from "punishing involuntary sitting, lying, or sleeping in public at any time of day because such conduct is an *unavoidable consequence* of being human and homeless without any available shelter in the [Defendant jurisdictions]." *Id.* at 1138 (emphasis and brackets supplied). See also *Cobine v. City of Eureka*, 250 F.Supp.3d 423, 431 (ND CA 2017) (applying *Jones* and rejecting in part a motion to dismiss an action brought by a homeless individual).

Plaintiffs have shown both that there is insufficient shelter space available and that, for "a portion of the homeless population, the 'chronic homeless,' living in a shelter is not a viable option." *Id.,* quoting *Bell v. City of Boise*, 834 F.Supp2d 1103, 1108 (D. Idaho 2011), *rv'd on other grounds,* 709 F.3d 890, 894-4 (9th Cir. 2013). They have also submitted ample evidence that Defendants' ordinances "effectively penalize[] the homeless simply for being present or engaging in innocent activity, such as sleeping, ... that , in effect, criminalizes the status of being homeless." *Id.*

## C.     Plaintiffs Have Shown That They Will Suffer Irreparable Harm Absent the Requested Relief

Absent the Court's intervention, Plaintiffs will suffer irreparable harm from enforcement of Defendants' anti-camping laws because they do, and will continue to, violate their constitutional rights.  "An alleged constitutional infringement will often

20

alone constitute irreparable harm." *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (internal citation omitted).  "Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm." *Nelson v. Nat'l Aeronautics & Space Admin*., 530 F.3d 865, 882 (9th Cir. 2008), *rv'd on other grounds and remanded*, 562 U.S. 134 (2011).

Plaintiffs have  met their burden to demonstrate"some actual or threatened injury." *Jones*, 444 F.3d at 1126.  Although several were convicted for violating some of the challenged ordinances in the past, that is not a requirement to obtain relief from this Court.  Again, they need only show a credible threat that they will be subject to enforcement of a criminal statute. *Id.* In other words, "[t]he plaintiff need only establish that there is a reasonable expectation that his conduct will recur, triggering the alleged har; he need not show that such recurrence is probable." *Id.* at 1127, citing *Honig v. Doe*, 484 U.S. 305, 318 & n.6 (1988).  *See also*, *Susan B. Anthony List,* 134 S. Ct. at 2345, (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).

There is no  reasonable countervailing interest of Defendants' that outweighs the dire impact on Plaintiffs from the loss of a place to sleep.  Plaintiffs are homeless, destitute and suffer from psychological, medical and physical disabilities. The inability to rest and sleep is "devastating" and clearly constitutes irreparable harm. *Jones*, 444 F.3d at 1137.  Moreover, the harm to Plaintiffs is not merely speculative and is likely to continue absent the requested injunction. *Alliance for the Wild Rockies*, 632 F.3d at 1135.

**D. The Balance of Equities Tips Sharply in Plaintiffs' Favor**

Where Plaintiffs show both the likelihood of success on the merits and irreparable harm, indisputably "the balance of equities and public interest tip in favor of Plaintiffs." *Los Padres Forestwatch v. U.S. Forest Service*, 776 F. Supp. 2d 1042, 1052 (N.D. Cal. 2011).  The balance depends on the potential harm to each side. *Allen v. City of Lake*, 71 F. Supp. 3d 1044, 1056–57 (ND Ca. 2014).  The more permanent Plaintiffs' harm if the requested relief is not granted and the more temporary Defendant's harm if it does, the greater the balance tips toward Plaintiffs. *League of*

*Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014). The balancing of harms here has already been made by the Court in *Jones*. In addition, "the protection of constitutional rights is a strong equitable argument in favor of issuing the injunction." *Id*.

### E.   A Temporary Restraining Order Is in the Public Interest

The fourth element is how the grant or denial of an injunction is likely to impact any non-parties. *Connaughton*, 752 F.3d at 766. This prong, too, is in Plaintiffs' favor since "[i]t is always in the public's interest to enjoin actions that violate an individual's constitutional rights, all the more so when this is being done in the name of their own government." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

## V.   CONCLUSION

For all of the foregoing reasons, a Temporary Restraining Order should issue to delay removal of Plaintiffs from the Injunction Area and suspend enforcement of Defendants' anti-camping ordinances pending a hearing on a Preliminary Injunction.

Dated: February 1, 2018          Respectfully submitted,

Elder Law and Disability Rights Center
Law Office of Carol A. Sobel
Schonbrun, Seplow, Harris & Hoffman


_____/s/   Carol A. Sobel_____
By: CAROL A. SOBEL
Attorneys for Plaintiffs