

<u>VIA ECF FILING</u>

February 9, 2018

The Honorable David. O. Carter
United States Courthouse
411 West Fourth Street, 9th Fl.
Santa Ana, CA, 92701

**Re:     Amicus Letter of Legal Aid Society of Orange County in Support of Preliminary
            Injunction in *Catholic Worker, et. al v. County of Orange*, 8:18-cv-00155-DOC-KES**

Dear Judge Carter:

      Pursuant to this Court's February 4, 2018 Order in the above-captioned case, Legal Aid Society of Orange County ("LASOC") submits this Amicus Letter urging the Court to grant a preliminary injunction enjoining the County of Orange from evicting, citing, or arresting the homeless residents currently living at the Santa Ana Riverbed.

      LASOC represents seven homeless individuals and People's Homeless Task Force, who are plaintiffs in *Ramirez, et al. v. County of Orange*, 8:18-cv-00220-DOC-JDE, filed in this Court and assigned to Your Honor on February 7, 2018.  In response to this Court's request for information regarding the circumstances faced by individuals living at the Riverbed, the impact of the County's eviction, and the limited availability of services and permanent housing options, we respectfully refer the Court to the Complaint filed in *Ramirez*, attached hereto as Exhibit A.

      As set forth in that Complaint, the majority of the people living at the Riverbed experience one or more disability.  As a result, many people, including our clients, cannot tolerate the overcrowded, dirty, noisy, and at times dangerous conditions of the County's shelters.  Thus, even assuming that a sufficient number of shelter beds were available to accommodate the hundreds of people living at the Riverbed, those beds are functionally unavailable because they do not accommodate people with disabilities.



We urge this Court to grant the requested injunction in full, and to restrain the County from evicting, citing, or arresting homeless residents at the Riverbed until disability appropriate services and housing solutions, including permanent supportive housing, are made available.

Respectfully submitted,

Lili V. Graham
Sarah J. Gregory
Michelle Kim Kotval

Exhibit A

1  LILI V GRAHAM SBN 284264
   lgraham@legal-aid.com
2  SARAH J. GREGORY SBN 303973
   sgregory@legal-aid.com
3  LEGAL AID SOCIETY OF ORANGE COUNTY
4  2101 North Tustin Avenue
   Santa Ana, California 92705
5  Telephone: 714.571.5282
   Facsimile: 714.571.5270
6
7  ATTORNEYS FOR PLAINTIFFS
8
9              UNITED STATES DISTRICT COURT
10    FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION
11
12 DAVID RAMIREZ, SHARON SWEAT,        No.
   STEPHENIE SAINT VINCENT, RAYA
13 IVES, DEREK MACARTHUR, KIM          CIVIL RIGHTS COMPLAINT FOR
   GRAY, and ERIK TEASLEY as           DECLARATORY RELIEF AND
14 individuals; PEOPLE'S HOMELESS      INJUNCTIVE RELIEF:
   TASK FORCE, an unincorporated
15 association;                        AMERICAN WITH DISABILITIES ACT (42
                                       U.S.C. § 12132); SECTION 504 OF THE
16            Plaintiffs,              REHABILITATION ACT (29 U.S.C. § 794);
                                       UNITED STATES CIVIL RIGHTS ACT (42
17                                     U.S.C. § 1983); U.S. AND CALIFORNIA
                                       CONSTITUTIONS; CALIFORNIA CIVIL
18        vs.                          CODE § 52.1.
19
20 THE COUNTY OF ORANGE, a
   municipal entity;
21
              Defendant.
22
23
24
25
26
27
28

                              1

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 12132 and 42 U.S.C. § 1983 because Plaintiffs' claims arise under the laws and Constitution of the United States.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the state law and state constitutional claims because Plaintiffs' state claims are related to Plaintiffs' federal claims, arise out of a common nucleus of operative facts, and form part of the same case or controversy under Article III of the U.S. Constitution.

2.      Venue is proper in the Central District of California because Defendant resides in the District and all events giving rise to Plaintiffs' claims occurred in the District.  The relief Plaintiffs seek is within this Court's power to grant.

## INTRODUCTION

3.      As this Complaint is filed, hundreds of Orange County's most vulnerable homeless residents are experiencing continual trauma as large squads of armed Sheriff Deputies and local law enforcement patrol their makeshift homes along the Santa Ana Riverbed, threatening arrests and citations if people do not disperse.  The County began its mass eviction of the homeless encampments at the Riverbed on January 22, 2018, and the homeless community at the Riverbed, including Plaintiffs, has been living in constant fear ever since.

4.      These vulnerable residents have been afraid to leave their tents and their few meager possessions as they watch Orange County personnel swarm the Riverbed wearing plastic suits, helmets, and gloves, cleaning out property that the County deems abandoned and throwing those items into garbage trucks.  Law enforcement is arresting any individual who has been out of contact with their probation or parole officer.  Disabled homeless individuals, including Plaintiffs David Ramirez and Sharon Sweat, have been handcuffed for suspected criminal activity but then released

2

when the officers realize those individuals did nothing wrong.  Homeless women are afraid to change their clothes in their tent out of fear that at any moment an officer will intrude, triggering flashbacks of trauma and abuse.

5.    Yet Plaintiffs David Ramirez, Sharon Sweat, Stephenie Saint Vincent, Raya Ives, Derek MacArthur, Kim Gray, and Erik Teasley, homeless individuals with various disabilities, remain on the Riverbed despite the hostile environment created by the County because they literally have nowhere else to go.  Their disabilities make it nearly impossible for them to live on the city streets or in any emergency shelter or transitional shelter, and they are terrified of leaving the only stable living environment available to them.

6.    The County announced its mass eviction on January 8, 2018 under the pretext of conducting flood control maintenance, giving residents—many of whom had been at the Riverbed for years—just two weeks' notice before the eviction began on January 22, 2018.  The County decided to evict these residents even though it was in the midst of implementing a program to relocate every willing homeless person on the Riverbed to appropriate housing and services before requiring them to leave County property (the "Program").  Under the Program, the County committed new and existing resources to assist Riverbed residents and employed outreach workers tasked with assessing each resident for appropriate case management, supportive services, and housing.  As of January 19, 2018, the County reported that 171 people on the Riverbed were currently undergoing case management and awaiting housing.  However, many other Riverbed residents, particularly people with disabilities such as Plaintiffs, have yet to access the Program at all, or have been denied access to the Program by reason of their disabilities.

7.    When it comes to solving homelessness, the County is the lead public agency.  The County controls the Riverbed land, decides when and how law enforcement will be utilized, employs the

3

outreach workers, and selects what housing and services options will be available to homeless individuals. The County also sits on over *$700 million* of available financial resources that have been earmarked to meet the needs of the County's most vulnerable residents, including the homeless individuals living on the Riverbed. On many occasions, Plaintiff People's Homeless Task Force ("PHTF") has attended County Board of Supervisor meetings to demand the use of this money to assist individuals at the Riverbed. Despite PHTF's efforts, and despite the desperate need for permanent solutions, vast portions of the County's fund goes unspent, including $146 million for housing vouchers, $67.5 million for residential mental health care, and $227 million in CalWORKs funding.

8.      The County is well aware that the majority of individuals at the Riverbed experience physical and/or mental health disabilities. Yet the County has implemented the Program in a way that is inaccessible to people with disabilities, resulting in an outright exclusion from the Program or a denial of equal access to the benefits of the Program, including case management, services, and permanent housing that appropriately accommodate their disabilities. After the County announced its mass eviction, Plaintiffs submitted formal reasonable modification requests to the County, informing the County of their physical and mental disabilities and requesting equal access to the Program. However, despite Plaintiffs' multiple attempts to engage with the County, the County refused to discuss reasonable modification of the Program.

9.      The County's actions and omissions are inconsistent with the Program's goal to "help homeless individuals" and "to provide access to permanent housing options for the individuals encamped along the flood control channel." Moreover, the County's actions and omissions violate the rights of Plaintiffs and the hundreds of other disabled Riverbed residents under federal law.

Plaintiffs bring this lawsuit to challenge Defendant's unlawful discrimination against Plaintiffs based on their disabilities.

