1 | **BROOKE WEITZMAN** SBN 301037
**WILLIAM WISE** SBN 109468
2 | **ELDER LAW AND DISABILITY RIGHTS CENTER**
1535 E 17th Street, Suite 104
3 | Santa Ana, California 92705
t. 714 617–5353
4 | e. bweitzman@eldrcenter.org
e. bwise@eldrcenter.org
5 |
6 |
7 | **CAROL A. SOBEL** SBN 84483
**MONIQUE ALARCON** SBN 311650
8 | **AVNEET CHATTHA** SBN 316545
**LAW OFFICE OF CAROL A. SOBEL**
9 | 725 Arizona Avenue, Suite 300
Santa Monica, California 90401
10 | t. 310-393-3055
e. carolsobellaw@gmail.com
11 | e. monique.alarcon8@gmail.com
e. avneet.chattha7@gmail.com
12 |
13 | ATTORNEYS FOR PLAINTIFFS
[ADDITIONAL COUNSEL ON NEXT PAGE]

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| Orange County Catholic Worker, et al., <br><br> Plaintiffs, <br><br> v. <br><br> County of Orange, et al., <br><br> Defendants. | Case No.: 18-CV-00155-DOC-KES <br><br> PLAINTIFFS' REPLY TO TO OSC RE ISSUANCE OF A PRELIMINARY INJUNCTION <br><br> Date: Tuesday February 13, 2018 <br> Time: 8:00 AM <br> Ctrm: SA 9D |

1  **PAUL L. HOFFMAN** SBN  71244
2  **CATHERINE SWEETSER** SBN 271142
   **COLLEEN M. MULLEN** SBN 299059
3  SCHONBRUN, SEPLOW, HARRIS & HOFFMAN
4  11543 W. Olympic Blvd.
   Los Angeles, California   90064
5  t.  310-396-0731
6  e. hoffpaul@aol.com
   e. csweetser@sshhlaw.com
7  e. cmullen@sshhlaw.com

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I. INTRODUCTION

Defendants fail to counter the irrefutable evidence that, on any given night, there is not adequate shelter for nearly half of the estimated 4800 unhoused individuals in the County.[1] Defendants also fail to defeat Plaintiffs' evidence of past and ongoing threats of citation and arrest simply for existing in public spaces in Orange County. Because Plaintiffs have demonstrated a likelihood of success on the merits and irreparable harm, the requested Preliminary Injunction should issue to stop evictions from the *Schuler* Injunction Area for trespass until appropriate alternatives are found. Moreover, this court should enjoin the ordinances criminalizing Plaintiffs for simply existing and sleeping in public places until adequate shelter is provided.

## II. THE COURT SHOULD ENJOIN CLOSURE OF THE *SCHULER* INJUNCTION AREA UNTIL ADEQUATE SHELTER IS FOUND.

### A. The County's Evidence Confirms No Shelter Is Available.

Contrary to the County's assertions, Plaintiffs address both the type and number of shelter beds available. Plaintiffs estimate 800 to 1200 people are currently in the Riverbed.[2] Even using the County's numbers, City Net interacted with 623 people and witnessed "202 street exits," leaving at least 421 people with known County contacts

---

[1] Defendant County submits data to the Department of Housing and Urban Development annually for a "Housing Inventory Count Report." A true and correct copy of the 2017 report is attached at Exhibit 26. It lists 951 "emergency, safe haven and transitional" units, but does not include the Courtyard or Bridges, so the 951 number is lower than Plaintiffs' estimated number of shelter beds and does not factor in the 7% increase in the number of homeless individuals in the 2017 PIT. https://www.hudexchange.info/programs/coc/coc-housing-inventory-count-reports/?filter_Year=2017&filter_Scope=CoC&filter_State=CA&filter_CoC=CA-602&program=CoC&group=HIC.

