

# TENT CITY, USA

The Growth of America's
Homeless Encampments and
How Communities are Responding

NATIONAL LAW CENTER
ON HOMELESSNESS & POVERTY

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

# ABOUT THE NATIONAL LAW CENTER ON HOMELESSNESS & POVERTY

The National Law Center on Homelessness & Poverty is the only national legal group dedicated to ending and preventing homelessness. It works to expand access to affordable housing, meet the immediate and long-term needs of those who are homeless or at risk, and strengthen the social safety-net through policy advocacy, public education, impact litigation, and advocacy training and support.

We believe all human beings have the right to a basic standard of living that includes safe, affordable housing, healthcare, and freedom from discrimination and cruelty.

For more information about the Law Center and to access publications such as this report, please visit www.nlchp.org.

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

## BOARD OF DIRECTORS | 2017

**Edward R. McNicholas**
*Chair*
Sidley Austin LLP

**Bruce E. Rosenblum**
*Vice-Chair*
The Carlyle Group

**Robert C. Ryan**
*Treasurer*
American Red Cross

**Kirsten Johnson-Obey**
*Secretary*
NeighborWorks America

**Eric A. Bensky**
Schulte Roth & Zabel LLP

**Paul F. Caron**
Microsoft Corporation

**Bruce J. Casino**
*Attorney*

**Rajib Chanda**
Simpson Thacher & Bartlett LLP

**Dwight A. Fettig**
Porterfield, Fettig & Sears LLC

**Julia M. Jordan**
Sullivan & Cromwell LLP

**Steve Judge**
Private Equity Growth Capital Council (retired)

**Father Alexander Karloutsos**
Greek Orthodox Archdiocese of America

**Georgia Kazakis**
Covington & Burling LLP

**Pamela Malester**
U.S. Department of Health and Human Services (retired)

**Tashena Middleton**
*Attorney*

**G.W. Rolle**
Missio Dei Church

**Jeffrey A. Simes**
Goodwin Procter LLP

**Vasiliki Tsaganos**

**Robert Warren**
People for Fairness Coalition

**Maria Foscarinis**
*President*
*Executive Director*

*Affiliations for identification purposes only*

## STAFF

**Driss Amara**
Social Work Intern

**Maggie Ardiente**
Development & Communications Director

**Tristia Bauman**
Senior Attorney

**Sonika Data**
Legal Intern

**Lisa DeBone**
Development & Communications VISTA

**Janelle Fernandez**
Law & Policy Program Coordinator

**Maria Foscarinis**
Executive Director

**Vincenza Githens**
Administrative Manager

**Janet Hostetler**
Deputy Director

**Sara Kang**
Networks VISTA

**Audrey Koontz**
Program Intern

**LaTissia Mitchell**
Executive & Development Specialist

**Michael Santos**
Attorney

**Darrell Stanley**
Database VISTA

**Eric Tars**
Senior Attorney

**Asritha Vinnakota**
Program Intern

# ACKNOWLEDGMENTS

**The National Law Center on Homelessness & Poverty is grateful to the following individuals and firms for their tremendous contributions to the research, writing, and layout of the report:**

Law Center staff, fellows, and interns, especially Eric S. Tars for serving as primary author and editor; Darrell Stanley, Michelle Loo (Emerson Hunger Fellow), Brian Davis (spring legal extern), Driss Amara (social work intern), and Hannah Mitchell (summer legal intern) for research and drafting; and Maria Foscarinis, Janet Hostetler, Tristia Bauman, and Janelle Fernandez for editing.

Guest authors, Kirsten Anderson, Southern Legal Counsel; Scott Dreher, Dreher Law Firm; Robert Gorrill, Just Housing; and Terese Howard, Denver Homeless Out Loud.

The following individuals contributed their time to interviews and/or shared information with the Law Center: Ellen Allen, Covenant House; Robert Clark, SCDOT; Kelley Cutler, SF Coalition on Homelessness; Stacey Denaux, One80 Place; Pastor David Greene, Purpose of Life Ministries; Anthony Haro, Lowcountry Homeless Coalition; Lon Klugman; Nicole Martinez, Mesilla Valley Community of Hope; Lydia Milnes, Mountain State Justice; Sam Petsonk, Mountain State Justice; Bronson Potter, City of Vancouver, WA; Amy Reynolds, SHARE; Councilman Leroy Robinson, City of Indianapolis; Don Sawyer, a Bigger Vision; Peggy Sheehan, City of Vancouver, WA; Andy Silver, Council for the Homeless; Jamie Spinelli, Community Services NW; Councilor Ty Stober, City of Vancouver, WA; Mayor John Tecklenburg, City of Charleston, S.C.; Sherry Weiwert, Downtown Indy; Alan Witchey, CHIP Indianapolis; Jeff Yungman, One80 Place.

This report would not have been possible without the support of our pro bono partners:

**Sullivan & Cromwell LLP,** in particular Joshua Handell, Matthew Wilson, Nicholas Loftus, Maggie Turner, Christen Boas Hayes, Elizabeth Ames, Khoa Tran, Anna Garnitz, Evan Sweeney, Olivia Desilva, and Laura Follansbee;

**Blank Rome LLP**, in particular Deborah Greenspan, David Grand, Rick Brooks, Adil Ahmed, Maria Carnicella, Carolyn Cody-Jones, Cole Duncan, Chrissy Dutton, Michael Guthrie, Noe Hamra, Munira Jesani, Cindy Moore, Daniel Oberdick, Courtney Presswood, Stefanos Roulakis, Amir Shiva, Lauren Wilgus, and Sophia Mitchell;

**Nixon Peabody LLP**, in particular Meghan Altidor, Conor Arpey, Christopher Azuoma, Theodore DiSalvo, Michael Haber, James Ingram, Anna Mikaelyan, and Shelby Nace;

**O'Melveny & Myers LLP**, in particular Chloe Chavez, Jeff Hoffner, David Lash, Dylan Towns, Eric Rodriguez, Maya Spitzer, Maha Syed, and Teo Stoica;

**Ballard Spahr LLP**, in particular Matthew Summers, Wendy Angus-Anderson, Lorna Banister, Lindsey Beideman, Andrew Brod, William Burton, Keli Colby, Elisabeth Connell, Jason Cover, John Engel, Allison Fresques, Carl Fridy, Allison In, Evan Krick, Chantelle McClamb, Bowen Ranney, Laurel Roglen, Evan Krick, Jeremy Sairsingh, Mary Gay Scanlon, Joshua Stanley, Shanellah Verna, and Lisa Whiteley;

**Hunton & Williams LLP**, in particular Brian Tanenbaum, Stephanie Meharg, Katie Pickens, Jessica Vara, Maddie Doucet Vicry, and Greer Watson.

The Law Center thanks Street Sense Media for the use of their photos throughout the report. Cover photo credit: ArliftAtoz2205.

The Allard K. Lowenstein International Human Rights Law Clinic at Yale Law School in collaboration with the Law Center, researched and wrote a previous version of this report, *Welcome Home: The Rise of Tent Cities in the United States.*

The Law Center acknowledges with gratitude the generous support of the Oakwood Foundation, Buck Foundation, Butler Family Fund, and Deer Creek Foundation.

The Law Center would also like to thank our LEAP member law firms: Akin Gump Strauss Hauer & Feld LLP, Arent Fox LLP, Covington & Burling LLP, Debevoise & Plimpton LLP, Dechert LLP, Fried Frank Harris Shriver & Jacobson LLP, Goldman Sachs Group, Inc., Goodwin Procter LLP, Hogan Lovells US LLP, Kirkland & Ellis LLP, Latham & Watkins LLP, Microsoft Corporation, Schulte Roth & Zabel LLP, Sheppard Mullin Richter & Hampton LLP, Sidley Austin LLP, Simpson Thacher & Bartlett LLP, Sullivan & Cromwell LLP, and WilmerHale.

Megan Godbey provided report design and layout.

# TABLE OF CONTENTS

2   **About The National Law Center on Homelessness & Poverty**

3   **Board Of Directors**

3   **Staff**

4   **Acknowledgments**

5   **Table Of Contents**

7   **Executive Summary**

16   **Introduction**

19   **Section 1: The Number of Encampments is Growing**

21     National Trends

21     Methodology and Process

22     Results

22       Number of Encampments Reported by the Media

22       Media Reports of Encampments

23       Number of Residents of Encampments

23       Average Time in Existence of Encampments

24       Legal Status of Encampments

24       State Data

27   **Section 2: Cities Largely Respond with Criminalization Approaches**

28     National Trends

28     Methodology and Process

29     Results

29       Ordinances, Published Procedures or Informal Practices

30       Legalized Encampments

30       Legal Limits on Enforcement of Anti-Camping Laws

30       Procedures Employed: Notice and Storage

31       Geographic Differences in Approach

32       Summary of Survey Results

33     The Costs of Law Enforcement Responseso to Encampments

34     Profiles of Criminalization Approaches to Encampments

35       Denver, Colorado

35       Titusville, Florida

37       Olympia, Washington

38       San Diego, California

39   **Section 3: Guiding Principles and Best Practices**

44   **Section 4: Case Studies of Less Punitive Approaches**

46     Procedures for Addressing Existing Encampments

46       Charleston, South Carolina – How the USICH Guidance Can Work in Practice

54       Indianapolis, Indiana – Ordinance for Ending Encampments through Housing

60       Charleston, West Virginia – Litigation Leading to Ending Encampments through Shelter or Housing

65       Conclusions

66     Cities Integrating Encampments As a Step in Addressing Homelessness

66       Las Cruces, New Mexico: City-Sanctioned Encampment with Co-Located Services

69       Washington State: Religious Organization Hosting Encampments

73       Vancouver, WA Legalized Overnight Camping – "A Better Practice"

78     Other Approaches

78       Safe Parking for Homeless Persons Living in Vehicles

80       Infill – Yes in My Back Yard

81       Conclusions, Models, Next Steps

82   **Section 5: Legal Standards on Responding to Encampments**

83     Federal Constitutional Standards

83       The Right to Personal Property (Fourth, Fifth, and Fourteenth Amendments)

83       Criminalization as Cruel and Unusual Punishment (Eighth and Fourteenth Amendments)

84       State-Created Danger and the Fundamental Interest in Bodily Integrity (Fourteenth Amendment)

84       Religious Hosts' Right to Free Exercise of Religion Under the First Amendment

86     State Law Standards

86       Implicit Permission (Promissory Estoppel)

86       Unclean Hands and the Duty to Aid the Poor

87       Necessity (The Right to Survive)

88     Settlement

89     Human Rights Standards

| | |
|---|---|
| 91 | International Covenant on Civil and Political Rights |
| 92 | International Convention on the Elimination of all Forms of Discrimination |
| 93 | Convention Against Torture and other forms of cruel, inhuman, or degrading treatment or punishment |
| 93 | Convention on the Rights of the Child |
| 94 | Special Rapporteur Reports |
| 95 | Universal Periodic Review |
| 95 | UN Sustainable Development Goals and Habitat III New Urban Agenda |
| **96** | **Appendices** |
| 96 | Appendix I: Annual Encampments Reported Data |
| 104 | Appendix II: Information Collected for 187 City Policy Survey |
| 105 | Appendix III: Regional City Chart |
| 106 | Appendix IV. Charleston, SC 10 Point Plan |
| 108 | Appendix V. Indianapolis Ordinance No. 2, 2016 |
| 110 | Appendix VI. Charleston, WV Encampment Ordinance |
| 113 | Appendix VII. Draft Seattle Ordinance Protecting the Rights and Property of Homeless Individuals |
| 119 | Appendix VIII. San Francisco Draft Ordinance on Encampment Removal |
| 122 | Appendix IX: Settlement Examples |

# EXECUTIVE SUMMARY

This report by the National Law Center on Homelessness & Poverty ("the Law Center") documents the apparent rapid growth of encampments of people experiencing homelessness or "tent cities" across the United States and the legal and policy responses to that growth. (This report uses the term "encampments" but recognizes that there are multiple ways to refer to the living situation of self-sheltering homeless persons).

**The number of documented homeless encampments has increased sharply**

This report finds that in the past decade, documented homeless encampments have dramatically increased across the country. Many encampments are designed to be hidden to avoid legal problems or evictions. While some encampments last for years, others are forced to move frequently. These factors make documenting their existence a challenge. As a proxy, this report counts only those encampments reported by the media, and of those, using only media reports that reference the state in which the encampment occurred. Only one report was counted for each encampment. While this is an imperfect proxy, the trends within that limited data set are useful and confirm anecdotal reports from across the country. Between 2007 and 2017:

- **The number of encampments reported grew rapidly**: Our research showed a 1,342 percent increase in the number of unique homeless encampments reported in the media, from 19 reported encampments in 2007 to a high of 274 reported encampments in 2016 (the last full year for data), and with 255 already reported by mid-2017, the trend appears to be continuing upward. Two-thirds of this growth comes *after* the Great Recession of 2007-2012 was declared over, suggesting that many are still feeling the long-term effects.

- **Encampments are everywhere:** Unique homeless encampments were reported in every state and the District of Columbia. California had the highest number of reported encampments by far, but states as diverse as Iowa, Indiana, Louisiana, Michigan, Oregon, and Virginia each tallied significant numbers of reported encampments.



- **Many encampments are medium to large**: Half the reports that recorded the size of the encampments showed a size of 11-50 residents, and 17 percent of encampments had more than 100 residents. Larger encampments are obviously likely to garner more coverage, but these figures suggest that there are high numbers of both medium and large encampments across the country.

- **Encampments are becoming semi-permanent features of cities:** Close to two-thirds of reports which recorded the time in existence of the encampments showed they had been there for more than one year, and more than one-quarter had been there for more than five years.

- **But most are not sanctioned and are under constant threat of eviction:** Three-quarters of reports which recorded the legal status of the encampments showed they were illegal; 4 percent were reported to be legal, 20 percent were reported to be semi-legal (tacitly sanctioned).



7

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

This increase in encampments reflects the growth in homelessness overall, and provides evidence of the inadequacy (and sometimes inaccessibility) of the U.S. shelter system. The growth of homelessness is largely explained by rising housing costs and stagnant wages. A new report by Freddie Mac documents a 60 percent drop in market-rate apartments affordable to very low-income families over just the past six years. Zillow recently documented a strong relationship between rising rents and the growth of homelessness, particularly in high-growth cities like Los Angeles, where a 5 percent rent increase equates to 2,000 additional homeless persons on the streets.

"There are … reasons to say no when officers offer to bring you to shelter. Agreeing to go to a shelter in that moment means losing many of your possessions. You have to pack what you can into a bag and leave the rest behind, to be stolen or thrown away by City workers. For me, I would have lost my bulky winter clothes, my tent, my nonperishable food, and the bike parts I used to make repairs for money. You give up all this property just for the guarantee—if you trust the police—of a spot on the floor *for one night*. It's not really a "choice" for me to give up all those resources. I needed to make smart survival decisions.

–Eugene Stroman, homeless in Houston, TX

The growth of encampments is a predictable result of policy choices made by elected officials. California, where the most homeless encampments were reported in our study, has acknowledged for a decade that it needs to be building approximately 180,000 units of new housing a year—but has been building less than half of that. Consequently, the *majority* of California renters now pay more than 30 percent of their income on rent, and nearly one third pay more than 50 percent, putting them just one missed paycheck or medical emergency away from eviction and possible homelessness. A recent Florida study found the majority of homeless persons surveyed named medical debt as the primary cause of their homelessness. Because the growth of encampments is primarily due to these other factors than individual character flaws or choices, the most effective responses will be systemic in nature and avoid involving individuals in the criminal justice system unnecessarily.

In the United States, the wealthiest country on earth, encampments of homeless people are unacceptable. But how cities respond to encampments varies widely.



## Many communities are responding with punitive law enforcement approaches

Municipalities often face pressure to "do something" about the problem of visible homelessness. For many cities, the response has been an increase in laws prohibiting encampments and an increase in enforcement. When a city evicts residents of an encampment and clears their belongings, it is often called a "sweep." We surveyed the laws and policies in place in 187 cities across the country (the first attempt at a national survey of formal and informal policies on encampments) and found:

- 33 percent of cities prohibit camping city-wide, and 50 percent prohibit camping in particular public places, increases of 69 percent and 48 percent from 2006-16, respectively.

- 50 percent have either a formal or informal procedure for clearing or allowing encampments. (Many more use trespass or disorderly conduct statutes in order to evict residents of encampments).

- Only five cities (2.7 percent) have some requirement that alternative housing or shelter be offered when a sweep of an encampment is conducted.

- Only 20 (11 percent) had ordinances or formal policies requiring notice prior to clearing encampments. Of those, five can require as little as 24 hours' notice before encampments are evicted, though five require at least a week, and three provide for two weeks or more. An additional 26 cities provided some notice informally, including two providing more than a month.

- Only 20 cities (11 percent) require storage be provided

8

for possessions of persons residing in encampments if the encampment is evicted. The length of storage required is typically between 30 and 90 days, but ranged from 14 to 120 days.

- Regional analysis found western cities have more formal policies than any other region of the country, and are more likely to provide notice and storage.

While a large and growing number of cities have formal or informal procedures for addressing encampments, relatively few affirmatively provide for the housing and storage needs of the persons living in the encampments.





"I honestly believe that people need to sleep and that people are healthier when they get sleep, they can make better decisions when they get sleep. If at some point in the future, we can have a place where people can go and sleep lawfully, I think that makes great sense. At the same time, [our decision not to enforce the anti-camping ordinance] gives us the opportunity to say, we can't enforce this [ordinance] rigorously when there aren't enough beds or even close to it for people to sleep."

–Andy Mills, Santa Cruz Police Chief

### Encampment Evictions are Expensive

Using the criminal justice system and other municipal resources to move people who have nowhere else to go is costly and counter-productive, for both communities and individuals. Honolulu, HI spends $15,000 per week—3/4 of a million dollars a year—sweeping people living in homeless encampments, many of whom simply move around the corner during the sweep and then return a day later. Washington, D.C. spent more than $172,000 in just three months on sweeps. Research shows that housing is the most effective approach to end homelessness with a larger return on investment. Beyond this misuse of resources, sweeping encampments too often harms individuals by destroying their belongings, including their shelter, ID and other important documents, medications, and mementos. More often than not, this leaves the homeless person in a worse position than before, with a more difficult path to exit homelessness. Moreover, sweeps frequently destroy the relationships that outreach workers have built with residents, and that residents have built with each other, again, putting further barriers between residents and permanent housing.

"Did I get arrested? Sure. I had nowhere else to go. They took me to jail, and took away my stuff…I was chased and cited by the city, but I was determined to sleep somewhere...Arrests delayed me getting stabilized for six months."

-Milton Harris, formerly homeless in Sacramento, CA

Other cities spend thousands of dollars on fences, bars, rocks, spikes, and other "hostile" or "aggressive" architecture, deliberately making certain areas of their community inaccessible to homeless persons without shelter. San Diego, CA, recently spent $57,000 to install jagged rocks set in concrete underneath an overpass in advance of the Major League Baseball All-Star game. Other cities, like Chicago, IL, simply fence off areas under bridges to prevent homeless persons from sheltering there. In either case, the money did not reduce the need for people to find shelter but potentially put people at greater vulnerability to exposure and hazards.

To illustrate what criminalization of encampments is like on the ground, we invited some of our local partners to offer examples of punitive, non-constructive approaches.

- **Denver**, **CO**: Law enforcement removed blankets from sleeping people in the middle of the night while the



Photo credit: Ben Burgess//Street Sense Media



temperatures were below freezing.

• **San Diego, CA**: The city uses a law intended to keep trash cans off the sidewalk to arrest and jail people who are living outside.

• **Olympia, WA:** The city uses trespass laws to charge people who are sleeping in the woods, despite the fact that there are only 250 shelter beds for at least 800 homeless people.

• **Titusville, FL:** The city dismantled an encampment in 2011 that was home to mostly veterans, destroying irreplaceable items including the ashes of one man's father and the WWII flag that another man's father earned for service in the military.

### *Law Enforcement Threats Do Not Decrease the Number of People on the Streets*

Many communities state they need criminalization ordinances to provide law enforcement with a "tool" to push people to accept services, such as shelter. Conducting outreach backed with resources for real alternatives, however, is the approach that has shown the best, evidence-based results. The 100,000 Homes Campaign found permanent housing for more than 100,000 of the most "service-resistant" chronically homeless individuals across America by listening to their needs and providing appropriate alternatives that actually meet their needs.

Most cities in the United States have insufficient shelter beds for the number of people experiencing homelessness; in some cities, the shortage is stark. So when law enforcement tells residents of encampments to go to a shelter, they risk finding the shelter full. Even where shelter beds are open, they are not always appropriate, or even adequate, for all people. Many shelters are available only to men or only to women; some require children, others do not allow children. Some do not ensure more than one night's stay, requiring daily long waits in line- sometimes far from other alternatives. Other shelters do not allow people to bring in personal belongings, much less store belongings during the day. These restrictions can make it very difficult to hold a job, whether day shift or night shift. Because of nighttime employment or physical disabilities, some people need a place to lie down undisturbed during the day. Congregant settings are not appropriate for all people, providing exposure to germs and noise and lacking privacy. And some shelters require residents to participate in religious activities, while others have time limits, charge money, or have other rules or restrictions that bar groups of people. Very few shelters allow pets. All of these factors may mean that even though a shelter may technically have a bed empty, it may not be actually accessible to an individual living in an encampment.

"I learned from other homeless people that the shelters were usually full, and it wasn't worth the effort to constantly wait in line…Going and seeking out shelter would have meant losing many of my things. I would have to pack a bag and leave everything else behind, trying to hide it in the bushes. I'd be risking a lot of my property just to try to get a shelter space for one night. Plus, with my cancer diagnosis, it felt like it was a health risk for me to go inside. It was cleaner on the street than it was in any of those shelters. In a tent, I could keep my area as clean as I wanted…. Rather than sacrificing my health and my dignity, I focused on moving on and making do with what was stable: a tent.

–Tammy Kohr, formerly homeless in Houston, TX

### Encampment Evictions are Not the Best Way to Protect Health & Safety

City officials frequently cite concerns for public health and safety as reasons for sweeps of encampments, but again the cost is high and the impact is either minor or counterproductive. At the extreme are cities like Denver, where law enforcement officers were caught on video pulling blankets off homeless persons in sub-zero temperatures. The Denver Mayor claimed his concern was for the homeless persons: "Urban camping—especially during cold, wet weather—is dangerous and we don't want to see any lives lost on the streets when there are safe, warm places available for people to sleep at night." But Denver has far fewer available shelter beds than homeless people, meaning that the city increased exposure and health risks for vulnerable people instead of decreasing them.

City officials will often highlight the health and safety hazards of open fires, public urination and defecation, and rodent infestation encouraged by litter. While these concerns are valid, sweeps rarely result in improved health or safety. What works is providing access to sanitation facilities and water, regular trash removal, and safe cooking facilities—all things that a city can do that improve the health and safety of all its residents.

### Case studies of non-enforcement approaches show promising lessons

This report explores experiments by a number of cities that have adopted approaches other than arbitrary evictions or criminalization, or at least approaches to lessen the number and negative consequences of encampment evictions. These are not all of the possible alternatives, nor do we cover every city that is using a non-enforcement approach. All of

the cities highlighted need further improvements in their policies, some even more than others. But each case study seeks to inspire communities by sharing how other cities are addressing concerns about homeless encampments more effectively, more humanely, and at lower cost.

### Cities Ending Encampments Through Housing

In 2015, the U.S. Interagency Council on Homelessness published guidance for cities entitled *Ending Homelessness for People Living in Encampments*. As the title implies, it emphasizes that the best approach to ending encampments is to end homelessness for the people living in them. It sets out four basic principles for effectively dealing with encampments:

1. Preparation and Adequate Time for Planning and Implementation

2. Collaboration across Sectors and Systems

3. Performance of Intensive and Persistent Outreach and Engagement

4. Provision of Low-Barrier Pathways to Permanent Housing

"The forced dispersal of people from encampment settings is not an appropriate solution or strategy, accomplishes nothing toward the goal of linking people to permanent housing opportunities, and can make it more difficult to provide such lasting solutions to people who have been sleeping and living in the encampment."

U.S. Interagency Council on Homelessness, *Ending Homelessness for People Living in Encampments* (2015)

This report looks at cities implementing this approach, at least in part:

- **Charleston, SC**, ensured adequate time for planning, outreach, housing and services to close a 100-person encampment through housing most of its residents, without a single arrest.

- **Indianapolis, IN**, adopted an ordinance requiring residents be provided with adequate alternative housing before an encampment can be evicted, and mandates at least 15 days' notice of planned evictions to encampment residents and service providers.

- **Charleston, WV**, settled litigation by adopting an ordinance requiring that encampment evictions cannot proceed unless residents are provided with adequate

alternative housing or shelter, and providing 14 days' notice to encampment residents and service providers of planned evictions, and that storage facilities will be made available for homeless individuals.

• **Seattle, WA and San Francisco, CA**, both cities proposed, but have not yet passed, ordinances that would improve upon Indianapolis, IN's and Charleston, WV's by ensuring adequate provision for sanitation and hygiene needs in existing encampments, as well as clear notice and provision of adequate housing alternatives and storage in the event of displacement. In 2016, the U.S. Department of Justice analyzed the Seattle proposal and found it to be a constitutional approach that is consistent with federal policy against criminalization.

Putting into law the commitment to closing encampments through housing the individuals living there encourages these communities to take an approach that will permanently end the need for the encampments.

I know the City is also saying they need to ban tents because our encampment is so dirty. The only reason it's dirty is that people are getting overwhelmed and they don't know what to do with their trash. If the City would give them a solution, they'd use it…. It's not like we can pay for a trash man. The tents themselves are clean. People have their own areas that they generally keep tidy. It's the areas where we leave trash to be picked up that are not clean. It's where we have to go to the bathroom that is not clean. Those problems have nothing to do with the tents, and they can be fixed with solutions other than jail.

–Tammy Kohr, formerly homeless in Houston, TX.

### Cities Integrating Encampments as a Step toward Addressing Homelessness

Our survey of 187 cities found only ten of these cities have explicitly permitted some form of legalized camping. Encampments are not an appropriate long term solution to homelessness or the nation's affordable housing crisis. However, in the absence of such solutions—and while we advocate for them—homeless people need a place to sleep, shelter themselves, and store belongings. In order to be successful, legalized encampments require a tremendous amount of planning, consultation, and collaboration with all stakeholders, most especially the homeless residents of the



> It should be uncontroversial that punishing conduct that is a universal and unavoidable consequence of being human **violates the Eighth Amendment** …Sleeping is a life-sustaining activity… If a person literally has nowhere else to go, then **enforcement of the anti-camping ordinance against that person criminalizes her for being homeless.**

— U.S. Department of Justice, Statement of Interest Brief, Bell v. Boise

encampment. In many cases, this time and effort may be better spent developing other interim or permanent housing solutions. However, the following cities, which allow some forms of temporary encampments, may have lessons for others on how to effectively use them to get people closer to adequate housing and avoid subjecting them unnecessarily to the criminal justice system:

• **Las Cruces, NM**, hosts a permanent encampment with a co-located service center.

• **Washington State** permits religious organizations to temporarily host encampments on their property.

• **Vancouver, WA**, permits limited overnight self-sheltering encampments on city property.

In each of the above case studies, we examine, to the extent possible, both the substance of the approach and the means by which each community came to adopt that approach, to assist other communities in implementing similar reforms.

### Other Approaches

Although outside the scope of our research for this report, we also mention some approaches that may merit further study. Some cities permit limited safe parking options for those who are living in vehicles, including **Eugene, OR; Los Angeles, CA; San Luis Obispo, CA; Santa Barbara, CA; and San Diego, CA.** Pilot programs in **Seattle, WA and Multnomah County, OR**, have  that permit, or even pay for, residents to host tiny homes in back yards to house persons experiencing homelessness.

### Courts are increasingly affirming the rights of homeless persons living in encampments

This report reviews relevant case law related to encampments. At the federal level, an increasing number

of courts are applying the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to protect the rights of homeless individuals to perform survival activities in public spaces where adequate alternatives do not exist; the rights of homeless individuals not to be deprived of their liberty or property without due process of law; the due process rights of homeless individuals to travel; and their rights to be free from cruel and unusual punishment. At the state level, the record is more mixed, but lawyers have created some important precedents using principles of estoppel, unclean hands, and necessity. Settlements in cases have generally resulted in minimum notice periods before evictions can take place and requirements for cities to store belongs that are seized, in addition to compensation for the victims of the sweeps and their attorneys. At least one settlement, in Charleston, WV, led to a requirement of providing alternative housing for encampment residents before they can be evicted.

Additionally, we review recent international human rights law developments on the right to adequate housing and prohibitions on criminalization of homelessness, which can provide useful lessons for governments struggling to deal with growing homelessness and encampments.

## Successful approaches to encampments all follow certain principles

Based on the case studies and our research to date, as well as relevant domestic and international laws and federal guidance that are reviewed in this report, we found certain key principles and corresponding practices appear to be important for successful interventions to end encampments in our communities—see the chart on the next page.

Beyond these specific recommendations, in order to create the long-term housing solutions communities needed to permanently end encampments, we also encourage individuals and organizations to look at the model policies of the **Housing Not Handcuffs Campaign**. The Campaign, launched in 2016 by the Law Center together with a number of other organizations and now endorsed by over 600 organizations and individuals, provides models for local, state, and federal legislation to shorten homelessness by stopping its criminalization, prevent people from becoming homeless through increased renter protections, and end homelessness through increasing access to deeply affordable housing.

View these policies and endorse the Housing Not Handcuffs Campaign at housingnothandcuffs.org.

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

| Encampment Principles and Practices | |
|---|---|
| **Principle 1**: All people need safe, accessible, legal place to be, both at night and during the day, and a place to securely store belongings—until permanent housing is found. | 1. Determine the community's full need for housing and services, and then create a binding plan to ensure full access to supportive services and housing affordable for all community members so encampments are not a permanent feature of the community.<br><br>2. Repeal or stop enforcing counterproductive municipal ordinances and state laws that criminalize sleeping, camping, and storage of belongings.<br><br>3. Provide safe, accessible, and legal places to sleep and shelter, both day and night. Provide clear guidance on how to access these locations.<br><br>4. Create storage facilities for persons experiencing homelessness, ensuring they are accessible–close to other services and transportation, do not require ID, and open beyond business hours. |
| **Principle 2**: Delivery of services must respect the experience, human dignity, and human rights of those receiving them. | 1. Be guided by frequent and meaningful consultation with the people living in encampments. Homeless people are the experts of their own condition.<br><br>2. Respect autonomy and self-governance for encampment residents.<br><br>3. Offer services in a way that is sensitive and appropriate with regard to race, ethnicity, culture, disability, gender identity, sexual orientation, and other characteristics. Use a trauma-informed approach. |
| **Principle 3**: Any move or removal of an encampment must follow clear procedures that protect residents. | Create clear procedures for ending homelessness for people living in pre-existing encampments, including:<br><br>1. Make a commitment that encampments will not be removed unless all residents are first consulted and provided access to adequate alternative housing or—in emergency situations—another adequate place to stay.<br><br>2. If there are pilot periods or required rotations of sanctioned encampments, ensure that residents have a clear legal place to go and assistance with the transition. Pilot periods or requiring rotation of legal encampments/parking areas on a periodic basis (e.g., annually or semi-annually) can help reduce local "not-in-my-back-yard" opposition, but shorter time periods hinder success.<br><br>3. Provide sufficient notice to residents and healthcare/social service workers to be able to determine housing needs and meet them (recommended minimum 30 days, but longer if needed).<br><br>4. Assist with moving and storage to enable residents to retain their possessions as they transfer either to housing, shelter, or alternative encampments. |
| **Principle 4**: Where new temporary legalized encampments are used as part of a continuum of shelter and housing, ensure it is as close to possible to fully adequate housing. | 1. Establish clear end dates by which point adequate low-barrier housing or appropriate shelter will be available for all living in the legal encampments.<br><br>2. Protect public health by providing access to water, personal hygiene (including bathrooms with hand washing capability), sanitation, and cooking services or access to SNAPS hot meals benefits.<br><br>3. Provide easy access to convenient 24-hour transportation, particularly if services are not co-located.<br><br>4. Statutes and ordinances facilitating partnerships with local businesses, religious organizations, or non-profits to sponsor, support or host encampments or safe overnight parking lots for persons living in their vehicles can help engage new resources and improve the success of encampments.<br><br>5. Do not require other unsheltered people experiencing homelessness to reside in the encampments if the facilities do not meet their needs. |

| **Principle 5**: Adequate alternative housing must be a decent alternative. | 1. Ensure that emergency shelters are low-barrier, temporary respites for a few nights while homeless individuals are matched with appropriate permanent housing; they are not long-term alternatives to affordable housing and not appropriate in the short term for everyone. Low-barrier shelter includes the "3 P's"—pets, possessions, and partners, as well as accessible to persons with disabilities or substance abuse problems. |
|---|---|
| | 2. Adequate housing must be: |
| |    a. Safe, stable, and secure: a safe and private place to sleep and store belongings without fear of harassment or unplanned eviction; |
| |    b. Habitable: with services (electricity, hygiene, sanitation), protection from the elements and environmental hazards, and not overcrowded; |
| |    c. Affordable: housing costs should not force people to choose between paying rent and paying for other basic needs (food, health, etc.); |
| |    d. Accessible: physically (appropriate for residents' physical and mental disabilities, close to/transport to services and other opportunities) and practically (no discriminatory barriers, no compelling participation in or subjection to religion). |
| **Principle 6**: Law enforcement should serve and protect all members of the community. | 1. Law and policies criminalizing homelessness, including those criminalizing public sleeping, camping, sheltering, storing belongings, sitting, lying, vehicle dwelling, and panhandling should be repealed or stop being enforced. |
| | 2. Law enforcement should serve and protect encampment residents at their request. |
| | 3. Law enforcement officers—including dispatchers, police, sheriffs, park rangers, and private business improvement district security—should receive crisis intervention training and ideally be paired with fully-trained multi-disciplinary social service teams when interacting with homeless populations. |

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

# INTRODUCTION

The United States continues to face a crisis of homelessness, brought on by a severe shortage of affordable housing. An estimated 2.5 to 3.5 million men, women, and children experience homelessness annually, including at least 1.35 million children, and over a million people working full- or part-time but unable to pay for housing.[1]

- According to a 2017 report by the Joint Center for Housing Studies at Harvard University, the number of cost-burdened households (paying more than 30 percent of income for housing) was 38.9 million in 2015, and the number of renters with severe burdens (more than 50 percent of income for housing) was 11.1 million in 2015—3.7 million more than in 2001.[2]

- A new report by Freddie Mac documents a 60 percent drop in apartments affordable to very low-income families over just the past six years.[3] Zillow recently documented a strong relationship between rising rents and the growth of homelessness, particularly in high-growth cities like Los Angeles, where a 5 percent rent increase equates to 2,000 additional homeless persons on the streets.[4]

- The U.S. has defined the level at which an individual or family needs housing assistance, but fails to provide it in adequate supply: only one in four who qualify for low-income housing assistance receive it.[5]

- More than 1.3 million school children were homeless during the 2015-2016 school year[6]—and almost 2.5 million children overall were homeless in 2013.[7] The school numbers represent an 3.4 percent increase since the previous year, and have almost doubled since

2007.[8] The number of people who have lost their homes and are living doubled up with family or friends due to economic necessity stood at 7 million people in 2014, a slight decline since 2013, but still 52 percent higher than before the recession in 2007.[9] The Department of Housing & Urban Development (HUD) reported an overall increase of .7% between 2016-2017. While some declines were reported, unsheltered homelessness--i.e those most likely to be living in encampments--soared, as much as 26% in Los Angeles.[10]

This crisis is the result of (ongoing) policy decisions to de-prioritize the need for affordable housing. President Franklin Delano Roosevelt's "Second Bill of Rights" committed the U.S. to the economic and social security of every American. Spurred not only by the Great Depression and the "Hoovervilles" or encampments that sprouted on the outskirts of towns across the country, but by the concern for the rise of fascism based on economic desperation, Roosevelt stated in 1944:

> We have come to a clear realization of the fact that true individual freedom cannot exist without economic security and independence. "Necessitous men are not free men." People who are hungry and out of a job are the stuff of which dictatorships are made....We have accepted, so to speak, a second Bill of Rights under which a new basis of security and prosperity can be established for all regardless of station, race, or creed. Among these are...the right of every family to a decent home...[11]

While never perfect (including policies that directly disadvantaged racial minorities), Roosevelt's premise of a basic commitment to the economic and social security of all Americans kept homelessness low for 40 years. However, beginning in the late 1970s, HUD's budget for affordable housing was cut by 50 percent, leading to the situation today where only 1 in 4 households that are income eligible

---

1    *See* NAT'L ALLIANCE TO END HOMELESSNESS, HOMELESSNESS LOOMS AS POTENTIAL OUTCOME OF RECESSION 5 (2009).

2    *See* JOINT CTR. FOR HOUSING STUDIES OF HARVARD UNIV., THE STATE OF THE NATION'S HOUSING 5 (2017), http://www.jchs.harvard.edu/sites/jchs.harvard.edu/files/harvard_jchs_state_of_the_nations_housing_2017.pdf [hereinafter STATE OF THE NATION].

3    FREDDIE MAC MULTIFAMILY, RENTAL AFFORDABILITY IS WORSENING 1 (2017), http://www.freddiemac.com/multifamily/pdf/rental_affordability_worsening.pdf.

4    CHRIS GLYNN & EMILY B. FOX, DYNAMICS OF HOMELESSNESS IN URBAN AMERICA 21 (2017), https://arxiv.org/pdf/1707.09380.pdf; *see also* Chris Glynn & Melissa Allison, *Rising Rents Mean Larger Homeless Population*, ZILLOW (Aug. 3, 2017), https://www.zillow.com/research/rents-larger-homeless-population-16124/.

5    Chris Glynn & Melissa Allison, *Rising Rents Mean Larger Homeless Population*, ZILLOW (Aug. 3, 2017), https://www.zillow.com/research/rents-larger-homeless-population-16124/.

6    *National Overview*, NAT'L CTR. FOR HOMELESS EDUC. (2017), http://profiles.nche.seiservices.com/ConsolidatedStateProfile.aspx.

7    AMER. INST. FOR RESEARCH, AMERICA'S YOUNGEST OUTCASTS: A REPORT CARD ON CHILD HOMELESSNESS 6 (2014), http://www.air.org/sites/default/files/downloads/report/Americas-Youngest-Outcasts-Child-Homelessness-Nov2014.pdf.

8    *National Overview*, NAT'L CTR. FOR HOMELESS EDUC. (2017), http://profiles.nche.seiservices.com/ConsolidatedStateProfile.aspx.

9    NAT'L ALLIANCE TO END HOMELESSNESS, THE STATE OF HOMELESSNESS IN AMERICA 3 (2016), http://naeh.wpengine.com/wp-content/uploads/2016/10/2016-soh.pdf.

10   U.S. DEP'T OF HOUSING AND URBAN DEV., THE 2016 ANNUAL HOMELESS ASSESSMENT REPORT TO CONGRESS, PART 1 POINT-IN-TIME ESTIMATES OF HOMELESSNESS (2017), https://www.hudexchange.info/resources/documents/2017-AHAR-Part-1.pdf  On a single night in January, 2016, the Department of Housing and Urban Development counted 553,742 people experiencing homelessness living in shelters and public places (the "HUD definition" of homelessness). *Id.*

11   President Franklin Roosevelt, Second Inaugural Address (Jan. 20, 1937).



Table 5.3—Percentage Distribution of Budget Authority by Agency: 1976–2022 :https://www.whitehouse.gov/omb/budget/Historicals
CPI data: http://www.usinflationcalculator.com/inflation/consumer-price-index-and-annual-percent-changes-from-1913-to-2008/



Table 5.2—Budget Authority by Agency: 1976–2022: https://www.whitehouse.gov/omb/budget/Historicals
CPI data: http://www.usinflationcalculator.com/inflation/consumer-price-index-and-annual-percent-changes-from-1913-to-2008/

for federal housing assistance actually receive it.[12] Federal spending on housing shrank from close to eight percent of the budget to barely over one percent. This gap was never made up for at the state or local level, and both federal and local governments continued to unbalance market mechanisms, largely incentivizing the construction and purchase of upper-income housing rather than lower-income housing.

**Policy choices or individual choices?**

California, where the most homeless encampments were reported in our study, has acknowledged for a decade that

it needs to be building approximately 180,000 units of new housing a year but has been building less than half of that.[13] Consequently, the majority of California renters now pay more than 30 percent of their income on rent, and nearly one third pay more than 50 percent, increasing their risk of housing insecurity and eviction.[14]

Meanwhile, the gap between wages and housing costs keeps growing. Since 1980, renters' income has been stagnant—indeed, between 2002 and 2012, wages declined for the entire bottom 70 percent of the wage distribution—

---

12   Nat'l Low Income Housing Coal., Out of Reach 2017: the High Cost of housing 6 (2017), http://nlihc.org/oor.

13   Cal. Dep't of Housing & Urban Dev., California's Housing Future: Challenges and Opportunities 1 (2017), https://www.hcd.ca.gov/policy-research/plans-reports/docs/California's-Housing-Future-Main-Document-Draft.pdf.

14   *Id.*

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding



Real average hourly wage growth, by percentile, 2000–2012

Source: Authors' analysis of Current Population Survey Outgoing Rotation Group microdata

Economic Policy Institute

while inflation-adjusted rents have soared 14.7 percent.[15] Rents in the New York metro area increased 50.7 percent in the last five years, while the income of New York-area renters from 25 to 44 years old rose just 8 percent in that same time.[16]

It is often assumed that people become homeless because of personal failures. Princeton Professor Eldar Shafir, an author of a study on rational decision-making by persons living in poverty published in the journal *Science* stated, "All the data shows it isn't about poor people, it's about people who happen to be in poverty. All the data suggests it is not the person, it's the context they're inhabiting."[17] Another study reports that "[e]xperiences of social bias, persistent poverty, and trauma can directly undermine brain development and the [executive function] skills" most needed for exiting poverty.[18] Indeed, there is a growing body of research that shows poverty is more likely to cause poor judgment than the reverse.[19]

While most, if not all, people make mistakes and errors of judgment, only some experience homelessness. Those who do experience homelessness often have run through all available personal and societal safety nets trying to

prevent their homelessness.[20] The cause becomes less about whether someone made a mistake and more about how many resources are available if something goes wrong. A recent survey in Florida found medical debt as the leading cause of homelessness.[21] While every homeless individual's path to homelessness is unique, it is becoming more and more apparent that most paths to homelessness are not about bad choices or personal failures, but rather the result of collective policy choices over time that have created a critical deficit of adequate, affordable housing and other safety net services.





THE AFFORDABLE HOUSING GAP

has created a **7.2 MILLION UNIT SHORTAGE** of affordable rental units available to our nation's lowest income renters

**31%** lowest income renters accessing affordable housing

**69%** lowest income renters paying more than they can afford

nlchp.org

"I've got economically zero unemployment in my city, and I've got thousands of homeless people that actually are working and just can't afford housing. There's nowhere for these folks to move to."

–Seattle City Councilman Mike O'Brien[22]

15  Heidi Shierholz & Lawrence Mishel, *A Decade of Flat Wages*, Econ. Pol'y Inst. (Aug. 21, 2013), http://www.epi.org/publication/a-decade-of-flat-wages-the-key-barrier-to-shared-prosperity-and-a-rising-middle-class/; Joel Kotkin, *This is Why You Can't Afford a House*, Daily Beast (Feb. 8, 2016), https://www.thedailybeast.com/this-is-why-you-cant-afford-a-house.

16  David Winzelberg, *NAR: NY rental costs unsustainable*, Long Island Bus. News (Mar. 16, 2015), http://libn.com/2015/03/16/nar-ny-rental-costs-unsustainable/.

17  Emily Badger, *How Poverty Taxes the Brain*, CityLab (Aug. 29, 2013), https://www.citylab.com/life/2013/08/how-poverty-taxes-brain/6716/.

18  Elisabeth Babcock, Using Brain Science to Design New Pathways Out of Poverty, at p. 2 http://s3.amazonaws.com/empath-website/pdf/Research-UsingBrainScienceDesignPathwaysPoverty-0114.pdf

19  Tara Garcia Mathewson, *How Poverty Changes the Brain*, The Atlantic (Apr. 19, 2017), https://www.theatlantic.com/education/archive/2017/04/can-brain-science-pull-families-out-of-poverty/523479/

20  *See, e.g.* Kay K. McChesney, *Absence of a family safety net for homeless families*, 19 J.L Sociology & Soc. Welfare 4, 55-72 (1992).

21  *Life on the Streets* Addictions.com, https://www.addictions.com/explore/life-on-the-streets/ (last visited Nov. 27, 2017); Jessica Lipscomb, *Medical Debt Biggest Cause of South Florida Homelessness, Survey Says*, Miami New Times (Oct. 5, 2017), http://www.miaminewtimes.com/news/medical-debt-ranks-no-1-cause-of-south-florida-homelessness-survey-says-9724408.

22  Gillian Flaccus & Geoff Mulvihill, *Growing Homeless Camps Contrast with West Coast Tech Wealth*, S.F. Chron. (Nov. 5, 2017), http://www.sfchronicle.com/news/article/Homeless-explosion-on-West-Coast-pushing-cities-12334291.php.

TENT CITY, USA: The Growth of America's Homeless Encampments and How Communities are Responding



Indeed, most communities not only have a gap in the amount of affordable housing needed but fail to even come close to matching the number of people experiencing homelessness with basic emergency shelter. Even where shelter beds are open, they are not always appropriate, or even adequate, for all people. Many shelters are available only to men or only to women or families. Some do not ensure more than one night's stay, requiring daily long waits in line- sometimes far from other alternatives. Other shelters do not allow people to bring in personal belongings, much less store belongings during the day. These restrictions can make it very difficult to hold a job—whether in daytime or nighttime. Because of nighttime employment or physical disabilities, some people need a place to lie down undisturbed during the day. Congregant settings are not appropriate for all people, providing exposure to germs and noise and lacking privacy. And some shelters require residents to participate in religious activities, while others have time limits, charge money, or have other rules or restrictions that bar groups of people. Very few shelters allow pets.

"I wouldn't call it a "choice" about whether to go to those shelters, because it felt like going back to prison. I wasn't allowed to leave when I wanted to, and I was locked in there for close to twelve hours. I had to risk bug bites and disease, sleeping on the floor with insects and rodents. The shelter staff harassed me. My possessions were at risk. And the rules they had made me feel so restricted and dehumanized. They controlled what I could read, who I could talk to, when I could eat and sleep, and whether I could go outside. I understand the need for rules with so many people, but it's institutional living just like a prison. You're in institutional living once you're inside of a shelter. And it isn't really a "choice" when you ask people to give up their rights like that."

–Eugene Stroman, formerly homeless in Houston, TX

Emergency shelter is designed to be used short term in an emergency—not as a long-term alternative to affordable housing. Shelters work best when used as designed, as low-barrier facilities that welcome all in need, and transition people quickly back out into adequate alternative housing.[23] This is the model that we have developed for responding to emergency housing needs after natural disasters: Federal Emergency Management Agency coordinates immediate emergency shelter and short-term post-disaster housing needs, then HUD provides longer term rental or home-rebuilding assistance, or even trailers or other interim housing if the supply of local housing is not adequate. The same principles apply to effectively addressing homelessness caused by economic disaster as they do to that caused by natural disaster.

Just as federal, state, and local policies predictably caused an increase in encampments over the past decade, policies can also help the situation. This report outlines some of the policies that will make the problem worse and some that will make it better. We hope this report serves as inspiration for communities looking to implement better policies and practices to address their encampments.

### Who is Homeless?

Ellen Tara James-Penney is an adjunct professor at San Jose State, with a full courseload of four classes, but between her student loans and the high cost of housing in San Jose, she lives out of her car. James-Penney worked in administration for a tech firm, but was laid off during the downturn in the economy. She went back to school and accumulated more than $140,000 in debt, which means she has to pay $2,000 per month in loans from her $2,500 per month salary, leaving her only $500 for the rest of her expenses. She is a white-collar professional who the housing market has left behind. http://sanfrancisco.cbslocal.com/2017/08/30/homeless-san-jose-state-professor-struggles-living-out-of-her-car/

---

23   *See, e.g.*, Katy Miller, *Using Shelter Strategically to End Homelessness*, U.S. INTERAGENCY COUNCIL TO END HOMELESSNESS (Apr. 1, 2016), https://www.usich.gov/news/using-shelter-strategically-to-end-homelessness. "Shelters must be low barrier, focus on assessment and triage, and intentionally link to permanent housing resources so that people move through to housing quickly — this is 'Housing First' at its best." *Id.*



# SECTION 1

**The Number of Encampments is Growing**

**TENT CITY, USA:** *The Growth of America's Homeless Encampments and How Communities are Responding*

## National Trends

Between 2007 and 2017:

1. **The number of encampments appears to be growing, rapidly**: Our research showed a rapid 1,342 percent increase in the number of homeless encampments reported, from 19 encampments in 2007 to a high of 274 unique encampments in 2016 (the last full year for data). With 255 encampments already reported by mid-2017, the trend appears to be continuing upward. Two-thirds of this growth comes *after* the Great Recession of 2007-2012 was considered over.

2. **Encampments are everywhere:** homeless encampments were reported in every state and the District of Columbia. California had the highest number of reports by far, but states as diverse as Iowa, Indiana, Louisiana, Michigan, Oregon, and Virginia all tallied significant numbers of reports.

3. **Many encampments are medium to large**: Half of the stories that reported the size of encampments showed a size of 11-50 residents, and 17 percent of encampments had more than 100 residents (17 percent). These medium to large encampments also experienced the greatest gross increase in numbers over the 10 year period. Larger encampments are likely to garner more news coverage, but these figures suggest that there are a high number of both medium and large encampments across the country.

4. **Encampments are becoming semi-permanent features of cities:** Close to two-thirds of reports which recorded the time in existence of the encampments showed they had been there for more than 1 year, and more than one-quarter had been there for more than six years.

5. **But most are not sanctioned and under threat of eviction:** Three-quarters of reports that recorded the legal status of the encampments showed they were illegal; 4 percent were reported to be legal, 21 percent were reported to be semi-legal (tacitly sanctioned). 35 percent of the reported encampments were planned to be or already had been evicted, most often with no alternative housing identified for those being displaced.



The number of homeless encampments reported has increased by **1,342%** in the last ten years

nlchp.org · Eric Falquero // Street Sense Media

Below follows a summary of the ten year data. Individual year profiles are available in Appendix I.

### Methodology and Process

The following data was extracted from approximately 1,600 news reports concerning homeless encampments in the United States that were published over the period January 2007 through mid-2017.[24] News articles were compiled from searches of Lexis, WestLaw, Bloomberg, and Google News using the search terms: ((Homeless OR transient) w/5 (camp OR encampment)) or "tent city" + [insert State name]. We excluded articles referencing encampments from the Occupy Movement beginning in 2011 unless those encampments specifically incorporated homeless persons, and we also excluded colonias, or informal settlements in the American Southwest which often have more formal construction despite not having title to the land. We examined all available data in the articles to determine the location of the encampment reported upon in order to ensure we did not double-count encampments that were reported in the media more than once.

We acknowledge our data does not represent an accurate count of encampments in the United States. Higher news reports of encampments could indicate the growth of unique encampments *or* merely increased journalistic attention to encampments that already existed, *or* some combination of the two. Additionally, because this survey was undertaken over the course of approximately six months in 2017—rather than at various intervals throughout the full ten-year window being studied—the year-over-year trends are susceptible to a form of recency bias, in which older reports are more likely to be non-digitized, pay-walled, excluded from search algorithms, or otherwise unavailable online. We attempted to correct for this through the use of the paid

---

24    This research was led and compiled by pro bono attorneys at Sullivan & Cromwell, LLP with significant assistance from Ballard Spahr LLP, Nixon Peabody LLP, and O'Melveny & Myers.

search engines which have more standardized sources archived further back. Encouragingly, the data from those sources are consistent with our non-paid findings.

This survey more likely underestimates the scale both of articles and of encampments. Any articles without the name of the state would have been excluded from the survey because of our search terms—the relatively low number of reports from Washington State and Hawaii, where we know many more encampments (and reports) exist, demonstrates the likelihood that this is an undercount. Further, as a practical matter many encampments are designed not to be noticed and come and go without ever being recorded in any news media. Others, while not hidden, may not be "newsworthy." Indeed, a recent report states there are 400 encampments in Seattle alone, compared to the nine recorded by our search.[25] Nonetheless, even with overly conservative annual totals, we believe the trend lines within the data set are useful. This is the first attempt at a longitudinal study that provides support for the anecdotal reports we have received from across the country that indicate that the number of homeless encampments is growing rapidly, and we believe it is important to share this data in hopes of reversing this trend. We encourage other, more rigorous studies to build on this effort.

## Results

### Number of Encampments Reported by the Media



## Encampments Reported

| Year | Reports | % Increase Year over Year | % Increase from 2007 |
|------|---------|---------------------------|----------------------|
| 2007 | 19 | | |
| 2008 | 29 | 53% | 53% |
| 2009 | 52 | 79% | 174% |
| 2010 | 67 | 29% | 253% |
| 2011 | 50 | -25% | 163% |
| 2012 | 94 | 88% | 395% |
| 2013 | 112 | 19% | 489% |
| 2014 | 146 | 30% | 668% |
| 2015 | 204 | 40% | 974% |
| 2016 | 274 | 34% | 1342% |
| **Total** | **1047** | | nlchp.org |

## Media Reports of Encampments

The number of media reports of homeless encampments increased by 1,029 percent between 2007 and 2017. This figure includes all articles we found according to our search terms, some of which cover the same encampment multiple times. The rapid growth of media coverage parallels the growth of reported encampments. Notably, the number of reports of homeless encampments more than doubled in the three years between 2013 and 2016 and rose by a third just in 2015-2016. 2017 data is only through the summer of 2017, but given that there are almost as many reports in just those months as all of 2016, we project the upward trend is continuing.



25   Gillian Flaccus & Geoff Mulvihill, *Growing Homeless Camps Contrast with West Coast Tech Wealth*, S.F. Chron. (Nov. 5, 2017), http://www.sfchronicle.com/news/article/Homeless-explosion-on-West-Coast-pushing-cities-12334291.php.

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

| Total Number of Reports of Homeless Encampments Reported Nationwide | |
|---|---|
| 2007 | 27 |
| 2008 | 38 |
| 2009 | 55 |
| 2010 | 74 |
| 2011 | 69 |
| 2012 | 120 |
| 2013 | 134 |
| 2014 | 175 |
| 2015 | 238 |
| 2016 | 326 |
| 2017* | 305 |

*2017 data was compiled between May and October, and thus does not represent a full calendar year of available news reports

## Number of Residents of Encampments

During the period of 2007-2017, 32 percent of relevant news stories contained data regarding the number of residents within reported homeless encampments. Of those reports, 9 percent have fewer than 5 residents, 10 percent have between 5 and 10 residents, 19 percent have between 11 and 20 residents, 31 percent have been 21 and 50 residents, 9 percent have between 51 and 75 residents, 5 percent have between 76 and 100 residents and 17 percent have greater than 100 residents.



The greatest increase in number of reported encampments was in the 21-50 range, followed by 51-75, and then greater than 100, so it appears that medium to large encampments are on the rise, or, at a minimum, getting the greatest news coverage.



## Average Time in Existence of Encampments

During the period of 2007-2017, 23 percent of relevant news stories contained data regarding the amount of time reported homeless encampments have been in existence. Of those, 7 percent had existed for less than one month, 22 percent had existed between one and six months, 8 percent had existed between seven and eleven months, 19 percent had existed between one and two years, 17 percent had existed between three and five years, 11 percent had existed between six and ten years and 16 percent had existed for greater than ten years. The last few years have seen the greatest growth of longer-term (more than one year) encampments, but also a sharp uptick in 1-6 month reports, which likely indicates both a growth of new encampments and also a quicker response by cities to evict them (which often prompts media coverage, as noted below).



**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

Section 1





## Legal Status of Encampments

During the period of 2007-2017, 73 percent of relevant news stories contained data regarding the legal status of reported homeless encampments. Of these reports, 4 percent were reported to be legal, 20 percent were reported to be semi-legal (tacitly sanctioned), and 76 percent were reported to be illegal. 35 percent of the reported encampments were planned to be or already had been evicted, most often with no alternative housing identified for those being displaced. While illegal encampments have long made up the majority, illegal encampments are also growing faster than other categories of encampments.

## State Data

The below chart shows media reports of encampments by state, with at least one encampment reported in each state (and Washington, D.C.). California had the highest number of reports by far. A reminder that this survey excluded media stories that did not mention the state name, or that had the word "homeless" further than five words away from either "encampment" or "tent city," so some states that have frequent reports of encampments have very few reflected here. For example Hawaii only recorded ten reports in our survey and Washington State, where a recent article stated Seattle alone had 400 encampments, only reported nine in our survey, demonstrating the likely under-inclusiveness of our search terms.[26]





---

26   Gillian Flaccus & Geoff Mulvihill, *Growing Homeless Camps Contrast with West Coast Tech Wealth*, S.F. Chron. (Nov. 5, 2017), http://www.sfchronicle.com/news/article/Homeless-explosion-on-West-Coast-pushing-cities-12334291.php.

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

**Section 1**

| Total Number of Reports of Homeless Encampments Reported By State  (*2017 partial year data) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **State** | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017*** |
| **AL** | 4 | 0 | 0 | 0 | 1 | 2 | 3 | 10 | 1 | 9 | 0 |
| **AK** | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 4 |
| **AZ** | 0 | 0 | 0 | 1 | 2 | 0 | 1 | 0 | 4 | 2 | 4 |
| **AR** | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 2 | 0 | 3 |
| **CA** | 6 | 7 | 16 | 24 | 20 | 50 | 35 | 62 | 100 | 129 | 120 |
| **CO** | 0 | 0 | 0 | 0 | 1 | 2 | 0 | 2 | 4 | 7 | 4 |
| **CT** | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 3 | 0 |
| **DC** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 |
| **DE** | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 3 | 0 | 1 | 0 |
| **FL** | 0 | 1 | 0 | 2 | 0 | 2 | 2 | 2 | 1 | 2 | 5 |
| **GA** | 0 | 0 | 1 | 0 | 0 | 1 | 4 | 1 | 0 | 3 | 1 |
| **HI** | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 2 | 4 | 10 |
| **ID** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 0 | 1 |
| **IL** | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 1 | 7 | 16 | 15 |
| **IN** | 0 | 0 | 2 | 2 | 0 | 1 | 10 | 4 | 1 | 26 | 27 |
| **IA** | 1 | 2 | 7 | 7 | 3 | 4 | 11 | 9 | 10 | 11 | 1 |
| **KS** | 0 | 1 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 2 |
| **KY** | 1 | 0 | 2 | 6 | 1 | 2 | 4 | 4 | 0 | 2 | 3 |
| **LA** | 9 | 16 | 1 | 3 | 2 | 2 | 1 | 13 | 2 | 2 | 0 |
| **ME** | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 2 | 13 | 15 | 4 |
| **MD** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 7 | 17 |
| **MA** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 |
| **MI** | 0 | 4 | 8 | 4 | 7 | 19 | 2 | 14 | 14 | 2 | 4 |
| **MN** | 0 | 0 | 0 | 1 | 0 | 1 | 3 | 0 | 0 | 0 | 0 |
| **MS** | 1 | 0 | 0 | 1 | 3 | 1 | 4 | 2 | 1 | 2 | 5 |
| **MO** | 0 | 0 | 1 | 4 | 3 | 9 | 4 | 4 | 3 | 7 | 9 |
| **MT** | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 1 |
| **NE** | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 0 | 1 | 0 |
| **NV** | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 3 |
| **NH** | 0 | 0 | 3 | 2 | 1 | 0 | 7 | 0 | 0 | 2 | 0 |
| **NJ** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 1 |
| **NM** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 2 | 6 |
| **NY** | 3 | 1 | 1 | 0 | 0 | 1 | 1 | 4 | 9 | 2 | 0 |
| **NC** | 0 | 0 | 1 | 2 | 0 | 0 | 10 | 1 | 3 | 1 | 1 |
| **ND** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| **OH** | 2 | 1 | 1 | 2 | 0 | 3 | 0 | 3 | 7 | 5 | 3 |
| **OK** | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 1 | 3 | 0 |
| **OR** | 0 | 2 | 1 | 0 | 1 | 2 | 11 | 4 | 12 | 9 | 9 |

**Section 1**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **PA** | 0 | 1 | 0 | 4 | 0 | 1 | 2 | 2 | 3 | 4 | 2 |
| **RI** | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 |
| **SC** | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 3 | 1 | 1 | 1 |
| **SD** | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 1 | 0 |
| **TN** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 5 | 2 |
| **TX** | 0 | 0 | 0 | 1 | 2 | 1 | 0 | 1 | 6 | 12 | 16 |
| **UT** | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 4 |
| **VT** | 0 | 0 | 0 | 0 | 20 | 0 | 0 | 1 | 0 | 2 | 1 |
| **VA** | 0 | 1 | 5 | 4 | 0 | 5 | 6 | 10 | 9 | 11 | 0 |
| **WA** | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 3 | 6 | 9 |
| **WV** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 |
| **WI** | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 1 | 1 | 2 |
| **WY** | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |



SECTION 2

**Cities Largely Respond with Criminalization Approaches**

**Section 2**

## National Trends

Many communities have responded to the growth of encampments described above by increasing the number, and the enforcement, of laws criminalizing homelessness. These policies are tremendously expensive for communities, and involvement in the criminal justice system often results in the further entrenchment of homelessness. It costs time and money to extricate oneself from the criminal justice system; criminal records make it more difficult to find jobs or housing. Sweeps of encampments without ensuring adequate notice and alternative housing can be life-threatening for the individuals living there. A handful of communities have begun looking at more constructive, less punitive approaches. This section looks at the range of policies that communities have adopted to specifically address homeless encampments and the harmful consequences of some of those policies; later sections then document the case studies of more constructive approaches.

Of the 187 Cities we reviewed,

- 33 percent of cities prohibit camping city-wide and 50 percent prohibit camping in particular public places, increases of 69 percent and 48 percent respectively between 2006 and 16. Many more cities use trespass or disorderly conduct statutes in order to evict residents of encampments.

- 50 percent have either a formal or informal procedure for clearing or allowing encampments.

- Only five cities (2.7 percent) have some requirement that alternative housing or shelter be offered when a sweep of an encampment is conducted.

- Only 20 cities (11 percent) had ordinances or formal policies requiring notice prior to clearing encampments. Of those, five can require as little as 24 hours' notice before encampments are evicted, though five require at least a week, and three provide for two weeks or more. An additional 26 cities provided some notice informally, including two that have provided more than a month.

- Only 20 cities (11 percent) require storage be provided for possessions of persons residing in encampments if the encampment is evicted. The length of storage required is typically between 30 and 90 days, but ranged from 14 to 120 days.

A regional analysis found western cities have more formal policies than any other region of the country, and are more likely to provide notice and storage.

## Methodology and Process

We researched 187 cities to determine the existence and nature of current statutory and other formal and informal policies with respect to homeless encampments.[27] To our knowledge, this is the first national survey of formal or informal policies related to encampment response. For purposes of this analysis, an encampment is defined as a group living arrangement in a public location involving semi-permanent shelters and storage of possessions. We looked at laws that criminalize camping or sleeping over the years 2006 and 16. We also collected and analyzed other practices and procedures have been adopted or employed to: (1) allow or prohibit encampments; (2) clear or close encampments; (3) how evictions are conducted, including notice to residents; and (4) the treatment of possessions of persons residing in encampments if there is an eviction.

Since 2006, the Law Center has been following 187 cities to see how their laws related to criminalization of homelessness have evolved; they were originally selected for geographic and population diversity. The Law Center updated this research in late 2016.[28] Through online research, we identified laws that restrict or prohibit seven different categories of conduct disproportionately performed by homeless people, including sleeping, sitting or lying down, and living in vehicles within public space. It is important to note that while our research documents the existence of these laws in different cities, enforcement of them may vary widely. Furthermore, the research was not intended to survey all of the many criminal statutes that could potentially be used to arrest people living in encampments. We note this representative sample leaves out many cities which may have relevant policies, so the lack of reference to those cities' policies should not be taken as an absence of their addressing encampments.

In 2017, we re-visited the 187 cities for additional information on how they deal with encampments. These are the steps we took:

*Step 1: Research:* For each municipality, we first determined whether there were any relevant ordinances directly addressing encampments. Next, we determined whether there were any judicial decrees governing the treatment of encampments. Third, we identified any published policy statements regarding encampments from police or other municipal departments (*e.g.*, sanitation, health, housing/

---

27   The following information was researched, collected and analyzed through the hard work of many pro bono volunteers from Blank Rome LLP.

28   Nat'l Law Ctr. on Homelessness & Poverty, Housing Not Handcuffs: Ending the Criminalization of Homelessness in U.S. Cities (2016), https://www.nlchp.org/documents/Housing-Not-Handcuffs.

homeless, public works, municipal databases, etc.). We further identified ordinances that do not specially address encampments but can be or have been relevant to actions taken in regard to them. We also canvassed news reports, contacted officials by telephone and interviewed representatives from organizations assisting the homeless in certain cities to help identify any informal policies or generally applied practices.

*Step 2: Data Compilation and Recording:* We compiled and collected information from the research for each municipality and entered the data on an excel spreadsheet so that it could be sorted and compiled. In order to do this, we applied certain rules about how to categorize information we had obtained. See Appendix II for information collected. We note that there are distinctions in the language used and nuances in ordinances that required some judgment about the proper placement for data collection purposes.

*Step 3: Verification:* Individual attorneys responsible for the research of each city were asked to verify the data entry on their respective cities to confirm the accuracy of any information/data that had been updated as part of the process of finalizing, revising and/or making consistent the data capture.

This research process was deliberately comprehensive to attempt to capture laws, policies, and practices that can exist in many different forms and places. Nonetheless, it is likely that some laws, policies, and practices were not captured. For example, Seattle's ordinance authorizing the establishment of legal encampments was not found in the initial research or quality control. Because we knew of it, we were able to add it into the data set, but others may still have been missed.

### Results

Ordinances, Published Procedures, or Informal Practices

Overall, we found that 30 percent of the cities surveyed (57 of 187) had either an ordinance, published procedure, or consent order or settlement addressing the treatment of homeless encampments.  The vast majority of these policies or procedures prohibit encampments.

- 43 of the 187 surveyed cities (23 percent) had an ordinance that specifically addressed encampments;

- Six of the surveyed cities (3 percent) were subject of judicial decrees or settlements governing the treatment of encampments; and

- 14 of the surveyed cities (7 percent) had a published



Surveyed Cities Identified as Having an Ordinance, Published Procedure of Police or Other Municipal Department, Consent Order or Settlement Specifically Addressing the Treatment of Homeless Encampments

57

130

■ Yes ■ No



Ordinances or Formal Policies Identified in 187 Surveyed Cities*

* Cities may be counted twice where more than one type of ordinance or formal policy has been identified.

policy procedure from police or other municipal departments addressing encampments.[29]

Furthermore, we found that an additional 36 cities (19 percent of the surveyed cities) have applied an informal practice or used more generic ordinances and procedures in clearing or allowing encampments even though they did not appear to have ordinances or formal written policies specific to encampments in place.

Overall, we found that approximately half of all cities surveyed

---

29    Although not appearing to specifically address encampments, we note that we also identified other more general ordinances addressing camps or camping in public parks in 25 percent (46) of the surveyed cities, and ordinances not specifically addressing encampments or camps that nevertheless could be used to address encampments in 21 percent (39) of the surveyed cities.  Note that some cities had more than one of the applicable ordinances or other procedures noted.

Cities with Ordinance, Consent Decree, Settlement or Formal Published Procedure Addressing Encampments *or* Applying Informal Practice or More General Ordinance



57

36

94

■ Cities with Ordinance, Consent Decree or Published Procedure Addressing Encampments

■ Additional Cities Applying Informal Practice or More General Ordinance

■ Neither

– 50 percent (93 of 187) *either* (i) have an ordinance, published procedure or consent order or settlement addressing the treatment of homeless encampments, *or* (ii) have applied an informal practice or applied more generic ordinances and procedures in clearing or allowing encampments.

### Legalized Encampments

Only three of our surveyed cities explicitly outline procedures for city-designated legalized encampments: Olympia, WA, provides details on how a religious organization or the county can host an encampment under the Washington State statute discussed in the case studies below;[30] Seattle, WA, which authorizes both religious organization hosted encampments and revised zoning laws to temporary encampments on city or private property;[31] and Sarasota, FL, allows the city commission to consent to temporary encampments on city property and prohibits enforcement of an anti-camping ordinance unless an offer of shelter is made.[32]

Milwaukee, WI, has a police procedure that allows encampments to exist unless complaints of criminal activity or health code violations compel an action, and in that event requires one week notice and referral to social service providers.[33]

### Legal Limits on Enforcement of Anti-Camping Laws

A further seven of our surveyed cities limit enforcement, at least on paper, in certain circumstances, despite criminalizing living out doors in various forms. Indianapolis, IN, (covered in a case study below) requires the offer of alternative *housing* before an encampment can be cleared, with emergency exceptions.[34] San Francisco, CA,[35] and Charleston, WV, (covered in case study below),[36] require an offer of *shelter* before an encampment clearing specifically. Clearwater[37] and Miami, FL,[38] require an offer of shelter before enforcement of a variety of criminalizing ordinances. Wichita requires police "make reasonable attempts to find shelter" before clearing an encampment and requires them to treat unattended property with the same respect as property in a home. Santa Cruz, CA,[39] and Boise, ID,[40] mandate no citation of individuals for camping if shelters are full. Los Angeles, CA, under court-approved settlement, will not enforce anti-camping ordinances overnight until 1,250 new units of low-income housing are created in Skid Row.[41]

### Procedures Employed: Notice and Storage

With respect to specific procedures that municipalities follow when clearing encampments, we found that:

- 20 cities (11 percent) had ordinances or formal policies requiring notice when clearing encampments, and an additional 26 cities (14 percent) appear to have provided notice when previously engaging in such clearing operations.

- The amount of notice required or provided was often 1-3 days, although in some instances such notice extended for several weeks. Notable examples include: Charleston, WV, provides 14 days' notice; [42] Indianapolis, IN provides 15 (both reviewed in case studies below);[43] Anchorage, AK, provides three or 15 days' notice, apparently at the law enforcement officer's

---

30   Olympia, Washington, Municipal Code § 18.50.010.

31   Seattle, Washington, Municipal Code § 23.42.054, 23.42.056.

32   Sarasota, Florida, Municipal Code § 34-37; 34-41.

33   Milwaukee Police Dep't, Standard Operating Procedure 165, Homeless Persons (2016) *available at* http://city.milwaukee.gov/ImageLibrary/Groups/mpdAuthors/SOP/165-HOMELESSPERSONS.pdf.

34   Indianapolis, Indiana Municipal Code §231-502. Housing may include transitional housing, a form of shelter.

35   San Francisco, California Police Code §169.

36   City of Charleston Homeless Encampment and Transient Outdoor Temporary Living Policy, City Council of Charleston, West Virginia [hereinafter "City Ordinance"].

37   Clearwater, Florida Municipal Code § 21.21.

38   *See* Pottinger v. City of Miami, 810 F. Supp. 1551 (S.D. Fl. 1992); Pottinger v. Miami Settlement Agreement, CASE NO. 88-2406-CIV-ATKINS, http://osaka.law.miami.edu/~schnably/pottinger/Settlement.html.

39   Santa Cruz, California Municipal Code § 6.36.010.

40   Boise, Idaho Municipal Code § 9-10-01, 02. The Law Center is currently in litigation with Boise because one shelter claims it will always put down an additional mat, and therefore is never full, essentially mooting the protection.

41   Los Angeles Municipal Code §41.18.

42   City of Charleston Homeless Encampment and Transient Outdoor Temporary Living Policy, City Council of Charleston, West Virginia.

43   Indianapolis, Indiana Municipal Code §231-502.

Case 8:18-cv-00155-DOC-JDE   Document 85-1   Filed 02/12/18   Page 31 of 124   Page ID
#:1491
**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

Section 2



discretion.[44]

- 21 cities require storage be provided for possessions of persons residing in encampments.

- The length of storage required is typically between 30 and 90 days, but ranged from 14 to 120 days.



Geographic Differences in Approach

To examine differences that may be found among different regions of the county, we divided the cities into four geographic regions (see Appendix III for classification). Our research indicates that cities in the Western region of the country were far more likely to have enacted ordinances or instituted written policy procedures addressing encampments than cities in other parts of the country. With respect to those cities that do not have ordinances or formal policies in place, we found that cities in the Northeast had the highest prevalence of informal practices or using more generic ordinances and procedures in clearing or allowing

encampments. Overall, we found that it was more common among cities in the Western region of the country than cities from other regions to have *either* (i) a formal ordinance, published procedure or consent order addressing the treatment of homeless encampments, *or* (ii) an informal practice or a process of utilizing more generic ordinances and procedures in clearing or allowing encampments.

With respect to requirements connected to sweeps of encampments, we found that the Western and Midwestern cities were much more likely to require notice when sweeping an encampment:





We also found that Western and Northeastern cities were more likely to have provided notice when not specifically required by ordinance or formal written policy:



We also found that a higher percentage of Western cities require storage when conducting sweeps:



## Summary of Survey Results

Our survey reveals that significantly more cities prohibit and restrict homeless encampments than safeguard the rights of encampment residents. Only a few municipalities follow federal guidance, discussed further in the next section, to allow encampments to be cleared only if specified alternative shelter or housing is available for those who are to be removed from the encampments. As will be discussed in the case studies, passing such ordinances can provide incentives for the municipalities to find permanent housing alternatives, but does not always do so.

Only 25 percent of cities formally required, or informally provided, notice before an encampment is cleared. Only 11 percent provided storage for belongings swept from encampments. In general, notice permits the residents of the encampment to locate alternative shelter, if it exists, or at a minimum ability to safeguard their belongings. Sufficient notice benefits both the homeless population and the city: if encampments are cleared with no notice, the city could well face a more significant humanitarian problem. While only a few cities require 30 days or more notice, we recommend this as a minimum to ensure ample time for outreach and connecting encampment residents to appropriate services lest they be pushed somewhere where they will simply end up on another street corner later.

Storage requirements allow homeless persons to retrieve belongings, including IDs and other important documents. While length of storage is important, even more important is ensuring accessibility of storage, as will be discussed in the case law section. Opening times beyond normal business hours, not requiring ID, and accessibility by public transit are

all important factors in creating adequate storage options.

Regardless of notice or storage, however, encampments exist because of a lack of suitable housing. Clearing encampments without notice or provision for appropriate housing solutions simply exacerbates the problems. Only ensuring access to permanent housing resolves encampments for good.

## The Costs of Law Enforcement Responses to Encampments

The costs to indiviuals from sweeps of encampments can be life-threatening: numerous lawsuits have documented necessary medications and shelter being stripped from persons forced to live on the streets. Taylor Andrew Kent is a disabled Air Force veteran diagnosed with terminal cancer living in the Civic Center Plaza in Santa Ana, CA.[45] One morning, despite his belongings being neatly arranged, the police swept his camp, seizing his backpack with medications, computer tablet, bedding, tent, medical card, Veterans Administration papwerwork, and bicycle.[46] Following the incident, he was unable to recover or replace his medications and was hospitalized for seizures and an infection.[47] When he returned, police ordered him to take down his tent and umbrella in the middle of a hot summer day, and he developed heat stroke.[48] He was treated on-site but refused to go back to the hospital for fear of his belongings being taken once again.[49] Countless other persons living in encampments face similar deprivations of necessary medications, ID, paperwork, phones, computers, and other key items that they need to help them both survive on the street and hopefully get back into housing.

Beyond these individual costs, the costs to cities and taxpayers of taking punitive approaches to homelessness can be staggering. The City Administrator's Office of Los Angeles, CA, found the city spends $100 million annually on homelessness, but $87 million of that was devoted to law enforcement responses leaving only $13 million for housing and services.[50] Honolulu, HI, spends $15,000 per week—$750,000 per year—on encampment sweeps, with many homeless residents simply moving around the corner for a day or two and then coming right back.[51] A

2014 analysis by Creative Housing Solutions evaluated the cost of homelessness in Central Florida at $31,000 per year for law enforcement and medical costs for each chronically homeless person; permanent housing and case managers would cost approximately $10,000 per year, saving $21,000 per year per individual housed, and collectively $149 million over the next decade.[52]

> "The sweeps have completely failed to address homelessness, which has increased dramatically over the years. Rather than put an immediate stop to this inhumane and ineffective policy, and directing taxpayer funds to homeless services and affordable housing, the Mayor is now proposing to outsource this failed strategy to the private sector to the tune of a million dollars."
>
> –Seattle City Councilor Kshama Sawant, June 14, 2017, http://www.realchangenews.org/2017/06/14/seattle-issues-1-million-contract-homeless-sweeps.

Cities also spend thousands of dollars on fences, bars, rocks, spikes, and other "hostile" or "aggressive" architecture, deliberately making certain areas of their community inaccessible to homeless persons without shelter. San Diego, CA, recently spent $57,000 to install jagged rocks set in concrete underneath an overpass in advance of the Major League Baseball All-Star game.[53] Spokane, WA, spent $150,000 to install rocks under their overpasses, for which the City Council President, Ben Stuckart, later apologized, stating, "I chose an expedient and strong-armed solution instead of the collaborative and holistic approach… the homeless citizens relocated from their community deserved an outstretched hand from their elected officials instead of a hammer and a bunch of rocks."[54] Other cities, like Chicago, IL, fence off areas under bridges to prevent homeless persons from sheltering there, and even redesign sidewalks to make them less accessible.[55] Santa Cruz, CA,

---

45   Complaint at ¶ 28, Orange County Catholic Worker v. Santa Ana, Case No. 2:17-cv-05667 (C.D. Cal. Aug. 1, 2017).

46   *Id.*

47   *Id.*

48   *Id.*

49   *Id.*

50   *See* Gale Holland, *L.A. Spends $100 Million a Year on Homelessness, City Report Finds*, L.A. Times (Apr. 16, 2015), http://www.latimes.com/local/lanow/la-me-ln-homeless-cao-report-20150416-story.html.

51   Dominique Times, *Weekly Cleanups Provide Temporary Respite from Homeless and Their Belongings*, Hawaii Star Advertiser (July 12, 2016), http://www.staradvertiser.com/2016/07/12/hawaii-news/weekly-cleanups-provide-temporary-respite-from-homeless-and-their-

belongings/.

52   Gregory A. Shinn, The Cost of Long-Term Homelessness In Central Florida: The Current Crisis & The Cost of Providing Sustainable Housing Solutions (2014), http://shnny.org/uploads/Florida-Homelessness-Report-2014.pdf.

53   *See* Mary Davis, *Rocks to oust homeless were about baseball, not neighbors.* San Diego Union Tribune (June 16, 2016), http://www.sandiegouniontribune.com/news/watchdog/sdut-homeless-rocks-all-star-game-2016jun16-htmlstory.html; San Diego Union Tribune Editorial Board, *San Diego's new homeless solution is a bad move*, San Diego Union Tribune (Apr. 28, 2016), http://www.sandiegouniontribune.com/opinion/editorials/sdut-imperial-avenue-underpass-rocks-homeless-2016apr28-story.html.

54   Grace Ditzler, *Council president regrets using boulders to move homeless*, KXLY (Sep. 8, 2017), http://www.kxly.com/news/local-news/council-president-regrets-using-boulders-to-move-homeless/617976161.

55   *See,* Mary Wisniewski, *Homeless group close to suit over bike path plan in Uptown*, Chicago Tribune (June 21, 2017), http://www.chicagotribune.com/news/columnists/wisniewski/ct-homeless-bridges-getting-around-0821-20170820-column.html.

Section 2

spent $1,000 per box to install loudspeakers on timers under several overpasses that emit high pitched noises at night that cause headaches.[56] The resources required to construct these features do nothing to solve the need for people to shelter, make people in need more vulnerable to natural hazards, and in the process, drain community funds to unproductive purposes.

 

Aggressive architecture costs cities thousands and does nothing to solve the problem of people needing a place to sleep. Photo credits: Ken Martin and Eric Falquero // Street Sense Media.

Many communities state they need criminalization ordinances to provide law enforcement with a "tool" to push people to accept services, but providing outreach backed with resources for real alternatives is the far better, proven approach. The 100,000 Homes Campaign, now known as "Built for Zero," found permanent housing for more than 100,000 of the most "service-resistant" chronically homeless individuals across America by listening to their needs and providing appropriate alternatives that actually meet their needs.[57] This approach may require upfront investment of time, but has documented far more permanent solutions, ensuring those communities' street corners will be free of homeless individuals not temporarily, because they are in jail, but long term, by ensuring they have an adequate alternative place to be.

When cities emphasize services and housing over law enforcement, the savings can be substantial: Miami-Dade County, Florida found that providing mental health de-escalation training to their police officers and 911 dispatchers enabled them to divert more than 10,000 people to services or safely stabilizing situations without arrest.[58] The jail population fell from over 7,000 to just over

4,700, and the county was able to close an entire jail facility, saving nearly $12 million a year.[59] Stories like this led to the White House launching the Data-Driven Justice Initiative in June 2016, and now more than 130 jurisdictions are participating in the effort to use data-driven strategies to reduce unnecessary incarceration and provide housing and services instead.[60]

Profiles of Criminalization Approaches to Encampments

To help illustrate how cities are using criminalization, or punitive, approaches to the growth of encampments, we asked several of our local partners to share their observations. They provide the following accounts.

---

56    Santa Cruz installs high pitch noise boxes along San Lorenzo River levee, KSBW (Sep. 9, 2014), http://www.ksbw.com/article/santa-cruz-installs-high-pitch-noise-boxes-along-san-lorenzo-river-levee/1054906.

57    *See Built for Zero*, COMMUNITY SOLUTIONS, https://www.community.solutions/what-we-do/built-for-zero (last visited Nov. 22, 2017).

58    Fact Sheet, White House Office of the Press Secretary, Launching the Data-Driven Justice Initiative: Disrupting the Cycle of Incarceration (June 30, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/06/30/fact-sheet-launching-data-driven-justice-initiative-disrupting-cycle.

59    *Id.*

60    *Id.; see also Data-Driven Justice: Disrupting the Cycle of Incarceration*, NAT'L ASSOC. OF COUNTIES, http://www.naco.org/resources/programs-and-services/data-driven-justice (last visited Nov. 22, 2017).

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

Section 2



Posted by **Kayvan Soorena Tyler Khalatbari-Limaki**
598,881 Views

👍 Like   ➦ Share

Source: Kayvan Soorena Tyler Khalatbari-Limaki, Nov. 29, 2016, https://www.facebook.com/kayvan.khalatbari/videos/vb.504543084/10154062686923085/?type=2&theater

### Denver, Colorado

-Terese Howard, Denver Homeless Out Loud

If you are homeless in Denver Colorado you are almost certain to be told by police "you can't be here." Denver has had a "camping ban" (better named "survival ban") since 2012. This law makes it illegal to use any form of protection from the elements other than your clothing. Denver winters get to be in the negative degrees and hundreds of homeless people sleep outside in this weather—if they were to obey the law and not cover themselves they would die.

Denver in 2016, under the direction of Mayor Hancock, increased the enforcement of the survival ban and other similar laws and practices in massive and regular sweeps. One horrible sweep happened on a December 2015 morning at 6 a.m. in the freezing snow. With no warning police came and started sweeping everyone away, telling them they could take one or two bags and everything else was going to be trashed and they had to move right now. One man in a wheel chair was arrested for not complying and his stuff was taken while he was taken to jail; he never found his belongings. Many people were left with no gear to survive the next cold winter night. Sweeps continued in these same areas as people come back to gather for safety, and in other areas where people moved to after the sweeps. In March 2016 the city did a massive and highly publicized sweep of hundreds of people clearing out the whole area

by the shelters where homeless people have been sleeping outside for years.

In November 2016, a video of law enforcement removing blankets from people sleeping outside while it was below freezing went viral.

Police enforcement continues in this area and around the city in a game of homeless whack-a-mole. People are swept from the downtown area to the river, from the river back downtown, and around the city. The enforcement of the survival ban does not just take place in large scale sweeps but in regular enforcement against people sitting with a blanket or even just sitting on a piece of cardboard. People have been arrested while sleeping in a parking lot by the shelter where hundreds of homeless people had been sleeping or hanging out in a few days earlier. People are awoken at all hours of the night and told to move. In November 2017, on a cold snowy day, the city took a homeless man's tent, sleeping bag, and blankets while his friends were there watching his stuff and left everything else scattered about. The city also has taken to closing off areas where homeless people rest with fences or "closed" signs.

We have a class action lawsuit active against the city of Denver for the sweeps based on the violation of our 4th and 14th amendment rights. This lawsuit says these practices are not only inhumane and ineffective, but unconstitutional. We also continue to run the Right to Rest Act at the Colorado State legislature which would protect our based human rights to exist in public space.

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

## Titusville, Florida



Source: City of Titusville pursuant to a public records request

Kirsten Anderson, Southern Legal Counsel, Inc.

Homelessness in rural areas and smaller cities is not as visible as in urban centers. Encampments tend to be hidden in the woods and located on either public or private property, sometimes with the consent of private landowners. The lack of visibility does not protect these encampments from harsh responses by local governments, as one community of homeless individuals in Titusville, FL, learned the hard way.

On June 22, 2011, the City of Titusville raided and systematically destroyed homeless encampments located on private property in wooded areas around the city. Titusville, home of the Kennedy Space Center, was about to host NASA's final launch of the Space Shuttle Program on July 8. In preparation for the estimated one million people who flooded into the area to commemorate this event, Titusville designed and implemented a "Homeless Camp Action Plan" to systematically map and dismantle homeless encampments throughout the City.

The City showed up, with no notice to the homeless residents of the community, many of whom were veterans, and bulldozed the camps. The City then disposed of all property it seized at the local dump, some of which was irreplaceable.

Southern Legal Counsel, a non-profit public interest law firm, collaborated with Community Legal Services of Mid-Florida (a federally funded Legal Services Corporation program) to obtain justice for homeless individuals who lost the only place they had to call home and everything they owned. After filing two federal lawsuits on behalf of 7 plaintiffs, a settlement was reached with the City to provide monetary damages to these individuals.

Lead plaintiff David Gotshall previously served in the U.S. Navy and was a veteran of Desert Storm. While he was away from his campsite, the City seized and destroyed all of his belongings including veteran's affairs paperwork, photographs, his family bible, an American flag, and an urn containing his father's ashes. Another plaintiff, Jeffrey Engebretsen, previously served in the U.S. Marine Corps. All of his property was also seized and destroyed by the City, including his grandmother's cross and a World War II flag that belonged to his father for service in the military.

No money can ever compensate these individuals for the loss of dignity and the destruction of such irreplaceable possessions. These types of sweeps are cruel and inhuman, but unfortunately continue to feature prominently in local government responses to encampments in Florida and across the country.

## Olympia, Washington

Robert Gorrill, Just Housing

Like in so many other U.S. cities, the concomitant effects of gentrification, an erosion of social and health services, low wages and unemployment, and an affordable housing shortage have caused a severe crisis of homelessness in Olympia, WA. Recent data has suggested that there are some 800-1,000 people without shelter in Thurston County (of which Olympia is the largest city). The majority of these people live in Olympia and even more use social services based in Olympia. Despite this high rate of homelessness, only about 250 shelter beds are available in the winter and less than 200 are available throughout the rest of the year. This means that the majority of the unhoused are rough sleepers - relegated to often inhospitable and dangerous living conditions outside, be it sleeping in the woods, under bridges, by railroad tracks, on sidewalks or in alleyways.

Olympia's city's government not only makes zero effort to ameliorate homelessness, it actively criminalizes and displaces the unhoused. This criminalization mostly occurs through the enforcement of various municipal ordinances, including policies that ban or limit public camping, loitering and sleeping in cars.

Enforcement of these ordinances constantly displaces unhoused people from one location to another throughout the city. People sleeping on sidewalks or benches during the day are roused by police because of the No Sit/No Lie ordinance, while campers off the beaten path in public parks are forced to move along because of the camping ban. The Olympia Police Department often charges unhoused people camping in the woods or sleeping on the sidewalk with trespassing, instead of formally charging people with violation of the camping ban or the No Sit/No Lie ordinance, perhaps to avoid constitutional scrutiny for their actions.

Moreover, the city government has vigorously enforced obscure codes against businesses that are seen as too homeless-friendly. Businesses who allow unhoused people to sleep on their property may be targeted by code-enforcement for allowing inadequate shelters (lack of sanitation, running water, etc.) on their property. Code-enforcement charges exorbitant fines on such businesses and recently the city government was threatening a landlord into evicting a local non-profit that works with survivors of abuse, because unhoused people slept by the non-profit at night.

When unhoused people and their supporters resist criminalization and displacement, the city responds with force. When protesters occupied public bathrooms, demanding they remain open on a 24/7 basis, police arrived in riot gear, arresting five and deploying less-lethal weapons to disperse the demonstration. When activists organized a small eviction defense of two campers in a park, 34 police officers showed up (close to half the department), arresting two and charging another with trespassing. After protesters hosted "camp-ins" throughout the summer in front of Olympia City Hall, Olympia's City Manager banned protests on that section of city property, in clear violation of first amendment rights. When a camp was organized shortly after this decision was made, Olympia police arrested four people, two of whom were on the public sidewalk, and used pepper-spray on another non-violent demonstrator.

## San Diego, California

Scott Dreher, Dreher Law Firm

As recently expressed by the former "homeless point-person" of San Diego, the city's approach to homelessness is: *"They just need to move away, just move, even if it's a couple blocks."*

The city's primary tool for this is an ordinance entitled "Unlawful Encroachments Prohibited" (Mun. Code 54.0110). It was designed to discourage businesses from leaving their trash cans on the sidewalk too long after trash pickup; it is a misdemeanor with a penalty of jail. It prohibits members of the public from placing any property anywhere in public, at any time. In practice, the city uses this law as the basis for mass "sweeps" of homeless people from entire city blocks. The city has even admitted that this "encroachments" ordinance is being used to circumvent the city's prior settlement and court order in a civil rights lawsuit over its citing of people for "illegal lodging" (*Spencer v. City of San Diego*).

The number of these citations has increased steadily each month since January 2017, including an 83 percent spike in September 2017.[61] Homelessness has increased 27 percent downtown according to the latest count last January, with the chronic-homeless population growing by 63 percent.[62]

While the city and its police officially claim that they offer help and services, people on the street tell a different story. They say the police rarely offer help and are constantly asking homeless San Diegans to move elsewhere. To the question "but where *can* I go," a common response is "I don't know but you can't stay here."

Jean DuBose and her boyfriend Rashad Burns were awakened just after 5:30 a.m. on Sept. 23, 2017 by an officer trying to unzip the tent they shared. The timing is significant: 5:30 a.m. is when a 2007 court settlement allows police to begin enforcing illegal lodging without needing to offer a shelter bed to the person being arrested. Within minutes, police handcuffed DuBose and Burns and arrested both for encroachment and illegal lodging. The couple looked on as police bagged their belongings. DuBose said she wasn't wearing a bra or socks at the time.

She was released from jail five days later, ending up downtown at 11:30 p.m. lacking nearly all of her things. Records clerks at the San Diego Superior Court said

recently that they had no record of charges filed against either of them.[63]

Parallel to its increased enforcement, San Diego closed public restrooms. This led to a large hepatitis-A outbreak and epidemic. The city then ignored the outbreak for several months, until a non-homeless person contracted the disease. Then the city stepped-up these sweeps under a "health emergency declaration" and also took steps to prevent public food-sharing and other homeless relief efforts by churches and citizens groups. Nearby local cities have already enacted "emergency" ordinance ostensibly preventing public feedings of "homeless" people while excepting from those ordinances public feedings of other people such as weddings, picnics, and club groups.

This past July, a group of homeless people filed a class action civil rights lawsuit against the city seeking to halt the unconstitutional enforcement of this vague "unlawful encroachment" ordinance against homeless people.[64] I represent the plaintiffs in this case.

The city has also aggressively increased its citations of homeless people for "unlawful vehicle habitation," (despite the landmark 2014 Ninth Circuit decision in Los Angeles' *Desertrain* case), resulting in a class action lawsuit in November 2017 on behalf of approximately 820 people, represented by several law firms, including mine and the Law Center, to halt the practice of citing people and confiscating their vehicles.[65]

It's a costly game of whack-a-mole, in which homeless people are cited under vaguely-worded, erratically enforced laws, taken to jail for several days, often without being charged, then forced to sign 'stay away orders' which prevent the people from returning to the area where they were cited (which is usually the area where the social service agencies and providers, and available beds and shelters, are located).

The sweeps and ticketing continue as the central theme of the city's "*move, just move, away*" homelessness policies.

---

61   (https://www.voiceofsandiego.org/topics/government/city-to-down-town-homeless-dont-get-comfortable/ )

62   (https://www.voiceofsandiego.org/topics/nonprofits/san-diegos-street-homelessness-problem-is-a-partly-a-shelter-problem/ ). ADD CITE TO Don't Count on It

63   (https://www.voiceofsandiego.org/topics/public-safety/homeless-enforcement-explodes-amid-hepatitis-outbreak/) (Lisa Halverstadt, Voice of San Diego, 10/20/2017))

64   (Arundel v. City of San Diego, Case No. 17-CV-01433-BEN-BLM) (http://www.voiceofsandiego.org/wp-content/uploads/2017/07/ARUNDEL-Compl.pdf ).

65   (Bloom v. City of San Diego, Case No. 3:17-cv-02324-AJB-NLS).



Section 3

**Guiding Principles and Best Practices**

In response to a previous Law Center report on this topic, *Welcome Home: The Rise of Tent Cities in America*, and growing concern across the country, the U.S. Interagency Council on Homelessness (USICH) convened a working group on encampments made up of city officials and advocates, including the Law Center. Out of those discussions the USICH published *Ending Homelessness for People Living in Encampments: Advancing the Dialogue*—a guidance document which emphasizes a constructive approach to encampments focused on ending homelessness for those living in them, rather than sweeping them out of public view with no long-term solution.[66] The approach is geared toward thoughtful, permanent solutions which address the needs of those in the encampments, rather than a reactive response, addressing only the concerns of those who would rather not see poverty in their communities. The guidance also offers a helpful checklist for communities interested in a constructive approach. The Law Center and numerous other groups remain in dialogue with the USICH to continue improving the guidance, but it is a useful standard by which we evaluate the communities' responses examined in some of the case studies below.



Ending Homelessness for
People Living in Encampments
*Advancing the Dialogue*

August 2015

**USICH Guidance on Encampments**

In 2015, the U.S. Interagency Council on Homelessness issued *Ending Homelessness for People Living in Encampments: Advancing the Dialogue*, which contains a useful checklist approach for communities addressing homeless encampments. The guidance first sets forth several underlying principles, including:

1. The forced dispersal of people from encampment settings is not an appropriate solution or strategy, accomplishes nothing toward the goal of linking people to permanent housing opportunities, and can make it more difficult to provide such lasting solutions to people who have been sleeping and living in the encampment.

2. Providing lasting solutions and ending the homelessness of people living in encampments requires a thoughtful, coordinated, and collaborative plan and process to ensure that people can be linked to appropriate housing options and that the presence of encampments in the community can be resolved.

Based on these principles, the guidance offers an action planning checklist based around four key elements:

1. **Preparation and Adequate Time for Planning and Implementation**: Action plans for creating and providing housing solutions for people living in encampments should ensure that there is adequate time for strategizing, collaboration, outreach, engagement, and the identification of meaningful housing options. Adequate time is essential to achieve the primary objective of meeting the needs of each person and assisting them to end their homelessness.

2. **Collaboration across Sectors and Systems**: Action plans should include collaboration between a cross-section of public and private agencies, neighbors, business owners, and governmental entities, based upon on where the encampment is located. The action plan should feature strong communication among a broad range of community service providers and managers of the permanent housing resources that are being utilized in order to maximize efficiency, align resources, and address system gaps.

3. **Performance of Intensive and Persistent Outreach and Engagement**: Action plans should involve agencies that have strong outreach experience and demonstrated skills in engaging vulnerable and unsheltered people. Effective outreach is essential for

---

66   U.S. Interagency Council on Homelessness, ENDING HOMELESSNESS FOR PEOPLE LIVING IN ENCAMPMENTS: ADVANCING THE DIALOGUE (2015), http://usich.gov/issue/human-rights/effective-community-based-solutions-to-encampments/ [hereinafter ENDING HOMELESSNESS].

effectively connecting people with coordinated assessment systems, resources, and housing options.

**Provision of Low-Barrier Pathways to Permanent Housing**: Action plans should focus on providing people with clear, low-barrier pathways for accessing and attaining permanent housing opportunities and should not focus on relocating people to other encampment settings.

The USICH, in its guidance, took a bright line approach that municipalities should never authorize or support encampments, because that diverts resources that could otherwise go to permanent housing solutions for the residents of those encampments. The underlying principle—

that every American deserves fully adequate housing, and encampments are not an acceptable alternative to permanent housing, is a valid one. But the USICH's stance is not realistic with the current shortage of affordable housing and the current need for housing. As one city official put it "we need to deal with the problem of where do people sleep *tonight* while we build the housing where they can affordably and permanently sleep for the long term." Furthermore, the criminal justice approach that so many communities are adopting is more expensive than supporting encampments short term- diverting a larger amount of resources away from permanent housing solutions.

Based on our research to date, and in consultation with affected communities, we have developed the following guiding principles and best practices, which may provide communities a path forward in the short term as they work toward permanent solutions.

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

**Section 3**

| Encampment Principles & Practices | |
|---|---|
| **Principle 1**: All people need safe, accessible, legal place to be, both at night and during the day, and a place to securely store belongings—until permanent housing is found. | 1. Determine the community's full need for housing and services, and then create a binding plan to ensure full access to supportive services and housing affordable for all community members so encampments are not a permanent feature of the community.<br><br>2. Repeal or stop enforcing counterproductive municipal ordinances and state laws that criminalize sleeping, camping, and storage of belongings.<br><br>3. Provide safe, accessible, and legal places to sleep and shelter, both day and night. Provide clear guidance on how to access these locations.<br><br>4. Create storage facilities for persons experiencing homelessness, ensuring they are accessible–close to other services and transportation, do not require ID, and open beyond business hours. |
| **Principle 2**: Delivery of services must respect the experience, human dignity, and human rights of those receiving them. | 1. Be guided by frequent and meaningful consultation with the people living in encampments. Homeless people are the experts of their own condition.<br><br>2. Respect autonomy and self-governance for encampment residents.<br><br>3. Offer services in a way that is sensitive and appropriate with regard to race, ethnicity, culture, disability, gender identity; sexual orientation, and other characteristics. Use a trauma-informed approach. |
| **Principle 3**: Any move or removal of an encampment must follow clear procedures that protect residents. | Create clear procedures for ending homelessness for people living in pre-existing encampments, including:<br><br>1. Make a commitment that encampments will not be removed unless all residents are first consulted and provided access to adequate alternative housing or—in emergency situations—another adequate place to stay.<br><br>2. If there are pilot periods or required rotations of sanctioned encampments, ensure that residents have a clear legal place to go and assistance with the transition. Pilot periods or requiring rotation of legal encampments/parking areas on a periodic basis (e.g., annually or semi-annually) can help reduce local "not-in-my-back-yard" opposition, but shorter time periods hinder success.<br><br>3. Provide sufficient notice to residents and healthcare/social service workers to be able to determine housing needs and meet them (recommended minimum 30 days, but longer if needed).<br><br>4. Assist with moving and storage to enable residents to retain their possessions as they transfer either to housing, shelter, or alternative encampments. |
| **Principle 4**: Where new temporary legalized encampments are used as part of a continuum of shelter and housing, ensure it is as close to possible to fully adequate housing. | 1. Establish clear end dates by which point adequate low-barrier housing or appropriate shelter will be available for all living in the legal encampments.<br><br>2. Provide access to water, personal hygiene (including bathrooms with hand washing capability), sanitation, and cooking services or access to SNAPS hot meals benefits, to protect public health.<br><br>3. Provide easy access to convenient 24-hour transportation, particularly if services are not co-located.<br><br>4. Statutes and ordinances facilitating partnerships with local businesses, religious organizations, or non-profits to sponsor, support or host encampments or safe overnight parking lots for persons living in their vehicles can help engage new resources and improve the success of encampments.<br><br>5. Do not require other unsheltered people experiencing homelessness to reside in the encampments if the facilities do not meet their needs. |

| **Principle 5**: Adequate alternative housing must be a decent alternative. | 1. Ensure that emergency shelters are low-barrier, temporary respites for a few nights while homeless individuals are matched with appropriate permanent housing; they are not long-term alternatives to affordable housing and not appropriate in the short term for everyone. Low barrier includes the "3 P's"—pets, possessions, and partners, as well as accessible to persons with disabilities or substance abuse problems. |
|---|---|
| | 2. Adequate housing must be: |
| |     a. Safe, stable, and secure: a safe and private place to sleep and store belongings without fear of harassment or unplanned eviction; |
| |     b. Habitable: with services (electricity, hygiene, sanitation), protection from the elements and environmental hazards, and not overcrowded; |
| |     c. Affordable: housing costs should not force people to choose between paying rent and paying for other basic needs (food, health, etc.); |
| |     d. Accessible: physically (appropriate for residents' physical and mental disabilities, close to/transport to services and other opportunities) and practically (no discriminatory barriers, no compelling participation in or subjection to religion). |
| **Principle 6**: Law enforcement should serve and protect all members of the community. | 1. Law and policies criminalizing homelessness, including those criminalizing public sleeping, camping, sheltering, storing belongings, sitting, lying, vehicle dwelling, and panhandling should be repealed or stop being enforced. |
| | 2. Law enforcement should serve and protect encampment residents at their request. |
| | 3. Law enforcement officers—including dispatchers, police, sheriffs, park rangers, and private business improvement district security—should receive crisis intervention training and ideally be paired with fully-trained multi-disciplinary social service teams when interacting with homeless populations. |



SECTION 4

**Case Studies of Less Punitive Approaches**

This section looks at cities that have begun to explore constructive approaches to homeless encampments. Each case study takes a critical eye to the laws, policies, and their implementation to see what inspiration can be gained from their successes, and what lessons can be learned from their shortcomings. The first set of these constructive case studies looks at cities that have succeeded, at least in part, in committing to only shut down encampments if the residents have access to appropriate housing or at least shelter. The second set examines cities which have integrated legalized encampments in various forms as a step toward addressing homelessness. Several previous reports, including the National Coalition for the Homeless' 2010 *Tent Cities in America: A Pacific Coast Report* and the Law Center's 2013 *Welcome Home: The Rise of Tent Cities in the United States* have shared some important additional examples of constructive practices.[67] Additionally, the USICH has recently issued several new case studies on cities' approaches to encampments.[68]

Case studies were developed through a combination of desk research and interviews with community stakeholders including city and state officials, legal and social providers, and, where possible, currently or formerly homeless individuals. We note that despite the constructive steps which warrant their inclusion on this list, many of these communities concurrently take other less constructive steps, so no city on its own represents a perfect model. Our hope in sharing these emerging models is to inspire communities to think outside the box and make the best use of their existing resources.

The Law Center does not think either encampments or emergency shelter are acceptable longer term substitutes for permanent housing. We recognize, however, peoples' need for safe, legal places to sleep tonight while permanent solutions are being implemented. We also recognize that some short-term responses to encampments make it harder for people to eventually get into housing or have unintended consequences while other approaches are more constructive. Punitive approaches using law enforcement are expensive and counter-productive, but

are still popular, partly because communities are not sure what else to do in the short term. Within the reality of people needing places to sleep and shelter themselves today, we urge all communities to move away from criminalization of homelessness and toward working with homeless residents to design constructive alternatives in the short term.

As part of this necessary dialogue, we offer the following case studies of cities that have tried various approaches that are less punitive. None of these approaches are perfect; some are better than others. Please note that, while we tried to be thorough in our case study research, there may be facts or perspectives we missed; additionally, conditions will likely change over time with some communities adopting more or less constructive approaches than what was studied here. For each case study, we offer a summary of how the community "measured up" compared to our suggested Encampment Principles and Practices. For these summaries, we used the following standards.

| | |
|---|---|
|  | A check-plus is reserved for instances where the community implemented the principle, both in practice and committed to it in writing. While a check-plus does not imply perfection, none of the case studies met this standard at this time. |
|  | A check indicates that the community fulfilled most of the principle. Perhaps, the community fulfilled the principle in practice but has not committed to do so in the future. Or perhaps the community fulfilled much of the principle, but is missing a significant element. |
|  | A check-minus indicates that the community took some constructive steps away from a purely punitive approach, but there is still significant room for improvement. The community perhaps adopted some component of the principle, but not a majority of it- or adopted the principle in writing, but not in practice. |
|  | An "X" indicates that the community did not appear to take any substantive actions toward fulfilling that principle. |

---

67  *See* NAT'L COAL. FOR THE HOMELESS, TENT CITIES IN AMERICA: A PACIFIC COAST REPORT (2010), http://www.nationalhomeless. org/publications/Tent percent20Cities percent20Report percent20 FINAL percent203-10-10.pdf [hereinafter TENT CITIES IN AMERICA]; JULIE HUNTER ET AL., WELCOME HOME: THE RISE OF TENT CITIES IN THE UNITED STATES 14, NAT'L LAW CTR. ON HOMELESSNESS & POVERTY AND ALLARD K. LOWENSTEIN INT'L HUMAN RIGHTS CLINIC, YALE LAW SCHOOL (2014), https://www.nlchp.org/documents/WelcomeHome_TentCities [hereinafter TENT CITIES IN AMERICA].

68  *See Case Studies: Ending Homelessness for People Living in Encampments*, U.S. INTERAGENCY COUNCIL ON HOMELESSNESS (Aug. 10, 2017), https://www.usich.gov/tools-for-action/case-studies-ending-home-lessness-for-people-living-in-encampments.

**Section 4**

### Procedures for Addressing Existing Encampments

### Charleston, South Carolina – How the USICH Guidance Can Work in Practice



Tent City, Charleston, SC. Source: Tecklenburg, Charleston's Homeless Encampment Experience, Mar. 13, 2017)

In early 2016, Charleston, SC, dismantled a large encampment known as "Tent-City" of more than 100 homeless persons living underneath the Interstate 26 overpass with zero arrests, and housing options made available for all residents. Unlike many cities, prior to dismantling Tent-City, the Mayor of Charleston, John Tecklenburg, and city service providers developed a 10-point plan of assistance (available as Appendix IV). The plan tried to consider legal and safety issues, including deprivation of property, due process of law, and the health and security of encampment residents.[69] The police explicitly did not arrest Tent-City residents or issue citations, but instead worked together with social service workers to transition residents to alternative housing arrangements. This case study compares the dismantlement of Tent-City against the guidelines issued in 2015 by the United States Interagency Council on Homelessness (USICH),[70] reviews the services Charleston deployed within the framework of existing best practices provided by the USICH with the intention of aiding policy-makers in developing their own action plans, and includes over thirty individual suggestions framed by four major goals as outlined in the body of this case study.[71] By providing a side by side comparison of the USICH guidelines (see above section) with the dismantling and subsequent

clear-out of Charleston's Tent-City, this case study seeks to offer practical guidelines for cities looking to effectively and humanely dismantle encampments of homeless persons.

| Charleston, SC's Efforts as Measured by the Encampment Principles | | |
|---|---|---|
| **Principle 1**: All people need safe, accessible, legal place to be, both at night and during the day, and a place to securely store belongings—until permanent housing is found. | Charleston created a plan and allowed people to stay at the encampment until placed in an alternative. Not everyone was placed in permanent housing. Charleston has committed to a Housing First approach going forward. | ✓ |
| **Principle 2**: Delivery of services must respect the experience, human dignity, and human rights of those receiving them. | Tent City residents were consulted throughout the process; appropriate services were provided. | ✓ |
| **Principle 3**: Any move or removal of an encampment must follow clear procedures that protect residents. | Charleston's 10-Point Plan set out a clear process for outreach to the affected community, with adequate notice and assistance with moving and storage to end the encampment constructively. These protections are not, however, guaranteed by law. | ✓ |
| **Principle 4**: Where new temporary legalized encampments are used as part of a continuum of shelter and housing, ensure it is as close to possible to fully adequate housing. | Charleston did not provide sanitary or other necessary services while the encampment still existed. Charleston's creation of a fund where private citizens and businesses could focus donations helped to create new resources for permanent housing. | ✓ |
| **Principle 5**: Adequate alternative housing must be a decent alternative. | Charleston created new resources for permanent housing and ensured some, but not all, homeless individuals were placed into permanent housing. | ✓ |
| **Principle 6**: Law enforcement should serve and protect all members of the community. | Law enforcement treated homeless individuals with respect and concern for their safety and well-being. No arrests were made during the removal of Tent City. | ✓ |

---

69   Interview with John Tecklenburg, Mayor, City of Charleston, S.C. (Apr. 10, 2017) [hereinafter Tecklenburg Interview]; *see also* Patrick Phillips & Alexis Simmons, *Charleston Leaders Announce 10-Point Plan to Help Homeless, Clear Tent City*, Live 5 News (Feb. 4, 2016), http://www.live5news.com/story/31143072/charleston-leaders-announce-10-point-plan-to-help-homeless-clear-tent-city.

70   Ending Homelessness, *supra* note 66.

71   *Id*.

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

## Background

In March 2015, an encampment of homeless persons began to form in the green space beneath and adjacent to the Ravenel Triangle, an area in Charleston where Interstate 26, the Ravenel Bridge of Highway 17 and Meeting Street connect.[72] To explain the influx of people residing in and around the Ravenel Triangle, stakeholders that were interviewed pointed to the convergence of different factors: the relocation of people displaced from smaller encampments,[73] the availability of volunteer outreach in the newly formed encampment,[74] and the reduction of income caused by a city-wide criminalization of panhandling on the peninsula.[75] By the end of January 2016, approximately 115 people resided in the encampment.[76]  By February 2016, city leaders, becoming increasingly concerned with the worsening quality of life experienced by residents of Tent-City, decided to dismantle the encampment and provide residents with alternative housing arrangements.[77]

According to service providers, the original inhabitants of Tent-City migrated from a smaller encampment, which once existed behind One80 Place, a local shelter. The occupants, known to local outreach workers as the "Woodsmen," attracted attention in the spring of 2015 when a series of concerns arose, including an uncontrolled fire, the proximity of the encampment to an interstate with inadequate safety barriers, and the occurrence of an unfortunate death.[78] Eventually, local law enforcement cleared the encampment behind One80 Place. Four of the "Woodsmen," who declined an offer to reside in the One80 Place shelter, ventured a quarter-mile north to a right of way beneath an I-26 overpass, beginning the occupation of what would become Tent-City.[79] What began as a few men hidden underneath the overpass eventually came to resemble an organized campground that included local outreach efforts and a nearby gathering tent where people living in the encampment would congregate, worship, and have a warm meal with church members.[80]

Tent-City's rapid growth also coincided with an anti-panhandling statute enacted by the City of Charleston in 2015.[81] The statute,[82] aimed at "aggressive" soliciting in the busiest tourist areas,[83] criminalized "solicitation of alms whether by offering something of nominal value in exchange for a donation or not."[84] Anthony Haro, executive director of the Lowcountry Homeless Coalition (LHC), observed the difficulty for those without employment to find a nightly hotel or housing after the ordinance.[85] Consequently, Tent-City was full of people whose only option was to turn to the kind of zero-cost housing option that the encampment provided. Due in large part to the reasons described above, Tent-City eventually grew to 115 homeless persons by the end of January 2015.[86]

### Applying the USICH Guidance on Ending Homelessness for People Living in Encampments

While Charleston's elected officials and homeless advocates did not explicitly reference the USICH guidance in their process of responding to Tent-City, they largely followed its principles, to great, if not perfect success, as will be demonstrated below. This analysis will apply the USICH framework of 1) Preparation and Adequate Time for Planning and Implementation; 2) Collaboration across Sectors and Systems 3) Performance of Intensive and Persistent Outreach and Engagement; and 4) Provision of Low-Barrier Pathways to Permanent Housing, to highlight lessons learned from the Charleston encampment dismantlement and suggest strategies for communities facing similar issues with encampments.

### I.  USICH ELEMENT: PLANNING, PREPARATION AND IMPLEMENTATION

For years, cities big and small have been forced to deal with the emergence of encampments and most are disbanded with no clear plan for long-term housing of their residents.[87] In accordance with USICH standards, communities should consider timelines, open communication forums, the needs

---

72   Interview with Robert Clark, District 6 Engineering Administrator, SCDOT (Mar. 27, 2017) [hereinafter Clark Interview].
73   Interview with Stacey Denaux, CEO, One80 Place (Mar. 31, 2017) [hereinafter Denaux Interview].
74   *Id.*
75   Interview with Jeff Yungman, Legal Director, One80 Place, Homeless Justice Project (Apr. 3, 2017) [hereinafter Yungman Interview].
76   Robert W. Kahle, *2016 Point-in-Time Report,* S.C. Coal. for the Homeless, http://lowcountryhomelesscoalition.org/point-in-time-homeless-count/ (last visited Feb. 20, 2017).
77   *See* Clark Interview, *supra* note 72.
78   Paul Bowers, *Tent City Cleared Out Behind Homeless Shelter,* Charleston City Paper (Mar. 16, 2015), http://www.charlestoncitypaper.com/charleston/tent-city-cleared-out-behind-homeless-shelter/Content?oid=5098420.
79   *See* Clark Interview, *supra* note 72.
80   *See Hot Dog Ministry,* East Cooper Baptist, https://eastcooperbapt.

com/local/article/hot-dog-ministry/ (last visited Jan. 11, 2017); Warren Peper, *Devotions & Hot Dogs,* Post and Courier (Jun. 26, 2014), http://www.postandcourier.com/features/devotions-hot-dogs/article_7758b22a-8e78-5aa2-8c67-9377e297d2a7.html.
81   *See* Charleston, S.C. Mun. Code §§ 17-91 through 122 (2015).
82   *Id.* § 17-91.
83   *Id.* § 17-102 (preventing solicitation in and around the Visitor Reception and Transportation Center District, or within fifty (50) feet of the perimeter of a(n): (a) Automatic teller machine; (b) Church grounds, while in session; (c)School grounds, while in session; (d) Library; (e) Hospital; (f) Funeral home; (g) Bank; (h) Hotel; (i) Outdoor dining area; (j) Entrance or exit of a performance venue; or (k) A special event).
84   *Id.* § 17-92.
85   Interview with Anthony Haro, Executive Director, Lowcountry Homeless Coalition (Jan. 11, 2017) [hereinafter Haro Interview].
86   *See, e.g., id.* .
87   *Id.* at 7.

Section 4

of every citizen, and prevention follow-up in their efforts to end homelessness and provide for long-term sustainable housing strategies.

The USICH lists four factors as common barriers to getting residents of encampments off the street, these include: (i) problems with shelters, (ii) lack of alternatives, (iii) lack of responsiveness by the community, and (iv) lack of coordination between key stakeholders.[88]

To address these barriers, the USICH suggests the following strategies, explained in greater detail below: (i) create plans to solve encampment issues with firm beginning and end dates;[89] (ii) communication and coordination between government and private entities;[90] (iii) proper notice to landowners to listen to and address their needs;[91] (iv) non-interference with existing outreach efforts for the needs of the encampment residents;[92] and (v) follow-up and continuous monitoring to prevent new encampments from arising.[93]

**i. Articulating a timeline with firm beginning and end dates, allowing residents to make their own decisions with the outreach programs available**

Like most encampments, Charleston's Tent-City formed among similarly situated persons looking for common ground to satisfy their own daily needs. However, following several fires and violent incidents, city officials expressed increasing concerns with safety issues[94] and decided to dismantle the encampment of approximately 100 tents.[95]

City leaders, led by Mayor John Tecklenburg, began holding meetings to discuss possible solutions in order to create a timeline for addressing concerns regarding the encampment.[96] The Mayor initially set out the expectation that the process had to be organized and non-confrontational,[97] and on February 4, 2016, the City announced a 10-Point Plan which would guide the clean-up and dismantling of Tent-City within a clear-cut timeframe.[98]



# Charleston leaders announce 10-point plan to help homeless, clear 'tent city'

Published: Thursday, February 4th 2016, 4:03 pm EST
Updated: Sunday, July 31st 2016, 9:22 am EST
By Patrick Phillips, Digital Content Manager  CONNECT
By Alexis Simmons, Reporter/MMJ  CONNECT



Photo caption: Source: Tecklenburg, Charleston's Homeless Encampment Experience, Mar. 13, 2017)

**ii. Honest communication between government and private entities, using traditional and non-traditional resources**

The newly-elected Mayor Tecklenburg did not campaign on homeless encampments and the housing crisis facing his constituents, but as a former board member of the city's main shelter, One-80 Place, the issue was, as he put it, consistently "in the corner of my eye."[99] He invited all members of the community to come to the table and discuss their roles openly as to how to best serve the encampment population.[100] Mayor Tecklenburg utilized resources from One80 Place to help with housing and outreach services. The Charleston Police Department played a crucial role in aspects of safety and organization, and local evangelical outreach organizations, with which the Mayor was familiar with and embraced, were turned to for community services.[101]

**iii. Consideration of the landowners' needs helps identify necessary resources and their role in the process**

The 10-Point Plan proffered by the City identified and considered the needs of landowners and determined their role, as suggested by USICH.[102] In this case, as with many encampments,[103] the landowner was easily identifiable,

---

88   *See* ENDING HOMELESSNESS, *supra* note 66.
89   *Id.*
90   *Id.*
91   *Id.*
92   *Id.*
93   *Id.*
94   *See* Clark Interview, *supra* note 72.
95   Diane Knich, *Tent City Fire Burns Clothing, Trash and a Few Tents*, POST AND COURIER (Feb. 1, 2016), http://www.postandcourier.com/archives/tent-city-fire-burns-clothing-trash-and-a-few-tents/article_228acce0-dd9c-593c-87bb-796d561b35cf.html.
96   *See* Tecklenburg Interview, *supra* note 69.
97   *Id.*
98   Shawn Cabbagestalk, *Charleston Leaders Plan to Clear Tent City Within 2 Months; Homeless to Go to One80Place*, COUNTON NEWS 2 (Feb. 4, 2016), http://counton2.com/2016/02/04/charleston-leaders-plan-to-clear-tent-city-within-2-months-homeless-to-go-to-one80place/.

99    *See* Tecklenburg Interview, *supra* note 69.
100   *Id.*
101   *Id.*
102   ENDING HOMELESSNESS, *supra* note .
103   *See* WELCOME HOME, *supra* note 67, at 14; *see also* Dave Munday, *Homeless Booted from Tent City*, POST AND COURIER (Mar. 15, 2015), http://www.postandcourier.com/archives/homeless-booted-from-tent-city/article_09f12bc9-1878-5778-982f-a27ad6df6a14.html.

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

since most of the encampment lay within public right-of-way owned by the South Carolina Department of Transportation (SCDOT).[104] In order for a successful solution, adequate preparation and discussion between the enforcement entity (City) and the landowner (SCDOT) was paramount.[105]

The needs of the landowner in this case were primarily maintenance and safety for those traveling the roadways in and around Tent-City.[106] The SCDOT requested additional resources for maintenance problems they attributed to Tent-City's occupation, including drainage, fencing and declining structural integrity of the roadway and bridge.[107] The coordinated efforts between the City, the Charleston Police and the SCDOT helped accomplish maintenance, repairs and eventual dismantlement of Tent-City while ensuring that the SCDOT did not evict residents of the encampment without consideration as to the people and personal property involved.[108]

### iv. Planning requires strategies for allocation of resources without sacrificing existing outreach efforts

There are several well-established organizations that provide resources and services to Charleston's homeless population.[109] Mayor Tecklenburg initially asked One80 Place, a long-standing service provider, to offer immediate shelter to those displaced from the encampment.[110]

In order to provide the "best services" to all, One80 Place continued to serve those already in housing services while also shifting other priorities, as possible under time and resource constraints.[111] The shelter did not cut any projects and remained focused on seeking to relocate One80 Place guests into long-term sustainable housing.[112]

Communities and organizations may need to assess the limitations of their own resources and plan accordingly. For instance, One80 Place can only house 160 people at a given time and is nearly always at full capacity.[113] Therefore, early planning required collaborative efforts that assessed the needs of both those living in an encampment and those already receiving shelter services.

Charleston's 10-Point Plan pledged to collaborate with One80 Place, support the LHC, and work with other government partners to identify additional shelter space.[114] The plan provided for new funding through private donations and grants.[115] The plan also provided for short term working goals using existing resources. However, it did not standardize future responses or provide for further assistance to ensure outreach efforts continue when tent cities reemerge.[116]

### v. Follow up and prevention requires adoption of a housing first model

Priority was placed on providing permanent housing options, or at a minimum, temporary housing with a path to permanency.[117] Residents and some service providers—including Anthony Haro, of the LHC, saw that Tent-City, along with outreach programs providing meals and services, was working better than some alternatives for the residents.[118] Haro and others led bi-weekly meetings with city officials to ensure the encampment residents would be in a better, not worse, situation after the camp closed.[119]



My name is Sarah, and I use to live in Tent-City. I had been homeless for five years. And I was so scared being on the streets; it was awful not knowing where I could sleep…not knowing how warm I would be—always being out in the rain. But when y'all came to me with this project…I accepted it. I took in on full force….I'm now in a three bedroom home. I got my

---

104   *See* Clark Interview, *supra* note 72.
105   *Id*.
106   *See* Clark Interview, *supra* note 72.
107   *Id*.
108   *Id*.
109   *See* Haro Interview, *supra* note 85 (One80 Place, Low Country Homeless Coalition, and HUD working together to provide a continuum of care).
110   *Id* ; *see also* Press Release, City of Charleston, S.C., City and Partners Announce 10-Point Plan for Tent City, http://www.charleston-sc.gov/CivicAlerts.aspx?AID=314&ARC=688 (last visited Feb. 22, 2017).
111   *Id*.
112   *Id*.
113   *Id*.

114   *See* Press Release, City of Charleston, S.C., City and Partners Announce 10-Point Plan for Tent City, http://www.charleston-sc.gov/CivicAlerts.aspx?AID=314&ARC=688 (last visited Feb. 22, 2017).
115   HOMELESS TO HOPE FUND, http://www.homelesstohopefund.org/ (last visited Nov. 22, 2017).
116   *See* Denaux Interview, *supra* note 73.
117   *See* Haro Interview, *supra* note 85.
118   *Id*. (Mr. Haro indicated that volunteers and community outreach organizations were providing tents, sleeping bags and basic needs to make the residents comfortable without a coordinated effort to solve the issue).
119   *Id*.

kids back. And I'm happy." (Source: Tecklenburg, Charleston's Homeless Encampment Experience, Mar. 13, 2017)

As of April 10, 2016, before Tent-City was cleared, 115 persons called Tent-City home.[120] One80 Place helped relocate at least twenty-three immediately into permanent housing and brought sixteen into their shelter.[121] At least 40 more were placed into a public shelter during the transition, 90 percent of whom eventually were placed into permanent housing. Fifteen others received transportation to their families in other communities.[122] In the end, more than half found their way to housing, but service workers lost touch with some as they proceeded toward eviction, so their outcome is not known.

Charleston's failure to track the residents after the camp closure may have limited the efficacy of its approach, as tracking could have allowed better follow-up outreach. Lack of information about longer term outcomes also limits our ability to assess the success of this approach, and for Charleston to learn and improve.

## II. USICH ELEMENT: COLLABORATION BETWEEN COMMUNITY STAKEHOLDERS

Government agencies, service providers, law enforcement, businesses, and volunteer advocates should work together to understand the needs of those living in an encampment while assessing the needs of the service providers themselves.[123] As explained in further detail below, the needs and opinions of the (i) encampment residents, (ii) law enforcement community, and (iii) private sector, at the very least, should be heard and discussed in detail in order to adequately address best practices for dismantling an encampment.

### i. Residents of the encampment desire and should be given a voice in their future

Options were important for the residents of Tent-City, many of whom did not want to move into One80 Place's shelter, but who could take advantage of One80 Place's Homeless Justice Project to help amplify their concerns.[124] The Homeless Justice Project provides legal services to those facing housing crises and works at least one-hundred active cases at any given time for those living in the shelter and on the streets of Charleston.[125] These advocates work daily with clients and are committed to supporting the

needs and desires of those living in an encampment and facing housing insecurity.[126] The relationship between such parties accord dignity to encampment residents and ensure residents' property and rights are protected.

Advocates, community outreach, and government agencies in Charleston collaborated with encampment residents to find housing solutions prior to closing the encampment.[127] Because residents were given their own personal stake and options for long-term housing, encampment residents felt heard and did not voice concerns to Justice Project workers regarding the process or choices post-dismantlement.[128]

### ii. Engaging law enforcement in non-traditional roles

Greg Mullen, Chief of the Charleston Police Department, and his staff were an integral part of the early planning process by attending round table discussions with stakeholders.[129] Mayor Tecklenburg led the discussions and emphasized that while enforcement is important, it must be used to bring resolution and services to those in need.[130] At these discussions, the City committed to a constructive and non-criminalizing approach to dismantling the encampment.[131] Patrol officers who work the neighborhood where Tent-City was formed were tasked with peacefully ensuring residents' property was properly documented and protected.[132] Collaboration and education efforts assisted local law enforcement in enforcing a sum-certain move out date while treating the residents with dignity.[133] These efforts contributed to the non-violent and lawful dismantlement of Tent-City without prosecution of residents.[134]

### iii. Government collaboration with the private sector to provide financial support

Mayor Tecklenburg also worked with the private sector and incorporated other social service agencies in order to provide funding for the Tent-City dismantlement.[135] In February 2016, Charleston established the city-affiliated Homeless to Hope Fund for the receipt of private donations to help with residents "transition to permanent housing, including transitional housing that can lead to permanent housing."[136] This collaborative fund initially opened with

---

120  *Id.*
121  *See* Denaux Interview, *supra* note 73.
122  *See* Tecklenburg Interview, *supra* note 69.
123  *See* Ending Homelessness, *supra* note 66
124  *See* Yungman Interview, *supra* note 75.
125  *Id.*
126  *Id.* (citing the personal decision to foster pets for clients living in the encampment in order to overcome housing barriers).
127  *See* Tecklenburg Interview, *supra* note 69.
128  *Id.*
129  *Id.*
130  *Id.*
131  *Id.*
132  *See* Denaux Interview, *supra* note 73 (police using cameras and documenting diligently personal property while helping store tents and items for residents during the initial move).
133  *See* Knich, *supra* note 95.
134  *See* Yungman Interview, *supra* note 75.
135  *See* Tecklenburg Interview, *supra* note 69.
136  *See* Tecklenburg Interview, *supra* note 69 (weekly meetings with 80



$15,000 in left over inauguration funds and $35,000 in city funds, but brought in over $100,000 in private donations.[137] As momentum built, the fund gave the public a venue through which to channel charitable intentions in a way that would lead to the end, rather than the extension, of the encampment.[138] The fund provided for financial reimbursement to community groups who submitted a plan of action in regard to an individual for whom funds would be used in order to minimize the likelihood he or she will return to homelessness.[139] This can help make allies of all the groups involved with the encampment and grow the pot of resources to ensure a transition to housing for all residents. In addition to creating "buy-in" from the private sector, this approach also supported Principle 4 by helping to fund additional permanent housing options.

## III. PERFORMING INTENSIVE AND PERSISTENT OUTREACH

Outreach efforts are crucial components of any plan that seeks to address the needs of encampment residents.[140] Service providers engaged in day-to-day services can help identify residents and facilitate the creation and maintenance of trust with the encampment residents. Collaboration and training between existing service providers and governmental entities increases the likelihood that outreach programs continue to provide long-term housing solutions to encampment residents. The USICH suggests that key outreach and engagement strategies include both supporting work of current outreach and sharing information while training for the future.[141] Those strategies are outlined in further detail below.

### i. Supporting work of current outreach in identifying residents and creating trust in the process

Each year, in order to allocate resources appropriately, the Charleston Point-In-Time count is coordinated by the LHC with help from community volunteers and aims to quantify the population size of those experiencing homelessness.[142]

---

clergy members which helped develop the ten-point plan).

137  *See* John Tecklenberg, Charleston's Homeless Encampment Experience, Presentation to National League of Cities (Mar. 13, 2017) (on file with author).

138  *See, e.g.*, Hands-On Charleston, FACEBOOK, https://www.facebook.com/groups/848128658638208/ (among others like it who worked independently to raise awareness and funding); *see also What We Do*, HOMELESS TO HOPE FUND, http://www.homelesstohopefund.org/what-we-do/ (last visited Nov. 22, 2017).

139  *Id.*

140  *See* ENDING HOMELESSNESS, *supra* note 66.

141  *Id.*

142  *See* Kahle, *supra* note 76 (HUD mandated one night count conducted in January of those persons either sheltered or non-sheltered). *See also* NAT'L LAW CTR. ON HOMELESSNESS & POVERTY, DON'T COUNT ON IT: HOW THE HUD POINT-IN-TIME COUNT UNDERESTIMATES THE HOMELESSNESS CRISIS IN AMERICA (2017), https://www.nlchp.org/documents/HUD-PIT-

In 2016, Charleston reported 461 persons experiencing homelessness, of which 198 were considered unsheltered.[143]

Addressing the needs of those living in Tent-City required the same outreach efforts that help conduct the yearly Point-In-Time Count.[144] Many residents of Tent-City were known to service providers through past census counts or as service recipients, while others were identified for the first time just prior to the decision to dismantle the encampment.[145] The 10-Point Plan incorporated existing outreach programs of the LHC and One80 Place,[146] which allowed them to visit tents and identify needs. As a result, the outreach programs were able to follow those who have been subsequently placed in housing.[147] Those efforts helped all parties involved work towards ending homelessness through housing assistance rather than mass evictions.[148]

**ii. Sharing information while training for the future**

Charleston successfully drew attention to Tent-City on a consistent basis. From bi-weekly town meetings to constant news coverage,[149] the future of Tent-City and its residents were the subject of daily conversations between residents, officials, and service providers.[150] The Charleston Police Department played a central role in ensuring open and transparent communication between residents and outreach programs.[151] Patrol officers visiting Tent-City treated the encampment like any other community, striving to know residents and their individual concerns.[152]

Open modes of communication contributed to long-term solutions and future training on issues of homelessness. For example, the SCDOT now works with local law enforcement to quickly identify and provide help to small encampments throughout South Carolina,[153] and One80 Place has refocused on a housing first strategy. Such collaborative efforts are central to ensuring a positive outcome.

## IV. LOW BARRIER HOUSING FIRST SOLUTIONS

In line with the USICH policy guidelines,[154] Mayor Tecklenburg, One80 Place, and the LHC agreed that a Housing First model, one that removes common barriers to sustainable housing for those experiencing homelessness, would be a critical component to ending homelessness for those living in the encampment. Removing behavior requirements such as curfews and strict anti-drug and alcohol policies in short-term housing facilities increased the likelihood that encampment residents would accept placement in those facilities. Housing First, whether adopted as part of encampment closure or as part of a long-term strategy, contributes to the ultimate goal of finding sustainable housing solutions for persons living on the streets.

**i. Removing obstacles that hinder quick access to housing**

In the One80 Place shelter, curfews, rules of sobriety, and basic civil behavior enforcement exist to ensure the safety of the residents who live together.[155] However, those rules are often barriers to short-term emergency shelter. Other shelter residency requirements, such as lack of a criminal background, minimum income, and participation in services could hinder a person transitioning from an encampment into affordable housing.[156] Stacy Denaux recognized that with the transition from Tent-City to One80 Place, many disruptions occurred both for the guests and the organization.[157] Her clinical team had to adapt to the Housing First standard, which required prioritizing residency over social and psychological treatment.[158] The residents already living there sometimes felt it unfair when Tent-City residents were prioritized in providing housing.[159] Still, a commitment to prioritizing housing needs ensured success for most people transitioning from Tent-City to housing services.[160]

**ii. Prioritizing the need of interim housing solutions by engaging partnerships**

For the transition from encampment to permanent housing to succeed, Mayor Tecklenburg felt that the Housing First model was ideal. The City sought to identify additional shelter space beyond that of One80 Place to shelter people until permanent solutions became available.[161] The City opened a low-barrier warming shelter to provide care when

report2017, discussing the shortcomings of the Point-In-Time count.
143   *Id.* at 6.
144   *See* Haro Interview, *supra* note 85.
145   Interview with Mary Vosburgh, Staff Attorney, Homeless Justice Project (Mar. 29, 2017) [hereinafter Vosburgh Interview].
146   *See* Phillips, *supra* note 69.
147   *See* Denaux Interview, *supra* note 73 (Homeless Management Information System ("HMIS") allowing those who enter the shelter from Tent-City to be easily followed).
148   *Id.*
149   *See* Knich, *supra* note 95 (covering Tent-City for the Post and Courier).
150   *See* Haro Interview, *supra* note 85 (bi-weekly meetings held at the city library with community and city leaders).
151   *See* Denaux Interview, *supra* note 73.
152   *Id.*
153   *See* Clark Interview, *supra* note 72.

154   *See* State of the Nation, *supra* note 2.
155   *See* Denaux Interview, *supra* note 73.
156   *Id.*
157   *Id.*
158   *Id.*
159   *Id.*
160   *Id.*
161   *See* Haro Interview, *supra* note 85.

the beds at One80 Place were full.[162]

To try to prevent another Tent-City, the City appointed a commission to identify long-term solutions to the problem of homelessness in the community.[163] Through the resulting "House Charleston" initiatives, Charleston continues to work toward the proven Housing First method of ending homelessness by working regionally to develop housing plans and working with individuals and landlords to provide immediate access to permanent affordable or supportive housing.[164]



"My name is Glenn and I was on the streets for three years. This project came about, and I took…advantage of the opportunities that were going to be given to me. [The City] did what they said they were going to do. I'm now in a two bedroom house, an apartment, with a roommate…I'm more comfortable now than I have been in a long time." (Source: Tecklenburg, Charleston's Homeless Encampment Experience, Mar. 13, 2017)

## CONCLUSION

Charleston successfully dismantled Tent-City without destroying a single item of claimed property or making a single arrest.[165] Charleston's 10-Point-Plan closely mirror the USICH guidelines.[166] Charleston planned and prepared for implementation with a firm beginning date for disassembly while allowing flexibility in execution.[167] Collaboration between community stakeholders ensured cohesive understanding and implementation of the ultimate goal to end the cycle of homelessness for those living in encampments.[168] Outreach programs engaged in the campaign to close Tent-City without sacrificing other homeless assistance efforts.[169] By adopting a Housing First model, Charleston focused on removing those barriers most common to providing both short and long-term housing to people living in encampments.[170] The establishment of multi-agency and diverse commissions helped open dialogue regarding initiatives seeking to end homelessness by providing permanent and affordable housing to those in the greatest need.[171]

---

162 *See* Tecklenburg Interview, *supra* note 69 (Leeds Avenue warming shelter opened in old jail work-camp building).
163 *Id.*
164 Press Release, City of Charleston, Local Mayors Prepare for Homeless Summit (Sept. 19, 2016). *See also* Alexis Simmons, *City of Charleston using 'housing first' approach to address homelessness in region*, Live 5 News (Feb. 3, 2017), http://www.live5news.com/story/34424389/city-of-charleston-using-housing-first-approach-to-address-homelessness. City officials report a drop in landlord resistance to housing homeless individuals as a result of outreach efforts.

165 *See* Tecklenburg Interview, *supra* note 69.
166 *See* Denaux Interview, *supra* note 73.
167 *Id.*
168 *See* Tecklenburg Interview, *supra* note 69.
169 *See* Haro Interview, *supra* note 85.
170 *See* Tecklenburg Interview, *supra* note 69.
171 *See* Haro Interview, *supra* note 85.

**Section 4**



*Indianapolis, Indiana – Ordinance for Ending Encampments through Housing*

Nearly every major city in the United States struggles with homelessness, and Indianapolis, IN, is no exception. In January 2017, Indianapolis' "Point-in-Time Homeless Count" found 1,783 persons in the city and the surrounding Marion County[172] experiencing homelessness—a 10 percent increase over the 2016 figures.[173] But in 2016, after much effort by local advocates, Indianapolis took a step farther than any other major city and enacted legislation that homeless encampments could not be swept unless adequate housing alternatives were provided.

Indianapolis' General Ordinance No. 2, 2016 ("Indianapolis Encampment Ordinance") is applicable to encampments located on public lands and requires that the City provide at least fifteen days' notice to encampment residents before they are displaced (except in cases of an emergency); catalog and provide storage for all personal items of encampment residents for up to 60 days; and coordinate with other service providers to ensure that transitional or permanent housing is available to displaced persons together with other "wrap-around services" for which they are eligible. All transitional and permanent housing must be "safe, reasonably clean and maintained, and approved by the city,"[174] and, except in the case of an emergency, the Indianapolis Encampment Ordinance specifically prohibits evictions if not enough housing and other services are available for all encampment residents.

The Indianapolis Encampment Ordinance, and the work surrounding its passage, have helped drive other efforts in the City.  In January of 2017, the City received $5,000,000 in federal funds for its Continuum of Care initiatives[175], and

in his most recent State of the City address, Indianapolis Mayor Joe Hogsett committed to providing supportive housing for 400 residents within a year.[176]

However, two recent encampment sweeps in Indianapolis occurred outside of this commitment to housing, demonstrating the limitations of such legislation.

In trying to summarize Indianapolis' efforts, as measured against the encampments principles, there was a tension between the city ordinance and implementation. The city ordinance takes admirable steps to supply a semblance of dignity and stability to people living outside. However, if that is not followed in practice, it is not particularly meaningful. The scores, therefore, show up somewhere in the middle.

| Indianapolis' Efforts as Measured by the Encampment Principles | | |
|---|---|---|
| **Principle 1**: All people need safe, accessible, legal place to be, both at night and during the day, and a place to securely store belongings—until permanent housing is found. | In principle, this is the idea behind the ordinance. In practice, due to limitations and exceptions, it has failed to fully implement the principle. Indianapolis has both failed to house individuals swept from encampments and to create binding plans to create long-term solutions to homelessness. |  |
| **Principle 2**: Delivery of services must respect the experience, human dignity, and human rights of those receiving them. | While the ordinance requires adequate housing based on consultation beforehand, in practice, residents have not been fully consulted and incorporated into decision-making. |  |
| **Principle 3**: Any move or removal of an encampment must follow clear procedures that protect residents. | Indianapolis' ordinance has model language with clear procedures. However, in practice, it has used the emergency exception and the limitation to public property to avoid implementing its process. | |

172   Indianapolis is located in Marion County.

173   Ind. Univ. Pub. Pol'y Inst., 2017 Homeless Count at Highest Level Since 2014 (2017), http://policyinstitute.iu.edu/Uploads/ProjectFiles/HomelessCount_2017.pdf.

174   Marion City. Minutes, *supra* note 161.

175   Russ McQuaid, *Indy Gets $5 Million in Federal Funds to Help the Homeless*, Fox 59 (Jan. 3, 2017, 5:09 PM), http://fox59.com/2017/01/03/indy-gets-5-million-in-federal-funds-to-help-the-homeless/.

176   Randy Spieth, *Homeless Population on the Rise as Mayor Challenges Community to Curb Issue*, Fox 59 (Apr. 20, 2017, 5:59 PM), http://fox59.com/2017/04/20/homeless-population-on-the-rise-as-mayor-challenges-community-to-curb-issue/.

| Principle 4: Where new temporary legalized encampments are used as part of a continuum of shelter and housing, ensure it is as close to possible to fully adequate housing. | Camps which are temporarily allowed to exist are not provided with services to improve residents' living conditions. | ✗ |
|---|---|---|
| Principle 5: Adequate alternative housing must be a decent alternative. | Indianapolis' ordinance is a model in requiring adequate alternative *housing* before eviction. In practice, the city has not provided adequate alternatives. | ✔– |
| Principle 6: Law enforcement should serve and protect all members of the community. | Indianapolis' law enforcement have demonstrated respect for homeless persons, but Indianapolis continues to use law enforcement to push homeless persons out of certain spaces under threat of law without providing adequate alternatives. | ✔– |

*Background*

In 2013, the City removed and demolished the "Irish Hill" encampment which, in addition to removing the encampments residents, also resulted in five arrests.[177] One of the encampment's leaders, Maurice Young, was arrested as an explicitly political act to draw attention to the lack of appropriate planning for the needs of homeless persons in Indianapolis.[178] The Irish Hill encampment had existed for approximately two years with 67 residents,[179] and its removal resulted in the near immediate scattering of those residents.

The dramatic removal of the Irish Hill encampment is told in the documentary "Under the Bridge: The Criminalization of Homelessness" directed by Don Sawyer. The film called attention to the fact that the only shelters in Indianapolis were privately run religious institutions with significant restrictions. In fact, according to the film, the city was not spending any resources on shelter services.

After local screenings of the film and other advocacy efforts by the former residents of Irish Hill, Don Sawyer, and others, Councilman Leroy Robinson introduced a Homeless Bill of

Rights in 2015 that was similar to laws passed in Rhode Island and Illinois.[180] The Bill of Rights would have provided certain protections for people experiencing homelessness including the right to move in public spaces, the right to vote, equal treatment by city agencies and the creation of an expectation of privacy (though did not provide the encampment protections in the Indianapolis Encampment Ordinance).[181] While a pared down version of the Bill of Rights was eventually approved by the Council, the proposal was ultimately vetoed by then Mayor Greg Ballard who cited liability and other concerns.[182] However, the very introduction of the Bill of Rights itself represented a "180-degree shift from past debates on the issues of homelessness and public nuisances"[183] as prior efforts in the City had focused instead on panhandling and other restrictions.





Producer/Director Don Sawyer's film "Under the Bridge," screened at HUD with the Law Center's assistance, helped turn the tide and hold the city accountable in pressing for the encampments ordinance. Photo credit: a Bigger Vision

177   Kristine Guerra & Diana Penner, *Downtown Indianapolis Homeless Camp Emptied; 5 Arrested*, INDIANAPOLIS STAR (Aug. 26, 2013, 3:46 PM), http://www.indystar.com/story/news/2013/08/26/downtown-indianapolis-homeless-camp-emptied-5-arrested/2702257/.

178   *Id.*

179   *Id.*

180   Brian Eason, *Indy Council Creates 'Homeless Bill of Rights'*, INDIANAPOLIS STAR (Mar. 2, 2015, 10:09 PM), http://www.indystar.com/story/news/politics/2015/03/02/indy-council-creates-homeless-bill-rights/24295055/

181   *Id. See also*, Indianapolis Prop. 15-041, introduced Feb. 9, 2015.

182   Brian Eason, *Mayor Greg Ballard Vetoes 'Homeless Bill of Rights'*, INDIANAPOLIS STAR (Mar. 16, 2015, 12:15 PM), http://www.indystar.com/story/news/politics/2015/03/16/mayor-greg-ballard-vetoes-homeless-bill-rights/24848613/.

183   Brian Eason, *Indy Council Creates 'Homeless Bill of Rights'*, USA TODAY (Mar. 3, 2015, 5:12 PM), https://www.usatoday.com/story/news/nation/2015/03/03/indy-council-creates-homeless-bill-rights/24333503/.

**Section 4**

*The 2016 Ordinance*

Through the fall of 2015, Don Sawyer toured the country with his documentary on the criminalization of homelessness in Indianapolis, including a showing at HUD Headquarters in Washington, D.C.[184] The showing and discussion included speakers from HUD and DOJ as well as the Law Center and the National Coalition for the Homeless. The national profile kept the pressure on the city, and after Joe Hogsett was inaugurated as the new Mayor, the Council reintroduced portions of the Homeless Bill of Rights.

In February of 2016, the Council passed General Ordinance No. 2, 2016. [185] The slimmed down Indianapolis Encampment Ordinance received near unanimous support from the Council, passing by a vote of 23-2.[186] Councilman Leroy Robinson claimed that this legislative action was in direct response to the removal of the Irish Hill encampment stating that its residents were not treated "fairly, adequately or sufficiently" during that process. [187] Councilman Robinson also acknowledged the need for continued action: "I believe that if the homeless community had more power… the City wouldn't do this to them. But we do, and that's why we have to push for this kind ordinance….We have to lead these efforts."[188] According to Sawyer, the passage of the Indianapolis Encampment Ordinance "represents a profound priority shift for the City of Indianapolis—it acknowledged the City's mistreatment of homeless citizens during camp shut-downs."[189]

The Indianapolis Encampment Ordinance itself is applicable to encampments located on public lands and requires that the City provide at least fifteen days' notice to encampment residents before they are displaced (except in cases of an emergency); catalog and provide storage for all personal items of encampment residents for up to 60 days; and coordinate with other service providers to ensure that transitional or permanent housing is available to displaced persons together with other "wrap-around services" for which they are eligible. All transitional and permanent housing must be "safe, reasonably clean and maintained, and approved by the city,"[190] and, except in the case of an emergency, the Indianapolis Encampment Ordinance specifically prohibits evictions if not enough housing and other services are available for all encampment residents.

While the Indianapolis Encampment Ordinance does not, itself, end homelessness, it does provide protections for those experiencing homelessness. Alan Witchey, Executive Director of Indianapolis' Coalition for Homelessness Intervention & Prevention (CHIP), stated that "the win for us is stopping a bad practice. When somebody is homeless and then gets evicted from a camp, then you potentially caused additional trauma to their life. It actually makes their life more complicated—evicting someone from homelessness to more homelessness is not a solution. But if you evict them and have [some housing] option[s], then that's great."[191]

Thus, Indianapolis became the first city to enshrine in a legally binding ordinance the principles of the USICH encampments guidance discussed above.[192] In particular, the Ordinance emphasizes preparation and planning, collaboration across different service providers (including the Reuben Engagement Center described below), and providing pathways to permanent housing, all of which are stressed in the guidance. Because the Ordinance requires providing alternative housing before an encampment eviction, it also stresses that homelessness should be addressed through housing alternatives, not criminalization.

*Beyond the Ordinance*

Passage of the Indianapolis Encampment Ordinance spurred discussion of solutions beyond criminalization in the larger community. Alan Witchey, stated that the Ordinance has "generated a lot of conversation within the business community and interest in a positive way."[193] This dialogue has given the business community "an opportunity to invest in solutions."[194] Witchey credits the Ordinance with propelling a partnership between CHIP and Downtown Indy, a non-profit that represents the interests of downtown businesses. They are partnering to provide continuing education to business stakeholders and hopefully secure additional resources for housing.[195]

184  See Press Release, Nat'l Law Ctr. On Homelessness & Poverty, New Documentary Shines a Light on the Criminalization of Those Without a Home (Dec. 1, 2016), http://www.nlchp.org/press_releas-es/12.1.2015_Under_the_Bridge.

185  MARION CTY., IND., MINUTES OF THE CITY-COUNTY COUNCIL 22 (Feb. 8, 2016), http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=2&ved=0ahUKEwj9tdnp0qLWAhVszIMKHV94BK0QFggvMAE&url=http%3A%2F%2Fwww.indy.gov%2FeGov%2FCouncil%2FMeetings%2FCouncil%2FDocuments%2F2016%2F02-08-16min.pdf&usg=AFQjCNEJpeb5YZ1Uxz_-vuysSsqcBhaiug [hereinafter MARION CTY. MINUTES].

186  Brian Eason, *Indy Council Oks New Protections for the Homeless; is Pan-handling Next?*, INDIANAPOLIS STAR (Feb. 8, 2016, 9:01 PM), http://www.indystar.com/story/news/politics/2016/02/08/indy-council-oks-new-protections-and-assistance-homeless/80016012/.

187  *Id.*

188  Interview with Leroy Robinson, Councilman, City of Indianapolis (May 11, 2017) [hereinafter Robinson Interview].

189  Email from Don Sawyer, Producer, A Bigger Vision Productions (Sept. 11, 2017) (on file with author).

190  MARION CTY. MINUTES, *supra* note 161.

191  Interview with Alan Witchey, Executive Director, CHIP Indianapolis (May 17, 2017) [hereinafter Witchey Interview].

192  ENDING HOMELESSNESS, *supra* note 66.

193  Witchey Interview, *supra* note 191.

194  *Id.*

195  *Id.*

The President of Downtown Indy, Sherry Weiwert, explains that, "there are mini-encampments in the downtown area that businesses are concerned about. The Encampment Ordinance provides language to talk about these mini-encampments and a basis for brainstorming alternatives to criminalization."[196]

> "The Encampment Ordinance provides language to talk about these mini-encampments and a basis for brainstorming alternatives to criminalization."
>
> – Sherry Weiwert, President, Downtown Indy

The City council also approved the Reuben Engagement Center ("Center").[197] This 30 bed, 11,000 square foot opened early in 2017 and now "provides shelter, case management, mental health evaluations, and housing referrals to chronically homeless individuals who are substance-addicted and/or mentally ill."[198] According to the Indianapolis Blueprint 2.0 Evaluation, the creation of the Reuben Engagement Center "required the support of the business community, government and community groups" and that "provided a forum to educate the broader community on the service and housing needs of chronically homeless individuals."[199] The Center was originally approved in 2011, when a private benefactor offered funding for it, but was delayed due to lack of funding for staffing.[200] The city finally approved funding for its staffing and creation in March 2015, in conjunction with the Homeless Bill of Rights that passed the Council but was never signed into law.[201] The Center itself is specifically referenced in the Indianapolis Encampment Ordinance as an entity that the City must coordinate with in the event that an encampment is displaced - so the two are designed to complement one another.





The push for better solutions to homelessness following the Irish Hill eviction  helped make possible the public-private partnership that led to the creation of the Reuben Engagement Center. Photo credit: a Bigger Vision

*Practical Limitations of the Ordinance*

The Indianapolis Encampment Ordinance has significant limitations. In particular, the Ordinance has an exemption for an "emergency" which is defined as "situations when a failure to act immediately could lead to serious harm to public health or safety."[202] The Ordinance also only applies to public (city or county) land—encampments existing on private land would not benefit from its protections.

Private Land Limitations

In early February of 2017, the residents of the "Jungle," a longtime encampment located in downtown Indianapolis, were notified by law enforcement officials that they would have to leave by the end of March. This was the first major encampment eviction since the enactment of the Ordinance. However, the city argued the Ordinance was not applicable because the encampment was located on private railroad property.

Advocates attempted to leverage the Ordinance in an effort to negotiate a more humane removal process, temporarily delaying the eviction in hopes of arriving at a permanent housing solution in line with the principles of the Ordinance. However, on March 30, 2017, the Jungle was cleared by CSX Transportation Police and the remaining residents were forced to leave.[203]

The Indianapolis Encampment Ordinance, and negotiations based on it, did have some impact on the process. Although the City did not participate in the removal, outreach efforts were undertaken prior to the Jungle being cleared—including a resource day that was held at the Reuben

---

196   Interview with Sherry Weiwert, President, Downtown Indy (May 24, 2017) [hereinafter Weiwert Interview].

197   Justin L. Mack, *Dream of Indianapolis Homeless Rehabilitation Center Becomes a Reality*, INDIANAPOLIS STAR (Jan. 2, 2017, 2:21 PM), http://www.indystar.com/story/news/crime/2017/01/02/dream-indianapolis-homeless-rehabilitation-facility-becomes-reality/96081118/.

198   *Reuben Engagement Center*, INDIANAPOLIS CONTINUUM OF CARE, http://indycoc.org/reuben-engagement-center/ (last visited Sept. 13, 2017).

199   *See* MARIE HERB & LIZ STEWART, INDIANAPOLIS BLUEPRINT 2.0 EVALUATION (Mar. 8, 2016), http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=9&ved=0ahUKEwilqMPo7ZrWAhXFLyYKHbcZCPsQFghIMAg&url=http%3A%2F%2Fwww.chipindy.org%2Fwp-content%2Fuploads%2F2015%2F01%2FBlueprint-2-0-evaluation-TAC-March-71.pdf&usg=AFQjCNEVre9PyRDVqrh9qZunRIrmTEOnIA.

200   *See* Brian Eason, *New center looks to rehab the homeless not jail them*, INDY STAR (June 2, 2015), https://www.indystar.com/story/news/politics/2015/06/02/new-center-looks-rehab-homeless-jail/28354157/.

201   *See, id.*

202   MARION CTY. MINUTES at 26, *supra* note 185.

203   Justin L. Mack, *'The Jungle' Homeless Camp is Cleared Out*, INDIANAPOLIS STAR (Mar. 30, 2017, 5:03 PM), http://www.indystar.com/story/news/2017/03/30/homeless-advocates-brace-final-day-jungle/99814974/.

Engagement Center which focused on connecting those experiencing homelessness with various advocates and other service providers.[204] At the time, Paul Babock, the interim director of the Office of Public Health and Safety, said that simply moving displaced residents to other encampments "would be counterproductive to our long-standing policy of trying to get people into housing"[205]The City also partnered with other groups and interests to try to establish either temporary or permanent housing for those displaced. [206] Ultimately, though, those plans fell through, and the removal process did not meet all of the needs of those removed.[207]



Jungle residents moving their belongings during their eviction. Photo source: a Bigger Vision

#### "Emergency" Exception

In addition to the inapplicability to private lands, another limitation of the Indianapolis Encampment Ordinance is the ability of the City to circumvent its protections in the event of an "emergency." While the City did not make use of that exception for the first year and a half of the Ordinance, in August 2017, it apparently did.

On August 4, 2017, the City distributed flyers in various locations declaring an "emergency order," which prohibited sitting or standing in certain underpasses, and that belongings and effects located in those locations needed to be cleared by August 8, 2017.[208] On the evening of August 8, City trucks removed property from the underpasses where the notices had been handed out without waiting to ensure housing was available to all who needed it.[209] The City claims "emergency" was in response to potential

exposure to terrorist attacks, such as had recently occurred in Europe and that persons experiencing homelessness "storing items or lying on the public sidewalk, as well as congregating on the sidewalks, even by standing" could hinder first responders.[210] The city did not cite any specific imminent threat.[211]



Maurice Young, homeless advocate and lead plaintiff in eviction lawsuit. Photo credit: a Bigger Vision

Maurice Young, who had been earlier evicted from the Irish Hill encampment, engaged with the ACLU of Indiana to serve as the lead plaintiff in the class action suit against the eviction. Factually, the complaint disputes the notion that any there was any interference or that any sidewalks were actually blocked.[212] The complaint describes the City notices as providing storage for property and effects at the Reuben Engagement Center, but further alleged that storage at the Reuben Engagement Center "was not a viable option for most of the homeless as this is not a place where the persons can easily retrieve their items once they are stored."[213] The complaint further described that persons experiencing homeless in the area "could not sleep, sit, stand or even stop under the four overpasses because of the alleged emergency even though at the time that the persons were informed of this by the police there were no events taking place at any nearby stadiums or other event venues and there were not a large number of non-homeless pedestrians traversing the area."[214] One of the main arguments in the complaint is that the term "emergency," as advanced by the City, is "extremely vague" and violates both the due process and equal protection clauses of the United States Constitution (the Indianapolis Encampment Ordinance itself is not directly mentioned in the complaint).[215] The complaint seeks a declaration that the ban is unconstitutional and a preliminary injunction enjoining the City from enforcing the

---

204   *Id.*

205   *Id.*

206   *Id. See also,* Interview with Don Sawyer, Producer and Director, "Under the Bridge" (May 1, 2017) [hereinafter Sawyer Interview].

207   Sawyer Interview, *supra.*

208   Complaint at 1, Young v. City of Indianapolis, Case No. 1:17-cv-2818 (S.D. Ind. Aug. 17, 2017).

209   *Id.* at 1, 4.

210   *Id.* at 1

211   *Id* at 4, 5.

212   *Id.* at 3

213   *Id.* at 4

214   *Id.* at 5

215   *Id.* at 7

ban order.[216] At the time of publication, the case is ongoing.

### Conclusions and Lessons Learned

Indianapolis set an important precedent by encoding in law some of the principles of the USICH guidance, including that homeless encampments should not be evicted without providing for the housing needs of those living there. Lessons learned for policy makers include: 1) it is possible to pass this kind of law; and 2) passing such a law can have positive spillover effects in mobilizing the community to take further steps to ensure its implementation, such mobilizing the political will to operationalize the Reuben Center.

On paper, the Ordinance implements many of the Principles we document as the best approach. In practice, however, the City's implementation of the Ordinance has not lived up to our Principles because of its geographic limitation and emergency exception. Nonetheless, local advocate Don Sawyer concluded that it is a win "because it [gives] us something to hold the city accountable to. As imperfect as it [is], we were able to use it to hold the city accountable during the Jungle encampment eviction…The culture must now catch up to the law."[217]

---

216  *Id.*
217  Sawyer Interview, *supra* note 206.

## Charleston, West Virginia – Litigation Leading to Ending Encampments through Shelter or Housing





The eviction of Tent City. Photo credit: Sam Petsonk

While Charleston, SC's 10 Principles were the result of good faith collaboration between the Mayor's office and local advocates, and Indianapolis' legislation came from leadership in city council backed by external advocacy, the legislation in this case study of Charleston, WV, resulted from litigation.

In January 2016, the Mayor of the City of Charleston, WV, ordered the dismantling of an encampment known as "Tent City" without prior notice to the homeless residents of the encampment.[218] Six months later, the residents, with assistance from Mountain State Justice, Inc., filed a lawsuit against the Mayor of Charleston, the City of Charleston, and the Charleston Police Department, alleging search and seizure violations as well as violations of procedural and substantive due process.[219] Less than six months after the lawsuit was filed, as a result of settlement discussions among the parties and the other various stakeholders in the City, the City Council enacted the "City of Charleston Homeless Encampment and Transient Outdoor Living Policy" (the "Charleston Encampment Ordinance"), and committed to opening a storage facility for homeless individuals.

The Charleston Encampment Ordinance sets forth the required procedures for closing homeless encampments and transient outdoor living situations located on public property in Charleston, drawing on the strategies outlined in the USICH Guidance.[220] This includes at least 14 days written notice to camp residents on public property,[221] and additionally to local service providers and Mountain State within 48 hours after being posted.[222] For encampments located on private property, the City must contact the encampment residents, as well as homeless outreach providers at least 24 hours prior to taking action to remove the encampment.[223] Notwithstanding the foregoing notice requirements, the City may take any and all actions to enforce state and local laws in the event of any circumstances posing an imminent threat to the health, safety, or welfare of any individual or the public.[224] The Ordinance also requires (i) providing outreach workers on-site to assist residents with temporary shelter and emergency service needs, (ii) providing transportation to such shelters and emergency services, (iii) providing residents of the camp with at least 60 minutes to collect their belongings, and (iv) providing specific procedures for documenting and cataloguing unclaimed personal items at the encampment and providing for the storage of those items at an established location for at least 14 days after the eviction.[225] If shelter is not available for an encampment resident that has requested it, the resident is allowed to remain on-site at the encampment until shelter is made available or another reasonable solution is determined.[226]

---

218   Erin Beck and Elaina Slauber, *Charleston Mayor Orders "Tent City" Dismantled*, Charleston Gazette-Mail, January 19, 2016, available at https://www.wvgazettemail.com/placement/charleston-mayor-orders-tent-city-dismantled/article_b764d542-5e1d-52aa-a795-350850c890a2.html (last accessed November 7, 2017).

219   Curtright v. Jones, Case No. 2:16-cv-06346, Complaint, filed 07/14/2016, at ¶6-7.

220   City of Charleston Homeless Encampment and Transient Outdoor Temporary Living Policy, City Council of Charleston, West Virginia [hereinafter "City Ordinance"]; *see also*, ENDING HOMELESSNESS, *supra* note 66.

221   City Ordinance, *supra* note 220.

222   *Id.*

223   *Id.*

224   *Id.*

225   Id.

226   *Id.*

TENT CITY, USA: The Growth of America's Homeless Encampments and How Communities are Responding

| Charleston, WV Efforts as Measured by the Encampment Principles | | |
|---|---|---|
| **Principle 1**: All people need safe, accessible, legal place to be, both at night and during the day, and a place to securely store belongings—until permanent housing is found. | Charleston put in place an ordinance requiring shelter or housing for those living in encampments or allowing them to stay in the encampment until such is available, although it is unclear what level of shelter is required. It also committed to construction of a storage facility. The city has not yet provided a specific plan for producing adequate affordable housing for all who need it. | ✔– |
| **Principle 2**: Delivery of services must respect the experience, human dignity, and human rights of those receiving them. | Charleston's ordinance requires outreach and consultation with encampment residents, but implementation of the ordinance has yet to be seen. | ✔ |
| **Principle 3**: Any move or removal of an encampment must follow clear procedures that protect residents. | Charleston now has clear procedures applicable on public and private property including 14 days' notice, moving assistance, and storage of items. Implementation remains to be seen. | ✔ |
| **Principle 4**: Where new temporary legalized encampments are used as part of a continuum of shelter and housing, ensure it is as close to possible to fully adequate housing. | Charleston has not committed to providing services for camps that are allowed to exist. | ✘ |
| **Principle 5**: Adequate alternative housing must be a decent alternative. | Charleston requires that encampment residents be offered shelter or permanent housing and the level of shelter required is not clear. Without a plan to provide permanent housing, it may be unlikely that permanent housing will result. Camp residents retain the right to stay if adequate alternatives are not provided. | ✔– |
| **Principle 6**: Law enforcement should serve and protect all members of the community. | Charleston law enforcement did not respect its original agreement to provide notice before evicting Tent City; relationships under the ordinance remain to be seen. | ✔– |

*BACKGROUND: THE "TENT CITY" LAWSUIT*

Tent City Eviction

Charleston's homeless population has been on the rise for at least a decade.[227] The encampment known as "Tent City" was established in Charleston along the west bank of the Elk River over ten years ago and included approximately twenty tents.[228]

Prior to the Mayor's eviction of Tent City, attorneys at Mountain State Justice, Inc. ("Mountain State"), a legal advocacy organization for low income West Virginians,[229] had been coordinating with Tent City residents and the Charleston police to prevent eviction of the residents without notice.[230] In August 2014, Lydia Milnes, an attorney at Mountain State, sent a letter to the Deputy Chief of the Charleston police department (the "CPD") describing reports of threats from officers of the Charleston police department to Tent City residents that the police would return to evict the residents.[231] The letter requested the department to confirm their prior understanding with the CPD that the CPD had no intention or plans to evict the encampment, and that, if it planned to evict, it would first provide notice to Mountain State, so that Mountain State could "help make certain that the residents were clearly informed at that time of what the law required and the options legally available to them."[232]

In January 2016, on one of the coldest nights of the year, Charleston Mayor, Danny Jones, ordered the dismantling of Tent City without notice to the residents. This was in response to "multiple complaints from nearby businesses.[233] Mayor Jones noted that Tent City residents were not warned of the eviction in order to avoid the need to pass legal scrutiny, saying "[t]here was a lawyer from Mountain Justice who got

---

227  Katy Anderson, Number of Homeless People on the Rise in Charleston, WSAZ News Channel 3, July 27, 2017, available at http://www.wsaz.com/content/news/Number-of-homeless-people-on-the-rise-in-Charleston--437056883.html (last accessed November 7, 2017).

228  Curtright v. Jones, *supra* note 219, at ¶6-8.

229  *See* https://www.mountainstatejustice.org (last accessed November 22, 2017).

230  In person interview with Sam Petsonk and Lydia Milnes, Mountain State Justice Attorneys (July 7, 2017) [hereinafter "Petsonk and Milnes Interview"].

231  Letter, dated, August 21, 2014, from Mountain State Justice, Inc. to Major Jason Beckett, Deputy Chief, Charleston Police Department.

232  *Id.*

233  See Beck and Slauber, *supra* note 218. *See also* People Ordered Out of West Virginia Homeless Encampment, January 20, 2016, available at http://www.times-news.com/news/people-ordered-out-of-west-virginia-homeless-encampment/article_cc430ad8-39ea-53f8-a16e-02d26cfbbc75.html (last accessed November 21, 2017): "Employees at Waste Management's hauling center were concerned about their own safety after 'disorderly' encampment occupants approached them" and "Foodland general manager Jeff Joseph said some homeless people had used the store to bathe in its restrooms.  He said they also destroyed property on multiple occasions….'It's very damaging not just to us, but to all of our businesses."

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

down there as we were doing it and he would've gone in court and tried to stop us and then we'd have to pay to fight it."[234]

Residents reported that they were not given enough time to collect their belongings during the eviction, and that when they later went to retrieve their belongings from storage, they could not locate many of their possessions.[235] One resident reported that he had about $700 worth of food, a two-room tent, several sleeping bags and blankets and personal hygiene items, but he was only able to find one bag of clothes at the storage facility.[236]

## Litigation

After learning of the eviction, Mountain State attorneys discussed the eviction with former Tent City residents and created an inventory of lost items for purposes of filing a complaint against the City.[237] According to Mountain State attorneys, Mountain State initially tried to mediate with the CPD in order to revisit their prior understandings with the CPD regarding notice and to establish an express policy from the CPD regarding eviction.[238] However, the parties were unable to achieve such a resolution.[239] Although the CPD previously indicated their willingness to provide notice to encampment residents and Mountain State, they were slow to respond to Mountain State's requests regarding a formal police procedure. Mountain State thought some of the delay was due to the CPD preference to coordinate with the Mayor and City Council regarding a formal encampment eviction process.[240]

On July 14, 2016, two residents of Tent City, on behalf of themselves and others similarly situated (collectively, the "Plaintiffs"), filed a lawsuit against the Mayor individually and in his official capacity, the City, and the CPD (collectively, the "Defendants").[241] The Complaint, prepared by Mountain State, alleged (i) violations of the Plaintiffs' right to be free from unreasonable search and seizure of their property without a warrant under the Fourth Amendment of the U.S. Constitution and the West Virginia Constitution,[242] (ii)

violations of the Plaintiff's procedural due process rights under the Fourteenth Amendment to the U.S. Constitution and the West Virginia Constitution, due to the seizure and destruction of the Plaintiff's personal property without notice[243] and (iii) violations of the Plaintiff's substantive due process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution and the West Virginia Constitution, due to the deprivation of Plaintiffs' homes and personal property needed for their survival.[244] The Complaint directly references the USICH guidance on homeless encampments[245] as well as the U.S. Department of Justice's Division of Community Oriented Policing Services' notice regarding procedures for engaging with homeless communities[246] and noted that the defendants were "on specific notice of governmental policies and standards of conduct…against the destruction of encampments of the homeless, and the Defendants had received specific notice of feasible alternatives to depriving the residents of Tent City of their belongings that were necessary for survival in the frigid winter months."

## *MEDIATION, SETTLEMENT, AND THE CHARLESTON ENCAMPMENT ORDINANCE*

### Mediation and Settlement of the Lawsuit

The parties entered into mediation discussion within weeks after the Mountain State lawsuit was filed.[247] Mountain State felt they were able to organize settlement discussions relatively quickly, in large part, because of their longer term relationships with the former residents of Tent City, service providers located in Charleston, the City, and the CPD.[248] Mountain State also emphasized that it was important that they always had at least one member of the homeless community at each meeting.[249] From Mountain State's perspective, the purpose and scope of the meetings among the various stakeholders were to negotiate compensation to the residents of Tent City for the loss or destruction of their personal property as well as to discuss formalizing, as an official ordinance of the City, the requirement for providing prior notice to encampment residents prior to dismantling any encampment.[250] According to the City Attorney of Charleston, Paul Ellis, the City's goals were similar.[251] The City wanted to make clear that while the City was not in

---

234  Carrie Hodousek, *Residents Lash Out at Charleston Mayor for Dismantle of Tent City*, WV Metro News, January 20, 2016; available at http://wvmetronews.com/2016/01/20/residents-lash-out-at-charleston-mayor-for-dismantle-of-tent-city/ (last accessed November 7, 2017).

235  Erin Beck, *Tent City Resident Says Belongings Missing; Officials Say Only Trash Thrown Away*, January 20, 2016, available at https://www.wvgazettemail.com/placement/tent-city-resident-says-belongings-missing-officials-say-only-trash/article_1fc381d4-1a4f-5478-b5b7-667c863409d5.html (last accessed November 15, 2017).

236  *Id.*

237  *Id.*

238  *Id.*

239  *Id.*

240  *Id.*

241  See Complaint, *supra* note 219.

242  *Id.* at ¶ 79-87 and ¶ 108-115.

243  *Id.* at ¶ 88-97 and ¶ 116-120.

244  *Id.* at ¶ 98-107 and . ¶ 121-130.

245  *Id.* at ¶ 18.

246  *Id.* at ¶ 19.

247  Petsonk and Milnes Interview, *supra* note 230.

248  *Id.*

249  *Id.*

250  *Id.*

251  In person interview with Paul Ellis, City Attorney of Charleston, WV (December 6, 2017) [hereinafter "Ellis Interview"].

favor of people living outside, they did want to recognize everyone's rights to due process and to respect property rights, and they recognized that a written policy assists everyone, including the City, with implementing uniform procedures for eviction.[252]

Settlement conferences were held at Covenant House, the only day shelter in Charleston.[253] Ellen Allen, the executive director of Covenant House, maintains that discussions were successful because "everyone came to the table" and the discussions were collaborative.[254] Using examples of ordinances from other cities and localities provided by the Law Center and the USICH guidance, Mountain State drafted the initial proposal that ultimately became the basis for the City ordinance.[255]

In September 2017, a final mediation order was entered in the case where the parties agreed as follows: (1) the City made a global settlement offer of $20,000 to resolve all claims of the individuals residing at Tent City, with each claimant to receive its pro rata share of the settlement, but no less than $1,200 per person,[256] (2) the City agreed to work with local homeless providers to complete construction of a secure outdoor storage facility before July 1, 2018 to be made available to homeless residents of the City,[257] (3) the parties acknowledged that the City, after consultation with local homeless service providers and the plaintiffs, passed a resolution on December 19, 2016 authorizing annual funding of $75,000 to Prestera, a local homeless outreach provider, in order to allow Prestera to hire two new outreach workers dedicated to serving the homeless population of Charleston[258] and (4) the parties acknowledged that, after consultation with the local homeless providers and the Plaintiffs, the Charleston City Council adopted the Charleston Encampment Ordinance on December 19, 2016.[259]

## Major Provisions of the Charleston Encampment Ordinance

The Charleston Encampment Ordinance sets forth the required procedures for closing homeless encampments and transient outdoor living situations located on public property in Charleston.[260] The Charleston Encampment Ordinance also adopts several of the effective strategies and approaches outlined in the USICH guidance, related to preparation and adequate time for planning, as well as collaboration across sectors and systems.[261] Prior to closing an encampment located on public property, the City must "provide at least 14 days written notice [to the residents] of its intent to close the encampment in a manner reasonably intended to inform individuals residing at the encampment site," and at a minimum, must post the notice at the places of ingress to and egress from the encampment.[262] The notice itself must state the designated closing date of the encampment on which all structures and personal belongings will be removed from the encampment, and indicate that no person shall be allowed to remain at the encampment after the designated date.[263] The notice is also required to be provided to Kanawha Valley Collective (a collective of non-profit homeless and related service providers funded, in part, by the City) ("KVC") and Mountain State within 48 hours after being posted.[264] For encampments located on private property, the City must contact the encampment residents, as well as homeless outreach providers at least 24 hours prior to taking action to remove the encampment from private property.[265] Notwithstanding the foregoing notice requirements, the City may take any and all actions to enforce state and local laws in the event of any circumstances posing an imminent threat to the health, safety, or welfare of any individual or the public.[266]

In addition to establishing a formal notice requirement in advance of an encampment eviction, the City Ordinance provides for the procedures to be followed by the City at the time of the eviction.[267] The requirements include (i) providing outreach workers on-site from KVC to assist residents with temporary shelter and emergency services needs, (ii) providing transportation to such shelters and emergency services, (iii) providing residents of the camp with at least 60 minutes to collect their belongings, and (iv) providing specific procedures for documenting and cataloguing unclaimed personal items at the encampment and providing for the storage of those items at an established location for at least fourteen (14) days after the eviction.[268] If shelter is not available for an encampment resident that has requested it, the resident is allowed to remain on-site at the encampment until shelter is made available or another reasonable solution is determined.[269]

---

252  *Id.*
253  Telephone interview with Ellen Allen, Covenant House Executive Director (November 1, 2017) [hereinafter "Allen Interview"].
254  *Id.*
255  Petsonk and Milnes Interview, *supra* note 230.
256  Curtright v. Jones, Case No. 2:16-cv-06346, Mediation Agreement, filed on 9/1/17, at ¶ 1-2.
257  *Id.* at ¶ 3.
258  *Id.* at ¶ 8.
259  *Id.* at ¶ 7.
260  City Ordinance, *supra* note 220.
261  ENDING HOMELESSNESS, *supra* note 66.
262  City Ordinance, *supra* note 220.
263  *Id.*
264  *Id.*
265  *Id.*
266  *Id.*
267  *Id.*
268  Id.
269  *Id.*

Upon receiving notice of an eviction from the City, the Charleston Encampment Ordinance also requires active collaboration and participation from KVC and its affiliates in coordinating the efforts of service providers, faith-based organizations and street ministries to ensure that encampment residents are offered shelter or permanent housing and similar services for which they are eligible.[270]

*LITIGATION: A SUCCESS STORY*

While the filing of the Complaint by Mountain State Justice was initially an adversarial act, the resulting settlement discussions and development of the Charleston Encampment Ordinance were ultimately a collaborative effort. Ellen Allen of Covenant House noted that in drafting the ordinance, the parties made efforts to "look at the practicality of concerns of the entire [Charleston] community" while also treating all parties with "dignity and respect".[271] She also notes that enacting the ordinance has called the entire community to be more astute at noticing when encampments are developing so that law enforcement may make the encampment residents aware (in conformity with the requirements of the ordinance) that they cannot remain there, and allowing the various service providers in the City to coordinate with the residents to offer them temporary shelter and other services.[272] Since the Charleston Encampment Ordinance was enacted by the City in December 2016, there have been at least two more encampment evictions by the City, but they have been done in compliance with the ordinance.[273] Mountain State Justice notes the importance of having written guidelines that can now be legally enforced by the residents when not followed by the City.[274] The City Attorney also noted that the policy is beneficial to all parties, including the City.[275] Prior to enactment of the ordinance, encampment issues were resolved on a "case by case basis depending on who someone talked to."[276] Ellis states, "At least locally, my experience has been that most public employees want to do the right thing, but it's hard to do the right thing if they don't know what that is. So we needed a policy."[277] Ellis also states that the collaborative effort among the City, the providers, and the homeless in developing the ordinance generated a "helpful working dialogue" among all groups and has led to additional communication among the groups, including the creation of a "Homeless Task Force."[278]

The City's position, however, is that they would have enacted an ordinance and provided for the other items achieved by mediation (the outdoor storage facility and the additional funding for Prestera, among others) without a lawsuit, and that the litigation was "counterproductive."[279] Sam Petsonk's, of Mountain State Justice, response is that while he does not presuppose otherwise, the litigation allows the parties to "record and formalize the outcomes" that the parties have achieved.[280] Ellen Allen also notes that the "litigation was key" in bringing the issue to the "front and center" and allowing all stakeholders to come to the table and work to resolve the encampments issue.

**CONCLUSION**

The Charleston Encampment Ordinance takes important steps to implement several key objectives of the USICH guidance and our Principles. Major concerns remain around the lack of requirement for permanent housing as opposed to temporary shelter, as well as the relatively short notice period, particularly for private property, which may create challenges for outreach workers to find adequate alternatives. How these concerns will manifest remains to be seen, though the two initial evictions reported by our interviewees seem to hold promise. Hopefully, other communities will not need litigation to spur such conversation, but Charleston's example shows that the positive collaborative results can still come from initial adversarial encounters.

---

270  *Id.*
271  Allen Interview, *supra* note 253.
272  *Id.*
273  Petsonk and Milnes Interview, *supra* note 230.
274  *Id.*
275  Ellis Interview, *supra* note 282.
276  *Id.*
277  *Id.*
278  *Id.*

279  *Id.*
280  *Id.*

## Conclusions

These case studies demonstrate several approaches to dealing with encampments that avoid or minimize resorting to punitive, law enforcement techniques. Each of them have strengths and weaknesses and strong implementation is a major driver in whether the approach meets our proposed principles & practices.  City legislators in San Francisco, CA, and Seattle, WA, have drafted approaches that improve on the ordinances in Indianapolis, IN, and Charleston, WV. The U.S. Department of Justice even approved Seattle's draft as a constitutionally appropriate approach.[281]

> "…[C]riminalizing homelessness is both unconstitutional and misguided public policy, leading to worse outcomes for people who are homeless and for their communities…[Seattle's proposed ordinance] CB 118794 is drafted within this context, recognizing that encampments exist and that the rights of people experiencing homelessness must be respected…. Although the enactment of CB 118794 would not solve the problem of homelessness in Seattle, the bill is consistent with the position we took in Bell v. Boise in its acknowledgement of the human rights of people experiencing homelessness.
>
>     --U.S. Department of Justice, Letter to City of Seattle

Seattle and San Francisco's draft ordinances (full text available in Appendices VII and VIII, respectively) were developed with the participation of those who have experienced life in encampments, and include several key elements, based on a recognition of the existence of encampments as a public health issue requiring effective immediate and long-term solutions:

1. Sanitation: Seattle requires the city "shall provide basic garbage, sanitation, and harm reduction services upon request at outdoor living spaces containing more than five (5) individuals; San Francisco requires a toilet and scheduled trash removal for encampments greater than 30 persons.

2. Eviction: Seattle requires adequate housing be available to all those affected at least 30 days before the eviction, sufficient outreach is conducted to place them into it, and adequate notice is given about the plan for eviction and property storage; San Francisco requires the city to develop a relocation plan with residents that provides permanent housing, or temporary shelter with a plan to transition into permanent housing, and 15 days notice.

3. Emergency Eviction: Both allow for emergency eviction where unsafe or hazardous conditions exist, but in Seattle, the city must first provide at least 72 hours to cure the hazardous conditions, and failing that, provide at least 48 hours notice and identify a nearby adequate alternative location where people can safely exist; San Francisco also requires the city attempt to cure or mitigate public health issues, and failing that, provide appropriate notice based on the circumstances.

4. Property Storage: Seattle requires removed property must be stored in an accessible location for 90 days; San Francisco requires 24 hours personal notice or seven days posted notice before the removal of property, and storage for 120 days.

The Seattle and San Francisco models are recommended as a starting point for communities, but it is essential to work with the individuals experiencing homelessness in your community to see what elements may need to be adjusted or added depending on local circumstances. In general, homeless people living on the streets (just like all of us) have need for shelter from the elements, their property, and sanitation. By finding other ways of meeting those needs in the short term, such as storage facilities or port-a-potties, communities can ensure that the negative public health and safety impact of existing encampments is minimized for both homeless and housed residents alike while efforts are made to ensure full access to affordable, appropriate housing.

---

281  Letter from Lisa Foster, Director, Office for Access to Justice, U.S. Dept. of Justice, to Seattle City Councilors (Oct.13, 2016), (https://assets.documentcloud.org/documents/3141894/DOJ-ATJ-Letter-to-Seattle-City-Council-10-13-2016.pdf).

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

**Section 4**

Cities Integrating Encampments As a Step in Addressing Homelessness

Las Cruces, New Mexico: City-Sanctioned Encampment with Co-Located Services



Photo Credit: Hope Village Las Cruces

Las Cruces, a small city in southern New Mexico, has embraced Camp Hope, a 50-person homeless encampment, as an integral part of their community's response to homelessness. The success of this encampment comes from three major factors: 1) partnerships with groups outside of the encampment; 2) location on the Mesilla Valley Community of Hope campus along with five area service providers who ensure the camp is part of a continuum of services, with a strong emphasis on it being a place of transition into permanent housing; and 3) the encampment is self-governing and autonomous within its boundaries. Thanks to these elements, the encampment has helped hundreds of individuals transition into permanent housing, including helping the city reach "functional zero" veterans' homelessness.

In trying to summarize Las Cruces' efforts, as measured against the encampments principles, there was a tension between what Camp Hope offered and what was available to other people experiencing homelessness. Camp Hope is small—only 50 people at a time can live there—and does not allow children. Camp Hope offers self-governance, a secure place to stay, and access to services. However, such amenities are not offered to people experiencing homelessness outside of Camp Hope. The scores below reflect the need for further scaling up of the program.

## Las Cruces' Efforts as Measured by the Encampment Principles

| Principle | City's Efforts | Score |
|---|---|---|
| **Principle 1**: All people need safe, accessible, legal place to be, both at night and during the day, and a place to securely store belongings—until permanent housing is found. | The city allows Camp Hope to provide a safe, accessible, legal place to be and store belongings both day and night. But those who cannot access the Camp are still subject to criminalization. | ✓− |
| **Principle 2**: Delivery of services must respect the experience, human dignity, and human rights of those receiving them. | Camp Hope has a strong self-government, and the organizations at the Mesilla Valley Community of Hope provide appropriate care. | ✓ |
| **Principle 3**: Any move or removal of an encampment must follow clear procedures that protect residents. | Encampments other than Camp Hope in Las Cruces are not protected by any procedure. | ✓− |
| **Principle 4**: Where new temporary legalized encampments are used as part of a continuum of shelter and housing, ensure it is as close to possible to fully adequate housing. | Camp Hope provides access to water, hygiene, sanitation, and cooking facilities, as well as co-located additional services. However, these are only available to the people in Camp Hope. | ✓− |
| **Principle 5**: Adequate alternative housing must be a decent alternative. | Camp Hope offers a low-barrier alternative to sleeping on the streets, including access for pets, possessions, and partners (though not children), for those lucky enough to get in. The MVCH agencies seek to place people into permanent housing, but this is not required. | ✓− |
| **Principle 6**: Law enforcement should serve and protect all members of the community. | Camp Hope largely polices itself and law enforcement is invited in when necessary and acts appropriately. Outside of Camp Hope, however, there is still criminalization of homelessness. | ✓− |

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

## Background

In 1993, five community organizations working on homelessness issues came together to form the Mesilla Valley Community of Hope (MVCH) campus to house their services together, including day shelter, intensive case management, housing programs, and assistance with disability applications.[282] Initially the campus did not have any overnight shelter, but in 2011, with winter coming and unregulated encampments causing problems in other neighborhoods, and with the support of MVCH, three determined individuals experiencing homelessness negotiated a temporary zoning agreement with the City of Las Cruces allowing homeless people to camp on an adjacent piece of property owned by the city.[283] With assistance from community organizations, Camp Hope adjusted to gain permanent status, and the encampment now hosts up to 50 residents at a time (pets allowed, but no children), and last year hosted 193 individuals over the course of the year. Residents enforce their own rules, including no drinking or drugs on the property, and are self-governing and have weekly meetings to resolve problems and make plans.[284] The MVCH organizations use the camp to provide some elements of basic stability to residents as the organizations work to secure permanent housing for residents. Camping is not a programmatic stepping stone to housing.[285]

*"The level of support here is just so phenomenal that it does make a difference. A guy who camped out behind the garden shed for 10 years just came in this year to ask for help with his SSI and to get him into housing. It takes that long for some people."*

*–Matt Mercer, Camp Hope co-founder*

## Partnerships

Partnerships have been key to the encampment's success. Five organizations partnered to create the MVCH, enabling homeless persons in the community to get showers, laundry, meals, and case management all in one place. The camp greatly benefited from the "Engineering Without Borders" program at the New Mexico State University Geography Department. The encampment's initial zoning variance only gave them until March 2012; following that they had to rezone as a planned unit development.[286] The students and their professors surveyed the site pro bono and planned everything from tent location to drainage plans and access plans, and then volunteered to provide the construction.[287] Student groups have continued to contribute, with students from Dona Ana Community College now involved in developing and constructing three-sided shelter structures which comply with the non-residential zoning requirements, but provide better shelter than tents and tarps alone.[288]



Partnering with students at New Mexico State University enabled the residents to plan the encampment to meet zoning standards.

The MVCH organizations do not want Camp Hope to be an end point for residents, but a place to transition to permanent housing. Although Camp Hope imposes some rules on entrance, the organizations implement a Housing First approach to permanent housing, and have several facilities for permanent housing, including Adobe Hope Housing and Sue's House for chronically homeless women.[289] But beyond their own housing, they partnered with the Mesilla Valley

282   *About Us*, Mesilla Valley Community of Hope, http://www.mvcom-munityofhope.org/about-us/ (last visited Nov. 22, 2017).

283   Lauren Villagran, *Tales of Two Tent Cities: No Longer 'Every man for himself'*, Albuquerque Journal (Jan. 25, 2015), https://www.abqjournal.com/531417/camp-hope-las-cruces.html.

284   *Id.*

285   *About Us*, Mesilla Valley Community of Hope, http://www.mvcom-munityofhope.org/about-us/ (last visited Nov. 22, 2017).

286   Kristen Sullivan, *NMSU's Engineering Without Boundaries Brings Hope to Homeless Camp*, N.M. State Univ. News Ctr. (May 8, 2015), https://newscenter.nmsu.edu/articles/view/11151/nmsu-s-engineering-without-boundaries-brings-hope-to-homeless-camp.

287   *Id.*

288   Damien Willis, *Structures Improve Life at Camp Hope*, Las Cruces Sun-News (Jan. 8, 2017), http://www.lcsun-news.com/story/news/local/2017/01/08/structures-improve-life-camp-hope/96264732/.

289   *See About Us*, Mesilla Valley Community of Hope, http://www.mv-communityofhope.org/about-us/ (last visited Nov. 22, 2017).

Public Housing Authority to secure 22 units specifically for veterans, which has helped the city successfully keep veterans' homelessness at "functional zero" for two years in a row.[290] (Functional zero does not mean no veteran will become homeless again, homeless veterans are quickly identified and provided with the housing and supportive services they need). Similar partnerships with agencies such as the Veteran's Administration; Children, Youth, and Families Department; Social Security Administration; Income Support division; and mental health care providers have helped MVCH move 661 individuals into permanent housing last year.

### Location and Co-location

Camp Hope affords those experiencing homeless with the opportunity to be conveniently located next to all the direct services the five agencies on the MVCH campus provide. MVCH provides day shelter, including showers, laundry, lockers, internet, phone, and postal services as well as case management and access to 8 housing programs, SSI/SSDI applications, veterans services, ID assistance, reduced fare bus passes;[291] St. Luke's Health Care Clinic provides over 500 patients a year medical, dental, and behavior health care in a comprehensive setting;[292] El Caldito Soup Kitchen provides meals; Jardin de los Ninos provides early childhood education, therapeutic intervention, and comprehensive services to homeless and near homeless children, from the ages of six weeks to ten years, and their families;[293] and Casa de Peregrinos Emergency Food Bank provides more than a million pounds of food per year to thousands of needy families.[294] The campus itself is also located within walking distance of downtown, and, as noted above, MVCH provides reduced fare bus passes, in case residents need referrals or access to other services.

"If you look at Camp Hope, for its size and scale, it is a tremendous success," he said. "As a city, the challenge is what do we do next? How do we plan and work as a community that is inclusive?"

—City Councilor Nathan Small, whose district includes Camp Hope]

### Self-governance

From the beginning, MVCH and Camp Hope residents agreed that the residents would come up with rules and procedures to govern themselves, within the host agencies' legally-required and mission-driven guidelines.[295] The camp residents organize weekly meetings for resolving disputes, and the rules, such as no weapons, drinking, drugs, or abusive language on the property, are self-enforced, creating a sense of ownership of the encampment, rather than a client-provider relationship with MVCH, where residents might take less responsibility for the upkeep of the encampment.[296] The camp requires residents to volunteer six hours per week, such as participating in the 24-hour/day safety team or collecting donations.[297] Camp residents say the safety and convenience of having a legal, regulated place to stay compensates for much of the camp's drawbacks, including a lack of hot water and electricity and rules prohibiting propane stoves.[298]

### Conclusion

According to the residents, the service providers, and city and state agencies, Camp Hope has been a success and a model for providing a low-cost, safe, secure location from which residents can base their transition back to housing at their own pace. Although encampments do not provide fully adequate housing, Camp Hope addresses many of our proposed principles, and measurably improves its residents' enjoyment of many of those elements versus surviving on the streets. Residents have a legal place to sleep and store their belongings day and night; services and infrastructure are available through the co-located services on the MCVH campus; the camp is free to residents; tents, and recently developed three-sided structures provide improved habitability over street homelessness; the camp has wheelchair accessible units, and its lack of curfew and other barriers ensure its accessibility; its location close to downtown and with many services is excellent; and its self-governance model ensures the culture of its residents is respected. Without Camp Hope, many chronically homeless persons would be living on the streets under precarious, unsafe conditions that would pose barriers to their own attempts to exit homelessness and could cause concerns among other members of Las Cruces. Communities looking to integrate legal encampments as a temporary arrangement while permanent options are developed should look to Camp Hope's example as one that appears to be working for many members of its community.

290  Samantha Lewis, *Las Cruces Reaches 'Functional Zero' Again, Ending Homelessness for City's Veterans* (Aug. 15, 2016), http://kfoxtv.com/news/local/las-cruces-reaches-functional-zero-again-ending-home-lessness-for-citys-veterans.

291  Matt Mercer, *Key Ingredients for Camp Hope* (Jan. 8, 2015), https://prezi.com/uge763ivshxi/key-ingredients-for-camp-hope/.

292  *About Us*, ST. LUKE'S HEALTH CARE CLINIC, http://slhcclc.com/?page_id=10 (last visited Nov. 22, 2017).

293  JARDIN DE LOS NINOS, http://www.jardinlc.org/index.html (last visited Nov. 22, 2017).

294  *History*, CASA DE PEREGRINOS, http://www.casadeperegrinos.org/home/history (last visited Nov. 22, 2017).

295  Mercer, *supra* note 291.

296  *See Camp News & Notes Archive*, HOPE VILLAGE LAS CRUCES, HTTPS://HOPEVILLAGELASCRUCES.WORDPRESS.COM/PRESS/CAMP-NEWS-NOTES-ARCHIVE/ (last visited Nov. 22, 2017).

297  *See* Sullivan, *supra* note 286; *see* Mercer, *supra* note 291.

298  *See* Villagran, *supra* note 283.

## Washington State: Religious Organization Hosting Encampments

The State of Washington has struggled to find solutions to address homelessness, and in particular, to find immediate, safe and secure shelter on a temporary basis when traditional shelters are at capacity.[299] The Washington State Legislature raised concern at the beginning of 2010 that there were approximately 22,619 people experiencing homelessness in the State of Washington according to a single-night count.[300] Approximately 39 percent of those people were unsheltered,[301] residing in, among other places, cars, parks, sidewalks, and encampments.[302] That year, the Washington State Legislature, finding that religious organizations were uniquely positioned to provide temporary shelter on their property, performing "a valuable public service that, for many, offer[ed] a temporary, stop-gap solution to the larger social problem of increasing numbers of homeless persons,"[303] passed legislation granting religious organizations authority to host temporary encampments for homeless persons.[304] This legislation prevents local jurisdictions from imposing conditions on religious organizations that host encampments, with certain exceptions to protect public health and safety.[305] The same iteration of this law is codified under three statutes: 36.01.290[306] applies to counties, 35A.21.360[307] applies to "code cities", and 35.21.915[308] applies to all other cities and towns.

Washington State's protection of religious organizations' right to host encampments is interesting, but has some serious shortcomings. It provides no resources, limited stability for a limited number of people, and no path to permanent housing solutions

| Washington State's Efforts as Measured by the Encampment Principles | | |
|---|---|---|
| **Principle 1**: All people need safe, accessible, legal place to be, both at night and during the day, and a place to securely store belongings—until permanent housing is found. | Washington State's religious encampment host statute provides for religious organizations to provide a safe, legal place to be and store their belongings, both day and night. It does not, however, require any provision of, or even a plan for, the development of permanent housing or shelter. | ✓− |
| **Principle 2**: Delivery of services must respect the experience, human dignity, and human rights of those receiving them. | The religious host statute allows for the development of encampments by religious organizations, which could take into account the needs and experiences of those they seek to serve, but this is not necessarily required. | ✗ |
| **Principle 3**: Any move or removal of an encampment must follow clear procedures that protect residents. | The statute permits cities to impose time limits that may push an encampment to close before an alternative host can be found. | ✗ |
| **Principle 4**: Where new temporary legalized encampments are used as part of a continuum of shelter and housing, ensure it is as close to possible to fully adequate housing. | The statute requires access to basic water, hygiene, and sanitation. | ✓ |
| **Principle 5**: Adequate alternative housing must be a decent alternative. | The statute does not require the provision of adequate housing upon the termination of an encampment. | ✗ |
| **Principle 6**: Law enforcement should serve and protect all members of the community. | The state does not prohibit discrimination against, or criminalization of, homeless persons. | ✗ |

---

299  In a 2016 survey of unsheltered homeless people living in Seattle, Washington, the largest city in the state, when asked for reasons why such individuals were not currently using shelter services, 36.4 percent of respondents reported that they do not use shelter services because "[t]hey are too crowded," and another 30 percent responded said because "[t]hey are full." "Well over 90 percent" of those surveyed "said they would move into safe and affordable housing if it were offered." City of Seattle, 2016 Homeless Needs Assessment 8 (2016), http://mrsc.org/getmedia/8d5ab109-d85d-4e5c-9ff1-8c97ff524b4b/SeattleHomelessNeedsAssesmentReport.aspx.

300  Dep't of Commerce, Wash. State Point in Time Count of Homeless Persons (2010), http://www.commerce.wa.gov/wp-content/uploads/2016/10/hau-pit-count-2010.pdf. See also Nat'l Law Ctr. on Homelessness & Poverty, Don't Count on It: How the HUD Point-in-Time Count Underestimates the Homelessness Crisis in America (2017), https://www.nlchp.org/documents/HUD-PIT-report2017, discussing the shortcomings of the Point-In-Time count.

301  Id.

302  HUD's Homeless Assistance Programs, A Guide to Counting Unsheltered Homeless People 4 (2004), https://www.hudexchange.info/onecpd/assets/File/Guide-for-Counting-Unsheltered-Homeless-Persons.pdf.

303  Wash. Rev. Code § 36.01.290 (2017); Wash. Rev. Code § 35A.21.360 (2017); Wash. Rev. Code § 35.21.915 (2017).

304  Id.

305  Id.

306  Wash. Rev. Code § 36.01.290 (2017).

307  Wash. Rev. Code § 35A.21.360 (2017).

308  Wash. Rev. Code § 35.21.915 (2017).

Response to this religious hosts law has been mixed. Given shortages in shelter space, churches and other religious institutions often provide "the easiest and clearest path" to quickly organize a temporary encampment.[309] However, because the law imposes few restrictions on these encampments and emphasizes minimal local government interference, conditions at some encampments have prompted complaints from neighboring businesses and residents who are concerned about garbage, crime, and other health and safety issues.[310] In response to the law, many cities have imposed additional regulations on encampments, citing the public health and safety exception.[311] Many of these regulations set maximum time limits, requiring encampments to move to different locations every few months,[312] and provides residents with less stability. The Washington State Senate recently proposed legislation which would amend the current religious hosts law, addressing some of the local jurisdictions' concerns, while placing greater restrictions on such jurisdictions' abilities to regulate the encampments.[313]

### Background: The Free Exercise of Religion

In 2009, the Washington State Supreme Court issued a decision on constitutional challenges to the regulation of a temporary homeless encampment hosted by religious organizations in the Puget Sound area.[314] The encampment, known as "Tent City 4," housed approximately 60 to 100 people and moved from place to place every 90 days. Northshore United Church of Christ was one of the organizations that agreed to host. The church applied for a temporary use permit to host the encampment with the City of Woodinville. A few months prior to the church's application however, the city had passed a temporary moratorium on all such permits, and therefore denied the church's permit application. Despite this denial, Tent City 4 moved onto the church's property.[315]

The court examined whether the city's moratorium substantially burdened the church's free exercise of religion under the Washington constitution.[316] The court held that it did, as the total moratorium gave the church no alternatives, denying its ability to host Tent City 4 and therefore denying a part of its religious practice.[317] The court was clear though, that not all regulations would be deemed a substantial burden on religious exercise, stating, "[A] homeless encampment likely affects the neighbors who live nearby far more than it impacts most parishioners who spend only hours in church weekly while neighbors must live continuously with the encampment. Cities may mediate these externalities reflecting concerns for safety, noise, and crime but may not outright deny consideration of permitting."

The following year, Washington passed the aforementioned legislation, authorizing religious organizations to host temporary encampments on any property owned or controlled by such organizations.[318] The law prohibits counties, cities, and towns from enacting regulations that impose any conditions on the religious organizations, other than those necessary to protect public health and safety and which do not substantially burden such organizations.[319] The law further provides that municipalities may not require religious institutions to obtain liability insurance for the encampments or indemnify the municipalities against such liability.[320] Municipalities are also prohibited from charging fees in excess of the actual costs associated with the review and approval of the required permit applications for homeless encampments.[321]

### Religious Organization Hosting in Practice

Many religious organizations in the State of Washington have embraced this opportunity to serve people experiencing homelessness in their community. As of September 2017, there were four formal encampments hosted by churches

---

309  Interview with Ty Stober, City Council Member, Vancouver City Council (July 6, 2017) [hereinafter Stober Interview.

310  *E.g.,* Wendy Culverwell, *Kennewick Cracks Down on Church-Sponsored Homeless Camp,* TRI-CITY HERALD (Mar. 5, 2017), http://www.yakima-herald.com/news/news_watch/kennewick-cracks-down-on-church-sponsored-homeless-camp/article_9305a922-01d4-11e7-924f-3ff9821a7cbe.html.

311  *E.g.,* KIRKLAND, WASH. MUN. CODE § 127; LYNNWOOD, WASH. MUN. CODE § 21.74.

312  *E.g.,* LYNNWOOD, WASH. MUN. CODE § 21.74.040.

313  S.B. 5657 (2017-18), http://app.leg.wa.gov/billsummary?BillNumber=5657&Year=2017.

314  City of Woodinville v. Northshore United Church, 211 P.3d 406 (2009).

315  *Id.* at 408.

316  *Id.* at 409 ("Washington's constitution guarantees, '[a]bsolute freedom of conscience in all matters of religious sentiment, belief and worship' and also provides that this 'shall not be so construed as to ... justify practices inconsistent with the peace and safety of the state'" citing WASH. CONST. art. I, § 11).

317  *Id.* at 411.

318  The Final Bill Report of the Engrossed Substitute House Bill 1956 (ESHB 1956), which codified the religious hosts law, provided that, "Both the Washington Constitution and the U.S. Constitution recognize that the free exercise of religion is a fundamental right, and both extend broad protection to this right. Notably, the Washington courts have recognized that with respect to freedom of religion, the Washington Constitution extends broader protection than the first amendment to the federal constitution." Final Bill Report, ESHB 1956, http://apps.leg.wa.gov/documents/billdocs/2009-10/Pdf/Bill percent20Reports/House/1956-S.E percent20HBR percent20FBR percent2010.pdf.

319  WASH. REV. CODE § 36.01.290 (2017); WASH. REV. CODE § 35A.21.360 (2017); WASH. REV. CODE § 35.21.915 (2017).

320  *Id.*

321  *Id.*

in the Puget Sound area alone.[322] These four encampments can accommodate approximately 200 individuals.[323] They are self-managing camps that require residents to participate in decision-making and serving the camp, and prohibit drugs, alcohol, and violence.[324] Greater Seattle Cares, a local nonprofit organization, provides support for these and other homeless encampments in the Seattle area. The nonprofit coordinates with the religious organizations hosting such encampments, delivering meals, clothing and supplies,[325] including arranging for mobile dental clinics and donations of pet foot for the camps' pets.[326]

Not all encampments are supported by nonprofits unaffiliated with their religious hosts. In Aberdeen, Washington in 2015, for example, Hoquiam First Presbyterian Church offered its parking lot as a camping spot for homeless individuals.[327] Food and supplies for that encampment were donated by individual volunteers. The pastor of the church was impressed by the community's response and its efforts to provide support to the encampment. She said that hosting was "an amazing experience... The things we've learned and the friendships we've made and the relationships we've established both with campers and the people in our community have just been awesome."[328]

### Community Restrictions on Hosting

Because the law grants religious institutions such broad authority to host encampments, many jurisdictions have enacted regulations that impose additional restrictions on the temporary encampments. Under the state law, the cities must justify the regulations as necessary to protect the public health and safety without substantially burdening the religious organization.[329] The City of Lynwood, for example, has limited the size of encampments to 100 people, prohibits unaccompanied minors, requires encampments meet certain sanitation regulations, and has guidelines for specific lighting, fencing, and setbacks.[330] Lynwood further

limits the duration of encampments to 90 days, and does not grant permits for the same site more than once in a calendar year.[331] The City of Kirkland shares similar criteria, but additionally prohibits all children and pets.[332] Kirkland also requires a "code of conduct" at each site, which, at minimum, must prohibit drugs, alcohol, weapons, violence, open flames, and loitering in the surrounding neighborhood, and must enforce quiet hours.[333]

The City of Bothell has many regulations in common with Lynwood and Kirkland, but has even greater requirements for the permit application process, requiring the applicant to "identify potential adverse effects of the proposed transitory accommodation on neighboring properties and the community and...develop measures to mitigate such effects."[334] If the proposed encampment is within 600 feet of any licensed child care facility or elementary, middle, junior high, or high school, the applicant must reach out to the facility or school for its objections or concerns and negotiate a mitigation plan.[335] Like Lynwood, Bothell limits encampments to 90 days per site, and prohibits sites from hosting more than once in a twelve month period.[336]

Cities have faced criticism of these regulations from religious leaders,[337] especially those regulations that impose strict time limits.[338] In response, city leaders say that they are "trying to balance religious groups' constitutional right to help the poor with local government's responsibility to protect the health and safety of residents and the time it takes to process a permit and notify neighbors."[339] While time limits can make finding new sites to host encampments very difficult, they can also minimize the number of neighbor complaints.[340] In Kennewick, Washington, for example,

---

322   *Locations & Hosts*, Greater Seattle Cares, http://greaterseattlecares.org/encampments/location-hosts/ (last visited Nov. 22, 2017).

323   *Id.*

324   *Encampments*, Greater Seattle Cares, http://greaterseattlecares.org/encampments/ (last visited Nov. 22, 2017).

325   *Mission & History*, Greater Seattle Cares, http://greaterseattlecares.org/about/mission-history/ (last visited Nov. 22, 2017).

326   *A Special Day at Tent City 3*, Greater Seattle Cares (Nov. 18, 2015), http://greaterseattlecares.org/encampment-stories/a-special-day-at-tent-city-3/.

327   Jake Schild, *Homeless Camp Residents, Volunteers Scramble to Find New Location*, Spokesman-Review (Nov. 28, 2015), http://www.spokesman.com/stories/2015/nov/28/homeless-camp-residents-volunteers-scramble-to-fin/.

328   *Id.*

329   Wash. Rev. Code § 36.01.290 (2017); Wash. Rev. Code § 35A.21.360 (2017); Wash. Rev. Code § 35.21.915 (2017).

330   Lynwood, Wash. Mun. Code § 21.74 (2017), http://www.codepublishing.com/WA/Lynnwood/html/Lynnwood21/Lynnwood2174.html#21.74.

331   *Id.*

332   Kirkland, Wash. Mun. Code § 127 (2017), http://www.codepublishing.com/WA/Kirkland/html/Kirkland127/Kirkland127.html#127.44

333   *Id.*

334   Bothell, Wash. Mun. Code § 12.06.160 (2017), http://www.codepublishing.com/WA/Bothell/html/Bothell12/Bothell1206.html#12.06.160

335   *Id.*

336   *Id.*

337   *E.g.*, Lynn Thompson, *Churches Say Suburbs' Red Tape Barring Doors to Tent Cities*, Seattle Times (Jan. 29, 2015), http://www.seattletimes.com/seattle-news/churches-say-suburbs-red-tape-barring-door-to-tent-cities/ (Rev. Bill Kirlin-Hackett, director of the Interfaith Task Force on Homelessness, stated, "If you limit encampments to faith communities that can afford the fees and add an ordinance that they can only do it once a year, you run out of faith communities pretty quickly.")

338   *E.g.*, Schild, *supra* note 327 (Pastor Val Metrpolous, pastor of Amazing Grace Church in Aberdeen, Washington, expressed her frustration, "We are hoping in the long run that they [the cities] will start seeing this is everybody's problem, not just the churches'...It's really hard to move every 90 days.").

339   Thompson, *supra* note 337.

340   In its 2016 Homeless Needs Assessment, the City of Seattle interviewed more than 1,050 individuals experiencing homelessness. A significant number of those surveyed had lived in encampments. While many were supportive of the encampments, others felt oppo-

a city with fewer regulations on homeless encampments, Dayspring Ministries hosted an encampment in its parking lot for more than half a year.[341] Responding to complaints from local businesses and other residents, the city considered a new "Temporary Housing Emergency" ordinance in 2017 which would limit the size and duration of the encampments.[342] The ordinance would impose even greater restrictions on the identification of the prospective residents, including confirming that such residents do not appear on any sex offender registries.[343] As of March 2017, Kennewick had tabled the proposed ordinance while the Washington State Legislature considered a new bill which addressed similar issues.

### New Proposed State Legislation on Community Limits

In early 2017, the Washington State Senate passed Substitute Senate Bill No. 5657, which would amend the religious hosts law.[344] If enacted, the bill would further restrict localities' ability to regulate homeless encampments hosted by religious institutions. For example, cities would be prohibited from "limit[ing] a religious organization's tent encampment hosting term to fewer than four months unless consented to by that religious organization for a specific instance."[345] However, the law would allow jurisdictions to require a three-month period between encampments and would require religious organizations "to enter into written agreements to protect the public health and safety" of the residents in the community.[346] Sex offender checks would be required for all prospective residents, and those managing the encampments would be required to use Washington's homeless management information system, which collects and manages data on people experiencing homelessness.[347]

### Conclusion

Homelessness is a growing problem in Washington State, with some data showing a 3.5 percent increase between 2016 and 2017.[348] While encampments hosted by religious organizations are not a permanent fix, they do address immediate needs while longer term solutions to Washington's lack of affordable permanent housing are sought.[349] The State of Washington should be commended for attempting to find solutions to reduce its growing homeless population and encouraging religious organizations to provide temporary shelter that is safe and secure for those in their community experiencing homeless. Ultimately though, as these encampments are forced to move from site to site, ongoing support and oversight is needed to help the encampments function, reduce adverse effects on the surrounding neighborhoods, and make conditions in encampments as humane as possible. Increased involvement by organizations like Greater Seattle Cares and other stakeholders can help to coordinate efforts at the camps, find potential host sites,[350] improve relations with congregations and neighboring residents, and connect homeless individuals with services and more permanent housing.

---

sition from the neighboring community. One respondent said, "As a veteran, I hate those encampments. All the neighborhood hates your guts." CITY OF SEATTLE at 24, 13, *supra* note 299.

341  Culverwell, *supra* note 310.

342  *Id.*

343  KENNEWICK, WASH., CITY COUNCIL MEETING SCHEDULE (2017), https://www.go2kennewick.com/AgendaCenter/ViewFile/Agenda/_02212017-798.

344  S.B. 5657 (2017-18), http://app.leg.wa.gov/billsummary?BillNumber=5657&Year=2017.  As of September 2017, the bill was still pending before the House Committee on Community Development, Housing and Tribal Affairs.

345  State of Wash., 65th Leg. 2017 Reg. Sess., Subst. S.B. 5657, http://lawfilesext.leg.wa.gov/biennium/2017-18/Pdf/Bills/Senate percent20Bills/5657-S.pdf.

346  *Id.*

347  *Id.*

348  Vernal Coleman, *Washington State Homeless Numbers Grew Last Year*, SEATTLE TIMES (June 7, 2017), http://www.seattletimes.com/seattle-news/washington-state-homeless-numbers-grew-last-year/.

349  "Advocates for the homeless and officials working to end homelessness all point to rising rents and the lack of affordable or permanent housing options as underlying causes [of rising homelessness in Washington]." *Id.*

350  As of September 2017, several encampments supported by Greater Seattle Cares, including Tent City 3, had Facebook pages which would alert homeless residents of when and where the encampments would move next. *E.g.*, https://www.facebook.com/Tent-City-3-233907999985618/ (no longer active as of Nov. 22, 2017).

### Vancouver, WA Legalized Overnight Camping – "A Better Practice"

In 2016, the City of Vancouver, Washington passed Municipal Code § 8.22.040-050 ("Vancouver Camping Ordinance")[351] permitting camping on most public property from 9:30 p.m. to 6:30 a.m., excluding public parks and areas posted with "no trespassing" signs.[352] This followed the U.S. Department of Justice's statement of interest brief in a lawsuit challenging an anti-camping law, *Bell v. Boise*, stating that "[i]f a person literally has nowhere else to go, then enforcement of the anti-camping ordinance against that person criminalizes her for being homeless" in violation of the Eighth Amendment.[353]

During this case study, interviewees (including city officials, service providers, and formerly homeless individuals) identified room for improvement in several areas. First, the definition of public property in the ordinance is not straightforward, particularly when persons experiencing homelessness are attempting to determine if they can legally sleep in a given area. Second, interviewees recognized issues in the planning and execution of the ordinance, including failure to address other human needs, storage, and restraint on hours. Lastly, interviewees emphasized the importance of stakeholder involvement in crafting such an ordinance, including service providers and those experiencing homelessness themselves.

*"I would be hesitant to call it a best practice, I would call it a better practice. Best practice would be we would have housing for everybody and the support services we need for everybody. [It is b]etter than where we were."*

*– Vancouver City Attorney Bronson Potter*

| Vancouver, WA's Efforts as Measured by the Encampment Principles | | |
|---|---|---|
| **Principle 1**: All people need safe, accessible, legal place to be, both at night and during the day, and a place to securely store belongings—until permanent housing is found. | Vancouver's ordinance, while providing important legal safety for nights, fails to make clear where the safe, legal space is, and also fails to address daytime and storage needs. |  |
| **Principle 2**: Delivery of services must respect the experience, human dignity, and human rights of those receiving them. | Vancouver's ordinance recognizes the human need to sleep, but is not guided by the other expressed needs of its homeless residents. |  |
| **Principle 3**: Any move or removal of an encampment must follow clear procedures that protect residents. | Vancouver only provides safe sleep at night; encampment removal is otherwise unregulated. | ✗ |
| **Principle 4**: Where new temporary legalized encampments are used as part of a continuum of shelter and housing, ensure it is as close to possible to fully adequate housing. | Vancouver provides only for secure overnight tenure; it does not address other access to water, hygiene, sanitation, or meal preparation needs. | ✗ |
| **Principle 5**: Adequate alternative housing must be a decent alternative. | Vancouver does not require provision of adequate alternative housing. | ✗ |
| **Principle 6**: Law enforcement should serve and protect all members of the community. | Vancouver permits overnight self-sheltering, but still criminalizes daytime self-sheltering and sleeping; a challenge for homeless persons working at night. |  |

351   *Get the Facts About the City's Camping Ordinance*, CITY OF VANCOUVER, WASHINGTON, http://www.cityofvancouver.us/citycouncil/page/get-facts-about-citys-camping-ordinance (last visited July 25, 2017).
352   VANCOUVER MUN. CODE § 8.22.040-050 (2015).
353   Statement of Interest of the United States, *Bell v. Boise*, 993 F. Supp. 2d 1237 (D. Idaho 2014) (No. 1:09–cv–00540–REB), https://www.justice.gov/crt/ file/761211/download.

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

### Background

Homelessness in Clark County, Washington, which includes the city of Vancouver, increased by more than 8 percent[354] in 2016, with approximately 692 people experiencing homelessness counted in a single-night study.[355] Of those 692 people, approximately 228 individuals were unsheltered, meaning they were "living in a location not meant for human habitation."[356] Like many other cities across the nation, in addition to increased numbers of people experiencing homelessness, Vancouver has a chronic shortage of shelter space that simply cannot support the number of people sleeping on the streets,[357] but public attention was not focused on this.[358] With the camping ban, unsheltered homeless people often hid themselves and the public was generally not faced with the scope of the problem.

The city attorney's office became concerned about the analysis in *Jones v. City of Los Angeles*[359] and, later, the U.S. Department of Justice's statement of interest[360] in *Bell v. Boise*.[361] Given the chronic shortage of even emergency shelter, the city attorney's office recommended that the city ordinance change to permit camping to permit camping on most publicly owned property within the city limits from 9:30 p.m. to 6:30 a.m., excluding public parks, to address both the legal and humanitarian concerns.[362] During the time that the ordinance was going through the

city council's processes and following its passage, a large, urban homeless encampment grew to approximately 150 people, raising health and safety concerns.[363] In response to the encampment, the city council amended its municipal code in November 2015,[364] and began enforcing the hour restrictions of the new camping ordinance. This included evicting the encampment.[365]

Today, enforcement is primarily manifested as "move along" warnings.[366] As officers make their patrols through the different areas of the city, if homeless individuals are still camping after 6:30 a.m., they are likely to be asked to move along, rather than being ticketed.[367] Law enforcement does issue tickets when the individual has refused to cooperate after multiple warnings.[368] Responses from the public have been mixed, from concerned and inspired to do something about the issue, to blame and discomfort.[369] Businesses are concerned about having people outside their places of business during business hours, leaving trash, and defecating in the area,[370] while neighborhoods report concerns about trash and safety.[371] As Andy Silver, executive director of Council for the Homeless, noted, ending the prohibition on camping in public parks allows individuals experiencing homelessness into public right of ways, forcing recognition of the scope of homelessness in ways that businesses and neighborhoods find problematic.[372]

> "[W]hen you're standing there as a homeless person being told to go… But when you don't have any destination" or don't know where to go, the "idea of having to go somewhere is very defeating, both figuratively and literally…Finally it is not a crime to be homeless."
>
> – Lon Klugman, formerly homeless person in Vancouver, WA

354  Patty Hastings, *Point in Time Count: Homeless Population up 8 Percent*, COLUMBIAN (May 5, 2017, 5:56 PM), http://www.columbian.com/news/2017/may/05/point-in-time-count-homeless-population-up-8-percent/.

355  *Point in Time Count*, COUNCIL FOR THE HOMELESS (2016), http://www.councilforthehomeless.org/point-in-time-count/. *See also* NAT'L LAW CTR. ON HOMELESSNESS & POVERTY, DON'T COUNT ON IT: HOW THE HUD POINT-IN-TIME COUNT UNDERESTIMATES THE HOMELESSNESS CRISIS IN AMERICA (2017), https://www.nlchp.org/documents/HUD-PIT-report2017, discussing the shortcomings of the Point-In-Time count.

356  *Id.* This number is likely under-representative of the number of people who are actually experiencing homelessness due to the limitations of how the Point in Time Count is conducted. *See* DON'T COUNT ON IT, *supra*.

357  Interview with Bronson Potter, City Attorney, City of Vancouver, Wash., City Attorney's Office (July 20, 2017) [hereinafter Potter Interview]; *see also* Interview with Peggy Sheehan, Neighborhood Liaison, City of Vancouver, Wash. (July 14, 2017) [hereinafter Sheehan Interview]; Stober Interview, *supra* note 309.

358  Interview with Amy Reynolds, Deputy Director, Share (July 11, 2017) [hereinafter Reynolds Interview]; Stober Interview, *supra* note 309

359  Potter Interview, *supra* note 357; *see Get the Facts About the City's Camping Ordinance*, CITY OF VANCOUVER, WASH., http://www.cityofvancouver.us/citycouncil/page/get-facts-about-citys-camping-ordinance (last visited July 25, 2017).

360  Statement of Interest of the United States, *Bell v. Boise*, 993 F. Supp. 2d 1237 (D. Idaho 2014) (No. 1:09–cv–00540–REB), https://www.justice.gov/crt/ file/761211/download.

361  Potter Interview, *supra* note 357; Interview with Andy Silver, Executive Director, Council for the Homeless (June 23, 2017) [hereinafter Silver Interview]; *see Get the Facts About the City's Camping Ordinance*, CITY OF VANCOUVER, WASH., http://www.cityofvancouver.us/citycouncil/page/get-facts-about-citys-camping-ordinance (last visited July 25, 2017).

362  Potter Interview, *supra* note 357.

363  *Id.*; Silver Interview, *supra* note 361; *see also* Interview with Jamie Spinelli, Outreach, Community Services NW (July 6, 2017) [hereinafter Spinelli Interview]; Reynolds Interview, *supra* note 358.

364  Vancouver Municipal Code § 8.22.040-050 (2015); *Get the Facts About the City's Camping Ordinance*, CITY OF VANCOUVER, WASHINGTON, http://www.cityofvancouver.us/citycouncil/page/get-facts-about-citys-camping-ordinance (last visited July 25, 2017)

365  Potter Interview, *supra* note 357; Silver Interview, *supra* note 361; *see also* Stober Interview, *supra* note 309.

366  Reynolds Interview, *supra* note 358; Spinelli Interview, *supra* note 363; *see also* Silver Interview, *supra* note 361.

367  Reynolds Interview, *supra* note 358; Silver Interview, *supra* note 361.

368  Potter Interview, *supra* note 357; *see also* Interview with Lon Klugman, formerly homeless (July 14, 2017) [hereinafter Klugman Interview].

369  Reynolds Interview, *supra* note 358; *see also* Sheehan Interview, *supra* note 357.

370  Stober Interview, *supra* note 309; *see also* Silver Interview, *supra* note 361.

371  Sheehan Interview, *supra* note 357; Silver Interview, *supra* note 361.

372  *See* Silver Interview, *supra* note 361.

The primary value of the ordinance is, as city councilman Ty Stober said, "someone can't be thrown in jail just for sleeping [at least at night], so there is the strength,"[373] but the ordinance has had secondary benefits as well. Because the city acknowledges it cannot eliminate the need to sleep by criminalizing it, according to some reports, setting this policy firmly in law has prompted new discussions about alternative, constructive solutions to addressing homelessness and has improved relationships between law enforcement and those on the streets as well as between law enforcement and service providers.[374] As Jamie Spinelli, an outreach worker for Community Services NW noted, the presence of a camping ban conveys to a group of people that because of their economic and/or housing status they can't lawfully perform a necessary human function, sleep.[375] Amy Reynolds, Deputy Director of Share, a local service provider, commented, if there are "not enough beds to be indoors and [people experiencing homelessness] cannot camp, [then you are] not allowing people to exist, [and that is] unreasonable."[376]

### Recommendations and Considerations for Moving Forward

Multiple interviewees willingly recognized the value and usefulness of the ordinance, but recognized it could be more holistic and does not overcome the bigger issue of available, affordable housing. City Attorney, Bronson Potter, said, "I would be hesitant to call if a best practice; I would call it a better practice. Best practice would be we would have housing for everybody and the support services we need for everybody. [It is b]etter than where we were."[377] This sentiment was echoed by others, both from the city and advocates' side, who commented that the camping ordinance is better than what existed before it, but remains an imperfect solution.[378] Absent affordable housing as a solution, service providers and formerly homeless interviewees commented that the ordinance could be improved by taking a more holistic approach.[379] Two categories were consistently reported and have been characterized as: (1) definitions and (2) planning and execution of the ordinance. Additionally, interviewees advocated for the involvement of stakeholders in creating any sort of camping ordinance.

### Definitions: "Public lands can be complicated."[380]

Although the ordinance permits overnight camping on public land, the city does not provide guidance on where those experiencing homelessness can legally go to set up camp during the permissible camping hours.[381] The lack of information sharing acts as a barrier for those experiencing homelessness.[382] Because the city does not provide information on where one can lawfully sleep and has not sanctioned any particular camping spot, knowing where it is actually lawful to sleep is a matter of trial and error or word of mouth.[383] One formerly homeless individual described it as a game of telephone, whereby information is passed from person-to-person, but gets distorted and skewed as it moves along, making it difficult to get accurate information on where one can lawfully camp.[384] For those experiencing homelessness, they are not able to go home and pick up the newspaper or watch the news on television, making it difficult for the information to get to them.[385] Service providers thus recommended providing and planning for a place where people could camp, or, at a minimum, informing those who are in contact with people experiencing homelessness where it is lawful for people to sleep outside so that when asked, they are able to provide that information.[386] Another barrier exists in the form of a city-county-state disconnect because, although the city permits camping between the hours of 9:30 p.m. and 6:30 a.m. on any street or publicly owned or maintained parking lot or other publicly owned or maintained area within the city, the county and state do not.[387] Consequently, if you are outside the city limits of Vancouver, you are likely unlawfully camping and subject to criminalization. However, these city-county-state boundaries are not clearly delineated.[388] Even within the city, without a clear guideline on what is or is not public, city property, people have to frequently move around to figure out what is permissible, city property to camp on.[389] Lastly, some interviewees noted that a separate prohibition on being in public parks between 10:00 p.m. and 5:00 a.m. essentially pushes homeless people into public right of ways, often near neighborhoods, raising public backlash.[390]

---

373   Stober Interview, *supra* note 309.
374   *See* Reynolds Interview, *supra* note 358 (commenting "[i]n the past year or so, [I] never heard more cops say we can't arrest ourselves out of homelessness. To me, [that is] a new way of talking about things"); Spinelli Interview, *supra* note 363; Stober Interview, *supra* note 309.
375   Spinelli Interview, *supra* note 363.
376   Reynolds Interview, *supra* note 358.
377   Potter Interview, *supra* note 357.
378   *See* Klugman Interview, *supra* note 368; Reynolds Interview, *supra* note 358; Silver Interview, *supra* note 361; Spinelli Interview, *supra* note 363; Stober Interview, *supra* note 309.
379   Silver Interview, *supra* note 361; *see also* Klugman Interview, *supra* note **368**; Spinelli Interview, *supra* note 363.

380   Reynolds Interview, *supra* note 358.
381   *Id.*; Sheehan Interview, *supra* note 357; Silver Interview, *supra* note 361.
382   *See* Klugman Interview, *supra* note 368.
383   *Id.*; Reynolds Interview, *supra* note 358; Silver Interview, *supra* note 361.
384   Klugman Interview, *supra* note 368.
385   *Id.*
386   Reynolds Interview, *supra* note **358**; *see also* Silver Interview, *supra* note 361.
387   Reynolds Interview, *supra* note 358; Spinelli Interview, *supra* note 363; *see also* Silver Interview, *supra* note 361; *see also* Vancouver, Washington, Municipal Code § 8.22.040
388   *See* Silver Interview, *supra* note 361.
389   *Id.*
390   *Id.*, *see also* Vancouver, Washington, Municipal Code § 15l04.150

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

*Planning and Execution: "The other human things we [as people] need are out of reach."[391]*

Interviewees also reported issues with the planning and execution of the ordinance, including that it fails to take care of certain human needs, such as access to bathrooms, security and safety, a way to prepare and store food, and trash disposal.[392] An approach that included these things could also help mitigate some of the community's concerns. Therefore, interviewees recommended a more thoughtful, holistic roll out of a similar policy in order to address some of these other human necessities.[393]

Another reported issue of planning and execution is related to timing and storage.[394] Though people are now able to camp on most public property from 9:30 p.m. to 6:30 a.m., they are not lawfully able to maintain their camp during the day.[395] Someone experiencing homeless does not have a home to store their belongings while trying to conduct their affairs during the day, thus they are required to either pack up everything they own and carry it with them from place to place or leave it and potentially be subject to charges for abandoning property or lose their belongings to theft.[396] This can act as a barrier to accessing services.[397] Both city officials and advocates also acknowledged the permissible camping hours as rather arbitrary.[398] As interviewees noted, in the Pacific Northwest, 9:30 p.m. means something totally different in December than in June, and the same with 6:30 a.m.[399] For much of the year, it is already very dark at these times, which adds another layer of difficulty for this population of people, many of whom have disabilities.[400] However, the legislative path on how to address this is not clear[401] and currently, proposed amendments to the ordinance exist to expand the hours on either side.[402] Another issue with the hours arises when someone who is homeless has a job that requires them to work a night shift, because after their shift they are not permitted to camp on public property during the day, when, because of their job, it is the only time for them to sleep and rest.[403]

*Stakeholder input: "[T]he things they experience are often things that people housed wouldn't even think of."[404]*

Finally, interviewees emphasized the importance of stakeholder involvement in crafting any sort of camping ordinance, including outreach workers, service providers, and importantly, the people who are experiencing homelessness themselves.[405] These conversations with the people most closely impacted would provide significant value, information, and insight to the conversation.[406] The failure of Vancouver to do this likely contributed to some of the problems they have faced with the ordinance.

While Vancouver continues to implement its camping ordinance, creation of the ordinance has fostered community dialogue that resulted in the city taking additional positive steps to address homelessness. In November 2016, Vancouver citizens overwhelmingly passed a property tax levy creating the Affordable Housing Fund to provide more affordable housing in the city to very low-income families and seniors who earn 50 percent or less of the area median income.[407] The funds assessed by the property tax are intended for the buying, building, and preserving of low-income rental housing and to assist in preventing homelessness through rental assistance and housing services.[408] The tax will be paid by commercial and residential property owners and capped at $6 million per year for seven years.[409] Approximately 67 percent of the funds will be used to build and preserve affordable housing, 25 percent will be used for rental assistance vouchers and services, 5 percent will be used to build transitional housing or shelters for people transitioning from living on the streets to permanent homes, and the last 3 percent will be used for implementation and administrative costs associated with the management of the fund.[410] These steps indicate hearing the concerns of those most at risk of homelessness.

---

391  Spinelli Interview, *supra* note 363.
392  Reynolds Interview, *supra* note 358; Silver Interview, *supra* note 361; Spinelli Interview, *supra* note 363; *see also* Klugman Interview, *supra* note 368.
393  Silver Interview, *supra* note 361; *see also* Klugman Interview, *supra* note 368; Reynolds Interview, *supra* note 358.
394  Spinelli Interview, *supra* note 363.
395  *See* Vancouver Mun. Code § 8.22.040-050.
396  *See* Spinelli Interview, *supra* note 363.
397  *Id.*
398  *E.g.*, Reynolds Interview, *supra* note 358.
399  Spinelli Interview, *supra* note 368; Stober Interview, *supra* note 309.
400  *Id.*
401  Stober Interview, *supra* note 309.
402  *See* Silver Interview, *supra* note 361.
403  Spinelli Interview, *supra* note 363.

404  *Id.*
405  *See* Klugman Interview, *supra* note 368; Spinelli Interview, *supra* note 363.
406  *See* Spinelli Interview, *supra* note 363.
407  *Affordable Housing Fund*, City of Vancouver, Wash., http://www.cityofvancouver.us/ced/page/affordable-housing-fund (last visited July 27, 2017).
408  *Id.*
409  *Id.*
410  *Id.*

*Conclusion*

In the wake of the camping ordinance revision, Vancouver and its citizens continue to seek solutions to address the issue of homelessness. Recently, the city council considered a proposed amendment to the camping ordinance advocated by local homeless advocates that would extend the hours that a person may legally camp.[411] There are mixed feelings among stakeholders and city councilmembers regarding the value of this amendment.[412] As one formerly homeless individual commented, it "could be helpful for a lot [of people experiencing homelessness] and no good for others."[413] Still others noted that in the grand scheme of homelessness, extending permissible camping hours is not the biggest issue and does not take the city to a more positive place.[414] As of the time of publishing this report, the proposed amendment has been tabled until later for further discussion.[415]

Even as Vancouver's camping ordinance appears to represent a net gain for people experiencing homelessness, it does not match up to the Principles we outline in this report. As neighborhood liaison Peggy Sheehan commented, "as a whole system, [we] have to try to figure out how to house people" and allowing people to sleep on the streets is not a complete solution, rather only a "piece of the puzzle."[416]

---

411  *See* Silver Interview, *supra* note 361; Stober Interview, *supra* note 309
412  *See* Spinelli Interview, *supra* note **Error! Bookmark not defined.**;
     Stober Interview, *supra* note 309.
413  Klugman Interview, *supra* note 368.
414  Reynolds Interview, *supra* note 358; Stober Interview, *supra* note 309.
415  Stober Interview, *supra* note 309.
416  Sheehan Interview, *supra* note 357.

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

**Section 4**

### Other Approaches

Although outside the scope of our research for this report, we also mention some approaches that may merit further study. Eugene, OR, Los Angeles, CA, San Luis Obispo, CA, Santa Barbara, CA, and San Diego, CA, permit local non-profits to sponsor safe parking areas with sanitation facilities for those who are living out of their cars. Seattle, WA, and Multnomah County, OR, have pilot programs that permit, or even pay for, residents to host tiny homes in back yards to house persons experiencing homelessness.

### Safe Parking for Homeless Persons Living in Vehicles

> Young people are buying vans and buses now for remodeling, not because it is the hipster thing to do but because they can't find housing within their income.
> – Sue Sierralupe, Occupy Medical



We need rent control laws.

Photo credit: Heather Sielicki

After losing their home, many homeless individuals hang on to their vehicles as long as possible, to provide them with shelter from the elements, secure storage for their belongings, and transportation to employment or other services. As with other forms of homelessness, living in vehicles has increased.[417] With this increase in many communities have come new bans on living in vehicles, indeed, this was the area of steepest growth — 143 percent — in our survey of 187 cities between 2006-2016.[418] Some communities, however, have made initial steps to provide some safe, legal lots for vehicle dwellers to park their cars, vans, and RVs. In-depth case studies are outside the scope of this report, but we offer brief summaries of some of the programs that cities are piloting.

### *Eugene, OR*

Since at least 1997, Eugene Oregon has allowed public and private entities, including non-profits, businesses, or religious organizations, to host vehicles for overnight parking.[419] The current version of the car camping ordinance grants permission for up to six vehicles to park at each site overnight.[420] Each site host must ensure availability of sanitary facilities, garbage disposal services, and a storage area for campers to store any personal items so that they are not visible from any public street.[421] St. Vincent de Paul Church provides siting and camper screening and placement for all the sites, as well as taking care of portable restrooms and garbage disposal for sites that choose to participate in their program, while some hosts provide their own sanitation services.[422] St. Vincent de Paul currently operates more than 70 spots at 43 addresses, and other churches, non-profits, and business host additional spots.[423] Additionally, Eugene allows single-family homeowners in residential districts to host one vehicle in their driveway or one tent in their backyard.[424]



RV legally parked in a Eugene Car Camping Spot. Photo credit: Homeless Working Group of the Eugene Human Rights Commission

---

417   *See, e.g.*, Elizabeth Chou & Susan Abram, *Where Do the Homeless Sleep? LA County Now Knows*, Daily News (Aug. 28, 2017), http://www.dailynews.com/2017/07/28/where-do-the-homeless-sleep-la-county-now-knows/.

418   *See* Housing Not Handcuffs, *supra* note 28, at 11.

419   *See* Eugene, OR Ordinance No. 20097 (1997), http://coeapps.eugene-or.gov/cmoweblink/DocView.aspx?id=363273&searchid=fabd64d5-e09e-4be3-a78e-bccfda48e319&dbid=0;

420   Eugene, OR Ordinance No. 20517, http://coeapps.eugene-or.gov/cmoweblink/DocView.aspx?id=981598&searchid=fabd64d5-e09e-4be3-a78e-bccfda48e319&dbid=0.

421   *See id.*

422   *Car Camping Program*, Eugene, OR, https://www.eugene-or.gov/3703/Car-Camping-Program (last visited Nov. 22, 2017).

423   *Id.*

424   Eugene, OR Ordinance No. 20517, http://coeapps.eugene-or.gov/cmoweblink/DocView.aspx?id=981598&searchid=fabd64d5-e09e-4be3-a78e-bccfda48e319&dbid=0.

### Los Angeles, CA

Los Angeles has an enormous population of people living in vehicles. L.A. City counted 7,100 persons living in vehicles (cars and RVs) in January 2016, and L.A. County counted 12,200 persons living in vehicles, representing one-quarter of the estimated total population experiencing homelessness.[425] Los Angeles lost a lawsuit, *Desertrain v. Los Angeles,* over its arbitrary enforcement of its anti-car-camping law in 2014.[426] In 2017, an amendment to LAMC (Los Angeles Municipal Code) 85.02 required each police district to demarcate where homeless persons can legally park and sleep, and to print and make available online maps to for car and RV dwellers.[427] Although proponents of the reform stated as much as half of the city would be available, unfortunately because the ordinance states vehicle dwelling is prohibited at all times within one block or 500 feet of licensed schools, pre-schools, daycare facilities, or parks, and vehicles must otherwise comply with regular parking restrictions,[428] the actual figure is closer to only 10 percent, such that the regulation acts as an effective ban on vehicle living.[429]

### San Luis Obispo, CA

Starting in 2012, San Luis Obispo allows for organizations to apply to host safe parking lots by applying for a permit, which requires a site plan indicating sanitation, hygiene, and safety (lighting), and a buffer of 50 feet from residential neighbors are addressed, that the provider has a neighborhood relations plan, and a plan for servicing the lot.[430] Residents are required to have a valid driver's license, registration, insurance, and pass a criminal background check and enroll in case management.[431]

### Santa Barbara, CA

Following a lawsuit about vehicle dwelling in 2004, Santa Barbara launched New Beginnings' Safe Parking Program which provides safe overnight parking, case management, and outreach to individuals and families living in their vehicles.[432] In partnership with local churches, governmental and non-profit agencies and businesses, it operates 138 safe overnight parking spaces, distributes more than 450 pounds of food each month and offers case management to help participants into permanent housing and employment.[433] Current proof of valid driver's license, vehicle registration and insurance is required.[434] It should be noted that Santa Barbara also passed a law banning RVs (and other oversize vehicles) from parking anywhere on their streets, at any time.[435] This has caused problems for people who had been using the overnight spots as they have no place to park during the day.[436]

### San Diego, CA

Since 2010, the organization Dreams for Change has run a privately-funded safe lot program which partners with local businesses and non-profits to host the lot.[437] The program has served more than 3,000 individuals and families, and currently operates two lots serving 70 people per night and 350 people per year.[438] Dreams for Change screens clients for desire to exit homelessness before they are allowed to enter the program, and conducts a background check to see if they are on a sex-offender list because of children on the property.[439] Residents are required to meet with case workers who help them find jobs, homes and financial aid.[440] There is demand for more safe spaces; a recent report cited the current waiting list at approximately 25 families, with more added every day.[441] Local advocates also note that the existing lot programs do not allow RVs, which is a considerable limitation as this excludes many disabled people and families who are living in their RV. RVs

425  *Our Mission*, Safe Parking LA, https://www.safeparkingla.org/about-spala/ (last visited Nov. 22, 2017).
426  *Desertrain v. City of Los Angeles*, 754 F.3d 1147 (9th Cir. 2014).
427  *Our Mission*, Safe Parking LA, https://www.safeparkingla.org/about-spala/ (last visited Nov. 22, 2017).
428  L.A. Mun. Code (LAMC) 85.02 – Vehicle Dwelling (2017), https://www.lacity.org/for-residents/popular-services/comprehensive-homeless-strategy-implementation/los-angeles-municipal.
429  Gale Holland, *Homeless People Face L.A. Crackdown on Living in cars*, L.A. Times (Jan. 24, 2017), http://www.latimes.com/local/lanow/la-me-ln-homeless-rv-dwelling-20170113-story.html.
430  San Luis Obispo, CA Ordinance No. 17.08.115, www.slocity.org/home/showdocument?id=2540; *see also*, AnnMarie Cornejo, *SLO's Safe Parking Program for Homeless to be Expanded*, The Tribune (Sept. 4, 2013), http://www.sanluisobispo.com/news/local/article39453897.html.
431  *Id.*

432  *Safe Parking Program*, New Beginnings Counseling Center, http://sbn-bcc.org/safe-parking/ (Nov. 22, 2017).
433  *Id.*
434  *Id.*
435  *See* Nick Welsh, *Santa Barbara Bans RV Parking*, Santa Barbara Independent (Oct. 20, 2016), http://www.independent.com/news/2016/oct/20/santa-barbara-bans-rv-parking/.
436  *See* Nick Welsh, *City Ordinance Against Oversized Vehicles Takes Effect*, Santa Barbara Independent (Sept. 7, 2017), http://www.independent.com/news/2017/sep/07/city-ordinance-against-oversized-vehicles-takes-ef/.
437  Gary Warth, *Homeless Living in Cars Find Safe Havens*, San Diego Trib. (June 23, 2017), http://www.sandiegouniontribune.com/news/homelessness/sd-me-homeless-parkin-20170619-story.html.
438  *History & Mission*, Dreams for Change, http://www.dreamsforchange.org/history-mission/ (last visited Nov. 22, 2017).
439  *See* Warth, *supra* note 437.
440  *Id.*
441  *Id.*

are further subjected to parking restrictions that regular vehicles are not, which makes it even harder for those living in RVs to avoid tickets. [442]

### Infill – Yes in My Back Yard

Beyond larger scale encampments, a number of communities have proposed innovative "infill" ordinances or programs that enable housed residents (often plural, as a form of community building) to host tents or tiny homes in their back yards or cars or RVs in their driveways, literally flipping the notion of "not in my backyard" on its head. Many of these programs are recent, and outside the focus of this report, but they are mentioned as ideas to study further.

### Seattle BLOCK Project

The BLOCK Project is a community-building approach that proposes hosting a BLOCK Home (tiny house) in the backyard of one single-family lot on every residentially zoned block within the City of Seattle.[443] The tiny homes are 125 square feet and designed to be self-sufficient, including a kitchen, bathroom, sleeping area, solar-panels, greywater system, and composting toilet.[444] Because the homes are no larger than a storage shed and need no connection to the grid, they are legal in residentially zoned areas.[445] As of October, 2017, the project has four homes committed and 27 additional families who have volunteered their back yards, although getting full neighborhood support remains a challenge in some cases.[446] The project uses a questionnaire to match hosts and residents and provides ongoing support through a social worker.[447] Residents have an indefinite rental contract, allowing them to take as much time as they need to transition to other housing, or stay if they need to.[448] Residents will pay 30 percent of their income on rent, divided between the host family, a maintenance program, and reinvestment into building new homes.[449]



BLOCK home Design by BLOCK Architects

"By bringing together an entire block to unite around a vision of lifting someone out of homelessness, not only will that individual benefit, but the entire neighborhood will be stronger."

- Mike O'Brien, Seattle City Councilmember

### Multnomah County A Place for You Project and Other Ideas

Multnomah County is offering to build a full tiny home in homeowners' back yards; the homeowner will receive the tiny home for free after five years of allowing a homeless family to live there.[450] The county hopes to build up to 300 homes in area back yards eventually, but for now has a one year pilot with four units.[451] Each unit is 200 square feet, will be connected to both electrical and plumbing grids.[452] The county aim to fit them within Portland's accessory-dwelling unit allowance of the zoning code or some other pre-existing legal setting, which will also help avoid the pushback often experienced in attempting to site homeless facilities or affordable housing into neighborhoods.[453] Residents may be expected to pay 30 percent of their income into a savings account to be used for moving into permanent housing at the end of their stay.[454] More than 800 potential hosts have indicated interest.[455]



---

442   *See Bloom et. al. v. City of San Diego, et. al.,* Case No. 3:17-CV-02324-AJB-NLS, Complaint (Nov. 15, 2017).

443   THE BLOCK PROJECT, http://www.the-block-project.com/home/ (last visited Nov. 22, 2017).

444   *Id.*

445   Stephanie Hoover, *Facing Homelessness Aims to Build Small Houses on Every City Block,* REAL CHANGE NEWS (Apr. 5, 2017), http://realchange-news.org/2017/04/05/facing-homelessness-aims-build-small-hous-es-every-city-block.

446   *See* Jenny Cunningham, *Would You House a Homeless Man in Your Backyard? This Couple Said Yes,* GUARDIAN (Oct. 11, 2017), https://www.theguardian.com/us-news/2017/oct/11/seattle-homelessness-back-yard-tiny-home-block-project.

447   Julia Grace-Sanders, *A New Place for Seattle's Homeless: In My Back-yard,* CROSSCUT (May 11, 2017), http://crosscut.com/2017/05/a-new-place-for-seattles-homeless-in-my-backyard/.

448   *Id.*

449   *See* Hoover, *supra,* note 445.

450   Rachel Monahan, *Multnomah County Hopes to Build Granny Flats to House Hundreds of Homeless Families in Portland Backyards,* WILLAMETTE WEEK (Mar. 14, 2017), http://www.wweek.com/news/city/2017/03/14/multnomah-county-hopes-to-build-granny-flats-to-house-hundreds-of-homeless-families-in-portland-backyards/.

451   *Id.; Everything There is to Know Now About the A Place for You Granny Flats Project,* MULTNOMAH CTY., OR,  (Mar. 28, 2017), https://multco.us/multnomah-county/news/everything-there-know-now-about-place-you-granny-flats-project.

452   *Id.*

453   *Id.*

454   *Id.*

455   Multnomah County, *supra,* note 451.

### Hawaii Yard Rental Proposal

Hawaii HB 968 was introduced last session to provide homeowners the ability to rent yard or driveway space to those living in tents or RVs in order to alleviate the crisis of homelessness.[456] The bill provides an exemption to any zoning ordinances unless the lease would violate health or safety regulations or any other private agreements.[457] The bill passed several committees, but ultimately failed to pass the entire House or be referred to the Senate this term.

[Text box: "I think everyone's just trying to nibble away at the edge of this homeless issue, providing as many alternatives as possible…Most states, there's plenty of land. We're ocean-locked, we're on an island, and there's only so many places you can go." –Hawaii Rep. Bob McDermott, co-sponsor of HB 968]

### Conclusions, Models, Next Steps

Although legal encampments are not an end solution to homelessness, they can provide important stability for people and their belongings that can actually enable them to get off the streets more quickly, or at a minimum improve their quality of life while homeless. We recommend every community immediately repeal any ordinance criminalizing sleeping or sheltering in order to come into constitutional compliance, but Vancouver's example—and Los Angeles' with regard to car camping—shows that when communities take this step, they should also be prepared with clear guidance on exactly what is allowed where, and a plan to get that information to those who need it. Infill programs like those in development in Seattle and Portland may also provide both immediate relief for those in homelessness as well as help meet the desperate need for long-term affordable housing. For communities considering some form of legalized encampments as an emergency solution and part of a continuum, our Encampment Principles and Practices can help ensure the best outcomes for all members of the community, housed and unhoused. Ultimately, however, communities must fully face their affordable housing deficits in order to stem the flow of new families into homelessness.

---

456   H.B. 986, 2017 Reg. Sess, (HI. 2017).
457   *Id.*



SECTION 5

**Legal Standards on Responding to Encampments**

This section sets out relevant international, regional, domestic, and comparative legal standards that either directly deal with homeless encampments or are relevant to how cities respond to encampments. These legal standards are important for avoiding costly litigation, but also helpful in informing communities of appropriate, constructive responses. Elected officials who want to promote constructive approaches can use the cases outlined below to emphasize why criminalization should not be seen as an option. Legal advocates can similarly use them to dissuade communities from turning to criminalization and instead promote better solutions. For further information, refer to the Law Center's *Housing Not Handcuffs: A Litigation Manual,* and *Welcome Home: The Rise of Tent Cities in the U.S.* for further comprehensive coverage of legal issues around criminalization and encampments. [458]

United States: Domestic Legal Standards

### Federal Constitutional Standards

### The Right to Personal Property (Fourth, Fifth, and Fourteenth Amendments)

Some courts have found Fourth and Fourteenth Amendment violations of individuals' right to personal property where police have destroyed or confiscated property without notice in the course of their sweeps of encampments. [459] For example, in *Lavan v. City of Los Angeles,* the Ninth Circuit upheld a district court order restraining the city from summarily destroying personal possessions left on Skid Row sidewalks. [460] Homeless individuals had brought a §1983 lawsuit challenging the city's practice of destroying their personal possessions when they momentarily left them on public sidewalks to perform necessary tasks such as showering, eating, and using restrooms. [461] Important to the decision, plaintiffs were able to establish with specificity the importance of items lost, such as identification documents, medical supplies, and irreplaceable mementos.

Another key case is *Cash v. Hamilton County Department of Adult Probation,* where homeless individuals brought a §1983 lawsuit against the Cincinnati, Ohio Department of Adult Probation alleging that the destruction of their property during a community service cleaning of homeless sites violated their Fifth and Fourteenth Amendment right to due process. [462] The district court granted summary judgment to the city. [463] The Sixth Circuit reversed, noting that destruction of property without any notice and without the ability to reclaim their belongings would violate plaintiffs' right to due process. [464] The court held that there were genuine issues of material fact as to whether their property was destroyed as part of an official city policy and as to whether adequate notice was provided. [465] The case was remanded to the district court; however, on September 20, 2006, the parties settled the case. [466] Under current procedures, personal property that is taken is retained and notice is given at the site regarding where such property may be retrieved. [467]

These cases are particularly relevant to situations where governments take enforcement actions such as sweeps or raids. Precedents such as *Cash* and *Lavan* are not as immediately relevant where governments provide due process and storage of belongings; however, findings about the reasonableness of government interference and the adequacy of the projected procedures would still have to factor in the existence of adequate alternatives and the intrinsic right to personal property individuals continue to have in their items of value. While the holdings of *Cash* and *Lavan* most strongly protect the right to notice and an opportunity to be heard, [468] they remain relevant in other contexts where fundamental property or survival interests are at stake.

### Criminalization as Cruel and Unusual Punishment (Eighth and Fourteenth Amendments)

Some courts have also found that, particularly where no alternatives exist, the criminalization of necessary, life-sustaining activities such as sitting, eating, or sleeping constitutes cruel and unusual punishment under the Eighth Amendment. The landmark case is *Pottinger v. City of Miami,* in which the district court found that ordinances criminalizing sitting, sleeping, eating, or congregating in public and confiscating or destroying homeless individuals' property violated the right to be free from cruel and unusual

---

458  *See* NAT'L LAW CTR. ON HOMELESSNESS & POVERTY, HOUSING NOT HAND-CUFFS: A LITIGATION MANUAL (2017), https://www.nlchp.org/documents/Housing-Not-Handcuffs-Litigation-Manual; WELCOME HOME, *supra* note 67.

459  *See Lavan v. City of Los Angeles,* 693 F.3d 1022 (9th Cir. 2012); *Kincaid v. City of Fresno,* No. 1:06-CV-1445-OWW-SMS, 2006 WL 3542732, (E.D.Ca. Dec. 8, 2006).

460  *Lavan,* 693 F.3d 1022.

461  *Lavan,* 693 F.3d at 1024.

462  388 F.3d 539 (6th Cir. 2004).

463  *Id.* at 540.

464  *Id.* at 542 ("There can be little doubt that the plaintiffs have a protected property interest in their own items of value.") (citing *Harris v. City of Akron,* 20 F.3d 1396, 1401 (6th Cir. 1994)).

465  *Id.* at 543-544. *See also Kincaid v. City of Fresno,* 2006 WL 3542732 (E.D. Cal. Dec. 8, 2006).

466  *Cash v. Hamilton Dep't of Adult Prob.,* No. 1:01-CV-753, 2006 WL 314491 (S.D. Ohio Feb. 8, 2006).

467  *Id.*

468  *See Lavan,* 693 F.3d at 1032 ("The City admits that it failed to provide any notice and opportunity to be heard...before it seized and destroyed [plaintiffs'] property."); *Cash,* 388 F.3d at 544 ("The established precedent is that individuals whose property interests are at stake are entitled to a 'notice and opportunity to be heard.'")(quoting *U.S. v. James Daniel Good Real Prop.,* 510 U.S. 43, 48 (1993)).

TENT CITY, USA: The Growth of America's Homeless Encampments and How Communities are Responding

punishment under the Eighth Amendment.[469]

The Pottinger court relied centrally on the fact that the presence of homeless individuals and their performance of survival activities in public were involuntary because they had no alternatives:[470] there was no shelter space available.[471] The court granted an injunction prohibiting the city from enforcing the ordinance until it had established arrest-free zones for homeless individuals.[472] The Ninth Circuit made a similar finding in the Jones v. Los Angeles opinion that was later vacated and withdrawn as part of a settlement agreement between the parties.[473] District courts in the Ninth Circuit have split on the continuing validity this vacated opinion,[474] however, the U.S. Department of Justice reinforced the Jones/Pottinger standard as the appropriate one in a statement of interest brief filed in Bell v. Boise,[475] and the Eleventh Circuit employed similar logic (ultimately denying a homeless individual's Eighth Amendment claim because shelter space was available).[476]

Homeless litigants who have attempted to rely on the Eighth Amendment to prevent eviction or punishment before it happens, rather than after it has already occurred, have had mixed success. In Kohr v. Houston, the Southern District of Texas granted a temporary restraining order preventing a new anti-camping ordinance from going into effect to evict a downtown encampment, stating "The fact that the governmental entity has not fully enforced the alleged unconstitutional conduct does not bar a suit for injunctive relief where the alleged unconstitutional conduct is imminent or is in process."[477] But the Arizona district court in Davidson v. Tucson, held that the "Eighth Amendment protection against cruel and unusual punishment can only be invoked by persons convicted of crime," and that since no named plaintiff at the homeless encampment at issue had yet been

convicted under the trespass statute, "Plaintiffs cannot meet their burden of proving probable success on the merits of their Eighth Amendment claim."[478] In Veterans for Peace v Seattle, the Western District of Washington also found that the Eighth Amendment was not implicated because that Constitutional provision applies "only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions."[479]

A key element in Eighth Amendment challenges is government action criminalizing necessity or survival activities in the absence of alternatives. Demonstrating the absence of those alternatives can be important. But for cities, it is important to consider whether all people truly have access to existing alternatives.

### State-Created Danger and the Fundamental Interest in Bodily Integrity (Fourteenth Amendment)

When governments destroy homeless individuals' personal property, they may also infringe on the individuals' substantive due process rights.[480] Specifically, such actions may infringe on homeless individuals' Fourteenth Amendment fundamental interest in bodily integrity. Under the "State-Created Danger" doctrine, individuals' fundamental interest in bodily integrity is violated when the government deliberately exposes them to danger. This interest would require more than just notice and an opportunity to be heard in order to justify government action against homeless encampments.

This concept is known as the "State-Created Danger" doctrine. A 1989 Supreme Court opinion denied a general duty for government to act to preserve the fundamental interests of its people, but contained language that all circuits but one have subsequently used to carve out a narrow exception to that rule.[481] The Court's reasoning implicitly excepted circumstances in which the government played a role in creating or exacerbating the danger that threatened on a plaintiff 's due process rights.[482] This duty to prevent harm exists, for instance, when police officers remove a belligerent drunk from a bar and leave him in subzero temperatures without a coat while banning him

---

469  810 F. Supp. 1551, 1554 & 1584 (S.D. Fla. 1996).

470  Id. at 1580-81.

471  See infra for discussion of Joel v. Orlando.

472  Id. at 1584.

473  See Jones v. City of Los Angeles, 444 F.3d 1118 (9th Cir. 2006) (finding that enforcement of ordinance criminalizing sitting, lying, or sleeping on public sidewalks violated Eighth Amendment prohibition against cruel and unusual punishment). But see Joel v. City of Orlando, 232 F.3d 1353 (11th Cir. 2000), cert. denied, 149 L.Ed.2d 480 (2001).

474  See, e.g. Cobine, et.al. v. City of Eureka, et. al., C 16-02239 JSW, Order Granting in Part and Denying in Part Temporary Restraining Order (May 5, 2016) ("Although the opinion has been vacated and cannot be cited for precedential value, the Court finds its reasoning is persuasive here."); see contra, Lehr v. City of Sacramento, 624 F. Supp. 2d 1218, 1231 ("…despite any similarities between Jones and the instant case, this Court is not now bound by the majority's rationale and cannot today accept its logic.").

475  Bell v. Boise, et. al., 1:09-cv-540-REB, Statement of Interest of the United States (Aug. 6, 2015); see also Joel v. City of Orlando, 232 F.3d 1353 (11th Cir. 2000), cert. denied, 149 L.Ed.2d 480 (2001).

476

477  Kohr v. Houston, 4-17-CV-01473, Temporary Restraining Order (Aug. 22, 2017) (citing Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2342–43, 189 L. Ed. 2d 246 (2014)).

478  924 F. Supp. 989, 992-93 (D. Ariz. 1996).

479  Veterans for Peace Greater Seattle, Chapter 92 v. City of Seattle, No. C09-1032 RSM, 2009 WL 2243796 (W.D.Wa. Jul. 24, 2009) at *6 (citing Ingraham v. Wright, 430 U.S. 651, 671 n. 40 (1977)).

480  As opposed to the procedural due process rights recognized in Lavan and Cash (see supra note 459).

481  DeShaney v. Winnebago County Dep't of Soc. Servs, 489 U.S. 189 at 196, 201 (1989); Laura Oren, Deshaney and "State-Created Danger": Does the Exception Make the "No-Duty" Rule?, Admin. & Reg. L. News, Summer 2010, at 4 (finding evidence holdings that DeShaney's dicta implies a "State-Created Danger" exception in all circuit courts but the Fifth Circuit).

482  Id. at 20.

from either driving away or re-entering the bar.[483]

*Sanchez v. City of Fresno* consolidated over thirty cases homeless plaintiffs brought against the city concerning its sweep actions against their encampments in late 2011 and early 2012.[484] The homeless individuals alleged the city intentionally demolished their encampments at the onset of winter—a time when they most needed their property to protect them from the elements.[485] They argued the city infringed not only on their Fourth Amendment right against unreasonable seizure, but also on their Fourteenth Amendment substantive due process right to life.[486]

The city moved to dismiss the plaintiffs' Fourteenth Amendment substantive due process claim. It argued that because the Fourth Amendment protected their property on more specific grounds, any due process analysis was inappropriate.[487] The homeless litigants opposed the city's motion, arguing that a Fourteenth Amendment claim was appropriate because the city's conduct "literally impaired [plaintiffs'] right to life."[488] The court denied the city's motion. It ruled that the city's actions arguably triggered a doctrine which "provide[s] for liability under substantive due process where a state or local official acts to place an individual in a situation of known danger with deliberate indifference to their personal, physical safety."[489]

However, in May 2014,[490] the court granted defendants' motion for summary judgment with regard to all claims except the intentional infliction of emotional distress.[491] The court offered no opinion on whether defendants affirmatively placed plaintiffs in danger, holding instead that the claim failed on the grounds of deliberate indifference.[492] Specifically, the court found that the threat of physical violence did not rise to an unusually serious risk of harm for lack of "actual, serious bodily injury" and that plaintiffs failed to provide "competent evidence connecting any claimed injury to the weather.[493] Thus, plaintiffs' claim failed on the first prong of the deliberate indifference standard, which requires a showing of an unusually serious risk of harm.[494]

The Sanchez court's ruling potentially opens the door to arguments that some government actions against homeless encampments implicate residents' fundamental interest in bodily integrity. How far the "State-Created Danger" theory will ultimately carry depends on a plaintiff's ability to demonstrate that, in addition to creating the dangerous condition, the city behaved deliberately or in a manner that "shocks the conscience"[495] and that the danger it created was particularized[496] and foreseeable.[497]

Religious Hosts' Right to Free Exercise of Religion Under the First Amendment

When governments act against homeless individuals encamped on the property of religious institutions with the permission of those institutions, they may infringe on the institutions' First Amendment right to free exercise of religion. In *Fifth Avenue Presbyterian Church*, the Second Circuit upheld a district court grant of a preliminary injunction against the city preventing them from dispersing homeless individuals sleeping on church property.[498] The Second Circuit found that the church was likely to prevail on the merits on its free exercise claim because preventing the church from using its own property to provide shelter for the homeless burdened its protected religious activity, and the city failed to show a compelling interest sufficient to outweigh this protected interest.[499]

In a case directly addressing religious institutions' right to host homeless encampments, the Washington State Supreme Court found that the city's refusal to process land use applications and allow a church to host an encampment on its property placed a substantial burden on the church's right to free exercise of religion under the

---

483  *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082 (9th Cir. 2000).

484  *Sanchez v. City of Fresno*, No. 1:12-CV-00428-LJO-SKO (E.D. Cal. Dec. 26, 2012).

485  *See id.* at Doc. 46 *18.

486  *See id.* at Doc. 38 ¶33 and ¶36.

487  *See id.* at Doc. 45 *9.

488  *Id.* at Doc. 40 *17.

489  *Id.* at Doc. 46 *16.

490  Plaintiffs also filed a motion for summary judgment that was denied in its entirety.

491  *Sanchez v. City of Fresno*, No. 1:12-CV-00428-LJO-SKO, 2014 WL 2042058 *37 (E.D. Cal. May 16, 2014). In October 2014, a number of plaintiffs and defendants reached an undisclosed settlement as to the remaining claim.

492  *Id.* at *32.

493  *Id.* at *35, 37.

494  The court additionally granted defendants motion for summary

judgment as to plaintiffs' equal protection claim, claims under the California Constitution, and plaintiffs Subia's and Ward's claims under the California Civil Code. *Id.* at * 49.

495  Mere negligence causing unintended loss of or injury to life, liberty or property does not implicate the due process Clause, *Daniels v. Williams*, 474 U.S. 327, 328 (1986), but recklessness or "gross negligence" may. *See County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). "Deliberate indifference" is certainly sufficient, *see Daniels*, 474 U.S. at 330-331 and *County of Sacramento*, 523 U.S. at 850, but in emergency situations in which deliberation is not possible, the standard of fault is higher. *See County of Sacramento*, 523 U.S. at 852-853.

496  *See e.g. Ruiz v. McDonnel*, 299 F.3d 1173, 1183 (10th Cir. 2002) (state's improper licensure of a childcare facility "affected the public at large" and was therefore insufficiently particular to the plaintiff ).

497  *See e.g. Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729, 733 (8th Cir. 1993) (3rd party assault two years after state placed assailant in plaintiff 's special education program was "too remote a consequence" to satisfy the state-created danger doctrine). Note that the particulars of this doctrine vary somewhat from circuit to circuit. *See e.g. Ulrig v. Harder*, 64 F.3d 567 (10th Cir. 1995); *Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006); *Estate of Smith v. Marasco*, 318 F.3d 497 (3d Cir. 2003).

498  293 F.3d 570 (2d Cir. 2002), cert. denied, 127 S. Ct. 387 (2006).

499  *Id.* at 575-576.

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

Washington State Constitution.[500] Since the basis in these cases is the right to free exercise of religion, a court's holding likely will not significantly be affected by whether the government takes a direct enforcement action or sues for an injunction. The Washington court found that when the city refused to process the church's application, it "gave the Church no alternatives."[501] Once again, this highlights the centrality of necessity arguments to courts' reasoning in all these cases, whether the primary challenge is based on the First Amendment or on due process or right to property considerations.

### State Law Standards

### Implicit Permission (Promissory Estoppel)

If a municipality has behaved in a way that suggests consent to allow a homeless encampment, and homeless individuals have relied on that behavior to establish one, the doctrine of promissory estoppel may prevent ("estop") that municipality from asking a court to eject the encampment. Depending on the factual circumstances, some homeless encampments will be able to employ this theory. In order to argue promissory estoppel, homeless encampments must show evidence of a promise and reasonable reliance on that promise. For example, in Lakewood, New Jersey,[502] Tent City's residents argued that police and other government officials had condoned their encampment and that they had relied on their assurances "by taking steps to make their encampment in the woods safer and a bit more livable."[503]

When ruling on Lakewood's motion requesting summary judgment, the Superior Court for Ocean County, New Jersey relied on this theory of promissory estoppel. Lakewood had asked the court to determine that Tent City's residents had no right to interfere with Lakewood's possession of the property they were occupying.[504] The court reasoned that a jury could "easily conclude" that Lakewood had encouraged people to live in Tent City if the defendants proved their claim that police had brought people to Tent City and provided Tent City with garbage disposal services.[505] On that basis, it denied Lakewood's motion because it felt the defendants had made out a plausible case for promissory estoppel.[506]

### Unclean Hands and the Duty to Aid the Poor

When plaintiffs sue for trespass, nuisance, or encroachment, they ask courts to enjoin defendants from using land in a way that interferes with those plaintiffs' property rights.[507] The doctrine of "Unclean Hands" prevents a court from granting an injunction to a litigant guilty of wrongdoing directly connected with the lawsuit.[508] In order to rely on an "Unclean Hands" theory, homeless encampments must show that the governments suing them have breached some duty they owe to the residents of those encampments. While "Unclean Hands" arguments have yet to be successful, they have elicited favorable dicta from courts that have considered them.

When the encampments were sued, both Tent City in Lakewood, NJ[509] and Camp Runamuck, in Providence, RI,[510] argued "Unclean Hands" on the basis of statutes in their respective states creating a duty for cities to shelter the poor.[511] New Jersey requires its municipal directors of welfare to "render such aid and material relief as he may in his discretion deem necessary to the end that the person may not…be deprived of shelter."[512] Rhode Island requires Providence's director of public welfare to "afford temporary relief to poor and indigent persons."[513]

Each encampment argued that because their respective cities had failed to meet their legal obligations to aid the encampments' residents, courts should deny the cities' requests for injunctive relief.[514] In response, both Providence and Ocean County (in which Lakewood sits) pointed out that the statutes upon which Camp Runamuck and Tent City relied give municipal directors discretion to determine what relief is necessary to fulfill their duties.[515]

---

500  *City of Woodinville v. Northshore United Church of Chris*t, 166 Wash.2d 633, 644-45 (Wash. 2009).

501  *Id.*

502  *See* WELCOME HOME, *supra* note 67.

503  *Twp. of Lakewood v. Brigham et al* ., No. L-2462-10, Br. of the Homeless Individuals in Op. to Lakewood's Mot. for Partial Summ. J. (Dec. 6, 2011) at *2, *4-5 (N.J. Super.).

504  *Id* ., Br. of Pl. Twp. of Lakewood in Support of Mot. for Partial Summ. J. (Aug. 20, 2011) at *1 (N.J. Super.).

505  *See id* ., Tr. of Mot. for Summ. J. (Jan. 6, 2012) at *10-11.

506  *Id.* at *21.

507  Cf. 42 Am. Jur. 2d Injunctions § 53.

508  4 A.L.R. 44(II)(a) (Originally published in 1919). Notably, this doctrine is rarely applied to governments. 28 Am. Jur. 2d Estoppel and Waiver § 131

509  *See* WELCOME HOME, *supra* note 67.

510  *See* WELCOME HOME, *supra* note 67.

511  Lakewood, No. L-2462-10, Br. of the Homeless Individuals in Op. to Lakewood's Mot. for Partial Summ. J. (Dec. 6, 2011) at *19-22; *City of Providence v. Doe et al. & Kali*, No. PC09-5252, Def.'s Mot. to Stay. Enforcement of Prelim. Inj. (Sept. 25, 2009) at *2-3 (R.I. Super.).

512  N.J. Stat. Ann. § 44:1-88 (West).

513  R.I. Gen. Laws Ann. § 40-5-4 (West).

514  *See* WELCOME HOME, *supra* note 67.

515  *See* Lakewood, No. L-2462-10, Ltr. Br. of Ocean Cty. Bd. of Social Services in Resp. to Third Party Pt.'s, Homeless Individuals' Cross-Mot. (Mar. 11, 2013) at *10 (emphasizing discretion when restating the relevant New Jersey statute); *Providence v. Doe*, No. PC09-5252, Ct. Hrg. (Sept. 14, 2009) at *217-218 ("[I]f the defendants are going to cite to that statute I just wanted the Court to know…it is, in effect, purely discretionary with the Court."). In other contexts, state courts in Kansas, New York, and West Virginia have denied claims based on a state duty to aid the poor on the basis of legislative discretion. *See Bullock v. Whiteman*, 254 Kan. 177 (Kan. 1993); *RAM v. Blum*, 103 Misc. 2d 237, 239 (Sup. Ct. N.Y. County 1980); *State ex rel. K.M. v. West Virginia Dept. of Health and Human Res* ., 575 S.E.2d 393 (W.Va. 2002).

In both New Jersey and Rhode Island, the courts neither fully vindicated nor fully discredited either side's argument. Neither court expressly relied on a statutory duty to aid the poor in reaching its decision. The New Jersey court avoided ruling on the extent of Lakewood's responsibility by denying its motion for summary judgment on other grounds.[516] The Rhode Island court did not find any of Camp Runamuck's arguments convincing enough to prevent it from granting Providence an injunction disbanding the encampment.[517] It held that because the homeless defendants had not made applications for aid through the mechanism established in Providence's city ordinances,[518] the city could not be held to its duty.[519] On the other hand, neither court was willing to hold that its state statute provided cities enough discretion to vitiate their duties to the poor. The New Jersey court felt that "there is a governmental responsibility here to care for the poor at some level."[520] The Rhode Island court was even firmer: "[Section] 45-1 [sic] isn't discretionary. The city is required to relief [sic] and support."[521]

Many states have legal provisions homeless encampments could rely on to assert an "Unclean Hands" defense. Many states have language in either their constitutions or their laws directing or empowering their legislatures to provide for the poor or for the public welfare; several more have constitutional statements of principle involving public welfare.[522] In Indiana and Maine, courts have enforced

municipalities' duties under these laws, although under different circumstances.[523] Even when unsuccessful, homeless litigants employing this defense may elicit favorable dicta from courts.

## Necessity (The Right to Survive)

The necessity defense applies when an individual is faced with some immediate harm and escapes it by engaging in conduct that would typically be illegal.[524] The defense is available in a number of cases involving homeless litigants: judges have recognized necessity when governments have cited encampments[525] as well as individual campers.[526] Homeless litigants have also argued necessity in response to government litigation to evict them from encampments.[527] In order to prevail, homeless litigants defending their encampments must show that their trespass is justified because any harm they cause to landowners is outweighed by the harm their trespass avoids—an imminent threat to their own lives. Additionally, homeless litigants must show they had no legal alternatives to avoid this harm.[528] Depending on the particular state constitutional provisions available, homeless litigants may be able to bolster the necessity defense (as litigants in the Lakewood Tent City case did) by asserting a "constitutional right to survive."[529]

The leading case applying the necessity defense to tent cities is *In re Zeitler*.[530] An administrative hearing found that "taking the tents away from the homeless people living in the encampments…[w]ith no shelter beds available… would also deprive these people of the basic necessity of

516  *See* Promissory Estoppel, *infra.*
517  *Providence v. Doe*, No. PC09-5252, Ct. Hr'g. (Sept. 14, 2009) at *228-242 (bench ruling).
518  *See id.* at *217 (citing Providence, Rhode Island, Municipal Code § 2-12-29 (2012)).
519  *Cf. id.* at *234.
520  *Lakewood*, No. L-2462-10, Tr. of Mot. for Summ. J. (Jan. 6, 2012) at *14.
521  *Providence v. Doe*, No. PC09-5252, Ct. Hr'g. (Sept. 14, 2009) at *218.
522  Mandatory constitutional provisions (creating some duty, but leaving significant discretion to the legislature): Ala. Const. art. IV § 88; Alaska Const. art. VII § 5; Del. Const. art. XII §1; Idaho Const. art. X §1; Kansas Const. art. VII § 4; MCLS Const. art. 1, § 2; Missouri Const. art IV § 37; Nevada Const. art. 13 § 1; N.Y. Const. art. XVII § 1; N.C. Const. art. XI § 4; Okla. Const. art. XVII § 3; P.R. Const. art. II § 20; W.Va. Const. art. IX §2; Wyo. Const. art. 7 § 20. Enabling constitutional provisions: Cal. Const. art. XVI § 11; Ga. Const. art. III § 9; Hawaii Const. art. IX § 5; Ind. Const. art IX § 3; La. Const. art. XII § 8; Miss Const. art. 4 § 86; Mont. Const. art. XII § 3; N.M. Const. art. IX § 14; Tex. Const. art. III § 51-a. Statutory poor laws: AS §§ 47.25.120–47.25.300 (Alaska); Cal. Welf. & Inst. Code § 17000 (California); Colo. Rev. Stat. § 26-2-102 (Colorado); Conn. Gen. Stat. § 17b-190 through -219 (Connecticut; 31 Del. C. § 512 (Delaware); D.C. Code § 4-202.01 (District of Columbia); 20 HRS § 346-362 (Hawaii); 305 Ill. Comp. Stat. 5/6-1 through 5/6-12 (Illinois); Ind. Code § 12-20-1-1 through 12-20-28-3 (Indiana); IA Code § 252.25 (Iowa); Kan. Stat. Ann. § 39-701 to -709 (Kansas); Me. Rev. Stat. tit. 22. § 4307 (Maine); Md. Human Services Code Ann. § 5-403 (Maryland); Mass. Gen. Laws, ch. 118 § 4B (Massachusetts); MCLS § 125 (Michigan); Minn. Stat. § 256D.01 through 256D.21 (Minnesota); Miss. Code Ann. § 43-1-4(a) (Mississippi); Neb. Rev. Stat. 68-131 (Nebraska); NRS 428.010 (Nevada); N.H. Rev. Stat. Ann. § 165:1 (New Hampshire); N.J. Stat. 44:8-107 et seq. (New Jersey); N.M. Stat. 8.106.100 et seq (New Mexico); N.Y. Soc. Serv. Law § 62(1) (New York); N.D. Cent. Code § 50-24.5-02 (North Dakota); Ohio Rev.

Code Ann. § 5115 (Ohio); Okla. Stat. tit. 56, § 26.3 et seq. (Oklahoma); 62 P.S. § 432.1-432.24 (Pennsylvania); R.I. GEN. LAWS § 40-5-1 (Rhode Island); S.D. Codified Laws § 28-13-1 through 28-13-44 (South Dakota); Utah Code Ann. § 35A-3-401 through -402 (Utah); VT. STAT. ANN. tit. 33 § 2103 (Vermont); Va. Stat. 63.2 § 6 (Virginia); RCW § 74.04 (Washington). Constitutional statements of principle: Ill. Const. art. I § 2; R.I. Const. art. I § 2; S.C. Const. art. XII § 1.
523  *Ctr. Twp. of Marion Cty. v. Coe*, 572 N.E. 2d 1350 (Ind. Ct. App. 1991) (upholding trial court's order directing township to provide shelter to homeless under Indiana's poor laws, finding "[t]emporary lack of funds is not an excuse"); *Beaulieu v. City of Lewiston*, 440 A.2d 334 (Me. 1982) (city ordinance that provided shelter assistance to renters but not mortgage payers violated Maine's poor laws, finding "[t]here can be no doubt that shelter is a basic necessity essential to maintain a relief applicant, within the meaning of a general assistance program.").
524  *See e.g.* 1 Wharton's Criminal Law § 90 (15th ed.); Rest. 2d Torts § 197 (1965).
525  *See In re Zeitler*, (Iowa City of Des Moines Jan. 31, 2013) (Admin. Hr'g. Dec. & Order & Notice of Rt to Appeal) *rev. pending sub. nom. City of Des Moines v. Webster*, No. 05771-EQCE-073786 (Iowa Dist. Apr. 3, 2013).
526  *In re Eichorn*, 69 Cal.App.4th 382 (1998).
527  *See e.g. Lakewood*, No. L-2462-10, Ltr. Br. in Support of Homeless Individuals' Cross-mot. for Interim Relief (Mar. 4, 2013) at *9-10 (citing N.J. Const. Art. I § 1).
528  The standard to which they must prove this element is uncertain. *See discussion infra.*
529  *Id.*
530  *See In re Zeitler*, *supra* note 525.

adequate sleep."[531] On appeal, the district court reversed and held that the necessity defense was available, but appellees did not meet its elements because their decision to remain in their encroachments under the bridge was not reasonably necessary to prevent the harm of staying in a crowded shelter and leaving their possessions unattended, nor was it an unexpected "emergency."[532]

While *In re Zeitler* is the first opinion to allow homeless individuals to rely on a necessity defense in a civil context, the necessity defense is generally available in civil suits, as the City of Des Moines admits.[533] The city's alternate theory—that the homeless individuals failed to prove every element of their defense—may be more plausible but is not certain to succeed. *In re Zeitler* relied on two California cases discussing how the necessity defense should apply to homeless individuals in a criminal context: *Tobe v. City of Santa Ana*[534] and *In re Eichorn*.[535] Both concerned the same underlying facts: Santa Ana's police sweeps of homeless individuals sleeping outdoors. *Tobe* concerned whether the anti-camping statute under which police had arrested the homeless plaintiffs was unconstitutional. *In re Eichorn* concerned whether the necessity defense was available to a particular *Tobe* plaintiff as he fought Santa Ana's attempt to convict him under the same statute. In both, the courts struggled not with the "legitimate harm" element of a necessity defense but rather with whether homeless individuals had legal alternatives available to avoid the harm.

In *Tobe*, the California Supreme Court acknowledged the possible viability of a necessity defense in certain circumstances. It rejected a facial challenge to Santa Ana's anti-camping statute, concluding that because homeless individuals could rely on the necessity defense, the law was not unconstitutional on its face.[536] Then, the court went on to consider whether the necessity defense was available to each plaintiff, concluding that "they simply did not demonstrate that the ordinance had been enforced in a constitutionally impermissible manner against homeless persons who had no alternative but to 'camp' on public property in Santa Ana."[537] Under the facts of that particular case, the court found that the plaintiffs were unable to show that they could not find lawful shelter, had been denied public assistance, or turned away from an emergency shelter on the night in question.[538] Moreover, under the facts of that case, the court was unconvinced by

a plaintiff's declaration that sleeping outdoors was "safer" than sleeping in the emergency shelter.[539] In *Eichorn*, by comparison, the California Court of Appeals developed the standard somewhat more expansively, ordering a lower court to allow Eichorn to argue necessity before his jury and holding that that defense would require him to show that "[legal] alternatives were inadequate" in order to receive a jury trial.[540] A key difference appears to be the nature of the alternative that would have been available in each of the cases—on the one hand an emergency shelter, and on the other trespassing on private property or walking to a different city.

Until then, *In re Zeitler* stands as a favorable precedent that would allow homeless litigants to take advantage of the necessity defense to overcome initial trial motions and to proceed to discovery, thereby improving their bargaining position.

## Settlement

Settlements always represent a compromise between parties and rarely achieve all of the goals of either party. That said, it is possible for creative settlements to lead to a solution that meets the needs of both parties. For example, in the case study on Charleston West Virginia discussed above, plaintiffs' goal was to get a tiny house village, instead, the settlement resulted in storage facilities that, while not housing, will help more people.[541] When approaching settlement discussions, it is important to consider possible unintended consequences. For example, if a party agrees to provide storage facilities for people experiencing homelessness at a location outside of town and provides bus passes to access that storage, it is still necessary to consider how the storage will be accessed: How far away is the bus stop from the storage facility? How long does it take round-trip? Is it practical for people to access the facility and still accomplish other things one may need to in the day, such as attend appointments or return in time for a meal at a local shelter? Is it practical for a person to go back and forth with their things from the storage facility to the city and back? It is important to be conscious of how certain agreements could produce an unintended result and set precedent for others moving forward. The table in Appendix IX provides examples of settlement agreements with at least some positive elements.[542]

531   *Id.* at *4.
532   *Id.*
533   *Id.* at ¶22(D-F) (citing REST 2d TORTS § 197); *see also* AmJur 2d §158.
534   *Tobe v. City of Santa Ana*, 892 P.2d 1145 (Cal. 1995).
535   *In re Eichorn*, 69 Cal. App. 4th 382 (Cal. 1998).
536   *Id.* at 1088.
537   *Id.*
538   *Id.*

539   *Id.*
540   *See In re Eichorn*, 69 Cal. App. 4th 382, 390 (Cal. App. 1998). The Court felt that "neither trespassing on private property nor walking to a different city was an adequate alternative." *Id.* at 391 n.4.
541   See Case Study, Charleston, WV, *supra*.
542   For a more detailed summary of the cases, *see* HOUSING NOT HAND-CUFFS: A LITIGATION, *supra* note 458.

TENT CITY, USA: The Growth of America's Homeless Encampments and How Communities are Responding

## Human Rights Standards

Human Rights Law has many standards that may be helpful in shaping constructive alternatives to criminalization.

Since 1948, numerous declarations and conventions have to varying degrees recognized a right to housing. It is important to note up front that this does not envision free single family homes for everyone; it is a more nuanced responsibility for governments to ensure all residents have access to adequate, affordable housing. Treaties with a right to housing include the International Bill of Human Rights (International Covenant on Civil and Political Rights, or ICCPR; International Covenant on Economic, Social, and Cultural Rights, or ICESCR; and the Universal Declaration of Human Rights, or UDHR), as well as more recent international human rights instruments, such as the Convention on the Protection of Migrant Workers and the Declaration on Social Progress and Development. The legal status of these instruments varies: covenants, statutes, protocols, and conventions are legally binding for states that ratify or accede to them. Over time, tenets of these legally binding agreements may become accepted principles of customary international law, a form of international common law. [543] Declarations, principles, guidelines, standard rules, and recommendations, on the other hand, have no binding legal effect on their own; however, such instruments are seen to have moral force, serve as evidence of emerging customary law, and to provide practical guidance to states in their conduct.[544]

These standards can be a helpful complement to domestic standards. Courts are looking to international standards for guidance, regardless of whether those standards are in binding agreements or not. Supreme Court cases,[545] as well as rulings by lower federal and state courts,[546] have relied on international standards and rulings as persuasive



authority, particularly as sources of "evolving standards of decency" in interpreting the Eighth Amendment.[547]

It is worth noting that federal policy advocacy adopting a human rights perspective on homelessness has shown demonstrable results. Over the past decade, the Law Center has worked across multiple human rights monitors to establish a strong international human rights norm condemning criminalization of homelessness as cruel, inhuman, and degrading treatment. This has been accompanied by numerous specific recommendations to federal agencies to decrease criminalization, from funding incentives to enforcement action, many of which federal agencies have actually implemented. In 2012, the USICH issued a report, *Searching out Solutions*, that criticizes criminalization measures and notes that they may violate not only federal constitutional rights but also our international human rights obligations under the ICCPR and Convention Against Torture (CAT)—the first time a federal agency report has addressed a domestic practice as a potential treaty violation.[548] Since then, both HUD and DOJ have incorporated references to the criminalization of homelessness as a human rights violation in official materials, indicating a culture shift within the federal government itself and its comfort with addressing

---

543   "International Law: The Core International Human Rights Instruments and their monitoring bodies," Office of the High Commission for Human Rights. *See* http://www2.ohchr.org/english/law/ (last visited November 13, 2011).

544   *Id.*

545   *See, e.g.,* Roper v. Simmons, 125 S.Ct. 1183 (2005); *Lawrence v. Texas,* 539 U.S. 558 (2003).

546   *See, e.g.,* Brennan v. State of Florida, 754 So. 2d 1 (Fla. 1999) (Amstead, concurring). (A concurring judge considered the ICCPR in a case where the court struck down the juvenile death penalty under the Florida Constitution.); Sterling v. Cupp, 290 Ore. 611 (1981) & Bott v. Deland, 922 P.2d 732 (1996) (rev'd on other grounds). (In these cases, the courts considered international legal standards for the treatment of prisoners to determine whether their current treatment violated state constitutions.); Moore v. Ganin, 223 Conn. 557 (1995) (Peters, J, concurring) (The concurring judge used the ICESR and UDHR to support its interpretation that the Connecticut Constitution to provide social welfare requirement.); Boehm v. Superior Court, 178 Cal.App.3d 494 (1986). (The court cited to the Universal Declaration to support its interpretation of California's welfare statute to include food, clothing and housing allowances.).

547   *See Roper, supra* note 545, at 1198.

548   U.S. INTERAGENCY COUNCIL ON HOMELESSNESS, SEARCHING OUT SOLUTIONS: CONSTRUCTIVE ALTERNATIVES TO THE CRIMINALIZATION OF HOMELESSNESS 8 (2012) (USICH and the Access to Justice Initiative of the U.S. Dep't of Justice, with support from the Department of Housing and Urban Development, convened a summit to gather information for this report).

criminalization in human rights terms.[549] Even more importantly, both HUD and DOJ have actually taken concrete actions to end criminalization—providing funding incentives to communities to stop the practice, filing a statement of interest brief in a case against criminalization, and supporting a bill to constructively address encampments— that directly implemented recommendations from human rights treaty bodies.[550] These explicit acknowledgements by federal agencies that governments have duties under human rights treaties that may be violated by criminalization practices provides significant persuasive weight for lawyers who want to incorporate international standards into their courtroom advocacy.

This section provides only developments in international law since the 2013 publication of our report *Welcome Home: The Rise of Tent Cities in the United States*, which addresses the full scope of international and regional human rights law, as well as comparative law from India, Colombia, South Africa, and Canada on the topic. That report is recommended for a fuller discussion of these issues.

Under international law, there is a clear and long-established right to housing.[551] Through General Comments issued by the Committee on Economic, Social, and Cultural Rights and reports issued by Special Rapporteurs, the right to housing has been delineated to include not just any form of shelter but rather "adequate" shelter, with respect to its legal security of tenure, the availability of services, materials, facilities and infrastructure, affordability, habitability, accessibility, location, and cultural adequacy.[552] As part

of this growing body of housing rights, forced evictions have become tantamount to illegal action in cases where no alternative or emergency housing is provided.[553] Most of the international treaties that provide a right to shelter or housing (the UDHR, ICCPR, and ICESCR) have the widespread support and endorsement of the international community.[554]

Given that the U.S. has ratified the ICCPR, CAT, and the Committee on Elimination of Racial Discrimination (CERD) and is a signatory to the ICESCR, the CRC, and the Convention on the Rights of Persons with Disabilities (CRPD), the U.S. has affirmative obligations not to infringe upon certain freedoms of homeless individuals. Under its international legal obligations, many policies in the United States that currently relate to both homelessness in general and to tent cities and encampments in particular violate international law. There have been cases of forced evictions against tent city residents and tent city closures without the provision of adequate alternative or emergency housing.[555] In other places, municipalities have institutionalized tent cities as a less expensive option than providing better, alternative housing. The existence of tent cities may itself, in some instances, be a facial violation of the right to adequate housing, because it represents the failure to provide fully adequate housing the residents of the encampment. While the right to housing is one that may progressively be realized, aspects of the right to housing should immediately be respected. And where federal and local governments do not provide alternative accommodations, it is a violation of the human rights to life, to shelter, and to freedom from cruel, inhuman, and degrading treatment to interfere with homeless individuals' ability to shelter themselves.[556]

City and local governments may be violating numerous other rights of homeless individuals, particularly in the context of homeless encampments. Freedom of movement and the right to travel, freedom from arbitrary arrest and interference with one's home, as well as property rights have been violated regularly, often by law enforcement or local

549   *See, e.g.* U.S. Dept. of Housing & Urban Development, Decriminalizing Homelessness (2017), https://www.hudexchange.info/homelessness-assistance/alternatives-to-criminalizing-homelessness/ (see picture in text); Letter from Lisa Foster, Director, Office for Access to Justice, U.S. Dept. of Justice, to Seattle City Councilors, (Oct.13, 2016), (https://assets.documentcloud.org/documents/3141894/DOJ-ATJ-Letter-to-Seattle-City-Council-10-13-2016.pdf) (stating "Although the enactment of CB 118794 would not solve the problem of homelessness in Seattle, the bill is consistent with the position we took in Bell v. Boise in its acknowledgement of the human rights of people experiencing homelessness."); Matthew Doherty, *Council Confronts Racial Disparities in Homelessness, Reducing Criminal Justice System Involvement and Homelessness among Native Americans* (Nov. 11, 2015), http://usich.gov/blog/council-meeting-update-october-2015.

550   U.S. Dept. of Housing & Urban Development, Notice of Funding Availability for the 2015 Continuum of Care Program Competition, 44 (2015); U.S. Dept. of Justice, Office of Public Affairs, *Justice Department Files Brief to Address the Criminalization of Homelessness* (Aug. 6, 2015), http://www.justice.gov/opa/pr/justice-department-files-brief-address-criminalization-homelessness.

551   While United States has been a signatory to the International Covenant on Economic, Social, and Cultural Rights since 1979, it has not yet ratified the treaty, so is only under an obligation not to violate the object and purpose of the treaty, including with regard to the right to housing. *See* Asst. Sec. of State for Democracy, Human Rights, & Labor Michael Posner, *The Four Freedoms Turn 70,* (Mar. 24, 2011); Convention on the Law of Treaties Art. 18, May 23, 1969, 1155 U.N.T.S. 331.

552   *See* General Comment 4, The Right to Adequate Housing (Sixth

session, 1991), U.N. Doc. E/1992/23, annex III at 114 (1991), reprinted in Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI/GEN/1/Rev.6 at 18 (2003).

553   *See* Welcome Home, *supra* note 67.

554   There are 167 parties to the ICCPR and 74 signatories; the ICESCR has 160 Parties and 70 signatories. *See* http://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=IV-3&chapter=4&lang=en (last visited February 25, 2012).

555   *See, e.g.*, *Police Slash Open Tents to Roust the Homeless*, St. Petersburg Times (Jan. 20, 2007).

556   *See* preceding discussion in this section; *see also* Nat'l Law Ctr. on Homelessness & Poverty, Cruel, Inhuman, and Degrading: Homelessness in the United States under the International Covenant on Civil & Political Rights (2013).

government officials.[557] The rights of certain subgroups of the population protected under international law, such as children or people with disabilities, are also implicated by the adverse treatment of homeless people and those living in encampments.

### International Covenant on Civil and Political Rights

The International Covenant on Civil and Political Rights (ICCPR)[558] is one of the foundational human rights treaties of modern international human rights law, which the U.S. ratified in 1992.[559] The ICCPR imposes an immediate obligation "to respect and to ensure" the rights it proclaims and to take whatever other measures are necessary to bring about that result.[560] The. Human Rights Committee reviews the parties to the treaty every 4 years on their compliance. Following intense advocacy during the March 2014 review of the U.S.,[561] the Committee directly addressed the criminalization of homelessness in the U.S., stating:

> While appreciating the steps taken by federal and some state and local authorities to address homelessness, the Committee is concerned about reports of criminalization of people living on the street for everyday activities such as eating, sleeping, sitting in particular areas etc. The Committee notes that such criminalization raises

concerns of discrimination and cruel, inhuman, or degrading treatment (arts. 2, 7, 9, 17, and 26).

The State party should engage with state and local authorities to: (a) abolish criminalization of homelessness laws and policies at state and local levels; (b) ensure close cooperation between all relevant stakeholders including social, health, law enforcement and justice professionals at all levels to intensify efforts to find solutions for the homeless in accordance with human rights standards; and (c) offer incentives for decriminalization and implementation of such solutions, including by providing continued financial support to local authorities implementing alternatives to criminalization and withdrawing funding for local authorities criminalizing the homeless.[562]

As will be shown below, this language was then built upon by the other treaty bodies.



US ICCPR Review 2014: Cruel, Inhuman, and Degrading

"I'm just simply baffled by the idea that people can be without shelter in a country, and then be treated as criminals for being without shelter. The idea of criminalizing people who don't have shelter is something that I think many of my colleagues might find as difficult as I do to even begin to comprehend."

- Sir Nigel Rodley, Chair of the UN Human Rights Committee and Former U.N. Special Rapporteur on Torture

The ICCPR does not enumerate a right to housing, but it includes other rights that are implicated in situations faced by persons living in tent cities or homeless encampments. The ICCPR recognizes the right to life (Article 6), which has been interpreted by the Human Rights Committee, to include right to shelter oneself from the elements.[563] Article

---

557 *See* HOUSING NOT HANDCUFFS, *supra* note 28.

558 Adopted and opened for signature 16 December 1966; entered in force 23 March 1976.

559 U.S. reservations, declarations, and understandings, International Covenant on Civil and Political Rights, 138 Cong. Rec. S4781-01 (daily ed., April 2, 1992). The U.S. adopted a number of reservations, declarations, and understandings upon its ratification of the ICCPR, including the declaration "that the United States declares that the provisions of Art.s 1 through 27 of the Covenant are not self-executing" (Declaration #1). However, it also states that "this Covenant shall be implemented by the Federal Government to the extent that it exercises legislative and judicial jurisdiction over the matters covered therein, and otherwise by the state and local governments; to the extent that state and local governments exercise jurisdiction over such matters, the Federal Government shall take measures appropriate to the Federal system to the end that the competent authorities of the state or local governments may take appropriate measures for the fulfillment of the Covenant." (Understanding #5). Finally, there is a declaration to the effect that "it is the view of the United States that States Party to the Covenant should wherever possible refrain from imposing any restrictions or limitations on the exercise of the rights recognized and protected by the Covenant" (Declaration #2). Given that none of the other reservations or declarations speaks specifically to the right to housing provided by the ICCPR, it can be assumed that the U.S. intends to recognize and protect that right.

560 THOMAS BUERGENTHAL, DINAH SHELTON, DAVID P. STEWART, INTERNATIONAL HUMAN RIGHTS IN A NUTSHELL, 52 (4th ed. 2009).

561 *See U.S. Treatment of Homeless Persons Cruel, Inhuman and Degrading Say UN Experts*, NAT'L LAW CTR. ON HOMELESSNESS & POVERTY (Mar. 14, 2014), http://campaign.r20.constantcontact.com/render?ca=b2957dbb-d79d-49fb-9fc3-e1fd066a8b0a&c=0a4b2470-3768-11e3-91c0-782bcb740129&ch=0a51db30-3768-11e3-91c0-782bcb740129; NAT'L LAW CTR. ON HOMELESSNESS & POVERTY, CRUEL, INHUMAN & DEGRADING: HOMELESSNESS IN THE UNITED STATES UNDER THE INTERNATIONAL COVENANT ON CIVIL & POLITICAL RIGHTS (2013), https://www.nlchp.org/documents/Cruel_Inhuman_and_Degrading.

562 Human Rights Committee, Concluding Observations, CCPR/C/USA/CO/4, para. 19, Apr. 23, 2014.

563 UN Human Rights Committee (HRC), *UN Human Rights Committee: Concluding Observations: Canada*, 7 April 1999, CCPR/C/79/

7 says that no one shall be subjected to "cruel, inhuman or degrading treatment," while Article 9 highlights "the right to liberty and security of person" and the right to be free from "arbitrary arrest or detention." Arbitrary arrests and degrading treatment of homeless individuals by law enforcement or other personnel, based on the performance of survival activities in a public space, violates these provisions. The ICCPR also enshrines the right to free movement and choice of residence (Article 12), and the right to be free from arbitrary or unlawful interference with one's privacy, family, home or correspondence and protected by the law against such interference (Article 17). The ICCPR also protects the right to family (Article 23), which implicates housing rights as the separation and dissolution that families often face once they lose their homes, typically through forced gender and age segregation in the shelter system, is a direct threat to people's rights to maintain and protect their family units. Article 26 of the ICCPR protects all persons against discrimination on the basis of race. These provisions may be regarded as providing, if not a right to housing, at least a right to choose one's residence, to move freely from place to place, and to be free from interference in one's home. The excerpt from the 2014 review above references articles 2, 7, 9, 17, and 26 as being potentially implicated in the criminalization of homelessness.[564]

Additionally, during the 2006 review of the U.S. under the treaty, the Human Rights Committee specifically raised the issue of disparate racial impact of homelessness on African American communities in the U.S. and called on the U.S. to "take measures, including adequate and adequately implemented policies, to bring an end to such de facto and historically generated racial discrimination."[565]

International Convention on the Elimination of all Forms of Discrimination

The U.S. signed the International Convention on the Elimination of all Forms of Discrimination (ICERD) on September 28, 1966, and subsequently ratified the treaty on October 21, 1994.[566] Article 5 of the ICERD[567] provides a broad range of protections and socioeconomic rights,

including the right to freedom of movement and residence within the border of the State; the right to public health, medical care, social security and social services; and the right to equal participation in cultural activities. It also explicitly provides for the right to housing (Article 5(e)(iii)), and notably, "the right of access to any place or service intended for use by the general public, such as transport hotels, restaurants, cafes, theatres and parks."

In August 2014, the Committee on the Elimination of Racial Discrimination (CERD) echoed the Human Rights Committee's concern about criminalization through the lens of its disparate racial impact:

> While appreciating the measures taken by federal and some state and local authorities to address homelessness, the Committee is concerned at the high number of homeless persons, who are disproportionately from racial and ethnic minorities, particularly African Americans, Hispanic/Latino Americans and Native Americans, and at the criminalization of homelessness through laws that prohibit activities such as loitering, camping, begging, and lying in public spaces (arts.2 and 5(e)).

> The Committee calls upon the State party to:

> (a) Abolish laws and policies making homelessness a crime;

> (b) Ensure close cooperation among all relevant stakeholders, including social, health, law enforcement and justice professionals at all levels to intensify efforts to find solutions for the homeless in accordance with human rights standards; and

> (c) Offer incentives to decriminalize homelessness, including by providing financial support to local authorities that implement alternatives to criminalization, and withdrawing funding from local authorities that criminalize homelessness.[568]

The Committee also called this recommendation "of particular importance" and requested the U.S. "to provide detailed information in its next periodic report [in 2017] on concrete measures taken to implement these recommendations."[569]

Add.105, available at: http://www.unhcr.org/refworld/docid/3df378764.html [accessed 20 April 2012].

564   Human Rights Committee, Concluding Observations, CCPR/C/USA/CO/4, para. 19, Apr. 23, 2014.

565   UN Human Rights Committee (HRC), *Concluding Observations of the Human Rights Committee on the Second and Third U.S. Reports to the Committee (2006),* 27 July 2006, CCPR/C/SR.2395, http://www1.umn.edu/humanrts/usdocs/hruscomments2.html.

566   U.S. reservations, declarations, and understandings, International Convention on the Elimination of All Forms of Racial Discrimination, 140 Cong. Rec. S7634-02 (daily ed., June 24, 1994).

567   International Convention on the Elimination of All Forms of Racial Discrimination, Dec. 21, 1965, S. Exec. Doc. C, 95-2 (1978); S. Treaty Doc. 95-18; 660 U.N.T.S. 195, 212.

568   Committee on the Elimination of Racial Discrimination, Concluding Observations, CERD/C/USA/CO/7-9, para. 12, Aug. 29, 2014.

569   *Id. at* 34.

### Convention Against Torture and other forms of cruel, inhuman, or degrading treatment or punishment

The Convention Against Torture and other forms of cruel, inhuman, or degrading treatment or punishment (CAT), which the U.S. ratified in 1990, protects against cruel, inhuman, and degrading treatment (Article 16), a standard similar to our own Eighth Amendment.[570] During the November 2014 review of the U.S., Committee member Sapana Pradhan-Malla raised the recommendations of the two other U.N. monitoring bodies, saying, "I'm hoping the U.S. government will commit to implementing the recommendations of the Human Rights Council and the CERD Committee to use federal grant funding incentives to decrease the criminalization of homelessness."[571]



To use federal grant funding incentives to decrease the criminalization of homelessness.

CAT Committee member Sapana Pradhan-Malla asks the U.S. to use federal grant funding incentives to decrease the criminalization of homelessness as part of its commitment to the implementation of the treaty.

With this, all three treaty bodies which review the U.S. had specifically condemned criminalization and called for various forms of implementation, which the government then actually executed, in greater or lesser part, as indicated above.

### Convention on the Rights of the Child

The Convention on the Rights of the Child (CRC)[572], which the U.S. has signed, but not yet ratified,[573] recognizes the right of every child to "a standard of living adequate for the child's physical, mental, spiritual, moral and social development" (Article 27). Although the CRC recognizes that parents/guardians have the primary responsibility to secure those living conditions necessary for their child's development, it also states:

> States Parties, in accordance with national conditions and within their means, shall take appropriate measures to assist parents and others responsible for the child to implement this right and shall in case of need provide material assistance and support programmes, particularly with regard to nutrition, clothing and housing.[574]

Each treaty has a treaty monitoring body that oversees its implementation and develops guiding commentary called "General Comments" and analyses of state reports that interpret and clarify the meaning of many provisions of the treaties they oversee, much as agencies in the U.S. issue regulations or other official guidance on statutory implementation.[575] In June 2017, the UN Committee on the Rights of the Child published its General Comment on Children in Street Situations, providing authoritative guidance to countries on developing comprehensive, long-term national strategies on homeless children and youth, using a holistic, child rights approach and addressing both prevention and response.[576] The Law Center helped lead an international process convened by the American Bar Association Commission on Homelessness & Poverty which informed the drafting of the Comment.[577] In part due to the Law Center's work, the General Comment defines the discrimination experienced by homeless youth to include "repressive efforts to prevent begging, loitering, vagrancy, running away or survival behaviours, for example, the criminalization of status offences, street sweeps or "round-ups", and targeted violence, harassment and extortion by police."[578] To remedy this, the Comment states: "Discrimination should be eliminated formally, by

---

570  Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984), entered into force June 26, 1987; U.S. reservations, declarations, and understandings, Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Cong. Rec. S17486-01 (daily ed., Oct. 27, 1990).

571  *In Wake of U.N. Torture Committee Call for More Action on Homelessness, U.S. Gets Failing Grades on Right to Housing Report Card,* NAT'L LAW CTR. ON HOMELESSNESS & POVERTY (Dec. 10, 2014), https://www.nlchp.org/press_releases/Press_Release_CAT_and_Report_Card; *Committee Against Torture considers report of the United States,* COMMITTEE AGAINST TORTURE (Nov. 13, 2014), http://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=15290&LangID=E.

572  Convention on the Rights of the Child, Nov. 20, 1989, 1577 U.N.T.S. 3; 28 I.L.M. 1456 (1989).

573  UN Treaty Collection, Status of the Convention on the Rights of the Child, http://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=IV-11&chapter=4&lang=en (last visited Nov. 9, 2011).

574  *Id.* at Art. 27(3).

575  THOMAS BUERGENTHAL, DINAH SHELTON, DAVID P. STEWART, INTERNATIONAL HUMAN RIGHTS IN A NUTSHELL, 74 (4th ed. 2009)

576  U.N. Committee on the Rights of the Child, General Comment 21 on Children in Street Situations, U.N. Doc. CRC/C/GC/21 (2017).

577  American Bar Association Commission on Homelessness & Poverty, International Summit on the Legal Needs of Street Youth (2017), https://www.americanbar.org/groups/public_services/homelessness_poverty/events_cle/street_youth.html.

578  U.N. Committee on the Rights of the Child, General Comment 21 on Children in Street Situations, para. 14, U.N. Doc. CRC/C/GC/21 (2017).

**Section 5**

ensuring that a State's constitution, laws and policies do not discriminate on the grounds of street situation, and substantively, by paying sufficient attention to children in street situations as a group who have suffered persistent prejudice and who require affirmative action."[579]

The Comment also makes clear countries "shall take appropriate measures to assist parents and others responsible for the child to implement [the right to an adequate standard of living] and shall in case of need provide material assistance and support programmes, particularly with regard to nutrition, clothing and housing…. designed and implemented on the basis of a child rights approach. With regard to housing, security of tenure is essential for preventing children from coming into street situations. This includes access to adequate housing that is safe, with access to safe drinking water, sanitation and hygiene facilities. Children, including those living in informal or illegal housing, should not be subject to forced evictions prior to the provision of adequate alternative accommodation."[580]

### Special Rapporteur Reports

In addition to treaties and declarations, international law is developed and made more specific through the work of Special Rapporteurs. Special Rapporteurs are independent experts tasked by the U.N. Human Rights Council with reporting on, and developing new standards for, human rights specific thematic areas.[581] Special Rapporteurs bear a specific mandate from the United Nations Human Rights Council within the scope of "Special Procedures" mechanisms to investigate human rights situations and conduct fact-finding missions to countries.[582] Thanks to focused advocacy, numerous rapporteurs have commented directly on the issue criminalization of homelessness, laying the groundwork for the treaty committee comments described above.[583]

Building on this record, in 2016, the U.S. hosted an official mission visit from the U.N. Working Group on People of African Descent which critiqued ongoing racial segregation and racial disparities in housing and homelessness (including the police response to homelessness). [584] It made recommendations to reform police conduct and uphold the right to adequate housing.[585] The UN Special Rapporteur on Freedom of Assembly and Association also conducted an official mission visit to the U.S. in 2016, noting "a number of cities have ordinances which prevent homeless people from gathering in certain public places, despite the fact that most have literally nowhere else to go."[586] Finally, in 2016, the U.N. Special Rapporteur on the right to adequate housing focused her annual report on homelessness and stated to comply with human rights law:

…(e) Any and all laws or measures that criminalize, impose fines on or restrict homeless people or behaviour associated with being homeless, such as sleeping or eating in public spaces, must be immediately repealed;

(f) Homeless people must be recognized as a protected group in all relevant domestic anti-discrimination and hate-crime laws, including where relevant in national Constitutions, national and subnational human rights legislation and in city charters;

(g) A careful review of existing legislation and policies must be undertaken to ensure that those that include discriminatory intent or effect against people who are homeless are repealed or amended, in compliance with international human rights law. Funding or transfer payments for local programmes should be made conditional on the elimination of all laws that criminalize or discriminate against homeless persons;…[587]

---

579   *Id.,* at para. 27.

580   *Id.,* at para. 51.

581   *See* Office of the High Commissioner for Human Rights, *Special Procedures of the Human Rights Council,* http://www.ohchr.org/EN/HR-Bodies/SP/Pages/Welcomepage.aspx.

582   Office of the United Nations High Commissioner for Human Rights, Special Procedures of the Human Rights Council, http://www2.ohchr.org/english/bodies/chr/special/index.htm (last visited February 25, 2012).

583   U.N. Human Rights Council, *Report of the U.N. Special Rapporteur on the Human Right to Safe Drinking Water and Sanitation, Catarina de Albuquerque, Addendum: Mission to the United States of America,* ¶ 58, A/HRC/18/33/Add.4 (2011), http://www2.ohchr.org/english/bodies/hrcouncil/docs/18session/A-HRC-18-33-Add4_en.pdf; U.N. Human Rights Council, *Report of the Special Rapporteur on Adequate Housing as a Component of the Right to an Adequate Standard of Living, and on the Right to Non-Discrimination in this Context, Raquel Rolnik, Mission to the United States of America,* ¶ 95, U.N. Doc. A/HRC/13/20/Add.4 (Feb. 12, 2012) (hereinafter "Housing Rapporteur Report"); U.N. Human Rights Council, *Final Draft of the Guiding Principles on Extreme Poverty and Human Rights, Submitted by the Special Rapporteur on Extreme Poverty*

*and Human Rights, Magdalena Sepúlveda Carmona,* ¶¶ 65, 66(c), U.N. Doc. A/HRC/21/39 (July 18, 2012); U.N. Human Rights Council, *Report of the Special Rapporteur on Extreme Poverty and Human Rights,* ¶¶ 48-50, 78(c), U.N. Doc. A/67/278 (Aug. 9, 2012); Special Rapporteurs on the Rights to Adequate Housing, Water and Sanitation, and Extreme Poverty and Human Rights, *USA: "Moving Away from the Criminalization of Homelessness, A Step in the Right Direction"* (Apr. 23, 2012), http://www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=12079&LangID=E.

584   *See* U.N. Human Rights Council, *Report of the Working Group of Experts on People of African Descent on its mission to the United States of America,* ¶ 50-53, 72, 76, 83 A/HRC/33/61/Add.2 (2016), https://documents-dds-ny.un.org/doc/UNDOC/GEN/G16/183/30/PDF/G1618330.pdf?OpenElement.

585   *See id. at* ¶¶98-100, 108, 109, 120.

586   Maina Kiai, Statement by the United Nations Special Rapporteur on the rights to freedom of peaceful assembly and of association at the conclusion of his visit to the United States of America (July 27, 2016), http://freeassembly.net/news/usa-statement/.

587   Report of the Special Rapporteur on adequate housing as a component of the right to adequate standard of living, and on the right to non-discrimination in this context, Leilani Farha, para. 91, A/HRC/31/54, Dec. 30, 2015.

### Universal Periodic Review

Through the Universal Periodic Review (UPR), the Human Rights Council reviews every country in the world every 4 years for their compliance with all the human rights treaties they have ratified as well as the Universal Declaration of Human Rights and following up on Rapporteur visits that have been made.[588] During the 2010 UPR, the U.S. Department of Housing and Urban Development stated that human rights norms play a role in shaping housing policy.[589] In September 2015, as part of its second UPRI, in discussing how the U.S. government implements its human rights obligations, it stated that it "helps communities pursue alternatives to arrest and prosecution of individuals for various behaviours associated with homelessness by focusing on providing technical assistance and financial resources to help communities provide housing first."[590] It supported, in part, a recommendation from the Human Rights Council to "[g]uarantee the right by all residents in the country to adequate housing, food, health and education, with the aim of decreasing poverty, which affects 48 millions of people in the country;"[591] and supported fully recommendations to "[i]nvest further efforts in addressing the root causes of recent racial incidents and expand its capacity in reducing poverty in neighborhoods experiencing sub/par public services, including access to adequate housing and public safety"[592] and "[a]mend laws that criminalize homelessness and which are not in conformity with international human rights instruments."[593]

### UN Sustainable Development Goals and Habitat III New Urban Agenda

In 2015, the U.S. also signed on to the U.N. Sustainable Development Goals, including goal 11 on Sustainable Cities and Communities pledging to make cities inclusive, resilient, safe and sustainable.[594] And in October 2016, the U.S. signed on to the New Urban Agenda, the outcome report of the U.N. Habitat III conference.[595] The signatories "commit to promote national, sub-national, and local housing policies that support the progressive realization of the right to adequate housing for all as a component of the right to an adequate standard of living, that address all forms of discrimination and violence, prevent arbitrary forced evictions, and that focus on the needs of the homeless, persons in vulnerable situations, low income groups, and persons with disabilities, while enabling participation and engagement of communities and relevant stakeholders, in the planning and implementation of these policies including supporting the social production of habitat, according to national legislations and standards."[596] The Agenda also stated "we commit to combat homelessness as well as to combat and eliminate its criminalization through dedicated policies and targeted active inclusion strategies, such as comprehensive, inclusive and sustainable housing first programmes."[597]

588   See Office of the High Commissioner for Human Rights, Universal Periodic Review (2017),  http://www.ohchr.org/EN/HRBodies/UPR/Pages/UPRMain.aspx.

589   See U.S. Department of Housing and Urban Development Statement on the U.S. Participation in the United Nations' Universal Periodic Review, http://portal.hud.gov/hudportal/HUD?src=/press/speeches_remarks_statements/2010/statement-110510.

590   Report of the Working Group on the Universal Periodic Review, United States of America, A/HRC/30/12, ¶ 116 (July 20, 2015).

591   Id., at  ¶ 176.309.

592   Id., at  ¶ 176.124.

593   Id., at  ¶ 176.310.

594   G.A. Res. 70/1, Transforming Our World: 2030 Agenda for Sustainable Development (Sept. 25, 2015), available at: http://www.un.org/ga/search/view_doc.asp?symbol=A/RES/70/1&Lang=E; Sustainable Development Knowledge Platform, Sustainable Development Goal 11, available at https://sustainabledevelopment.un.org/sdg11.

595   UN conference agrees new urban development agenda creating sustainable, equitable cities for all, UN Sustainable Development Blog (Oct. 20, 2016), http://www.un.org/sustainabledevelopment/blog/2016/10/un-conference-agrees-new-urban-development-agenda-creating-sustainable-equitable-cities-for-all/; Outcome document of the United Nations Conference on Human Settlements (Habitat III), Quito Declaration on Sustainable Cities and Human Settlements for All,  Quito, October 17-20, 2016, ¶ 31, 33, 108 (2016) (hereinafter "New Urban Agenda"), https://www2.habitat3.org/bitcache/97ced11dcecef85d41f74043195e5472836f6291?vid=588897&disposition=inline&op=view.

596   New Urban Agenda, supra note 595, at ¶ 31.

597   Id. at ¶33, 108.

**Appendices**

# Appendix I: Annual Encampments Reported Data

Profile of 2017 Homeless Encampments (partial year data)

*Residents of Encampments*

- In 2017, 46 percent of relevant news stories contained data regarding the number of residents within reported homeless encampments. Of the 2017 national reports of homeless encampments with relevant data, 4 percent have fewer than five residents, 10 percent have between 5 and 10 residents, 17 percent have between 11 and 20 residents, 26 percent have been 21 and 50 residents, 20 percent have between 51 and 75 residents, 9 percent have between 76 and 100 residents and 13 percent have greater than 100 residents.

*Average Time in Existence of Encampments*

- In 2017, 21 percent of relevant news stories contained data regarding the amount of time reported homeless encampments have been in existence. Of the 2017 national reports of homeless encampments with relevant data, 10 percent had existed for less than one month, 30 percent had existed between one and six months, 13 percent had existed between seven and eleven months, 13 percent had existed between one and two years, 11 percent had existed between three and five years, 11 percent had existed between six and ten years and 13 percent had existed for greater than ten years.

*Legal Status of Encampments*

- In 2017, 74 percent of relevant news stories contained data regarding the legal status of reported homeless encampments. Of the 2017 national reports of homeless encampments with relevant data, 6 percent were reported to be legal, 14 percent were reported to be semi-legal (tacitly sanctioned), and 80 percent were reported to be illegal.

*State-Level Trends*

- While there are reports of homeless encampments for most states in 2017, the most occurred in California (39 percent), Indiana (9 percent), Maryland (6 percent), Texas (5 percent), Illinois (5 percent), and Hawaii (3 percent). Please see Table 3 for a state-by-state breakdown of the number of homeless encampments from 2007 to 2017.





Profile of 2016 Homeless Encampments

*Residents of Encampments*

- In 2016, 49 percent of relevant news stories contained data regarding the number of residents within reported homeless encampments. Of the 2016 national reports of homeless encampments with relevant data, 9 percent have fewer than five residents, 9 percent have between 5 and 10 residents, 13 percent have between 11 and 20 residents, 44 percent have been 21 and 50 residents, 5 percent have between 51 and 75 residents, 4 percent have between 76 and 100 residents and 15 percent have greater than 100 residents.

*Average Time in Existence of Encampments*

- In 2016, 24 percent of relevant news stories contained data regarding the amount of time reported homeless encampments have been in existence. Of the 2016 national reports of homeless encampments with

relevant data, 4 percent had existed for less than one month, 23 percent had existed between one and six months, 4 percent had existed between seven and eleven months, 28 percent had existed between one and two years, 22 percent had existed between three and five years, 5 percent had existed between six and ten years and 14 percent had existed for greater than ten years.

*Legal Status of Encampments*

- In 2016, 75 percent of relevant news stories contained data regarding the legal status of reported homeless encampments. Of the 2016 national reports of homeless encampments with relevant data, 4 percent were reported to be legal, 19 percent were reported to be semi-legal (tacitly sanctioned), and 77 percent were reported to be illegal.

*State-Level Trends*

- While there are reports of homeless encampments for most states in 2016, the most occurred in California (40 percent), Indiana (8 percent), Illinois (5 percent), Maine (5 percent), and Texas (4 percent). Please see Table 3 for a state-by-state breakdown of the number of homeless encampments from 2007 to 2017.



Profile of 2015 Homeless Encampments

*Residents of Encampments*

- In 2015, 45 percent of relevant news stories contained data regarding the number of residents within reported homeless encampments. Of the 2015 national reports of homeless encampments with relevant data, 11 percent have fewer than five residents, 8 percent have between 5 and 10 residents, 25 percent have between



11 and 20 residents, 25 percent have been 21 and 50 residents, 6 percent have between 51 and 75 residents, 9 percent have between 76 and 100 residents and 15 percent have greater than 100 residents.

*Average Time in Existence of Encampments*

- In 2015, 22 percent of relevant news stories contained data regarding the amount of time reported homeless encampments have been in existence. Of the 2015 national reports of homeless encampments with relevant data, 10 percent had existed for less than one month, 21 percent had existed between one and six months, 10 percent had existed between seven and eleven months, 17 percent had existed between one and two years, 17 percent had existed between three and five years, 8 percent had existed between six and ten years and 17 percent had existed for greater than ten years.

*Legal Status of Encampments*

- In 2015, 66 percent of relevant news stories contained data regarding the legal status of reported homeless encampments. Of the 2015 national reports of homeless encampments with relevant data, 3 percent were reported to be legal, 23 percent were reported to be semi-legal (tacitly sanctioned), and 74 percent were reported to be illegal.

*State-Level Trends*

- While there are reports of homeless encampments for most states in 2015, the most occurred in California (42 percent), Michigan (6 percent), Maine (5 percent), Oregon (5 percent), and Iowa (4 percent). Please see Table 3 for a state-by-state breakdown of the number of homeless encampments from 2007 to 2017.

**Appendices**





Profile of 2014 Homeless Encampments

*Residents of Encampments*

- In 2014, 53 percent of relevant news stories contained data regarding the number of residents within reported homeless encampments. Of the 2014 national reports of homeless encampments with relevant data, 9 percent have fewer than five residents, 12 percent have between 5 and 10 residents, 20 percent have between 11 and 20 residents, 34 percent have been 21 and 50 residents, 9 percent have between 51 and 75 residents, 1 percent have between 76 and 100 residents and 15 percent have greater than 100 residents.

*Average Time in Existence of Encampments*

- In 2014, 30 percent of relevant news stories contained data regarding the amount of time reported homeless encampments have been in existence. Of the 2014 national reports of homeless encampments with relevant data, 4 percent had existed for less than one month, 13 percent had existed between one and six months, 9 percent had existed between seven and eleven months, 15 percent had existed between one and two years, 26 percent had existed between three and five years, 9 percent had existed between six and

ten years and 23 percent had existed for greater than ten years.

*Legal Status of Encampments*

- In 2014, 76 percent of relevant news stories contained data regarding the legal status of reported homeless encampments. Of the 2014 national reports of homeless encampments with relevant data, 2 percent were reported to be legal, 15 percent were reported to be semi-legal (tacitly sanctioned), and 83 percent were reported to be illegal.

*State-Level Trends*

- While there are reports of homeless encampments for most states in 2014, the most occurred in California (35 percent), Michigan (8 percent), Louisiana (7 percent), Alabama (6 percent), and Virginia (6 percent). Please see Table 3 for a state-by-state breakdown of the number of homeless encampments from 2007 to 2017.





## Profile of 2013 Homeless Encampments

### *Residents of Encampments*

- In 2013, 49 percent of relevant news stories contained data regarding the number of residents within reported homeless encampments. Of the 2013 national reports of homeless encampments with relevant data, 18 percent have fewer than five residents, 12 percent have between 5 and 10 residents, 15 percent have between 11 and 20 residents, 27 percent have been 21 and 50 residents, 11 percent have between 51 and 75 residents, 2 percent have between 76 and 100 residents and 15 percent have greater than 100 residents.

### *Average Time in Existence of Encampments*

- In 2013, 19 percent of relevant news stories contained data regarding the amount of time reported homeless encampments have been in existence. Of the 2013 national reports of homeless encampments with relevant data, 4 percent had existed for less than one month, 20 percent had existed between one and six months, 4 percent had existed between seven and eleven months, 16 percent had existed between one and two years, 24 percent had existed between three and five years, 24 percent had existed between six and ten years and 8 percent had existed for greater than ten years.

### *Legal Status of Encampments*

- In 2013, 78 percent of relevant news stories contained data regarding the legal status of reported homeless encampments. Of the 2013 national reports of homeless encampments with relevant data, 4 percent were reported to be legal, 15 percent were reported to be semi-legal (tacitly sanctioned), and 81 percent were reported to be illegal.

### *State-Level Trends*

- While there are reports of homeless encampments for most states in 2013, the most occurred in California (26 percent), Iowa (8 percent), Oregon (8 percent), Indiana (7 percent), and North Carolina (7 percent). Please see Table 3 for a state-by-state breakdown of the number of homeless encampments from 2007 to 2017.





## Profile of 2012 Homeless Encampments

### *Residents of Encampments*

- In 2012, 48 percent of relevant news stories contained data regarding the number of residents within reported homeless encampments. Of the 2012 national reports of homeless encampments with relevant data, 14 percent have fewer than five residents, 7 percent have between 5 and 10 residents, 24 percent have between 11 and 20 residents, 31 percent have been 21 and 50 residents, 10 percent have between 51 and 75 residents, 3 percent have between 76 and 100 residents and 10 percent have greater than 100 residents.

### *Average Time in Existence of Encampments*

- In 2012, 23 percent of relevant news stories contained data regarding the amount of time reported homeless encampments have been in existence. Of the 2012 national reports of homeless encampments with relevant data, 14 percent had existed for less than one month, 11 percent had existed between one and six months, 7

**Appendices**

percent had existed between seven and eleven months, 25 percent had existed between one and two years, 7 percent had existed between three and five years, 32 percent had existed between six and ten years and 4 percent had existed for greater than ten years.

*Legal Status of Encampments*

• In 2012, 66 percent of relevant news stories contained data regarding the legal status of reported homeless encampments. Of the 2012 national reports of homeless encampments with relevant data, 8 percent were reported to be legal, 22 percent were reported to be semi-legal (tacitly sanctioned), and 71 percent were reported to be illegal.

*State-Level Trends*

• While there are reports of homeless encampments for most states in 2012, the most occurred in California (42 percent), Michigan (16 percent), and Missouri (8 percent). Please see Table 3 for a state-by-state breakdown of the number of homeless encampments from 2007 to 2017.





Profile of 2011 Homeless Encampments

*Residents of Encampments*

• In 2011, 46 percent of relevant news stories contained data regarding the number of residents within reported homeless encampments. Of the 2011 national reports of homeless encampments with relevant data, 6 percent have fewer than five residents, 6 percent have between 5 and 10 residents, 28 percent have between 11 and 20 residents, 44 percent have been 21 and 50 residents, 0 percent have between 51 and 75 residents, 3 percent have between 76 and 100 residents and 13 percent have greater than 100 residents.

*Average Time in Existence of Encampments*

• In 2011, 26 percent of relevant news stories contained data regarding the amount of time reported homeless encampments have been in existence. Of the 2011 national reports of homeless encampments with relevant data, 0 percent had existed for less than one month, 6 percent had existed between one and six months, 0 percent had existed between seven and eleven months, 33 percent had existed between one and two years, 6 percent had existed between three and five years, 11 percent had existed between six and ten years and 44 percent had existed for greater than ten years.

*Legal Status of Encampments*

• In 2011, 67 percent of relevant news stories contained data regarding the legal status of reported homeless encampments. Of the 2011 national reports of homeless encampments with relevant data, 4 percent were reported to be legal, 22 percent were reported to be semi-legal (tacitly sanctioned), and 74 percent were reported to be illegal.

*State-Level Trends*

• While there are reports of homeless encampments for most states in 2011 the most occurred in California (29 percent), Vermont (29 percent), and Michigan (10 percent). Please see Table 3 for a state-by-state breakdown of the number of homeless encampments from 2007 to 2017.





Profile of 2010 Homeless Encampments

*Residents of Encampments*

- In 2010, 43 percent of relevant news stories contained data regarding the number of residents within reported homeless encampments. Of the 2010 national reports of homeless encampments with relevant data, 9 percent have fewer than five residents, 16 percent have between 5 and 10 residents, 22 percent have between 11 and 20 residents, 25 percent have been 21 and 50 residents, 3 percent have between 51 and 75 residents, 6 percent have between 76 and 100 residents and 19 percent have greater than 100 residents.

*Average Time in Existence of Encampments*

- In 2010, 22 percent of relevant news stories contained data regarding the amount of time reported homeless encampments have been in existence. Of the 2010 national reports of homeless encampments with relevant data, 0 percent had existed for less than one month, 6 percent had existed between one and six

months, 19 percent had existed between seven and eleven months, 13 percent had existed between one and two years, 25 percent had existed between three and five years, 6 percent had existed between six and ten years and 31 percent had existed for greater than ten years.

*Legal Status of Encampments*

- In 2010, 88 percent of relevant news stories contained data regarding the legal status of reported homeless encampments. Of the 2010 national reports of homeless encampments with relevant data, 6 percent were reported to be legal, 38 percent were reported to be semi-legal (tacitly sanctioned), and 56 percent were reported to be illegal.

*State-Level Trends*

- While there are reports of homeless encampments for most states in 2010, the most occurred in California (32 percent), Iowa (9 percent), and Kentucky (8 percent). Please see Table 3 for a state-by-state breakdown of the number of homeless encampments from 2007 to 2017.





Profile of 2009 Homeless Encampments

*Residents of Encampments*

- In 2009, 42 percent of relevant news stories contained data regarding the number of residents within reported homeless encampments. Of the 2009 national reports of homeless encampments with relevant data, 9 percent have fewer than five residents, 39 percent have between 5 and 10 residents, 13 percent have between 11 and 20 residents, 13 percent have been 21 and 50 residents, 4 percent have between 51 and 75 residents, 0 percent have between 76 and 100 residents and 22 percent have greater than 100 residents.

*Average Time in Existence of Encampments*

- In 2009, 20 percent of relevant news stories contained data regarding the amount of time reported homeless encampments have been in existence. Of the 2009 national reports of homeless encampments with relevant data, 27 percent had existed for less than one month, 18 percent had existed between one and six months, 9 percent had existed between seven and eleven months, 9 percent had existed between one and two years, 18 percent had existed between three and five years, 9 percent had existed between six and ten years and 9 percent had existed for greater than ten years.

*Legal Status of Encampments*

- In 2009, 65 percent of relevant news stories contained data regarding the legal status of reported homeless encampments. Of the 2009 national reports of homeless encampments with relevant data, 5 percent were reported to be legal, 28 percent were reported to be semi-legal (tacitly sanctioned), and 67 percent were reported to be illegal.

*State-Level Trends*

- While there are reports of homeless encampments for most states in 2009, the most occurred in California (29 percent), Michigan (15 percent), and Iowa (13 percent). Please see Table 3 for a state-by-state breakdown of the number of homeless encampments from 2007 to 2017.





Profile of 2008 Homeless Encampments

*Residents of Encampments*

- In 2008, 53 percent of relevant news stories contained data regarding the number of residents within reported homeless encampments. Of the 2008 national reports of homeless encampments with relevant data, 5 percent have fewer than five residents, 5 percent have between 5 and 10 residents, 15 percent have between 11 and 20 residents, 10 percent have been 21 and 50 residents, 10 percent have between 51 and 75 residents, 0 percent have between 76 and 100 residents and 55 percent have greater than 100 residents.

*Average Time in Existence of Encampments*

- In 2008, 16 percent of relevant news stories contained data regarding the amount of time reported homeless encampments have been in existence. Of the 2008 national reports of homeless encampments with relevant data, 17 percent had existed for less than one month, 66 percent had existed between one and six months, 0 percent had existed between seven and

eleven months, 17 percent had existed between one and two years, 0 percent had existed between three and five years, 0 percent had existed between six and ten years and 0 percent had existed for greater than ten years.

*Legal Status of Encampments*

- In 2008, 79 percent of relevant news stories contained data regarding the legal status of reported homeless encampments. Of the 2008 national reports of homeless encampments with relevant data, 0 percent were reported to be legal, 33 percent were reported to be semi-legal (tacitly sanctioned), and 67 percent were reported to be illegal.

*State-Level Trends*

- While there are reports of homeless encampments for most states in 2008, the most occurred in Louisiana (42 percent), California (18 percent), and Michigan (11 percent). Please see Table 3 for a state-by-state breakdown of the number of homeless encampments from 2007 to 2017.





# Appendix II: Information Collected for 187 City Policy Survey

*With respect to ordinances and policies of each city:*

- Whether an ordinance specifically prohibits or allows encampments. This category records ordinances specifically addressing encampments, which includes ordinances specifically using the term "encampment" and also ordinances broadly using other terms like camps or urban camping or outdoor dwelling or tent living in public places that have been used in connection with homeless encampments or have language specifically directed at homeless camps, or other descriptions that make it clear it was intended to address encampment)

- Whether a consent decree or settlement of litigation addressing prohibiting or allowing encampments applies to the municipality

- Whether published procedures of the city's police department prohibit or allow encampments

- Whether published procedures of other city departments or agencies (other than police) prohibit or allow encampments

- Whether other ordinances address camps and camping in public parks. This category recorded ordinances that do not specifically address encampments but do generally address camping limitations in public parks

- Whether there are other ordinances noted that did not specifically address encampment. This category records information on other ordinances we found that do not specially address encampments but could be relevant to actions taken in regard to them, such as those addressing prohibited uses of public rights of way, camping in public places, nuisances, public peace and building security).

- Whether a municipal policy with respect to encampments was verbally described or provided. This includes recorded statements provided verbally to our research team and statements made by officials as recorded in press reports)

- Whether there are news articles that describe policies or actions with taken regard to encampments

*With respect to notice of sweeps of encampments:*

- Whether an ordinance or formal policy requires sweep notice, and if so, how long a period of notice is required

- Whether sweep notice was provided in identified instances even if we did not find any formal policy requiring such notice, and if so how long a period of notice was provided

*With respect to requirements connected to sweeps of encampments:*

- Whether alternative housing is required, and if so how long

- What alternative housing (or access to beds) is provided

- Whether sweep storage is required and if so, how long was storage required and how much storage was required

- Whether the city has an applicable sweep emergency clause

*With respect to any legalized encampments:*

- Whether legalized encampments are permanent or temporary, and if temporary, how long

- Any size limit on legalized encampments

- The governance of any legalized encampments

- The residences of legalized encampments

- The financial responsibility for legalized encampments

- The provision of sanitation needs of temporary encampments

- Other relevant notes

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

# Appendix III: Regional City Chart

| Surveyed Cities by Geographic Region | | | |
|---|---|---|---|
| **Northeast (25 Cities)** | **Midwest (37 Cities)** | **South (69 Cities)** | **West (56 Cities)** |
| Hartford, CT | Chicago, IL | Mobile, AL | Anchorage, AK |
| New Haven, CT | Evanston, IL | Montgomery, AL | Fairbanks, AK |
| Norwalk, CT | Woodstock, IL | Fayetteville, AR | Juneau, AK |
| Stamford, CT | Bloomington, IN | Little Rock, AR | Glendale, AZ |
| Augusta, ME | Indianapolis, IN | North Little Rock, AR | Mesa, AZ |
| Bangor, ME | Jeffersonville, IN | Dover, DE | Phoenix, AZ |
| Portland, ME | South Bend, IN | Wilmington, DE | Scottsdale, AZ |
| Boston, MA | Bettendorf, IA | Washington, DC | Tempe, AZ |
| Fall River, MA | Cedar Rapids, IA | Bradenton, FL | Tucson, AZ |
| Worcester, MA | Davenport, IA | Clearwater, FL | Bakersfield, CA |
| Concord, NH | Des Moines, IA | Daytona Beach, FL | Berkeley, CA |
| Manchester, NH | Waterloo, IA | Fort Lauderdale, FL | El Cajon, CA |
| Atlantic City, NJ | Lawrence, KS | Fort Myers, FL | Fresno, CA |
| Newark, NJ | Topeka, KS | Gainesville, FL | Long Beach, CA |
| Trenton, NJ | Wichita, KS | Hallandale Beach, FL | Los Angeles, CA |
| Buffalo, NY | Detroit, MI | Jacksonville, FL | Modesto, CA |
| New York, NY | Kalamazoo, MI | Key West, FL | Oakland, CA |
| Rochester, NY | Pontiac, MI | Lake Worth, FL | Redondo Beach, CA |
| Allentown, PA | Kansas City, MO | Miami, FL | Sacramento, CA |
| Philadelphia, PA | St. Louis, MO | Naples, FL | San Bruno, CA |
| Pittsburgh, PA | Minneapolis, MN | Orlando, FL | San Diego, CA |
| Newport, RI | St. Paul, MN | Palm Bay, FL | San Francisco, CA |
| Providence, RI | Lincoln, NE | Sarasota, FL | San Jose, CA |
| Burlington, VT | Omaha, NE | St. Augustine, FL | San Luis Obispo, CA |
| Montpelier, VT | Fargo, ND | Tampa, FL | Santa Barbara, CA |
| | Grand Forks, ND | Albany, GA | Santa Cruz, CA |
| | Cincinnati, OH | Athens, GA | South Lake Tahoe, CA |
| | Cleveland, OH | Atlanta, GA | Tracy, CA |
| | Columbus, OH | Augusta, GA | Ukiah, CA |
| | Dayton, OH | Brunswick, GA | Union City, CA |
| | Toledo, OH | Columbus, GA | Boulder, CO |
| | Pierre, SD | Savannah, GA | Colorado Springs, CO |
| | Rapid City, SD | Statesboro, GA | Denver, CO |
| | Sioux Falls, SD | Stone Mountain, GA | Lakewood, CO |
| | Eau Claire, WI | Washington, GA | Honolulu, HI |
| | Madison, WI | Covington, KY | Maui County, HI |
| | Milwaukee, WI | Lexington, KY | Boise, ID |
| | | Louisville, KY | Idaho Falls, ID |
| | | Baton Rouge, LA | Pocatello, ID |
| | | Lafayette, LA | Billings, MT |
| | | New Orleans, LA | Las Vegas, NV |
| | | Shreveport, LA | North Las Vegas, NV |
| | | Baltimore, MD | Pahrump, NV |
| | | Elkton, MD | Reno, NV |
| | | Frederick, MD | Albuquerque, NM |
| | | Biloxi, MS | Santa Fe, NM |
| | | Asheville, NC | Beaverton, OR |
| | | Charlotte, NC | Corvallis, OR |
| | | Raleigh, NC | Eugene, OR |
| | | Oklahoma City, OK | Portland, OR |
| | | Tulsa, OK | Salt Lake City, UT |
| | | Charleston, SC | Olympia, WA |
| | | Columbia, SC | Seattle, WA |
| | | Memphis, TN | Spokane, WA |
| | | Nashville, TN | Woodinville, WA |
| | | Amarillo, TX | Cheyenne, WY |
| | | Austin, TX | |
| | | Corpus Christi, TX | |
| | | Dallas, TX | |
| | | El Paso, TX | |
| | | Fort Worth, TX | |
| | | Houston, TX | |
| | | San Antonio, TX | |
| | | Norfolk, VA | |
| | | Richmond, VA | |
| | | Roanoke, VA | |
| | | Suffolk, VA | |
| | | Virginia Beach, VA | |
| | | Charleston, WV | |

Appendices

## Appendix IV. Charleston, SC 10 Point Plan



JOHN J. TECKLENBURG
MAYOR

*City of Charleston*
*South Carolina*

OFFICE OF
COMMUNICATIONS

*For Release: February 4, 2016*

### CITY AND PARTNERS ANNOUNCE 10-POINT PLAN FOR "TENT CITY"

*Charleston, S.C.*—At a background briefing today, the City of Charleston -- along with partners including the Lowcountry Homeless Coalition, One80 Place and others -- laid out its roadmap for helping the citizens living in the area that has become known as "Tent City." The encampment has emerged on the northern peninsula of Charleston over the last year and the City is working with partners to assist homeless individuals in finding necessary supportive services, including shelter and permanent housing.

"This plan is a roadmap to get us started," City of Charleston Mayor John Tecklenburg said. "I am grateful for the assistance One80 Place and the Homeless Coalition have provided in creating this way forward. Not only will those without shelter have the resources they need to begin re-ordering their lives, but we are doing this in a way that will return the area to normalcy within the next 30-60 days. We are a caring city, and we are approaching this situation with attention and respect for everyone involved."

The Lowcountry Homeless Coalition's executive director Anthony Haro added, "This has clearly become an unsustainable situation. We look forward to working with the city, the county and others to find permanent homes and long-term housing solutions for these individuals as well as others in our community who are experiencing homelessness."

The ten-point roadmap includes the following steps, according to City of Charleston Housing and Community Development Director Geona Shaw Johnson:

- Beginning Friday, February 5th, the property's principal owner, the South Carolina Department of Transportation will begin to clean up the site, removing trash and debris that has accumulated near the main encampment.
- On Monday and Tuesday, February 8th – 9th, the area around Lee and Meeting streets, including the large white tent, will be cleared. Those currently living in that location will be offered immediate shelter by One80 Place.

50 BROAD STREET • CHARLESTON, S.C. 29401 • TELEPHONE (843) 724-3746• FAX (843) 724-3734

- In the same timeframe, the areas on the East side of Meeting St. will also be cleared, with shelter again offered by One80 Place.
- The City will partner with SCDOT to establish clear legal jurisdiction over the area through a new lease agreement, which will be presented to Charleston City Council.
- Collaborate directly with churches and other charitable organizations to coordinate any further distribution of donated items and to keep the encampment clean.
- Support the work of the Lowcountry Homeless Coalition and other non-profit and faith-based organizations to provide information and housing-assistance services to homeless individuals, including the development of individualized housing plans.
- Continue current efforts with county officials and nonprofit partners to identify additional shelter space to house those who have been living in the encampment until more permanent housing options are available.
- Work with area residents, local elected officials and neighborhood association leaders to ensure that the needs of neighborhood residents are protected throughout the process.
- Establish a city-affiliated website, which will allow private citizens to get involved by making donations and volunteering their time. The associated fund will be opened with $50,000 -- $35,000 from the City of Charleston and $15,000 from the 2016 Charleston Inaugural Committee.
- Appointment of a citizens "blue ribbon" commission to begin bringing people together around long-term solutions to the problem of homelessness in our community, so that this situation does not repeat itself in the future.

"No plan is perfect," said Johnson, "and we understand there are going to be challenges. However, we believe that this strategy will allow us to resolve this situation humanely, and in a way that benefits the city, the neighborhood residents and those currently living in Tent City."

###

**MEDIA CONTACT:**          Jack O'Toole, Director of Communications
                            Media Relations/Public Information
                            (843) 518-3228
                            otoolej@charleston-sc.gov

**Appendices**

# Appendix V. Indianapolis Ordinance No. 2, 2016

CITY-COUNTY GENERAL ORDINANCE NO. 2, 2016
Proposal No. 12, 2016

PROPOSAL FOR A GENERAL ORDINANCE amending the Revised Code to add certain protections for the homeless.

WHEREAS, on January 28, 2015, outreach workers counted 1,666 persons in Marion County who were homeless; and

WHEREAS, based on national research, the number of persons who experience homelessness at some point during the year is three to five times the number counted during a point-in-time count such as the January 28, 2015 count; and

WHEREAS, the estimated number of persons in Marion County who experience homelessness during the course of a year ranges from 5,000 (point-in-time results x 3) and 8,330 (point-in-time results x 5); and

WHEREAS, Marion County has a shortage of shelters that can accommodate individuals and families, victims of domestic violence, and unmarried couples, and the County therefore provides limited help to those experiencing homelessness; and

WHEREAS, there is a shortage of transitional housing as well as permanent housing for those experiencing homelessness; and

WHEREAS, there is also a shortage of emergency shelter space operated by secular entities for individuals and families; and

WHEREAS, the persons experiencing homelessness should be entitled to protection from arbitrary and capricious treatment by local government; now, therefore:

BE IT ORDAINED BY THE CITY-COUNTY COUNCIL OF THE
CITY OF INDIANAPOLIS AND OF MARION COUNTY, INDIANA:

SECTION 1.  Title I, Chapter 231 of the "Revised Code of the Consolidated City and County," is hereby amended by adding a new Article V, to read as follows:

## ARTICLE V.  PROTECTIONS FOR THE HOMELESS

### Sec. 231-501.  Purpose and intent.

No person should suffer unnecessarily or be subject to unfair discrimination or arbitrary treatment based on his or her homeless status.  It is the intent of this article to lessen the adverse effects and conditions caused by the lack of a home or residence.

### Sec. 231-502.  Definitions.

For purposes of this Article:

(a)  the term "emergency" means situations when a failure to act immediately could lead to serious harm to public health or safety.

(b)  the term "homeless" has the definition set forth at 24 CFR Sections 91.5, 582.5, and 583.5;

(c)  the term "camp" means a place on public property with temporary accommodations of tents or other structures in which homeless persons have been living.

### Sec. 231- 503.  Protections in the event of displacement.

(a)  If a homeless person is to be displaced from a camp, the city, through the department of public works, must maintain and catalogue their personal items, including but not limited to, clothing, blankets, identification documents, birth certificates, and other personal documents and effects, in a safe and secure place for a minimum of 60 days.  After 60 days, if the city has made reasonable efforts to notify the displaced person, the city may securely dispose of any unclaimed personal items.  For purposes of this subsection, the

GENERAL ORDINANCE RECORD 2016

G.O. No. 2, 2016
Page 2

obligations to maintain and catalogue personal items shall be limited to those items that may fit entirely within one 96-gallon container per displaced person.

(b) For purposes of subsections (b) through (d) of this section, the term "city" refers to the department of public safety. Before the city may displace a homeless person from a camp, the city must give at least fifteen (15) days' notice to the homeless persons living in the camp, to the Reuben Engagement Center, and to the Indianapolis Continuum of Care or similar organizations designated by the city; provided, however, that if the city makes a written determination that an emergency exists, the city may give whatever notice is reasonable under the circumstances.

(c) Upon receiving the notice described in subsection (b), the Indianapolis Continuum of Care or similar organization designated by the city will coordinate the efforts of all participating service providers, faith-based organizations, street ministries, the Reuben Engagement Center, and volunteers to ensure that the homeless persons to be displaced are provided available transitional housing or permanent housing, and comprehensive wrap-around services for which they are eligible, unless the homeless person refuses the assistance. The transitional or permanent housing must be safe, reasonably clean and maintained, and approved by the city.

(d) If there is insufficient available housing and services as described in subsection (c) to meet the needs of all displaced homeless persons in a camp scheduled to be closed by the city, the city must wait until there is sufficient available housing and services before it can close the camp, and in the interim the city will give priority to long-term residents of the camp; provided, however, that if the city makes a written determination that an emergency exists, the city does not need to wait until there is sufficient available housing and services before it can close the camp.

SECTION 2. This ordinance shall be in effect from and after its passage by the Council and compliance with IC 36-3-4-14.

The foregoing was passed by the City-County Council this 8th day of February, 2016, at 8:30 p.m.

ATTEST:

_____
Maggie A. Lewis
President, City-County Council

_____
NaTrina DeBow
Clerk, City-County Council

Presented by me to the Mayor this 11th day of February, 2016.

_____
NaTrina DeBow
Clerk, City-County Council

Approved and signed by me this _____ day of February, 2016.

_____
Joseph H. Hogsett, Mayor

GENERAL ORDINANCE RECORD 2016

# Appendix VI. Charleston, WV Encampment Ordinance

## CITY OF CHARLESTON HOMELESS ENCAMPMENT AND TRANSIENT OUTDOOR TEMPORARY LIVING POLICY

### 1.     Purpose and intent.

It is a goal of the City of Charleston that all of its residents have permanent housing. Any resident who is homeless is encouraged to take advantage of the free assistance and available services offered within the City, provided by the Kanawha Valley Collective (a collective of non-profit homeless and related service providers funded, in part, by City, hereinafter "KVC"), including, but not limited to, shelter, wrap-around services, and permanent housing. Based on a review of current federal and assistance provider publications on homeless encampments and discussions with the primary organizations in Charleston that provide services for the homeless, living outdoors in a homeless encampment or a transient outdoor living situation is disfavored by a majority of homeless advocates and service providers, is inconsistent with the City's goal, and is discouraged.

Notwithstanding, it is the intent of this policy to lessen the adverse conditions affecting homeless individuals while also recognizing the interests of businesses, private property owners and all residents and visitors to the City of Charleston.

### 2.     Definitions.  For the purposes of this policy only, the following terms are defined as follows:

(a)     "Homeless" means: An individual or family with a primary residence that is: a public or private place not designed for or ordinarily used as a regular living or sleeping accommodation for human beings; or an emergency shelter.

(b)     "Encampment" means: homeless individuals or families residing out of doors on a common site for 30 days or more, which may or may not include common areas designed to provide food, living and sanitary services to occupants of the encampment.

(c)     "Transient outdoor temporary living" means: a homeless person(s) residing out of doors on public property in a fixed location for seven or more days and less than 30 days.

(d)     "Sorting Exercise" means: a separation of things of personal, legal, or material value from things without such value.

### 3.     Procedure when closing an encampment.

(a) Before the City closes an encampment located on public property, the City will provide at least 14 days' written notice of its intent to close the encampment site in a manner reasonably intended to inform individuals residing at the encampment site. At a minimum, City will post the notice at places of ingress and egress to the encampment and at any existing common areas of the encampment, and will provide notice to individuals present at the encampment during the posting. The notice will state the designated closing date on which all remaining structures and personal

1

property will be removed from the real property and indicate that no person will be permitted to remain on the property beyond the designated closing date.

(b) Within forty-eight (48) hours of the notice provided pursuant to subsection 3(a) herein, the City will provide a copy of the notice to designated representatives of the KVC and Mountain State Justice.

(c) On the designated closing date of the encampment, and at the time designated for closing but prior to taking any action in furtherance thereof, the City will provide or facilitate the following:

1. Outreach workers from KVC or its affiliated entities will be available on site to provide and assist with temporary shelter, housing, wrap-around services, and/or other emergency services;
2. Upon consultation with KVC and/or its affiliated entities, City will provide transportation from the site to location(s) in the City providing temporary shelter, housing and/or other emergency services;
2. All homeless individuals still present at the encampment at the designated closing date and time will be given at least 60 minutes to remove their personal property and/or structures from the site;
3. For all remaining personal property and structures, City will conduct a sorting exercise on site. Representatives from KVC or their affiliated entities and representatives from Mountain State Justice will be notified of the sorting exercise and will be invited to participate in the sorting exercise;
4. The City will store or facilitate the storage of any personal items not discarded in the sorting exercise at a location accessible by public transportation and accessible to those with disabilities for a minimum of 14 days. City will coordinate with the KVC and its affiliated entities on a case-by-case basis to determine the best available location for storage;
5. The City will document by photograph the personal items to be stored and will organize the personal items in a manner reasonably designed to facilitate identification and retrieval of the personal items by owner(s);
6. The City will post notice for at least 14 days at the location of the encampment identifying the location of stored personal property and providing instructions for reclaiming stored personal property;
7. After a minimum of 14 days following posting of the notice set forth in 3(c)(6) herein, the City may dispose of any unclaimed personal items.

(d) Upon receiving the notice described in subsection 3(a) herein, the KVC and its affiliates (Covenant House, Prestera, Roark-Sullivan Lifeway Center, Sojourners), any similar organizations designated by the City, and Mountain State Justice will coordinate the efforts of all interested service providers, faith-based organizations, street ministries, and volunteers to ensure that the homeless persons from the encampment are offered shelter or permanent housing, and comprehensive wrap-around services for which they are eligible.

(e) To the extent that any homeless person from the encampment requests shelter and shelter is not available, that person for whom shelter is unavailable may be allowed to remain on the site of the

2

Case 8:18-cv-00155-DOC-JDE   Document 85-1   Filed 02/12/18   Page 112 of 124   Page ID #:1572

encampment, if on public property, beyond the date and time of closure until shelter or other reasonable solution is determined.

(f) If an owner of private property knowingly permits an encampment to exist on their property and requests the City's assistance in removing said encampment, the City will contact homeless services providers, including outreach workers, at least 24 hours prior to taking action to remove the encampment from the private property. City will require confirmation that the encampment has received a minimum of 24-hour notice of the closing, and that individuals in the encampment have been offered shelter or other emergency services.

## 4.    Procedure for transient outdoor living situations.

(a)  When the City is made aware of a transient outdoor living situation, it will contact and request assistance from outreach worker(s), and may make contact with the individual(s) to notify them that an outreach worker will be contacting them and that under City policy they have forty-eight (48) hours to remove any personal items and vacate the site.  Upon notice from City, the outreach worker(s) will make contact with the individual(s) in the transient outdoor living situation to offer services and inform them that under City policy, they have a maximum of forty-eight (48) hours to remove any personal items and vacate the site.  The outreach worker(s) will advise the City when contact is made and services are offered, and will coordinate with City until the individual(s) relocate to a location to receive shelter and/or services with assistance from the outreach worker(s) or vacate the property.

(b) After the expiration of at least forty-eight (48) hours after confirmation that persons in a transient living situation have been advised of City policy and services have been offered, the City may require that individuals leave the site, and may remove and discard any personal items that remain at the site.

## 5.    Exigent Circumstances; Public Safety

Notwithstanding the notice, time periods and other procedures set forth in this policy, City may take any and all actions at any time to enforce state and local laws in circumstances that pose an imminent threat to the health, safety or welfare of any individual or the public.

3

# Appendix VII. Draft Seattle Ordinance Protecting the Rights and Property of Homeless Individuals

CITY OF SEATTLE

AN ORDINANCE to Protect Public Health and Safety, and REDUCE THE HARMS EXPERIENCED BY UNSHELTERED RESIDENTS _____

COUNCIL BILL _____

**AN ORDINANCE relating to city responses to people who are homeless living on public property, and setting standards and procedures for remedying unsafe conditions and protecting the rights and property of homeless individuals.**

WHEREAS, the Mayor and the City Council convened the Housing Affordability and Living Agenda ("HALA") Task Force and charged it with creating a plan to generate 50,000 units of housing over the next decade, which the Task Force did;

WHEREAS, pending the implementation of the HALA plan, the City lacks affordable permanent and/or transitional housing to meet the needs of those experiencing homelessness in the City;

WHEREAS, this lack of housing has resulted in a public health crisis and exacerbated the harms experienced by unsheltered residents in the City;

WHEREAS, the January 29, 2016, One Night Count found 2,942 individuals sleeping unsheltered in Seattle, an increase of 4.6 percent from the previous year and part of a 67 percent increase in homelessness in Seattle since 2011;

WHEREAS, in 2013, the City›s Human Services Department found disproportionality of homelessness among people of color and other groups such as veterans and LGBTQ individuals;

WHEREAS, in response to the increase in the number of people experiencing homelessness, the Mayor declared a Civil Emergency on Homelessness in November 2015 that called for federal and state assistance, as well as innovative and proactive strategies to assist those in need;

WHEREAS, the City's lack of sufficient and appropriate beds to accommodate the needs of all people experiencing homelessness has led to unauthorized outdoor living spaces in the City;

WHEREAS, the City is committed to protecting the civil rights as well as the public health and safety of all people, including those experiencing homelessness;

WHEREAS, no person should suffer or be subject to unfair discrimination or arbitrary treatment based on housing status;

WHEREAS, the long-term solution for homelessness is a "housing first" approach that provides sufficient adequate and accessible permanent housing for people who are homeless;

WHEREAS, finding permanent and sustainable housing for homeless individuals is a priority for the City, as is avoiding additional harm to those who are living unsheltered;

WHEREAS, overnight shelters will continue to remain critical and life-saving services, particularly during times of individual crisis or severe weather;

WHEREAS, removing outdoor living spaces or impounding vehicles being used as residences when there is not sufficient adequate and accessible alternative housing exacerbates the hazards facing unsheltered individuals;

WHEREAS, the condition and/or location of outdoor living spaces or vehicles used as residences can raise public health and/or safety concerns to which the City must respond; and

WHEREAS, it is the intent of this body to provide clear procedures to ensure that the City can respond appropriately and adequately to such concerns, as well as to emergency situations, without subjecting unsheltered individuals to greater hardships;

NOW, THEREFORE, BE IT ORDAINED BY THE CITY OF SEATTLE AS FOLLOWS:

### Section I. Definitions.

The following definitions apply through this ordinance:

A.  "Adequate and accessible housing" for purposes of this ordinance and as used throughout means, at a minimum, indoor living space: (1) where a person has the right to reside and keep his or her belongings on an ongoing, long-term basis at any time of day or night; (2) that meets living standards commonly acceptable to society, and includes safety from other individuals, the elements, and exposure to disease or filth, room to move about, storage space for belongings, the ability to maintain current household composition, accommodation for physical or mental limitations, and access to hygiene facilities; and (3) that is actually accessible to the individual who is or will be living in that space, including that the individual must not be barred as a result of criminal background, treatment status, ability to show identification, household composition, physical or mental limitations, or otherwise.

B.  "City" means the City of Seattle and any of its contractors, agents, employees or partners.

C.  "Outdoor living space" means any outdoor public space that homeless individual(s) use to live or sleep in, as evidenced by the presence of a sleeping bag, shelter, tarp, tent, bed, cardboard, metal sheeting, furniture, or other objects demonstrating an intent to live in the location for one or more days, whether or not continuously.

D.  "Hazardous condition" means a condition that creates an imminent and likely public health or safety harm. The public health or safety harm must be created by the presence of a particular condition and not a generalized harm common to all who are unsheltered.

E.  "Household" means a group of individuals who wish to live together because they are relatives, are in a family relationship, or for other reasons. A household may include pets.

F.  "Personal property" means any item which an individual owns and which might have value or use to that individual, regardless of whether the item is left unattended for temporary periods of time or whether it has monetary value. Personal property includes vehicles. This does not include items which pose an obvious health or safety risk, or are clearly contaminated in way which a reasonable person would conclude the items should not be stored with other property.

G.  "Public space" means any area which is owned, leased, maintained, controlled, or managed by a government or public entity.

H.  "Removal" means action to remove people, camps, structures or personal property located at outdoor living spaces.

I.  "Impoundment" means any action by the city to remove or tow a vehicle used as a residence without the express approval of the vehicle's owner.

J.  "Unsafe location" means a location that poses imminent danger of harm to individuals residing in that location or to the general public. The danger of harm must be created by the presence of the specific outdoor living space or vehicle used as a residence at the particular location and not generalized danger of harm common to all who are unsheltered.

K.  "Unsuitable location" means a location that has a specific public use that is substantially impeded as a result of an outdoor living space or vehicle used as a residence in that location, and where the public lacks alternative means to accomplish the specific public use.

### Section II. Community Response Line.

A.  For the benefit of all City residents, the City has an interest in preventing the build-up of garbage, human waste, and other refuse at outdoor living spaces and other public spaces. The City Customer Service Bureau shall serve as the coordinating

**Appendices**

entity for requests for clean-up and/or basic services.

B.   The City shall investigate requests for clean-up including a site visit if more than three (3) separate requests are made.

C.   The City shall provide basic garbage, sanitation, and harm reduction services upon request at outdoor living spaces containing more than five (5) individuals

**Section III. Removal or Impoundment.**

The City may respond appropriately to emergency situations such as fires, crimes, or medical crises as it normally would outside outdoor living spaces. However, except as specified in Section IV,the City may undertake a removal or impoundment action only when the City has satisfied the following conditions:

A.   Adequate and accessible housing is available beginning at least 30 days before the time of removal or impoundment, to all individuals whose persons, personal possessions and/or vehicles are being removed or impounded.

B.   The affected individuals have been engaged with sufficient outreach over a period of not less than 30 days, to allow those interested to move voluntarily to adequate and accessible housing. Sufficient outreach involves, at a minimum: (1) making an individual assessment of each affected individual, which includes, but is not limited to, considerations of household composition; disability; mental illness or other mental or emotional capacity limitations; substance use or treatment status; geographic needs, such as proximately to personal support, healthcare, employment and other geographic considerations; and ongoing support needs; (2) identifying and offering adequate and accessible housing based on this individual assessment; and (3) if an offer is accepted, providing assistance with both the administrative and logistical aspects of moving into the identified adequate and accessible housing.

C.   The City has provided written notice meeting the following requirements:

1.   Notice must include the following information:

a.   The specific date and time the removal or impound will take place, which must not be fewer than thirty (30) days from notice date;

b.   Explanation of the actions that will be taken during the removal or impoundment and how loss of personal property can be avoided;

c.   Information about where personal property will be safeguarded if seized during the removal or impoundment and how it can be retrieved after removal or impoundment;

d.   Contact information for the outreach organizations that will work with that site as specified in subsection (2) above; and

e.   A statement that adequate and accessible housing is available for all affected individuals.

2.   Notice must be provided in languages likely to be spoken by impacted individuals, and through methods capable of being understood by persons with physical and mental disabilities.

3.   Notice must be posted in a conspicuous location at the relevant outdoor living space or on the relevant vehicle, as well as affixed to all tents and structures used for shelter at that location.

D.   During a removal or impoundment, the City will safeguard all personal property free of charge according to the following requirements:

1.   For individuals present at the time of the removal or impoundment who have accepted the offer of an adequate and accessible housing but do not have the ability to transport their personal property, the City shall transport all personal property to the location of the accepted housing the day of the removal or impoundment.

2.   For individuals absent at the time of the removal or impoundment, the City must document that those individuals had actual notice of the removal or impoundment.

3.   For individuals absent at the time of removal or impoundment, or present but who did not accept the offer of adequate

and accessible housing and do not have the ability to transport their personal property, the City will safeguard all personal property as follows:

a.   Personal property must be photographed and catalogued by location and with identifying details of the personal property prior to being put into storage. Such information must be searchable by computer and by calling a City agent.

b.   The location of the storage facility must be accessible by public transportation and accessible to those with disabilities.

c.   Its operating hours must extend beyond normal business hours to accommodate those who work or have other obligations during midweek during normal business hours.

d.   Photo identification shall not be required as a condition of retrieval;

e.   The City must post notice for 90 days at the location of the removal or impoundment with the location of the seized personal property and instructions for reclaiming such personal property.

f.   Within 24 hours of the removal, a City agent or employee must return to the site and seek to inform individuals of how to retrieve their items.

g.   After 90 days, the City may dispose of any unclaimed personal items provided all the above requirements have been met.

**Section IV. Hazards and Unsafe or Unsuitable Conditions.**

A.   If an outdoor living space or a vehicle used as a residence is in an unsafe or unsuitable location, or creates or contains a hazardous condition, the City may undertake a removal or impoundment action if conducted in accordance with the procedures set forth in this Section.

B.   Prior to conducting removal or impoundment actions based on unsafe or unsuitable locations, the City must do the following:

1.   The City must inform all individuals staying at such location the reasons that it is unsafe or unsuitable at least 48 hours prior to any removal or impoundment.

2.   If an outdoor living space covers both safe or suitable and unsafe or unsuitable locations, the City may only undertake removal or impoundment actions that are in the unsafe or unsuitable location.

3.   The City must identify and make available a nearby, alternative location to camp or park that is not unsafe or unsuitable to all affected individuals.

4.   The City must conduct sufficient individualized outreach.

C.   Prior to conducting removal or impoundment actions based on hazardous conditions, the City must do the following:

1.   The City must provide access to basic garbage, sanitation, and harm reduction services as dictated by the nature of the hazardous condition, for at least 72 hours.

2.   The City must make reasonable efforts to identify the likely source of the hazardous condition and take action against only those responsible for creating the hazardous condition.

3.   The City must provide a meaningful opportunity to cure the hazardous condition, including: (a) an effective cure notice of the specific conditions that create the hazardous condition and information on how that condition can be remedied; and (b) provision of necessary items, such as garbage bags and bins, rodent traps, intravenous needle receptacles, and/or portable toilets, among others, that would allow the individuals to cure the hazardous condition. The City must allow individuals at least 72 hours to cure the hazardous condition before posting notice of removal or impoundment, and shall not conduct removal or impoundment if the hazardous conditions have been cured.

4.   The City must conduct direct outreach through site visits to: (a) inform all affected individuals prior to or during the cure period that the location has a hazardous condition and the actions needed to cure that condition; and (b) inform all affected

individuals whether the hazardous condition has been remedied after the cure period, and if not, why not.

D.   Prior to removal or impoundment, the City must provide written notice meeting the following requirements:

1.   Notice must include the following information:

a.   The specific date and time the removal or impound will take place;

       i.   The removal or impound may not take place fewer than 48 hours from the date of notice in the case of unsafe or unsuitable location;

       ii.   The removal or impound may not take place fewer than five (5) days from the date of notice in the case of a hazardous condition;

b.   Explanation of how the location of the outdoor living space or vehicle is unsafe and/or unsuitable, or the hazardous condition has not been remedied;

c.   Explanation of the actions that will be taken during the removal or impoundment and how loss of personal property can be avoided;

d.   Information about where personal property will be safeguarded if seized during the removal or impoundment and how it can be retrieved after removal or impoundment;

e.   Clear directions to the alternative location;

f.   Contact information for the outreach organizations that will work with that site as described in subsection (4) below; and

g.   If available, a statement that adequate and accessible housing is available for all affected individuals;

2.   Notice must be provided in languages likely to be spoken by impacted individuals, and through methods capable of being understood by persons with physical and mental disabilities.

3.   Notice must be posted in a conspicuous location at the relevant outdoor living space or on the relevant vehicle, as well as affixed to all tents and structures used for shelter at that location.

4.   Sufficient individualized outreach must involve, at a minimum, the following actions:

a.   Informing all affected individuals of the availability of the alternative location for the outdoor living space or vehicle, or offering adequate and accessible housing; and

b.   Offering assistance with both the administrative and logistical aspects of moving into the identified alternative location or adequate and accessible housing.

E.   During a removal or impoundment, the City will safeguard all personal property free of charge according to the following requirements:

1.   For individuals present at the time of the removal or impoundment who do not have the ability to transport their personal property, the City shall transport all personal property to the alternative location.

2.   For individuals who are absent at the time of the removal or impoundment or who are present but who do not wish to move to the alternative location and do not have the ability to transport their personal property, the City will safeguard all personal property as follows:

a.   Personal property must be photographed and catalogued by location and with identifying details of the personal property prior to being put into storage. Such information must be searchable by computer and by calling a City agent.

b.   The location of the storage facility must be accessible by public transportation and accessible to those with disabilities.

c.   Its operating hours must extend beyond normal business hours to accommodate those who work or have other obligations during midweek during normal business hours.

d.   Photo identification shall not be required as a condition of retrieval;

e.   The City must post notice for 90 days at the location of the removal or impoundment with the location of the seized personal property and instructions for reclaiming such personal property.

f.   Within 24 hours of the removal, a City agent or employee must return to the site and seek to inform individuals of how to retrieve their items.

g.   After 90 days, the City may dispose of any unclaimed personal items provided all the above requirements have been met.

**Section V. Collaboration With Other Entities.**

The City will only direct, engage, cooperate, or contract with any other entity to engage in any removal or impoundment action in accordance with this ordinance.

**Section VI. Implementation and Advisory Committee.**

To ensure the ordinance meets the goals of protecting the public health, public safety, and civil rights of all people, including those experiencing homelessness, the City shall establish an Implementation and Advisory Committee ("Committee").

A.   The functions and duties of the Committee shall be to:

1.   Advise the Mayor, Council, and relevant departments of concerns and issues with regard to City's removal and impoundment actions, and provide recommendations, findings, or other reports as appropriate related to such concerns and issues;

2.   Review proposed implementation plans and guidelines, and provide comments regarding the same to department staff charged with contracting outreach workers, notice, storage, etc.;

B.   The Committee shall consist of eleven (11) members. The Mayor shall appoint one member. Each Councilmember shall appoint one member and the Council collectively shall appoint one member. The members will be appointed to serve staggered three (3) year terms, but may be reappointed to subsequent terms.

1.   The Committee members should have current or recent (within the last five years) professional, personal, or research experience associated with provision of services to individuals experiencing homelessness, or with public health or public safety.

C.   The Director of the Human Services Department and the Director of the Finance and Administrative Services Department shall assign at least one staff member to support the work of the Committee. A representative of various City Departments, including but not limited to the Office for Civil Rights, Parks and Recreation Department, Seattle Police Department, Department of Transportation, and/or the City Attorney's Office, shall attend the committee meetings upon request of the Committee.

**Section VII. Penalties.**

Failure by the City or any of its partners, agents, or contractors to follow the requirements of this ordinance shall result in a penalty paid by the City to each affected individual of $250 per violation, in addition to any actual damages incurred. The Seattle Office of Civil Rights shall be charged with the oversight, investigation and enforcement of the provisions of this ordinance.

# Appendix VIII. San Francisco Draft Ordinance on Encampment Removal

[Administrative Code - Homeless Encampments]

**Ordinance amending the Administrative Code to require the City to store personal property removed from homeless encampments and provide prior notice of such removal; establishing property maintenance requirements for homeless encampments; and requiring the City to develop a relocation plan prior to requiring the relocation of occupants of a homeless encampment.**

Be it ordained by the People of the City and County of San Francisco:

Section 1. Chapter 20 of the Administrative Code is hereby amended by adding Article XVI, to read as follows:

### *ARTICLE XVI: HOMELESS ENCAMPMENTS*

*SEC. 20.16-1.   Definitions*

*SEC. 20.16-2.   Personal Property Removal and Storage*

*SEC. 20.16-3.   Property Maintenance*

*SEC. 20.16-4.   Relocation Plan*

*SEC. 20.16-5.   Administrative Implementation*

*SEC. 20.16-6.   Undertaking for the General Welfare*

### *SEC. 20.16-1.   DEFINITIONS.*

*"City" means the City and County of San Francisco and its departments.*

*"Encampment" means a site where tents, tarpaulins, or other non-permanent structures are used as temporary quarters for sleeping and shelter for a person or persons Note: we do not want protections only for encampments above 30 – because for one it is going to be much easier for the city to relocate encampments while they are small instead of waiting until it grows large. We do want bathrooms and garbage when city chooses to let it be when size is 30+*

*"Personal Property" means property that consists of readily identifiable personal effects in including, but not limited to, blankets, clothing, radios, TVs, sleeping bags, ground covers, toiletries, eye glasses, jewelry, medications, personal papers, recyclables, shoes, tarpaulins, bags, backpacks, tents, luggage or other items of significant value.*

### *SEC. 20.16-2.   PERSONAL PROPERTY REMOVAL AND STORAGE.*

*(a) The City may not remove Personal Property from public space without giving prior written notice to the occupants of the Encampment. The City shall provide such notice at least 24 hours before the Personal Property is to be removed, unless there is an immediate threat to public health.*

*(b) The notice described in subdivision (a) may be served personally upon the owner of the Personal Property, or may be posted in a conspicuous location within or near the location for at least 7 days, and shall state:*

*(1) The date by which the City will remove the Personal Property;*

*(2) That Personal Property will be stored for 120 days, except Personal Property that poses a threat to public health, including, but not limited to, weapons, open food containers, and items infested with insects or vermin; and*

*(3) The process for retrieving Personal Property.*

*(c) Upon the removal of Personal Property from an Encampment, the City shall catalogue and store the Personal Property for at*

**Appendices**

least 120 days, provided, however, that the City is not required to store Personal Property that poses a threat to public health, including, but not limited to, weapons, open food containers, and items infested with insects or vermin.

### SEC. 20.16-3.  PROPERTY MAINTENANCE.

(a) The City shall not engage in cleaning of a section of a street or sidewalk on which an Encampment is located between the hours of 10:00 p.m. and 7:00 a.m.

(b) The City shall provide the following facilities and services in every Encampment that contains more then 30 people in a 150 foot radius:

(1) At least one toilet for every 30 occupants;

Outreach and needs assessment of occupants and

(3) Waste management services including, but not limited to, collection containers for solid waste, scheduled collection and disposal of containerized waste, and collection of recyclable waste.

### SEC. 20.16-4.  RELOCATION PLAN.

(a)  Before issuing an order requiring the relocation of occupants of an Encampment, the City shall:

(1)  Engage in outreach to the occupants of the Encampment to assess their needs and to solicit input on the planned relocation;

(2)  Develop and carry out a communication plan to inform the occupants of the Encampment, residential neighbors, and local businesses about the timing of the relocation;

(3) Collaborate with the occupants of the Encampment to develop a relocation plan that identifies permanent housing into which the occupants may move. If sufficient permanent housing is not available, the relocation plan shall identify temporary shelter into which the occupants of the Encampment may move, and shall include a plan for transitioning the occupants from temporary shelter to permanent housing within a reasonable time period.

(4)  Provide 15 days written notice of the order to relocate, either by personal service upon the occupants of the Encampment or by posting such notice in a conspicuous location within or near the Encampment.

(b) The foregoing subsection (a) shall not apply if the City finds that immediate relocation is necessary due to an immediate threat to public health; provided, however, the City shall attempt to mitigate the health emergency prior to declaring a threat to public health, and give the occupants whatever notice is reasonable under the circumstances before the relocation occurs. In the event personal property is removed or encampments are relocated because of immediate ghreat to public health the deaprtment shall notify the Board of Supervisors within 5 business days.

### SEC 20.16-5. ADMINISTRATIVE IMPLEMENTATION.

(a) The Department of Public Works shall be responsible for implementing Sec.20.16-2 of this Article XVI.

(b) The Department of Public Works may issue rules, regulations, and/or guidelines, consistent with the objectives and requirements of Sec.20.16-3 of this Article XVI.

(c) Consistent with Charter requirements, the Department of Homelessness and Supportive Housing may enter into contracts or other agreements with other City departments, public agencies, and private entities, including not-for-profit organizations, to administer Sec. 20.16-4 of this Article XVI.

(d) Within twelve months of the effective date of this Article XVI, and every twelve months thereafter, the [Department] shall submit to the Board of Supervisors a report that summarizes:

(1) Occasions of personal property removal and storage

(2) Number and location of encampments for which garbage and toilets were provided

(3)      Number of people relocated and outcome of that relocation, including numbers placed in

*temporary shelter, permanent housing,and other pertinint information.*

*(4)      Information on any determinations of public health threat, reason for determination and documentation of threat, length of time threat remained in public space and remediation efforts, such as pest control, garbage service or other steps taken to address public health threat.*

*(e)  All City officers and entities shall cooperate with the [Department] in the implementation and administration of this Chapter 106.*

### SEC. 26.16-6. UNDERTAKING FOR THE GENERAL WELFARE.

*In enacting and implementing this Article XVI, the City is assuming an undertaking only to promote the general welfare. It is not assuming, nor is it imposing on its officers and employees, an obligation for breach of which it is liable in money damages to any person who claims that such breach proximately caused injury.*

Section ___. Effective Date. This ordinance shall become effective 30 days after enactment. Enactment occurs when the Mayor signs the ordinance, the Mayor returns the ordinance unsigned or does not sign the ordinance within ten days of receiving it, or the Board of Supervisors overrides the Mayor's veto of the ordinance. [If the operative date of the ordinance is different than the effective date, then note the operative date in this section and change the title of the section to "Effective and Operative Dates," or note the operative date elsewhere in the ordinance.]

Section ___. Scope of Ordinance. In enacting this ordinance, the Board of Supervisors intends to amend only those words, phrases, paragraphs, subsections, sections, articles, numbers, punctuation marks, charts, diagrams, or any other constituent parts of the Municipal Code that are explicitly shown in this ordinance as additions, deletions, Board amendment additions, and Board amendment deletions in accordance with the "Note" that appears under the official title of the ordinance.  [Applicable if ordinance revises or deletes existing Code section(s); not applicable if ordinance only adds new Code section(s).]

Section ___. [Some ordinances may call for other standardized sections. The Legislative Handbook on the I:\ drive includes standardized sections for General Welfare, Severability, Sunset, and other common provisions.]

APPROVED AS TO FORM:

DENNIS J. HERRERA, City Attorney

By:      _____

      ATTORNEY'S NAME

      Deputy City Attorney

n:\legana\as2016\1600691\01105773.docx

# Appendix IX: Settlement Examples

| Case | Context | Claims | Settlement Agreement |
|------|---------|--------|----------------------|
| *Sager v. City of Pittsburgh*, No. 03-0635 (W.D. Pa. 2003). | Sweeps of property | Alleged 4th, 5th, and 14th Amendment violations | Provided procedures for pre-collection notification, collection of personal items during clean-ups, and for the return of property collected.<br><br>• Seven days' written notice prior to the clean-up to homeless persons by posting the notice at each encampment or at each identifiable group of possessions, and by faxing the notice to homeless service providers.<br><br>• All items that are not health/safety hazards or refuse are to be placed in large, transparent trash bags and properly tagged and itemized.<br><br>• Notice will be posted as to recovery procedures.<br><br>• Specific days and times that a secure storage area must be available to persons reclaiming their belongings. |
| *Moe v. City of Akron*, No. 5:14-cv-2197 (N.D. Ohio filed Oct. 3, 2014). | Encampment sweeps | Class action for violations of plaintiffs' federal and state constitutional rights protecting unlawful seizure, as well as due process violations arising out of homeless campsite cleanups. | Individual plaintiffs received undisclosed monetary relief.<br><br>Specific procedures relating to the disposal of any personal property located on public property.<br><br>• The city will not remove any personal items of homeless individuals unless it provides written notice of no less than forty-eight hours.<br><br>• Any personal property that is removed by the city will be stored for no less than thirty days.<br><br>• The city will develop procedures by which people may retrieve their items.<br><br>• The city is not responsible for providing notice of removal if it reasonably concludes that the property is abandoned or that exigent circumstances exist. |
| *Henry v. City of Cincinnati*, No. C-1-03-509 (S.D. Ohio 2003). | Sweeps – property seizure | Alleging violations of 1st, 4th, 8th, and 14th Amendment rights. | • The police must give a homeless individual who is engaging in prohibited activity seventy-two hours' notice before arresting that person.<br><br>• The officer must transmit this notification to a designated social service agency to conduct any outreach needed.<br><br>• The seventy-two hour time period does not begin until the officer contacts the social service agency. |
| *Martin v. City and County of Honolulu*, 15-cv-00363 (D. Haw. Aug. 15, 2016). | Sweeps – destruction of property | Class action for violations of the 4th and 14th Amendments | Changes to the way the city conducts its enforcement actions, including:<br><br>• Provide public notice of when the city will be conducting enforcement actions.<br><br>• Give individuals thirty minutes to move their items at the start of enforcement actions, even if the individuals are located in a public park past closing time.<br><br>• Not throw away an individual's possessions (absent certain exceptions) and instead to collect everything for storage.<br><br>• Store all property collected for forty-five days and allow it to be retrieved within that time, including circumstances for retrieval without payment. |

**TENT CITY, USA:** The Growth of America's Homeless Encampments and How Communities are Responding

| | | | |
|---|---|---|---|
| *Allen v. City of Pomona*, No. 16-cv-1859 (C.D. Cal. Filed Mar. 18, 2016). | Sweeps – seizing and destroying property | | • Required the city to establish and fund a transitional storage center, which will consist of lockers that homeless persons can use to store their belongings.<br><br>• Provided plaintiffs with priority with regards to permanent housing resources developed by the city to the maximum extent allowed by law.<br><br>• Established required procedures regarding the city's handling of homeless persons' property.<br><br>• Required the city to produce a semiannual report regarding the status of its homeless population.<br><br>• Monetary settlement to plaintiffs and attorneys' fees. |
| *Lehr v. City of Sacramento*, No. 2:07-cv-01565 (E.D. Cal. Aug. 2, 2007). | Ordinance prohibiting sleeping outside and taking and destroying property | Alleging violations of 4th, 8th, and 14th Amendment rights. | • $488,000 in damages<br><br>• Forty-eight hours' notice before sweeping a homeless camp.[598] |
| *Spencer v. City of San Diego*, No. 04 CV-2314 BEN (S.D. Cal. May 2, 2006). | Illegal lodging citations for sleeping on the street. | Alleging violation of 8th Amendment right.[599] | • The San Diego Police Department officers "will not ordinarily issue Penal Code section 647(j) citations between the hours of 2100 and 0530."<br><br>• The settlement agreement was based on, and incorporated by reference, the S.D.P.D.'s training bulletin, dated November 17, 2006, regarding the illegal lodging statute.<br><br>• The training bulletin emphasizes that officers must remember that part of their role is to provide information to people about relevant social services and to assist those who cannot assist themselves. It provides guidelines that limit the enforcement of the illegal lodging statute (e.g., only in areas where the city has received complaints and not ordinarily "between the hours of 2100 and 0530"). The bulletin also outlines various procedures that should be followed before issuing a citation (e.g., establishing that the person's conduct constitutes "lodging" and then establish that the lodging is "without permission"), as well as additional investigative issues that should be considered. |

598  The City of Sacramento continued to litigate the case. In May 2009, the city was successful on motion for summary judgment as to plaintiff's first cause of action, an Eighth Amendment claim alleging cruel and unusual punishment, as to all plaintiffs. The city was also successful in receiving summary judgment on the second cause of action, the Fourth and Fourteenth Amendment privacy claims based on unreasonable confiscation of property, as to all individual plaintiffs aside from one plaintiff, Connie Hopson, who was the only one to allege that her property had been taken against her will and thus the only one with standing. Accordingly, only one plaintiff remained with a claim against the city. In August, 2009, the class containing "[a]ll persons in the City of Sacramento...who were, or are, or will be homeless at any time after August 2, 2005, and whose personal belongings have been taken and destroyed, or will be taken and destroyed, by one or more of the defendants," was certified with Hopson as representative plaintiff. Despite not settling, the city council held a special meeting in March 2009 in which it passed resolutions to improve and expand homeless services and to use $1 million to implement the strategy. The strategy includes providing shelter beds, transitional housing, permanent supportive housing, permanent housing, storage for personal property, kennel services for pets, and other supportive services. The first statement in the background section of the resolution states, "housing is a basic human right."

599  The Court relied on Jones v. City of Los Angeles in denying the city's motion to dismiss and plaintiffs relied on the same case in their memorandum supporting their application for preliminary injunction. Jones v. City of Los Angeles held that a city cannot "criminalize acts (such as sleeping) that are an integral aspect" of the status of being homeless.



# NATIONAL LAW CENTER
## ON HOMELESSNESS & POVERTY

2000 M Street NW, Suite 210, Washington, DC 20036

Phone: 202.638.2535  |  Fax: 202.628.2737

www.nlchp.org

CFC # 11947

www.facebook.com/homelessnesslaw

twitter.com/nlchphomeless

www.linkedin.com/company/national-law-center-on-homelessness-and-poverty