

# HOUSING NOT HANDCUFFS

Ending the Criminalization of Homelessness
in U.S. Cities

NATIONAL LAW CENTER
ON HOMELESSNESS & POVERTY

# ABOUT THE NATIONAL LAW CENTER ON HOMELESSNESS & POVERTY

The National Law Center on Homelessness & Poverty is the only national organization dedicated solely to using the power of the law to end and prevent homelessness. We work with federal, state and local policymakers to draft laws that prevent people from losing their homes and to help people out of homelessness. We have been instrumental in enacting numerous federal laws, including the McKinney-Vento Act, the first major federal legislation to address homelessness. The Act includes programs that fund emergency and permanent housing for homeless people; makes vacant government properties available at no cost to non-profits for use as facilities to assist people experiencing homelessness; and protects the education rights of homeless children and youth. We ensure its protections are enforced, including through litigation.

We aggressively fight laws criminalizing homelessness and promote measures protecting the civil rights of people experiencing homelessness. We also advocate for proactive measures to ensure that people experiencing homelessness have access to permanent housing, living wage jobs, and public benefits.

For more information about our organization, access to publications, and to contribute to our work, please visit our website at www.nlchp.org.

# LAW CENTER BOARD OF DIRECTORS*

**Edward McNicholas,** *Chair*
Sidley Austin LLP

**Bruce Rosenblum**, *Vice-Chair*
The Carlyle Group

**Kirsten Johnson-Obey**, *Secretary*
NeighborWorks

**Robert C. Ryan**, *Treasurer*
American Red Cross

**Eric Bensky**
Schulte, Roth & Zabel LLP

**Paul F. Caron**
Microsoft Corporation

**Bruce J. Casino**
Attorney

**Rajib Chanda**
Simpson Thacher & Bartlett LLP

**Dennis Dorgan**
Fundraising Consultant

**Dwight A. Fettig**
Porterfield, Fettig & Sears LLC

**Julia M. Jordan**
Sullivan & Cromwell LLP

**Steve Judge**
Private Equity Growth Capital Council (retired)

**Father Alexander Karloutsos**
Greek Orthodox Archdiocese of America

**Georgia Kazakis**
Covington & Burling LLP

**Pamela Malester**
Office for Civil Rights, U.S. Dept. of Health and Human Services (retired)

**Tashena Middleton Moore**
Attorney

**G.W. Rolle**
Missio Dei Church

**Erin Sermeus**
OWN TV

**Jeffrey A. Simes**
Goodwin Procter LLP

**Vasiliki Tsaganos**
Attorney

**Robert Warren**
People for Fairness Coalition

**Maria Foscarinis**
President
Executive Director
NLCHP

*Affiliations for identification purposes only*

# LAW CENTER STAFF

**Diane Aten**
Director of Development & Communications

**LaToya Ball**
Administrative Manager

**Tristia Bauman**
Senior Attorney

**Grace Beal**
Development & Communications Assistant

**Jenifer Brewer**
AmeriCorps VISTA Member, Data Management

**Janelle Fernandez**
Law & Policy Program Coordinator

**Maria Foscarinis**
Executive Director

**Janet Hostetler**
Deputy Director

**Linaise Lima**
AmeriCorps VISTA Member, Development & Communications

**LaTissia Mitchell**
Executive & Development Specialist

**Michael Santos**
Attorney

**Eric Tars**
Senior Attorney

Case 8:18-cv-00155-DOC-JDE   Document 85-2   Filed 02/12/18   Page 4 of 73   Page ID #:1588

# ACKNOWLEDGEMENTS

The Law Center thanks Tristia Bauman (primary author), Janet Hostetler, Janelle Fernandez, Eric Tars, Michael Santos, Jenifer Brewer, Elizabeth Dennis, Ruth El, and Maria Foscarinis for their contributions to this report.

Special thanks to the law firm Sullivan & Cromwell for its generous pro bono support and assistance in creating the Prohibited Conduct Chart and to volunteers with the organization Statisticians Without Borders for help analyzing cost studies.We are grateful to the funders whose support enables us to carry out our critical work, including the Herb Block Foundation, the Deer Creek Foundation, and the Ford Foundation.

 Finally, we thank the 2016 members of our Lawyers Executive Advisory partners (LEAP) program for their generous support of our organization: Akin Gump Strauss Hauer & Feld LLP; Arent Fox LLP; Covington & Burling LLP; Debevoise & Plimpton; Dechert LLP; DLA Piper; Fried, Frank, Harris, Shriver & Jacobson LLP; Goldman Sachs LLP; Goodwin Procter LLP; Hogan Lovells US LLP; Katten Muchin Rosenman LLP; Latham & Watkins LLP; Manatt, Phelps & Phillips, LLP; Microsoft Corporation; Schulte Roth & Zabel LLP; Sheppard, Mullin, Richter & Hampton LLP; Sidley Austin LLP; Simpson Thacher & Bartlett LLP; Sullivan & Cromwell LLP; and WilmerHale.

The Law Center would also like to thank Megan Godbey for the report design.

The Law Center is solely responsible for the views expressed in this report.

**Photography Credits**
Cover: Piotr Ciuchta, Ali Halit Diker, Michael Niemis
Tristia Bauman

# TABLE OF CONTENTS

7    FOREWORD

8    EXECUTIVE SUMMARY

17    INTRODUCTION

21    CRIMINALIZATION OF HOMELESSNESS

22        The Law Center's Survey of Cities Criminalizing Homelessness

22        Camping in Public

23        Sleeping in Public

24        Sitting or Lying Down in Public

24        Loitering, Loafing, and Vagrancy

24        Begging in Public

25        Living in Vehicles

25        Food Sharing Bans

26        Criminalization Laws Harming Homeless Children and Youth

28    HALL OF SHAME: CALLING OUT BAD POLICIES AND PRACTICES

30    PROBLEMATIC CRIMINALIZATION LAW ENFORCEMENT PRACTICES

30        Evictions of Homeless Encampments

31        Orders to "Move On"

31        Trespass and Banishment

31        Enforcement of Criminalization Laws by Private Security Personnel

33    FEDERAL EFFORTS TO COMBAT THE CRIMINALIZATION OF HOMELESSNESS

33        U.S. Department of Justice: Strong Statement of Interest brief filed in Bell v. Boise

33        U.S. Department of Housing & Urban Development: Federal funds incentivize communities to reduce criminalization

34        U.S. Interagency Council on Homelessness: Guidance issued on Homeless Encampments

34        U.S. Department of Education: Guidance issued to help implement the Every Student Succeeds Act

34        U.S. Department of Justice: Office of Community Oriented Policing Services (COPS) E-Newsletter

34        U.S. Department of Justice: Comment on Seattle Encampment Proposal

34        Federal Court Decisions Finding Criminalization Policies Unconstitutional

36    CRIMINALIZATION HARMS ENTIRE COMMUNITIES

36        Criminalizing Homelessness is Ineffective Policy that Does Not Work to End Homelessness

36        Employment

36        Housing

37        Public Benefits

37        Voting

37        Access to Justice

38        Adds to the Epidemic of Mass Incarceration of Poor Communities and Mentally Ill People

38        Criminalizing homelessness costs more than solving it with housing and services

40 HALL OF FAME: CITIES WITH NOTABLE CONSTRUCTIVE ALTERNATIVE POLICIES

42 CONSTRUCTIVE SOLUTIONS TO HOMELESSNESS AND POLICY RECOMMENDATIONS

42      Shorten Homelessness by Ending the Criminalization Homelessness

42      Repeal and defund the criminalization of homelessness

42      Improve police training and protocols

43      End incentives to criminalize homelessness and poverty

43      Develop constructive encampment policies

43      Prohibit the local criminalization of homelessness through state legislation

44 PREVENT HOMELESSNESS BY STRENGTHENING HOUSING PROTECTIONS AND ELIMINATING
   UNJUST EVICTIONS

44      Prohibit housing discrimination and enforce anti-discrimination laws

44      Prohibit source of income discrimination

44      Enact "just cause" eviction laws

44      Provide a right to counsel in housing cases involving indigent renters

45      Plan for discharges from jails and prisons.

45      Plan for discharges from hospitals.

46 END HOMELESSNESS BY INCREASING ACCESS TO AND AVAILABILITY OF AFFORDABLE
   HOUSING

47      Dedicate funding streams to housing and services for homeless people.

47      Invest in permanent housing with supportive services for people experiencing homelessness.

47      Index minimum wage to actual housing costs for a given area.

48      Index Supplemental Security Income and Social Security Disability Insurance payments to actual
        housing costs for a given area.

48      Institute a universal voucher program.

49      Use surplus and vacant property to house and provide services to homeless people.

49      Ensure local zoning restrictions do not impede affordable housing development.

50 CONCLUSION

51 APPENDIX A: PROHIBITED CONDUCT CHART

72 APPENDIX B: HOUSING NOT HANDCUFFS MODEL POLICY

HOUSING NOT HANDCUFFS: Ending the Criminalization of Homelessness in U.S. Cities

# FOREWORD

We must develop a greater understanding of the connection between homelessness and involvement in the criminal justice system. The recognition that there is an inappropriate connection between those who are homeless and their overrepresentation in the criminal justice system is a necessary first step in formulating policies that will reduce this strain on our democracy.



The use of the criminal justice system to punish those whose only crime is being poor and without housing is not worthy of our great nation. It is unconstitutional and, moreover, it is bad public policy. Such policies only reinforce and strengthen the vicious cycle that entrap too many of our fellow citizens in poverty and homelessness. It is time – indeed, it is past time – for this to end. The negative, long term impact of these policies on our society and on individual Americans is real, incalculable, and unnecessary.

The criminalization of homelessness must end. It is costly, unjust, and clearly not a solution to homelessness. The Law Center's work protecting the rights of people experiencing homelessness and poverty must be supported by those of us in the legal profession who have a unique responsibility, and ability, to make our nation more fair, more just, and more caring.

If we work together, if we commit ourselves, if we challenge an unjust and illogical status quo we can bring about positive change. The problem of homelessness is largely a man-made problem that is susceptible to man-made solutions. We control our destiny. We hold within our hands the power to make better the lives of those who are homeless and who are too infrequently called what they are: American citizens.

- The Honorable Eric Holder, Attorney General of the United States, 2009-15



EXECUTIVE SUMMARY

Homelessness remains a national crisis, as stagnated wages, rising rents, and a grossly insufficient social safety net have left millions of people homeless or at-risk - including at least 1.36 million homeless children enrolled in U.S. public schools. Although many people experiencing homelessness have literally no choice but to live outside and in public places, laws and enforcement practices punishing the presence of visibly homeless people in public space continue to grow. Homeless people, like all people, must engage in activities such as sleeping or sitting down to survive. Yet, in communities across the nation, these harmless, unavoidable behaviors are punished as crimes or civil infractions.

NO SAFE PLACE: The Criminalization of Homelessness in U.S. Cities

This report – the only national report of its kind - provides an overview of criminalization measures in effect across the country and looks at trends in the criminalization of homelessness, based on an analysis of the laws in 187 cities that the Law Center has tracked since 2006. We also analyze local trends related to the enforcement of these laws, and describe the growing federal trend to oppose and discourage local criminalization policies and practices.

This report further discusses why laws criminally or civilly punishing homeless persons' life-sustaining activity are ineffective, how they are expensive to taxpayers, and how they often violate homeless persons' constitutional and human rights.

Finally, we offer constructive alternative policies to criminalization laws and practices, making recommendations to federal, state, and local governments on how to best address the problem of visible homelessness in a sensible, humane, and legal way.

**KEY FINDING: People experiencing homelessness continue to be arrested and ticketed for living in public spaces, even when they have no other alternatives.**

**The growing affordable housing gap and shrinking social safety net have left millions of people homeless or at-risk.** A lack of affordable housing is the leading cause of homelessness, and the problem is worsening. Rising rents, historically low vacancy rates, and the continued decline of federally subsidized housing have led to a 7.2 million unit shortage of affordable rental units available to our nation's lowest income renters. To put this into context, this means that for every 100 extremely poor households in the country, only 31 will find affordable and available rental units. Sixty-nine of the 100 will be forced to pay more than they can afford, leaving them unstably housed and vulnerable to homelessness.

**Many American cities have fewer emergency shelter beds than people who need shelter.** Because homelessness is driven by a large and critical shortage of affordable housing, many

individuals and families need help not just for one or two nights, but for long periods of time. Yet many communities continue to treat shelters as the answer to all homelessness, tasking shelters with meeting both emergency needs and longer term systemic shortages of permanent housing. As a result, communities with shelter space often lack sufficient beds for all individuals and families that are homeless. This leaves homeless people across the country with no choice but to struggle for survival in public places.

**Despite a lack of affordable housing and shelter space, many cities have chosen to criminally or civilly punish people living on the street for doing what any human being must do to survive.** Cities continue to threaten, arrest, and ticket homeless persons for performing life-sustaining activities – such as sleeping or sitting down - in outdoor public places, despite a lack of any lawful indoor alternatives. In addition, as cities increasingly use police power to evict homeless people or encampments from public places, often with little or no notice, the frequent result is the unconstitutional destruction of homeless persons' belongings.

**Prevalence of Laws Criminalizing Homelessness**

The Law Center surveyed 187 cities and assessed the number and type of municipal codes that criminally or civilly



THE AFFORDABLE HOUSING GAP

has created a **7.2 MILLION UNIT SHORTAGE** of affordable rental units available to our nation's lowest income renters

**31%** lowest income renters accessing affordable housing

**69%** lowest income renters paying more than they can afford

nlchp.org

punish the life-sustaining behaviors of homeless people. The results of our research show that the criminalization of necessary human activities is prevalent and increasing in cities across the country. Of the 187 cities measured by the Law Center for this report, we found that:

- **Laws prohibiting camping in public**

  o   33% of cities prohibit camping in public city-wide.

  o   50% of cities prohibit camping in particular public places.

- **Laws prohibiting sleeping in public**

  o   18% of cities prohibit sleeping in public city-wide.

  o   27% of cities prohibit sleeping in particular public places.

- **Laws prohibiting sitting and lying down in public**

  o   47% prohibit sitting and lying down in public.

- **Laws prohibiting loitering, loafing, and vagrancy**

  o   32% prohibit loitering, loafing, and vagrancy city-wide.

  o   54% prohibit loitering, loafing, and vagrancy in particular public places.

- **Laws prohibiting panhandling**

  o   27% of cities prohibit panhandling city-wide.

  o   61% of cities prohibit panhandling in particular public places.



- **Laws prohibiting living in vehicles**

  o   39% of cities prohibit living in vehicles.

- **Laws restricting food sharing**

  o   6% of cities restrict food sharing.

**KEY FINDING: Laws criminalizing homelessness have dramatically increased over the past ten years.**

The Law Center has tracked the same 187 cities since 2006 to determine the relative increase or decrease of criminalization laws over time. Our research reveals that laws punishing the life-sustaining conduct of homeless people has increased in every measured category since 2006, and in some cases dramatically so.

- **Laws prohibiting camping in public**

  o   Bans on camping city-wide have increased by 69%.

  o   Bans on camping in particular places have increased by 48%.

- **Laws prohibiting sleeping in public**

  o   Bans on sleeping in public city-wide have increased by 31%.

  o   Bans on sleeping in particular public places decreased by 11%. This is the only category where there has been a decrease in the past ten years, however, this decline has been offset by increases in bans on sleeping in public city-wide.



No Safe Place: The Criminalization of Homelessness in U.S. Cities

- **Laws prohibiting sitting and lying down in public**

  o  Bans on sitting and lying down in public have increased by 52%.

- **Laws prohibiting loitering, loafing, and vagrancy**

  o  Bans on loitering, loafing, and vagrancy city-wide have increased by 88%.

  o  Bans on loitering, loafing, and vagrancy in particular public places have increased by 14%.

- **Laws prohibiting panhandling**

  o  Bans on panhandling city-wide have increased by 43%.

  o  Bans on panhandling in particular public places have increased by 7%.

- **Laws prohibiting living in vehicles**

  o  Bans on living in vehicles has increased by 143%.

### Hall of Shame: Calling out Bad Policies and Practices

The Law Center recognizes that most cities are struggling with difficult policy choices over how to reduce homelessness and often pursue a combination of good (constructive) and bad (destructive) policies. Rather than call out individual cities for being the best or worst, we have identified particularly bad laws or practices of certain cities to include in our Hall of Shame. The following list of city laws and practices have been chosen due to their aggressive enforcement of criminalization laws and history of evicting homeless encampments.

### Threats of arrest: Denver, CO

Subsidized housing in Denver is at capacity, and has a waiting list of 6,500 families. Moreover, 73% of homeless people surveyed by Denver Homeless Out Loud in 2013 reported being turned away from emergency shelter due to overcrowding. Despite these facts, the city has engaged in aggressive enforcement of its anti-camping law. While the number of tickets actually issued for illegal camping is low, the Denver Police Department makes thousands of "street checks" related to violation of the law – a practice that advocates say amounts to use of threats by police to ticket or arrest homeless people unless they dismantle their camps. Since 2012, 6,789 individuals and families have been made to dismantle their camps, even during Denver's



frigid winter months.

### Evictions: Honolulu, HI

Honolulu outlawed sitting and lying in public places, and has issued a whopping 16,215 warnings and 534 written summonses since the law was enacted at the end of 2014. In addition, the city has conducted numerous sweeps of encampments where homeless people lived, despite their lack of indoor alternatives. A survey of homeless encampment residents in Hawaii found that these sweeps have resulted in the loss of personal identification, tents, medicine, and even personal items, like children's toys. Moreover, the city has been transparent about its goal of removing Honolulu's homeless population from view. Indeed, one proposed plan is to relocate homeless people to a separate island that previously served as a garbage dump and former internment camp during WWII.

### Citations: Dallas, TX

The City of Dallas has repeatedly cited the city's homeless population, which includes an estimated 600 unsheltered people, for sleeping in public. Indeed, between January 2012 and November 2015, the city issued over 11,000 citations for sleeping in public. The city has also aggressively enforced its panhandling ban, issuing approximately 2,000 citations for panhandling in 2015 alone. In addition to creating unaffordable debt, nonpayment of these citations bars a person from obtaining official photo identification.



## Exclusion: Puyallup, WA

Even though there is no year-round emergency shelter available to the rapidly growing homeless population in Puyallup, the city has enacted a number of laws making it illegal to camp, panhandle, sit or lie down in large swaths of the city, or to be present in public parks after closing. Moreover, the city has amended its trespass law to allow people to be banned from all public places within the city for up to five years if they violate any of these laws – an inevitability for homeless people who have no ability to comply due to a lack of alternatives.

**KEY FINDING: Local governments are engaged in problematic enforcement of these laws.**

**Local governments have increasingly subjected homeless encampments to eviction with little or no notice.** These evictions, or homeless "sweeps", not only displace homeless people from public space, but they often result in the loss or destruction of homeless persons' few possessions. The loss of these items, which can include critical identification documents, protective tents, or even needed medical equipment, can be devastating to homeless people. Yet, these sweeps are often conducted by governments with no plan to house or adequately shelter the displaced encampment residents. Instead, homeless people are merely dispersed to different public places, leading to the inevitable reappearance of outdoor encampments.

**Local governments are banishing homeless people from public places through use of "move on" orders and trespass warnings.** Despite a lack of lawful, indoor places where they can be, homeless people are often threatened with tickets or arrests if they fail to "move on" from outdoor locations.  In addition to being futile, use of "move along" orders discriminates against homeless people who have not violated any laws, and who are merely present in public. Moreover, local governments have used their trespass authority to ban homeless people from returning to these areas, sometimes for years, resulting in their banishment from large swaths of public space, or from entire communities.

**KEY FINDING: The federal government is mounting pressure on local governments to end the criminalization of homelessness.**

While the tide of criminalization policies continues to grow at the local level, the opposite is true at the federal level. Since 2012, when the federal government released its first report on constructive alternatives to criminalization policies, it has mounted increasing pressure on local governments to abandon criminalization strategies in favor of data-informed alternative policies that work to sustainably end homelessness in a cost-effective way. Notable federal actions include:

**U.S. Department of Justice: Strong Statement of Interest brief filed in *Bell v. Boise***

On August 6, 2015, the U.S. Department of Justice filed a statement of interest brief in *Bell v. Boise*, a federal lawsuit challenging the Idaho city's laws criminalizing homeless camping. The federal government's brief argued that enforcement of the anti-camping ordinance against people who have no option but to sleep outside due to a lack of adequate shelter options criminalizes them for their status, in violation of the 8th Amendment's prohibition against cruel and unusual punishment.

**U.S. Department of Housing & Urban Development: Federal funds incentivize communities to reduce criminalization**

In both 2015 and 2016, the U.S. Department of Housing & Urban Development included significant incentives to reduce criminalization in its competitive grant application for nearly $2 billion in federal funding for shelter and homeless housing for local communities. The amended grant application currently includes a 2-point question inquiring into what steps applicant Continuums of Care, typically led by local government agencies, are taking to reduce the criminalization of homelessness.