## PARTIES

**A.    Plaintiffs**

10.    Plaintiff DAVID RAMIREZ ("Ramirez") is 33 years old and has been homeless for over two years.  He was born and raised in Orange County and currently lives at the Riverbed.  Ramirez is disabled as defined by the ADA[1] and meets the definition of "chronically homeless" as defined by the U.S. Department of Housing and Urban Development ("HUD").[2]  As a child, Ramirez was a victim of severe abuse and neglect.  This trauma contributed to Ramirez's development of several mental health conditions, including bipolar disorder, depression, and anxiety.  These mental health disabilities have prevented Ramirez from holding the steady full-time employment necessary to afford market-rate rents in Orange County.

11.    Ramirez and his husband, who also suffers from mental health disabilities, became homeless in approximately 2015, when Orange County Housing Authority terminated the couple's Shelter-Plus-Care Housing Voucher.  Ramirez began living in his car until he fell behind on his car payments and the car was repossessed.  Without his car and no housing option, Ramirez and his husband began

---

[1] "Disability" means "(A) a physical or mental impairment that substantially limits one or more major life activities; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12101(1).  "[M]ajor life activities include but are not limited to caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  *Id.* § 12101(2)(A).  Major life activity also includes the operation of a major bodily function including the immune system, digestive, neurological, brain, respiratory, and reproductive functions.  *Id.*  § 12101(2)(B).
[2] HUD regulations define "chronically homeless" to mean an individual with a disability who lives in a place not meant for human habitation, and has been homeless continuously for at least 12 months or on at least four separate occasions in the last three years.  24 C.F.R. § 91.5(1).  A "homeless individual" is one who lacks a fixed, regular, and adequate nighttime residence.  42 U.S.C. § 11302(a)(1).

living behind a storage facility in Fountain Valley until Fountain Valley police evicted the couple from the storage facility and told them to move to the Riverbed, where local police would not bother them. Out of options, Ramirez moved to the Fountain Valley section of the Riverbed in approximately February 2017.

12. In November 2017, the County evicted Ramirez from the Fountain Valley section of Riverbed and arrested his husband for trespassing. In the course of the eviction, Ramirez informed County workers of his and his husband's mental health disabilities and told them that he had nowhere else to go and requested additional time to move as a reasonable accommodation for his disability. However, the County only offered to drive Ramirez and his husband to the County's "Courtyard" shelter in Santa Ana, a former bus terminal that was originally meant for 200-250 people, but that now shelters over 400 people each night on closely packed cots. With nowhere else to go, Ramirez accepted the County's offer. However, the overcrowded, loud, and dirty conditions at the Courtyard immediately began to trigger Ramirez's and his partner's mental health symptoms. After only two nights at the Courtyard, another Courtyard resident became aggressive and punched Ramirez in the face, resulting in Ramirez's eviction from the Courtyard. Ramirez returned to Fountain Valley, where he slept in an alley for approximately one month, until the Fountain Valley police pushed the couple out again. Once again, Ramirez had nowhere to go but the Riverbed. He has been living on the Riverbed, north of Chapman Avenue since approximately December 2017.

13. Plaintiff SHARON SWEAT ("Sweat") is 49 years old and has been homeless for 16 years. She has been living at the Riverbed for the last 14 years. Sweat is disabled as defined by the ADA and meets the definition of chronically homeless as defined by HUD regulations. As a child, Sweat was a victim of severe abuse and neglect, ultimately resulting in her removal from the family home by Child Protective Services. Sweat has suffered extreme trauma as an adult, including surviving

6

sexual assault and domestic violence. These traumas contributed to Sweat's development of severe depression and anxiety. As a result of her mental health conditions, Sweat experiences memory loss, insomnia, flashbacks, paranoia, reclusiveness, and difficulty trusting others. These symptoms are heightened when she is under stress.

14. Sweat became homeless in approximately 2002 after escaping from an abusive relationship. She lived in the Santa Ana Civic Center for approximately two years, until she was forced to leave by Santa Ana Police. With nowhere else to go, Sweat moved to the Riverbed, where she has lived ever since. Although not ideal, the Riverbed has allowed Sweat to create the kind of privacy, space, and control that she needs to manage her disabilities. She has a community she can rely on and keeps an emotional support animal that helps her cope with her depression and anxiety.

15. Plaintiff STEPHENIE SAINT VINCENT ("Saint Vincent") is 43 years old and has been homeless for approximately 19 months. Saint Vincent is disabled as defined by the ADA and meets the definition of chronically homeless as defined by HUD regulations. Saint Vincent suffered years of sexual abuse as a child. Due in part to the trauma she experienced, Saint Vincent now suffers from a number of mental health conditions, including multiple personality disorder, borderline schizophrenia, bipolar disorder, and anxiety. Saint Vincent also has physical disabilities, including sleep apnea and leg and arm injuries that required two separate surgeries last year. Saint Vincent receives Supplement Security Income ("SSI") because her disabilities prevent her from working.

16. Saint Vincent became homeless in approximately 2016, when she was evicted from her home after her landlord gave her an ultimatum of engaging in sexual acts with him or moving off the premises. She chose to leave. With nowhere to go, Saint Vincent slept in various locations around Orange County, including motel rooms, city streets, and a temporary shelter. The shelter's crowded, noisy conditions triggered her mental symptoms, forcing her to leave. With nowhere else to go, Saint

Vincent moved to the Riverbed, where she currently resides. Although not ideal, the Riverbed has allowed Saint Vincent to create community and achieve the personal space and control she needs to manage her disabilities.

17.     Plaintiff RAYA IVES ("Ives") is 40 years old and has been homeless for seven years. She has lived at the Riverbed for approximately the last year. Ives is disabled as defined by the ADA and meets the definition of chronically homeless as defined by HUD. Ives is a victim of domestic violence. As a result of years of violence at the hands of her former partner, who was later convicted of felony assault, Ives suffers from post-traumatic stress and severe anxiety. Her mental health disabilities often lead to insomnia and affect her ability to interact with others, particularly men. Ives also suffered physical injuries that have left her with constant knee pain and fatigue.

18.     Due to her former abusive relationship, Ives lost her Section 8 housing voucher. Without that support, Ives had no place to live and became homeless. Over the last several years, Ives has lived at over a dozen shelters and transitional housing for domestic violence survivors. None of these short-term housing options resulted in access to permanent affordable housing. These short-term shelters also triggered her mental health conditions and, after each stay, Ives had no choice but to return to living on the streets. Ives has attempted to stay at the Courtyard two times in the last year. On both occasions, Ives was sexually harassed by male staff and residents, re-traumatizing her and causing her to fear for her safety.

19.     Plaintiff ERIK TEASLEY ("Teasley") is 47 years old and homeless. He currently lives at the Riverbed. Teasley is disabled as defined by the ADA and meets the definition of chronically homeless as defined by HUD. As a child, Teasley was a victim of physical abuse and emotional neglect. As a result of that trauma, Teasley experiences depression and anxiety. He also suffers from flaccid paralysis as a result of an accident in 2007 which left his right arm with limited mobility and

strength. Teasley's mental and physical disabilities have prevented him from holding steady full-time employment, which ultimately led to his homelessness.

20.     Teasley moved to the Fountain Valley section of the Riverbed about 2 years ago. There, he was able to keep a tent that protected him from the elements and provided a degree of privacy. However, in November 2017, County officials swept the area and forced Teasley to move. Teasley gathered what he could in the short time he was given and with no other place to go, moved to the area of the Riverbed where he currently stays.

21.     Plaintiff DEREK MACARTHUR ("MacArthur") is 50 years old and homeless. He has lived at the Riverbed since approximately May 2017. MacArthur is disabled as defined by the ADA and meets the definition of chronically homeless as defined by HUD. MacArthur has been diagnosed with bipolar disorder, depression, and anxiety. He also suffers from various medical conditions, including spinal stenosis, and respiratory problems. As a result of his disabilities, MacArthur requires privacy and cannot tolerate exposure to groups of people he does not know. These mental and physical disabilities have prevented MacArthur from holding steady full-time employment that would enable him to afford market-rate rents in Orange County, ultimately resulting in homelessness.

22.     Before arriving to the Riverbed, MacArthur lived on the streets of Anaheim. There, Anaheim Police Department frequently confiscated and destroyed items essential to MacArthur's survival, including a tent and sleeping bag. He was also repeatedly ticketed and arrested. On multiple occasions, Anaheim police instructed MacArthur to move to the Riverbed. The constant police harassment took a toll on MacArthur's health. In approximately May 2017, MacArthur left Anaheim and moved to the Riverbed. Although not ideal, the Riverbed has allowed MacArthur to create and control the personal space he needs to manage his disabilities.