[2] The Orange County Veteran and Military Family Collaborative receives reports from Volunteers of America, a non-profit entity funded by the Veterans Adminstration to, in part, maintain a by-name list of unsheltered veterans in the County. The list currently shows well over 400 homeless Veterans. Ex. 29.

in the Riverbed as of January 2018.[3] Price Decl. ¶6. Thus, the County's belated assertion that there are only 300 people left in the Riverbed is not supported by evidence.[4] The County admits that it does not have 300 beds available.[5] Last week, there were several hundred fewer beds because the two armories closed for military use and the replacement locations provided about a third of the space at the armories and even more hurdles for those with disabilities. *See* Decl. of Harry Langbacher at ¶¶8-10 and Exhibit 27 (closures and alternate location on Mercy House volunteer website.

No Defendant submitted evidence that contradicts Plaintiffs' evidence that the only shelters not at or near full capacity are the Armories. *See* Garrow Decl. ¶20; Christie Decl.¶¶6-9 (demand for beds at Bridges exceeds supply); Langenbacher Decl. ¶4 (Bridges full most nights with a waiting list); Hoiberg Decl.¶7 (people camped outside Courtyard; full capacity) [Dkt #30]; Weitzman Decl. Exh. 18 (County email: fewer than 20 beds at Courtyard); Carroll Decl. ¶8 (turned away from Courtyard) [Dkt. #25]; Gainers Decl. ¶¶3-6 (told repeatedly no beds at Courtyard). The County provides vague, unsupported claims of "openings daily" at Bridges and the Courtyard. Price Decl. ¶14. These assertions are contradicted by Anaheim. *See infra* fn.8. The County refers to beds that are not prioritized for, or limited to, people in the Riverbed. If they

---

[3] Even assuming these numbers are correct and no other barriers exist to staying at the Armories until they close in six weeks, the County estimate of 170 beds to 200 beds available nightly at the Armories is still much lower than estimate of the number of people now living in the Injunction Area. *See* Exh. 18.

[4] Mr. Kim's statement of the number of people in the Riverbed currently, Kim Decl. ¶11, is not supported by any objective evidence and is contradicted by CityNet reports, Amicus LASOC, and the Orange County Catholic Worker evidence.

[5] The County claims there were 248 shelter vacancies as recently as January 1, 2018 (Kim Decl. ¶9), but this was prior to closure notices posted on January 3 and before City Net increased efforts to move people to shelters. Plaintiffs believe that 80% of the 248 spaces are inadequate mats at the armories and beds reserved for law enforcement drops. Except for the armories, all shelters are at or near capacity each night.

2

exist, they could as readily be filled by the hundreds currently camped in the Civic Center.

Defendants argue that Plaintiffs have been offered and rejected shelter,[6] Plaintiffs demonstrated why the shelters do not accommodate their disabilities,[7] family status, work schedules, or other factors.[8] The inescapable reality is that the shelters that would be available to Plaintiffs -- excluding all that restrict admission by gender, family status, location, age and other factors, including length of stay - or those such as Bridges that require referral by an approved agency, or that a person be able-bodied and pay a fee for participation in a program - are already at capacity every night.[9]

### B. Plaintiffs Have Standing to Challenge the County's Actions

Neither a conviction or citation is required for standing to challenge a criminal statute, because a direct injury may occur "even earlier" in the criminal process. *Jones,*

---

[6] The Cities' reliance on *Bell v. City of Boise*, 834 F.Supp. 2d 1103 (D. Idaho 2011), r'vd on other grounds, 709 F.3d 790 (9th Cir. 2003), is unavailing. Under *Jones v. City of Los Angeles*, 444 F.3d 1118, 1132 (9th Cir. 2006), vacated on other grounds, 505 F.3d 1006 (9th Cir. 2007), when "the number of homeless persons ... far exceeds the number of available shelter beds[,]" it violates the Eighth Amendment to enforce laws like Boise's. *See* U.S. Statement of Interest, Ex. 28 at p.13. The *Boise* court found that the law was not enforced on nights there were no shelter beds available. The case is again on appeal. *Robert Martin v. City of Boise*, Cir. Case No. 15-35845: argued www.https://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000011939.