27% of cities prohibit panhandling city-wide

61% of cities prohibit panhandling in particular public places

NO SAFE PLACE: The Criminalization of Homelessness in U.S. Cities

**Federal court decisions striking down panhandling bans**

Following the 2015 U.S. Supreme Court decision, *Reed v. Town of Gilbert,* clarifying First Amendment law on content-based restrictions on protected speech, federal courts around the country have struck down laws prohibiting panhandling.  The first case to apply *Reed* to panhandling cases was *Norton v. City of Springfield,* the Law Center's successful Seventh Circuit challenge to Springfield, Illinois' panhandling law, which restricted vocal pleas for immediate donations of cash. Since *Norton,* panhandling bans in Worcester and Lowell, Massachusetts; Portland, Maine; Grand Junction, Colorado; and Tampa, Florida were similarly struck down.

**U.S. Interagency Council on Homelessness: Guidance issued on Homeless Encampments**

The U.S. Interagency Council on Homelessness published guidance on encampments in 2015. The guidance, "Ending Homelessness for People Living in Encampments: Advancing the Dialogue" emphasizes that the forced dispersal of encampments is not an appropriate solution to homelessness, and can make it more difficult to achieve lasting housing and service outcomes. The guidance advises communities not to forcibly evict homeless people, and to instead engage encampment residents to develop a plan for connecting them to low-barrier pathways to permanent housing.

**U.S. Department of Education: Guidance issued to help implement the Every Student Succeeds Act**

In 2016, the U.S. Department of Education issued guidance advising school districts and states to coordinate with local and state legislatures to ensure that local laws and policies, particularly status offense laws and other laws that serve to criminalize homelessness, are not interfering with homeless students' ability to get to school and access education.

The Law Center has long advocated for federal action to counter criminalization, and growing evidence indicates that it is making a difference in local communities. Some examples include:

• **Changes to enforcement of panhandling laws**

**Example: Madison, WI**

After the 7th Circuit Court of Appeals struck down Springfield, Illinois' panhandling ban in *Norton v. City of Springfield*, local advocates sent a letter to the Madison, Wisconsin City Attorney advising of the decision and the similar constitutional concerns raised by Madison's panhandling law. In response, Madison City Attorney Michael May recommended a moratorium on enforcement of the city's panhandling ban.

• **Amendments to camping ordinances**

**Example: Vancouver, WA**

After the Department of Justice filed its statement of interest brief in *Bell v. Boise*, local homeless advocates contacted the City of Vancouver to advise that the federal government's analysis in the brief also applied to Vancouver's then-existing camping ban. In response, the City Council voted to amend its camping ordinance to permit overnight camping on public grounds throughout the city, with few restrictions.

• **Stopping evictions of homeless encampments**

**Example: Chicago, Illinois**

After the USICH guidance on homeless encampments was issued, the Chicago Coalition for the Homeless used the occasion to convene a broad set of stakeholders, including local lawmakers and people experiencing homelessness, to discuss city policies related to homeless encampments. After discussing the principles of the guidance and their application to local homeless encampments, the city temporarily agreed not to seize the tents of homeless persons and committed to permanently house at least 75 of the city's homeless campers. While discussions in Chicago on this issue are ongoing, the voices of homeless people have been prominently featured in the discussions – a key recommendation of the USICH guidance.

**KEY CONCLUSION: Criminalization is ineffective and expensive public policy.**

**Criminalization policies are ineffective and actually make homelessness harder to exit.** Because people experiencing homelessness are not on the street by choice but because they lack choices, criminal and civil punishment serves no constructive purpose. Instead, arrests, unaffordable tickets, and the collateral consequences of criminal convictions make it more difficult for people to exit homelessness and get back on their feet. For example, even misdemeanor convictions can make someone ineligible for subsidized housing under local policy, and criminal records are routinely used to exclude applicants for employment or housing. These barriers to income and housing can prolong a person's homelessness,



or even make it permanent. Moreover, fines and court fees associated with resolving a criminalization case can amount to hundreds, or even thousands, of dollars. Without the resources to pay, homeless people may be subject to additional jail time.

**Criminalizing homelessness wastes precious public resources on policies that do not work to reduce homelessness.** Criminalization is the most expensive and least effective way of addressing homelessness. A growing body of research comparing the cost of homelessness--including the cost of criminalization--with the cost of providing housing to homeless people shows that ending homelessness though housing is the most affordable option over the long run. Indeed, the provision of housing using a Housing First model, which focuses on providing people with quick access to housing and any needed services to maintain housing stability, is cheaper and more effective than all other strategies for addressing homelessness. With state and local budgets stretched to their limit, rational, cost-effective policies are needed – not ineffective measures that waste precious taxpayer dollars.

**Examples of cost study findings:**

• A 2014 analysis by Creative Housing Solutions evaluated the cost of homelessness in **Central Florida** and found that providing chronically homeless people with permanent housing and case managers would cost approximately $10,000 per year; $21,000 less than the region was spending on law enforcement and medical costs for each chronically homeless person. The provision of **housing would save taxpayers $149 million over the next decade.**

• A 2009 study of chronically homeless individuals in **Seattle, Washington** found participants in the Housing First program had median costs of $4,066 per person each month, but that those **costs decreased by 60% after one year in housing** – even after factoring

in the cost of housing and supportive services. Indeed, researchers stated that, "permanent, rather than temporary housing may be necessary to fully realize these cost savings, because benefits continued to accrue the longer these individuals were housed."

• A 2015 report evaluating **Commonwealth of Massachusetts** Home & Healthy for Good programming found that providing housing and supportive services to chronically homeless individuals using a Housing First model is not only more effective at ending homelessness and improving formerly homeless persons' life and health quality, but it also was more cost effective than managing homelessness on the street or in shelter. Specifically, the report found that Massachusetts **saved an average of $9,339 per formerly homeless person.**

**Using the criminal justice system to address homelessness misuses police resources to address a social problem.** This overuse of police to solve social problems has been criticized by many – including police officers – as contributing to the current climate of tension between police and neighborhoods subjected to unnecessarily high levels of police activity.

**Hall of Fame: Cities with Notable Constructive Alternative Policies**

As noted above, local governments across the country often adopt both constructive and destructive policies related to homelessness. Rather than identify cities that are better or worse, we are highlighting in our Hall of Fame a number of positive policies and practices that should be replicated across the country.

**Providing Housing Instead of Evicting Encampments: Indianapolis, IN**

Indianapolis became the first city in the country to enact a law that requires the local government to provide adequate housing alternatives before evicting homeless people from encampments. In addition, the law requires that camp residents be given a minimum of 15 days' notice before closing a camp, and that the city must offer to store their personal belongings for up to 60 days before they can be disposed of or destroyed. This law implements the USICH guidance on encampments, and was highlighted as a model by the National League of Cities.

NO SAFE PLACE: The Criminalization of Homelessness in U.S. Cities



**18%** of cities prohibit sleeping in public city-wide

**27%** of cities prohibit sleeping in particular public places

### Decriminalization of Homelessness and Investment in Housing and Services: Syracuse, NY

Mayor Stephanie Miner has expressly rejected the criminalization of homelessness as a strategy for the city to address homelessness, and has openly advocated for housing as an alternative. She has worked with others in the city, including the police force, to ensure that the city is pursuing constructive approaches to homelessness, and not punishing people for their visible poverty. Syracuse Mayor Miner even refused to follow a January 2016 order by New York Governor Andrew Cuomo to arrest any homeless people who refused to enter into shelters. Rather than adopt this criminalizing approach, the Mayor has engaged in persistent outreach to people experiencing homelessness and connections to housing using a Housing First model. This has helped Syracuse become one of the nation's first cities to end veteran homelessness.

### Innovative Emergency Shelter Model: San Francisco

In many communities, emergency shelter is unsafe, inadequate, or laden with restrictions that make it inaccessible to many homeless people.  San Francisco's Navigation Center eliminates those unnecessary barriers to shelter access. The Navigation Center, first opened in a vacant former school property, does not have curfews – which is helpful to people who work odd hours – and it does not require a shelter resident to exit the premises each morning. In addition, the Navigation Center permits mixed gender sleeping arrangements, rather than requiring families and couples to separate, as often happens in shelters. It does not prohibit entry by persons with pets. Also, the Navigation Center provides storage for homeless persons' belongings and does not require sobriety or participation in religious or other services while there. Although the Navigation Center is able to serve only

a small fraction of the city's 3,500 unsheltered homeless people – the original location has a maximum capacity of 75 – the city has plans to expand the model to six locations.

### Dedicated Local Funding for Homeless Services: Miami-Dade County, Florida

Miami-Dade County has dedicated funding for homeless services through its Homeless and Domestic Violence Tax. The 1% tax is collected on all food and beverage sales by establishments licensed by the state to serve alcohol on the premises, excluding hotels and motels. 85% of the tax receipts go to the Miami-Dade County Homeless Trust, which was created in 1993 by the Board of County Commissioners to implement the local continuum of care plan and to monitor agencies contracted by the County to provide housing and services for homeless people.

**KEY RECOMMENDATION: Communities should end the criminalization of homelessness.**

Criminalization is not the answer to meeting the needs of cities that are concerned about homelessness. There are sensible, cost-effective, and humane solutions to homelessness, which a number of cities have pursued. The following examples represent important steps in the right direction, and these practices should be widely replicated. It is important to note, however, that the best and most enduring solution to ending homelessness is increased investment in affordable housing. Without additional investment in housing at the level needed to end current and prevent future homelessness, even the best models will be unable to solve the problem.

### Policy Recommendations:

• The laws, policies, and practices that prohibit or limit the use of public space by homeless people for life-sustaining activities should be repealed and defunded.

• Homeless people should not be subject to, or threatened with, civil or criminal sanctions or harassment by law enforcement, other state actors, and/or private security personnel for conducting life-sustaining activities in public places.

• Homeless persons' personal property should not be subject to unreasonable searches and seizures.

• Local governments should adopt constructive policing protocols, supported by police training designed to improve interactions with homeless and mentally ill people.

Case 8:18-cv-00155-DOC-JDE   Document 85-2   Filed 02/12/18   Page 16 of 73   Page ID #:1600

- Local governments should develop constructive encampment policies, including designating areas where homeless people may safely and lawfully camp, store belongings, and receive necessary sanitation and other public services.

- State governments should enact legislation that prohibits local governments from enacting or enforcing criminalization ordinances.

**KEY RECOMMENDATION: Prevent Homelessness by Strengthening Housing Protections and Eliminating Unjust Evictions.**

- State and local governments should develop policies for cleaning public places that do not displace homeless people from public lands, nor result in the destruction of their belongings, when there is no adequate housing alternative.

- States and local governments should enact laws prohibiting housing discrimination based upon an individual's or family's perceived or actual housing status, lack of an address, or status as a victim of domestic violence, sexual assault, or human trafficking.

- States and local governments should enact laws that prohibit source of income discrimination.

- States and local governments should enact laws that prohibit discrimination based upon an individual's criminal, eviction, or credit history that is unrelated to the individual's future ability to abide by reasonable terms of tenancy.

- States and local governments should enact laws prohibiting evictions except upon good cause.

- States and local governments should enact laws that guarantee a right to counsel in all eviction actions.

- Prisons, jails, hospitals, mental health care facilities, and foster care systems should develop and implement plans for discharging people from those institutions or systems of care directly into housing with supportive services as necessary.

**KEY RECOMMENDATION: End Homelessness by Increasing Access to and Availability of Affordable Housing.**

- Federal, state, and local governments should dedicate funding streams to housing and services for homeless people.

- The federal government should fully fund the National Housing Trust Fund.

- All levels of government should index their minimum wage to actual housing costs for a given area.

- Supplemental Security Income and Social Security Disability Insurance payments should be indexed to actual housing costs for a given area.

- The federal government should institute a universal voucher program.

- All levels of government should use their surplus property to house and provide services to homeless people.

- Local governments should suspend zoning restrictions on affordable housing wherever the need for affordable housing is greater than the supply.

**Methodology**

With the assistance of the law firm Sullivan & Cromwell, the Law Center examined the city codes of 187 cities across the country, which are listed in our Prohibited Conduct Chart. Through online research, we identified laws that restrict or prohibit seven different categories of conduct disproportionately performed by homeless people, including sleeping, sitting or lying down, and living in vehicles within public space. It is important to note that while the chart notes the existence of these laws in different cities, enforcement of them may vary widely.

NO SAFE PLACE: The Criminalization of Homelessness in U.S. Cities



INTRODUCTION

Nationwide, homeless people are ticketed, arrested, and jailed under laws that treat the life-sustaining conduct of homeless people – such as sleeping or sitting down - as civil or criminal offenses. Even where homeless people have no access to affordable housing or emergency shelter, cities routinely punish or harass homeless people for their presence in public places. In addition, cities often displace homeless people from public space without providing any permanent housing alternatives.

This report discusses ten-year trends in laws that criminally or civilly punish homelessness, using data from 187 cities across the country.

## Homelessness is an Ongoing, But Solvable, National Crisis

Homelessness remains a national crisis. The U.S. Department of Housing & Urban Development ("HUD") 2015 Point-in-Time Count reported that 564,708 people were homeless on a single night in January – with 31% of those living unsheltered.[1] Even this high number, however, is widely accepted to be an undercount of the homeless population,[2] particularly as it relates to unaccompanied homeless youth.[3] Still, this data is one important indicator of the size of the homeless crisis in America, and it also helps to highlight regional differences in the growth of homelessness. For example, while the most recent Point-in-Time Count found that homelessness nationwide decreased by 2% from 2014 to 2015, 16 states – primarily in the west and northeast - experienced increases.[4]

The U.S. Department of Education collects data on the number of homeless youth enrolled in our nation's public schools, another important indicator of the scale of the homeless crisis. Currently, there are over 1.36 million homeless children counted in our public schools – a 70% increase since the inception of the housing foreclosure crisis in 2007.[5] Some of these children live among the estimated 7 million U.S. households living doubled up with friends and family[6], while others live unsheltered.[7]

At the local level, many communities across the country have experienced explosive growth in their homeless populations. In the Seattle/King County area of Washington,

for example, there were 4,505 unsheltered homeless people identified in the 2016 street count – a 19% increase since the previous year.[8] Indeed, several communities in the western United States and the entire state of Hawaii have declared homeless states of emergency.[9]

Moreover, homelessness has become increasingly visible in many cities, due in part to the effect of urban redevelopment and its displacement of poor and homeless people from areas where they have historically lived. The cities of Glendale, Long Beach, and Pasadena, California, saw the number of tents, "shantytowns", and people living in vehicles increase by 85% in 2015.[10] And, as affordable housing becomes increasingly scarce, this problem is likely to grow.

### A lack of accessible and affordable housing causes homelessness

In the 1980's, homelessness emerged as a national epidemic and has remained a national crisis since that time. This resulted from a number of economic factors and policy reforms, most notably the dramatic reduction of federally subsidized housing.[11] A reduced federal commitment to making housing affordable for all began during the Reagan Administration and continues today.[12]

The loss of subsidized housing has corresponded with increasing unaffordability in the private housing market.[13] Increased demand for rental units and low vacancy rates have caused rents to rise at an annual rate of 3.5% - the quickest pace in three decades.[14] The result is that there is no single state, or even county, in the nation where a worker earning the federal minimum wage of $7.25 an hour can

1   U.S Dept. of Hous. & Urb. Dev. Ann'l Homeless Assessment Rep. to Cong.: Part I (Nov. 2015) [herein after HUD AHAR Part I], https://www.hudexchange.info/resources/documents/2015-AHAR-Part-1.pdf.

2   See Maria Foscarinis, Homeless Problem Bigger Than Our Leaders Think, USA Today (Jan. 16, 2014), http://www.usatoday.com/story/opinion/2014/01/16/homeless-problem-obama-america-recession-column/4539917/.

3   See Nat'l Alliance to End Homelessness, The State of Homelessness in America (Apr. 6, 2016) [herein after NAEH State of Homelessness], http://www.endhomelessness.org/page/-/files/2016%20State%20Of%20Homelessness.pdf.

4   Id.

5   Nat'l Low Income Hous. Alliance, "Number of Homeless Students Grows More than 70% since 2007-2008" (Sept. 21, 2015), http://nlihc.org/article/number-homeless-students-grows-more-70-2007-2008.

6   NAEH State of Homelessness at page 3 ("In 2014, 7 million people in poor households were doubled up with family and friends, the most common prior living situation before becoming homeless. ΩThis represents a 9 percent decrease from 2013 and the first significant decrease in the size of this at- risk population since the Great Recession. Forty-seven states and D.C. had decreases. Still, the number of people in poor households living doubled up is 52 percent higher now than in 2007, prior to the recession.")

7   HUD AHAR Part I at page 8 ("On a single night in January 2015…20,462 people in families with children were counted in un-sheltered locations such as under bridges, in cars, or in abandoned buildings.")

8   Seattle/King Cnty. Coal. on Homelessness, 2016 Street Count Results (2016), http://www.homelessinfo.org/what_we_do/one_night_count/2016_results.php.

9   Nat'l Alliance to End Homelessness, Homelessness: A State of Emergency (Feb. 2016) http://www.endhomelessness.org/page/-/files/Homelessness_A%20State%20of%20Emergency_2.pdf.

10  Gale Holland and Peter Jamison, L.A. Sees Another Sharp Rise in Homelessness and Outdoor Tents, L.A. Times, (May 4, 2016), http://www.latimes.com/local/lanow/la-me-ln-homeless-count-20160504-story.html.

11  See Daniel Weinberger, The Causes of Homelessness in America, EDGE Poverty & Prejudice: Soc. Sec. at the Crossroads (1999), https://web.stanford.edu/class/e297c/poverty_prejudice/soc_sec/hcauses.htm ("The recession of the late 1970s left 10 percent of the workforce unemployed and this, followed by economic deregulation and an unequal system of taxation, 'contributed to the creation of 9 to 10 million more poor people in the 1980s.")

12  Id.

13  See The United States Conf. of Mayors, Hunger & Homelessness Survey: A Status Rep. on Hunger & Homelessness in America's Cities (Dec. 2015), https://www.usmayors.org/pressreleases/uploads/2015/1221-report-hhreport.pdf.

14  Nat'l Low Income Housing Coalition, Out of Reach 2016: No Refuge For Low Income Renters, (2016) [hereinafter NLIHC Out of Reach], http://nlihc.org/sites/default/files/oor/OOR_2016.pdf.

NO SAFE PLACE: The Criminalization of Homelessness in U.S. Cities

afford a modest two-bedroom apartment at market rent.[15]

As rents have risen, federally subsidized housing has continued to decline. Today only 1 in 4 eligible renters receive federal housing assistance, and waiting lists for the resources that do exist are long - sometimes numbering in the tens of thousands.[16] In Miami-Dade County, for example, there are over 28,000 people on the waiting list for public housing alone.[17] This leaves most people with no realistic chance of obtaining the housing support that they need.

Yet, the need is greater than ever. Today, there is a 7.2 million unit shortage of affordable rental units available to our nation's lowest income renters.[18] To put this into context, this means that for every 100 extremely poor households in the country, only 31 will find affordable and available rental units.[19] Sixty-nine of the 100 will be forced to pay more than they can afford, leaving them unstably housed and vulnerable to homelessness.[20]

Without major policy changes, this situation will not improve.

### Discriminatory Housing Practices Contribute to Homelessness

There are a number of widespread discriminatory practices that create barriers to housing access, and thus contribute to homelessness. Indeed, housing discrimination has contributed to racial segregation, concentrated poverty, and other structural inequalities that create elevated risks of homelessness for vulnerable people. People whose social support networks consist of friends and family who may be similarly poor and at-risk of homelessness, for example, cannot rely upon those supports to catch them when they fall through the cracks of an unfair housing market.[21]

Landlords in the private market commonly refuse to rent to people using housing vouchers, for example, as too few communities have outlawed discrimination based on source of income, or prevented the use of source of income discrimination as a proxy for other forms of discrimination. The result is that people who have waited, perhaps for



years, on long subsidized housing waitlists may lose the subsidy when they cannot find a unit before the voucher expires.[22]

Refusal to rent to people with criminal histories also contributes to homelessness and disproportionately impacts people of color. In a study done by the Equal Rights Center of housing discrimination in the District of Columbia, it was found that housing agents discriminated against black women with reported criminal histories at a much higher rate than similarly situated white women.[23] Most often, the discrimination resulted in differing information about how criminal history screening policies were likely to affect the housing application. For example, one black woman was told that a felony record would disqualify her from housing, whereas her white counterpart was told that, "they could probably work with her."[24]

15   Id.
16   Center on Budget & Policy Priorities, *Policy Basics: Federal Rental Assistance* (Dec. 2015) [hereinafter CBPP Policy Basics], http://www.cbpp.org/research/housing/policy-basics-federal-rental-assistance.
17   Miami Dade, Public Housing & Community Dev., Waiting List Ranking/Position List Number, (2014), http://www.miamidade.gov/housing/waiting-list-rankings.asp.
18   *See* NLIHC Out of Reach at page 4.
19   Id.
20   Id.
21   Matthew Desmond, *Evicted: Poverty and Profit in the American City* (2016) [hereinafter Evicted.]