23. Plaintiff KIM GRAY ("Gray") is 49 years old and has been homeless for over 8 years. She has lived at the Riverbed for most of the time she has been homeless. Gray is disabled as defined by the ADA and meets the definition of chronically homeless as defined by HUD. Gray suffers from various mental health conditions, including panic attacks, anxiety, and depression. Gray lived at the Riverbed with her husband until early 2017, when she and her husband were forced to move from one area of the Riverbed to her current location. About a month later, her husband suffered a cardiac arrest and died. The death of her husband worsened her mental health conditions, increased her depression and anxiety, causing her to feel extremely vulnerable. She requires a private space and a companion animal to manage her disabilities. These mental health disabilities have prevented Gray from holding steady full-time employment that would enable her to afford market-rate rents in Orange County.

24. Plaintiff PEOPLE'S HOMELESS TASK FORCE ("PHTF") is a grassroots association formed to assist and advocate on behalf of homeless residents of Orange County. PHTF's mission is to advocate for a Housing First model in Orange County as a solution to ending homelessness. As a result of the County's planned eviction of Riverbed residents, PHTF has been required to divert enormous resources away from its mission in order to provide assistance to residents living along the Riverbed. PHTF has shifted resources to (1) addressing the County Board of Supervisors to oppose the eviction; (2) raising public awareness of the plight of the homeless and the negative impacts of the eviction; (3) contacting County personnel to gather information about the eviction and sharing that information with homeless Riverbed residents; (4) attempting to identify safe alternative locations for people living at the Riverbed to live; (5) mobilizing transportation and other equipment to assist people being evicted; (6) monitoring and recording the activity of County personnel along

the Riverbed to identify potential civil rights violations; and (7) working to reassure homeless residents experiencing mental health symptoms caused by the eviction.

25.     Due to this drain on its resources, since the eviction began, PHTF has been unable to engage in advocacy relating to the Housing First model or to serve homeless residents in other parts of Orange County.  The vast majority of people who have requested PHTF's assistance are chronically homeless Riverbed residents experiencing physical and/or mental disabilities, and who have been unable to access disability appropriate housing.

**B.      Defendant**

26.     Defendant County of Orange ("County" or "Defendant") is a municipal entity with the capacity to sue and be sued.

27.     Defendant, its employees and agents, participated personally in the unlawful conduct challenged herein and, to the extent that they did not personally participate, authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and the harm suffered by Plaintiffs.  Each acted in concert with each other.  The challenged acts caused the violation of Plaintiffs' rights.

**FACTUAL ALLEGATIONS**
**HOMELESSNESS IN ORANGE COUNTY**

28.     In 2017 at least 4,792 people were homeless in the County, according to the Orange County Point-In-Time Count, an annual countywide census of people experiencing homelessness.  Of those, 54% went unsheltered on any given night.  Over the last several years, the number of unsheltered individuals has steadily increased in part due to the lack of emergency shelters and permanent affordable housing available in the Orange County housing market, but also due to the County's failure to address the systemic causes of homelessness.

11

29.     The Riverbed is home to one of the largest concentrations of unsheltered homeless people in Orange County.  The largest homeless encampments can be found along the banks of the Riverbed in Anaheim, Orange, and Santa Ana.

30.     The County has allowed homeless individuals to reside at the Riverbed for many years.  For example, Plaintiff Sweat has lived on the Riverbed for approximately 14 years.  Although the Riverbed has minimal facilities for basic human activities, the population living at the Riverbed has continued to grow as Orange County's cities have increasingly criminalized their homeless populations, often telling homeless individuals, including individual Plaintiffs, that they must leave city limits or that they should go to the Riverbed because it is not patrolled by local police. According to a 2016 study by the American Civil Liberties Union, 33 of the 34 cities in the County criminalize homelessness,[3] including by seizing homeless residents' property and citing or arresting them for activities that are the unavoidable consequences of being homeless, including sitting, sleeping, or storing property.

31.     In response to increasing homelessness in the County, the cities bordering the Riverbed have chosen to close off public spaces to homeless residents and increase law enforcement in the homeless community.  In 2016, the City of Santa Ana evicted hundreds of people from its Civic Center, fencing off public spaces and ticketing or arresting people for camping or possessing too much property, forcing many people to move to the Riverbed.

32.     In February 2017, homeless individuals living at the Riverbed sued the County in the United States District Court regarding the County's unconstitutional seizure and destruction of homeless residents' property.  On March 7, 2017, the parties stipulated to, and the Court granted, a preliminary

---

[3] ACLU SoCal, *Nowhere to Live: the Homeless Crisis in Orange County & How to End It* at 6 (2016).

injunction preventing the County from violating individuals' constitutional rights in a designated area of the Riverbed north of the Santa Ana Freeway and south of Ball Road (the "Injunction Area.").[4]

33.     In September 2017, the City of Anaheim declared a "state of emergency" related to increasing rates of homelessness and passed "Operation Home Safe," a program ostensibly designed to address homelessness.  Although the resolution empowered staff to increase shelter and services, including identifying locations for at least 500 shelter beds or other housing options and expediting the completion of an additional 100 beds at the Bridges at Kraemer shelter, Anaheim also ordered an increase in law enforcement in homeless communities.  The increase in law enforcement occurred immediately, with Anaheim police joining the Orange County Sheriff to patrol in and around the Riverbed.  However, upon information and belief, not a single additional shelter bed has been added as a result of Operation Home Safe.

34.     In November 2017, the County evicted an encampment of more than 100 unhoused people living in the Fountain Valley section of the Riverbed, including Plaintiff Ramirez.  During the County's November 2017 eviction, County workers directed many people to move to the Injunction Area.  Upon information and belief, county workers explained that the Injunction Area would be a safe place to camp and that no evictions would take place there for at least a year.

35.     Unable to live in the cities or the southern sections of the Riverbed, hundreds of people now reside in the Injunction Area.  While life at the Riverbed is difficult, homeless individuals have used the Riverbed as a home of last resort, where they are not subjected to enforcement targeting homeless communities, such as expensive ticketing, property seizures, or arrests by local police departments.

36.     In addition, the Riverbed has allowed Plaintiffs and others similarly situated to achieve stability and privacy.  Personal space is extremely important to the health and well-being of people

---

[4] *See Schuler v. County of Orange*, No. 8:17-cv-00259 DOC KES, Dkt. Nos. 1, 3 (C.D. Ca. 2017).

experiencing disabilities, including Plaintiffs.  According to a recent County-commissioned study, the individuals living at the Riverbed are some of the most vulnerable people in all of Orange County. Over 51% of homeless residents surveyed reported having a disability, and over 42% state that they have mental health concerns.[5]  Additionally, 37.5% of those surveyed are victims of domestic violence.

37.     As these statistics show, there is a strong link between disability and homelessness.  Low-income individuals already face an overwhelming shortage of housing options in Orange County, and housing is even more limited for people experiencing a disability, who often require affordable, permanent, and accessible housing with wrap-around services, such as permanent supportive housing.

## THE COUNTY'S FUNDING TO END HOMELESSNESS

38.     The County is the lead public agency receiving federal funding to address Orange County's homelessness issues.  According to *An Assessment of Homeless Services in Orange County*, published by the County Executive Office in 2016, the County had $786,481,342 for homeless services in the fiscal year 2016-2017 alone.[6]  Of that total, nearly $700 million was identified as unspent "available" funds.  This staggering number includes over $146 million for housing vouchers, $8 million for affordable housing development, $67.5 million for mental health treatment and residential care, and nearly $227 million in CalWORKS funding, which includes funding to assist victims of domestic violence.[7]  The County has received hundreds of millions of dollars in California

---

[5] City Net, *Census of Homeless Individuals in the Flood Control Channel* (2017).
[6] County of Orange, County Executive Office, *An Assessment of Homeless Services in Orange County* at 42 (Oct. 18, 2016).
[7] *Id.*

Mental Health Services Act funds for the purpose of assisting homeless individuals with mental disabilities, much of which has gone unspent.[8]

39.     The County also leads the Continuum of Care ("CoC"), a regional system to coordinate housing and supportive services, and is responsible for allocating regional HUD monies to the 34 cities in its jurisdiction.[9]  As part of its evaluation for the CoC, the County identified services and housing for homeless individuals as a high priority.