[7] As Plaintiffs argue in their motion, "access to a bed is an integral part of the 'adequate shelter' mandated by the Eighth Amendment." See *Thomas v. Baca*, 514 F. Supp. 2d 1201, 1216 (C.D. Cal. 2007); see also *Lareau v. Manson*, 651 F.2d 96, 107 (2d Cir. 1981) (forcing individuals to sleep on mattresses on floor "do[es] not provide minimum decent housing" necessary to "pass constitutional muster").

[8] *Ramirez v. The County of Orange*, 8:18-cv-00220-DOC-JDE, is also before the Court, raising similar claims of the failure of shelters to accommodate the disabilities of unhoused persons in the Riverbed.

[9] *See* fn. 5, *supra*. *See also* Amicus Letter of Legal Aid Society of Orange County, Dkt. 70 at 1, Ex. A; Garrow Decl. ¶¶19-24 (number of homeless exceed transitional and emergency shelter spots by about two-to-one; Courtyard is either at capacity or unfit for disabled persons); Ex Parte Mem. at pp. 5-7; Fields Supp. Decl. ¶¶1-3.

3

444 F.3d at 1129 (citing *Dickey v. Florida,* 398 U.S. 30, 43 (1970)); *see also* Ex Parte Mem. at 12-15. Plaintiffs need not be cited for trespassing or nuisance to bring their Eighth and Fourteenth Amendment claims. *See* Pl. Ex Parte Mem. at pp. 12-15. It is sufficent that Ms. Fields was detained by officers on suspicion of trespassing. Fields Supp. Decl. ¶¶9. The County reaffirmed its intent to cite and arrest Plaintiffs immediately and would have done so absent the emergency stay. Dkt. 52-1, 55.

Since *Jones,* the Supreme Court has twice held that imminence does "not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced." *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 128–29 (2007); *accord Susan B. Anthony List v. Driehaus,* 134 S. Ct. 2334, 2346 (2014) (threat of criminal enforcement sufficient). Here, Plaintiffs *actually* exposed themselves to liability as they have stayed in the Riverbed. Ex.7.

## II. A PRELIMINARY INJUNCTION SHOULD ISSUE AS TO THE CITIES

### A. City of Anaheim

#### 1. Plaintiffs have shown a likelihood of success of finding Anaheim's camping ordinance unconstitutional as applied

The City of Anaheim relies heavily on the fact that sleeping is permitted within city limits as long as it is inside a park, with limited property (i.e., while not "us[ing] or maintain[ing] luggage" or "sleeping bags"), §§11.10.020, 11.10.030, and only during the day. Anaheim Opp. pp. 2-3, 6-7, 10-12. The test for the Eighth Amendment cannot be whether a person has a place to sit during the day. It must be, as with counting presence in shelters, whether a person may be arrested because they have no place to sleep at night.[10] Being forced to stay up all night is not a viable option: sleep is "an

---

[10] The City-Net survey results submitted by Anaheim confirm Plaintiffs' estimate of the number of unhoused persons in the City. There are 906 homeless individuals in Anaheim, almost 800 (88%) of whom are unsheltered. Anaheim Opp Ex. 6.

identifiable human need." *Walker v. Schult*, 717 F.3d 119, 121-22 (2d Cir. 2013). Loss of sleep causes or exacerbates cardiovascular disease and cancer.[11] Also, the rest of the world is not on this night schedule. Homeless people have meetings with social service and medical providers, attend treatment and training programs, and some work during the day. They cannot sleep all day and wander the streets all night to avoid arrest.