22   Equal Rights Center, *Will You take My Voucher?:An Update on Housing Choice Voucher Discrim. In District of Columbia*, (2013), http://www.equalrightscenter.org/site/DocServer/Will_You_Take_My_Voucher.pdf?docID=1921
23   Kelly Cohen, *Study finds racial discrimination in D.C. housing market*, Washington Examiner (Oct. 19, 2016), http://www.washington-examiner.com/study-finds-racial-discrimination-in-d.c.-housing-market/article/2604984
24   http://dcist.com/2016/10/black_women_housing_discrimination.php



**There are fewer emergency shelter beds than homeless people in many communities across the country**

Emergency shelter is not a long-term solution to the affordable housing crisis, but it has been relied upon as such, leaving shelters overflowing with individuals and families without other options for immediate, interim, or permanent housing. Across the country, there are fewer shelter beds than homeless people, and shelter is at, or even over, capacity.[25] In some places, the gap between available space and human need is significant, leaving thousands of people with no choice but to live outdoors in public places. Los Angeles County, for example, identified a homeless housing gap of nearly 26,000 units to meet the needs of its homeless population, including a deficit of 2,681 emergency shelter beds.[26]

Even where shelter beds are available, they may not be truly accessible to the people who need it.[27] Restrictions on age, gender, or even religious affiliation can create barriers to entry for homeless people.[28] A family with small children, for example, may be turned away from a shelter that serves only adult males. A mother with an adolescent son may be turned away from all-women shelter. There are seldom spaces for couples to stay together. Moreover, shelters may not be a safe option, particularly where overcrowding has contributed to unsanitary conditions or risk of violent crime.[29]

25   See NAEH State of Homelessness ("In 2015, 98.1% of emergency shelter beds across the nation were full, and have been consistently utilized above 90% since 2007. In many states, the utilization rate is above 100%.")

26   The Los Angeles Homeless Servs Authority, *Rep. on Homeless Housing Gaps in the County of Los Angeles* (January 2016), https://assets.documentcloud.org/documents/3106007/LA-County-Housing-Gap-Analysis.pdf.

27   Skinner, Suzanne and Rankin, Sara, *Shut Out: How Barriers Often Prevent Meaningful Access to Emergency Shelter* (May 9, 2016), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2776421.

28   *Id.* at page 2 ("Restrictions governing who can enter bar many people from shelter, while benefitting others. A prime example is that most shelters are restricted to either single males or single females. Families, youth, transgendered individuals, and heterosexual couples consequently are automatically excluded from the vast majority of shelters.")

29   *Id.* at page 16.

NO SAFE PLACE: The Criminalization of Homelessness in U.S. Cities



CRIMINALIZATION OF HOMELESSNESS

The activities attendant to human survival include many things that most of us would never consider doing in public, like sleeping overnight, going to the bathroom, or bathing. But, unsheltered homeless people do not have the luxury of privacy, and must carry out their private lives in public places. With no ability to abstain from basic human conduct, and with no private place to perform actions like sitting down or falling asleep, homeless people across the country are set up to violate laws prohibiting such conduct in public places.

These laws are often justified under the dubious theory that they are necessary to protect the public interest. The evidence reveals, however, that criminalization laws – which may include either criminal or civil punishments - are ineffective, expensive, and often violate the civil and human rights of homeless people.

The misuse of police power to address social problems has been criticized as contributing to the current climate of tension between police and their communities.[30] Enforcement of criminalization laws breeds distrust or even animosity between law enforcement and homeless people, in turn undermining governmental efforts to connect people with housing, shelter, or other needed services.

It also turns police officers into part of the problem, rather than a critical part of the solution. Police officers are uniquely situated to have contact with homeless people on the streets, in parks, and in other public areas that are patrolled. When given support by other key stakeholders, like mental health professionals and housing advocates, they are enabled to play a constructive role in addressing homelessness. But, even the best efforts of homeless outreach or crisis intervention teams cannot succeed unless they are paired with adequate housing and service resources.

### The Law Center's Survey of Cities Criminalizing Homelessness

Since 2006, the Law Center has tracked a core set of 187 cities nationwide and evaluated the number of ordinances in these cities prohibiting certain conduct, like sleeping, sitting down, and living in vehicles. This is the only such data on the prevalence of these laws nationwide. This section discusses the prevalence and dramatic increase in laws civilly or criminally punishing homelessness since 2006, broken down by category of prohibited conduct.

The data reveals that, in 2016, laws criminalizing homelessness remain highly prevalent and, in most cases, are increasing across the country. Many cities leave literally no lawful place for homeless people to perform one or more of the following categories of prohibited conduct, creating the constant threat of harassment, ticketing, or arrest of homeless people in those communities.



33% of surveyed cities prohibit camping in public city-wide

50% of surveyed cities prohibit camping in particular public places

### Camping in Public

One common form of criminalization measure is to prohibit "camping" in public. These laws are often written broadly to encompass a wide range of living arrangements, prohibiting homeless people from using any resource that might be their only option for shelter. They may also prohibit merely sleeping in public space.

Of the cities surveyed for this report, our 2016 research reveals that:

- 33% of cities prohibit camping in public city-wide. This represents an increase of 69% over the past ten years.

- 50% of cities prohibit camping in particular public places. This represents an increase of 48% over the past ten years.

Some of these laws prohibit camping as it is commonly understood. In Minneapolis, for example, it is illegal for a homeless person to use a "camp car, house trailer, automobile, tent or other temporary structure" as temporary housing anywhere in the city.[31]

Camping bans may also be broadly written to prohibit simply sleeping outside, or using any resource to protect oneself from the elements. In Charlotte, NC, "camping" is defined to include, "the use of city property for living accommodation purposes such as sleeping, or making preparations to sleep (including the laying down of bedding for the purpose of sleeping)…on city property for living accommodation purposes."[32] The law also specifically prohibits items that provide "partial shelter from the elements", and authorizes police to "summarily remove a temporary shelter, bedding or personal belongings."[33]

---

30  Harv. L. Rev., *Considering Police Body Cameras*, Vol. 128, No. 6, (Apr. 10, 2015), http://harvardlawreview.org/2015/04/considering-police-body-cameras/.

31  Minneapolis, Minn. Code, Art. I, Ch. 244.02(a).
32  Charlotte, N. C. Code, Art. I, § 15-26(a)
33  Charlotte, N. C. Code, Art. I, § 15-26(c).

Camping bans may result in immediate arrests of homeless people, but often these laws are punished by the issuance of a civil ticket or, increasingly, a threat to arrest or ticket someone. In Denver, Colorado, for example, few tickets have actually been issued for violation of the city's camping ban, yet a review of court records reveals that Denver police have made nearly 2000 "street checks" related to violation of the law – a practice that advocates say amounts to use of threats by police to ticket or arrest homeless people unless they dismantle their camps and move on.[34] As a result of such contacts, 6,789 individuals and families have been made to dismantle their camps since 2012, many during Denver's frigid winter months.[35]

City-wide bans on camping may be written to prohibit "camping" on all public and private property, thus limiting the ability of faith-based organizations and other private property owners to provide homeless people with a safe place to camp. Indeed, these laws may subject consenting private property owners to fines and other legal penalties for allowing homeless people to camp on their property.

By leaving no single place where homeless people can lawfully camp, these bans transform entire communities into "no homeless zones" where homeless people are left with the choice of facing constant threat of arrest or leaving town. These laws may be illegal, however, when they punish a homeless person for conduct inextricably linked to their homeless status. As stated by the U.S. Department of Justice in its statement of interest brief in *Bell v. Boise*, "[i]f a person literally has nowhere else to go, then enforcement of the anti-camping ordinance against that person criminalizes her for being homeless" in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.[36]



> **Criminally prosecuting those individuals for something as innocent as sleeping, when they have no safe, legal place to go, violates their constitutional rights. Moreover, enforcing these ordinances is poor public policy. Needlessly pushing homeless individuals into the criminal justice system does nothing to break the cycle of poverty or prevent homelessness in the future. Instead, it imposes further burdens on scarce judicial and correctional resources, and it can have long-lasting and devastating effects on individuals' lives."**
>
> - Principal Deputy Assistant Attorney General Vanita Gupta, head of the U.S. Department of Justice Civil Rights Division. [37]

### Sleeping in Public

Human beings – indeed, every living creature – must sleep. Yet, many cities outlaw this action when it is conducted in public space.

Of the cities surveyed for this report, our 2016 research reveals that:

- 18% of cities prohibit sleeping in public city-wide. This represents an increase of 31% since 2006.

- 27% of cities prohibit sleeping in particular public places. This represents a decrease of 11%, which is the only decrease found for any measured category since 2006.

Laws banning sleeping may be written to prohibit the activity outright at any time of day. In Dallas, Texas, for example, it is unlawful to sleep or "doze" in, "a street, alley, park, or other public place."[38] And, despite the City's estimated 600 unsheltered homeless people, Dallas has aggressively enforced this law by issuing over 11,000 citations for sleeping in public between January 2012 and November 2015.[39]

---

34   Walker, Chris, Westword, *DPD Crackdown on Homeless: Camping-Ban Enforcement up 500%* (May 24, 2016), http://www.westword.com/news/dpd-crackdown-on-homeless-camping-ban-enforcement-up-500-percent-7933788.

35   *Id.*

36   U.S. Dep't of Just. Statement of Interest brief in *Bell v. Boise* [hereinafter DOJ Statement of Interest] https://www.justice.gov/crt/file/761211/download.

37   U.S. Dept. of Just., *Justice Department Files Brief to Address the Criminalization of Homelessness* (August 6, 2015) available at https://www.justice.gov/opa/pr/justice-department-files-brief-address-criminalization-homelessness.

38   Dallas, TX Code Art. I, §31-13.

39   Eric Nicholson, *Dallas' Neverending Crackdown on Sleeping while Homeless*, Dallas Observer (Jan. 29, 2016), http://www.dallasobserver.com/news/dallas-neverending-crackdown-on-sleeping-while-homeless-7971590

Another common form of anti-sleeping law is one that limits when sleep may occur. In Louisville, KY, the city's disorderly conduct law includes a prohibition against sleeping in public, "during the hours of darkness."[40] While this law does not technically prohibit a homeless person from sleeping at some point each day, it does force human beings – who are diurnal by nature – to sleep during the day or not sleep at all. Moreover, compliance may be practically impossible for homeless people who must work, go to school, or attend appointments during business or daylight hours.

Other time limitations do not apply to particular hours of the day, but instead limit the activity when it occurs for too long. In Columbia, SC, it is unlawful to sleep "in a single place for any substantial prolonged period of time."[41] This vague time limitation also applies to storage of personal belongings.[42] A law like this invites individual officers to make personal determinations about when a person has remained in a single place for too long – or, to permit individual complaints from the community to dictate when the law should apply.

Unlike most of the measured categories of conduct, there has been a decrease in cities prohibiting sleeping in particular public places since 2006. Unfortunately, this decrease has been more than offset by the increase in cities that prohibit sleeping in public city-wide.

As with laws prohibiting camping, laws that ban sleeping outdoors when there are no sheltered alternatives may violate constitutional protections against cruel and unusual punishment.

**Sitting or Lying Down in Public**

Bans on sitting or lying down in public, often called "sit/lie" laws, are another common form of criminalization ordinance. Although every human being must occasionally rest, sit/lie laws punish homeless people for resting in various public places, such as in parks or on sidewalks.

Of the cities surveyed for this report, our research reveals that:

• 47% of cities prohibit sitting and lying down in public. This represents a 52% increase since 2006.

In Honolulu, the local sit/lie law has been enforced so aggressively that it has drawn national attention, and pointed criticism from homeless and civil rights advocates.

Since the expanded sit/lie ban was signed into law in late 2014, the city has issued a whopping 16,215 warnings and 534 written summonses.[43] It has also been transparent about its goal of removing Honolulu's homeless population from view. Indeed, one proposed plan is to relocate homeless people to a separate island that previously served as a garbage dump, as well as an internment camp during WWII.[44]

Proponents of sit/lie laws may argue that such laws are necessary to protect or improve economic activity in parts of the city where visibly homeless people are present. However, a study done by University of California Berkeley Law's Policy Advocacy Clinic found that a sit/lie ban had no effect on economic activity, but created significant public expenses related to implementation and enforcement of the law.[45]

**Loitering, Loafing, and Vagrancy**

Laws prohibiting loitering, loafing, or vagrancy, are common throughout the country. Similar to historical Jim Crow, Anti-Okie, and Ugly laws, these modern day ordinances grant police a broad tool for excluding visibly poor and homeless people from public places.[46]

Of the cities surveyed for this report, our 2016 research found that:

• 32% prohibit loitering, loafing, and vagrancy city-wide. This represents an increase of 88% since 2006.

• 54% prohibit loitering, loafing, and vagrancy in particular public places. This represents a 14% increase since 2006.

In Burlington, Vermont, loitering is defined to mean, "remaining idle in essentially one location and shall include

40   Louisville-Jefferson County Metro Code Title XIII, § 132.03(A)(18).
41   Columbia, S. C. Code of Ordinances Article IV, § 14-105.
42   Columbia, S. C. Code of Ordinances Article IV, § 14-105.
43   Adam Nagourney, *Aloha & Welcome to Paradise. Unless You're Homeless*, The N.Y. Times, (June 3, 2016), http://www.nytimes.com/2016/06/04/us/hawaii-homeless-criminal-law-sitting-ban.html?_r=0.
44   Cathy Busewitz, *Honolulu mayor outlines Sand Island emergency homeless camp*, Hawaii News Now (Jul. 2, 2015), http://www.hawaiinewsnow.com/story/29465451/honolulu-mayor-outlines-sand-island-emergency-homeless-camp.
45   *See* Joseph Cooter, et al., Berkley Law Policy Advocacy Clinic, University of California, *Does Sit-Lie Work: Will Berkeley's "Measures" Increase Economic Activity and Improve Services to Homeless People?* (2012), available at http://www.law.berkeley.edu/files/1023sit-lie2.pdf ("Our literature review did not reveal any evidence of Sit-Lie's efficacy in other jurisdictions, and of the fifteen survey responses we received, none directed us to any evidence in support of their views about the positive or negative impacts of Sit-Lie.").
46   Ortiz, Javier and Dick, Matthew and Rankin, Sara, The Wrong Side of History: A Comparison of Modern and Historical Criminalization Laws (May 4, 2015), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2602533.

NO SAFE PLACE: The Criminalization of Homelessness in U.S. Cities

the concepts of spending time idly loafing or walking about aimlessly."[47] Because homeless people do not have the luxury of a private space where they might rest, laws like that in Burlington, Vermont subject a homeless person to criminal penalties anytime they choose to remain in one place for too long.

**Begging in Public**

In the absence of employment opportunities or other sources of income, begging may be a homeless person's best option for obtaining the money that they need to purchase food, public transportation fare, medication, or other necessities.

Of the cities surveyed for this report, our 2016 research revealed that:

• 27% of cities prohibit panhandling city-wide. This represents an increase of 43% since 2006.

• 61% of cities prohibit panhandling in particular public places. This represents an increase of 7% since 2006.

Some panhandling laws prohibit begging outright, while others place strict limitations on how the action is performed. In Raleigh, North Carolina a person must obtain a permit to beg, which is limited to those who can furnish photo identification.[48]

Laws prohibiting "aggressive panhandling" are another common version of panhandling ban. Though these laws are purportedly aimed at curbing threatening or intimidating behavior that may accompany panhandling, some laws are designed to ban even innocuous and inherently harmless behavior. In Mobile, Alabama, for example, a person would be in violation of the municipal code for "aggressive panhandling" if he or she simply requests a donation from a person standing in line to enter a commercial establishment – no matter how mildly the request was made.[49]

Even where cities have chosen to limit their prohibition of panhandling to particular places, the impact can be as great as that of a city-wide ban. This is because commercial and tourist districts, the areas where panhandling is most likely to be prohibited, are often the only places where homeless people have regular access to passersby and potential donors.

A recent series of successful lawsuits challenging panhandling laws may help to reverse their upward trend. Laws restricting or penalizing begging, which is constitutionally protected speech, may infringe upon the right to free speech guaranteed under the First Amendment. In 2015, the U.S. Supreme Court decision in *Reed v. Town of Gilbert*[50] clarified when a regulation on speech is content-based and subject to strict judicial scrutiny. Since that time, a number of federal courts have struck down bans on begging in public.[51] The case that set the precedent for applying *Reed* to panhandling cases was a challenge to a Springfield, Illinois panhandling law, which restricted vocal pleas for immediate donations of cash.[52]

**Living in Vehicles**

Sleeping in one's own vehicle is often a last resort for people who would otherwise be forced to sleep on the streets. A dramatically growing number of cities across the nation, however, have chosen to impose criminal or civil punishments on people who live in their private vehicles, despite their lack of housing options.

Of the cities surveyed for this report, our 2016 research reveals that:

• 39% of cities prohibit living in vehicles. This represents an increase of 143% since 2006.

Much like outdoor camping and sleeping bans, city-wide restrictions on living in vehicles may leave no lawful place where homeless people may live in a community. In San Antonio, Texas, for example, it is unlawful to use, "a vehicle for living accommodation" in any public place throughout the city.[53]

The consequences of violating a ban on living in vehicles can be severe, and may prolong or even entrench a person's homelessness. Bans that permit vehicle impoundment, or that result in impoundment flowing from unpaid tickets or other enforcement of such bans, can cause homeless people to lose their shelter, transportation, and personal belongings in one fell swoop – with no realistic option to retrieve or replace them.

47   Burlington, VT, Code of Ordinances, Ch. 21, Art. 1.
48   Raleigh, N. C. Part 13, Chapter 2, §. 13-2007(a).
49   Mobile, AL Code, Article V, §55-101(2).
50   *Reed v. Town of Gilbert*, 135 S.Ct. 2218 (2015).
51   Debra Cassens Weiss, *Courts strike down panhandling bans based on Supreme Court's sign decision*, ABA Journal (May 10, 2016), http://www.abajournal.com/news/article/courts_strike_down_panhan-dling_bans_based_on_supreme_court_decision_on_sign.
52   *Norton v. City of Springfield*, 806 F.3d 411 (2015).
53   San Antonio Code of Ordinances, Art. I, §. 21-28.



**"I fled a domestic violence marriage that would have killed me … [and] was homeless for four months with my three children…. [B]eing in my car made me feel safer…. The car provided protection….[T]he car enabled us to have our meals, to do homework sessions for the kids…. The car was our dressing room, and sometimes our bathing room."**

- Michelle Doe, testifying in California in support of AB718 on May 13, 2015



**Food Sharing Bans**

Cities across the country have restricted sharing free food in public.

Of the cities surveyed for this report, our 2016 research reveals that:

• 6% of cities restrict sharing food in public.

Many cities have chosen to restrict homeless persons' access to food under the flawed premise that providing homeless persons with free food encourages them to remain homeless. But, this theory is not founded on evidence – nor common sense. Restricting access to free, safe food will do nothing to end homelessness, which is rooted in a lack of access to affordable housing. Instead, these restrictions incentivize hungry people to search for food in unsanitary places, such as garbage cans.

More than limiting food availability to homeless people, food sharing laws also expose individuals or organizations, often faith-based organizations, to fines or criminal liability for feeding poor and hungry persons. In so doing, these laws may represent an unconstitutional restraint on religious expression.

Cities restricting food sharing have decreased slightly in recent years, perhaps in response to a number of successful legal challenges of food sharing bans.[54] And, while this is a positive sign, it should be noted that food sharing bans are unique among criminalization ordinances in that they impose liability on homeless service providers and other individuals, rather than on homeless people themselves. In this way, reduction of food sharing bans do not directly reduce criminalization of homelessness.

**Criminalization Laws Harming Homeless Children and Youth**

Homeless children and youth are subject to liability under criminalization ordinances applicable to all age groups, as well as ordinances that apply uniquely to them, such as status offenses. Schools also play a role in entangling homeless children and youth with the juvenile and criminal justice systems through harsh, zero-tolerance school discipline policies.

**Status Offenses**

Status offenses are behaviors or actions that are legal for adults but punishable when performed by legal minors, under the age of 18. States differ in their approaches to defining and addressing status offenders, and while few states statutorily define status offenses as delinquent behavior, status offenses often result in treatment as a juvenile delinquent.[55] This can occur, for example, when a status offender is placed on probation, but later incarcerated pursuant to a technical violation of probation, "regardless of whether the status offense was serious enough to initially warrant the use of confinement."[56]

Running away is a crime in some states. Unaccompanied youth, even those who may be fleeing homes where they have been physically, sexually, or emotionally abused, can be liable just for being unaccompanied. Some jurisdictions even allow runaway youth to be held with juvenile offenders.[57]

54 Nat'l Law Center on Homelessness & Poverty, No Safe Place: Advocacy Manual, (2014), https://www.nlchp.org/documents/No_Safe_Place_Advocacy_Manual.
55 Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice, https://www.ojjdp.gov/mpg/litreviews/status_offenders.pdf.
56 Id.
57 Nat'l Law Ctr. on Homelessness & Poverty, Alone Without a Home: A State-by-State Review of Laws Affecting Unaccompanied Youth (2012), available at http://nlchp.org/Alone_Without_A_Home.

DOT...ING the CRIM...za...on of...for...on U.S. Cities

Truancy laws prohibit school-aged children from being out of school. Yet, for homeless children, regular access to school may be difficult and the reason for being out of school may be partly or completely attributable to homelessness. Homeless students who are unable to get to school on time due to lack of access to adequate and appropriate transportation may be cited for truancy.[58] Still, failure to regularly attend school can result in unwarranted punishment of homeless youth. In California, for example, a youth can be deemed a "habitual truant" and the youth can be declared a ward of the court. Until recently, California law even permitted youth to be incarcerated for truancy.