40.     Despite its vast funding reserves from federal and state grants, the County has historically lacked the political will to implement the services identified as long-term solutions to solve homelessness, such as affordable housing and supportive services.  This failure has had severe financial repercussions for the County.  According to a 2017 study, the County, local municipalities, and other service providers spent nearly $300 million on the homeless population in the 12-month period encompassing 2014/2015, including $121 million on health care and emergency services.[10]  The study concluded that the costs of homelessness to the County and other service providers actually *decline* when the homeless are housed.  For example, the study concluded that "[a]s a result of decreases in service utilization and criminal justice contacts, the estimated average annual cost of services is 40% lower for the chronically homeless in permanent supportive housing ($51,587) in

---

[8] Jordan Graham, *Santa Ana riverbed homeless to get toilets, showers while supervisors work on plan to move them out*, Orange County Register (June 6, 2017)(reporting that the County has over $250 million in unspent Mental Health Services Act funding).  On January 9, 2018, the County Board of Supervisors directed the Orange County Health Care Agency to use $15 million of available unspent Mental Health Services Act funds to house chronically homeless individuals with severe mental illnesses.  The directive will be brought back to the Board of Supervisors in spring of 2018 for final approval.
[9] *An Assessment of Homeless Services in Orange County* at 9.
[10] D. Snow, R. Goldberg, *Homelessness in Orange County: The Costs to Our Community* at 7 (2017).

15

comparison to the chronically homeless living on the streets and in emergency shelters ($85,631), even taking into consideration the program costs of permanent supportive housing."[11]

### THE COUNTY'S EMERGENCY SHELTERS

41.     Emergency shelters are defined as "any facility with overnight sleeping accommodations, the primary temporary shelter for the homeless in general or for specific populations of the homeless."[12] By design, emergency shelters are not intended for long-term stays.

42.     The County has two emergency winter shelters: the Fullerton Armory, with 237 beds, and the Santa Ana Armory, with 200 beds (collectively, the "Armories").  For the 2017-2018 season, the Santa Ana Armory is open from approximately November 2017 to April 2018.  The Fullerton Armory is open from approximately December 2017 to April 2018.

43.     Upon information and belief, the Armories are only open between the hours 7 p.m. and 6 a.m. and do not guarantee availability the following night.  The bedding at the Armories consists of a thin mat on the floor, which is inaccessible for most people with disabilities.  The Armories do not allow couples to stay together, do not allow support animals, and limit possessions to small bags of belongings without a storage option for other property.  Additionally, the Armories only accept people who are able to come and go during set hours.  For people who work, who need to attend court, or who meet with service providers, the restricted hours impose an additional hurdle to staying at the Armories.

44.     The County also runs the Bridges at Kraemer Place ("Kraemer") shelter in Anaheim, California.  Kraemer has 100 beds that can only be accessed through a referral from a social service provider.  Individuals sleep together in stacked bunk beds.  Kraemer does not allow couples to sleep

---

[11] *Id.* at 26.
[12] 24 C.F.R. § 91.5 Subpart A, Definitions.

together, does not allow support animals, and limits the amount of property one can bring in. There is also a 180-day maximum stay, after which many individuals are returned to the streets.

45.     The Courtyard, also run by the County, is a converted open-air bus terminal that was approved for 200-250 people, but that now houses over 400 people every night lying side by side on cots. The Courtyard is currently at double capacity, making it overcrowded, loud, unsanitary, and dangerous. The Courtyard is not near any other shelters, so people who are turned away from the Courtyard typically have no choice but to sleep outside, subjected to the intense anti-camping and excessive property enforcement by Santa Ana police.[13]

46.     In addition to the County-run shelters, the Salvation Army runs the Hospitality House in Santa Ana with 25 beds for transitional housing and 25 beds for emergency shelter—all of which are reserved for men. Service animals are only permitted if they have federal paperwork; no support animals are permitted. A requirement of staying in the Hospitality House is attendance at a meeting before dinner during which a religious service with prayer is held. The Hospitality House is typically at capacity every night.

47.     Colette's House, another private shelter, is open only to women and children. Residents are required to participate in a six-month transitional program, which includes finding a job and working 32 hours per week. No animals are allowed. Colette's House is usually at capacity.

## PLAINTIFFS HAVE NO REASONABLE
## ALTERNATIVE BUT TO LIVE AT THE RIVERBED

48.     Sheltering oneself is a basic human need and it is harmless to others.

49.     There is a strong correlation between disability, trauma, and homelessness. Research shows that childhood trauma, including child abuse, can "rewire" the developing brain, producing changes in both brain function and structure, and resulting in mental health conditions such as depression,

---

[13] Santa Ana Municipal Ordinance §§ 10-550, 10-551.

aggressiveness, anxiety, memory problems, posttraumatic stress disorder, and attention deficit hyperactivity disorder (ADHD).[14]  According to one study, 92% of homeless women surveyed experienced severe physical and/or sexual assault at some point in their lives—60% of whom experienced the assault by the age of 12.[15]  As a result of the trauma they experienced early in their lives, these individuals often develop one or more mental health disabilities.

50.     There is also a strong link between disability, unemployment, and poverty.  According to statistics from the Employment and Disability Institute at Cornell University, 26.6% of non-institutionalized persons aged 21 to 64 years with a disability in the United States were living below the poverty line in 2016, while 77% were employed less than full-time.[16]  In contrast, only 10.9% of non-disabled people in the U.S. live below the poverty line.[17]  In short, people with disabilities are more than twice as likely to face poverty than people without disabilities.

51.     Plaintiffs' poverty and homelessness are a direct practical result of their disabilities.  All of the individual Plaintiffs suffered intense trauma during their lives, often during childhood, and all of them suffer from mental health conditions as adults.  Plaintiffs' mental health conditions cause them to experience intense depression, fear, anxiety, paranoia, memory loss, and flashbacks to traumatic experiences.  In turn, these trauma-based mental health disabilities prevent Plaintiffs from being able to maintain stable interpersonal relationships or to hold the kind of job that would allow them to afford Orange County's rents, ultimately leading to their homelessness.

---

[14] Health Care for the Homeless Clinicians' Network, National Health Care for the Homeless Council, *Homelessness & Family Trauma: The Case for Early Intervention* at 2 (2003).
[15] A. Browne, SS. Bassuk, *Intimate violence in the lives of homeless and poor housed women: prevalence and patterns in an ethnically diverse sample*, Am. J. Orthopsychiatry 67(2): 261–278 (1997).
[16] W. Erickson, C. Lee, S. von Schrader, *Disability Statistics from the American Community Survey*, Cornell University (2017) *available at* www.disabilitystatistics.org.
[17] *Id.*

52.     As a result of their disabilities, temporary or transitional shelters are functionally unavailable to Plaintiffs and others like them because those types of living arrangements are temporary and more likely to aggravate their mental health and/or physical conditions than help.  The shelters and transitional housing programs in Orange County have an overcrowded congregate living environment, are noisy, have a complete lack of privacy, often prohibit lying down or stay during the day, present an increased risk of infection, and may have strong odors from smoke and chemical cleaning products that can aggravate respiratory disabilities.  Most shelters do not accept emotional support animals and do not permit couples to sleep together, thereby separating family members and causing additional trauma.  In addition, the staff at County shelters are not trained to accommodate people experiencing disabilities, particularly mental disabilities.[18]  Plaintiffs are psychologically triggered and re-traumatized when they spend time in shelters.

53.     Shelters and transitional housing are also not appropriate for Plaintiffs and others with similar disabilities because these shelters are not meant for long-term occupancy and only offer temporary housing for those fortunate enough to get a bed.  As the homeless population in Orange County has grown, transitional housing providers have no choice but to turn many people away, or to return people to the street once they reach a shelter's maximum stay.[19]  This practice perpetuates the cycle of instability homeless individuals experience as they move from street to shelter to street, or from shelter to shelter.  Even those individuals who are able to access the shelter system are often condemned to spending at least some time on the streets, with all the associated health and safety risks, given the strict time limits placed on shelters.  For many people with disabilities, including

---

[18] *See, e.g.*, *County's 'Courtyard' Homeless Shelter Gets Mixed Reviews*, Voice of OC (Nov. 29, 2016), *available at https://voiceofoc.org/2016/11/countys-courtyard-homeless-shelter-gets-mixed-reviews/.*

[19] Housing Shortage Sent Homeless at Transitional Shelter Back to Streets, Voice of OC (Nov. 22, 2017), *available at* https://voiceofoc.org/2017/11/housing-shortage-sent-homeless-at-transitional-shelter-back-to-streets/(homeless individuals returned to the streets after reaching maximum stay)

Plaintiffs, this constant upheaval aggravates their disabilities, causing re-traumatization and deterioration of their health.