Anaheim's attempt to distinguish sleeping from camping is unavailing. A person forced to sleep outside must use a tent, tarp, or sleeping bag to protect themselves and their property from the elements, especially in cold wet weather. To make criminal the use of items to keep oneself warm would violate Plaintiffs' constitutional rights. See *Wilson v. Seiter,* 501 U.S. 294, 304 (1991) ("low ... temperature at night combined with a failure to [provide[ blankets" produced a "mutually enforcing effect," showing the loss of warmth, an identifiable human need). *See also Palmer v. Johnson*, 193 F.3d 346, 353 (10th Cir. 1996) (inmates forced to sleep outside without blankets, extra clothing or shelter in temperatures below 59 degrees suffered a denial "of the minimal civilized measure of life's necessities").

### 2. The harm is imminent to Plaintiffs who intend to stay in Anaheim if forced to leave the Riverbed

Plaintiffs Bell and Carroll have alleged that if the Riverbed is closed, they intend to move back into Anaheim. Bell Supp. Decl. ¶¶2-3, Carroll Supp. Decl. ¶¶2-3. The Work Notice announced that the Santa Ana Riverbed section where Bell and Carroll live would be closed as of January 22. Pl. Ex.7. Anaheim officials made public statements reiterating the City's contention to enforce its anti-camping law with the Riverbed closure. Pl. Ex.21 at 6. On February 8, Plaintiff Raltson was arrested by Anaheim officers for violating the ordinances challenged here. Ralston Supp. Decl. ¶¶5-9. As a result, he lost his property and his support dog. *Id.* ¶¶10-13. This demonstrates

---

[11] https://www.sciencedaily.com/releases/2015/01/150105081757.htm

an imminent threat of enforcement and support his fear of arrest. *Id.* ¶14.

### C. City of Costa Mesa

#### 1. Ms. Fields has presented evidence of irreparable harm

Ms. Fields presented evidence that she had been cited and threatened with citation at night in the City of Costa Mesa. Dec. of Fields, ¶10-13. She also explained why she asked for a residence in Costa Mesa, as her job is there and her social worker is there. Fields Decl. ¶¶3, 6. Ms. Fields stated that officers told her that she could be cited for violating the anti-camping ordinance if she continued to engage in unavoidable behavior - sleeping - in Costa Mesa. Fields Decl. ¶14. This is ample evidence of imminent, irreparable harm. The fear of citation is currently constraining her from residing in Costa Mesa. Fields Decl. ¶15. She works in Costa Mesa and lived there until she became homeless. Fields Decl. ¶¶3,10. A preliminary injunction would allow her to return to Costa Mesa to be closer to her job and her case worker.

#### 2. Costa Mesa's "voluntary" cessation of an unlawful policy does not moot the need for an injunction.

The Ninth Circuit found in *Bell* that a city could not moot a duly enacted anti-camping ordinance by simply declaring itself to have a policy that the law would not be enforced at night. *Bell v. City of Boise*, 709 F.3d 890, 900 (9th Cir. 2013) (reversing and remanding to the district court). Costa Mesa cannot now moot its law by claiming an unwritten policy not to cite or ticket people at night. The City's opposition proves that this "policy" is, at best, discretionary. Costa Mesa Supp. Opp. at 9.[12] The evidence shows that police have been enforcing the ordinance as codified. Dkt. 61-3 at 36-37 (misdemeanor citations to couple sleeping under blankets outside a park at night). The police knew the individuals to be homeless when they cited them. *Id*. at 34. ("[T]hey had

---

[12] Costa Mesa produces a weekly report of homeless individuals assisted. In the week of January 7 to January 13, the City reported "temporary housing" for three chronically homeless" now in a local jail. Ex. 30.

been sleeping there for quite some time. I have received multiple calls for service regarding Ross and Day camping on ... city sidewalks in the past.").

Nor does Costa Mesa's opposition state that the policy is available to or known by the general public. Fields Supp. Decl. ¶6. Ms. Fields gets off work at 11:00 p.m. and does not get back to her tent until 2:00 a.m. some nights because of the bus schedule. *Id.* ¶3. She cannot sleep in a shelter with a curfew because of her work. Ms. Fields was told that, to avoid receiving tickets, she would need to leave the city; she was not told she could sleep in the park at night if she woke up earlier. Fields Supp. Decl. ¶6.