Curfew laws prohibit anyone under the age of 18 from being in the public past a certain time at night. Many states explicitly authorize curfews at the state level, and many more cities and localities have them on their books. Again, complying with this law may be impossible for children and youth experiencing homelessness with nowhere to go.

**School Discipline**

Schools also play a role in criminalizing homeless youth through school discipline policies that directly or indirectly involve students in the juvenile justice system.[59] These rules can disproportionately impact homeless students, including those who are also children and youth of color; those who identify as lesbian, gay, bisexual, transgender, and queer or questioning; English learners; and students with disabilities.[60] While schools can be a gateway to needed supports and services for many homeless children and youth, they can also be a pipeline for homeless students to come into contact with the juvenile and criminal justice systems.[61] Status offenses, for example, may be impossible to avoid for a homeless student.[62] Those who do not have access to clean laundry may likewise face discipline for

not following the rules regarding the school uniform.[63] In one case, a student, whose family had just been evicted, was expelled after bringing the family's kitchen utensils – including a knife – to school in his backpack.

Laws criminalizing homeless youth restrict their rights, limit their opportunities for education, housing, and employment, and often put further barriers between them and a safe and secure lifestyle. Moreover, these laws, policies, and practices often entangle otherwise law-abiding youth with the juvenile and criminal justice systems. Rather than punishing them for behavior they often cannot avoid, states and localities should find ways to divert homeless youth to social supports and services, minimize civil or criminal court involvement, and foster positive school climates to keep homeless youth safe at school.

---

58   *Id.*
59   *See e.g.*, Texas Appleseed, *Class, Not Court: Reconsidering Texas' Criminalization of Truancy* (2015), *available at* https://www.texasap-pleseed.org/sites/default/files/TruancyReport_All_FINAL_SingleP-ages.pdf;
60   *See e.g.*, U.S. Dep't of Educ., *Education for Homeless Children and Youths Program Non-Regulatory Guidance, Title VII-B of the McKinney-Vento Homeless Assistance Act, as Amended by the Every Student Succeeds Act, Non-Regulatory Guidance* (hereinafter "2016 Guidance"), at 6 (July 27, 2016), *available at* http://www2.ed.gov/policy/elsec/leg/essa/160240ehcyguidance072716.pdf (citations omitted); *see also* Ctr. for Am. Progress, *Seeking Shelter: The Experiences and Unmet Needs of LGBT Homeless Youth* (Sept. 2013), *available at* https://www.americanprogress.org/wp-content/uploads/2013/09/LGBTHome-lessYouth.pdf
61   Nat'l Law Ctr. on Homelessness & Poverty, *No Barriers: A Legal Advocate's Guide to Ensuring Compliance with the Education Program of the McKinney-Vento Act (2nd Ed.)*, at 52 (2016), *available at* https://www.nlchp.org/documents/NoBarriers,
62   Nat'l Law Ctr. on Homelessness & Poverty, *Homeless Students Count: How States and School Districts Can Comply With the New McKinney-Vento Education Law Post-ESSA*, at 5 (2016), available at https://www.nlchp.org/documents/Homeless-Students-Count.
63   *Id.; see also,* Jerome Dineen, *Strict Dress Codes Create Educational Barriers for Homeless Kids,* Street Sense, Oct. 31, 2016, http://street-sense.org/article/uniform/#.WCDiUcmlxbJ.

Case 8:18-cv-00155-DOC-JDE   Document 85-2   Filed 02/12/18   Page 28 of 73   Page ID #:1612

# HALL OF SHAME: CALLING OUT BAD POLICIES AND PRACTICES

The Law Center recognizes that most cities are struggling with difficult policy choices over how to reduce homelessness, and often pursue a combination of good (constructive) and bad (destructive) policies. Rather than call out individual cities for being the best or worst, we have identified particularly bad laws or practices of certain cities to include in our Hall of Shame. The following list of city laws and practices have been chosen due to their aggressive enforcement of criminalization laws and history of evicting homeless encampments.





**Threats of arrest: Denver, CO**

Subsidized housing in Denver is at capacity, and has a waiting list of 6,500 families. Moreover, 73% of homeless people surveyed by Denver Homeless Out Loud in 2013 reported being turned away from emergency shelter due to overcrowding. Despite these facts, the city has engaged in aggressive enforcement of its anti-camping law. While the number of tickets actually issued for illegal camping is low, the Denver Police Department makes thousands of "street checks" related to violation of the law – a practice that advocates say amounts to use of threats by police to ticket or arrest homeless people unless they dismantle their camps. Since 2012, 6,789 individuals and families have been made to dismantle their camps, even during Denver's frigid winter months.

**Evictions: Honolulu, HI**

Honolulu outlawed sitting and lying in public places, and has issued a whopping 16,215 warnings and 534 written summonses since the law was enacted at the end of 2014. In addition, the city has conducted numerous sweeps of encampments where homeless people lived, despite their lack of indoor alternatives. A survey of homeless encampment residents in Hawaii found that these sweeps have resulted in the loss of personal identification, tents, medicine, and even personal items, like children's toys. Moreover, the city has been transparent about its goal of removing Honolulu's homeless population from view. Indeed, one proposed plan is to relocate homeless people to a separate island that previously served as a garbage dump and former internment camp during WWII.





**Citations: Dallas, TX**

The City of Dallas has repeatedly cited the city's homeless population, which includes an estimated 600 unsheltered people, for sleeping in public. Indeed, between January 2012 and November 2015, the city issued over 11,000 citations for sleeping in public. The city has also aggressively enforced its panhandling ban, issuing approximately 2,000 citations for panhandling in 2015 alone. In addition to creating unaffordable debt, nonpayment of these citations bars a person from obtaining official photo identification.

**Exclusion: Puyallup, WA**

Even though there is no year-round emergency shelter available to the rapidly growing homeless population in Puyallup, the city has enacted a number of laws making it illegal to camp, panhandle, sit or lie down in large swaths of the city, or to be present in public parks after closing. Moreover, the city has amended its trespass law to allow people to be banned from all public places within the city for up to five years if they violate any of these laws – an inevitability for homeless people who have no ability to comply due to a lack of alternatives.

# PROBLEMATIC CRIMINALIZATION LAW ENFORCEMENT PRACTICES

**Evictions of Homeless Encampments**

"The forced dispersal of people from encampment settings is not an appropriate solution or strategy, accomplishes nothing toward the goal of linking people to permanent housing opportunities, and can make it more difficult to provide such lasting solutions to people who have been sleeping and living in the encampment."[64]

Homeless encampments across the country, even those that have existed for years, are increasingly subject to sudden evictions or "sweeps." A homeless "sweep" is a practice designed to remove homeless people and their belongings from a given area, typically involving both police and other governmental actors, like city or county parks departments or state transportation departments.

Often conducted with little or no notice, sweeps not only physically displace homeless people from public space, but they often result in the loss or destruction of people's few possessions. Tents, clothing, and even photo identification are commonly discarded as trash during a sweep. A survey of homeless encampment residents in Hawaii found that 57% of people lost their personal identification, 40% lost their tents, and 21% lost medicine.[65]

The loss of these items can be devastating to homeless people. For example, the loss of identification documents can make it difficult, if not impossible, for someone to access employment, gain access to housing, or even to exercise their basic right to vote.[66] And, the loss of warm clothing, protective tents, and medication can become a matter of life and death. In the case of *Kincaid v. City of Fresno*, for example, a City of Fresno police officer destroyed the asthma medication and nebulizer machine which a homeless plaintiff, Jeannine Nelson, needed to breathe.[67] The destruction of this property landed Ms. Nelson in the emergency room, a costly medical intervention, and required her to eventually replace her medications and breathing machine – all at taxpayer expense.[68]

Worse yet, sweeps are often conducted by governments with no plan to house or adequately shelter the displaced encampment residents. Instead, homeless people are made to leave their encampment communities without being offered any alternative places to live. Because this will merely disperse, rather than reduce, homelessness, new encampments will inevitably reappear. And, without sanitation services, so will the public health and safety concerns that led to the sweep in the first place. Indeed, California's state transportation agency eliminated 217 homeless encampments between July 2014 and February 2015, only to have some of them reopen the very same day.[69]

The cost to taxpayers for this ineffective exercise of governmental power is significant. The City of San Francisco, for example, spends over $3 million a year cleaning encampments, and the state department of transportation spends an additional $1.3 million.[70] As described by San Francisco's Human Services Agency director, Trent Rohrer, sweeps have been a, "colossal waste of city resources and a colossal waste of time."[71]



**[Sweeps] are not working. They've just become part of the process that homeless folks routinely go through in this cat-and-mouse game that we've been playing."**

– Honolulu City Councilman Joey Manahan [72]

---

64   United States Interagency Council on Homelessness, *Ending Homelessness for People Living in Encampments: Advancing the Dialogue* (August 2015) available at https://www.usich.gov/resources/uploads/asset_library/Ending_Homelessness_for_People_Living_in_Encampments_Aug2015.pdf.

65   Tai Duson-Strane & Sarah Soakai, *The Effects of City Sweeps and Sit- Lie Policies Honolulu's Houseless,* Dep't of Urb. & Reg. Planning U. of Haw. at Mānoa, (June 2015),  http://blog.hawaii.edu/durp/files/2015/06/Houseless-Honolulu-Report.small_.pdf.

66   Colleen Cosgrif, *Your Address Could Determine Your Right To Vote, What if you don't have one?,*Street Sense, (Sept. 21, 2016),  http://streetsense.org/article/your-address-could-determine-your-right-to-vote-what-if-you-dont-have-one/#.WCFpaYWcHIU.

67   *Kincaid v. Fresno*, 2006 WL 3542732 (E.D. Cal. Dec.  8, 2006).

68   *Id.*

69   S.F. Coalition on Homelessness, Punishing the Poorest: How the Criminalization of Homelessness Perpetuates Poverty in S.F., (March 2015) [hereinafter Punishing the Poorest in S.F.), http://www.cohsf.org/Punishing.pdf.

70   *Id.*

71   *Id.*

72   Rui Kenaya, *Endless Sweeps: City Keeps Rousting Homeless at a Cost of $75,000 a Year*, Honolulu Civil Beat (July 22, 2015), http://www.civilbeat.org/2015/07/swept-away-city-keeps-rousting-homeless-at-a-cost-of-750000-a-year/

## Orders to "Move On"

Another trend in law enforcement is to threaten to write a ticket or make an arrest if a homeless person fails to "move on" from the location where they are found. But, without any available alternatives, homeless people will remain in public space and may be repeatedly told to "move on" without any lawful place to move to. In a survey by San Francisco Coalition on Homelessness, 91% of respondents who had been told to move out of public space simply moved to other public space due to a lack of alternatives.[73] And, of the 9% who moved indoors, "many of these moves were only temporary: most reported moving to drop-in centers or the public library, or riding a city bus."[74]

In addition to being futile, use of "move along" orders discriminates against homeless people who have not violated any laws, and who are merely present in public. NYCLU and Picture the Homeless filed a complaint with the New York City's Commission on Human Rights following an intensive effort by NYPD to "move along" homeless people in East Harlem.[75] The complaint argues that NYPD amounts to unlawful "bias-based profiling."[76]



**Where are we going to go?" asked Alvir Gavorkain, a 58-year-old woman who has been homeless since 2002. "I'm sick and old, I can't keep doing this every time they ask me to move."[77]**

## Trespass and Banishment

Trespass authority is a broad tool that has been used to effectively banish homeless people from public places. Data from Colorado highlights the disparate impact of trespass laws on homeless people. In 2013 and 2014, over half of all trespass citations were issued to homeless people in Denver.[78] And, that number balloons to 80% in Boulder and 100% in Grand Junction.[79]

Challenging trespass orders is not always feasible, as orders may be issued without any process in place to challenge them. And, even when a process exists, it may not be available as a practical matter to people who are not adequately informed of the process, or who are unable to successfully navigate it without paid legal assistance.

Use of trespass laws can result in homeless people being banished from large swaths of public space, or from entire communities. In Puyallup, Washington, homeless people lack access to both affordable housing and emergency shelter, leaving them with nowhere to live but outside and in public spaces. Moreover, through a patchwork of local criminalization ordinances, there is no public place within the City where homeless people are legally permitted to sleep, store their needed belongings, and perform other necessary, life-sustaining activities. Yet, violation of these laws can result in a trespass order of exclusion from all public places in the city for as much as five years.[80] Moreover, violation of the trespass ban can result in criminal penalties under Washington state law.[81]

## Enforcement of Criminalization Laws by Private Security Personnel

Business Improvement Districts ("BIDs") engaged in homeless outreach via their representative ambassadors, even if well intended, can also create undue harm to homeless people through problematic enforcement of criminalization laws. While BID ambassadors often give the appearance of having official authority, denoted by a uniform, they are not police personnel, nor do they carry police power. Still, to a layperson – particularly a homeless person who is being asked to leave an area by someone who appears vested with authority – the distinction between a BID ambassador and police officer is not always clear.[82] Moreover, there is an inherent conflict of interest between BID ambassadors, with an interest in reducing visible homelessness in commercial districts, and homeless people who have no other lawful place to be.

BIDs often play an active role in promoting the criminalization of homelessness, either by complaining about the presence of homeless people in local business districts or by directly lobbying for enactment of criminalization policies. Denver's business community, through the Downtown Denver Partnership, has advocated

---

73  Punishing the Poorest in S.F. at page 23.

74  *Id.*

75  New York Civil Liberties Union, *Complaint: NYPD Unlawfully Orders Homeless People To Leave Public Spaces,* (May 26, 2016), https://www.cityofpuyallup.org/DocumentCenter/View/165

76  *Id.*

77  Ruben Vives & Gale Holland, *'Where are we going to go?' L.A. Homeless Sweeps Continue Despite Lawsuit,* L.A. Times, (Mar. 15, 2016), http://www.latimes.com/local/lanow/la-me-ln-l-a-homeless-sweep-freeway-overpass-20160315-story.html.

78  University of Denver Sturm College of Law Homeless Advocacy Policy Project, *Too High a Price: What Criminalizing Homelessness Costs Colorado* (2016), http://www.law.du.edu/documents/homeless-advocacy-policy-project/2-16-16-Final-Report.pdf.

79  *Id.*

80  Puyallup, WA Ordinance No. 3098, https://www.cityofpuyallup.org/DocumentCenter/View/165.

81  R.C.W 9A.52.080(1) is a misdemeanor punishable by up to 90 days in jail and a $1,000 fine.

82  Glyman, Alex and Rankin, Sara, Blurred Lines: Homelessness & the Increasing Privatization of Public Space (May 6, 2016). Seattle University School of Law, Homeless Rights Advocacy Project, 2016, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2776876.

for bans on panhandling, sitting or lying on sidewalks, and even opposed the use of sleeping bags in public.[83] It also promoted installment of "homeless parking meters," designed to direct money that may otherwise be given to panhandlers into meters that raise public funding to address homelessness.[84] After these meters were installed, however, it was discovered that Denver Human Services intended to use the funds to pay for evictions of homeless encampments.[85] Only after receiving negative press attention did the city reverse its position, but still defended that use as "perfectly within the bounds of the purpose of the fund."[86]

Businesses in Portland, Oregon have similarly campaigned for laws prohibiting sitting and lying in public[87], and a group of local businesses in Portland even sued the city to protest its short-lived "safe sleep policy" that allowed homeless people to sleep in public without sanction.[88]



Homeless Persons' Access to Justice

CRIMINALIZED
- Can't pay fine
- Bench Warrant

ARRESTED
- Can't pay or be released without bail
- Lengthy pre-trial detention
- Accepts plea

CONVICTED
- No probation without address
- Can't pay court fees

MORE PENALTIES
- Additional incarceration
- Loss of job, voting rights, access to benefits

---

83  Joe Palazzolo & Alejandro Lazo, *Denver's Bus's Take Active Role in Homeless Policies,* Wall St J. , (Oct. 16, 2016), http://www.wsj.com/articles/denvers-businesses-take-active-role-in-homeless-policies-1476639643.

84  *Id.*

85  Jon Murray, *Denver reverses decision to pay for homeless sweeps out of fund that contains donations,* The Denver Post, (June 30, 2016 at 3:23 P.M. updated July 12, 2016 at 3:34 P.M) http://www.denverpost.com/2016/06/30/denver-homeless-sweep-donation-fund-decision/.

86  *Id.*

87  Joe Palazzolo & Alejandro Lazo, *Bus. Interests Hold Sway on Cities Homeless Policies,* The Wall St. J. (Oct. 15, 2016), http://www.wsj.com/articles/cities-adopt-homeless-policies-pushed-by-downtown-business-interests-1476544016.

88  Brad Schmidt, *Portland sued over homeless camping,* The Oregonian http://www.oregonlive.com/portland/index.ssf/2016/04/portland_sued_over_homeless_ca.html.

NO SAFE PLACE: The Criminalization of Homelessness in U.S. Cities

# FEDERAL EFFORTS TO COMBAT THE CRIMINALIZATION OF HOMELESSNESS

In stark contrast to the continued increase of criminalization at the local level, the federal government in recent years has been strongly pushing in the other direction. In its 2012 report, "Searching Out Solutions: Constructive Alternatives to the Criminalization of Homelessness", the U.S. Interagency Council on Homelessness urged local governments to stop criminalizing homelessness, and to instead implement constructive alternative policies aimed at sustainably ending homelessness.[89] Since 2015, the federal government has gone on to take an even stronger stance. Here are several recent actions taken by the federal government to discourage and oppose the criminalization of homelessness:

## U.S. Department of Justice: Strong Statement of Interest brief filed in *Bell v. Boise*

On August 6, 2015, the U.S. Department of Justice filed a statement of interest brief in *Bell v. Boise*, a lawsuit filed by the Law Center in federal district court on behalf of six homeless plaintiffs who were convicted under laws that criminalized sleeping or camping in public.[90] The brief argued that enforcement of the anti-camping ordinance against people who have no option but to sleep outside due to a lack of adequate shelter options criminalizes a homeless person for his or her status, in violation of the 8th Amendment's prohibition against cruel and unusual punishment.

Recognizing that a lack of adequate alternatives made it "impossible for some homeless individuals to comply" with the camping ban, DOJ stated that application of the camping ban to homeless people punishes harmless universal conduct, serves no legitimate purpose, and criminalizes the status of homelessness in violation of the 8th Amendment's prohibition against cruel and unusual punishment.[91]

In filing the brief, DOJ set forth what it believes to be the appropriate legal framework for analyzing these kinds of claims, citing to the opinion in *Jones v. City of Los Angeles* where the Ninth Circuit found

unconstitutional the City of Los Angeles' practice of enforcing anti-camping ordinances when homeless people were unable to secure shelter.[92]

Homeless advocates have been able to leverage the filing of the brief to secure modest policy changes to existing camping bans. Local homeless advocates in Vancouver, Washington, for example, contacted the city to advise that the federal government's analysis in the brief also applied to Vancouver's then-existing camping ban. In response, the City Council voted to amend its camping ordinance to permit overnight camping on public grounds throughout the city, with few restrictions.

"It should be uncontroversial that punishing conduct that is a universal and unavoidable consequence of being human violates the Eighth Amendment. . .  Sleeping is a life-sustaining activity—i.e., it must occur at some time in some place.  If a person literally has nowhere else to go, then enforcement of the anti-camping ordinance against that person criminalizes her for being homeless."[93]

## U.S. Department of Housing & Urban Development: Federal funds incentivize communities to reduce criminalization

In both 2015 and 2016, the Department of Housing & Urban Development included significant incentives to reduce criminalization in its competitive grant application for nearly $2 billion in federal funding to local communities. Continuums of Care ("CoCs"), which are quasi-governmental bodies tasked with coordinating funding for homeless housing and services, can receive up to two points on their application if they work to prevent the criminalization of homelessness. To achieve maximum points, CoCs must, "indicate specific strategies to ensure homelessness is not criminalized…".[94] In a competitive funding environment, the loss of a single point can make the difference between a project receiving funding or not.

89   U.S. Interagency Council on Homelessness, *Searching Out Solutions: Constructive Solutions to the Criminalization of Homelessness*, (2012), https://www.usich.gov/resources/uploads/asset_library/RPT_SoS_March2012.pdf.

90   *Bell v. Boise*, 993 F.Supp.2d 1237 (2014).

91   *See* U.S. Dep't of Just. Statement of Interest brief in *Bell v. Boise*.

92   *Jones v. City of Los Angeles*, 444 F.3d 1118 (9th Cir.2006). The Jones opinion was vacated pursuant to settlement, but still has persuasive value.

93   DOJ Statement of Interest, supra note 37.

94   U.S. Dep't of Housing and Urb. Dev't Notice of Funding Availability (NOFA) for the Fiscal Year (FY) 2016 Continuum of Care Program Competition, Comm. Planning & Dev't, (Sept. 14, 2016), https://www.hudexchange.info/resources/documents/FY-2016-CoC-Program-NOFA.pdf.