54.     Even if shelters were accessible to Plaintiffs and other homeless individuals with disabilities, there are not enough shelter beds in the County to accommodate the County's unsheltered homeless population.  Upon information and belief, all of the County's shelters are currently near or at capacity.  There are currently hundreds more unsheltered homeless people than available emergency shelter beds, even when accounting for seasonal and overflow spaces.[20]

55.     Unable to use the County's transitional housing due to their disabilities and given a lack of space, Plaintiffs have no alternative to living on the streets.  Plaintiffs moved to the Riverbed as a last resort, seeking refuge from frequent harassment by local police.  All of the Plaintiffs have been harassed, cited, arrested, or had their property seized by local police for unavoidable and harmless activities, causing them to have a deep distrust of people in uniform.  Although living at the Riverbed is not ideal, it accommodates Plaintiffs' disabilities better than living in a temporary shelter or on the streets of Orange County because it provides Plaintiffs with autonomy, stability, and control of their personal space, which are crucial to helping Plaintiffs manage their disabilities.  For Plaintiffs and hundreds of others like them, moving to the relative stability of the Riverbed was their only option.

**THE COUNTY'S PROGRAM TO RELOCATE HOMELESS INDIVIDUALS FROM THE RIVERBED TO APPROPRIATE HOUSING, INCLUDING PERMANENT HOUSING**

56.     Since approximately 2016, the County has undertaken efforts to integrate its homeless resources and build out its capacity to provide housing solutions and supportive services to the County's homeless population.

57.     In 2016, the County hired a Director of Care Coordination to coordinate the County's efforts to address homelessness.  On October 18, 2016, the County published *An Assessment of Homeless*

---

[20] *See An Assessment of Homeless Services in Orange County* at 7, 22-23.

*Services in Orange County*, which recommended strategies for meeting the immediate basic needs of homeless people and for leveraging the County's resources to increase permanent housing solutions.[21]

58.     On June 6, 2017, the Orange County Board of Supervisors approved $750,000 to enter into a contract with a homeless outreach organization to facilitate enhanced provision of services and housing to Riverbed residents. The ultimate goal was to engage and relocate Riverbed residents to appropriate housing solutions. The County stated that these services would be available to any individual willing to accept the County's help.

59.     On June 27, 2017, the Orange County Board of Supervisors approved funding to expand the County's "Whole Person Care" services to include additional recuperative care for the County's homeless population. In a press release announcing the expansion, the County stated that "[w]orking with the homeless population in a holistic way that addresses health, addiction, job re-entry and mental health services will provide relief to emergency rooms in ways we haven't seen before." As part of the expansion, the County will receive an increase in matching federal dollars, with total spending reaching $31,066,860.

60.     Also on June 27, 2017, the Orange County Board of Supervisors approved the County's Mental Health Services Act Three Year Plan for fiscal years 2017/2018 to 2019/2020, which expands funding for mental health housing and wrap-around services, including to the County's homeless population.

61.     To fulfill the Program's goals, on or about July 1, 2017, the County entered into a contract with City Net, a nonprofit service provider, that would provide triage operations, intensive case management, and links to both transitional and permanent supportive housing.

---

[21] *Id.* at 8.

62.     On the County's behalf, County personnel, including the County Health Care Agency ("HCA") Behavioral Health Outreach and Engagement unit, and City Net would "conduct a daily coordinated campaign of outreach efforts in order to provide comprehensive resources to serve the homeless population at the Riverbed," including "facilitating verifiable street exits from the focus area." Consistent with the County's Ten-Year Plan to End Homelessness, which committed the County to prioritize the "creation of affordable permanent housing, permanent supportive housing and permanent housing with support services," the County stated that it would utilize "new and existing resources" throughout the County in order to "assist homeless neighbors onto a path that leads towards permanent housing stability."[22]

63.     On July 10, 2017, the County issued a press release regarding the Program. The press release explained that the Program would "leverage existing Permanent Supportive Housing grants through Continuum of Care funding to provide access to permanent housing options for the individuals encamped along the flood control channel."[23] The County Board of Supervisors also directed HCA to include $5 million in funding from the Mental Health Services Act to be directed to permanent supportive housing solutions.

64.     The County stated that its goal was to "engage all individuals encamped in the area with case management activities and coordinate 10-15 connections to housing resources per month through collaborative case management."[24] Supervisor Lisa Bartlett recognized that "[c]hronically homeless individuals with disabilities who lack stable housing often do not receive the appropriate preventative care or supportive services."[25]

---

[22] City Net, Flood Control Channel, *available at* http://citynet.org/flood-control-channel/.
[23] County Executive Office, *County Partners with City Net for Santa Ana River Flood Control Channel Homeless Engagement Initiative* (Jul. 10, 2017).
[24] *Id.*
[25] https://www.ocregister.com/2017/12/02/housing-is-a-hand-up-not-a-hand-out/

65.     In July and August of 2017, City Net, on the County's behalf, conducted a census of the homeless population at the Riverbed in order to better understand the services needed.  The census results showed that over 51% of homeless residents surveyed reported having a disability, over 42% had mental health concerns, and 37.5% were victims of domestic violence.  Over 70% of those surveyed reported being homeless for over one year.  Additionally, 81% of those surveyed stated they are interested in case management.

66.     Once the census was completed, the County began a massive outreach to Riverbed residents, offering residents an individualized needs assessment followed by offer of placement in service programs and housing.  This outreach effort was conducted by three County agencies: HCA, City Net, and the Orange County Sheriff, with support from the Anaheim and Orange Police Departments.

67.     City Net was tasked with conducting a personalized assessment of each Riverbed resident.  Upon information and belief, City Net relied in part on the Vulnerability Index—Service Prioritization Decision Assistance Tool ("VI-SPDAT"), a questionnaire designed to identify individual needs and match them with appropriate housing and services, including emergency shelters, transitional housing, and permanent housing.  The VI-SPDAT produces a numerical score that City Net uses to prioritize the most vulnerable individuals.  Individuals with high VI-SPDAT scores became eligible for available Permanent Supportive Housing ("PSH"), a program designed to provide housing and supportive services on a long-term basis to chronically homeless people.  Individuals with lower scores may be offered temporary housing assistance, such as emergency shelters, transitional housing, recuperative care beds, or Rapid Re-Housing ("RRH"), which is designed to move people quickly out of homelessness and into housing.  City Net or County personnel were tasked with assisting individuals to make arrangements and fill out the necessary paperwork for placement in the relevant housing program.

23

68.     In September 2017, the Orange County Sheriff, accompanied by police officers from local police departments, conducted over 1,000 outreach contacts to individuals living at the Riverbed. Large groups of armed officers in full uniform would surround Riverbed residents at their tents, often calling into the person's tent and informing them that the Sheriff wanted to speak to them.  When the person came out, officers asked a series of questions, which the officers said would allow residents to access services.  Officers asked residents for personal information and noted that information on Sheriff Department field survey cards.  Simultaneously, law enforcement was running a program to check each individual for active warrants and criminal activity.  Not surprisingly, the Sheriff reported that, out of over 1,000 field surveys, 910 people declined services.

69.     Finally, HCA staff, including "Mental Health Specialists" with HCA's Behavioral Health Outreach and Engagement unit, conducted outreach and assessments of Riverbed residents in order to connect them to appropriate services and housing.  Although HCA staff has acknowledged the importance of building trust and rapport with homeless individuals experiencing disabilities, upon information and belief, HCA's assessment involves a brief 20-30 minute interview by HCA staff who are wearing uniforms provided by the County and who are often accompanied by the Orange County Sheriff or other law enforcement.  Upon information and belief, HCA staff conducting the assessments do not have the training appropriate to identify people with disabilities in the field, and HCA does not use any formalized questionnaire or other tool developed to identify and accommodate people with disabilities in the field.  HCA's assessment itself contains few, if any, questions relating to mental and physical disabilities and does not include any review of an individual's medical history, including the review of medical records, opinions from doctors, or psychological evaluations.  Most often, the interaction between HCA staff and a homeless individual consists of nothing more than

HCA's offer of a ride to the Courtyard.  If the individual expresses doubt or an inability to use shelters, HCA staff identifies the individual as "refusing services."