### 3. Costa Mesa's statute is unconstitutionally vague.

The examples Costa Mesa provides prove that its statute is unconstitutionally vague as it is unclear what constitutes "camp paraphernalia" under the statute. Individuals were cited for sleeping "inside a sleeping bag" with a "pillow," having a "supply of food in bags and boxes" and "a large orange water cooler" and other "carts" and "bins". Dkt. 61-3 at 4. The nighttime citations issued to Mr. Ross and Ms. Day occurred not when they were using a tent but for sleeping with "shopping carts" and "blankets." Dkt. 61-3 at 34. Mr. MacDonald was sleeping in a public parking lot inside a sleeping bag and with a bicycle, Dkt. 61-3 at 46; Ms. Evatt was ticketed outside the senior center when she was sleeping near "bedding, clothes, a baby stroller, wheeled luggage, a back pack, a purse, food, a pitcher of water," Dkt. 61-3 at 40. If possessing luggage and a backpack constitutes camping, anything could be considered "camp paraphernalia." This is essentially an anti-sleeping statute.[13]

---

[13] Defendants rely upon *Lehr v. City of Sacramento*, 624 F. Supp. 2d 1218 (E.D. Cal. 2009), and *Ashbaucher v. City of Arcata*, 2011 WL 11211481 (N.D. Cal. 2010). Those cases are neither binding nor persuasive. Both courts found that sleeping on the street was conduct rather than status, even though plaintiffs had nowhere else to sleep. Both cases directly contradict the Ninth Circuit's ruling in *Jones*. For this reason, several courts have rejected the *Lehr* rationale. *See Anderson v. City of Portland*, 2009 U.S. Dist. LEXIS 67519, 2009 WL 2386056 (D. Oregon Jul. 31, 2009); *Cobine v. City of Eureka*, 250 F.Supp.3d 423, 431 (ND CA 2017); and *Sanchez v. City of Fresno*, 914

### 4. The irreparable harm to Plaintiffs outweighs the City's interest in citing them for camping.

Costa Mesa claims that the threats and citation issued to Ms. Fields were "mistakes" and contrary to the City's "practice" of not enforcing the anti-camping ordinance. La Pointe Decl. ¶ 9. An injunction will codify this informal practice so that there will be a written and nonrepealable policy, thus avoiding purported "mistakes." As the City notes, it has other laws to curtail unlawful *behavior*, as opposed to status. *See* Opp. at 8; Sharpnack Decl. (Dkt. 61-3) ¶11. The city's concerns about "attractive and blight-free condition[s]," Opp. at 8, are outweighed by Plaintiffs' constitutional rights. *Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005, 1019-20 (2011).

**D. City of Orange**

### 1. Plaintiff Ralston's detention by City of Orange Police demonstrates harassment simply for being present in public

Defendant City of Orange argues that, because no Plaintiffs were cited for a violation of Orange Municipal Code (OMC) 12.66.030, no imminent threat of irreparable harm exists. This assertion is belied by recent public statements of City officials, expressly threatening enforcement of anti-camping and other laws if homeless persons evicted from the Riverbed try to enter and stay in Orange. One councilmember posted on social media: "I asked the City attorney to review our laws strictly focusing on the laws of Panhandling, Vagrancy, Loitering and Anti-camping...my hope in this review is that the Attorney will find more ways for the City to help the 'homeless to move along' and leave our city." [Dkt.#17, p.29 (Ex. 22)]. In another, the councilman stated that the City has "developed an operational plan to minimize the migration of homeless into [the] City" and encourages residents to contact the Orange Police if they see "questionable activities." Pl. Ex. 22. The Orange Police Department distributed a flyer inviting residents to contact the police if they see a suspicious person or activity by

---

F.Supp.2d 1049, (ED CA 2012).