This is the first time that the federal government has used its funding power to influence local criminalization policies, which sets important precedent.

**U.S. Interagency Council on Homelessness: Guidance issued on Homeless Encampments**

In 2015, U.S. Interagency Council on Homelessness published guidance, entitled "Ending Homelessness for People Living in Encampments: Advancing the Dialogue".[95] The guidance emphasizes that the forced dispersal of encampments is not an appropriate solution to homelessness, and can make it more difficult to achieve lasting housing and service outcomes. The guidance advises communities not to forcibly evict homeless people, and to instead provide low-barrier pathways to housing. It also urges local leadership to "prioritize the voice of those will be directly affected" by encampment evictions. [96]

The Chicago Coalition for the Homeless has leveraged the guidance to convene a broad set of stakeholders, including local lawmakers and homeless people, to discuss homeless encampment policy in Chicago. After discussing the principles of the guidance and their application to local homeless encampments, the city agreed not to seize the tents of homeless persons and committed to permanently house at least 75 of the city's homeless campers.

**U.S. Department of Education: Guidance issued to help implement the Every Student Succeeds Act**

In 2016, the U.S. Department of Education issued guidance advising school districts and states to coordinate with local and state legislatures to ensure that local laws and policies, particularly status offense laws and other laws that serve to criminalize homelessness, are not interfering with homeless students' ability to get to school and access education.[97]

**U.S. Department of Justice: Office of Community Oriented Policing Services (COPS) E-Newsletter** The newsletter, published in December 2015, encourages law enforcement to promote alternatives to the criminalization of homelessness.[98] Articles featured in the newsletter were produced in coordination with the Departments of Housing and Urban Development, Health & Human Services, U.S. Interagency Council on Homelessness, and the National Law Center on Homelessness & Poverty.

**U.S. Department of Justice: Comment on Seattle Encampment Proposal**

The U.S. Department of Justice issued a letter to Seattle City Councilmembers in response to a request for an opinion on proposed Seattle City Council Bill 118794,[99] which provides that the city may not remove homeless people from certain outdoor encampments unless "adequate and accessible housing" is available. In the comment letter, DOJ stated that the bill is, "without question" consistent with important constitutional principles, and stated that the bill, "recognize[s] that encampments exist and that the rights of people experiencing homelessness must be respected."[100] The letter also reaffirmed its position that the criminalization of homelessness is unconstitutional, quoting extensively from its statement of interest brief filed in the *Bell v. Boise* case.

**Federal Court Decisions Finding Criminalization Policies Unconstitutional**

There have been a number of successful legal challenges to criminalization laws since our last report on the topic[101], and our forthcoming Housing Not Handcuffs Advocacy Manual will include a summary of these cases. Two particular legal trends are worth noting here, however, including:

**Federal court decisions striking down panhandling laws**

Following from the U.S. Supreme Court decision in *Reed v. Town of Gilbert*, panhandling laws have been struck down by federal courts in cities across the country. The unanimous decision, reached in June 2015, stated that, "[g]

---

95   U.S. Interagency Council on Homelessness, *Ending Homelessness for People Living in Encampments: Advancing the Dialogue* (August 2015) [hereinafter USICH Encampment Guidance], https://www.usich.gov/resources/uploads/asset_library/Ending_Homelessness_for_People_Living_in_Encampments_Aug2015.pdf.

96   Nat'l Law Center on Homelessness & Poverty, *Fed. gov. recomm. Housing, not sweeps for homeless encampment residents*, (Aug. 12, 2015). https://www.nlchp.org/press_releases/Press%20Release%208.12.2015.

97   U.S. Dept. of Education, *Non-Regulatory Guidance Early Learning in the Every Student Succeeds Act: Expanding Opportunities to Support Our Youngest Learners*, http://www2.ed.gov/policy/elsec/leg/essa/essaelguidance10202016.pdf.

98   U.S. Dept. of Justice, Community Policing Dispatch (Dec. 2015), https://cops.usdoj.gov/html/dispatch/12-2015/index.asp.

99   Seattle City Council Bill 118794, http://seattle.legistar.com/LegislationDetail.aspx?ID=2828033&GUID=C106B277-5187-44F2-BD63-76B9E067403D.

100  Letter from Lisa Foster, Director Office of Access to Justice, U.S. Dept. of Justice, https://www.documentcloud.org/documents/3141894-DOJ-ATJ-Letter-to-Seattle-City-Council-10-13-2016.html.

101  National Law Center on Homelessness & Poverty, *No Safe Place Advocacy Manual* (2014), https://www.nlchp.org/documents/No_Safe_Place_Advocacy_Manual.

...OT... ...ing the ...sac... of ...for... ...tion in U.S. Cities

overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."[102] Such a law must survive strict judicial scrutiny to be constitutional under the First Amendment, which means that the government must show that the restriction on speech furthers a compelling governmental interest and is narrowly tailored to achieve that interest.

The Court of Appeals for the Seventh Circuit, in a decision two months later, struck down a panhandling restriction in Springfield, Illinois under the rationale of *Reed*.[103] The Springfield ordinance prohibited vocal requests for immediate donations of cash, but permitted other kinds of solicitation. The decision in this case, *Norton v. City of Springfield*, set the precedent for several other federal courts that struck down panhandling bans in Worcester and Lowell, Massachusetts; Portland, Maine; Grand Junction, Colorado; Tampa, Florida; and Springfield, Illinois.[104]

These decisions have also led to voluntary cessation of panhandling law enforcement. After the 7th Circuit Court of Appeals struck down Springfield, Illinois' panhandling ban in *Norton v. City of Springfield*, the ACLU of Wisconsin sent a letter to the Madison, Wisconsin City Attorney advising of the decision and the similar constitutional concerns raised by Madison's panhandling law.[105] In response, Madison City Attorney Michael May recommended a moratorium on enforcement of the city's panhandling ban.[106]

**Federal court decisions finding sweeps of homeless encampments unconstitutional**

Several federal courts have been asked to consider enforcement of camping bans against homeless people, including the practice of evicting homeless encampments, resulting in a number of recent decisions finding cities liable for violating the constitutional rights of homeless people. In Pomona, California, for example, a lawsuit filed on behalf of 15 homeless residents and a local church challenging the City's practice of summarily seizing and destroying homeless persons' property – including medication and

identification documents - resulted in a settlement that requires the city to collect and store property for free for up to 90 days.[107] Most critically, it prevents the City from enforcing its laws criminalizing camping and sleeping in public until the City has provided adequate alternatives.[108] Similarly, in Clark County, Washington, a lawsuit challenging the practice of homeless sweeps resulted in a settlement that provides expanded notice requirements and property protections – and requires the County to pay $250,000 in damages and attorneys fees.[109]

---

102   *Reed v. Town of Gilbert*, 135 S.Ct. 2218 (2015).

103   *Norton v. City of Springfield*, 768 F.3d 713 (7th Cir. 2014).

104   Debra Cassens Weiss, *Courts strike down panhandling bans based on Supreme Court's sign decision*, ABA Journal (May 10, 2016), http://www.abajournal.com/news/article/courts_strike_down_panhan-dling_bans_based_on_supreme_court_decision_on_sign.

105   Letter from Karyn Rotker, Senior Staff Attorney, ACLU of Wisconsin Foundation, http://www.wispolitics.com/1006/1516LetterMadison.pdf.

106   Dean Moisman, *Under Pressure, Madison is backing off controversial panhandling ordinance*, Wisconsin State Journal (Jan. 8, 2016), http://host.madison.com/wsj/news/local/govt-and-politics/under-pressure-madison-is-backing-off-controversial-panhandling-ordi-nance/article_cffb9e4f-84e5-5be6-8e65-6e5094f736a0.html.

107   Doug Smith, *Settlement of lawsuit over treatment of homeless in Po-mona*, Los Angeles Times (Aug. 29, 2016), http://documents.latimes.com/settlement-lawsuit-over-treatment-homeless-pomona/.

108   *Id.*

109   Katie Gillespie, *Clark County settles homeless case for $250,000*, The Columbian (Sept. 28, 2016), http://www.columbian.com/news/2016/sep/28/clark-county-settles-homeless-case-for-250000/.

# CRIMINALIZATION HARMS ENTIRE COMMUNITIES

**Criminalizing Homelessness is Ineffective Policy that Does Not Work to End Homelessness**



**Imagine this: You are living on the street after an unexpected divorce where you lost your house, you lost your job of twenty-five years, and you had a falling out with your family over how you got into this whole situation. Then, you try to put the pieces of your life back together. You go to a temporary work-placement office to get a job to make money for the day, but the manager says you won't be able to handle the work because you are homeless and therefore too unstable. So you decide to go to a local government agency seeking public assistance, but the clerk tells you government services are unavailable because you have no address. Defeated, you go to a shelter where you once volunteered, this time in search of a bed. But the shelter is full. After all this, you resolve to take one day at a time, and today starts on the street. The only problem is, police officers keep waking you up, saying you can't sleep here and there. Eventually, one officer confiscates the suitcase with all your remaining possessions. You decide enough is enough--you're going to speak your mind about how you have been treated. It's election day, and you're going to vote into the mayor's office someone who will stand against such callous police and local government practices. The only problem is, when you go to reregister to vote, they ask for identification with your current address, but you do not have one and cannot get one."[110]**

Criminalization strategies fail to address the root causes of homelessness and can create barriers to obtaining employment, stable housing, education, and access to justice.

## Employment

It is a common misconception that homeless people do not work, but the data on this point shows that many do,[111] and criminalization laws threaten their employment.

When a homeless person is arrested and jailed for harmless behavior like sleeping in a public park, he or she may suddenly miss work – perhaps for an extended period of time – creating a strong risk that the job will be lost. Even where there is not a prolonged period of incarceration associated with the arrest, homeless defendants who wish to exercise their constitutional right to due process and defend against the charge may be required to attend multiple court hearings, and miss additional time at work before the cases are finally resolved. Moreover, fines and court fees associated with resolving a criminalization case can amount to hundreds, or even thousands, of dollars. Without the resources to pay, homeless people may be subject to additional jail time, interrupting employment even after a criminal case has been resolved.

In addition, unpaid tickets or criminal convictions can severely restrict homeless persons' employment options. Jobs that require a drivers' license, for example, may not be available to a homeless person who has had her license suspended pursuant to unpaid fines or certain criminal convictions. Research by Rutgers University found that 42% of people with a license suspension lost jobs as a result, and 45% of those could not find other employment.[112]

A criminal record may also cause a homeless person to be rejected by private employers who inquire about prior arrests on job application forms. Moreover, potential employers frequently run criminal background checks and may choose not to hire anyone with a criminal past, even where the facts of the underlying crime have no bearing on the person's ability to perform the job. In this way, arrests and criminal convictions can create a long-term, or even lifetime, barrier to employment and the income homeless people need to afford stable housing.

## Housing

Given the lack of housing affordable to the lowest income Americans, subsidized housing programs, such as the Section 8 voucher program and public housing, are a critical means of preventing and ending homelessness. Homeless people may find, however, that having a criminal record has made them ineligible for federal housing subsidies.

---

110   Jonathan J. Sheffield, Homeless Bills of Rights: Moving United States Policy Toward A Human Right to Housing, 22 Geo. J. on Poverty L. & Pol'y 321 (2015)

111   The U.S. Conf. of Mayors, *Hunger & Homelessness Surv.: A Stat. Rep. on Hunger & Homelessness in America's Cities*, (Dec. 2015),  https://www.

usmayors.org/pressreleases/uploads/2015/1221-report-hhreport. pdf. (18% of homeless people are employed per the US Conference of Mayors.)

112   *See* Coalition on Homelessness, Punishing the Poorest: How the Criminalization of Homelessness Perpetuates Poverty in S.F., (March 2015).

Applicants for federally subsidized housing are required to disclose any criminal convictions on their records, even those for minor and non-violent crimes. Under federal law, only two types of people must be permanently barred: 1) people found to have manufactured or produced methamphetamine on the premises of federally assisted housing, and 2) sex offenders subject to a lifetime registration requirement.[113] Otherwise, Public Housing Authorities (PHAs), the local administrators of federally subsidized housing programs, have broad discretion to determine their own policies regarding the eligibility of people with criminal records. Many PHAs utilize overly exclusive policies when determining applicant eligibility. For example, some PHAs prohibit anyone with a criminal record – even for minor offenses – from receiving assistance. The federal government has taken steps to address these overly restrictive policies. In June 2011, former HUD Secretary Shaun Donovan issued a memorandum to PHAs encouraging them to consider the seriousness and age of offenses when determining eligibility for assistance, as well as evidence of rehabilitation.[114] Later, in November 2015, HUD issued a notice informing PHAs and owners of other federally-assisted housing that, "arrest records may not be the basis for denying admission, terminating assistance or evicting tenants."[115]

### Public Benefits

While a disabled individual is incarcerated, federal benefits that they rely upon to pay for housing, such as Supplemental Security Income ("SSI"), are suspended.[116] And, if the period of incarceration extends beyond one year, benefits are terminated and the recipient must submit a new application.[117] A new application does not guarantee that benefits will be re-awarded, and even when they are, the new application may take months or even years to get approved. As a result, many people with disabilities reentering society from jails and prisons have no ability to pay for housing, leaving them prone to homelessness.

### Voting

Criminal convictions can also cost someone their voting rights, which can be especially problematic for poor and homeless people who have little economic or other power to influence policy change.[118] Moreover, voting rights may be unavailable as a practical matter to homeless persons who have lost their personal identification documents and cannot satisfy voter ID laws.[119]

### Access to Justice

Navigating the criminal justice system can be difficult for anyone. These problems can be particularly difficult, however, for people without a permanent address, regular access to transportation, a safe place to store personal records, and few or no financial resources. The lack of a permanent address and financial resources create barriers to accessing justice for homeless defendants at every level of the criminal justice system. Indeed, a faulty system of excessively high fines, bail, and fees, and limited access to probation all contribute to homeless people being incarcerated more often, and for longer, than their housed counterparts.

Once arrested, unaffordable bail and the lack of a mailing address can result in a homeless person remaining in custody until his case is resolved – often through a conviction that results in unaffordable court fees and costs.[120] Indeed, fees are present at multiple stages of the criminal justice process, including costs associated with applying for a court-appointed attorney and performing court ordered probation. These fees are often well beyond a homeless person's ability to pay, and can even result in future incarceration for failure to resolve the debt.

Also, homeless people are more prone to violate their probation due to practical difficulties in complying with the ordered conditions. Maintaining a stable location where they can be monitored by probation officers, affording public transportation to and from required appointments, and remaining out of high crime areas can all be difficult, if not impossible, conditions for homeless people to comply with.[121]

Even where the life-sustaining conduct of homeless people is civilly, rather than criminally, punished, access to justice

113  24 C.F.R. § 960.553(a)(2)(i) (2014).

114  Letter from Shaun Donovan, Sec'y, U.S. Dep't of Hous. & Urban  Dev., to Pub. Hous. Auth. Exec. Dir. (June 17, 2011), available at  http://nhlp.org/files/Rentry%20letter%20from%20Donovan%20 to%20 PHAs%206-17-11.pdf.

115  U.S. Dept. of Housing and Urban Development, Notice PIH 2015-19, (Nov. 2, 2015), http://portal.hud.gov/hudportal/documents/ huddoc?id=PIH2015-19.pdf.

116  Social Security Administration, *What Prisoners Need to Know*, https:// www.ssa.gov/pubs/EN-05-10133.pdf.

117  *Id.*

118  Am. Bar Ass'n., User Guide, (2013), http://www.abacollateralconse- quences.org/user_guide/#q01_h.

119  Michael Wines, *As ID Laws Fall, Voters See New Barriers Rise*, N.Y.Times, (Oct. 25, 2016), http://www.nytimes.com/2016/10/26/us/ elections/voter-id-laws.html

120  Human Rights Watch, *The Price of Freedom: Bail & Pretrial Detention of Low Income Nonfelony Defendants in New York City*, (Dec. 2, 2010), https://www.hrw.org/report/2010/12/02/price-freedom-bail-and- pretrial-detention-low-income-nonfelony-defendants-new-york.

121  San Francisco Coalition on Homelessness, Punishing the Poorest: How the Criminalization of Homelessness Perpetuates Poverty in San Francisco (2015) available at http://wraphome.org//wp-con- tent/uploads/2015/03/Punishing.pdf.

## Housing First in Central Florida



By implementing a Housing First strategy, Central Florida could save **$21,000** per person annually, reducing spending by **two-thirds**

$31,000.00 — Annual cost per person of arrests, jail stays, ER visits, & hospital stays

$10,000.00 — Annual cost per person of permanent housing & a case manager

access is implicated for homeless people. Civil sanctions do not provide for the same due process protections as criminal penalties.[122] A homeless person who has received a ticket does not have the right to an attorney or the right to secure a jury trial. This is true even though the person may be incarcerated later for failure to pay the underlying fine.[123]

Civil punishments may also lay the foundation for future criminal violations. For example, it is common for unpaid fines to result in the suspension of one's drivers' license. For those without realistic public transportation options, attending work, school, medical appointments, or other obligations may become impossible without driving. Yet, driving with a suspended license is a crime and, in some states, can even result in a felony conviction.[124]

### Adds to the Epidemic of Mass Incarceration of Poor Communities and Mentally Ill People

Over 11 million people are cycled through our nation's jails each year, costing local governments approximately $22 billion annually.[125] Arrests of people experiencing

homelessness has significantly contributed to this costly epidemic, as homeless people are as much as 11 times more likely to experience incarceration than those in the general population.[126]

The criminalization of homelessness also further harms already marginalized communities, including communities of color, persons with disabilities, and members of the LGBTQ community. 56% of incarcerated homeless people in San Francisco's jail, for example, are black – even though they make up only 6% of the general population and less than 40% of the homeless population.[127] Members of the LGBTQ community are also harmed by criminalization policies and practices that target homeless youth, like truancy laws, as an estimated 40% of unaccompanied homeless youth identify as LGBTQ.

People living with mental illness are also vulnerable to incarceration at inflated rates, with 64% of all people held in local jails having a mental illness.[128]

Homeless people are as much as 11 times more likely to experience incarceration than those in the general population.

### Criminalizing homelessness costs more than solving it with housing and services

Criminalization measures waste limited state and local resources. Rather than addressing the causes of homelessness and helping people escape life on the streets, criminalization "creates a costly revolving door that circulates individuals experiencing homelessness from the street to the criminal justice system and back."[129] Indeed, USICH estimates that chronic homelessness, due in part to its criminalization, costs the public between $30,000 and $50,000 per person every year.[130]

122  Olson, Justin and MacDonald, Scott and Rankin, Sara, Washington's War on the Visibly Poor: A Survey of Criminalizing Ordinances & Their Enforcement (May 6, 2015). Seattle University School of Law Research Paper No. 15-19, Published by the SU Homeless Rights Advocacy Project, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2602318.

123  Id.

124  Fla. State Statute, Title XXII, Ch. 322 Sec. 264.

125  The White House, Fact Sheet: Launching the Data-Driven Justice

Initiative: Disrupting the Cycle of Incarceration (June 30, 2016) available at https://www.whitehouse.gov/the-press-office/2016/06/30/fact-sheet-launching-data-driven-justice-initiative-disrupting-cycle.

126  United States Interagency Council on Homelessness, Reducing Criminal Justice System Involvement Among People Experiencing Homelessness (August 2016) available at https://www.usich.gov/resources/uploads/asset_library/Criminal_Justice_Involvement_08_2016.pdf.

127  San Francisco Coalition on Homelessness, Punishing the Poorest: How the Criminalization of Homelessness Perpetuates Poverty in San Francisco (2015) available at http://wraphome.org/wp-content/uploads/2015/03/Punishing.pdf.

128  The White House, Fact Sheet: Launching the Data-Driven Justice Initiative: Disrupting the Cycle of Incarceration (June 30, 2016) available at https://www.whitehouse.gov/the-press-office/2016/06/30/fact-sheet-launching-data-driven-justice-initiative-disrupting-cycle.

129  U.S. Interagency Council on Homelessness, Searching Out of Solutions: Constructive Solutions to the Criminalization of Homelessness, (2012), https://www.usich.gov/resources/uploads/asset_library/RPT_SoS_March2012.pdf.

130  U.S. Interagency Council on Homelessness, USICH Blog, (June 2015), https://www.usich.gov/news/archive/a/2015/06/.

NO SAFE PLACE: The Criminalization of Homelessness in U.S. Cities

A growing body of research comparing the cost of homelessness (including the cost of criminalization) with the cost of providing housing to homeless people shows that housing is the most affordable option. With state and local budgets stretched to their limit, rational, cost-effective policies are needed – not ineffective measures that waste precious taxpayer dollars.