70.     Although the County knew that a majority of Riverbed residents have disabilities, the County did not attempt to evaluate the immediate need of people with disabilities or to accommodate their disabilities during the assessments.  The County encouraged people with disabilities to go to shelters without regard for whether the shelter was disability appropriate for the person, even though the County was aware of shelter conditions and even though the County has ample resources to facilitate permanent supportive housing, Shelter-Plus-Care, or Section 8 housing for those who cannot utilize the shelters.

71.     In December 2017, the Board of Supervisors extended the City Net contract for another six-month period, from January 1, 2018, to June 30, 2018.  In December 2017, Carrie Braun, the County's public information manager, stated that "[t]hese are vulnerable individuals who need services.  The county needs to balance the needs of the housed and the unhoused.  With the sheer enormity of the situation and hundreds of individuals, it's going to take time to do it correctly."[26]  As of January 19, 2018, 171 individuals had participated in the County's Program and are currently receiving case management, but have not received appropriate housing.

**THE COUNTY ABRUPTLY BEGINS A MASS EVICTION OF THE RIVERBED ENCAMPMENTS, EVEN THOUGH HUNDREDS OF PEOPLE, MANY OF THEM WITH DISABILITIES, HAD NOT YET BEEN ABLE TO ACCESS THE PROGRAM**

72.     Political pressure to remove the homeless encampments along the Riverbed began to dramatically increase toward the end of 2017.  In August 2017, over 11,000 people signed a petition calling on the County to remove the Riverbed residents.  In September 2017, the City of Anaheim

---

[26] David Whiting, *Fear, loathing and hope for homeless on the Santa Ana River Trail*, Orange County Register (Dec. 8, 2017) *available at* https://www.ocregister.com/2017/12/08/fear-loathing-and-hope-for-homeless-on-the-santa-ana-river-trail/.

declared a "state of emergency" with respect to the Riverbed, increasing pressure on the County to clear the Riverbed's encampments and to permit Anaheim police to conduct patrols along the Riverbed.

73.     In the face of mounting political pressure, on or about January 3, 2018, the County announced plans to evict all homeless individuals from the Riverbed.  The County announced the eviction even though an estimated 700 people or more still remain at the Riverbed, many of whom experience disabilities and who had not yet been able to access the Program or any housing solutions that would accommodate their disabilities.

74.     In a January 3, 2018 Memorandum from the Orange County Executive Office, issued in conjunction with the announced eviction, the County stated that "the County will be on-site during this transition to provide necessary services to connect those who wish to accept the help with the teams that can provide it."  However, the County stated that the only housing that would be offered during the eviction is "the Courtyard in Santa Ana and at Bridges at Kraemer Place in Anaheim as appropriate."[27]  Neither is "appropriate" for Plaintiffs with their disabilities.

75.     On January 8, 2018, the County posted Work Notices along the Riverbed, giving residents two weeks to vacate the Riverbed.  The Work Notices stated that individuals who remain on or return to the Riverbed after January 22, 2018 will be prosecuted under California law, including Penal Code §§ 370, 372, 602 and 555 *et seq*.

76.     Surrounding cities, including Orange and Anaheim, publicly stated that homeless people being evicted from the Riverbed would not be permitted to move into their jurisdictions.[28]

---

[27] January 3, 2018 Memorandum of Frank Kim, County Executive Officer, to County Board of Supervisors Chairwoman Michelle Steel re Orange County Flood Control District; Santa Ana Riverbed Encampments (hereinafter, "January 3, 2018 Memo").
[28] Jordan Graham, *Orange County is ready to clear out the Santa Ana riverbed homeless encampment. But where – and exactly when – will they go?*, Orange County Register (Jan. 21, 2018)

**PLAINTIFFS REQUEST A REASONABLE MODIFICATION
OF THE PROGRAM, BUT THE COUNTY DENIES THEIR REQUESTS**

77.     As of the date the eviction was announced, only Plaintiffs MacArthur, Sweat, and Ives had been contacted by the County to participate in the Program.  However, the County failed to accommodate their disabilities or to connect them with disability appropriate housing options.  None of the other Plaintiffs had been assessed or connected to services that would accommodate their disabilities.

78.     Between January 12 and January 22, 2018, each of the Plaintiffs submitted a reasonable modification request to the County pursuant to the ADA (collectively, the "Requests").  Each Plaintiff informed the County that he or she has a disability under the ADA and that, as a result of that disability, is unable to participate in the Program in a way that provides access equal to that of non-disabled individuals.  Further, each Plaintiff requested that, as a reasonable modification to the Program, the County modify the Program to permit him or her to equally participate, and that he or she be permitted to remain at the Riverbed until the County connects him or her to housing that accommodates his or her disability.

79.     In response to Plaintiffs' Requests, and although Plaintiffs explained that they were requesting an accommodation to the assessment itself, the County stated that Plaintiffs' only option is to undergo an assessment with HCA staff.

80.     On, January 30, 2018, Plaintiffs Ramirez, Sweat, Saint Vincent, Gray, and Teasley underwent the assessment with HCA staff.  Although Plaintiffs had submitted the Requests notifying the County of their disabilities, HCA staff made no attempt to accommodate or even address those disabilities during the assessment.  In addition, although Plaintiffs informed the County that shelters and

*available at* https://www.ocregister.com/2018/01/21/orange-county-is-ready-to-clear-out-the-santa-ana-riverbed-homeless-encampment-but-where-and-exactly-when-will-they-go/.

transitional housing were not appropriate for their disabilities, the first and often only option the County offered Plaintiffs was shelters.

81.     Sharon Sweat's assessment was conducted on the public bike trail in front of her tent by two HCA staff members.  Throughout the entire assessment, Sweat and HCA staff stood while officers from the Orange County Sheriff and Orange Police Department patrolled the area around Sweat's tent on foot and in squad cars.  Although the HCA staff members had no previous interactions with Sweat, and although Sweat stated that she had been a victim of assault the night before, HCA staff made no attempt to build rapport with her, gain her trust, or to make her feel comfortable by taking her to a more private space.

82.     The first question HCA asked was "what can we do for you today."  When Sweat said she did not know how to answer that, HCA staff immediately asked if she would go to an emergency shelter.  In fact, even though Sweat stated that she did not know anything about the "Courtyard," HCA staff did not explain that the Courtyard housed over 400 people with no privacy whatsoever.  Although Sweat was visibly shaken, stated that she was "overwhelmed," and that she did not "play well with others," and although Sweat had submitted a Request explaining the nature of her disabilities, that she had lived at the Riverbed for 14 years, and that she was unable to go to a temporary shelter, HCA staff did not ask if she had any concerns about going to a shelter and made no attempt to ask whether a shelter would be disability appropriate for her.  Instead, HCA pushed Sweat to go to the Courtyard the very next day.  When Sweat stated "I can't do this this right now," HCA staff asked if she was "refusing services."  The assessment triggered Sweat's mental illness symptoms and made her feel out of options, threatened, and re-traumatized.  Ultimately, the only accommodation HCA offered was to give her an extra day to pack before taking her to the Courtyard.

83.     After the assessment, Sweat learned from former Courtyard occupants about the crowded conditions at the shelter and determined that it would just aggravate her mental health conditions. Sweat informed the County that she could not go to the Courtyard and requested information about housing that would accommodate her disabilities.  To date, the County has not responded.

84.     All of the Plaintiffs have had similar experiences in trying to access the County's Program.  In the face of the County's failure to accommodate their disabilities, which will take away Plaintiffs' only place to sleep and exacerbate their disabilities, Plaintiffs had no choice but to file this lawsuit.