8

people living the Riverbed. Pl. Ex. 8. Together, these facts prove the imminent threat of citation for violating OMC 12.66.030 by sleeping on a sidewalk with a tent or blanket. Shoemake ¶¶14-17; Ralston ¶¶7-8, 16; Schuler ¶¶3, 7. [Dkt. 26,21,23]

The City of Orange asserts that it does not issue citations for OMC 12.66.030 until an officer first offers services to a person. Plaintiff Ralston's recent experience disproves this.[14] He was detained by officers while he was on a public sidewalk with his property neatly packed up and to the side. Officers cited him, offering no services other than a ride to a temporary shelter. *Id.* Mr. Ralston's conduct at the time fully comported with the decision in *Lavan v. City of Los Angeles*, 693 F.3d 1022, (9th Cir. 2012), holding that municipal laws do not trump the constitutional rights of homeless individuals to keep personal property on a public sidewalk while they "attend[] to necessary tasks such as eating, showering, and using restrooms." *Id.* at 1023.

**2. The harm to plaintiffs is imminent and ongoing**

Plaintiffs were ordered to leave the Riverbed immediately under threat of arrest by the County for trespass, which would have occurred but for the Court's emergency order. At the same time, the City of Orange has posted fliers, advising local residents and businesses that the Riverbed is being closed and asking residents to call if they suspect violations of the law by the homeless community forced out of the Riverbed, including the City's laws challenged here as unconstitutional. The plaintiffs who lived in Orange, or recently attempted to leave the riverbed in Orange, have faced citation and harassment. Shawn Carroll was recently stopped and warned that the police would have a "zero tolerance policy for the homeless." Decl. of Carroll, ¶12.

The City does not deny that its officers tell homeless people within city limits that they face arrest for violating the anti-camping law. In fact, the City admits to an enforcement policy based on complaints by nearby residents about homeless person's

---

[14] Ex. 33 (https://www.youtube.com/watch?v=xz2uAj_11No&feature=youtube)

presence. Orange Opp. p.1. This deters homeless people from sleeping in Orange, making the harm imminent and ongoing. *Susan B. Anthony List,* 134 S.Ct. at 2347 (forced refrain from constitutionally protected conduct is a "substantial hardship").

### 3. The evidence proves a lack of shelter in the City of Orange

Finally, the City of Orange argues that lack of beds should be made on a City rather than County level. City of Orange Opp. to Ex Parte at 7:4-16. The City Net census conducted in late 2017 reported at last 205 people in the Riverbed are from Orange. Pl. Ex. 6. While the City is part of Bridges in Anaheim, that shelter only has 100 beds, admits people from nine cities, and is always at or near full capacity.[15] The only shelter actually located in the City is Casa Teresa Emergency Maternity Shelter. *See* Casa Teresa Annual Report.[16] Thus, whether measured by City or County-wide, the facts lead to the same result: homeless people in Orange have no choice but to sleep outside.

## III. CONCLUSION

For all of the foregoing reasons, Plaintiffs met their burden to show a "serious question," if not a likelihood of success on the merits, and irreparable harm from the imminent violations of their constitutional rights if the requested relief does not issue.

Dated: February 12, 2018                Respectfully submitted,

Elder Law and Disability Rights Center
Law Office of Carol A. Sobel
Schonbrun Seplow Harris & Hoffman

   /s/   Carol A. Sobel
By: CAROL A. SOBEL
Attorneys for Plaintiffs

---

[15] Anaheim confirms the lack of shelter. "Currently, homeless residents have trouble accessing an emergency shelter. ... [T]o utilize one of the 100 beds at Bridges at Kraemer, one must be referred to the shelter, must be 18 years old or older ... The Anaheim Police Department conducts their own homeless outreach, so they have been provided with five beds. The amount of guaranteed beds at Bridges at Kraemer is not sufficient to address the current number of unsheltered Anaheim residents. ... Although [the Fullerton] armory is available ... , this emergency shelter is seasonal and all clients must exit the shelter at 6 a. m." Dkt. 59-6, p.13.

[16] http://casateresa.org/wp-content/uploads/2017/01/Casa-Teresa-15annualreport-11.pdf