A 2014 analysis by Creative Housing Solutions evaluated the cost of homelessness in Central Florida and found that providing chronically homeless people with permanent housing and case managers would cost approximately $10,000 per year; $21,000 less than the region was spending on law enforcement and medical costs for each chronically homeless person. The savings from providing housing would save taxpayers $149 million over the next decade.[131]

Studies of homelessness in Seattle, Washington revealed similar results. A 2009 study by the Journal of the American Medical Association found that chronically homeless participants in Seattle's Housing First program had median costs of $4,066 per person each month, but that those costs decreased by 60% after one year in housing – even after factoring in the cost of housing and supportive services.[132] Indeed, researchers stated that, "permanent, rather than temporary housing may be necessary to fully realize these cost savings, because benefits continued to accrue the longer these individuals were housed."[133] Other research by the Homeless Rights Advocacy Project at Seattle University School of Law's Korematsu Center found that investment in permanent housing, rather than criminalization strategies, could save taxpayers over $2 million in criminal justice and other costs every year.[134]

An evaluation by the Massachusetts Housing and Shelter Alliance of Massachusetts' Home & Healthy for Good program found that permanent supportive housing using a Housing First model is not only more successful at ending homelessness, but it also was more cost effective than managing homelessness on the street or in shelter.[135]

Housing First is an approach to providing housing that centers on pairing people with quick access to permanent housing, without threshold requirements such as sobriety or minimum income, and then providing services as needed. Using this model, Massachusetts saved an average of $9,339 per formerly homeless person.[136]

Implementing constructive alternatives to criminalization also saves cities money in other ways. Criminalization laws expose local governments to protracted and expensive litigation for violating homeless persons' civil and human rights. The City of Los Angeles, for example, has agreed to pay nearly $3 million dollars in attorneys' fees and other costs to resolve several lawsuits filed against it in the past three years on behalf of homeless persons and their advocates.[137] Positive solutions to homelessness avoid this expense while also reducing the numbers of homeless people living outdoors.

Criminalizing homelessness may also cost communities nearly $2 billion in federal funding for homeless housing and services under the recently amended grant application for HUD CoC funding.[138] As many communities have no other dedicated funding for emergency shelter and other needed homeless services, the loss of federal monies could be devastating.

At a time when government budgets are shrinking, expensive and ineffective strategies should be avoided. The human and financial toll of cycling people through jails, crisis centers, emergency rooms, and emergency shelters back to the streets is substantial – and the cycle is extremely difficult for homeless people to break. Investing in strategies that work to prevent and end homelessness is a smart use of taxpayer money and should be the strategy of choice for any city seeking to resolve the problem of visible homelessness to the benefit of the entire community

131   Gregory A. Shinn, The Cost of Long-Term Homelessness In Central Florida:  The Current Crisis & The Cost of Providing Sustainable Housing Solutions, (2014), http://shnny.org/uploads/Florida-Home-lessness-Report-2014.pdf.

132   Mary E. Larimer, PhD; Daniel K. Malone, MPH; Michelle D. Garner, MSW, PhD, Health Care & Public Service Use & Costs Before & After Provision of Housing for Chronically Homeless Persons with Severe Alcohol Problems, The JAMA Network, (Apr. 1, 2009), http://jamanetwork.com/journals/jama/fullarticle/183666.

133   Id.

134   Howard, Joshua and Tran, David and Rankin, Sara, At What Cost: The Minimum Cost of Criminalizing Homelessness in Seattle and Spokane (May 6, 2015). Available at SSRN: https://ssrn.com/abstract=2602530 or http://dx.doi.org/10.2139/ssrn.2602530.

135   Mass .Housing & Shelter Aliiance, Perm. Supportive Housing: A Solution Driven Model, (Jan. 2015),http://www.mhsa.net/sites/default/files/January%202015%20HHG%20Report.pdf.

136   Id.

137   Emily Alpert Reyes, L.A. agrees to pay nearly $950,000 in two cases involving the homeless, L.A. Times, (June 14, 2016 at 11:08 A.M.), http://www.latimes.com/local/lanow/la-me-ln-attorney-fees-homeless-case-20160613-snap-story.html.

138   U.S. Dep't of Housing and Urb. Dev't Notice of Funding Availability (NOFA) for the Fiscal Year (FY) 2016 Continuum of Care Program Competition, Comm. Planning & Dev't, (Sept. 14, 2016), https://www.hudexchange.info/resources/documents/FY-2016-CoC-Program-NOFA.pdf.

HOUSING NOT HANDCUFFS: Ending the Criminalization of Homelessness in U.S. Cities

# HALL OF FAME: CITIES WITH NOTABLE CONSTRUCTIVE ALTERNATIVE POLICIES

As noted above, local governments across the country often adopt both constructive and destructive policies related to homelessness. Rather than identify cities that are better or worse, we are highlighting in our Hall of Fame a number of positive policies and practices that should be replicated across the country.





**Protecting Encampments: Indianapolis, IN**

Indianapolis became the first city in the country to enact a law that requires the local government to provide adequate housing alternatives before evicting homeless people from encampments. In addition, the law requires that camp residents be given a minimum of 15 days' notice before closing a camp, and that the city must offer to store their personal belongings for up to 60 days before they can be disposed of or destroyed. This law implements the USICH guidance on encampments, and was highlighted as a model by the National League of Cities.

**Decriminalization of Homelessness and Investment in Housing and Services: Syracuse, NY**

Mayor Stephanie Miner has expressly rejected the criminalization of homelessness as a strategy for the city to address homelessness, and has openly advocated for housing as an alternative. She has worked with others in the city, including the police force, to ensure that the city is pursuing constructive approaches to homelessness, and not punishing people for their visible poverty. Syracuse Mayor Miner even refused to follow a January 2016 order by New York Governor Andrew Cuomo to arrest any homeless people who refused to enter into shelters. Rather than adopt this criminalizing approach, the Mayor has engaged in persistent outreach to people experiencing homelessness and connections to housing using a Housing First model. This has helped Syracuse become one of the nation's first cities to end veteran homelessness.





**Innovative Emergency Shelter Model: San Francisco**

In many communities, emergency shelter is unsafe, inadequate, or laden with restrictions that make it inaccessible to many homeless people in need. San Francisco's Navigation Center eliminates those unnecessary barriers to shelter access. The Navigation Center, first opened in a vacant former school property, does not have curfews – which is helpful to people who work odd hours – and it does not require a shelter resident to exit the premises each morning. In addition, the Navigation Center permits mixed gender sleeping arrangements, which is a feature attractive to couples who may otherwise be separated in a traditional shelter. It does not prohibit entry by persons with pets. Also, the Navigation Center provides storage for homeless persons' belongings and does not require sobriety or participation in religious or other services while there. Although the Navigation Center is able to serve only a small fraction of the city's 3,500 unsheltered homeless people – indeed, the original location has a maximum capacity of 75 – the city has plans to expand the model to six locations.

**Dedicated Local Funding for Homeless Services: Miami-Dade County, Florida**

Miami-Dade County has dedicated funding for homeless services through its Homeless and Domestic Violence Tax. The 1% tax is collected on all food and beverage sales by establishments licensed by the state to serve alcohol on the premises, excluding hotels and motels. 85% of the tax receipts go to the Miami-Dade County Homeless Trust, which was created in 1993 by the Board of County Commissioners to implement the local continuum of care plan and to monitor agencies contracted by the County to provide housing and services for homeless people.

Case 8:18-cv-00155-DOC-JDE   Document 85-2   Filed 02/12/18   Page 42 of 73   Page ID #:1626

# CONSTRUCTIVE SOLUTIONS TO HOMELESSNESS AND POLICY RECOMMENDATIONS

Criminalization policies are ineffective, expensive, often unconstitutional, and inconsistent with federal recommendations and human rights norms. Yet, these policies persist due, in part, to a lack of awareness of constructive alternative solutions to homelessness. Instead of criminalizing the life-sustaining conduct of homeless people, all levels of government should institute data-informed policies that work to end homelessness and save public resources. The Housing Not Handcuffs campaign, a nationwide campaign launched by the Law Center which is aimed at ending the criminalization of homelessness and promoting constructive alternative policies, has developed a model policy to achieve these goals. The model policy is available in Appendix B of this report. Included within those policies are the following recommendations:

### Shorten homelessness by ending the criminalization of homelessness

#### Repeal and Defund the Criminalization of Homelessness

The laws, policies, and practices that prohibit or limit the use of public space by homeless people for life-sustaining activities should be repealed and defunded. Homeless people should not be subject to, or threatened with, civil or criminal sanctions or harassment by law enforcement, other state actors, and/or private security personnel for conducting life-sustaining activities in public places. In addition, homeless persons' personal property should not be subject to unreasonable searches and seizures.



**Communities across the country are dedicated to ending and preventing homelessness, and law enforcement can play key roles and offer unique perspectives necessary to inform this discussion and end the cycle between homelessness and jail or prison experienced by so many,"**

- Matthew Doherty, Executive Director of the U.S. Interagency Council on Homelessness.[139]

### Improve police training and protocols

Police officers should work collaboratively with mental health professionals, housing advocates, and other strategic partners to address homelessness. To accomplish this, cross-training and information sharing is critical.[140] Communication between these key stakeholders should be open and frequent, and police officers should be made aware of the full range of housing and service options available to the homeless individuals they encounter.

Police officers should also be trained on how to respond to crises involving people with mental illness. Learning how to recognize psychiatric distress and de-escalate volatile situations can prevent unnecessary use of police force. It can also help reduce the likelihood that homeless people suffering from mental illness will be placed in jail, rather than in treatment.

Police officers should also be trained on the constitutional bounds of their use of power. Police training of the District of Columbia's Metropolitan Police Department provides an excellent model. The Washington Legal Clinic for the Homeless has developed a 2-hour training program, called "Homelessness 101", which it has used to train local police agencies for the past fifteen years. The training, which includes a presentation by a formerly homeless person, has resulted in vastly improved interactions between homeless people and MPD, and has been well-received by police officers and homeless people alike.[141]

"Unconstitutional policing undermines community trust," said Vanita Gupta, Principal Deputy Assistant Attorney General and head of the Civil Rights Division at the U.S. Department of Justice. "Blanket assumptions and stereotypes about certain neighborhoods and certain communities can lead residents to see the justice system as illegitimate and authorities as corrupt. Those perceptions

139  Matthew Doherty, *Incarceration & Homelessness: Breaking the Cycle*, Comm. Policing Dispatch, Vol. 8, Iss. 12, (Dec. 2015), https://cops. usdoj.gov/html/dispatch/12-2015/incarceration_and_homeless-
ness.asp.

140  Marcy Thompson, *Law Enforcement is Critical Comp. of the Coordi-nated Effort to End Homelessness*, Comm. Policing Dispatch, Vol. 8, Iss. 12, (Dec. 2015), http://cops.usdoj.gov/html/dispatch/12-2015/le_critical_to_end_homelessness.asp.

141  The Wash. Legal Clinic for the Homeless, *Changing Police Response to Homelessness, One Officer at a Time*, (Sept. 17, 2014), http://www.legalclinic.org/changing-police-response-to-homelessness-one-officer-at-a-time/.

NO SAFE PLACE: The Criminalization of Homelessness in U.S. Cities

can drive resentment. And resentment can prevent the type of effective policing needed to keep communities and officers safe."[142]

## End incentives to criminalize homelessness and poverty

Law enforcement may not wish to support criminalization policies, as they recognize that temporarily cycling people through local jails or citing them with fines that they cannot afford is ineffective and counterproductive. Yet, they may be under significant pressure to enforce bad policies due to citizen complaints or pressure from local leadership. Indeed, law enforcement may be directly incentivized to criminalize homelessness through the use of arrest quotas. In Albuquerque, New Mexico, for example, police officers were advised to arrest at least five panhandlers each month. Local governments should eliminate all police quotas that incentivize police to ticket or arrest homeless people for such harmless conduct.

## Develop constructive encampment policies

Homeless encampments are not a permanent solution to homelessness. Housing is the only permanent solution. Safe and lawful homeless encampments can be a critical interim measure, however, for ending the criminalization of homelessness while affordable and accessible housing policies are pursued. Emergency shelters are not able to address the crisis needs of all people experiencing homelessness. This is due not only to the lack of capacity, but also due to a number of factors that make emergency shelter an inappropriate option for many homeless people.[143]

Local governments can develop constructive encampment policies, including designating areas where homeless people may safely and lawfully camp and store belongings. To best serve the encampment population, and to reduce harm to homeless residents and the surrounding communities, encampments should be provided with trash service, water service, and other necessary services, like toilets.

In addition, local governments should develop constructive policies for addressing existing homeless encampments modeled on federal guidance. At a minimum, state and local governments should develop policies for cleaning public places that do not displace homeless people from public lands, nor result in the destruction of their belongings, when there is no adequate housing alternative.

## Prohibit the local criminalization of homelessness through state legislation

Cities using the criminal justice system to effectively push homeless people out of their city can lead to a "race to the bottom" where cities compete to make their communities so inhospitable to homeless people that they will relocate elsewhere. One legislative model that would prevent this domino effect is the Right to Rest Act, which has been introduced in the state legislatures of California,[144] Colorado,[145] and Oregon,[146] and which will be reintroduced in each of these states in 2017. The Right to Rest Act is state-level legislation that would prohibit localities from criminalizing acts of rest, like sleeping and sitting down, in public places.

Other state-level legislation that can be helpful in reducing criminalization is a Homeless Bill of Rights similar to what has been enacted in Rhode Island, Connecticut, and Illinois.[147] In Illinois, for example, the Bill of Rights for the Homeless Act guarantees homeless people, "the right to use and move freely in public spaces…in the same manner as any other person and without discrimination on the basis of his or her housing status."[148] The Act also grants homeless people, "the right to a reasonable expectation of privacy in his or her personal property to the same extent as personal property in a permanent residence."[149]

---

142  Robin McDonald, *DOJ Civil Rights Chief Links to Local Distrust of Police to "Unconstitutional" Tactics"*, Law.com, (Sept. 21, 2016), http://www.law.com/sites/almstaff/2016/09/21/doj-civil-rights-chief-links-local-distrust-of-police-to-unconstitutional-tactics/?kw=DOJ%20Civil%20Rights%20Chief%20Links%20Local%20Distrust%20of%20Police%20to%20%E2%80%98Unconstitutional%E2%80%99%20Tactics&cn=20160921&pt=AfternoonUpdate&src=EMC-Email&et=editorial&bu=Law.com&slreturn=20160827150538.

143  Skinner, Suzanne and Rankin, Sara, *Shut Out: How Barriers Often Prevent Meaningful Access to Emergency Shelter* (May 9, 2016), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2776421.

144  California Senate Bill 876 (2015-2016), https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=201520160SB876.

145  Colorado House Bill 16-1191 http://www.leg.state.co.us/clics/clics2016a/csl.nsf/fsbillcont/CB9137EB594834CF87257F240063FA10?Open&file=1191_01.pdf.

146  Oregon Senate Bill 629 (2015), https://olis.leg.state.or.us/liz/2015R1/Downloads/MeasureDocument/SB629.

147  National Law Center on Homelessness & Poverty, From Wrongs to Rights: The Case for Homeless Bill of Rights Legislation (2014), https://www.nlchp.org/documents/Wrongs_to_Rights_HBOR.

148  Illinois Public Act 098-0516.

149  Illinois Public Act 098-0516.

# PREVENT HOMELESSNESS BY STRENGTHENING HOUSING PROTECTIONS AND ELIMINATING UNJUST EVICTIONS

**Prohibit housing discrimination and enforce anti-discrimination laws**

Housing discrimination creates barriers to housing access that contribute to and perpetuate homelessness. Denial of housing based on an individual's criminal, eviction, or credit history is common, and is often a proxy for discriminating against poor people of color.[150] It can also unfairly prevent people who were unjustly arrested or evicted from gaining access to housing through no fault of their own.[151] States and local governments should enact laws that prohibit discrimination based upon an individual's criminal, eviction, or credit history that is unrelated to the individual's future ability to abide by reasonable terms of tenancy.

Governments should also enact laws prohibiting housing discrimination based upon an individual's or family's perceived or actual housing status, or lack of an address. One method for accomplishing this is to enact legislation protecting homelessness as a protected status. Madison, Wisconsin, for example, has enacted such legislation that prohibits discrimination against homeless people in access to housing and employment.[152] Advocates in the District of Columbia have been advocating for a similar inclusion of homelessness as a protected class under the DC Human Rights Act, which would provide protection against discrimination in access to education, housing, employment, and access to places of public accommodation.

**Prohibit source of income discrimination**

Refusal to rent to people based upon their sources of income is a common and discriminatory housing practice that disproportionately harms elderly, disabled, and other vulnerable groups of people. Policies that reject recipients of social security, child support, federal income supports, or Section 8 housing vouchers, should be outlawed and enforced to ensure that discrimination based on legitimate sources of income do not unfairly deny housing access to poor people.

**Enact "just cause" eviction laws**

In many states, renters in privately owned rental housing may be evicted after their lease has expired, even if they are responsible tenants. No reason or "just cause" is needed before someone can be forced from their housing, usually upon as little as 30 days' notice, which may not be enough time to find adequate alternative housing. These evictions without cause are particularly problematic in tight, expensive rental markets, as landlords displace existing tenants in favor of new renters who can afford higher rents.

Just cause eviction laws, which limit the reasons by which renters may be legally evicted from their housing, are important for protecting renters' security of tenure.

**Provide a right to counsel in housing cases involving indigent renters**

Access to counsel is elusive for poor people as legal aid offices are unable to meet the need for services to defend against evictions. Although roughly one in five Americans qualify for free legal assistance, most are turned away due to a lack of available resources.[153] In addition, many millions more do not qualify for free services, yet are still too poor to afford legal representation.

Laws that guarantee a right to counsel in eviction cases can address this gap in services, prevent unnecessary eviction, and also save taxpayer dollars. Tenants facing eviction without legal representation are likely to lose their homes, but the assistance of counsel can reduce the chances of

---

150  National Fair Housing Alliance, *Discriminatory Effects of Credit Scoring on Communities of Color* (June 2012), http://www.national-fairhousing.org/LinkClick.aspx?fileticket=yg7AvRgwh%2F4%3D&tabid=3917&mid=5418.

151  The federal Protecting Tenants at Foreclosure Act ("PTFA"), which expired at the end of 2014, provided uniform legal protection to renters in the wake of the foreclosure crisis. Under the PTFA, the bona fide leases of renters in foreclosed properties survived foreclosure, and all such renters were provided with a minimum of 90 days' notice before eviction. Despite this federal protection, many renters in foreclosed properties were subjected to sudden eviction by financial institutions under less protective, preempted state laws. Although these evictions were illegal, and may ultimately have been dismissed, the record of eviction may remain on their rental histories and harm their future ability to rent in the private market.

152  Jeff Glaze, *City Council Overrides Paul Soglin's veto, adds homeless as protected class*, Wisc. St. J., (Jun. 17, 2015), http://host.madison.com/wsj/news/local/govt-and-politics/city-council-overrides-paul-soglin-s-veto-adds-homeless-as/article_4005aa45-cc4a-509d-8b32-ecf13a5a3347.html.

153  Legal Services Corporation, The Unmet Need for Legal Aid, http://www.lsc.gov/what-legal-aid/unmet-need-legal-aid.

PROTECTING THE RIGHTS OF PEOPLE EXPERIENCING HOMELESSNESS in U.S. Cities

getting evicted by more than 75 percent.[154] In a 2016 report commissioned by the New York City Bar Association, it was found that a bill providing a right to council in housing cases would save the city $320 million annually.[155]

**Plan for discharges from jails and prisons**

Transition planning from incarcerating settings can help reduce recidivism. To be most effective, the process must begin while people are still incarcerated, allowing them to connect to services tailored to their unique needs rather than releasing them with no place to go.

Discharge planning from jail and prison should include processes for determining whether someone was experiencing homelessness prior to incarceration, and whether they are likely to return to homelessness upon exit. This would include an assessment of whether they can be reunified with family members or other social supports. Also, communities should examine how criminal justice resources can be used to fund rental assistance.

It is also important to address the legal needs of people leaving incarceration who are at risk of homelessness, and collaborations between jails, prisons, and legal services attorneys can be an important part of that. For example, assistance with restoration of lost benefits or civil rights, assistance with record sealing or expungement, and addressing disqualifications in housing, education, and even parental rights can be important to ensuring that someone can maintain housing stability.

**Plan for discharges from hospitals**

Proper discharge planning from hospitals can improve the health of patients and save money for communities by reducing avoidable emergency room visits, readmissions and lengthy hospital stays.[156] Some recommended steps for effective discharge include helping people enroll in Medicaid and other benefits. It is also important to identify patients experiencing or at risk of homelessness as a part of routine screening. Hospitals can also collaborate with or create respite and recuperative care programs to allow people a safe and stable place to heal when they no longer

require the level of services provided in a hospital setting. Supporting these programs can include donating medical staff, diagnostic services, and administrative support.

Illegal hospital "dumping" has been the subject of several recent lawsuits brought by the City of Los Angeles. A December 2014 lawsuit against Good Samaritan Hospital for releasing a man with a foot injury with nothing but a bus token resulted in a $450,000 settlement.[157] In 2008, Hollywood Presbyterian Medical Center settled a similar case for $1 million after a paraplegic patient was found, "crawling around skid row wearing a hospital gown and colostomy bag."[158]

---

154   essica Silver-Greenberg, For Tenants Facing Eviction, New York May Guarantee a Lawyer, N.Y. Times (Sept. 26, 2016), http://www.nytimes.com/2016/09/27/nyregion/legal-aid-tenants-in-new-york-housing-court.html?_r=0.