## THE PROGRAM DISCRIMINATES AGAINST PEOPLE WITH DISABILITIES

85.     The County knew when it began the Program that the majority of people living at the Riverbed are chronically homeless individuals experiencing physical or mental disabilities, or both. The County's own census showed that 51% of the population had a disability, that 42% had a mental health concern, and that 37% were victims of domestic violence, a sub-population with high occurrences of PTSD and other trauma-related mental health concerns.  In comparison, only 8.5% of the County's total population is affected by one or more disabilities.[29]

86.     In addition, the County has recognized that mental illness and homelessness is "often inextricably intertwined"[30] and has concluded that "[t]he homeless population represents a high-risk group with significant acute and chronic health conditions, co-occurring substance abuse and/or mental health conditions."[31]  According to the Orange County Sheriff-Coroner's Department, there were over 200 reported deaths among the homeless population between December 2016 and

---

[29] 2012 -2016 American Community Survey 5-Year Estimates: Disability in Orange County, California.
[30] Orange County, *Mental Health Services Act Three Year Plan FY 17/18-19/20* at 10 (2017).
[31] *An Assessment of Homeless Services in Orange County* at 23.

December 2017.  The County was aware that deaths of homeless people are caused primarily by untreated health conditions, substance abuse and mental health disabling factors.[32]

87.     Although the County knew that the majority of the Riverbed's homeless population was experiencing disabilities, the County did not attempt to make the Program accessible to people with disabilities.

88.     The County's Program discriminates against homeless individuals with disabilities living at the Riverbed, including Plaintiffs, in at least three ways.  First, individuals with disabilities are denied the benefits of the Program, including disability appropriate housing, as a result of their disability. Second, individuals with disabilities are required to participate in the Program assessments without any accommodation for their disability, which has a disparate negative impact on the participants' health.  Third, some individuals with disabilities are excluded from participating in the Program altogether.

A.      **People With Disabilities Are Routinely Denied the Benefits of the Program, Including Disability Appropriate Housing**

89.     The County has discriminated against people with disabilities by pushing them into shelters that fail to accommodate, and in many cases even worsen, their disabilities.  All of the Plaintiffs were encouraged to go to shelters, even though the County knew or should have known that Plaintiffs and others like them cannot tolerate the overcrowded, noisy, congregate living environment and related problems common in all of the County's shelters.  The County knew or should have known that the temporary nature of the shelters does not provide stability, and that the shelters' restricted access and lack of guaranteed beds creates a sense of instability and constant upheaval that exacerbates disabilities.

---

[32] *Id.*

30

90.     Although, upon information and belief, the County offered long-term services and permanent housing to some Riverbed residents, Plaintiffs and others like them were routinely denied access to the permanent housing benefits of the Program by reason of their disabilities.

91.     The County knew or should have known that people with disabilities were being denied equal access to the Program, particularly after receiving Plaintiffs' Requests for reasonable modifications under the ADA.  Despite this knowledge, the County refused to modify the Program to accommodate people with disabilities, instead choosing to characterize those remaining on the Riverbed as "service resistant" and to continue with their forced eviction.

92.     The County's abrupt eviction of people living at the Riverbed discriminates against people with disabilities by forcing them to leave their only stable living environment even though they have not been afforded equal access to the Program, aggravating mental health conditions and putting their health and safety at risk.

**B.   The Program Assessments Discriminate Against People With Disabilities, Particularly Mental Health Disabilities**

93.     According to the United States Interagency Council on Homelessness ("USICH"), composed of nineteen federal cabinet and agency heads, "intensive and persistent outreach and engagement" is required to reach the most vulnerable members of the homeless community.  The County knew or should have known that it takes time, multiple contacts, and a validating therapeutic approach in order to make the Program accessible to homeless individuals, who disproportionately have experienced trauma and its associated mental and physical disabilities.[33]  The County's failure to tailor assessment questions, to use appropriately trained staff, and to conduct the assessments in a

---

[33] E. Cronin, et al., *The impact of the therapeutic alliance on treatment outcome in patients with dissociative disorders*, Eur. J. Psychotraumatology Vol. 5 (2014) (discussing the importance of using the "therapeutic alliance" in the provision of services to people experiencing mental health conditions related to trauma, including building rapport and being empathetic and kind during interactions).

31

disability appropriate setting discriminates against people with disabilities by re-traumatizing individuals and triggering mental health symptoms.

94.     The County knew or should have known that its assessments, including the VI-SPDAT and HCA assessments, are insufficient to elicit information about a person's disability and how that disability impacts their housing needs.

95.     The VI-SPDAT does not include any medical record review, clinical evaluation, or questions tailored to accomplish a comprehensive assessment of physical or mental health conditions that would allow the County to match those individuals with disability appropriate housing.  Nor did the County use tools tailored to make the assessment accessible to people with mental health disabilities, such as beginning the assessment with validating questions or questions designed to build trust and rapport.

96.     The assessment conducted by HCA is even more cursory than the VI-SPDAT.  Although HCA's assessment is conducted by Mental Health Specialists, it does not include any questions about the person's background, the trauma they have experienced, the nature of their disabilities, or even whether they have ever been treated for a mental health condition.  Moreover, the County made no attempt to create a private space to conduct the assessment, for example by setting up a tent or driving a trailer throughout the Riverbed encampments to conduct proactive outreach and use as a mobile assessment space.

97.     As a result, the assessments discriminate against people with disabilities because it screens them out of the Program by deeming them "service resistant" or by awarding them a lower VI-SPDAT score that makes them ineligible for higher levels of housing assistance appropriate to their needs.

**C.  The Program Excludes Some People With Disabilities Entirely**

98.     The County knew or should have known that its Program would be inaccessible to some people experiencing disabilities because many of the Program assessments were conducted by the Sheriff on joint patrols with local police, including Anaheim and Orange Police Department officers. Even where HCA conducted the assessments, HCA staff was in uniform and was often accompanied by law enforcement.

99.     The presence of law enforcement makes it unlikely that people who have experienced trauma and its associated disabilities would feel comfortable enough to be able to fully participate in the assessment and share sensitive personal information.  Indeed, many people with mental health conditions report being "scared" of talking to County workers and often hide when County workers come to the Riverbed.  As a result, some people with disabilities are not assessed and/or are deemed "service resistant," and are thereby excluded from the Program altogether.

**CAUSES OF ACTION**
**FIRST CAUSE OF ACTION**
**Violation of Americans with Disabilities Act**
**(42 U.S.C. § 12132)**

100.    Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

101.    Title II of the ADA, 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

102.    Plaintiffs are "qualified persons with disabilities" as defined under the ADA.  42 U.S.C. § 12102; 42 U.S.C. § 12131; 28 C.F.R. § 35.104.

103.    Under the ADA's broad language, a "program, service, or activity" includes within its scope "anything a public entity does."  *Yeskey v. Pennsylvania Dep't of Corr.*, 118 F. 3d 168, 171 & n. 5 (3d Cir. 1997), *aff'd* 524 U.S. 206 (1998) (quoting 28 C.F.R. Pt. 35, App. A, preamble to ADA

33

regulations).  At all times relevant to this action, Defendant has been a public entity within the meaning of Title II of the ADA and has provided programs, services, or activities to the public.  The County's Program, including the assessment of each Riverbed resident in order to relocate them from the Riverbed to appropriate housing solutions, is a service, program, or activity of the County.

104.    Title II protects people with disabilities from facially neutral policies that burden people with disabilities more than others, by requiring that the public entity provide reasonable modifications to avoid the discrimination unless the public entity can demonstrate that such modifications would result in a fundamental alteration of the program.  28 C.F.R. § 35.130(b)(7); *Crowder v. Kitagawa*, 81 F. 3d 1480 (9th Cir. 1996).  A failure to provide such modifications is an independent basis for liability under the ADA.  28 C.F.R. § 35.130(b)(7)(i); *Wis. Cmty. Servs. v. City of Milwaukee*, 465 F.3d 737, 751 (7th Cir. 2006).

105.    Reasonable modifications can adjust for the financial limitations that arise from a disability, not just the immediate manifestations of the impairment that gives rise to the disability.  *Giebeler v. M & B Associates*, 343 F. 3d 1143, 1152 (9th Cir. 2003).

106.    Plaintiffs are eligible for the Program and requested reasonable modifications that would not fundamentally alter the nature of the service provided.  By refusing to reasonably modify their policies and practices as described herein to refrain from evicting Plaintiffs from the Riverbed until Plaintiffs are able to access the Program in a way that reasonably accommodates their disabilities and affords them an opportunity to access the benefits of the Program, including the provision of affordable, accessible and disability appropriate housing, Defendant has violated and continues to violate the antidiscrimination requirements of Title II of the ADA.