155   New York City Bar, New Study Finds Right to Counsel in Eviction Cases Would Save Money for NYC (Aug. 8, 2016), http://www.nycbar.org/media-listing/media/detail/new-study-finds-right-to-counsel-in-eviction-cases-would-save-money-for-nyc-1.

156   Authored by Carol Wilkins for The U.S. Interagency Council on Homelessness, *Partnering with Hospitals to End Homelessness*, (Aug. 2016), https://www.usich.gov/resources/uploads/asset_library/working-with-hospitals-to-end-homelessness.pdf.

157   Richard Winton, *Patient dumping accusation leads to $450,000 settlement from Good Samaritan Hospital*, L. A. Times, (Apr. 21, 2016), http://www.latimes.com/local/lanow/la-me-ln-patient-dumping-20160421-story.html.

158   *Id.*



END HOMELESSNESS BY INCREASING ACCESS TO AND AVAILABILITY OF AFFORDABLE HOUSING

The most important way to address homelessness is to increase the availability of affordable housing. While there are an increasing number of good models to maximize the use of existing housing resources, without a substantial new investment in housing, even the best models will be unsuccessful.

## Dedicate funding streams to housing and services for homeless people

Governments must commit financial resources to help prevent and end homelessness.

One example of a local dedicated funding stream is Miami-Dade County's Homeless and Domestic Violence Tax. The tax, designed as a dedicated revenue stream to fund homeless services, imposes a 1% tax on all food and beverage sales by establishments licensed by the state to serve alcohol on the premises, excluding hotels and motels. 85% of the tax receipts go to the Miami-Dade County Homeless Trust, which coordinates the County's efforts to end homelessness. The food and beverage tax raises almost $20 million a year, helping to fund emergency, supportive and transitional housing, and other homeless services within Miami-Dade County.

Another example of dedicated funding is the National Housing Trust Fund ("NHTF"). The NHTF is a HUD-administered block grant to states, designed to increase the amount of affordable housing stock to extremely low-income households.[159] Critically, the NHTF is funded by statute from profits from Freddie Mac and Fannie Mae, and is not subject to the annual appropriations process. HUD announced in April 2016 that $174 million is available in the fund for 2016.

## Invest in permanent housing with supportive services for people experiencing homelessness

There is a large body of research demonstrating that permanent supportive housing saves public resources, improves communities by reducing street homelessness, and improves the health and well-being of homeless people. Local and state governments should redirect resources currently spent on criminalizing homelessness and redirect those funds to permanent supportive housing using a Housing First model. The Housing First model is premised on the idea that pairing homeless people with immediate access to their own apartments – without barriers and without mandated compliance with services - is the best way to sustainably end their homelessness. Under this model, homeless people are quickly placed into permanent housing, supplemented by any supportive services necessary to help them maintain housing stability. The State of Utah, which in 2005 was the first to apply the Housing First model state-wide, has famously reduced chronic homelessness by 91% since that time, and has achieved significant tax dollar savings as a result.[160]

Medicaid can help pay for supportive services necessary to keep people in stable housing.[161] States have the option of ensuring their Medicaid plans can pay for housing-related supportive services, and they should take steps to ensure that they maximize this resource.

## Index minimum wage to actual housing costs for a given area

Nowhere in the country can someone working full time at the minimum wage afford even a one bedroom apartment at the federal affordability guideline of 30% of monthly income going to rent.[162] In 2016, the average minimum wage needed to afford a one bedroom unit is $16.35 per hour, above even the $15 minimum wage seen in a few progressive communities.[163] Indeed in many communities, a worker at the federal minimum would literally need to work every waking minute of their lives, 112 hours per week, 52 weeks per year, to be able to afford a 2 bedroom apartment.[164] Due to federal cut backs, of every four households that should be getting housing assistance, only one of them actually gets it.[165]

Between 2003 and 2013, the number of Extremely Low-Income (ELI) households rose by 40 percent, to 10.4 million, while the number of units renting for less than $400 per month only increased by 10 percent, leaving only 31 affordable units for every 100 needy households.[166] 75% of ELI renter households are spending more than half of their income on rent and utilities.[167]

Indexing the local minimum wage to local housing costs would ensure that all workers are able to have safe and stable housing and have enough time to help their kids at school or enjoy life with their families and participate more in the local economy.

## Index Supplemental Security Income and Social Security Disability Insurance payments to actual housing costs for a given area

---

159   National Housing Trust Fund, Frequently Asked Questions, (June 2016), http://nlihc.org/sites/default/files/NHTF_FAQ.pdf.

160   Kelly McEvers, Utah Reduced Chronic Homelessness By 91

Percent; Here's How, NPR (Dec. 10, 2015), http://www.npr.org/2015/12/10/459100751/utah-reduced-chronic-homelessness-by-91-percent-heres-how.

161   The U.S. Interagency Council on Homelessness, *A Quick Guide to Improving Medicaid Coverage for Supportive Housing Serv.*, (May 2015), http://www.csh.org/wp-content/uploads/2015/05/A-Quick-Guide-To-Improving-Medicaid-Coverage-For-Supportive-Housing-Services1.pdf.

162   NLIHC Out of Reach, supra note 15.

163   *Id.*

164   *Id.*

165   See Joint Center for Housing Studies of Harvard University, *The State of the Nation's Housing* (2016), http://www.jchs.harvard.edu/sites/jchs.harvard.edu/files/jchs_2016_state_of_the_nations_housing_lowres.pdf.

166   *Id.*

167   *Id.*

As with inadequate minimum wages to meet local housing costs, individuals relying on Supplemental Security Income (SSI) or Social Security Disability Insurance (SSDI) often find housing costs consume their entire supplement check, leaving them no money for even utilities, let alone food or other necessities.[168] For 4.9 million people with disabilities ages 18 to 65 who have limited assets and are unable to work, SSI is their sole source of income.[169] The maximum SSI payment for an individual is $735, meaning to achieve the federal affordability standard of 30% of their income, they would have to find an apartment for less than $220 per month. In 162 housing markets across 33 states, one-bedroom rents exceeded 100% of the monthly SSI payment, and rents in 15 of these areas exceeded 150% of SSI.[170] Again, because there is currently only enough funding for one in four eligible renters to receive federal housing assistance, this means three in four of these renters are paying more than 50% of their income on housing, putting them one step away from homelessness.

Due to a lack of available affordable housing, many individuals relying on SSI or SSDI must choose between living in public institutions, nursing homes, overcrowded and substandard housing, or the streets. But when their incomes are supplemented with other rental subsidies to enable community-based living, the cost is one-third of the cost of the least-expensive state hospital bed.[171]

Indexing the SSI or SSDI payment itself to local housing costs would prevent the need for additional subsidies and be a cost-effective strategy for states and the federal government.

**Institute a universal voucher program.**

Over half of all American renters pay more than 30% of their income for housing, and for extremely low-income (ELI) households, 75% of them are paying more than 30%. Average rents have increased for 23 straight quarters, and were 15.2% higher in 2014 than in 2009.[172] Since 1991, the number of poor families that have to spend more than half of their income on housing costs has risen by 10%.[173]

On top of the existing gap in availability of affordable units, the supply of low-cost rental units has declined since 2007.[174] While ELI renter households may qualify for federal and local subsidy programs, demand for these programs far exceeds the supply.

A universal voucher program, which provides that every household below a certain income level could receive a voucher to limit their housing costs to 30 percent of their monthly income, would immediately cause the rates of evictions and homelessness to plummet and provide millions of people with the stability to provide adequate food and other necessities for their family and focus on their work, education, and other activities.[175] A conservative estimate for the cost of such a program adds only $22.5 billion to the federal budget—a large sum, but less than a quarter of what the mortgage interest income tax deduction cost the government ($101.5 billion), with 72% of the benefit going to homeowners making more than $100,000/year.[176] Surely we can spend more to subsidize those making the least than we do subsidizing those making the most.

**Use surplus and vacant property to house and provide services to homeless people.**

All levels of government own real property that is vacant or unneeded to execute their governmental duties. These unused assets can be turned to productive use if they are made available to provide needed shelter, housing, and services to homeless people. One model for using surplus government property in this way is the Title V program, which is part of the federal McKinney-Vento Homeless Assistance Act.[177] Under the Title V program, eligible homeless service providers – including state and local governments and private non-profit organizations – are granted a right of first refusal to receive unneeded federal buildings and land before such property can be otherwise transferred or sold. Critically, title to these properties is provided for free to successful applicants, which has enabled resource limited homeless service providers to create or expand services in over 30 states across the country. While the program has not been adequately implemented by the federal government, over 2 million homeless and formerly homeless people are housed, sheltered, or otherwise served by programs operating in Title V properties each year.[178]

---

168   *See* NLIHC Out of Reach, supra note 15.
169   *See* National Low Income Housing Coalition, *SSI Recipients Experience Housing Shortages in Every State* (June 15, 2015), http://nlihc.org/article/ssi-recipients-experience-housing-shortages-every-state.
170   *Id.*
171   *Id.*
172   See David M. Abromwitz, *The Housing Market is not Only for Homeowners, Center for American Progress* (2012), http://www.americanprogress.org/issues/housing/report/2012/10/47408/the-housing-market-is-not-only-for-homeowners/.
173   FiveThirtyEight, Andres Flowers, *Why So Many Poor Americans Don't Get Help Paying for Housing*, (September 2016), http://fivethirtyeight.com/features/why-so-many-poor-americans-dont-get-help-paying-for-housing/.

---

174   NLIHC Out of Reach, supra note 15.
175   *See* Evicted at 308-313, supra note 22.
176   National Low Income Housing Coalition, *The Mortgage Interest Deduction: Frequently Asked Questions* (2013), http://nlihc.org/sites/default/files/MID_FAQ_4-12-13.pdf.
177   42 U.S.C. §11411
178   The Law Center works with the federal government to better implement and improve the program, including by assisting with the

All levels of government should assess their real property holdings, determine which unneeded properties are suitable for homeless use, and develop a legal framework for transforming these properties into homeless housing, shelter, and/or services as needed.

**Ensure local zoning restrictions do not impede affordable housing development.**

Cities should examine their zoning requirements, and other regulations like density restrictions or parking requirements, to determine whether they can be sensibly revised to allow for increased affordable housing development. Inclusionary zoning policies can encourage production or rehabilitation of affordable housing through the use of building incentives, like density bonuses or expedited permitting. To be most effective, inclusionary zoning policies should be mandatory, made affordable to those earning less than 30% of median income, and kept affordable for the long-term.

Local governments should also suspend zoning restrictions on affordable housing wherever the need for affordable housing is greater than the supply.

drafting of a bill currently pending in the 114th Congress to improve transparency into the federal government's real property holdings and to make explicit that permanent housing is an eligible use of transferred properties. The Federal Assets Sale and Transfer Act of 2016, H.R. 4465, that would make these important improvements to the Title V program, passed the U.S. House of Representatives in May 2016.

# CONCLUSION

Over the past ten years, there has been a dramatic increase in criminalization laws, yet access to affordable housing grows ever more elusive.

Criminally and civilly punishing homeless people for engaging in life-sustaining activities in public space does not solve the underlying causes of homelessness, but rather exacerbates them by creating barriers to housing, employment, and services needed to escape life on the streets. Moreover, these laws waste precious and limited community resources by temporarily cycling homeless people through the costly criminal justice system to no effect – and at great taxpayer expense.



Instead of relying upon ineffective, expensive, and potentially illegal criminalization laws to address homelessness, communities should pursue constructive policy solutions that work to prevent and end homelessness. Most importantly, federal, state, and local governments should invest in affordable housing at the level necessary to meet the human need, and eliminate barriers to housing access imposed by discriminatory housing practices.

We can end homelessness in America and, in doing so, improve the quality of life for everyone. This will not happen, however, as long as communities continue to rely upon misguided criminalization policies that punish people for being homeless, without offering real solutions to the problem.

NO SAFE PLACE: The Criminalization of Homelessness in U.S. Cities

# APPENDIX A: PROHIBITED CONDUCT CHART

With the assistance of the law firm Sullivan & Cromwell, the Law Center examined the city codes of 187 cities across the country, which are listed in our Prohibited Conduct Chart. Through online research, we identified laws that restrict or prohibit seven different categories of conduct disproportionately performed by homeless people, including sleeping, sitting or lying down, and living in vehicles within public space.

Researchers carefully evaluated the language and definitions used in various codes to avoid including laws that appeared directly aimed at preventing other illegal acts unrelated to homeless individuals, such as loitering with the intent to solicit prostitution. Also, the chart does include laws that, while not facially discriminatory, could be or have been enforced in a manner that disproportionately affects homeless individuals.

Although the chart reviews the laws in existence in different cities, enforcement of these laws varies widely.

| | | 2016 PROHIBITED CONDUCT CHART | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Sleeping, Camping, Lying and Sitting, and Vehicle Restrictions | | | | | | Loitering and Vagrancy | | Begging | | Food Sharing |
| **State** | City | Sleeping in public city-wide | Sleeping in particular public places | Camping in public city-wide | Camping in particular public places | Sitting/ lying in particular public places | Lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/ living accommodation) | Loitering/ Loafing/ Vagrancy city-wide | Loitering/ Loafing in particular public places | Begging in public places city-wide | Begging in particular public places | Food Sharing city-wide or in particular public places (i.e. bans) |
| Total number of surveyed cities with this type of ordinance | | 34 | 50 | 61 | 93 | 88 | 73 | 60 | 100 | 50 | 114 | 12 |
| Percent of surveyed cities with this type of ordinance | | 18.2% | 26.7% | 32.6% | 49.7% | 47.1% | 39.0% | 32.1% | 53.5% | 26.7% | 61.0% | 6.4% |
| AK | Anchorage | | | | | X | | X | | | X | |
| AK | Fairbanks | | | | | | | | | | | |
| AK | Juneau | | | | | X | X | | X | X | | |
| AL | Mobile | | X | | | | | X | X | X | | |
| AL | Montgomery | X | | | X | X | X | X | X | | | |
| AR | Fayetteville | | | | X | X | | | | | X | |
| AR | Little Rock | | X | X | X | | | | X | X | X | |
| AR | North Little Rock | | | | | | | | | X | | |

No Safe Place: The Criminalization of Homelessness in U.S. Cities

| 2016 PROHIBITED CONDUCT CHART | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Sleeping, Camping, Lying and Sitting, and Vehicle Restrictions | | | | | | Loitering and Vagrancy | | Begging | | Food Sharing |
| State | City | Sleeping in public city-wide | Sleeping in particular public places | Camping in public city-wide | Camping in particular public places | Sitting/ lying in particular public places | Lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/ living accommodation) | Loitering/ Loafing/ Vagrancy city-wide | Loitering/ Loafing in particular public places | Begging in public places city-wide | Begging in particular public places | Food Sharing city-wide or in particular public places (i.e. bans) |
| AZ | Glendale | | | X | | | X | | | | | |
| AZ | Mesa | X | | | X | X | | | | X | X | |
| AZ | Phoenix | X | | X | | X | X | X | X | | X | |
| AZ | Scottsdale | | | X | | | X | | | | | |
| AZ | Tempe | X | | X | | X | X | | | X | X | |
| AZ | Tucson | | X | | X | X | | | | | X | |
| CA | Bakersfield | X | | X | | | X | | | | | |
| CA | Berkeley | | X | | X | X | | | X | | | |
| CA | El Cajon | X | X | X | X | | X | X | | | X | |
| CA | Fresno | | | | X | | | | X | | | |

| 2016 PROHIBITED CONDUCT CHART | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Sleeping, Camping, Lying and Sitting, and Vehicle Restrictions | | | | | | Loitering and Vagrancy | | Begging | | Food Sharing |
| State | City | Sleeping in public city-wide | Sleeping in particular public places | Camping in public city-wide | Camping in particular public places | Sitting/ lying in particular public places | Lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/ living accommodation) | Loitering/ Loafing/ Vagrancy city-wide | Loitering/ Loafing in particular public places | Begging in public places city-wide | Begging in particular public places | Food Sharing city-wide or in particular public places (i.e. bans) |
| CA | Long Beach | | X | X | X | | X | | X | | X | |
| CA | Los Angeles | | | | X | | | X | X | | X | |
| CA | Modesto | | | X | X | X | X | | X | | X | |
| CA | Oakland | X | | | | X | X | X | X | X | X | |
| CA | Redondo Beach | | | X | X | | X | | X | X | X | |
| CA | Sacramento | | | X | X | X | | | X | X | X | |
| CA | San Bruno | | | | | X | X | | | | X | |
| CA | San Diego | | | | X | X | X | X | | | | |
| CA | San Francisco | | X | | X | | X | | X | | X | |
| CA | San Jose | | X | | X | X | X | | | | | |

No Safe Place: The Criminalization of Homelessness in U.S. Cities

| | | Sleeping, Camping, Lying and Sitting, and Vehicle Restrictions | | | | | | Loitering and Vagrancy | | Begging | | Food Sharing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2016 PROHIBITED CONDUCT CHART** | | | | | | | | | | | | |
| **State** | City | Sleeping in public city-wide | Sleeping in particular public places | Camping in public city-wide | Camping in particular public places | Sitting/ lying in particular public places | Lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/ living accommodation) | Loitering/ Loafing/ Vagrancy city-wide | Loitering/ Loafing in particular public places | Begging in public places city-wide | Begging in particular public places | Food Sharing city-wide or in particular public places (i.e. bans) |
| CA | San Luis Obispo | | | | X | X | X | | X | | X | |
| CA | Santa Barbara | X | | X | X | X | | | | X | X | |
| CA | Santa Cruz | X | | X | | X | X | X | X | | X | |
| CA | South Lake Tahoe | X | X | X | X | | X | | | | | |
| CA | Tracy | | | X | | | X | | X | X | X | |
| CA | Ukiah | | | X | X | | X | | X | | X | |
| CA | Union City | | | | | X | X | X | X | | X | |
| CO | Boulder | | | X | X | | X | | | | X | |
| CO | Colorado Springs | X | | X | X | X | | | X | X | X | |
| CO | Denver | | | X | X | X | | | X | | | |

HOUSING NOT HANDCUFFS: Ending ................................................................................................

Case 8:18-cv-00155-DOC-JDE   Document 85-2   Filed 02/12/18   Page 56 of 73   Page ID #:1640

| 2016 PROHIBITED CONDUCT CHART | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Sleeping, Camping, Lying and Sitting, and Vehicle Restrictions | | | | | | Loitering and Vagrancy | | Begging | | Food Sharing |
| State | City | Sleeping in public city-wide | Sleeping in particular public places | Camping in public city-wide | Camping in particular public places | Sitting/ lying in particular public places | Lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/ living accommodation) | Loitering/ Loafing/ Vagrancy city-wide | Loitering/ Loafing in particular public places | Begging in public places city-wide | Begging in particular public places | Food Sharing city-wide or in particular public places (i.e. bans) |
| CO | Lakewood | | | | X | X | | | X | | X | |
| CT | Hartford | | | | | | | X | | | X | |
| CT | New Haven | | X | | X | X | | X | | | X | |
| CT | Norwalk | | | | X | | | X | | | X | |
| CT | Stamford | | | | | | | X | X | | | |
| DC | Washington | | | | | | | X | | | X | |
| DE | Dover | | | | X | | | | X | | X | |
| DE | Wilmington | | | | | | | X | | X | X | |
| FL | Bradenton | | | X | | X | | | | | | |
| FL | Clearwater | | | X | X | X | X | X | | X | X | |

National Law Center on Homelessness & Poverty

No Safe Place: The Criminalization of Homelessness in U.S. Cities

| 2016 PROHIBITED CONDUCT CHART | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Sleeping, Camping, Lying and Sitting, and Vehicle Restrictions | | | | | | Loitering and Vagrancy | | Begging | | Food Sharing |
| State | City | Sleeping in public city-wide | Sleeping in particular public places | Camping in public city-wide | Camping in particular public places | Sitting/ lying in particular public places | Lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/ living accommodation) | Loitering/ Loafing/ Vagrancy city-wide | Loitering/ Loafing in particular public places | Begging in public places city-wide | Begging in particular public places | Food Sharing city-wide or in particular public places (i.e. bans) |
| FL | Daytona Beach | X | | X | | X | | X | | | X | |
| FL | Fort Lauderdale | | | | | X | X | X | | | X | |
| FL | Fort Myers | | X | | X | X | | | X | | X | |
| FL | Gainesville | | | | X | X | X | | | X | X | X |
| FL | Hallandale Beach | X | X | X | X | | X | | | | X | |
| FL | Jacksonville | | X | | X | X | X | | | | X | X |
| FL | Key West | | | X | X | X | X | | | | X | |
| FL | Lake Worth | | | X | | | X | | X | | | |
| FL | Miami | X | X | X | X | X | X | X | X | | X | |
| FL | Naples | | X | | | | | | X | | | |

| 2016 PROHIBITED CONDUCT CHART | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Sleeping, Camping, Lying and Sitting, and Vehicle Restrictions | | | | | | Loitering and Vagrancy | | Begging | | Food Sharing |
| State | City | Sleeping in public city-wide | Sleeping in particular public places | Camping in public city-wide | Camping in particular public places | Sitting/ lying in particular public places | Lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/ living accommodation) | Loitering/ Loafing/ Vagrancy city-wide | Loitering/ Loafing in particular public places | Begging in public places city-wide | Begging in particular public places | Food Sharing city-wide or in particular public places (i.e. bans) |
| FL | Orlando | X | X | X | X | X | | X | | | X | X |
| FL | Palm Bay | | X | | X | | | | X | X | X | X |
| FL | Sarasota | X | X | X | X | | X | | | | X | |
| FL | St. Augustine | X | | X | | | | | X | X | X | |
| FL | Tampa | X | X | | X | | X | | | X | X | X |
| GA | Albany | X | | X | | X | | X | | X | | |
| GA | Athens | | | | X | | X | X | | X | | |
| GA | Atlanta | X | | X | X | | X | | X | | X | |
| GA | Augusta | | | | X | X | | X | X | | X | |
| GA | Brunswick | | X | X | | | | X | | X | | |