107.    Title II also protects people with disabilities against intentional discrimination by a public entity where the public entity has knowledge that a harm to a federally protected right is substantially

likely and fails to act upon that the likelihood. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001). Defendant intentionally discriminated against Plaintiffs and other homeless residents with disabilities because they had had knowledge that the majority of Riverbed residents are disabled and because Plaintiffs alerted Defendant to the need for accommodations, yet Defendant failed to modify the Program to allow equal access to the Program and deliberately refused to engage in the interactive process with Plaintiffs.

108. Title II regulations interpreting the ADA prohibit a public entity from utilizing criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination based on disability. 29 C.F.R. § 35.130(b)(3).

109. A public entity is also prohibited from imposing eligibility criteria that screen out or tend to screen out individuals with disabilities from fully and equally enjoying any service, program, or activity. 28 C.F.R. § 35.130(b)(8).

110. It is Defendant's policy and practice to administer the Program without accommodating for people with disabilities, including by employing an assessment that does not appropriately identify and assess disabilities and does not connect people with disabilities to disability appropriate housing. This failure to accommodate people with disabilities has the effect of discriminating against and imposing disproportionate burdens on people with disabilities based on their disability, screening out such persons from the benefits of the County's Program, and denying them meaningful access to such benefits compared to the amenities enjoyed by and available to people without disabilities.

111. In carrying out Defendant's policies and practices as described herein, Defendant has utilized criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination based on disability. 29 C.F.R. § 35.130(b)(3).

112.     In carrying out Defendant's policies and practices as herein described and denying Plaintiffs'

request for reasonable modification in violation of Plaintiffs' rights under the ADA, Defendant has

acted knowingly and with deliberate indifference to the harm substantially likely to occur.

113.     Plaintiffs are entitled to injunctive and declaratory relief, attorneys' fees and costs.

### SECOND CAUSE OF ACTION
### Violation of § 504 of the Rehabilitation Act of 1973
### (29 U.S.C. § 794)

114.     Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs

as if fully set forth herein.

115.     Section 504 of the Rehabilitation Act of 1973 requires that qualified persons with disabilities

be provided with meaningful access to federally funded programs.  In order to ensure meaningful

access, reasonable modifications may be required unless the recipient of federal funding can

demonstrate that such modifications would result in a fundamental alteration in the nature of the

program.  29 U.S.C. § 749; 24 C.F.R. §§ 8.3 and 8.4; *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

116.     At all times relevant herein, Defendant has been the recipient of financial assistance from the

federal government and the Program which discriminates against Plaintiffs, upon information and

belief, is federally funded.

117.     Defendant's actions and omissions as herein stated have denied Plaintiffs' rights to reasonable

modifications, thereby denying them meaningful access to the Program and to the amenities that the

County offers residents without disabilities, thereby subjecting them to discrimination on the basis of

disability in violation of section 504 of the Rehabilitation Act.

118.     Plaintiffs are entitled to injunctive and declaratory relief, and attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
**Violation of Substantive Due Process: State Created Danger / Reckless Endangerment**
**(42 U.S.C. § 1983; Fourteenth Amendment)**

119.    Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

120.    Under the Substantive Due Process Clause of the Fourteenth Amendment, the state deprives a person of a substantive due process right if it affirmatively places the person in a position of danger. *Wood v. Ostrander*, 875 F. 2d 578, 583 (9th Cir. 1989).

121.    Defendant has acted and continues to act affirmatively as described herein to place Plaintiffs in a highly dangerous situation that they would not otherwise face, threatening Plaintiffs' health and safety, risking serious exacerbation of their disabilities, and putting their lives at risk.

122.    Defendant has acted affirmatively by implementing a comprehensive plan to assess Plaintiffs and relocate them without affording them meaningful access to the benefits of the Program, including housing that accommodates their disabilities.  By failing to modify the assessment to accommodate Plaintiffs' disabilities, Defendant has exposed Plaintiffs to flashbacks, re-traumatization, heightened mental health symptoms, and psychological damage.  Further, by pushing Plaintiffs to go to temporary shelters without any accommodation for their disabilities, Defendant has subjected Plaintiffs to dangers that put their health and well-being at risk, including aggravation of their mental health conditions and physical disabilities, loss of property that is essential to their survival, and the loss of the stability and community that is available to them at the Riverbed.

123.    In the absence of Defendant's affirmative actions, Plaintiffs would not face these highly dangerous situations.  Plaintiffs knew or reasonably should have known that their actions would create these threats to Plaintiffs' health and safety.

37

124.    Defendant acted with reckless disregard or deliberate indifference to the dangers they were creating for Plaintiffs because Defendant knew or should have known that Plaintiffs and other homeless individuals at the Riverbed experience disabilities, are chronically homeless, and have no other viable options for shelter, in violation of Plaintiffs' substantive due process rights under the Fourteenth Amendment to the U.S. Constitution.  *Wood*, 875 F. 2d at 583.

125.    As a result of Defendant's actions, Plaintiffs' health and safety have been placed in grave danger in violation of the Fourteenth Amendment.

126.    An actual controversy exists between Plaintiffs and Defendant as to whether Defendant has violated and/or are imminently threatening to violate 42 U.S.C. § 1983.  Plaintiffs have no adequate remedy at law for the violations stated herein and are therefore entitled to injunctive, declaratory, and other equitable relief.  Plaintiffs are also entitled to attorneys' fees and costs.

**FOURTH CAUSE OF ACTION**
**Equal Protection**
**(Fourteenth Amendment, U.S. Constitution; Art. 1 § 7, California Constitution)**

127.    Equal protection requires that the same means and methods be applied impartially to all constituents, so that the laws operate equally and uniformly on all persons in similar circumstances, meaning that persons who are similarly situated with respect to a law must be treated alike.

128.    As a result of Defendant's unequal treatment of disabled homeless individuals, Plaintiffs are intentionally and arbitrarily denied protections of their rights and have suffered from unequal treatment under the law solely on the basis of their being disabled and homeless.

**FIFTH CAUSE OF ACTION**
**Violation of Bane Act**
**(California Civil Code § 52.1)**

129.    Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

130.    California Civil Code § 52.1, also known as the "Bane Act," provides a cause of action to individuals whose exercise or enjoyment of rights secured by the United States and/or California Constitutions and other laws has been interfered with, or attempted to be interfered with, by another's threat, intimidation, or coercion.

131.    By their conduct and actions as set forth herein, Defendant has interfered with, has attempted to interfere with, and continues to interfere with, by threat, intimidation, and/or coercion by the Orange County Sheriff and citations, arrests, and punishments or the threat thereof, Plaintiffs' exercise of their rights to meaningfully access the County's Program, as those rights are secured by federal and state statutory protections guaranteed to individuals with disabilities.

132.    There was and is no lawful justification for Defendant to threaten, intimidate, or coerce any of the Plaintiffs or to attempt to use threats, intimidation, or coercion as described herein to interfere with Plaintiffs' exercise of their rights.  Defendant's actions were and are taken willfully and with malice and oppression in order to deter and/or prevent Plaintiffs from exercising their rights.

133.    As a direct and legal result of Defendant's actions, Plaintiffs are entitled to injunctive relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray as follows:

134.    For a declaratory judgment that Defendant's Program and the eviction of Plaintiffs and other homeless individuals with disabilities from the Riverbed discriminates on the basis of disability in violation of the ADA, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794;

135.    For a declaratory judgment that Defendant's policies, practices and conduct as alleged herein violate Plaintiffs' rights under the United States and California constitutions and the laws of the United States and the State of California;

136.    For a temporary restraining order, preliminary and permanent injunction, enjoining and restraining Defendant from engaging in the policies, practices and conduct complained of herein, specifically that Defendant be enjoined from evicting Plaintiffs and other homeless residents with disabilities from the Riverbed without first modifying the Program to enable people with disabilities to meaningfully participate in the Program and to access the benefits of the Program, including disability appropriate housing;

137.    For an award to Plaintiffs of reasonable attorneys' fees;

138.    For an award to Plaintiffs costs of suit; and

139.    For any such other and further relief that the Court deems just and proper.


Dated: February 7, 2018

                                Respectfully submitted,

                                LEGAL AID SOCIETY OF ORANGE COUNTY


                                ___/S/___ Lili V Graham_____ _____
                                By: LILI V GRAHAM