National Law Center on Homelessness & Poverty

No Safe Place: Advocacy Manual for Ending the Criminalization of Homelessness in U.S. Cities

| | | Sleeping, Camping, Lying and Sitting, and Vehicle Restrictions | | | | | | Loitering and Vagrancy | | Begging | | Food Sharing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2016 PROHIBITED CONDUCT CHART** | | | | | | | | | | | | |
| **State** | City | Sleeping in public city-wide | Sleeping in particular public places | Camping in public city-wide | Camping in particular public places | Sitting/ lying in particular public places | Lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/ living accommodation) | Loitering/ Loafing/ Vagrancy city-wide | Loitering/ Loafing in particular public places | Begging in public places city-wide | Begging in particular public places | Food Sharing city-wide or in particular public places (i.e. bans) |
| **GA** | Columbus | | | X | | | X | X | | | | |
| **GA** | Savannah | | | | | | X | | X | X | | |
| **GA** | Statesboro | | | | | | | X | X | X | | |
| **GA** | Stone Mountain | X | | | | | X | X | | | | |
| **GA** | Washington | | | | | | | X | | | | |
| **HI** | Honolulu | | | | X | | | | X | | X | |
| **HI** | Maui County | | | | X | | | | | | X | |
| **IA** | Bettendorf | | | | X | X | | | | | X | |
| **IA** | Cedar Rapids | | | | | | | | | | | |
| **IA** | Davenport | | | | X | | X | X | | | | X |

| | | Sleeping, Camping, Lying and Sitting, and Vehicle Restrictions | | | | | | Loitering and Vagrancy | | Begging | | Food Sharing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **State** | City | Sleeping in public city-wide | Sleeping in particular public places | Camping in public city-wide | Camping in particular public places | Sitting/ lying in particular public places | Lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/ living accommodation) | Loitering/ Loafing/ Vagrancy city-wide | Loitering/ Loafing in particular public places | Begging in public places city-wide | Begging in particular public places | Food Sharing city-wide or in particular public places (i.e. bans) |
| IA | Des Moines | | | | X | | | X | X | | | |
| IA | Waterloo | | | | | | | | | | | |
| ID | Boise | | X | X | X | X | X | X | X | X | | |
| ID | Idaho Falls | | X | | | | | | | | | |
| ID | Pocatello | | | | | | | | X | | X | |
| IL | Chicago | | X | | | | | | | X | | |
| IL | Evanston | | X | | | | | | X | | X | |
| IL | Woodstock | | | | | | | | | | X | |
| IN | Bloomington | | | | X | | | | | | | |
| IN | Indianapolis | | X | | | | | X | | X | X | X |

**2016 PROHIBITED CONDUCT CHART**

No Safe Place: The Criminalization of Homelessness in U.S. Cities

| 2016 PROHIBITED CONDUCT CHART | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Sleeping, Camping, Lying and Sitting, and Vehicle Restrictions | | | | | | Loitering and Vagrancy | | Begging | | Food Sharing |
| State | City | Sleeping in public city-wide | Sleeping in particular public places | Camping in public city-wide | Camping in particular public places | Sitting/ lying in particular public places | Lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/ living accommodation) | Loitering/ Loafing/ Vagrancy city-wide | Loitering/ Loafing in particular public places | Begging in public places city-wide | Begging in particular public places | Food Sharing city-wide or in particular public places (i.e. bans) |
| IN | Jeffersonville | | | | | | X | | X | | | |
| IN | South Bend | | | X | X | X | | | X | X | X | |
| KS | Lawrence | | X | | X | | | | X | X | X | |
| KS | Topeka | | X | | | | X | | X | | | |
| KS | Wichita | | | X | X | | X | X | X | X | | |
| KY | Covington | | X | | X | | | | | | X | X |
| KY | Lexington | | X | | | | | | | X | | |
| KY | Louisville | X | | X | | | | | | | X | |
| LA | Baton Rouge | | | | | | | | X | | X | |
| LA | Lafayette | | | | | X | X | | | | X | |

| | | 2016 PROHIBITED CONDUCT CHART | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Sleeping, Camping, Lying and Sitting, and Vehicle Restrictions | | | | | | Loitering and Vagrancy | | Begging | | Food Sharing |
| State | City | Sleeping in public city-wide | Sleeping in particular public places | Camping in public city-wide | Camping in particular public places | Sitting/ lying in particular public places | Lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/ living accommodation) | Loitering/ Loafing/ Vagrancy city-wide | Loitering/ Loafing in particular public places | Begging in public places city-wide | Begging in particular public places | Food Sharing city-wide or in particular public places (i.e. bans) |
| LA | New Orleans | | X | | X | X | | | X | | X | |
| LA | Shreveport | | X | | X | | X | | X | | X | |
| MA | Boston | | X | | | X | | | X | | X | |
| MA | Fall River | | | | X | | | | X | | | |
| MA | Worcester | | | | | | | | | | X | |
| MD | Baltimore | | | | | X | | X | | | X | X |
| MD | Elkton | | | | | X | | | X | | | |
| MD | Frederick | | | | X | | | X | X | X | | |
| ME | Augusta | | | | | | X | | | | | |
| ME | Bangor | | | | X | | | X | | | X | |

USE NO MORE: Laws for Ending the Criminalization of Homelessness in U.S. Cities

| | | 2016 PROHIBITED CONDUCT CHART | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Sleeping, Camping, Lying and Sitting, and Vehicle Restrictions | | | | | | Loitering and Vagrancy | | Begging | | Food Sharing |
| State | City | Sleeping in public city-wide | Sleeping in particular public places | Camping in public city-wide | Camping in particular public places | Sitting/ lying in particular public places | Lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/ living accommodation) | Loitering/ Loafing/ Vagrancy city-wide | Loitering/ Loafing in particular public places | Begging in public places city-wide | Begging in particular public places | Food Sharing city-wide or in particular public places (i.e. bans) |
| ME | Portland | | | | | X | X | X | X | | X | |
| MI | Detroit | | | | | | X | X | X | | X | |
| MI | Kalamazoo | | | X | | | | | X | | X | |
| MI | Pontiac | | | | | X | | | X | X | X | |
| MN | Minneapolis | | X | X | | | X | | | | X | |
| MN | St. Paul | | | X | X | X | X | X | X | | X | |
| MO | Kansas City | | | X | | X | | X | | | | |
| MO | St. Louis | | | | | | | X | X | | X | |
| MS | Biloxi | | | | | X | X | X | X | | | |
| MT | Billings | | | | | | X | X | | | X | |

## 2016 PROHIBITED CONDUCT CHART

| State | City | Sleeping, Camping, Lying and Sitting, and Vehicle Restrictions | | | | | | Loitering and Vagrancy | | Begging | | Food Sharing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Sleeping in public city-wide | Sleeping in particular public places | Camping in public city-wide | Camping in particular public places | Sitting/ lying in particular public places | Lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/ living accommodation) | Loitering/ Loafing/ Vagrancy city-wide | Loitering/ Loafing in particular public places | Begging in public places city-wide | Begging in particular public places | Food Sharing city-wide or in particular public places (i.e. bans) |
| NC | Asheville | X | | X | | X | | X | X | | X | |
| NC | Charlotte | | X | X | | X | | | | | X | |
| NC | Raleigh | | X | | | | | | X | X | X | |
| ND | Fargo | | | | | | | | | | X | |
| ND | Grand Forks | | | | X | X | | | | | X | |
| NE | Lincoln | | | | | X | | | X | X | | |
| NE | Omaha | | | | | | | | X | | | |
| NH | Concord | | | X | | X | | | X | | X | |
| NH | Manchester | X | X | | X | X | X | | X | | | |
| NJ | Atlantic City | X | X | | | X | | | X | | X | |

National Law Center on Homelessness & Poverty

No Safe Place: The Criminalization of Homelessness in U.S. Cities

| 2016 PROHIBITED CONDUCT CHART | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Sleeping, Camping, Lying and Sitting, and Vehicle Restrictions | | | | | | Loitering and Vagrancy | | Begging | | Food Sharing |
| State | City | Sleeping in public city-wide | Sleeping in particular public places | Camping in public city-wide | Camping in particular public places | Sitting/ lying in particular public places | Lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/ living accommodation) | Loitering/ Loafing/ Vagrancy city-wide | Loitering/ Loafing in particular public places | Begging in public places city-wide | Begging in particular public places | Food Sharing city-wide or in particular public places (i.e. bans) |
| NJ | Newark | | | | X | | | | X | X | X | |
| NJ | Trenton | X | | | | X | | | | | X | |
| NM | Albuquerque | | | | X | | | | X | | X | |
| NM | Santa Fe | | | X | | | X | | | | X | |
| NV | Las Vegas | | X | | X | | X | | | | X | X |
| NV | North Las Vegas | | X | | X | X | | | X | | | |
| NV | Pahrump | X | | | | X | X | X | | | X | |
| NV | Reno | | | | X | X | | | X | | X | |
| NY | Buffalo | | X | | | X | | | X | X | | |
| NY | New York | | | | X | X | X | | X | X | X | |

## 2016 PROHIBITED CONDUCT CHART

| State | City | Sleeping, Camping, Lying and Sitting, and Vehicle Restrictions | | | | | | Loitering and Vagrancy | | Begging | | Food Sharing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Sleeping in public city-wide | Sleeping in particular public places | Camping in public city-wide | Camping in particular public places | Sitting/ lying in particular public places | Lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/ living accommodation) | Loitering/ Loafing/ Vagrancy city-wide | Loitering/ Loafing in particular public places | Begging in public places city-wide | Begging in particular public places | Food Sharing city-wide or in particular public places (i.e. bans) |
| NY | Rochester | | X | | X | X | | | X | | X | |
| OH | Cincinnati | | | | | X | | | | X | X | |
| OH | Cleveland | | X | | | X | | | X | | X | |
| OH | Columbus | | | | X | X | | | X | | X | |
| OH | Dayton | | | | | X | X | | | | X | X |
| OH | Toledo | | | | | X | | X | X | X | | |
| OK | Oklahoma City | | X | X | X | | | | X | | X | |
| OK | Tulsa | | | X | X | | X | | X | | X | |
| OR | Beaverton | | | | | X | X | | X | | | |
| OR | Corvallis | X | X | | X | X | X | | | | X | |

No Safe Place: The Criminalization of Homelessness in U.S. Cities

| | | Sleeping, Camping, Lying and Sitting, and Vehicle Restrictions | | | | | | Loitering and Vagrancy | | Begging | | Food Sharing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **State** | City | Sleeping in public city-wide | Sleeping in particular public places | Camping in public city-wide | Camping in particular public places | Sitting/ lying in particular public places | Lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/ living accommodation) | Loitering/ Loafing/ Vagrancy city-wide | Loitering/ Loafing in particular public places | Begging in public places city-wide | Begging in particular public places | Food Sharing city-wide or in particular public places (i.e. bans) |
| **OR** | Eugene | | X | X | | X | | | X | | | |
| **OR** | Portland | | X | X | X | X | | | X | | | |
| **PA** | Allentown | | | | X | X | | X | X | | X | |
| **PA** | Philadelphia | | | | | X | | X | X | X | | |
| **PA** | Pittsburgh | | | | X | | | | | | X | |
| **RI** | Newport | X | | | | X | | X | X | | | |
| **RI** | Providence | | X | | | X | | | X | | X | |
| **SC** | Charleston | | | | X | | X | X | X | | X | |
| **SC** | Columbia | | | X | | X | | X | | | X | |
| **SD** | Pierre | | | X | | X | X | | | X | | |

| | | 2016 PROHIBITED CONDUCT CHART | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Sleeping, Camping, Lying and Sitting, and Vehicle Restrictions | | | | | | Loitering and Vagrancy | | Begging | | Food Sharing |
| State | City | Sleeping in public city-wide | Sleeping in particular public places | Camping in public city-wide | Camping in particular public places | Sitting/ lying in particular public places | Lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/ living accommodation) | Loitering/ Loafing/ Vagrancy city-wide | Loitering/ Loafing in particular public places | Begging in public places city-wide | Begging in particular public places | Food Sharing city-wide or in particular public places (i.e. bans) |
| SD | Rapid City | | X | | | X | | | X | | | |
| SD | Sioux Falls | | | X | | X | | | X | | X | |
| TN | Memphis | | | | | | | | X | | X | |
| TN | Nashville | | | | X | | | | | | X | |
| TX | Amarillo | | | X | X | | | | X | | | |
| TX | Austin | | X | X | | X | | | X | | X | |
| TX | Corpus Christi | | | | X | | | | X | | | |
| TX | Dallas | X | | | X | | | | X | | X | X |
| TX | El Paso | | | | X | | | | X | X | | |
| TX | Fort Worth | | | | X | | | | | X | X | |

National Law Center on Homelessness & Poverty

No Safe Place: The Criminalization of Homelessness in U.S. Cities

| | | Sleeping, Camping, Lying and Sitting, and Vehicle Restrictions | | | | | | Loitering and Vagrancy | | Begging | | Food Sharing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **State** | City | Sleeping in public city-wide | Sleeping in particular public places | Camping in public city-wide | Camping in particular public places | Sitting/lying in particular public places | Lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/ living accommodation) | Loitering/ Loafing/ Vagrancy city-wide | Loitering/ Loafing in particular public places | Begging in public places city-wide | Begging in particular public places | Food Sharing city-wide or in particular public places (i.e. bans) |
| **TX** | Houston | | | | X | X | X | | | | X | |
| **TX** | San Antonio | | | X | X | X | X | | X | | X | |
| **UT** | Salt Lake City | X | | X | X | X | X | X | | | | |
| **VA** | Norfolk | | X | X | | | X | X | | | X | |
| **VA** | Richmond | | | X | | X | | X | X | | X | |
| **VA** | Roanoke | | | | | | X | | | | | |
| **VA** | Suffolk | | | X | | | | | | | X | |
| **VA** | Virginia Beach | X | X | X | | X | X | | | X | | |
| **VT** | Burlington | | | | X | | | X | X | | X | |
| **VT** | Montpelier | | | | | | | | X | X | | |

| | | 2016 PROHIBITED CONDUCT CHART | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Sleeping, Camping, Lying and Sitting, and Vehicle Restrictions | | | | | | Loitering and Vagrancy | | Begging | | Food Sharing |
| **State** | City | Sleeping in public city-wide | Sleeping in particular public places | Camping in public city-wide | Camping in particular public places | Sitting/ lying in particular public places | Lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/ living accommodation) | Loitering/ Loafing/ Vagrancy city-wide | Loitering/ Loafing in particular public places | Begging in public places city-wide | Begging in particular public places | Food Sharing city-wide or in particular public places (i.e. bans) |
| **WA** | Olympia | X | | | X | X | | | | X | | |
| **WA** | Seattle | | | | X | X | X | | | | | |
| **WA** | Spokane | X | | X | X | X | | | | X | | |
| **WA** | Woodinville | | | | X | | X | | X | | | |
| **WI** | Eau Claire | | | X | X | | | X | X | | | |
| **WI** | Madison | | X | | X | | | | X | X | | |
| **WI** | Milwaukee | | | | | | | | X | | X | |
| **WV** | Charleston | | | | | | X | | X | X | | |
| **WY** | Cheyenne | | | | | | X | X | | | | |

National Law Center on Homelessness & Poverty

No Safe Place: The Criminalization of Homelessness in U.S. Cities

| | PREVALENCE OF LAWS BY YEAR | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sleeping, Camping, Lying and Sitting, and Vehicle Restrictions | | | | | | Loitering and Vagrancy | | Begging | | Food Sharing |
| Year | Sleeping in public city-wide | Sleeping in particular public places | Camping in public city-wide | Camping in particular public places | Sitting/ lying in particular public places | Lodging, living, or sleeping in vehicles (or parking a vehicle used as a lodging/living accommodation) | Loitering/ Loafing/ Vagrancy city-wide | Loitering/ Loafing in particular public places | Begging in public places city-wide | Begging in particular public places | Food Sharing city-wide or in particular public places (i.e. bans) |
| 2006 | 14% | 30% | 19% | 34% | 31% | 16% | 17% | 47% | 19% | 57% | N/A |
| 2009 | 14% | 37% | 21% | 41% | 33% | 18% | 21% | 57% | 18% | 62% | N/A |
| 2011 | 18% | 41% | 21% | 49% | 37% | 33% | 25% | 67% | 22% | 68% | N/A |
| 2014 | 18% | 26% | 32% | 49% | 47% | 38% | 32% | 53% | 26% | 61% | 7% |
| 2016 | 18% | 27% | 33% | 50% | 47% | 39% | 32% | 53% | 27% | 61% | 6% |

# APPENDIX B: HOUSING NOT HANDCUFFS MODEL POLICY

# HOUSING
## NOT HANDCUFFS

**The Housing Not Handcuffs Act of 2017:**

Stop Criminalization of Homelessness, Eliminate Unjust Evictions, & Increase Access to Affordable Housing

With the cost of housing far outstripping wages, millions of Americans face homelessness each year, and millions more live in tenuous or unstable housing situations. All Americans need access to affordable housing, defined by legal security of tenure, habitability, accessibility, location, cultural adequacy, and provision of any needed services. But right now, over 7 million households in the U.S. lack access to affordable housing; of this number some are forced to live in public places. At the same time, many communities have enacted or are enforcing laws that make living in public a crime. This is potentially unconstitutional, wastes precious public funds, and makes it harder for people to exit homelessness by saddling them with criminal records.

To this end, the Housing Not Handcuffs campaign presents model policies for the local, state, and federal levels to break this vicious cycle and shift law and policy away from this misuse of the criminal justice system to address homelessness and towards true solutions.

**What types of proposals are included in the model policies?**

**Shorten Homelessness by Stopping its Criminalization**

- Until sufficient affordable, safe, and decent housing is available to meet the need of homeless individuals and families, the laws, policies, and practices that prohibit or limit the use of public space by homeless people for life-sustaining activities shall be repealed, and will not be enforced or funded.

  o No person shall be subject to, or threatened with, civil or criminal sanctions or harassment by law enforcement, other state actors, and/or private security personnel for moving, resting, sitting, standing, lying down, sleeping, protecting oneself from the elements, or conducting other life sustaining activities on public property or in a legally parked car.

  o The right to use and move freely in places of public accommodation without discrimination based on actual or perceived housing status shall not be abridged.

  o No person shall be subject to civil or criminal sanctions for soliciting, sharing, accepting, or offering food, water, money or other donations in public places.

  o Personal property of homeless persons shall not be subject to unreasonable search and seizure.

**Prevent Homelessness by Strengthening Housing Protections and Eliminating Unjust Evictions**

- It shall be unlawful to deny housing or social services based upon an individual's or family's:

  o Perceived or actual housing status, including lack of an address;

  o Lack of rental history due to homelessness;

  o Poor credit history due to homelessness;

  o Source of income; or

National Law Center on Homelessness & Poverty

NLCHP – Protecting and Promoting the Right to Housing for All in U.S. Cities

- o Status as a victim of domestic violence, sexual assault or human trafficking.

- It shall be unlawful to deny housing based upon an individual's criminal, eviction, or credit history that is unrelated to the individual's future ability to abide by reasonable terms of tenancy.

- Evictions without just cause shall be unlawful.

- A right to counsel shall be provided in all eviction cases.

- Any institution or system of care that receives [federal/state/local] funds, such as prison/jail/detention, health/mental health care, and foster care, shall develop and implement a plan to discharge residents into housing.

- State level: Each state shall make birth certificates and state identification cards available without cost.

**End Homelessness by Increasing Access to and Availability of Affordable Housing**

- Universal protections shall be instituted such that no person need pay more than 30% of their income on rent. These shall include:

  - o A minimum wage indexed to actual housing costs for a given area;

  - o Federal level: Supplemental Security Income and Social Security Disability Insurance payments indexed to actual housing costs for a given area;

  - o A universal voucher program.

  - o A small area Fair Market Rent (FMR) shall be used to determine voucher values.

- Federal level: The National Housing Trust Fund shall be fully funded

- Local & State levels: Establish and fund local/state housing trust funds

- Surplus government property and vacant private property shall be made available, at no cost, to provide housing and/or services for homeless persons.

- Local level: In order to promote the immediate growth of adequate housing stock appropriate to meet the needs of the community:

  - o When need for affordable housing is greater than supply, zoning restrictions on affordable housing shall be suspended.

  - o For all new residential buildings, or expansions of existing developments, of a certain size, a certain percentage of the units will be reserved for persons earning 30% of area median income or less.

- Federal & State levels: Adequate housing, including supportive services, shall be provided for those exiting state care.