

# HOUSING
# NOT
# HANDCUFFS

A Litigation Manual

## NATIONAL LAW CENTER
### ON HOMELESSNESS & POVERTY

# ABOUT THE NATIONAL LAW CENTER
# ON HOMELESSNESS & POVERTY

The National Law Center on Homelessness & Poverty is the only national organization dedicated solely to using the power of the law to end and prevent homelessness. We work with federal, state and local policymakers to draft laws that prevent people from losing their homes and to help people out of homelessness. We have been instrumental in enacting numerous federal laws, including the McKinney-Vento Act, the first major federal legislation to address homelessness. The Act includes programs that fund emergency and permanent housing for homeless people; makes vacant government properties available at no cost to non-profits for use as facilities to assist people experiencing homelessness; and protects the education rights of homeless children and youth. We ensure its protections are enforced, including through litigation.

We aggressively fight laws criminalizing homelessness and promote measures protecting the civil rights of people experiencing homelessness. We also advocate for proactive measures to ensure that people experiencing homelessness have access to permanent housing, living wage jobs, and public benefits.

For more information about our organization, access to publications, and to contribute to our work, please visit our website at www.nlchp.org.

This litigation manual is offered as an advocacy tool for use as part of the Housing Not Handcuffs Campaign (HNH Campaign). Housing Not Handcuffs was initiated by the National Law Center on Homelessness & Poverty and more than 100 participating organizations to end the criminalization of homelessness and to promote housing policies. You can learn more about the HNH Campaign at www.housingnothandcuffs.org.

# LAW CENTER BOARD OF DIRECTORS*

**Edward McNicholas**
*Chair*
Sidley Austin LLP

**Bruce Rosenblum**
*Vice-Chair*
The Carlyle Group

**Kirsten Johnson-Obey**
*Secretary*
NeighborWorks

**Robert C. Ryan**
*Treasurer*
American Red Cross

**Eric A. Bensky**
Schulte, Roth & Zabel LLP

**Paul F. Caron**
Microsoft Corporation

**Bruce J. Casino**
Attorney

**Rajib Chanda**
Simpson Thacher & Bartlett LLP

**Dwight A. Fettig**
Porterfield, Fettig & Sears LLC

**Julia M. Jordan**
Sullivan & Cromwell LLP

**Steve Judge**
Private Equity Growth Capital Council (retired)

**Father Alexander Karloutsos**
Greek Orthodox Archdiocese of America

**Georgia Kazakis**
Covington & Burling LLP

**Pamela Malester**
Office for Civil Rights, U.S. Dept. of Health and Human Services (retired)

**Tashena Middleton Moore**
Attorney

**G.W. Rolle**
Missio Dei Church

**Erin Sermeus**
OWN TV

**Jeffrey A. Simes**
Goodwin Procter LLP

**Vasiliki Tsaganos**
Attorney

**Robert Warren**
People for Fairness Coalition

**Maria Foscarinis**
*President*
Executive Director
NLCHP

*\*Affiliations for identification purposes only*

# LAW CENTER STAFF

**LaToya Ball**
Administrative Manager

**Tristia Bauman**
Senior Attorney

**Janet Hostetler**
Deputy Director

**Grace Beal**
Development & Communications Assistant

**Janelle Fernandez**
Law & Policy Program Coordinator

**LaTissia Mitchell**
Executive & Development Specialist

**Michael Santos**
Attorney

**Eric Tars**
Senior Attorney

**Maria Foscarinis**
Executive Director

# ACKNOWLEDGMENTS

The Law Center thanks Tristia Bauman, Janet Hostetler, Janelle Fernandez, Eric Tars, Maria Foscarinis, and Elizabeth Dennis for their contributions to this report.

Special thanks to the law firm Sheppard Mullin Richter & Hampton LLP for its generous pro bono support and assistance in updating the report and case summaries. In particular, the Law Center thanks Daniel Brown, Nicole Bagood, and David Poell.

We are grateful to the funders whose support enables us to carry out our critical work, including the Herb Block Foundation, the Deer Creek Foundation, and the Ford Foundation.

Finally, we thank the 2017 members of our Lawyers Executive Advisory partners (LEAP) program for their generous support of our organization: Akin Gump Strauss Hauer & Feld LLP; Arent Fox LLP; Covington & Burling LLP; Debevoise & Plimpton LLP; Dechert LLP; DLA Piper LLP; Fried, Frank, Harris, Shriver & Jacobson LLP; Goodwin Procter LLP; Hogan Lovells US LLP; Latham & Watkins LLP; Manatt, Phelps & Phillips, LLP; Microsoft Corporation; Schulte Roth & Zabel LLP; Sheppard, Mullin, Richter & Hampton LLP; Sidley Austin LLP; Simpson Thacher & Bartlett LLP; Sullivan & Cromwell LLP; and WilmerHale.

The Law Center would also like to thank Megan Godbey for the report design.

The Law Center is solely responsible for the views expressed in this report.

**Cover photo credits:**
Francis Storr | Flickr
Glasseyes View | Flickr
Beth H | Flickr
Dave Kaylor

# TABLE OF CONTENTS

6      **EXECUTIVE SUMMARY**

9      **INTRODUCTION**

10     **LEGAL STRATEGIES TO COMBAT CRIMINALIZATION OF HOMELESSNESS**

10         Overview

10         Challenging Bans on Camping and/or Sleeping in Public

11         Challenging Evictions of Homeless Encampments ("Sweeps")

11         Challenging Bans on Loitering, Loafing, and Vagrancy

11         Challenging Bans on Sitting or Lying Down in Public

11         Challenging Bans or Restrictions on Panhandling

12         Challenging Laws Banning Living in Vehicles

12         Persuasive Human Rights Theories

15     **CONSIDERATIONS FOR BRINGING LITIGATION**

15         Factual Research: Topics to Investigate

16         Public Records Requests

17         Issues to Consider in Working with Plaintiffs

18         Issues to Consider in Identifying Defendants

19     **LITIGATION AND STRATEGY**

19         Drafting the Complaint

20         Discovery

20         Experts

20         Summary Judgment

20         Trial

20         Settlement

21     **CASE SUMMARIES**

21         Challenges to Bans on Camping and/or Sleeping in Public and Encampment Evictions

46         Challenges to Bans on Loitering, Loafing, and Vagrancy

51         Challenges to Bans on Sitting or Lying Down in Public

52         Challenges to Bans or Restrictions on Panhandling

67         The Necessity Defense

68         Challenges to Food Sharing Bans and Advocacy

72         Right to Privacy

73         Miscellaneous

# EXECUTIVE SUMMARY

**Since the previous edition of this manual was published in 2014, there has been significant litigation challenging the criminalization of homelessness, almost all of it dealing with evictions of homeless encampments and bans on panhandling.**

Most recent cases have upheld the legal rights of homeless persons to perform various life-sustaining behaviors in public places. Since 2014, favorable results[1] were obtained in:

- 75% of cases challenging evictions of homeless encampments and/or seizure and destruction of homeless persons' belongings.

- 57% of cases challenging enforcement of camping and/or sleeping restrictions.

- 100% of cases challenging laws restricting begging and solicitation.

Particularly notable recent developments include:

- A ruling from a federal appeals court applied new Supreme Court First Amendment precedent to strike down an anti-panhandling ban and affected courts and cities across the country.

- A statement of interest brief filed by the U.S. Department of Justice stated that making it a crime for people who are homeless to sleep in public places, particularly in the absence of sheltered alternatives, unconstitutionally punishes them for being homeless.

**Crisis of Homelessness**

Stagnated wages, rising rents, and a grossly insufficient social safety net have left millions of people homeless or at-risk - including at least 1.36 million homeless children enrolled in U.S. public schools. A lack of affordable housing is the leading cause of homelessness, and the crisis is rapidly worsening. Today, there is a shortage of 7.4 million affordable and available rental homes for our nation's poorest renters. This shortage has left millions of households paying more than they can sustainably afford for housing, and it has caused homelessness across the country.

While emergency shelter is not a solution to homelessness, some American cities task homeless shelters with meeting both emergency needs and longer term systemic shortages of permanent housing. As a result, communities with shelter space often lack sufficient beds for all individuals and families that are homeless. This leaves homeless people across the country with no

## Upholding Legal Rights

Since 2014, most cases have upheld the legal rights of homeless persons to perform various life-sustaining behaviors in public places, including:

**75%** of cases challenging laws restricting camping and sleeping in public, and challenges to evictions of homeless encampments.

**57%** of cases challenging enforcement of camping or sleeping bans.

**100%** of cases challenging laws restricting begging and solicitation.

nlchp.org

choice but to struggle for survival in public places.

**Criminalization of Homelessness: Trends and Consequences**

Despite a lack of affordable housing and shelter space, many cities have chosen to threaten, arrest, and ticket homeless persons for performing life-sustaining activities – such as sleeping or sitting down - in outdoor public space. Indeed, the Law Center's November 2016 report on the criminalization of homelessness, "Housing Not Handcuffs: Ending the Criminalization of Homelessness in U.S. Cities" revealed that laws civilly and criminally punishing homelessness are prevalent and dramatically increasing across the country.[2] For example, half of all cities have one or more laws restricting camping in public, and city-wide bans on camping have increased by 69% since 2006.

In addition to laws that civilly and criminally punish homelessness, the Law Center has noted a rise in governmental practices designed to remove homeless people from public view that may not result in ticketing or arrest. Evictions of homeless encampments, for example, may be justified as a public health and safety measure even in the absence of a camping ban. Not only do these practices displace homeless people from public space without offering them any other place to go, but they may also result in the loss of homeless persons' personal property.

Because people experiencing homelessness are not on the street by choice but because they lack choices, criminal and civil punishment serves no constructive purpose. Instead, criminalizing homelessness wastes precious public resources on policies that do not work to reduce homelessness. Quite the opposite, arrests, unaffordable tickets, and displacement from public space for doing what any human being must do to survive can make homelessness more difficult to escape.

---

1   Favorable results in these cases include success in securing injunctions to prevent enforcement of the challenged laws, awards of monetary damages, and settlements that modified laws or altered patterns of enforcement to comport with the civil rights of homeless people.

2   Housing not Handcuffs, Ending the Criminalization of Homelessness in U. S. Cities, Nat'l Lat Center on Homelessness & Poverty (2016) [hereinafter "Housing Not Handcuffs"].

**Court Challenges to Laws Restricting Camping and Sleeping**

When there are fewer affordable housing units and shelter beds available than people who need them, people are left with no choice but to live outdoors and in public space. Despite a lack of alternative places to live, cities across the country have enacted laws making the life-sustaining activities of homeless people in public space a crime or civil offense.

In many cities, police or other government officials conduct evictions or "sweeps" of public areas where homeless people are living, seizing, destroying, or otherwise causing the loss of homeless people's personal property. This property often includes food, clothing, medicine, identification, and irreplaceable personal items, such as photographs. Evictions also cause homeless people to be displaced from their communities, further harming and marginalizing them, without providing any place for them to go.

Increasingly, however, legal challenges to laws punishing sleeping and camping in public, and challenges to the practice of homeless sweeps, have been successful on constitutional grounds. Key recent decisions include:

*Eighth Amendment Challenges to Camping/Sleeping Prohibitions*

In Eighth Amendment challenges to anti-camping ordinances and enforcement, plaintiffs argue that enforcement of such laws violates the Eighth Amendment prohibition against cruel and unusual punishment.

• On August 6, 2015, The United States Department of Justice filed a statement of interest in the Law Center's case of *Bell v. Boise*, arguing that making it a crime for people who are homeless to sleep in public places, particularly in the absence of sheltered alternatives, unconstitutionally punishes them for being homeless[3] The Justice Department urged the court to adopt the rationale of *Jones v. City of Los Angeles*, a Ninth Circuit decision which held that criminalizing life-sustaining conduct in public by homeless people, in the absence of any available alternative, is tantamount to criminalizing homeless status in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.[4] As stated by the Justice Department in its filing, "[i]t should be uncontroversial that punishing conduct that is a universal and unavoidable consequence of being human violates the Eighth Amendment. Sleeping is a life-sustaining activity—i.e., it must occur at some time in some place.  If a person literally has nowhere else to go, then enforcement of the anti-camping ordinance against that person criminalizes her for being homeless."[5]

In *Cobine v. City of Eureka*,[6] eleven homeless plaintiffs who (along with approximately 150 other homeless people) had continuously camped in the Palco Marsh area of Eureka, California filed suit in federal court against the city when, under the authority of an anti-camping ordinance, the city began issuing notices of eviction and confiscating personal property. The plaintiffs filed suit noting that homeless individuals outnumber emergency shelter beds by a factor of nearly three to one, and arguing that criminalizing public camping in a city without adequate shelter space violated their Eighth Amendment rights. The U.S. District Court for the Northern District of California enjoined the Eureka from enforcing the anti-camping ordinance until the city provided the plaintiffs with shelter and followed specific procedures for storing confiscated property.[7]

Challenges to the constitutionality of anti-camping ordinances have also been raised as defenses to criminal charges under such laws. For example:

In *The City of North Bend v. Joseph Bradshaw*,[8] a homeless plaintiff was criminally charged with unlawful camping after he was found asleep outside with his belongings. In his defense, Joseph Bradshaw argued that enforcement of the anti-camping ordinance against him violated his right to be free from cruel and unusual punishment under the Eighth Amendment. The Municipal Court for the City of Issaquah in King County concluded that enforcement of the camping ban violated Mr. Bradshaw's constitutional rights to travel and to be free from cruel and unusual punishment.

*Fourth and Fourteenth Amendment Challenges to Evictions of Homeless Encampments*

Evictions of encampments of homeless people have also been successfully challenged on Fourth and Fourteenth Amendment grounds when residents' possessions are confiscated or destroyed without adequate notice and other due process protections. Key recent decisions include:

• In *Allen v. City of Pomona*,[9] fourteen homeless plaintiffs filed suit on behalf of a class against the City of Pomona arising out of the City's policy and practice of seizing and destroying homeless persons' property, without notice and over the objections of the property owners, in violation of plaintiffs' Fourth and Fourteenth Amendment rights. The plaintiffs' complaint detailed several instances where police officers had permanently deprived plaintiffs of their most essential belongings, including food stamp cards, medication, tents, blankets, state-issued identification cards, birth certificates, and treasured family heirlooms with sentimental value. In

---

3    *Bell v. Boise* 993 F. Supp. 2d 1237, (D. Idaho 2014). US Statement of Interest available at https://www.justice.gov/crt/file/761211/download.

4    *Jones v. City of Los Angeles*.444 F.3d 1118 (9th Cir.2006). The Jones opinion was vacated pursuant to settlement, but still has persuasive value.

5    *Bell v. Boise* 993 F. Supp. 2d 1237, (D. Idaho 2014). US Statement of Interest available at https://www.justice.gov/crt/file/761211/download.

6    *Cobine v. City of Eureka*, No. C 16-02239 (JSW), 2016 WL 1730084 (N.D. Cal. May 2, 2016).

7    The plaintiffs also argued that the city's seizure of their property violated their Fourth and Fourteenth Amendment rights to be secure from government seizure without due process of the law.

8    *City of North Bend v. Bradshaw*, Case No. YI 32426A (North Bend Muni. Ct. Jan. 13, 2015).

9    *Allen v. City of Pomona*, No. 16-cv-1859 (C.D. Cal. filed Mar. 18, 2016).

August, 2016, the city and the plaintiffs agreed to a sweeping settlement agreement that, among other relief, provided plaintiffs with priority with regards to permanent housing resources developed by the city to the maximum extent allowed by law.

• In *Mitchell v. City of Los Angeles*, homeless individuals, the Los Angeles Community Action Network, and the Los Angeles Catholic Worker filed suit to challenge the City's practice of seizing and destroying homeless persons' property during arrests and street cleanings. The federal district court ordered the City to stop seizing and destroying homeless persons' property, to improve its property storage procedures, and to make critical belongings like tents and medication available within 24 hours after the seizure.

© KeithAllisonPhoto.com

*First Amendment Challenges to Laws Restricting Begging and Solicitation*

For many homeless people who do not have income from employment or government benefits, panhandling may be the best option for survival. Unfortunately, too many local governments, instead of finding ways to help homeless persons obtain income, housing, and social services, seek to prohibit panhandling. There have been several successful challenges to panhandling laws since 2015 when the U.S. Supreme Court clarified First Amendment law on content-based restrictions on protected speech in *Reed v. Town of Gilbert*. Indeed, our research finds that panhandling bans have been found unconstitutional on First Amendment grounds in every legal challenge decided since *Reed*. Key recent decisions include:

• The first case to apply *Reed* to panhandling cases was *Norton v. City of Springfield*,[10] the Law Center's successful Seventh Circuit challenge to Springfield, Illinois' panhandling law, which restricted vocal pleas for immediate donations of cash. Explaining that *Reed* describes content based discrimination as a "law [that] applies to particular speech because of the topic discussed *or* the idea or message expressed,"[11] the Seventh Circuit found that Springfield's ordinance regulates speech "because of the topic discussed" and that the law lacked a compelling justification.

• In *Thayer v. City of Worcester*,[12] plaintiffs sought a preliminary injunction against enforcement of two City of Worcester ordinances restricting panhandling. Plaintiffs alleged that the ordinances, which prohibited aggressive panhandling and walking on traffic medians for purposes of soliciting donations, were content based restrictions on speech in violation of the First Amendment right to free speech. On appeal, the First Circuit held that the laws did not violate the First Amendment, but the judgment of the First Circuit was vacated following *Reed* and the matter was remanded to the trial court for

further consideration in light of the new precedent. On remand, the trial court found that the ordinances failed to pass muster under the First Amendment because they were not sufficiently tailored to the public interests they were purportedly designed to address.

• In *Homeless Helping Homeless, Inc. v. City of Tampa*,[13] a charity offering emergency shelter to homeless people brought suit in federal court against the City of Tampa, Florida to challenge a city ordinance banning the solicitation of "donations or payment" in parts of downtown Tampa. The court agreed with Homeless Helping Homeless that soliciting "donations or payment" is a form of speech protected by the First Amendment, that Tampa's ordinance constituted a regulation of that speech in a traditional public forum, and that Tampa's ordinance is a content-based regulation of that speech. After the city of Tampa admitted that no compelling government interest supported the ordinance, the court held that the ordinance failed the strict scrutiny test and did not pass constitutional muster, and permanently enjoined Tampa from enforcing it.

**This Manual**

This litigation manual provides an overview of legal theories that have been used successfully to challenge criminalization policies and practices, and it also sets forth several important considerations for bringing litigation on behalf of homeless people. In addition, it includes numerous summaries of cases that have been brought over the years to protect the civil and human rights of homeless people.

Success in preventing the criminalization of homelessness will not, however, achieve the long-term goal of ending homelessness by ensuring that all Americans have access to safe and affordable housing in neighborhoods of opportunity. It is critical that litigation strategies support organizing and policy advocacy efforts to ensure that legal challenges help secure solutions to the underlying causes of homelessness.

---

10   *Norton v. City of Springfield*, 768 F.3d 713 (7th Cir. 2014) and *Norton v. City of Springfield* 806 F.3d 411 (7th Cir. 2015).

11   *Id.*

12   *Thayer v. City of Worcester*, 755 F.3d 60 (1st Cir. 2014) and *Thayer v. City of Worcester*, 144 F. Supp. 3d 218 (D. Mass. 2015).

13   *Homeless Helping Homeless, Inc. v. City of Tampa*, No. 8:15-CV-1219-T-23AAS, 2016 WL 4162882 (M.D. Fla. Aug. 5, 2016).

# INTRODUCTION

**Homelessness is a national crisis, with rising rents, historically low vacancy rates, and a grossly insufficient social safety net leaving millions of people homeless or at-risk - including at least 1.36 million homeless children enrolled in U.S. public schools. Today, there is a shortage of 7.4 million affordable and available rental units for our nation's poorest renters.[14] This housing gap leaves millions of individuals and families across the country spending more than they can sustainably afford to keep roofs over their heads – or leaves them unable to afford housing at all.**

Many American cities have fewer emergency shelter beds than people who need shelter. Because homelessness is driven by a large and critical shortage of affordable housing, many individuals and families need help not just for one or two nights, but for long periods of time. Yet many communities continue to treat shelters as the answer to all homelessness, tasking shelters with meeting both emergency needs and longer term systemic shortages of permanent housing. As a result, communities with shelter space often lack sufficient beds for all individuals and families that are homeless. This leaves homeless people across the country with no choice but to struggle for survival in public places.

Although many people experiencing homelessness have literally no choice but to live outside and in public places, laws and enforcement practices punishing the presence of visibly homeless people in public space continue to grow. Homeless people, like all people, must engage in activities such as sleeping or sitting down to survive. Yet, in communities across the nation, these harmless, unavoidable behaviors are punished as crimes or civil infractions.

Our recent report on national trends in criminalization, *Housing Not Handcuffs: Ending the Criminalization of Homelessness in U.S. Cities* analyzed laws that prohibit the life-sustaining activities of homeless people in 187 cities nationwide since 2006. This analysis revealed that laws civilly or criminally punishing homeless are prevalent and dramatically rising across the country.

We also analyzed local enforcement practices, including increasingly common evictions of homeless encampments upon little or no notice. These evictions, or homeless "sweeps", not only displace homeless people from public space, but they often result in the loss or destruction of homeless persons' few possessions. The loss of these items, which can include critical identification documents, protective tents, or even needed medical equipment, can be devastating to homeless people. Yet, these sweeps are often conducted by governments with no plan to house or adequately shelter the displaced encampment residents. Instead, homeless

people are merely dispersed to different public places, leading to the inevitable reappearance of outdoor encampments

Laws criminally or civilly punishing homeless persons' life-sustaining activity are ineffective policies that fail to address the underlying causes of homelessness. Because people experiencing homelessness are not on the street by choice but because they lack choices, criminal and civil punishment serves no constructive purpose. Instead, arrests, unaffordable tickets, and the collateral consequences of criminal convictions make it more difficult for people to exit homelessness and get back on their feet. For example, even misdemeanor convictions can make someone ineligible for subsidized housing under local policy, and criminal records are routinely used to exclude applicants for employment or housing. These barriers to income and housing can prolong a person's homelessness, or even make it permanent.

Criminalization laws also waste precious taxpayer dollars on policies that do not work to reduce homelessness**.** Criminalization is the most expensive and least effective way of addressing homelessness. A growing body of research comparing the cost of homelessness--including the cost of criminalization--with the cost of providing housing to homeless people shows that ending homelessness though housing is the most affordable option over the long run.

Moreover, criminalization policies often violate homeless persons' constitutional and human rights. A number of lawsuits challenging violations of homeless persons' constitutional rights have been filed since the Law Center released its last advocacy manual in 2014. Most recent cases have upheld the legal rights of homeless persons to perform various life-sustaining behaviors in public places. Litigation surrounding evictions of homeless encampments (also known as "sweeps") and restrictions on panhandling have been especially prevalent since 2014, and the following trends have emerged:

- 75% of cases challenging evictions of homeless encampments and/or seizure and destruction of homeless persons' belongings.

- 57% of cases challenging enforcement of camping and/or sleeping bans.

- 100% of cases challenging laws restricting begging and solicitation.

This litigation manual is a companion piece to *Housing Not Handcuffs*. It is meant to be a resource for legal advocates working on the ground to combat criminalization in their communities. This manual evaluates recent trends in criminalization case law, describes successful legal challenges to criminalization policies and practices, and provides case summaries from criminalization litigation broken down by category of prohibited conduct.

---

14   Nat'l Low Income Hous. Coal., "Study Shows Massive Shortage of Affordable Hous. For Lowest Income Households in Am., (Mar. 2, 2017), available at http://nlihc.org/press/releases/7544.

# LEGAL STRATEGIES TO COMBAT CRIMINALIZATION OF HOMELESSNESS

**Lawyers have various legal strategies available to combat criminalization measures. Criminal defense lawyers can use constitutional arguments in criminal proceedings to challenge a charge against a homeless person. Constitutional and other legal challenges can also be brought proactively against a municipality to challenge civil rights violations faced by homeless persons. Further, attorneys can mitigate some of the worst collateral consequences of the criminalization of homelessness by providing representation to homeless individuals subject to civil or criminal citations or challenges, even without raising constitutional challenges. This manual focuses on considerations when bringing proactive civil rights litigation.**



© David Lat

### Overview[15]

Homeless individuals and service providers have brought various legal challenges to municipal ordinances or statutes that criminalize homelessness. Claims may be brought under 42 U.S.C. § 1983 against laws that violate rights guaranteed by the U.S. Constitution. State constitutions may offer differing or broader protections. In addition, human rights protected under international law can provide persuasive theories that have gained traction in some courts.

### Challenging Bans on Camping and/or Sleeping in Public

Because many municipalities do not have adequate affordable housing or shelter space to meet the need, homeless people are often left with no alternative but to live and sleep in public spaces. Many municipalities have enacted laws imposing criminal penalties upon homeless individuals for sleeping outside. In 2016, the Law Center found that laws prohibiting camping[16] have increased by 69% since 2006, with as many as a third of cities nationwide banning the activity throughout the entire community.[17] Laws prohibiting sleeping in public are slightly less common, with 27% banning sleeping either city-wide or in particular public places.[18] Enforcement of these laws may result in unaffordable tickets,

loss or destruction of personal property, or even jail time for the "crime" of trying to survive outdoors.

Laws punishing people for sleeping outside have been challenged in courts as a violation of homeless persons' civil rights. Some courts have found that laws criminally punishing the life-sustaining activities of homeless people amounts to criminalization of homeless status in violation of the **Eighth Amendment's** prohibition against cruel and unusual punishment. In reaching this conclusion, courts have looked at whether the number of homeless people exceeds the amount of available emergency shelter to determine whether criminalization of activities such as camping in public are voluntary conduct or conduct inextricably linked with homeless persons' status.

On August 6, 2015, the U.S. Department of Justice filed a statement of interest brief in *Bell v. Boise*, a lawsuit filed by the Law Center in federal district court on behalf of six homeless plaintiffs who were convicted under laws that criminalized sleeping or camping in public.[19] The statement of interest advocates for the application of the analysis set forth in *Jones v. City of Los Angeles*, a Ninth Circuit decision that was subsequently vacated pursuant to a settlement.[20] In *Jones*, the court considered whether the city of Los Angeles provided sufficient shelter space to accommodate the homeless population.  The court found that, on nights when individuals are unable to secure shelter space, enforcement of anti-camping ordinances violated their constitutional rights.

The position of the Justice Department was underscored in subsequent remarks made by then-Attorney General Loretta Lynch at a White House convening on incarceration and poverty, and

---

15   This manual does not create an attorney and client relationship with you. The information herein is not offered as legal advice and should not be used as a substitute for seeking professional legal advice. It does not provide an exhaustive list of considerations to be worked out before bringing litigation in any particular case.

16   Camping bans may also be broadly written to prohibit simply sleeping outside, or using any resource to protect oneself from the elements. See Housing Not Handcuffs, supra note 2.

17   The Law Center surveyed 187 cities and assessed the number and type of municipal codes that criminally or civilly punish the life-sustaining behaviors of homeless people. The results of our research show that the criminalization of necessary human activities is prevalent and increasing in cities across the country. See Housing Not Handcuffs, supra note 2.

18   Id.

---

19   U.S. Dep't of Just. Statement of Interest brief in Bell v. Boise available at https://www.justice.gov/crt/ file/761211/download.

20   *Jones v. City of Los Angeles*, 444 F.3d 1118, 1126 (9th Cir. 2016).



again in a Department of Justice community policing newsletter dedicated to the criminalization of homelessness.[21] Beyond constitutional concerns, the federal government has repeatedly condemned the criminalization of homelessness as ineffective and expensive public policy. For example, the U.S. Interagency Council on Homelessness stated in its guidance on encampments that, "the forced dispersal of people from encampment settings is not an appropriate solution or strategy, accomplishes nothing toward the goal of linking people to permanent housing opportunities, and can make it more difficult to provide such lasting solutions to people who have been sleeping and living in the encampment."[22]

*"Many homeless individuals are unable to secure shelter space because city shelters are over capacity or inaccessible to people with disabilities," said Principal Deputy Assistant Attorney General Vanita Gupta, former head of the U.S. Department of Justice Civil Rights Division. "Criminally prosecuting those individuals for something as innocent as sleeping, when they have no safe, legal place to go, violates their constitutional rights. Moreover, enforcing these ordinances is poor public policy. Needlessly pushing homeless individuals into the criminal justice system does nothing to break the cycle of poverty or prevent homelessness in the future. Instead, it imposes further burdens on scarce judicial and correctional resources, and it can have long-lasting and devastating effects on individuals' lives."*

Laws banning sleeping and camping in public have also been challenged as violating the **fundamental right to travel**. Laws illegally penalize travel if they deny a person a "necessity of life."[23] Advocates have contended that arresting people for sleeping outside violates the fundamental right to travel by denying access to a necessity of life, i.e. a place to sleep. At least one court has found that if people are arrested for sleeping in public, those arrests have the effect of preventing homeless people from moving within a city or traveling to a city, thereby infringing upon their right to travel.[24]

### Challenging Evictions of Homeless Encampments ("Sweeps")

Some municipalities have engaged in sudden evictions of homeless encampments - often referred to as "sweeps" or "clean ups" - in areas where homeless individuals sleep, rest, and store belongings. During sweeps, police or city workers may confiscate and destroy belongings. Although it is appropriate for city, county, and state governments to clean public areas, courts have found that seizing and destroying homeless persons' personal property may violate their **Fourth Amendment** rights to be free from unreasonable searches and seizures. In addition, courts have found that failing to follow certain procedures when managing confiscated private property may violate due process rights under the **Fourteenth Amendment**.[25]

### Challenging Bans on Loitering, Loafing, and Vagrancy

Laws prohibiting loitering, loafing, or vagrancy, are common throughout the country. Similar to historical Jim Crow, Anti-Okie, and Ugly laws, these modern-day ordinances grant police a broad tool for excluding visibly poor and homeless people from public places. In 2016, the Law Center found that 32% of cities prohibit loitering, loafing, or vagrancy throughout entire communities – an 88% increase since 2006.

Municipalities have used broadly-worded loitering ordinances to target homeless individuals in public spaces. The Supreme Court has held that such ordinances are **unconstitutionally vague** when they do not give clear notice of the prohibited conduct or would allow for selective or arbitrary enforcement.[26]

### Challenging Bans on Sitting or Lying Down in Public

Bans on sitting or lying down in public are another common form of criminalization ordinance. Although every human being must occasionally rest, laws that restrict resting activities in public are increasingly common. In 2016, the Law Center found that 47% of cities prohibit sitting and lying down in public.[27] This represents a 52% increase since 2006.[28]

Laws restricting sitting or lying down in public have been challenged as violating the **fundamental right to travel**.[29]

### Challenging Bans or Restrictions on Panhandling

In the absence of employment opportunities or other sources of income, begging may be a homeless person's best option for obtaining the money that they need to purchase food, public transportation fare, medication, or other necessities. Despite this, many communities have restricted or banned begging or panhandling. In 2016, the Law Center found that 61% of cities studied nationwide restrict or ban panhandling in some or all public places.[30]

Laws prohibiting panhandling, solicitation, or begging may infringe on the **First Amendment** right to free speech. Courts have found begging to be protected speech and laws that target speech based on content must satisfy strict scrutiny to be constitutional.[31] This means that content-based restrictions on speech must be narrowly tailored to achieve a compelling governmental interest.[32] Even

21   U.S. Dept. of Justice, Community Policing Dispatch (Dec. 2015), https://cops. usdoj.gov/html/dispatch/12-2015/index.asp.

22   United States Interagency Council on Homelessness, Ending Homelessness for People Living in Encampments: Advancing the Dialogue (August 2015) available at https://www.usich.gov/resources/uploads/asset_library/Ending_ Homelessness_for_People_Living_in_ Encampments_Aug2015.pdf.

23   *Memorial Hosp. v. Maricopa County*, 415 U.S. 250, 258-59 (1974).

24   *Pottinger v. City of Miami*, 76 F.3d 1154 (11th Cir. 1996).

25   *Mitchell v. City of Los Angeles*, Case No.: 16-cv-01750 SJO (JPR) (C.D. Cal. April 2016).

26   *Chicago v. Morales*, 527 U.S. 41 (1999); *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972).

27   Housing Not Handcuffs, supra note 2.

28   Id.

29   *Roulette v. City of Seattle*, 850 F. Supp. 1442 (W.D. Wash. 1994), aff'd, 78 F.3d 1425 (9th Cir. 1996).

30   Housing Not Handcuffs, supra note 2.

31   *Reed v. Town of Gilbert*, 135 S.Ct. 2218 (2015)

32   Id.

where a restriction is content neutral, a panhandling ordinance may still be unlawful if it restricts more speech than is necessary to achieve a legitimate government interest or it fails to leave open ample alternative channels for begging speech.[33]

In addition, some courts have found laws prohibiting begging or panhandling to be unconstitutionally vague where the ordinances do not provide clear notice of the conduct prohibited and could be enforced it in an arbitrary or discriminatory manner.[34]

### Challenging Laws Banning Living in Vehicles

Sleeping in one's own vehicle is often a last resort for people who would otherwise be forced to sleep on the streets. A dramatically growing number of cities across the nation, however, have chosen to impose criminal or civil punishments on people who live in their private vehicles, despite their lack of housing options. In 2016, the Law Center found that 39% of cities prohibit living in vehicles.[35] This represents an increase of 143% since 2006.[36]

Laws prohibiting living in vehicles have been challenged as being **unconstitutionally vague** or inviting arbitrary enforcement in violation of due process.[37]

### Persuasive Human Rights Theories

Human rights theories provide useful tools when challenging ordinances criminalizing homelessness. Legal arguments supported by human rights treaties ratified by the U.S. can be used to ensure domestic law complies with such treaties, which have the same binding force as federal law.[38] Further, under international law, once the U.S. signs a treaty, it is obligated not to pass laws that would "defeat the object and purpose of [the] treaty."[39]

The Law Center has laid a solid base for using human rights in policy advocacy and litigation against criminalization measures. Federal documents recognize human rights standards as relevant to criminalization, including a 2012 report by the U.S. Interagency Council on Homelessness that acknowledged that "in addition to violating domestic law, criminalization measures may also violate international human rights law, specifically the Convention Against Torture and the International Covenant on Civil and Political Rights"[40] That language was subsequently echoed by the U.S. Department of Justice (DOJ)[41] and U.S. Department of Housing

and Urban Development (HUD).[42] At the international level, two of the three treaty bodies which oversee human rights treaties ratified by the U.S., the Human Rights Committee (HRC) and Committee on the Elimination of Racial Discrimination (CERD), have specifically condemned the criminalization of homelessness in the U.S. and called on the U.S. to "[a]bolish laws and policies making homelessness a crime."[43] The third treaty body to which the U.S. is subject, the Committee Against Torture, considered such recommendations at its review of U.S. compliance in November 2014,[44] and has asked the U.S. to address the issue at its upcoming review in 2018.[45]

While human rights treaties may not currently be enforceable on their own in U.S. domestic courts, judges in both state and federal settings have looked to human rights law and jurisprudence in a number of cases.[46] In addition, lawyers can also cite to these sources to support policy advocacy.[47] Numerous resources and networks exist to help litigators use these rich resources in their advocacy.[48]

### *Cruel and Unusual Punishment*

On multiple occasions, the U.S. Supreme Court has looked to international law in interpreting the scope of the Eighth Amendment protection against cruel and unusual punishment.[49] The Law Center has strategically built up commentary from the HRC and numerous other U.N. human rights monitors addressing criminalization of homelessness as cruel, inhuman, and degrading treatment – the international equivalent of our Eighth Amendment

---

33   *Norton v. City of Springfield*, 768 F.3d 713 (7ᵗʰ Cir. 2014) and *Norton v. City of Springfield* 806 F.3d 411 (7ᵗʰ Cir. 2015).

34   See, e.g., *Atchison v. City of Atlanta*, No 1:96-CV-1430 (N.D. Ga. July 17, 1996) (granting preliminary injunction).

35   Housing Not Handcuffs, supra note 2.

36   Housing Not Handcuffs, supra note 2.

37   *Desertrain v. City of Los Angeles*, 754 F.3d 1147 (9th Cir. 2014)

38   U.S. Const. art. VI, § 2; Id. art. II, § 2, cl. 2.

39   The Vienna Convention on the Law of Treaties, May 23, 1969, art. 18(a), 1155 U.N.T.S. 331.

40   U.S. Interagency Council on Homelessness, Searching out Solutions: Constructive Alternatives to the Criminalization of Homelessness 8 (2012), https://www.usich.gov/resources/uploads/asset_library/Searching_Out_Solutions_2012.pdf.

41   Letter from Lisa Foster, Director, Office for Access to Justice, U.S. Dept. of Justice, to Seattle City Councilors, (Oct.13, 2016), (https://assets.documentcloud.org/documents/3141894/DOJ-ATJ-Letter-to-Seattle-

City-Council-10-13-2016.pdf); Matthew Doherty, *Incarceration and Homelessness: Breaking the Cycle*, Community Policing Dispatch, U.S. Dept. of Justice Community Oriented Policing Services, vol. 8, Issue 12 (Dec. 2015), https://cops.usdoj.gov/html/dispatch/12-2015/index.asp.

42   U.S. Dept. of Housing & Urban Development, *Alternatives to Criminalizing Homelessness*, https://www.hudexchange.info/homelessness-assistance/alternatives-to-criminalizing-homelessness/.

43   U.N. Human Rights Committee, *Concluding observations on the fourth report of the United States of America*, ¶ 19, U.N. Doc. CCPR/C/USA/CO/4 (2014); Committee on the Elimination of Racial Discrimination, *Concluding Observations*, CERD/C/USA/CO/7-9, ¶ 12 (2014).

44   Concluding observations on the combined third to fifth periodic reports of the United States of America, adopted by the Committee at its fifty-third session (3-28 Nov. 2014), 19 Dec. 2014, available at http://www.ushrnetwork.org/sites/ushrnetwork.org/files/cat_us_concluding_observations_2014.pdf.

45   Committee Against Torture, *List of issues prior to submission of the sixth periodic report of the United States of America*, CAT/C/USA/QPR/6 ¶ 46 (2016), https://documents-dds-ny.un.org/doc/UNDOC/GEN/G17/019/66/PDF/G1701966.pdf?OpenElement.

46   *See* Opportunity Agenda, Human Rights in State Courts (2014), http://opportunityagenda.org/human_rights_state_courts_2014.

47   See, e.g., Leo Morales, An open letter to Mayor Bieter & Boise City Council re: proposed Ordinance 38-14, criminalizing houselessness in Boise, ACLU of Idaho (Sept. 23, 2014), https://acluidaho.org/an-open-letter-to-mayor-bieter-boise-city-council-re-proposed-ordinance-38-14-criminalizing-houselessness-in-boise/.

48   *See, e.g.* American University Washington College of Law Center for Human Rights and Humanitarian Law, *Local Human Rights Lawyering Project*, http://www.wcl.american.edu/humright/center/locallawyering.cfm; Columbia Law School Human Rights Institute, Bringing Human Rights Home Lawyers Network, http://web.law.columbia.edu/human-rights-institute/bhrh-lawyers-network.

49   *See, e.g.* Roper v. Simmons, 125 S. Ct. 1183, 1199 (2005); *Graham v. Florida*, 130 S. Ct. 2011; 176 L. Ed. 2d 825 (2010).; *Atkins v. Virginia*, 536 U.S. 304, 316 n.21 (2002).

standard - to provide evidence of an international norm that can guide judges to make similar findings domestically.[50] Rather than simply enjoining such laws only to see communities make minimal changes to the laws but continue criminalizing practices, international law may also provide support for more expansive remedies – such as provision of housing – to address underlying constitutional violations.[51]

*Freedom of Movement*

In *In Re White*, the California Court of Appeals cited the right to freedom of movement recognized in international law to support its conclusion that both the U.S. and California Constitutions protect the right to intrastate and intra-municipal travel.[52] The petitioner challenged a condition of her probation that barred her from being in certain defined areas of the city. The HRC, which oversees compliance with the International Covenant on Civil and Political Rights (ICCPR), has emphasized that the right to movement and the freedom to choose your own residence are important rights that should only be breached by the least intrusive means necessary to keep public order.[53] Further, in *Koptova v. Slovak Republic*, the CERD, which oversees the International Covenant on the Elimination of Racial Discrimination (ICERD), held that municipal resolutions in villages in the Slovak Republic, which explicitly forbade homeless Roma families from settling in their villages, and the hateful context in which the resolutions were adopted, violated the right to freedom of movement and residence within the border of a country in violation of the ICERD.[54]



Equal Protection/Freedom from Discrimination

Laws criminalizing aspects of homelessness, such as bans on sleeping or sitting in public, or the selective enforcement against homeless people of neutral laws such as those prohibiting loitering or public intoxication may violate human rights law. Both the ICCPR and ICERD, which the U.S. has signed and ratified, prohibit discrimination on the basis of race, and both the ICCPR and the Universal Declaration of Human Rights, a non-binding U.N. declaration, also protect against discrimination on the basis of property and "other status," which can include homelessness.[55] Laws that have a disparate impact on homeless individuals who are members of racial minorities have also been held to violate the ICERD and the ICCPR. In response to reports that "some 50 % of homeless people are African American although they constitute only 12 % of the U.S. population," the HRC stated that the "[U.S.] should take measures, including adequate and adequately implemented policies, to ensure the cessation of this form of de facto and historically generated racial discrimination,"[56] and the CERD expressed concern "at the high number of homeless persons, who are disproportionately from racial and ethnic minorities … and at the criminalization of homelessness through laws that prohibit activities such as loitering, camping, begging, and lying in public spaces" and called on the government to take corrective action.[57] The U.S. Supreme Court has also looked to international law in interpreting our own equal protection standards under the Fourteenth Amendment.[58]

50   *See* U.N. Human Rights Committee, *Concluding observations on the fourth report of the United States of America*, ¶ 19, U.N. Doc. CCPR/C/USA/CO/4 (2014); U.N. Human Rights Council, *Report of the Special Rapporteur on Adequate Housing as a Component of the Right to an Adequate Standard of Living, and on the Right to Non-Discrimination in this Context, Raquel Rolnik, Mission to the United States of America*, ¶ 95, U.N. Doc. A/HRC/13/20/Add.4 (Feb. 12, 2012) [hereinafter UNHRC, *Report of Raquel Rolnik*]; U.N. Human Rights Council, *Final Draft of the Guiding Principles on Extreme Poverty and Human Rights, Submitted by the Special Rapporteur on Extreme Poverty and Human Rights, Magdalena Sepúlveda Carmona*, ¶¶ 65, 66(c), U.N. Doc. A/HRC/21/39 (July 18, 2012); U.N. Human Rights Council, *Report of the Special Rapporteur on Extreme Poverty and Human Rights*, ¶¶ 48-50, 78(c), U.N. Doc. A/67/278 (Aug. 9, 2012); Special Rapporteurs on the Rights to Adequate Housing, Water and Sanitation, and Extreme Poverty and Human Rights, *USA: "Moving Away from the Criminalization of Homelessness, A Step in the Right Direction"* (Apr. 23, 2012), http://www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=12079&LangID=E; UNHRC, *Report of the Special Rapporteur on the human right to safe drinking water and sanitation, Catarina de Albuquerque, Addendum, Mission to the United States of America*, A/HRC/18/33/Add.4, Aug. 2, 2011; Special Rapporteur on the Human Right to Safe Drinking Water and Sanitation, *Stigma and the Realization of the Human Rights to Water and Sanitation*, U.N. Doc. A/HRC/21/42 (July 2, 2012); U.N. Human Rights Council, *Report of the Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia and Related Intolerance, Doudou Diène, Mission to the United States of America*, U.N. Doc. A/HRC/11/36/Add.3 (Apr. 28, 2009) [hereinafter UNHRC, *Report of Diène*].

51   Eric Tars, Heather Maria Johnson, Tristia Bauman & Maria Foscarinis, *Can I Get Some Remedy? Criminalization of Homelessness and the Obligation to Provide an Effective Remedy,* 45 Col. HRLR 738 (2014), http://nlchp.org/documents/HLRL_Symposium_Edition_Spring2014_Can_I_Get_Some_Remedy.

52   *In Re White*, 158 Cal. Rptr. 562, 567 (Ct. App. 1979).

53   Human Rights Committee, General Comment 27, Freedom of movement (Art. 12), U.N. Doc CCPR/C/21/Rev.1/Add.9 (1999).

54   *Koptova v. Slovak Republic*, (13/1998), CERD, A/55/18 (8 August 2000).

55   *See* International Covenant on Civil and Political Rights, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, entered into force Mar. 23, 1976 [hereinafter "ICCPR"]; Universal Declaration of Human Rights, G.A. res. 217A (III), U.N. Doc A/810 at 71 (194; International Convention on the Elimination of All Forms of Racial Discrimination, 660 U.N.T.S. 195, entered into force Jan. 4, 1969).

56   Concluding Observations of the Human Rights Committee on the Second and Third U.S. Reports to the Committee (2006)', available at http://hrlibrary.umn.edu/usdocs/hruscomments2.html.

57   Committee on the Elimination of Racial Discrimination, *Concluding Observations*, CERD/C/USA/CO/7-9, ¶ 12 (2014):; available at https://www.state.gov/documents/organization/235644.pdf.

58   Committee on the Elimination of Racial Discrimination, *Concluding Observations*, CERD/C/USA/CO/7-9, ¶ 12 (2014); Lawrence v. Texas, 539 U.S. 558 (2003); Grutter v. Bollinger, 539 U.S. 306, 344 (2003) (Ginsburg, J., concurring).

*Freedom from Forced Evictions*

Evictions that remove people from public spaces or outdoor encampments (sometimes referred to as "sweeps"), frequently without notice or housing relocation, may violate homeless people's right to freedom from forced evictions under international law. Forced evictions are described as "the permanent or temporary removal against their will of individuals, families and/ or communities from the homes and/or land which they occupy, without the provision of, and access to, appropriate forms of legal or other protection."[59]According to human rights law, "[e]victions should not result in rendering individuals homeless or vulnerable to the violation of other human rights."[60] In addition, "[n] otwithstanding the type of tenure [including the illegal occupation of land or property]," under human rights law "all persons should possess a degree of security of tenure which guarantees legal protection against forced eviction, harassment and other threats."[61] For homeless individuals affected by sweeps, human rights law requires that municipalities "take all appropriate measures, to the maximum of [their] available resources, to ensure that adequate alternative housing, resettlement or access to productive land, as the case may be, is available."[62] This principle has been applied in cases from South Africa establishing that homeless people could not be evicted unless alternative shelter was available.[63]




---

59  For an excellent summary of forced evictions under international law, see UN HABITAT and UN Office of the High Commissioner for Human Rights, Forced Evictions, Fact Sheet No. 25 Rev. 1I (2014), http://www.ohchr.org/ Documents/Publications/FS25.Rev.1.pdf.

60  UN Committee on Economic, Social and Cultural Rights,

61  UN Committee on Economic, Social and Cultural Rights, General Comment 4, *The right to adequate housing* (Sixth session, 1991), U.N. Doc. E/1992/23, annex III at 114 (1991), reprinted in Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI/GEN/1/Rev.6 at 18 (2003).

62  *See* General Comment No. 7.

63  See, e.g., *Occupiers of 51 Olivia Road, Berea Township and Another v. City of Johannesburg and Others*, (24/07) [2008] ZACC 1 (19 Feb. 2008); Michael Clark, Evictions and Alternative Accommodation in South Africa: An Analysis of the Jurisprudence and Implications for Local Government, SERI (2013), http://www.seri-sa.org/images/Evictions_Jurisprudence_Nov13.pdf.

# CONSIDERATIONS FOR BRINGING LITIGATION

**Before a complaint is ever filed, counsel must consider a wide range of factors to present the strongest case.**

**Factual Research: Topics to Investigate**

Counsel should seek to learn as much as possible about the ordinance or statute that will be challenged. This includes developing a firm understanding of the law's enactment, the jurisdiction's history of and policies regarding enforcement of the ordinance or statute, the municipality's relationship with shelters and other service providers, and difficulties homeless individuals may have complying with the ordinance. This research may be conducted by interviewing homeless individuals and service providers, reviewing municipal documentation found online, and by submitting public records requests.

The jurisdiction's history of, or policies regarding, enforcement can be critical to persuading a court that the problems identified in the eventual complaint are real, concrete, and recurring (and, therefore, not subject to dismissal on mootness or ripeness grounds). The types of questions counsel should ask about the nature of the enforcement should include:

(1) whether there have been changes in frequency or magnitude of enforcement;

(2) whether any notable swings in enforcement efforts are tied to particular events, political trends, enactment of new laws, or local citizen complaints;

(3) whether enforcement spikes during certain seasons or times of day;

(4) whether enforcement is focused on a particular area (and, conversely, whether some locations do not see enforcement); and

(5) whether enforcement is selective, meaning specific groups, such as homeless individuals, or a certain subset of the homeless population, are targeted.

Most importantly, counsel should note how potential defendants are enforcing the statute vis-à-vis specific individuals: is law enforcement issuing verbal warnings or citations, arresting violators, mandating relocation to a local shelter, or enforcing the law through some other means? Identifying municipal or police policies on enforcement is also important. Initial research on policies can be done by reviewing materials (such as press releases and reports) on a municipality's website and reviewing statements made to news media and in municipal or city council meetings. These facts will be critical in determining which legal claims have the greatest chance of success.



© Pedro Ribeiro Simões

Local service providers (such as shelters, food kitchens, clinics, and other social service organizations that serve indigent individuals) can serve as useful resources to understanding the municipality's attitude toward homelessness. Those service providers that are critical of criminalization practices may be important allies in working with plaintiffs and gathering factual information. They may also serve as informal consultants who can help counsel understand the conditions and challenges facing the local homeless population. In contrast, some service providers may not be receptive to assisting in challenges or may be hesitant to publicly support such efforts because of their relationships with the municipality and/or its police department. It may be persuasive to some service providers who participate in their local HUD Continuum of Care to note that HUD assigns two points on their funding application for Continuums that can answer specifically what steps they are taking to end criminalization in their funding application. Participating or assisting in a lawsuit may help with that. [64]

Counsel should examine additional barriers that may hinder homeless individuals' abilities to comply with the ordinance or statute at issue. For example, if making an Eighth Amendment argument where the availability of shelter space may be important, consider barriers to shelter use:

• Age, gender, and family composition restrictions on who may use shelter can leave homeless people with few or no shelter options;

• Mental health issues, such as Post Traumatic Stress Disorder, may make a group shelter setting medically inappropriate or unavailable;

---

[64] *See* U.S. Dept. of Housing & Urban Development, Notice of Funding Availability for the 2016 Continuum of Care Program Competition, 35 (2016), https://www.hudexchange.info/resources/documents/FY-2016-CoC-Program-NOFA.pdf; National Law Center on Homelessness & Poverty, *The Cost of Criminalizing Homelessness Just Went Up By $1.9 Billion* (2015), http://www.nlchp.org/press_releases/2015.09.18_HUD_NOFA_criminalization.

- Accessibility issues or lack of accommodations for persons with disabilities may render shelter unavailable;

- Religious differences may inhibit an individual from seeking shelter or services from providers that require or include religious services;

- Sobriety requirements can prevent homeless people struggling with alcohol or other addiction from accessing shelter; and

- Location/transportation issues may also limit access to available services, particularly if these are located away from public transportation or if individuals' physical disabilities make transportation difficult.

## Public Records Requests

A search of ordinances most likely applied to homeless persons, such as anti-camping, anti-sitting, and other similar laws, can provide information about enforcement against homeless people.

Local law enforcement will have information on arrests and citations for misdemeanor violations by homeless individuals. One way to search for such arrests and citations is by address. Many times a homeless person will list a local shelter or service provider as his or her address when arrested or cited. Police departments may have other ways of listing homeless persons' address in their records, such as "unknown," "no address," "homeless," or "transient."

Public records requests can be made of federal, state, and local governments. The federal Freedom of Information Act (FOIA) gives the public a right to obtain copies of certain documents from federal government agencies and applies to records held by agencies in the executive branch of government. Every U.S. state and some cities have passed laws similar to the federal FOIA that permit the public to request records from state and local agencies.

Public records requests can be helpful in identifying practices within your city that are negatively impacting homeless individuals. Information obtained from public records requests can help identify recurring civil rights violations that will help develop a litigation strategy, should other forms of advocacy with the city fail.

*How to Make the Request:*

Determine what records you need.

When making a request, it is important to describe the document you are seeking as precisely as possible and include enough information that the record will be reasonably identifiable. This is also important because there may be a copying or processing fee for records requests. See the list below for ideas on what information can be requested.

Identify the agency that has the records.

Public records requests should be directed to the agency that prepared, owned, or retains the records. If it is unclear which agency has the particular records, requests can be sent to multiple agencies.

Make a request to the agency in writing.

The websites of many state agencies provide detailed instructions on how to make public records requests and contain a form that can be used to submit such requests. If the agency in question does not provide such information, a letter should be sent to the agency reasonably describing the records requested and clearly marked as a public records request.

Request a fee waiver if needed.

Agencies can sometimes impose a significant cost for requesting documents; if this will be a barrier for your litigation, make sure to request a fee waiver in your initial application and explain you are making the request on behalf of an impoverished client and for the public good

Follow up on the request.

The federal FOIA requires a response within 20 working days, and state public records laws also impose deadlines by which the agency must respond. The request may be denied in whole or in part, but the agency is required to explain the reasons for denial. Negotiation may be helpful if the agency denies or challenges the scope of the request.

What to Request:

The different types of information advocates may consider seeking through a public records request include the following:

- All available records related to arrest, citation, warning or other actions taken by police officers in relation to violations under anticamping, anti-panhandling, loitering, and/or other ordinances used in your community to target homeless individuals;

- Any and all internal police department statements of policy, practice, guidance, or similar documents relating to the enforcement of any of the ordinances for which you are seeking records;

- All records related to sweeps and policies related to cleaning public spaces;

- All records related to citizen complaints to the police department related to homeless persons;

- All communications between the police department and city officials related to homelessness;

- Any records related to jail capacity, the cost of incarceration, and judicial resources involved in prosecuting homeless individuals; and

- All records related to official figures on the size of the local homeless population and the maximum capacity of local homeless shelters.



**Issues to Consider in Working with Plaintiffs**

Working effectively with plaintiffs is one of the most important aspects of litigation.[65]

*Individual Plaintiffs*

When filing a case in federal or state court, counsel should consider whether plaintiffs (1) meet the legal requirements of Article III standing and/or the relevant state law equivalent; (2) have claims not barred by applicable statutes of limitation; (3) have compelling facts; and (4) will be able to participate at depositions and trial. Plaintiffs who have ties within the homeless community and will be able to offer counsel guidance on the issues faced by, and remedies most likely to benefit, the homeless community can be particularly helpful.

To have standing, a plaintiff must demonstrate that he or she has personally suffered or will imminently suffer an injury that is fairly traceable to defendant's conduct and that a favorable decision is likely to redress the injury.[66] Injuries to constitutional rights are generally sufficient to establish standing. Where injunctive relief is sought, a plaintiff must further demonstrate a likelihood of future harm from the unconstitutional enforcement; this additional requirement is unnecessary for claims for monetary damages. While some courts have found that plaintiffs without convictions under anti-camping ordinances lack standing,[67] other courts have found that homeless plaintiffs have standing to challenge anti-camping or anti-sleeping ordinances, even if they have not

been convicted under the ordinances.[68] Counsel should also anticipate challenges to individual standing where a plaintiff, who seeks only injunctive relief, is no longer homeless, is incarcerated, or has moved from the area.[69]

Beyond standing requirements, however, there are several specific considerations counsel should consider when bringing litigation on behalf of homeless individuals.

First, counsel should consider the number of individual plaintiffs appropriate for an action. A large number of individual plaintiffs can be helpful. Unsheltered homeless individuals may move or become unavailable for other reasons. Further, a large number of plaintiffs will serve to underscore the severity of the issues raised in the litigation. A demographically diverse group of plaintiffs, where possible, may likewise represent the broad harm of a given ordinance.

Second, counsel should think carefully about how to address the potential vulnerabilities of specific plaintiffs, including to prepare those plaintiffs for deposition and trial and identify where supplemental information or expert testimony may need to be procured. Plaintiffs will likely need to explain the circumstances of their past and current living situations and how they became homeless, their employment history, any medical or mental health issues that impact their claims or damages, any criminal record and periods of incarceration, and the circumstances of their citations. Plaintiffs' mental health or criminal histories may also impact the weight given to their testimony. Counsel should consider from the outset whether protective orders may be needed with respect to confidential or sensitive information about the plaintiffs.

Third, counsel should consider how to stay in communication with plaintiffs throughout the duration of any litigation. There are a variety of ways to do so. Some homeless individuals will have email addresses that they check regularly. Others will routinely stay at the same shelter and will be accessible on a regular basis at the same location. To ensure that counsel does not lose touch with plaintiffs (and that counsel is not surprised by any unexpected developments), it is advisable to schedule regular meetings.

Fourth, counsel should discuss possible remedies with individual plaintiffs upfront to determine whether and how to pursue injunctive relief, monetary damages, and/or other relief.

*Class Actions – A Special Case*

A class action can demonstrate the severity of the issues addressed in litigation. However, counsel must consider whether the requirements embodied in Rule 23 of the Federal Rules of Civil Procedure and/or state law equivalent can be met, as well as the relative strategic merits of a class action. Some legal services organizations are prohibited from participating in class actions as either counsel or party. Filing a lawsuit as a class action has the benefit of being able to seek relief for a large group of individuals.

---

65   In addition to the issues discussed here, counsel should be aware of any jurisdictional, organizational, or ethical rules or limitations related to establishing the attorney-client relationship.

66   *Dennis Hollingsworth et al. v. Kristin M. Perry*, 133 S. Ct. 2652, 2661 (2013).

67   *Johnson v. Dallas*, 61 F.3d 442, 445 (5th Cir. 1995).

68   *Jones v. City of Los Angeles*, 444 F.3d 1118 (9th Cir. 2006).

69   *Cf. Poe v. Snyder*, 834 F.Supp.2d 721, W.D. Michigan (2011).

However, obtaining certification of the class is an additional hurdle to overcome in a lawsuit and may be a better option for certain types of suits than others.

*Organizational Plaintiffs*

Organizations may be named as plaintiffs if they can demonstrate standing and injury. An organization may be able to establish standing in a representative capacity if: 1) its members would otherwise have standing to sue in their own right, 2) the interests it seeks to protect are germane to the organization's interest, and 3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. An organization that suffers injury in its own right may have standing to sue. For example, an organization that has or will suffer economic harm or a diminution in membership due to unlawful conduct may be able to establish standing as an organizational plaintiff. Having organizations as plaintiffs can be an advantage, in the event that individual plaintiffs' claims are mooted out. Religious groups, shelters, and other service providers may have a stake in the outcome of litigation challenging an ordinance.

## Issues to Consider in Identifying Defendants

While conducting pre-trial research, counsel will need to identify defendants. This may include examining the actions of various government entities, including state and local governments and their agencies and law enforcement departments. Actions may be brought against specific individuals, based upon the level of individual knowledge and conduct. Counsel must give special consideration to issues of sovereign and qualified immunity and the requirement of § 1983 that liability is grounded in an official municipal policy.[70]

---

70   *Erwin Chemerinsky, Constitutional Law: Principles & Policies* 488-89 (2d ed. 2002).

# LITIGATION AND STRATEGY



© Karen Neoh

### Drafting the Complaint

In addition to working with plaintiffs to identify the appropriate claims and defendants, counsel has other strategic considerations when drafting the complaint.

*Level of Detail*

Counsel should consider the appropriate level of detail in drafting the complaint. At minimum, complaints filed in federal court must meet the requirements of Rule 8(a)(2) of the Federal Rules of Civil Procedure, *Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Complaints filed in state court may be subject to pleading requirements under state civil procedure laws. In both federal and state courts, the complaint can be an opportunity to educate the court, the media, and the public on the effects of criminalizing homelessness.

*Jury Demand*

Counsel should consider whether a bench trial or jury trial is preferable given the specific claims and parties. This will likely involve research and considering a local counsel's perspective on the court and the potential jury pool.

*Remedies*

Challenges to criminalization measures have been most successful where plaintiffs have sought specific declaratory and/or injunctive relief.[71] Monetary damages may also be sought and awarded, though these have been awarded more frequently where a plaintiff's property has been seized or destroyed.[72] Given the

needs of the specific plaintiffs, appropriate remedies may also include reimbursement of criminal fines and costs of incarceration, and expungement of violations of the challenged ordinances. Attorneys' fees and litigation costs should also be sought, when available.

In deciding whether to grant a preliminary injunction, courts frequently consider four factors, whether: (1) the moving party is likely to prevail on the merits of his or her claim, (2) the moving party will suffer irreparable injury unless the injunction issues, (3) the threatened injury outweighs the harm the injunction may do to the opposing party, and (4) the injunction would not be contrary to the public interest.[73] Irreparable harm is defined as harm that the plaintiff would suffer absent a preliminary injunction and that cannot later be compensated by damages or a decision on the merits.[74] Some courts do not structure or weigh the factors in any particular order, allowing the judge to exercise more discretion in determining whether a preliminary injunction should be issued; other courts will provide more guidance as to how to weigh or order similar factors.[75]

---

### Filing the Complaint or Sending a Demand Letter?

Sending a demand letter to the defendants, prior to filing the complaint, may provide an opportunity to educate decision-makers and resolve the matter outside of litigation. For instance, the municipality may be willing to amend the objectionable ordinance or put in place a policy clarifying it and limiting enforcement against persons experiencing homelessness. Counsel who is familiar with municipal decision-makers will have the best sense of whether this is an appropriate strategy. Preliminary research will help inform counsel as to the most appropriate tone of any demand letter and other negotiations with municipalities.

---

71  See e.g. *Jones v. City of Los Angeles*, 444 F.3d at 1120, 1138 (noting that plaintiffs sought a declaratory judgment that enforcement violates homeless persons' rights to be free from cruel and unusual punishment and an injunction against enforcement from 9:00 p.m. to 6:30 a.m. and in cases of medical necessity).

72  See, e.g., *Pottinger v. Miami*, 810 F. Supp. at 1570 ("[A] homeless person's personal property is generally all he owns; therefore . . . its value should not

be discounted.").

73  E.g. *Vision Center v. Opticks, Inc.*, 596 F.2d 111 (5th Cir. 1979); *Trak Inc. v. Benner Ski KG*, 475 F. Supp. 1076, 1077 (D. Mass. 1979); *SK&F, Co. v. Premo Pharmaceutical Laboratories, Inc.*, 625 F.2d 1055, (3d Cir. 1980). *CPG Products Corp. v. Mego Corp.*, 502 F. Supp. 42 (S.D. Ohio 1980); *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111 (7th Cir. 1997)

74  *Sampson v. Murray*, 415 U.S. 61 (1974) (citing *Virginia Petroleum Jobbers Ass'n v. Federal Power Commission*, 259 F.2d 921 (D.C. Cir. 1958).

75  *Lancor v. Lebanon Housing Authority*, 760 F.2d 361, 362 (1st Cir.1985) (heightened importance of probability of success); *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6 (7th Cir. 1992) (making the first two factors requirements); *Ilapak Research & Development S.A. v. Record SpA.*, 762 F. Supp. 1318 (N.D. Ill. 1991) (acknowledging that Seventh Circuit courts are to employ a sliding scale approach).

## Discovery

*Plaintiffs' Discovery*

Discovery provides important opportunities for factual development of the case – particularly in the context of challenges to criminalization measures for which many of the relevant documents will be exclusively in the defendants' possession. Counsel should strategically consider the use of interrogatories, requests for admission, and requests for production to gain information and documentary support needed to prove each element of plaintiffs' affirmative case.

Key categories of documents that may be available through discovery include: (1) copies of citations, police records or reports, audio-recordings, and emails relating to violations of the challenged ordinances; (2) guidance and instructions on enforcement, whether formal or informal (such as in emails), and training materials on the challenged ordinances; (3) internal communications regarding enforcement policies and practices; (4) annual or periodic reports or data relating to enforcement; (5) defendants' organizational/hierarchy charts; (6) reports or policy documents regarding the ordinances at issue or homelessness; (7) defendants' submissions to federal or state government agencies that pertain to homelessness (e.g. submissions to HUD); and (8) citizen complaints or other materials defendants may use to justify their practices. Materials that can be used to demonstrate an official policy or custom are of particular importance in litigating claims brought under § 1983.

As in other litigation, the meet and confer process is an opportunity to negotiate discovery and protection of confidential or sensitive information in documents. However, where defendants attempt to "hide" information or otherwise obstruct discovery, motions to compel may be necessary to secure materials critical to proving the case.

Depositions provide additional opportunities to develop information necessary to support the affirmative case, particularly with respect to proving an official policy or custom. Documents received earlier in discovery will help identify key witnesses to depose, including officers who have issued citations, persons responsible for the training or supervision of officers, and decision-makers who have created policy or have acquiesced to existing policy.

*Defendants' Discovery*

Counsel may encounter particular challenges when working with plaintiffs to respond to defendants' discovery requests. Plaintiffs who are homeless and have no reliable place to store their belongings may not have access to the documents sought. To the extent requests seek materials relating to enforcement, responsive documents may already be in the defendants' possession. Counsel can assist plaintiffs in procuring documents from medical providers, employers, and government agencies; however, this process may be time-consuming. Further, such materials may contain confidential or sensitive information that should be produced only subject to a protective order.

Memory issues may also be a hurdle both in responding to requests and in depositions. For instance, plaintiffs who frequently violate the challenged ordinances may, of necessity, may not recall the specific circumstances that led to the violation for which they were cited or arrested. Care should be given to adequately prepare plaintiffs for questioning.

*Third-Party Discovery*

Shelters and other service providers may also have key materials and information needed in litigation. Service providers who are supportive of the litigation may be willing to provide documents or information without a subpoena or court order. Defendants will likely also seek such discovery from third-party service providers.

## Experts

Experts can play an important role in helping fact-finders better understand conditions faced by many homeless individuals and reasons why compliance with ordinances may be impossible. Experts may address the conditions and causes of homelessness, the local conditions and availability of adequate shelter and services, safety concerns at shelters and in sleeping outdoors, and the effects of medical and mental health issues on compliance with the ordinances at issue.

## Summary Judgment

Based on the information gleaned in discovery, counsel should evaluate whether there is sufficient evidence to seek summary judgment as to some or all of plaintiffs' claims, or as to liability.

## Trial

When litigation leads to trial, counsel should carefully consider trial strategy and themes in light of the locality, its population and potential jury pool (or, if plaintiffs have selected a bench trial, in light of the judge's prior jurisprudence). Counsel should consider the most effective way to convey a compelling message about the impact of the given ordinance on the lives of the plaintiffs. In crafting the affirmative case, counsel should consider which witnesses and evidence can best support that message and the elements of each claim. Counsel should carefully consider the likely strengths and weaknesses of plaintiffs' and other witnesses' trial testimony. As with depositions, counsel must take special care to prepare trial witnesses.

## Settlement

Settlement negotiations may offer for the opportunity for a constructive solution that may balance the rights of homeless individuals with a municipality's goals. Settlements can also include remedies that would be unavailable from a trial. Settlements may limit enforcement against homeless individuals under certain circumstances, such as when shelters are full, or in specified locations or during certain hours. Settlements have frequently included funds set aside to assist homeless individuals. Conditions for settlement need to be clear to the parties involved, others similarly situated, and law enforcement, so that all understand what is permitted. To prevent future violations of rights, settlement conditions should also be tailored to allow effective monitoring.

# CASE SUMMARIES

## I. Challenges to Bans on Camping and/or Sleeping in Public and Encampment Evictions

### Federal Court Cases

*U.S. Supreme Court*

**Clark v. Community for Creative Non-Violence, 468 U.S. 288 (1984)**

In 1982, the Community for Creative Non-Violence (CCNV) held a round-the-clock protest demonstration on national park property near the White House, and was granted a permit to erect a symbolic campsite but denied permission to sleep at the campsite. CCNV challenged the applicable Park Service Regulation as unconstitutionally vague on its face and discriminatorily enforced in violation of the protesters' rights under the First Amendment. The U.S. Supreme Court reversed the holding of the Court of Appeals for the D.C. Circuit, finding that the regulation advanced a substantial government interest unrelated to the suppression of expression and was narrowly tailored to advance that interest. The court held that even if sleeping in connection with the demonstration is expressive conduct that is protected to some degree under the First Amendment, the challenged regulation was facially neutral and constituted a reasonable time, place, and manner restriction.

*First Circuit*

**Whiting v. Town of Westerly, 942 F.2d 18 (1st Cir. 1991)**

Two non-homeless out-of-state residents challenged the constitutionality of two Westerly, Rhode Island town ordinances banning sleeping outdoors on overbreadth, vagueness, and equal protection grounds. The U.S. Court of Appeals for the First Circuit affirmed the district court's finding that—absent expressive activity possibly covered by the First Amendment— sleeping in public is not constitutionally protected, neither ordinance was vague or overbroad as applied to plaintiffs' conduct, and enforcement procedures did not violate the equal protection rights of non-residents of Westerly.

*Second Circuit*

**Fifth Avenue Presbyterian Church v. City of New York, 177 Fed. Appx. 198 (2d Cir. 2006), cert. denied, 127 S. Ct. 387 (2006)**

The Fifth Avenue Presbyterian Church ("Church") sought an injunction preventing the City of New York from dispersing homeless persons whom the church invited to sleep on its outdoor property. In January 2002, the district court granted a preliminary injunction against the defendants with respect to the church property, finding that the church's use of its own property was a protected religious activity. However, the court denied the injunction as to the public sidewalk bordering the church's property. The city appealed to the Second Circuit.

The Law Center filed an amicus brief in the Second Circuit supporting the Church. It argued that the Church's activity was protected by the First Amendment, and that the activities of the Church were traditional forms of effective core outreach to homeless people. The Law Center also argued that the city's actions were plainly arbitrary and therefore violated the due process clause of the Fourteenth Amendment. The city's practice of forced removal of homeless people from the area around the Church also infringed on the homeless individuals' constitutionally protected freedom of movement.

In affirming the district court's decision to grant a preliminary injunction, the Second Circuit agreed that the Church's provision of sleeping space to homeless people was the manifestation of a sincerely held religious belief deserving of protection under the free exercise clause.[76]

After the grant of the preliminary injunction, the Church moved, and the city cross- moved, for summary judgment. The Church requested that the district court reconsider its decision that denied an injunction as to the Church's sidewalk, and asked for the preliminary injunction to be made permanent as to the Church staircases andsidewalk area. The Church claimed that the city's actions violated its rights under the free exercise clause of the First Amendment and that, therefore, the city's actions must be subject to strict scrutiny. In October 2004, the district court granted the permanent injunction with respect to the Church staircases, based on the Church's First Amendment claim.[77] The court rejected the city's claim that its actions were necessary to address a public nuisance. The city appealed to the Second Circuit.[78]

In April 2006, the Second Circuit affirmed the lower court's decision, and the U.S. Supreme Court denied the city's petition for writ of certiorari in October 2006.

**Betancourt v. Giuliani, 448 F.3d 547 (2d Cir. 2006), cert. denied, 127 S. Ct. 581 (2006)**

Augustine Betancourt brought suit against the Mayor, Police Commissioner, and the City of New York for his arrest under a New York law that makes it "unlawful for any person[s] . . . to leave . . . or permit to be left, any box, barrel, bale of merchandise or other movable property whether or not owned by such person[s], upon any . . . public place, or to erect or cause to be erected thereon any shed, building or other obstruction." At the time of arrest,

---

76   *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570 (2d Cir. 2002).

77   *Fifth Ave. Presbyterian Church v. City of New York*, 2004 WL 2471406 (S.D.N.Y. Oct. 29, 2004).

78   The Law Center filed another amicus brief on the Church's behalf in the Second Circuit. In addition to agreeing with the lower court's holding, the Law Center argued that the city's raids violated the homeless persons' fundamental right of association, right to free speech, and right to travel. Further, the Law Center contended that selective enforcement of nuisance and health laws under which the police conducted the raids violated the plaintiffs' equal protection rights.

Betancourt had made a tube out of cardboard and slept inside it on a park bench. After his arrest, he was strip-searched and placed in a holding cell. He was not prosecuted.

Betancourt brought a number of claims against the city, including a claim that the statute was unconstitutionally vague and overbroad as applied to his arrest. He also alleged that the strip search violated his Fourth Amendment rights because he was arrested for a minor offense and police did not have reasonable suspicion that he was concealing a weapon or other contraband.

Betancourt asserted the statute should be analyzed for vagueness using an "especially stringent" standard because the statute involved his fundamental right to travel and imposed criminal penalties without requiring a finding of criminal intent. The court, reasoning that the statute did not penalize "merely occupying" public space but rather obstructing public space, held that the statute did not penalize the right to travel and was not void for vagueness. The court found Betancourt had sufficient notice that his conduct was prohibited, and there are sufficient guidelines in place to limit police discretion in its application. The court granted Betancourt summary judgment on his illegal strip search claim but granted summary judgment in favor of defendants on all other claims.

Betancourt appealed and the appellate court affirmed the lower court judgment, holding that the code provision was not unconstitutionally vague as applied. Judge Calabresi dissented, finding that the statute did not sufficiently "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and did not "provide explicit standards for those who apply them." In Judge Calabresi's view, the word "erect" does not reasonably mean "fitting together of materials or parts," as the majority posited. Judge Calabresi further stated that Betancourt's boxes were not an "obstruction" but rather Betancourt was "occupying [a] public place with a few of [his] personal belongings." Judge Calabresi also criticized the majority's dismissal of the right-to-travel question, but did not pursue this issue since he found the statute undeniably void for vagueness even under the moderately stringent test that the majority applied. Finally, Judge Calabresi also pointed out in his dissent that the statutory context also made the statute difficult to understand, as the surrounding sections and the statement of legislative intent all pertain to abandoned automobiles.

**Picture the Homeless v. City of New York, No. 02 Civ. 9379 (S.D.N.Y. March 31, 2003)**

Picture the Homeless, a grass-roots organization led by homeless and formerly homeless persons, brought a § 1983 action against the city and its police department alleging violations of the due process clause of the Fourteenth Amendment for police harassment of homeless persons. The plaintiff alleged that the police were targeting homeless persons by arresting them for offenses for which non-homeless persons were not arrested. The parties settled the suit shortly after it was filed in 2003. The defendants issued directives to all officers on the Homeless

Outreach Unit and the NYPD Transit Bureau forbidding them to enforce laws selectively against homeless people, and, in the case of the Homeless Outreach Unit, to confirm that their primary mission is to provide outreach services to the homeless.

**Metropolitan Council Inc. v. Safir, 99 F. Supp. 2d 438 (S.D.N.Y. 2000)**

A tenants' advocacy organization filed suit to enjoin the city from preventing vigil participants who were protesting city rent increases from lying and sleeping on city sidewalks. The city took the position that it had authority to forbid all sleeping on city sidewalks because of the interest in safeguarding sleeping persons from the dangers of public places and keeping the sidewalks clear of obstructions. The court granted the preliminary injunction ruling that the First Amendment to the U.S. Constitution does not allow the city to prevent an orderly political protest from using public sleeping as a symbolic expression. The court held a statute that bans all public sleeping in any manner on public sidewalks is overbroad. However, the court did not maintain that the city could never regulate "disorderly public sleeping." On that issue, "the Court expresse[d] no opinion on and erect[ed] no bar to the City's prosecution for disorderly conduct of persons who are vulnerable and/or risk creating obstructions when they sleep prone on a City sidewalk."

### Third Circuit

**Sager v. City of Pittsburgh, No. 03-0635 (W.D. Pa. 2003)**

A class of homeless plaintiffs brought a § 1983 action against the City of Pittsburgh alleging violations of their Fourth, Fifth, and Fourteenth Amendment rights when the city asked the Pennsylvania Department of Transportation (PennDOT) to conduct repeated sweeps of homeless peoples' property located on PennDOT land.

The parties reached a settlement agreement that provided procedures for pre-collection notification, collection of personal items during clean-ups, and for the return of property collected. The city agency responsible for the clean-up is now required to give seven days' written notice to homeless persons by posting the notice at each encampment or at each identifiable group of possessions, and by faxing the notice to homeless service providers. All items that are not health/safety hazards or refuse are to be placed in large, transparent trash bags and properly tagged and itemized. Notice will be posted as to recovery procedures. The agreement outlines specific days and times that a secure storage area must be available to persons reclaiming their belongings.

**Project Share v. City of Philadelphia, No. 93-CV-6003 (E.D. Pa. 1993)**

Project Share sought a temporary restraining order and permanent injunction to prevent the City of Philadelphia from carrying out a proposed plan to seize, arrest, and remove homeless persons from Center City concourses in the absence of alternative shelter. The plaintiffs alleged that the city's actions would violate their

rights under the Fourth, Eighth, and Fourteenth amendments. The motion was voluntarily dismissed after the city agreed to find shelter for the homeless people who were likely to be affected by the proposed plan.

### Fourth Circuit

### Occupy Columbia v. Haley, 738 F.3d 107 (4th Cir. 2013)

Protesters brought a claim under § 1983 action against South Carolina government officials seeking a preliminary injunction to prevent officials from interfering with their 24-hour occupation of State House grounds. The plaintiffs alleged that a curfew requiring them to leave the public grounds between 6:00 p.m. and 6:00 a.m. each day violated their First Amendment rights of free speech, peaceable assembly, and petition. The defendants argued in response that camping and sleeping on the State House grounds was not protected expression under the First Amendment, and even if it was, the curfew constituted a permissible time, place, and manner restriction.

The district court found that the plaintiffs' conduct was protected expression under the First Amendment, that the curfew was not a reasonable time, place, and manner restriction, and granted a preliminary injunction. The defendants immediately passed an emergency regulation prohibiting use of the State House grounds for camping, sleeping, or any living accommodation purpose. The court found this regulation to be a valid time, place, and manner restriction, citing United States Supreme Court precedent in its decision.

Occupy Columbia subsequently filed an Amended Complaint in September 2012. The appellants moved to dismiss, arguing that the injunctive relief claims were moot, and that they were entitled to qualified immunity on the claims for damages. The district court dismissed the injunctive relief claims, but found that the defendants did not have qualified immunity. The Fourth Circuit affirmed, holding that defendants were not entitled to qualified immunity, and that "in the absence of a valid time, place, and manner restriction, arresting members of Occupy Columbia for their presence and protest on State House grounds after 6:00 p.m. was a violation of their First Amendment rights." In February 2014, the parties settled as to the fourth and fifth causes of action (damages under § 1983 and false imprisonment) and all other claims were subsequently dismissed.

### Patton v. City of Baltimore, No. S-93-2389, (D. Md. Sept. 14, 1994)

Plaintiffs filed an action in federal court against the City of Baltimore, the Downtown Management Authority, and the Downtown Partnership to prevent the continued arrest and harassment of homeless individuals engaged in ordinary and essential daily activities in public, such as sleeping, sitting, and meeting with friends, as well as begging. In its ruling on plaintiffs' motion for a preliminary injunction, the court struck down the city's aggressive panhandling ordinance, holding that it violated the Fourteenth Amendment's equal protection clause because it unlawfully discriminated between solicitation for charity and other types of solicitation. However, the court also found that the ordinance was narrowly tailored to meet a compelling state interest in protecting citizens and promoting tourism and thus did not violate the First Amendment. The court dismissed plaintiffs' claims alleging violations of their rights to privacy, freedom from cruel and unusual punishment, freedom of association, freedom from unreasonable search and seizure, and due process; and refrained from deciding whether there is a right to freedom of intrastate movement.

In September 1994, the parties reached a settlement agreement in which the city was to amend its panhandling ordinance to reflect that panhandling is protected speech and that persons are allowed to remain in public places unless they are violating other laws. The city also agreed to repeal a park solicitation rule and adopt policies with respect to homeless people and panhandlers.[79]

### Fifth Circuit

### Johnson v. City of Dallas, 61 F.3d 442 (5th Cir. 1995)

A class of homeless plaintiffs challenged Dallas' ordinances prohibiting sleeping in public, solicitation by coercion, removal of waste from garbage receptacles, and providing for the closure of certain city property during specific hours. The plaintiffs alleged that the city's enforcement of these ordinances violated their rights under the Fourth, Eighth, and Fourteenth Amendments. The plaintiffs also claimed the city's conduct constituted wrongful (tortious) malicious abuse of process. The U.S. District Court for the Northern District of Dallas granted plaintiffs' motion for a preliminary injunction in part, holding that the sleeping in public prohibition violated the Eighth Amendment because it imposed punishment on plaintiffs for their status as homeless people. Nevertheless, in its ruling on the motion for a preliminary injunction, the court, in dicta, rejected plaintiffs' other claims, including the equal protection claims, finding that the challenged ordinances did not impinge on plaintiffs' right to travel, homeless people do not constitute a suspect or quasi-suspect class, and the laws were rationally related to a legitimate state interest.

On appeal, the Fifth Circuit reversed the district court's order, vacated the preliminary injunction, and remanded the case with instructions to dismiss plaintiffs' Eighth Amendment claims for lack of standing. The court held that the Constitution's prohibition on cruel and unusual punishment applies only after conviction for a criminal offense, and, on the record before it—compiled prior to the district court's certification of the action as a class action—there was no apparent evidence that plaintiffs had actually been convicted of sleeping in public as opposed to merely being cited or fined. The district court did not dismiss the case as ordered by the Fifth Circuit. The defendants then filed a motion for summary judgment, which was denied.

The defendants next filed a petition for a Writ of Mandamus asking

---

79   Settlement Agreement, *Patton v. City of Baltimore*, No. S-93-2389 (D. Md. Sept. 14, 1994).

the Fifth Circuit to order the district court to dismiss the Eighth Amendment claim. Without seeking a response from plaintiffs, the Fifth Circuit issued the writ ordering the district court to dismiss the entire case. The district court dismissed the case as ordered. The plaintiffs filed a motion for reconsideration with the Fifth Circuit. As the thirty-day deadline for filing a notice of appeal for the dismissal approached, the Fifth Circuit still had not ruled on the motion for reconsideration. Therefore, plaintiffs filed a notice of appeal of dismissal to the Fifth Circuit. The Fifth Circuit then entered a modified writ ordering the district court to dismiss the Eighth Amendment claim only.

On April 24, 2001, the trial court granted the defendants' motion to dismiss the remaining claims, in addition to the Eighth Amendment claim.[80] The court ruled there could be no violation of the Fourth Amendment where the plaintiffs failed to establish they were ever actually arrested for sleeping in public. The court did not address plaintiffs' arguments attacking the vagueness of the ordinances. Instead, the court described the issue before it "a simple one" and ruled that because plaintiffs failed to present any evidence of their arrest, probable cause is factually uncontested and the arrests presumptively constitutional. Therefore, the court dismissed the case.

*The Law Center filed two amicus briefs in support of plaintiffs; the U.S. Department of Justice also filed an amicus brief in support of plaintiffs.*

### Sixth Circuit

### Moe v. City of Akron, No. 5:14-cv-2197 (N.D. Ohio filed Oct. 3, 2014)[81]

Six homeless plaintiffs filed a putative class action against the City of Akron and city officials alleging violations of plaintiffs' federal and state constitutional rights protecting unlawful seizure, as well as due process violations arising out of homeless campsite cleanups. Plaintiffs reached a settlement agreement whereby the individual plaintiffs received a monetary settlement of an undisclosed amount. All homeless individuals in Akron are intended beneficiaries of the agreement.

Specifically, pursuant to the settlement, the city agreed to implement specific procedures relating to the disposal of any personal property located on public property, including that the city will not remove any personal items of homeless individuals unless it provides written notice of no less than forty-eight hours. Moreover, any personal property that is removed by the city will be stored for no less than thirty days, and the city will develop procedures by which people may retrieve their items. However, the city is not responsible for providing notice of removal if it reasonably concludes that the property is abandoned or that exigent circumstances exist.

### Cash v. Hamilton Department of Adult Probation, 2006 WL 314491 (S.D. Ohio Feb. 8, 2006), No. 1:01-CV-753 (not reported in F. Supp. 2d)

Homeless individuals brought a § 1983 action against the City of Cincinnati and Hamilton County alleging that the city violated their Fifth and Fourteenth Amendment rights when their personal property was taken and destroyed by a city clean-up crew instructed to clean out under bridges and viaducts where homeless individuals resided. The District Court for the Southern District of Ohio granted summary judgment for defendant government officials. The Sixth Circuit reversed the district court's summary judgment and remanded the case. The Sixth Circuit received two petitions for rehearing en banc, which it denied on the grounds that the issues raised in the petitions had been fully considered.

On remand, plaintiffs moved for partial summary judgment, arguing that the evidence overwhelmingly showed that they lost their possessions pursuant to a policy or custom of the city, and that notice provided by the city was inadequate as a matter of law. Also on remand, the city moved to dismiss for lack of subject matter jurisdiction. The city relied on *Arnett v. Myers*, to support its argument that plaintiffs' claims were not ripe because plaintiffs had not exhausted state remedies to obtain just compensation for their loss.

The court denied plaintiffs' motion because questions of fact remained regarding whether plaintiffs' property was indeed discarded pursuant to a policy or custom of the city, and plaintiffs had not submitted any new evidence in support of their argument regarding the city's policy of discarding property of homeless persons without notice and a hearing. The court, however, denied the city's motion to dismiss because plaintiffs abandoned their takings claim; their remaining procedural due process claim did not require plaintiffs to exhaust any state remedies in order for their claim to be ripe. The case was settled on September 20, 2006. Under current procedures, personal property that is taken is retained and notice is given at the site regarding where such property may be retrieved.

### Henry v. City of Cincinnati, No. C-1-03-509 (S.D. Ohio 2003)

Homeless individuals brought a § 1983 action against the city alleging violations of First, Fourth, Eighth, and Fourteenth Amendment rights when the city passed restrictive anti-panhandling ordinances and threatened to arrest plaintiffs and seize their property after putting "no trespassing" signs up at an encampment serving as shelter for the plaintiffs. The district court granted plaintiffs' motion for a temporary restraining order against arresting plaintiffs or taking their belongings from the encampment. The case with respect to the sweeps settled soon after it was filed. An agreement was reached whereby the police must give a homeless individual who is engaging in prohibited activity seventy-two hours' notice before arresting that person. The officer must transmit this notification to a designated social service agency to conduct any outreach needed to help the person find a place to go or services. The seventy-two hour time period

---

80   No. 3:94-CV-00991-X (N.D. Tex. Apr. 24, 2001).
81   *Usner v. City of Akron*, (E.D. OH, filed Oct. 3, 2014) available at http://www.ohio.com/polopoly_fs/1.528523.1412374712!/menu/standard/file/tentsuit.pdf.

does not begin until the officer contacts the social service agency.

### Ashcraft v. City of Covington, No. 02-124-JGW (E.D. Ky. Sept. 23, 2003)

Homeless individuals brought a § 1983 action against the City of Covington, Kentucky, and its mayor alleging violations of their Fourth, Fifth, and Fourteenth Amendment rights when city employees and police raided their camps and seized their property. In reviewing cross-motions for summary judgment, the federal magistrate judge found that the plaintiffs were not trespassing, and therefore had a reasonable subjective privacy interest in their property. The plaintiffs' Fourth Amendment claim thus survived summary judgment. The magistrate also found, however, that there was no substantive due process violation, and that the city's defense of qualified immunity could stand for the other claims. The case settled in 2004; each of the five plaintiffs received $1,000 and their lawyers received attorney's fees.

### Clark v. City of Cincinnati, No. 1-95-448 (S.D. Ohio Oct. 25, 1995)

Homeless persons and advocates challenged two City of Cincinnati ordinances prohibiting sitting or lying on sidewalks and certain types of solicitation on First and Fourteenth Amendment grounds. In May 1998, U.S. District Court Magistrate Judge Jack Sherman, Jr., of the Southern District of Ohio, struck down, on First Amendment grounds, the ordinances meant to criminalize certain actions by homeless and low-income individuals. One ordinance made it a crime for a person to sit or lie on sidewalks in downtown Cincinnati or on the Cincinnati skywalk between the hours of 7:00 a.m. and 9:30 p.m. The other ordinance criminalized soliciting funds, whether by asking or through gesturing, within certain distances of some buildings, automatic teller machines and crosswalks, and in all areas after 8:00 p.m.

Accepting the Magistrate Judge's determination that the ordinances "likely infringe[d] upon plaintiffs' First Amendment right to freedom of speech to some degree," the U.S. District Court for the Southern District of Ohio issued a preliminary injunction enjoining the city from enforcing the ordinances, with the exception of the specific provision of the sidewalk ordinance that prohibited lying down. In light of its ruling in favor of plaintiffs on their First Amendment claim, the court did not reach a decision on plaintiffs' Fourteenth Amendment claims.

### Clements v. City of Cleveland, No. 94-CV-2074 (N.D. Ohio 1994)

In 1994, four individual plaintiffs and the Northeast Ohio Coalition for the Homeless challenged the Cleveland Police's practice of removing homeless people by coercion and force from downtown Cleveland to transport them to remote locations and abandon them. The plaintiffs sought a preliminary injunction that would prohibit the practice on the grounds that it violates plaintiffs' rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution and various provisions of the Ohio Constitution.

In February 1997, the four individual plaintiffs and the Coalition settled the lawsuit. Under the terms of the settlement, the city agreed to issue a directive to the police forbidding them from picking up and transporting homeless people against their will. The city also agreed to issue a public statement that violating homeless people's rights to move around downtown Cleveland is not and will not be city policy. Finally, the city agreed to pay $9,000 to the Coalition to be used for housing, education and job training for the homeless plaintiffs, and to pay $7,000 to cover a portion of the plaintiffs' costs in bringing suit.

### *Seventh Circuit*

### Glover v. Executive Director of the Indiana War Memorials Commission, No. 1:07-cv- 1109 (S.D. Ind., filed Aug. 30, 2007)

A class of plaintiffs filed a complaint against the Indiana War Memorials Commission, an entity that controls and manages certain public parks and memorials in the city of Indianapolis and throughout the state of Indiana. In the complaint they alleged that the commission has a policy or practice of removing persons from grounds controlled by the commission who are deemed to be "loitering" or engaging in other unlawful conduct based on unwritten and amorphous standards. The complaint specifically challenges the commission's practice of giving certain homeless individuals "no trespass" orders subjecting them to arrest and prosecution if they enter property controlled by the commission in the future. Additional practices challenged in the lawsuit include the imposition of a requirement by the commission that charitable groups obtain (and pay for) a permit in order to provide food to homeless individuals and that such groups limit the locations for food distributions.

The plaintiffs sought an injunction against the issuance and/or enforcement of no-trespass orders and the banning of persons from commission property based on what commission employees deem to be "loitering." After the filing of the complaint, the IWMC transferred control of policing functions of the memorials and parks to the Indiana State Police, who were not a party to the case.

In early 2009, before the class was certified, the case settled for $100 in damages, $25,000 in attorney fees, the purging of many no-trespass orders (including Glover's), and a promise from the Indiana State Police that they would enforce the law uniformly against everyone regardless of whether the individual is believed to be homeless.

### Love v. City of Chicago, No. 96-C-0396, 1998 U.S. Dist. LEXIS 1386 (N.D. Ill. Feb. 5, 1998)

Alleging violations of their Fourth, Fifth, and Fourteenth Amendment rights, a group of homeless plaintiffs challenged Chicago's policy and practice of seizing and destroying the personal property of homeless people in the course of cleaning particular areas of the city. After the city made some of plaintiffs' requested modifications to the challenged procedures, the U.S. District Court for the Northern District of Illinois denied plaintiffs' motion

for a preliminary injunction, finding that the city's practice was reasonable and did not violate plaintiff's rights.[82]

On March 11, 1997, plaintiffs sought to certify a class of homeless persons whose possessions were destroyed due to the city's off-street cleaning program. The court held that plaintiffs had satisfied all requirements for certification, and granted plaintiffs' class certification motion.

In December 1997, the city discarded the possessions of homeless individuals despite the fact that the possessions had been stored in "safe areas" as allowed by the temporary procedures. This action prompted plaintiffs to bring a renewed motion for a preliminary injunction claiming that the procedures violated plaintiffs' Fourth, Fifth and Fourteenth Amendment rights. The amount of possessions was greater than usual owing to Thanksgiving charity donations, and they were discarded along with others that had fallen off the safe areas and obstructed roadways.

While finding that the city violated its own procedures, the court was unwilling to require sanitation workers to sort through possessions of homeless people for reasons of sanitation and impracticability, stating that homeless people have the burden of separating and moving those items they deem valuable. Specifically, the court found that the program did not violate the Fourth Amendment, as it was reasonable, minimally intrusive and effective in preserving possessions of homeless people. The court stated that property normally taken by the city under the program is considered abandoned. The court ruled, however, that losses of possessions that had been placed in safe areas and subsequently discarded must be compensated. But as plaintiffs had not yet attempted to recover any compensation, any action was premature. Finally, the court held that the city adequately provided notice to homeless people through its practice of posting signs in the area, having city employees give oral notice a day before cleaning, and a second oral notification minutes before cleaning.

### Eighth Circuit

### Occupy Minneapolis v. County of Hennepin, 866 F.Supp.2d 1062 (D. Minn. 2011)

Occupy Minneapolis who maintained a continuous "occupation" of two plazas next to a government center brought suit against the County, the County Sherriff, and several County Commissioners alleging that restrictions imposed on protesters in the plaza, including a prohibition against sleeping on the plazas, violated their rights to freedom of speech, assembly, and to petition the government for redress of grievances under the First Amendment.

The court granted in part and denied in part the plaintiff's motion for a temporary restraining order. The motion was granted to the extent that it sought to enjoin the county from prohibiting signs and posters taped to Plaza property. The court found, however, that while protesters' activity of sleeping and erecting tents on the plazas was protected speech, the prohibition was a valid time, place, and manner restriction.

### Johnson v. Freeman, 351 F. Supp. 2d 929 (E.D. Mo. 2004)

Several individuals who are homeless or who were mistakenly identified as being homeless by police filed a § 1983 action, seeking injunctive and declaratory relief and damages against the City of St. Louis and the St. Louis Board of Police Commissioners. The plaintiffs alleged police "sweeps" against individual plaintiffs during the July Fourth holiday, in which arrests were apparently made without probable cause and for arguably fabricated charges, and during which firecrackers were used to intimidate plaintiffs. Moreover, plaintiffs alleged that police gave them the "option" to either perform community service and be released before adjudication of guilt or remain in jail. The plaintiffs' claims included violations of their Fourth, Fifth, Thirteenth, and Fourteenth Amendment rights, for unlawful searches and seizures, unlawful restraints on travel, punishment without due process, and involuntary servitude.

In October 2004, the district court issued a preliminary injunction, which requires the police to stop harassment of homeless people, downtown sweeps of the homeless before events, and arrests of homeless individuals without probable cause. When issuing the preliminary injunction, the court found the probability of a threat of irreparable harm because "so long as the practice of targeting homeless and homeless-appearing people to remove them from the Downtown area continues, plaintiffs are likely to suffer repeated violations of their constitutional rights [and such practice] is likely to deter individuals from seeking out the services required for daily living." The court also found that plaintiffs were likely to succeed on the merits and that the great harm to plaintiffs far outweighed any harm to defendants. The court granted plaintiffs' motion for preliminary injunctive relief "to protect the public interest and restore the public's faith in the fair application of law to all citizens." Subsequently, the court denied the city's motion to dismiss.[83]

In July 2005, plaintiffs filed to add thirteen plaintiffs (for a total of twenty-six) and added as defendants the Downtown St. Louis Partnership and fifteen individual police officers. In October 2005, the city settled the case, awarding plaintiffs $80,000 in damages. The settlement includes a series of protections for homeless persons. For example, the settlement agreement provides that all persons, including homeless persons, have the right to use public spaces so long as their activities are lawful; police shall not take any action to physically remove homeless persons from such spaces; police shall not order any person to move to another location when the person has a legal right to be there; police shall not destroy personal property of homeless persons; and police shall inventory the property of a homeless person who is arrested.

### Ninth Circuit

### Tammy Schuler et al. v. County of Orange, Case No. SA CV 17-0259-DOC (KESx)(C.D. Ca. Mar. 6, 2017)

Homeless individuals who currently reside in the Santa Ana

---

82   Love v. City of Chicago, No. 96-C-0396 (N.D. Ill. Oct. 10, 1996).

83   370 F. Supp. 2d 892 (E.D. Mo. 2005).

riverbed area filed suit challenging Orange County's practice of throwing out homeless persons' personal belongings, including essential items such as tents, blankets, and clothes. The plaintiffs filed a complaint alleging violations of the Fourth, Fifth, and Fourteenth Amendments, as well as other federal and California state law claims. The parties stipulated to a temporary injunction providing expanded protection of homeless persons' property interests.

**Martin v. City and County of Honolulu, 15-cv-00363 (D. Haw. Aug. 15, 2016)**

A certified class of "all homeless or formerly homeless individuals whose property was seized and destroyed by the city and county of Honolulu officials," filed suit against the city alleging violations of the Fourth and Fourteenth Amendments of the U.S. Constitution arising from the destruction of their property during enforcement actions ("sweeps") under the city's Stored Property Ordinance and Sidewalk Nuisance Ordinance. After the plaintiffs filed a motion for a preliminary injunction, the parties entered mediation and eventually reached a settlement of all claims, including a stipulation entered into by all parties setting forth injunctive relief to the settlement class.

Under the terms of the settlement, the city of Honolulu agreed to a comprehensive list of changes to the way it conducts its enforcement actions, including an agreement: 1) to provide public notice of when the city will be conducting enforcement actions; 2) to give individuals thirty minutes to move their items at the start of enforcement actions, even if the individuals are located in a public park past closing time; 3) to not throw away an individual's possessions (absent certain exceptions from a list of dangerous items, as well as some instances of perishable food) and instead to collect everything for storage; and 4) to store all property collected for forty-five days and allow it to be retrieved within that time, including circumstances for retrieval without payment.

**Smith v. Corvallis, Civ. No. 6:14-cv-01382-MC (D. Ore. June 6, 2016)[84]**

Three homeless individuals filed suit alleging that the City of Corvallis routinely confiscated and disposed of their property and the property of other homeless individuals living in the City of Corvallis without adequate notice in violation of their Fourth, Fifth, Eighth, and Fourteenth Amendments.

The city attempted to dismiss the homeless plaintiffs' claims by arguing that the plaintiffs "abandoned" their property prior to its disposal by the city, and that the city "stored" the property in a publicly accessible dumpster, which made it available for pickup. The court rejected these arguments.

The city also sought to dismiss the plaintiffs' Fourth Amendment search and seizure claim, arguing that the confiscated property had been "voluntarily abandoned" at the time of confiscation, thus making it exempt from Fourth Amendment protections. The court rejected this argument, holding that the question of whether or not the property had been abandoned was a question of material fact for the jury to decide. The court further held that the notice provided to the plaintiffs was insufficient and thus gave rise to a Fourth Amendment challenge. In addition, the court noted that even if the notice was sufficient, the plaintiffs would still have a Fourth Amendment claim because the city afforded the homeless plaintiffs no recourse to recover their property, instead immediately disposing of the property after seizing it.

The city also attempted to dismiss the plaintiffs' Fourteenth Amendment due process claim by arguing that the city provided plaintiffs with adequate remedies and notice before and after seizing their property, and that the city had grounds to reasonably believe that plaintiffs "abandoned" the seized property. The court did not find either of these arguments persuasive and denied the motion to dismiss. The court confirmed that the issues of the adequacy of a twenty-four hour notice policy and the sufficiency of the city's methods of storing the seized property were issues of fact for a jury to decide.

The court granted the city's motion to dismiss the plaintiffs' Fifth Amendment takings claim because the plaintiffs presented no evidence showing that they satisfied the exhaustion requirement, which requires a plaintiff to first exhaust all adequate state procedures and remedies for seeking just compensation.

The court also dismissed plaintiffs' Eighth Amendment cruel and unusual punishment claim because the plaintiffs did not allege that they were arrested or faced any kind of criminal charges, citations or fines.

The court dismissed the plaintiffs' Fourteenth Amendment equal protection claim because there was no evidence presented that any of the three plaintiffs were treated any differently than any other camper. Also, the court emphasized that, consistent with the 9th Circuit's current jurisprudence on the issue, the homeless are not a suspect class or even a quasi-suspect class.

Finally, the court dismissed the plaintiffs' intrusion upon seclusion claim because, in regards to the second element of the claim (i.e., the "private affairs or concern" element), the court found that the plaintiffs failed to argue that the plaintiffs' property was ever examined for any purpose related to intentionally intruding on their privacy.

**Cobine v. City of Eureka, No. C 16-02239 (JSW), 2016 WL 1730084 (N.D. Cal. May 2, 2016)**

For over ten years, the eleven homeless plaintiffs, and approximately 150 other homeless individuals, continuously camped in the Palco Marsh area of Eureka, California, which historically served as a popular campsite for Eureka's homeless population. In order to make room for a new waterfront trail, the City of Eureka sought to evict the homeless individuals living in the area. Specifically, under the authority of an anti-camping ordinance, the city began issuing

---

84    *Smith v. Corvallis*, Civ. No. 6:14-cv-01382-MC (D. Ore. June 6, 2016).

notices of eviction and confiscating the personal property of the individuals living in the Palco Marsh.

The plaintiffs filed a lawsuit and sought a temporary restraining order to prevent their eviction. The plaintiffs argued that the number of homeless individuals in the City of Eureka outnumbered beds available for the homeless by a factor of almost three to one, and criminalizing public camping in a city without adequate shelter space to accommodate the city's homeless population violated their Eighth Amendment rights. The plaintiffs also argued that the city's seizure of their property violated their Fourth and Fourteenth Amendment rights to be secure from government seizure without due process of the law.

At oral argument in the district court, the City of Eureka represented that it would guarantee shelter for the plaintiffs and would also institute procedures to address the process in which any seized property is stored and tagged. Based on this representation, the court enjoined the City of Eureka from enforcing the anti-camping ordinance unless and until the city: (1) provided the plaintiffs with shelter, and (2) followed certain specific procedures regarding the storage of confiscated property (which included, without limitation, providing tote bags for storage, labeling all property and storing the confiscated property for at least ninety days before the city could dispose of it). The district court found that if these conditions were met the plaintiffs "would have the remedy they seek – adequate shelter and due process."

With respect to the plaintiffs' Fourth Amendment claims, the court found that the plaintiff's property was entitled to Fourth amendment protection, but that the city provided sufficient due process by providing advance notice of the sweep, and 'adequate' post-seizure remedies (including the new storage processes). The court held that in order to succeed on their Eighth amendment challenge, plaintiffs would have to show both that they had no choice but to sleep in public and that the enforcement of the anti-camping ordinance criminalized the act of being homeless itself. Based on the city's promise to provide the plaintiffs (and the remaining homeless population) in the Palco Marsh area with shelter, the court found that the ordinance did not effectively criminalize homelessness itself and thus declined to enjoin the city from engaging in any future sweeps based on an Eighth Amendment challenge.

### Acosta v. City of Salinas, No. 15-cv-5415, 2016 WL 1446781 (N.D. Cal. Apr. 13, 2016)

Homeless plaintiffs moved for a temporary restraining order to enjoin the City of Salinas from enforcing a local ordinance authorizing the city to conduct cleanup sweeps of a homeless encampment in its Chinatown neighborhood. The ordinance stated that "no person shall fail to remove personal property stored on City Property by the date of scheduled removal provided on the written notice posted in accordance with the Administrative Procedure." The administrative procedure required outreach to affected individuals, referral of individuals to supportive services, advance notice of deadlines to remove personal property from public property, the city's storage of personal property that was removed by the established deadline, and an exception to permit temporary use of tents, sleeping bags, and the like overnight between 6:00 p.m. and 6:00 a.m. the next morning. Pursuant to the ordinance, the city conducted a cleanup sweep of the Chinatown neighborhood on the morning of March 29, 2016. Neither plaintiffs nor the city stated that there were more cleanup sweeps planned for the area, but the terms of the ordinance permitted the city to continue planning and executing sweeps.

The court denied plaintiffs' motion for a temporary restraining order on the grounds that plaintiffs did not demonstrate that they were deprived of their personal property by the city without notice or procedure in violation of their due process rights. Notably, none of the plaintiffs' submitted declarations stated that his or her own property had been seized or destroyed, or that the declarants witnessed harm to anyone who is a party to the case. Rather, plaintiffs only made broad statements about harm to third parties. On these facts, the court held that plaintiffs had not demonstrated a likelihood of success on the merits of their claim that the ordinance, as applied to them, violated the U.S. Constitution and failed to show a likelihood of irreparable harm in the absence of a temporary restraining order.

### Mitchell v. City of Los Angeles, Case No.: 16-cv-01750 SJO (JPR) (C.D. Cal. April 2016)

A group of homeless individuals, the Los Angeles Community Action Network, and the Los Angeles Catholic Worker filed suit to challenge the City of Los Angeles' practice of seizing and destroying homeless persons' property during arrests and street cleanings. Each of the homeless individuals live on the streets of Los Angeles' Skid Row area, and each had lost nearly all of their belongings at the hands of the Los Angeles Police Department and the LA Sanitation crews. None of the plaintiffs had been an opportunity to challenge the destruction of their property.

The federal district court ordered the city to stop seizing and destroying homeless persons' property, and to improve its property storage procedures. The city was also ordered to make critical belongings, like tents and medication, available within 24 hours after the seizure or immediately after a person is released from custody.

### Allen v. City of Pomona, No. 16-cv-1859 (C.D. Cal. filed Mar. 18, 2016)

In March 2016, fourteen homeless plaintiffs filed a putative class action suit against the City of Pomona arising out of the city's policy and practice of seizing and destroying homeless persons' property, without notice and over the objections of the property owners. The plaintiffs' complaint detailed several instances where police officers had permanently deprived plaintiffs of their most essential belongings, including food stamp cards, medication, tents, blankets, state-issued identification cards, birth certificates, and treasured family heirlooms with sentimental value.

In August 2016, the city and the plaintiffs agreed to a sweeping settlement agreement that provides for six main forms of relief. First, it required the city to establish and fund a transitional storage center, which will consist of lockers that homeless persons in Pomona can use to store their belongings. Second, it required the city to make a settlement payment to plaintiffs in the amount of $49,000 to be divided among and distributed to plaintiffs in agreed-upon amounts. Third, it provided plaintiffs with priority with regards to permanent housing resources developed by the city to the maximum extent allowed by law. Fourth, it established required procedures regarding the city's handling of homeless persons' property. Fifth, it required the city to produce a semiannual report regarding the status of its homeless population. Finally, it required the city to pay the plaintiffs' attorneys' fees in the amount of $160,000.

**Bell v. City of Boise, No. 09-cv-540, 2015 WL 5708586 (D. Idaho Sept. 28, 2015)**

After a complex procedural history, the remaining two homeless plaintiffs in *Bell v. City of Boise*, 709 F.3d 890 (9th Cir. 2013) filed a motion for summary judgment against the City of Boise challenging municipal ordinances that prohibited sleeping and camping at night in public places. The plaintiffs sought relief in the form of: (1) a declaration under 28 U.S.C. § 2201 that the ordinance violated the Eighth Amendment's prohibition against cruel and unusual punishment, and (2) a permanent injunction prohibiting the city from enforcing the ordinances.

On August 6, 2015, The United States Department of Justice filed a statement of interest, arguing that making it a crime for people who are homeless to sleep in public places, when there is insufficient shelter space in a city, unconstitutionally punishes them for being homeless. As stated by the Justice Department in its filing, "[i]t should be uncontroversial that punishing conduct that is a universal and unavoidable consequence of being human violates the Eighth Amendment. . .  Sleeping is a life-sustaining activity—i.e., it must occur at some time in some place.  If a person literally has nowhere else to go, then enforcement of the anti-camping ordinance against that person criminalizes her for being homeless."[85] The statement of interest advocates for the application of the analysis set forth in *Jones v. City of Los Angeles*, a Ninth Circuit decision that was subsequently vacated pursuant to a settlement.  In Jones, the court considered whether the city of Los Angeles provided sufficient shelter space to accommodate the homeless population.  The court found that, on nights when individuals are unable to secure shelter space, enforcement of anti-camping ordinances violated their constitutional rights.

The city filed a motion to dismiss the plaintiffs' claims for lack of subject-matter jurisdiction, arguing that plaintiffs did not have Article III standing to sue in federal court. The city argued that the ordinances at issue did not constitute cruel and unusual punishment because, by their terms, the ordinances are not to be enforced when a homeless individual "is on public property and there is no available overnight shelter." In addition, neither plaintiff demonstrated that he could not or would not stay in one or more of the available shelters (if there is space available), or that he has a disability that prevents him from accessing shelter space.

Based on these facts, the court held that there was no actual or imminent threat that either plaintiff would be cited for violating the anti-camping ordinances. In the absence of such a threat, the court concluded that the plaintiffs could not allege a sufficient injury-in-fact to establish legal standing, and dismissed the case.

At the time of publication of this report, the plaintiffs had appealed this decision to the Ninth Circuit.

*The Law Center serves as co-counsel in this case, along with Idaho Legal Aid Services and Latham & Watkins, LLP.*

**Glover v. City of Laguna Beach, No. 8:15-cv-01332 (C.D. Ca. filed Aug. 20, 2015)**

In October 2008, the City of Laguna Beach enacted municipal ordinances which prohibit camping and sleeping in public areas such as public parks, beaches or sidewalks. The Laguna Beach Police Department issued 160 misdemeanor citations in 2011 and 225 citations between January 2012 and June 2014 for violations of the anti-camping provisions. In November 2009, the city opened a permanent emergency shelter that could shelter forty-five people per night. The city gave priority to Laguna Beach locals who met certain residency criteria. If a person did not meet the residency criteria, they were required to enter a lottery to obtain a spot at the shelter for the night.

Five homeless individuals filed suit against the city and sought to represent a putative class of homeless, disabled persons living in Laguna Beach. The plaintiffs sought a preliminary injunction against the city and police department enjoining enforcement of the municipal ordinances against homeless, disabled individuals in public outdoor places where their disability and homelessness was either known to defendants or reasonably apparent to defendants. Plaintiffs alleged that the ordinances violated the Eighth Amendment of the U.S. Constitution by criminalizing "the status of being disabled and homeless in Laguna Beach."

The court disagreed with the plaintiffs' arguments and concluded that plaintiffs had not demonstrated that the plaintiffs had no choice to sleep in public places because individuals purportedly could not access or tolerate the homeless shelter.

The plaintiffs also alleged violations of the Americans with Disabilities Act ("ADA") on the grounds that the city had denied them a "benefit" in the form of "the provision of a safe, legal place to sleep." The court rejected this theory and stated that the provision of a safe, legal place to sleep was not "focused enough" to amount to a "benefit" under the ADA.

Ultimately, because the court found that plaintiffs did not demonstrate a likelihood of success on the merits of their Eighth

---

85    U.S. Dep't of Just. Statement of Interest brief in *Bell v. Boise* available at https://www.justice.gov/crt/file/761211/download.

Amendment claims or ADA claims, the court denied plaintiffs' motion for a preliminary injunction. The court acknowledged the plight of the homeless, but expressed skepticism as to whether the judiciary could impose a legal obligation on the city to address problems affecting the homeless.

The plaintiffs' Motion for Class Certification and both parties' Motions for Summary Judgment have been argued before the court and are still being considered as of the time this report was published.

**Lightsey v. City of Manteca, No. 2:15-cv-2368 (E.D. Cal. filed Nov. 13, 2015)**

The California Rural Legal Assistance organization filed suit on behalf of four homeless plaintiffs against the City of Manteca alleging § 1983 claims for violations of the Fourth, Eighth and Fourteenth Amendments of the U.S. Constitution. The plaintiffs claimed that the city implemented policies and practices that criminalize homelessness by prohibiting homeless people from sleeping outside or living on public property. Specifically, plaintiffs alleged that the ordinances at issue violate the equal protection clause, were unconstitutionally vague, and deprive plaintiffs' of the right to be free from unconstitutional searches and seizures.

The parties' reached a settlement on December 13, 2016 and the case was dismissed on February 1, 2017. Specific details concerning the terms of the settlement agreement were not yet released as of the time this report was published.

**Desertrain v. City of Los Angeles, 754 F.3d 1147 (9th Cir. 2014)**

A group of homeless plaintiffs, each cited for violating the law, challenged the constitutionality of a Los Angeles ordinance prohibiting the use of vehicles "as living quarters." The plaintiffs alleged that the police selectively enforced the law against homeless people in violation of their equal protection rights. Additionally, the plaintiffs argued that the law was unconstitutionally vague because it provided insufficient notice of the prohibited conduct and promoted arbitrary and discriminatory enforcement.

The city successfully moved for summary judgment dismissing the claims at the district court level. However, the Ninth Circuit reversed, holding that the ordinance was unconstitutionally vague in violation of due process.

**Porto v. City of Laguna Beach, 2013 WL2251004 (C.D. Cal. 2013)**

A Laguna Beach ordinance prohibited camping in any public area and sleeping in any public park or bench at night or on any public street or building at any time. The plaintiff Leonard Porto brought suit against the city, alleging that enforcement of the law violated his rights under the First, Fourth, Eighth, and Fourteenth Amendments.

The Magistrate found that Porto did not have standing to challenge the anti-sleeping ordinance because he had never been issued a citation or arrested. Merely being threatened, awoken, and issued

"courtesy notices" was not sufficient. The Magistrate also dismissed Porto's Fourth Amendment claim because no search or seizure was conducted, and held that he did not have a constitutionally protected liberty or property interest in access to the city's designated Alternative Sleeping Location. The plaintiff filed an opposition to the Magistrate's Report and Recommendation in California district court.

In September 2012, the court issued an order accepting and adopting the Magistrate's findings and recommendations, dismissing the case but granting plaintiff leave to amend certain asserted claims. The plaintiff filed an amended complaint against defendants shortly thereafter. In January 2013, the Magistrate once again dismissed plaintiff's complaint, save for his claim against the City of Laguna Beach challenging the durational residency requirement for utilizing the Alternative Sleeping Location. The district court subsequently accepted and adopted the Magistrate's findings and recommendations.

The defendants filed a Motion for Summary Judgment in January 2014 as to the remaining claim in the amended complaint. The Magistrate found the plaintiff failed to establish that he had sustained or was immediately in danger of sustaining some direct injury as the result of the challenged official conduct. In accordance with the Magistrate's Report and Recommendation, the district court granted defendants' Motion for Summary Judgment, dismissing the case.

**Bell v. City of Boise, 709 F.3d 890 (9th Cir. 2013)**

A group of homeless plaintiffs filed a lawsuit against the City of Boise, the Boise Police Department, and the Chief of Police, challenging the enforcement of Boise's anti-camping and disorderly conduct ordinances. The plaintiffs claimed that enforcement of these ordinances when there was insufficient shelter availability violated their right to travel and their right to be free from cruel and unusual punishment under the Eighth Amendment. The plaintiffs also argued that the vague and overbroad anti-camping law violated their right to due process under the Fourteenth Amendment.

The district court granted summary judgment for the defendants, dismissing the case for lack of subject matter jurisdiction and on mootness grounds. The Ninth Circuit Court of Appeals reversed and remanded, holding that jurisdiction does exist and that the plaintiffs' prospective relief claims were not mooted by the defendant's voluntary cessation of enforcement of the anti-camping law when no shelter space was available.

In February 2014, the plaintiffs filed an amended complaint alleging a violation of the Eighth Amendment, seeking injunctive relief under 42 USC § 1983 and declaratory judgment that the Boise City Codes against camping and disorderly conduct are unconstitutional. On a motion to strike, the court dismissed the § 1983 claim, finding that retrospective claims remained unavailable to the plaintiffs.

*The Law Center serves as co-counsel in this case, along with Idaho Legal Aid Services and Latham & Watkins, LLP*

### Sanchez v. City of Fresno, 914 F. Supp. 2d 1079 (E.D. Cal. 2012)

Luis Sanchez, a homeless resident of the City of Fresno, brought claims under § 1983 and California law challenging the city's formal policy of seizing and destroying homeless persons' property during "clean ups" of homeless encampments. This case was one of more than thirty similar cases filed by homeless individuals, all of which were consolidated for pretrial purposes, with the above-captioned matter serving as the lead case.

The city moved to dismiss the case, which was granted in part and denied in part. The court found that plaintiffs' federal takings claim was not ripe and that the city had a rational basis for targeting the possessions of homeless individuals for cleanup. The court held, however, that the plaintiffs stated valid substantive and procedural due process claims and a claim for conversion.

The plaintiffs filed an Amended Complaint alleging, among other things, an illegal search and seizure, conversion, breach of contract, and denial of due process and equal protection under the U.S. and California Constitutions. The city again moved to dismiss the case. The court granted in part and denied in part defendants' motion to dismiss; refusing to dismiss plaintiff's §1983 claim, California Constitutional claims, the Bane Act claim, the intentional infliction of emotional distress claim, or portions of the conversion claim; but dismissing the breach of contract claim.

Both parties moved for partial/summary judgment. In May 2014, the court granted defendants' motion for summary judgment with regard to all claims except intentional infliction of emotional distress. The court found that there was sufficient evidence of conduct that a reasonable juror could find to be outrageous. The plaintiffs' motion for summary judgment was denied in its entirety.

In October 2014, a number of plaintiffs and defendants reached an undisclosed settlement.

### Watters v. Otter, 955 F.Supp.2d 1178 (D. Idaho 2013), 986 F.Supp.2d 1162 (D. Idaho 2013), and 26 F.Supp.3d 1014 (D. Idaho 2014)

Occupy Boise, protesters who had established a tent city on state capitol grounds, sought an injunction against enforcement of Idaho's anti-camping law and a related law authorizing the State to remove and dispose of any unauthorized personal property on constitutional grounds.

The state successfully moved for summary judgment as to the facial constitutional challenges. While the court reaffirmed its original finding that Occupy Boise's tent city and overnight camping constituted expressive conduct protected under the First Amendment, the court found that the ban on "camping" or "sleeping" was a reasonable time, place, and manner restriction. It also found the ban on personal belongings related to camping was constitutionally proper. The court held, however, that Occupy Boise could maintain a 24-hour presence at the symbolic tent city provided that the protestors complied with all constitutional rules, including the prohibition against sleeping.

When the State imposed administrative regulations governing use of the Capitol Mall exterior, Occupy Boise argued that those rules impermissibly restricted First Amendment activity, and sought partial summary judgment declaring the rules invalid and permanently enjoining their enforcement . The court found that some of the challenged rules were reasonable time, place, and manner restrictions, and others were not.

In June, 2014, the court granted Occupy's motion for partial summary judgment declaring that (1) the State's policy of enforcing Idaho Code §§ 67-1613 and 67-1613A to remove Occupy's tents violates Occupy's First Amendment rights, and (2) in the future, the State must enforce the statutes consistently with the Court's interpretation of the statutes. The court granted plaintiff's motion for declaratory judgment, declaring that the defendants' policy of enforcing the ordinance violates the First Amendment; and that the defendants and their officers, agents, employees, attorneys, and all persons who are in active concert or participation with them shall enforce the ordinance consistently with the Court's decisions. The court also granted defendants' motion to dismiss, holding that because the legislature struck down the rules the court ruled as unconstitutional, plaintiff's challenge to those rules was moot. On February 26, 2015, the Court granted a motion for $179,803.50 in attorneys' fees to Occupy Boise.

### Ryden v. City of Santa Barbara, Case No. 09-CV-1578 (C.D. Cal. March 6, 2009)

A class of homeless plaintiffs in Santa Barbara, California, with the assistance of the ACLU of Southern California, brought a lawsuit against the City of Santa Barbara and its police department challenging city ordinances that prohibit sleeping in public places. The plaintiffs' alleged that the City of Santa Barbara violated the Fourth, Fifth, Eighth, and Fourteenth Amendments and the Americans with Disabilities Act when it criminalized plaintiffs for sleeping in public places when there was not shelter available. The plaintiffs requested preliminary and permanent injunctions to prevent the defendants from enforcing the city ordinances and a declaration that the defendants' actions violated the plaintiffs' constitutional rights.

The plaintiffs are chronically homeless individuals who were displaced from a 200-bed winter emergency shelter in Santa Barbara when it was transformed into a 100-bed transitional housing facility. The plaintiffs have mental and/or physical disabilities that prevented them from working or obtaining shelter for themselves. Two of the four named plaintiffs are veterans and all four named plaintiffs worked before becoming disabled. A conditional use permit required the transitional housing facility to exclude the plaintiffs who are unable to work because the permit allows the facility to house only episodically homeless individuals who are able to work. None of the plaintiffs were able to work. The plaintiffs alleged that when the shelter closed and they were

displaced, they were forced to sleep in public places because Santa Barbara failed to provide available alternative shelter, despite having the authority and the resources to do so.

The case settled in September 2009. In the settlement, Ryden agreed to dismiss the suit in exchange for the city's promise to (1) fund with substantial loans or grants the construction of 105 to 115 very-low-income house units, (2) facilitate outreach to chronically homeless individuals and identify the 50 most chronically homeless people in Santa Barbara for purposes of offering them right of first refusal to those housing units, and (3) create a program to avoid having chronically homeless people subject to prosecution under the public sleeping criminal and municipal ordinances.

The implementation of these programs is still underway, as the parties debate the meaning and language of the settlement agreement.

### Sipprelle v. City of Laguna Beach, No. 08-01447 (C.D. Cal., filed Dec. 23, 2008)

Homeless individuals in Laguna Beach, California with the assistance of the ACLU of Southern California and local law firms filed a lawsuit against the City of Laguna Beach and its police department challenging both a city ordinance that prohibits sleeping in public places and the selective targeting and harassment of homeless individuals by the police. The complaint highlighted a range of conduct by the local police department that prevented homeless individuals from carrying out life-sustaining activities, including criminalization of sleeping in public places, selective enforcement of local ordinances and laws, unwarranted stops and interrogations, and confiscation of property.

In their complaint, the plaintiffs contended that Laguna Beach had, prior to the filing of the complaint, organized a "Homeless Task Force" comprised of local leaders and that the city council had fully adopted the findings of the task force. The task force found that the city's homeless population, most of whom suffer from mental and/or physical disabilities, did not receive necessary mental health or medical care, nor were there a sufficient number of shelter beds available. The complaint alleged that in spite of the findings of the task force, the defendants continued to harass and intimidate homeless residents pursuant to the anti-sleeping ordinance and other quality of life ordinances, and that the city obstructed volunteers' efforts to assist the homeless community.

The complaint specifically alleged violations of the Fourth, Eighth and Fourteenth amendment, as well as violations of certain provisions of the Americans with Disabilities Act. On March 4, 2009, the Laguna Beach City Council repealed the city ordinance challenged in the complaint. The case was dismissed and arrests of plaintiffs expunged in July 2009.

### The Isaiah Project, Inc. v. City of San Diego, Case No. 09 CV 2699 (S.D. Cal.)

Homeless individuals and the Isaiah Project, a homeless services organization, challenged the city's destruction of personal property after the plaintiffs had temporarily left their belongings on the sidewalk while seeking services at a nearby day center or church. The plaintiffs alleged that notice regarding seizure of property was inadequate, because, among other things, it predated plaintiffs' temporary placement of their property and was not posted where the raids occurred. The plaintiffs' lawsuit alleged due process and equal protection violations, along with infringement of their right to be free from unreasonable search and seizure under the Fourth Amendment.

In March 2011, the parties reached a settlement agreement. The agreement provided for $160,000 to be paid to plaintiffs. The city also agreed to lease to the Isaiah Project a large warehouse in downtown San Diego for at least one year, to provide 500 storage bins, and to comply with a new procedure for storage of homeless persons' personal property. In November 2011, the Court approved the settlement class and judgment.

### Lehr v. City of Sacramento, 624 F.Supp.2d 1218 (E.D. Ca. 2009)

A group of homeless plaintiffs and non-profit organizations brought a § 1983 action challenging a City of Sacramento anti-camping ordinance on Eighth Amendment grounds. The plaintiffs also challenged the City's and County's practice of taking and destroying their personal property without providing adequate notice and the opportunity to reclaim their possessions on Fourth and Fourteenth Amendment grounds.

The court held that enforcement of the ordinance did not violate the Eighth Amendment, but that there was a genuine issue of material fact as to whether the seizure of property against the will of one plaintiff, Connie Hopson, violated the Fourth Amendment.

In March 2010, Sacramento County settled the case for damages and attorneys' fees. The remaining parties continued to litigate the matter through a jury trial on the question of liability and on May 9, 2011, a jury found the City of Sacramento liable to the certified class of plaintiffs for violation of their constitutional rights resulting in the seizure and loss of the plaintiffs' property. Further, the jury found that police seized and destroyed personal property of homeless people; that the police had a longstanding custom or practice of not giving adequate notice to homeless individuals concerning how they could retrieve their property; and that the police failed to implement an appropriate policy concerning booking and handling the property. The court ordered the city to provide forty-eight hours' notice before sweeping any homeless camp and to store any confiscated personal property of homeless persons to a storage location for a period not to exceed ninety days. The plaintiffs were awarded attorney's fees and costs of $783,079.58.

### Anderson v. City of Portland, 2009 WL 2386056 (D.Or. 2009)

The plaintiffs, a group of homeless individuals, filed suit challenging enforcement of a city ordinance that makes it unlawful for any person to camp in public or to set up a temporary structure in certain public places without a permit. The plaintiffs alleged that the city's

enforcement of the anti-camping ordinances violated their Eighth Amendment right to be free from cruel and unusual punishment. The plaintiffs also alleged that they were denied equal protection in violation of the Fourteenth Amendment, and that enforcement of the ordinance interfered with their fundamental right to travel and also infringed on their substantive liberty interests.

The city successfully moved to dismiss the plaintiffs' right to travel and substantive due process claims because the city's enforcement of the ordinances did not prevent the plaintiffs from traveling to or from the city, nor exclude them from certain areas of the city. The court denied the motion to dismiss, however, with respect to the plaintiff's Eighth Amendment and equal protection claims.

The plaintiffs filed an amended complaint in 2011, but voluntarily dismissed the lawsuit when the two sides reached a settlement. In the settlement, the city agreed to pay a total of $3,200 in damages to the six plaintiffs and three other individuals who brought claims. In lieu of paying attorney fees, the city made $37,000 available for its rental assistance program, which helps people experiencing homelessness afford permanent housing. Furthermore, the police were required to change their policies to provide additional notice before issuing camping citations, to improve procedures related to the removal of homeless persons' property, and to store items reasonably recognizable as belonging to a person.

### Veterans for Peace Greater Seattle, Chapter 92 v. City of Seattle, Case No. C09-1032 RSM (filed July 21, 2009)

The plaintiffs were a group of about 70 homeless people living in a homeless encampment on property partially owned by the City of Seattle and partially owned by the Washington State Department of Transportation. The encampment was known as "Nickelsville" after the mayor of Seattle, Greg Nickels. The plaintiffs filed suit in federal court on July 21, 2009, along with a motion for a temporary restraining order and preliminary injunction, to prevent a noticed sweep of the encampment, which, they asserted, would result in loss of their home, community, and property.

The court denied plaintiffs' motion, finding that there was no showing of irreparable harm because the encampment had only been in existence a short time and the plaintiffs had no legal right to live on the government property. The court noted that social services had been offered to the residents of the encampment. The court also found that the plaintiffs did not have a likelihood of success on the merits under their two constitutional causes of action, the fundamental right to travel and the Eighth Amendment right to be free from cruel and unusual punishment. The court found that the right to remain at a certain place does not implicate the constitutional right to travel and, even if it did, the compelling government interests in protecting its public spaces and protecting itself against liability outweigh any such rights. The court also rejected the plaintiffs' claim that the sweep would constitute cruel and unusual punishment, finding that the protection only applies to criminal defendants. The parties stipulated to a dismissal of the suit on October 8, 2010.

### Lehr v. City of Sacramento, No. 2:07-cv-01565 (E.D. Cal Aug. 2, 2007)

A group of homeless plaintiffs challenged and sought to enjoin enforcement of a City of Sacramento ordinance that prohibits homeless persons from sleeping outside, alleging violations of their Fourth, Eighth, and Fourteenth Amendment rights. They also challenged the city's and county's practice of taking and destroying their personal property, without providing adequate notice and the opportunity to retrieve or reclaim personal possessions before they are destroyed.

The plaintiffs argued that because sleeping is necessary to maintain human life, enforcement of the ordinance punishes plaintiffs based on their status as homeless persons, and therefore violates the Eighth Amendment's prohibition on cruel and unusual punishment. Plaintiffs noted in their complaint that rental housing in Sacramento is beyond the means of homeless people, and, with thousands of people in need of housing, the waiting time for persons on waiting lists for public housing or subsidized housing is more than two years. Further, shelters in Sacramento city and county cannot accommodate all homeless people in the area on any given night.

The plaintiffs also argued that the property confiscation without notice is a violation of their Fourteenth Amendment rights to due process of law and to be free from unreasonable searches and seizures. Lastly, plaintiffs argued that defendants' conduct reflects their "animus towards this disfavored group and lacks a rational relationship to any legitimate state interest," in violation of the equal protection clause of the Fourteenth Amendment.

The plaintiffs sought class certification, as well as a temporary restraining order and/or preliminary injunction and permanent injunction, declaratory judgment, return of plaintiffs' property, damages of at least $4,000 per incident and attorneys' fees and costs.

The city argued in response that the ordinances at issue are typically only enforced during the daylight hours and only in response to complaints by private property owners. The city stated that it provides a form to any person whose personal property is taken by the city as part of any citation or arrest, indicating when and where such property can be claimed.

In March 2010, Sacramento County settled the case for $488,000 in damages and a promise to give forty-eight hours' notice before sweeping a homeless camp. Of the settlement money, (1) $200,000 was allocated to pay verified claims with the residuum, if any, distributed to such non-profit corporation or corporations to provide for the needs of the homeless; (2) each of the representative plaintiffs received either $2,000 or $3,000, depending upon whether they lost property to the County during the class period, or not; (3) up to $100,000 was allocated for claims administration, including providing notice of the settlement of this action and the claims procedure; and (4) $150,000 went to attorney fees.

The City of Sacramento continued to litigate the case. In May 2009, the city was successful on motion for summary judgment as to plaintiff's first cause of action, an Eighth Amendment claim alleging cruel and unusual punishment, as to all plaintiffs. The city was also successful in receiving summary judgment on the second cause of action, the Fourth and Fourteenth Amendment privacy claims based on unreasonable confiscation of property, as to all individual plaintiffs aside from one plaintiff, Connie Hopson, who was the only one to allege that her property had been taken against her will and thus the only one with standing. Accordingly, only one plaintiff remained with a claim against the city. In August, 2009, the class containing "[a]ll persons in the City of Sacramento...who were, or are, or will be homeless at any time after August 2, 2005, and whose personal belongings have been taken and destroyed, or will be taken and destroyed, by one or more of the defendants," was certified with Hopson as representative plaintiff.

Despite not settling, the city council held a special meeting in March 2009 in which it passed resolutions to improve and expand homeless services and to use $1 million to implement the strategy. The strategy includes providing shelter beds, transitional housing, permanent supportive housing, permanent housing, storage for personal property, kennel services for pets, and other supportive services. The first statement in the background section of the resolution states, "housing is a basic human right."

### Jones v. City of Los Angeles, 444 F.3d 1118 (9th Cir. 2006)

Six homeless individuals filed suit to prevent the Los Angeles Police Department from ticketing and arresting people who sit, sleep or lie on public sidewalks. The plaintiffs contended that a city code provision prohibiting sitting, lying or sleeping on any street or sidewalk, as applied to homeless persons, violated the Eighth and Fourteenth Amendments. The plaintiffs argued that homelessness is an involuntary condition, as long as homeless people outnumber the available shelter beds. The court rejected plaintiffs' arguments and granted summary judgment for the city. The court did not accept plaintiffs' reliance on *Pottinger v. City of Miami*,[86] because plaintiffs were not a certified class and because the court preferred the reasoning in *Joyce v. City and County of San Francisco*,[87] in which the court ruled that homelessness is not a cognizable status. In granting summary judgment to the city, the court noted that the U.S. Supreme Court had never used the Eighth Amendment to protect "discrete acts of conduct even if such acts can be characterized as 'symptomatic' or 'derivative' of one's status."[88]

The plaintiffs appealed the case to the Ninth Circuit. Plaintiffs argued on appeal that because the number of homeless people in the city exceeds the number of shelter beds, homeless persons are forced to "involuntarily break the law each night." Therefore, enforcing the city code provision against plaintiffs essentially criminalizes the status of homelessness, in violation of the Eighth Amendment's cruel and unusual punishment clause. The city argued on appeal that plaintiffs lacked standing to pursue a claim under the Eighth Amendment because plaintiffs were not actually convicted under the city ordinance at issue and cannot demonstrate "real and immediate threat of repeated injury." The city noted that if a homeless person who is unable to find available shelter is charged under the city ordinance, he or she may raise the necessity defense to remove any threat of conviction. In addition, the city rejected plaintiffs' claim that homelessness is a status and contended that protection under the Eighth Amendment does not extend to conduct stemming from one's status.

In response, plaintiffs reiterated the extreme shortage of available shelter beds. The plaintiffs further demonstrated that two plaintiffs claimed they were convicted and they all legitimately feared future conviction and punishment under the city code. The plaintiffs also illustrated practical realities that limit any effectiveness of the necessity defense, as a homeless individual may not know to raise the necessity defense or be able to obtain an attorney to do so.

In April 2006, the Ninth Circuit struck down the ordinance, ruling that the Eighth Amendment prohibits the city from arresting people for sleeping on the street when there are no available shelter beds. The city filed a motion for rehearing and a request for rehearing en banc. The Ninth Circuit ordered mediation, and the parties settled the case. The settlement provides that the Los Angeles Police Department will not enforce the city code provision at issue between the hours of 9:00 p.m. and 6:00 a.m. until an additional 1,250 units of permanent supportive housing are constructed within the City of Los Angeles, at least 50 percent of which are located in Skid Row and/or greater downtown Los Angeles. The city may, however, enforce the code within ten feet of any operational and utilizable entrance to a building, exit, driveway or loading dock. In addition, before any person may be cited or arrested for a violation of the ordinance, a police officer must first provide a verbal warning and reasonable time to move. In the settlement of the case the plaintiffs consented to the city's request that the Ninth Circuit vacate its opinion. Ultimately, the Ninth Circuit opinion was vacated, and remanded to the district court for dismissal with prejudice against all defendants.[89]

### Spencer v. City of San Diego, No. 04 CV-2314 BEN (S.D. Cal. May 2, 2006)

A class of homeless plaintiffs brought a § 1983 action challenging the issuance of illegal lodging citations to homeless individuals sleeping on the street. The plaintiffs alleged that the citations violate their Eighth Amendment rights to be free from cruel and unusual punishment because there is no alternative sleeping area available. The city filed a motion to dismiss, claiming that none of the plaintiffs were actually convicted under the illegal lodging law. The plaintiffs filed an amended complaint alleging that seven of the ten plaintiffs were convicted under the law. The city filed another motion to dismiss, stating that the plaintiffs did not receive any punishment and thus could not raise their Eighth Amendment claims.

---

86   76 F.3d 1154 (11th Cir. 1996).
87   87 F.3d 1320 (9th Cir. 1996).
88   Order Denying Plaintiffs Motion for Summary Judgment; Granting Defendants' Motion for Summary Judgment.

89   505 F.3d 1006 (9th Cir. 2007).

In April 2006, the court denied the city's motion to dismiss, citing *Jones v. City of Los Angeles*. In November 2006, plaintiffs filed a memorandum of points and authorities supporting their application for preliminary injunction. The plaintiffs contended that they would succeed on the merits because the issuance of "sleeping tickets" to San Diego's homeless people impermissibly criminalizes involuntary acts "at all times and all places." The plaintiffs cited *Jones v. City of Los Angeles*, which held that a city cannot "criminalize acts (such as sleeping) that are an integral aspect" of the status of being homeless. The plaintiffs also cited announcements by the Mayor and the Police Chief vowing to continue to issue "illegal lodging" tickets to homeless people pursuant to the statute.

In February 2007, the parties entered into a settlement agreement. Under the agreement, the parties agreed that the San Diego Police Department officers "will not ordinarily issue Penal Code section 647(j) citations between the hours of 2100 and 0530." The settlement agreement was based on, and incorporated by reference, the S.D.P.D.'s training bulletin, dated November 17, 2006, regarding the illegal lodging statute. The training bulletin emphasizes that officers must remember that part of their role is to provide information to people about relevant social services and to assist those who cannot assist themselves. It provides guidelines that limit the enforcement of the illegal lodging statute (e.g., only in areas where the city has received complaints and not ordinarily "between the hours of 2100 and 0530"). The bulletin also outlines various procedures that should be followed before issuing a citation (e.g., establishing that the person's conduct constitutes "lodging" and then establish that the lodging is "without permission"), as well as additional investigative issues that should be considered.

### The Center v. Lingle, No. 04-537 KSC (D. Haw. 2004)

The Center (a nonprofit organization providing services for lesbian, gay, bisexual, transsexual, intersex, and questioning Hawaiians), Waianae Community Outreach (a non- profit organization providing services to the homeless), and an individual plaintiff sued the governor and Hawaii's Attorney General to seek an injunction barring the enforcement of a criminal trespass statute. The plaintiffs alleged that an amendment to the criminal trespass statute, Hawaii Statute § 708-815, violated the First and Fourteenth Amendments as well as the Hawaii Constitution. The amendment, passed as Act 50, Session Laws 2004, amended § 708-814(1) to protect public property from trespassers by applying the offense of criminal trespass in the second degree, a petty misdemeanor, to persons who enter or remain unlawfully on any public property after a reasonable warning or request to leave has been given by the owner or lessee of the property. The representative plaintiff was allegedly banned from Hawaii public libraries for a year for looking at gay-themed web sites on library computers. The plaintiffs also contended that the statute has been used to ban homeless persons from public beaches and public parks and to threaten homeless persons to leave certain public property immediately.

The plaintiffs alleged that this law lacks standards for determining what speech or conduct is prohibited and fails to provide any procedural safeguards. Therefore, plaintiffs claimed that the statute violates the First and Fourteenth Amendments of the U.S. Constitution and a provision of the Hawaii Constitution. The plaintiffs also argued that the statute is unconstitutionally vague and fails to establish the required minimal guidelines to govern law enforcement. The plaintiffs also challenged the statute for impermissibly making a distinction based on content, by favoring speech related to union activities. Finally, the plaintiffs claimed the statute infringed on one's right to move freely. The plaintiffs' complaint sought declaratory and permanent injunctive relief, as well as a declaration that the statute is unconstitutional as applied.

This lawsuit, combined with strong opposition from other homeless service providers, sparked the legislature to consider a repeal of Act 50. The legislature ultimately repealed part of Act 50 on July 8, 2005, including the amendments made to the offense of criminal trespass in the second degree.

### Chlubna v. City of Santa Monica, Case No. CV 09-5046 GW (C.D. Cal.)

A prospective class of homeless individuals sued the city of Santa Monica in federal court for criminalization of homelessness in violation of their Eighth Amendment right to be free from cruel and unusual punishment, right to equal protection, due process, Fourth Amendment right to be free from illegal search and seizure and freedom of movement and statutory protection against discrimination based on disability. The complaint alleges that, despite lack of adequate space in homeless shelters, Santa Monica in the previous year has undertaken a campaign to criminalize homelessness by selectively enforcing various city ordinances, including those prohibiting camping in public places, prohibiting sitting or lying in building entrances during certain hours, and prohibiting smoking in public. The selective enforcement of these ordinances was seemingly undertaken with the intent to make Santa Monica's homeless population move to other cities.

On October 27, 2009, the plaintiffs moved for certification of a class consisting of "All current and former disabled homeless residents of Santa Monica who have been, are, or will be subject to harassment, citation or arrest by the Santa Monica Police Department for camping, sleeping, loitering, smoking in public, trespassing, or any other conduct related to the presence of the individual in a purportedly proscribed area ('presence offenses')." Before the class certification motion was decided, the parties reached a settlement agreement and the case was dismissed on May 24, 2010.

### Halfpap v. City of Las Vegas, No. 2:06-CV-01636-RCJ-RJJ (D. Nev. Dec. 20, 2006)

In November 2006, three men were arrested for violating a repealed provision of a Las Vegas city ordinance, which prohibited, among other acts, sleeping within 500 feet of a deposit of feces or urine. The pertinent provisions of the law, which the city had passed a law in August 2006 prohibiting sleeping within 500 feet of a deposit of feces or urine, were repealed in September 2006.

The three individuals filed a lawsuit against the city that included numerous causes of action including violation of their civil rights, negligence, false imprisonment and assault and battery. In March 2007, the three plaintiffs entered into a settlement with the city under which the city paid each plaintiff $15,000 in damages.

**Kincaid v. City of Fresno, 2006 WL 3542732 (E.D. Cal. Dec. 8, 2006)**

The plaintiffs brought suit against the City of Fresno and the California Department of Transportation (CALTRANS) for their alleged policy and practice of confiscating and destroying homeless persons' personal property, including essential personal possessions, without adequate notice and in a manner that prevents the retrieval of such personal property prior to destruction. The plaintiffs argued that the sweeps of temporary shelters violate their federal and state constitutional rights to be free from unreasonable search and seizure, to due process of law and equal protection of the laws, as well as their other rights under California statutory and common law. The plaintiffs moved for a temporary restraining order and preliminary injunction prohibiting defendants' conduct.

The defendants contended that there are enough beds for homeless people in the City of Fresno, so they do not need to be present on private or other property within the city; temporary shelters and congregations of homeless persons are a risk to public health and safety and generate significant complaints from residents, businesses and property owners; the city provides sufficient advance notice, orally or sometimes in writing, to homeless persons if they must move or if any unclaimed property will be discarded; and the city has no funds or resources to transport or store the property of homeless persons until it is reclaimed.

The court found that plaintiffs were likely to succeed on the merits of their unlawful seizure claim because the city's "seizure of homeless people's personal property without probable cause and the immediate and permanent destruction of such property without a method to reclaim or to assert the owner's right, title, and interest to recover such personal property violates the Fourth Amendment." The court also found that, because the city was seizing "the very necessities of life: shelter, medicine, clothing, identification documents, and personal effects of unique and sentimental value," the inconsistent and confusing notice of up to a few days was inadequate. There was no post-deprivation remedy or opportunity to reclaim the property because all property was destroyed upon seizure. In addition, the court held that the balance of hardships weighs heavily in favor of plaintiffs. The court granted plaintiffs' motion for preliminary injunction.

In June 2008, the court approved two separate preliminary settlement plans, one between the plaintiffs and the city and the other between the plaintiffs and CALTRANS. Under the settlement agreements, the city and CALTRANS will contribute $400,000 and $85,000, respectively, to a Cash Fund to distribute cash and cash equivalent to verified members of the plaintiff class. In addition, the city will contribute $1,000,000 to a Living Allowance Fund to distribute funds to third parties for the payment of various living expenses on behalf of verified members of the plaintiff class. The city also agreed to pay plaintiffs' attorneys' fees in the amount of $750,000 and costs in the amount of $100,000.

Under the settlement agreement with the city, for at least five years the city must provide written notice to residents of the encampment of any need to vacate an encampment or remove personal property from an encampment. Any personal property of value collected by the city must be stored for ninety days, during which time the property shall be available to be reclaimed. The city must also serve notice to organizations that assist residents of temporary shelters.

Under the settlement agreement with CALTRANS, for at least five years CALTRANS must follow the legal principles set forth in the preliminary injunction and certain procedures when property is found. In general, CALTRANS employees must inform the owner of the property within a reasonable time and return the property to the owner. When the owner is unknown, depending on the value of the property found, the property must be turned over to the city police or the sheriff's department, or held for three months. For any property held by CALTRANS, a Lost and Found Report must be kept for twenty-four months. The notice to the plaintiff class will include a statement encouraging homeless people in Fresno not to set up camps or otherwise trespass or illegally encroach upon CALTRANS property. In July 2008, the court approved final settlement of the case.

**Amster v. City of Tempe, 248 F.3d 1198 (9th Cir. 2001)**

The Ninth Circuit rejected plaintiff's facial challenge of a Tempe ordinance requiring a person wishing to sit or lie down on a city sidewalk for certain types of events to first obtain a permit. Amster had organized several demonstrations on the city's sidewalks without obtaining permits, although the city had never actually enforced the ordinance during one of his demonstrations. The court found that the ordinance regulated conduct that was not expressive by itself, i.e., sitting or lying on a public sidewalk. Accordingly, the ordinance survived a facial challenge.

**Doucette v. City of Santa Monica, 955 F. Supp. 1192 (C.D. Cal. 1997)**

In early 1995, a class of homeless plaintiffs filed a complaint alleging that the City of Santa Monica's adoption and discriminatory enforcement of a series of ordinances to criminalize homelessness violated plaintiffs' rights under the First and Eighth Amendments. The plaintiffs also alleged violations of the Fourth Amendment's prohibition on unreasonable searches and seizures and the Fifth Amendment's prohibition of takings without just compensation. The U.S. District Court for the Central District of California denied plaintiffs' motion for summary judgment on their claim that the anti-solicitation law violated the First Amendment, and granted defendants' motion for summary judgment on that claim. The court held that the city's ordinance prohibiting "abusive solicitation" was a valid place and manner restriction, finding that it was content-neutral, narrowly tailored to meet a significant government

interest, left open ample alternative channels of communication, and did not allow law enforcement officers excessive discretion in enforcement. The court concluded that some of the manner restrictions imposed by the ordinance only affected conduct, not speech, and that the remaining provisions that did implicate the First Amendment were valid under the above three factor analysis.

In February 1997, the court granted summary judgment in favor of the defendants regarding the two remaining ordinances. The court held that the plaintiffs lacked standing to challenge one of the ordinances because it was no longer being enforced. Regarding the second ordinance, which included solicitation restrictions, the court indicated that: (1) there was no evidence that the ordinance discriminated against speakers based on the content of their speech; (2) the ordinance was narrowly tailored so as to achieve the significant government interest of preventing "intimidating, threatening, or harassing" conduct; (3) sufficient "alternative channels" for communicating would still be available; and (4) the ordinance did not place excessive discretion in the hands of law enforcement officials. Therefore, the court granted summary judgment for the defendants regarding the second ordinance.

### Joyce v. City and County of San Francisco, 87 F.3d 1320 (9th Cir. 1996)

In 1993, plaintiffs filed suit against the City of San Francisco challenging the "Matrix" program, San Francisco's official policy of vigorously enforcing a set of ordinances against homeless people. The U.S. District Court for the Northern District of California denied plaintiffs' motion for a preliminary injunction on the ground that the proposed injunction lacked specificity, would lead to enforcement problems, and that plaintiffs were unlikely to succeed on the merits. The court rejected plaintiffs' claim that the Matrix program punished them for their status in violation of the Eighth Amendment, finding that homelessness is not a status, and that the Matrix program targeted particular behavior. The court also rejected plaintiffs' claims alleging violations of their right to equal protection, due process, and their right to travel, as well as plaintiffs' vagueness and overbreadth challenges. In 1995, the district court granted defendants' motion for summary judgment.

On appeal, the U.S. Court of Appeals for the Ninth Circuit held, over plaintiffs' objections, that the case was moot because, under its new mayoral administration, the city had eliminated the official Matrix policy, dismissed numerous citations and warrants issued to homeless people under Matrix, and was unlikely to resume the program.[90]

*The Law Center filed an amicus brief on behalf of plaintiffs-appellants.*

### Davidson v. City of Tucson, 924 F. Supp. 989 (D. Ariz. 1996)

The plaintiffs sought an injunction against a Tucson resolution barring homeless encampments from city-owned property on Eighth Amendment and equal protection grounds. The court

held that the plaintiffs did not have standing to raise a cruel and unusual punishment claim because they had not been arrested or convicted under the ordinance. The court also held that plaintiffs' equal protection claims–that the ordinance discriminated against homeless people and that it violated their right to travel–were unlikely to succeed on the merits. The equal protection claim failed because the court did not consider homeless people a suspect class, and the fundamental right to travel does not include the right to ignore trespass laws or remain on property without regard to ownership.

### Berkeley Community Health Project v. City of Berkeley, 902 F. Supp. 1084 (N.D. Cal. 1995)

In January 1994, plaintiffs challenged two recently enacted Berkeley, CA ordinances prohibiting sitting or lying down on a sidewalk within six feet of the face of a building during certain hours and soliciting in certain locations or in a "coerc[ive], threaten[ing], hound[ing] or intimidat[ing]" manner. The plaintiffs alleged violations of their rights under the First and Fourteenth Amendments to the U.S. Constitution and various provisions of the California Constitution. The U.S. District Court for the Northern District of California issued a preliminary injunction forbidding enforcement of the anti-solicitation ordinance, finding that it was a content-based regulation of speech in violation of the Liberty of Speech Clause of the California Constitution. The court also issued a preliminary injunction prohibiting enforcement of the restriction on sitting, finding that sitting can sometimes constitute expressive activity, and that the ordinance did not further a substantial government interest unrelated to expression, was not narrowly tailored, and did not leave open ample alternative channels of communication. The defendants appealed the court's decision on the anti-solicitation ordinance to the Ninth Circuit, but the case was settled before the appeal was heard.

### Stone v. Agnos, 960 F.2d 893 (9th Cir. 1992)

A homeless man arrested for lodging in public alleged that his arrest violated his First Amendment rights and the destruction of his property following his arrest violated his Fourteenth Amendment right to due process. The court held that because sleeping is not protected under the First Amendment, there was no violation. The court also rejected the plaintiff's due process claim on the ground that he did not show that the police had acted unreasonably.

### Lee v. California Department of Transportation, 1992 U.S. Dist. LEXIS 21916, No. 3:92- CV-03131-SBA (N.D. Cal. Oct. 26, 1992)

A group of homeless individuals, who were arrested for illegally lodging on state property, brought a class action against the California Department of Transportation (CALTRANS) and local and state police departments, alleging that their essential personal belongings were intentionally confiscated and destroyed without even rudimentary process or compensation. The plaintiffs' §1983 claims alleged denial of due process and equal protection. In addition, plaintiffs alleged that defendants violated state laws relating to handling of lost property and establishment of tort liability.

---

90   87 F.3d 1320 (9th Cir. 1996).

The California State Police and its Chief moved to dismiss plaintiffs' complaint, and thereafter reached a settlement with plaintiffs. The State Police agreed not to destroy certain items of personal property of homeless persons, including eyeglasses, books and blankets, without providing a reasonable opportunity to recover the property. The City of Oakland defendants reached a similar settlement with plaintiffs.

CALTRANS and its director also moved to dismiss the case. CALTRANS argued that the Ninth Circuit's ruling in *Stone v. Agnos* required dismissal of plaintiffs' §1983 claim because Stone held that the disposal of property in connection with arrests for illegal lodging does not violate due process. The plaintiffs argued in response that Stone applies only to negligent confiscation of property, not the intentional destruction that was at issue in this case.

The court granted in part and denied in part defendants' motion to dismiss. Because §1983 only applies to "persons," the court dismissed the §1983 claims against CALTRANS. As for the director of CALTRANS, the court rejected defendants' argument based on Stone, because the motion in Stone was for summary judgment, where plaintiffs had to put forward evidence that the destruction of property was deliberate. In the present motion to dismiss, however, the court must accept plaintiffs' allegations (that the destruction of property was planned and deliberate) as true. Therefore, the court denied defendants' motion to dismiss the §1983 claims against the director of CALTRANS.

In May 1993, CALTRANS, its director, and plaintiffs reached a settlement. Under the agreement, CALTRANS must conspicuously post, in Spanish and in English, the location where property is found on a state right of way for forty-eight hours before the property (except immediate hazards) is removed. The posting must include the date and approximate time of the expected removal of the property; an advisement that property is subject to confiscation, and possible disposal, if not removed; a brief explanation of how to reclaim confiscated property; and the Department of Transportation public information telephone number. CALTRANS must retain items confiscated for twenty days, but its employees "will not be required to sift through piles of garbage to find items of value" or "spend inordinate time or resources collecting or storing property." Possessions will be released to persons who can identify them. Lastly, CALTRANS will not interfere with any law enforcement agencies' handling of arrestees' personal property in connection with arrests of homeless persons on state rights of ways.

### Eleventh Circuit

### Catron v. City of St. Petersburg, 658 F.3d 1260 (11th Cir. 2011)

The plaintiffs filed a complaint against the City of St. Petersburg under § 1983 alleging violations of the First, Fourth, Eighth, and Fourteenth Amendments of the U.S. Constitution and Article I, Section IX of the Florida Constitution, based on the city's "anti-homeless policies." The policies included the enforcement of ordinances that ban trespassing in public spaces, storing belongings on public property, sleeping in or on a right-of-way, and public

urination/defecation. The plaintiffs also alleged that the city had a policy of stopping homeless people and asking for identification, searching their possessions, and directing them to vacate public areas. The plaintiffs sought injunctive and declaratory relief.

The defendants filed a motion to dismiss which was granted.[91] The plaintiffs appealed to the Eleventh Circuit. The court vacated and remanded, finding that plaintiffs had stated a procedural due process claim under the U.S. Constitution and a right to travel claim under the Florida Constitution because the as presently written and allegedly enforced the ordinance lacked constitutionally adequate procedural protections. However, facing a hostile judge in the district court, plaintiffs voluntarily dismissed their case.

*The Law Center served as co-counsel on this case, along with Southern Legal Counsel and Florida Institutional Legal Services*

### Acevedo v. City of Jacksonville Beach, No. 3:03-CV-507-J-21HTS (M.D. Fla. 2003)

Homeless individuals and a non-profit homeless services provider brought a § 1983 action against the City of Jacksonville Beach, Florida, and the city police alleging violations of their First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights (and similar claims under the Florida Constitution) when the police arrested them for violating an anti-camping ordinance and seized and destroyed their belongings. The parties jointly dismissed the case, because none of the plaintiffs was able to continue with the suit.

### Joel v. City of Orlando, 232 F.3d 1353 (11th Cir. 2000), cert. denied, 149 L.Ed.2d 480 (2001)

James Joel, a homeless person, filed suit against the City of Orlando, arguing that the city ordinance prohibiting "camping" on public property violated his rights under the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution. City of Orlando police officers arrested Joel for violating Section 43.52 of the city's code for "camping" on public property. "Camping" under the code was defined to include "sleeping out of- doors." The district court granted summary judgment in favor of the city, and Joel appealed to the Circuit Court. The circuit court affirmed the district court's decision, holding that Joel had failed to prove that the ordinance was enacted for the purpose of discriminating against homeless people.

Considering the equal protection claim, the court held that homeless persons are not a suspect class and that sleeping out-of-doors is not a fundamental right. Therefore, the court used the rational basis test and held that the city was pursuing a legitimate governmental purpose by promoting aesthetics, sanitation, public health, and safety. Further, it rejected Joel's argument that even if the city met the rational basis test standard, the code nonetheless violated equal protection because it was enacted to "encourage discriminatory, oppressive and arbitrary enforcement'" against homeless people. The court found no such purpose behind the code.

---

91   See *Catron v. City of St. Petersburg*, 2009 WL 3837789 (M.D. Fla. 2009).

The court also rejected Joel's argument that the code was impermissibly vague on its face, and as applied to him. The court held that Joel's conduct was clearly within the scope of the code, and that the code was specific enough for a reasonable person to understand. Further, while the court agreed that police officers would have to use discretion in deciding what constitutes prohibited conduct, it found that guidelines promulgated by the city to assist police in enforcement were sufficient to decrease the likelihood of arbitrary and discriminatory enforcement. Finally, the court rejected Joel's argument that the city code violates his right to be free of cruel and unusual punishment. The court stated the city of Orlando has never reached its maximum capacity in its homeless shelters and no individual is turned away; therefore, Joel had an opportunity to comply with the ordinance. The Court ruled that unlike *Pottinger v. City of Miami*[92] and *Johnson v. City of Dallas*,[93] where sleeping out-of-doors was involuntary for homeless people, here it was voluntary.

### Richardson v. City of Atlanta, No. 97-CV-2468 (N.D. Ga. Aug. 28, 1997)

Nine Atlanta homeless people filed a federal lawsuit asking a judge to declare unconstitutional Atlanta's "urban camping" ordinance, which makes it a crime to sleep or lie down on public grounds. The city ordinance, which had been in effect more than six months, made it a crime to use any public place, including city parks and sidewalks, for living accommodations or for camping. It also made it illegal "to sleep, to lie down" or store personal property in any park owned by the city. Anyone found guilty of the crime could be imprisoned up to six months. Among those arrested were Charles Richardson, who was lying on a bench waiting for a soup kitchen to open and Christopher Parks, a homeless, seven-year employee at a restaurant, who missed one week of work sitting in jail after he was arrested for "urban camping" outside the city's Traffic Court building. The lawsuit stated that the police violated the Fourteenth Amendment's equal protection clause by targeting homeless people when enforcing the law, saying it constitutes punishment for individuals solely because they are homeless. The lawsuit also contended that city police were violating the rights of homeless people by either leaving or disposing of their belongings after they are arrested. The lawsuit settled and the plaintiffs received damages. As part of the settlement, the city has revised the ordinance to significantly limit the scope. Atlanta police officers must also now designate on arrest records the housing status of all detainees, in order to more effectively track patterns of discriminatory arrests of homeless people. Finally, police officers will undergo training regarding the issues and challenges faced by those who are homeless.

### Pottinger v. City of Miami, 76 F.3d 1154 (11th Cir. 1996)

A class of homeless plaintiffs challenged Miami's policy of arresting homeless people for conduct such as sleeping, eating, and congregating in public, and of confiscating and destroying homeless people's belongings. At trial, the U.S. District Court for the Southern District of Florida found that some 6000 people in Miami were homeless, that there were fewer than 700 shelter spaces, and that plaintiffs were homeless involuntarily. The court found that the criminalization of essential acts performed in public when there was no alternative violated the plaintiffs' rights to travel and due process under the Fourteenth Amendment, and right to be free from cruel and unusual punishment under the Eighth Amendment. In addition, the court found that the city's actions violated plaintiffs' rights under the Fourth Amendment. The court ordered the city to establish "safe zones" where homeless people could pursue harmless daily activities without fear of arrest.[94]

On appeal, the Eleventh Circuit remanded the case to the district court for the limited purpose of clarifying the injunction and considering whether it should be modified, since the "safe zones" were not operating as the district court envisioned.[95] On remand, the district court modified its injunction, enjoining the city from arresting homeless persons until the city established two safe zones.[96] In February 1996, the Eleventh Circuit referred the case for mediation.[97]

The parties negotiated a settlement during the court-ordered mediation process. The city agreed to implement various forms of training for its law enforcement officers for the purpose of sensitizing them to the unique struggle and circumstances of homeless persons and to ensure that their legal rights shall be fully respected. Additionally, the city instituted a law enforcement protocol to help protect the rights of homeless people who have encounters with police officers. The city also agreed to set up a compensation fund of $600,000 to compensate aggrieved members of the community.

*The Law Center filed an amicus brief on behalf of plaintiffs-appellees.*

### Williams v. City of Atlanta, No. 1:94-CV-2018 (N.D. Ga. Mar. 28, 1995)

A formerly homeless man in Atlanta challenged the constitutionality of Atlanta's ordinance that prohibited "remaining on any property which is primarily used as a parking lot" under the First, Fourth, Ninth, and Fourteenth Amendments and various provisions of the Georgia Constitution. The U.S. District Court for the Northern District of Georgia granted the City of Atlanta's motion for summary judgment, holding that the plaintiff lacked standing to challenge the ordinance since he was no longer homeless and thus no longer among the group of people vulnerable to arrest under

---

92   810 F. Supp. 1551 (S.D. Fla. 1992), remanded for limited purpose, 40 F.3d 1155 (11th Cir. 1994).

93   860 F. Supp. 344, 350 (N.D. Tex. 1994), rev'd on other grounds, 61 F.3d 442 (5th Cir. 1995).

94   *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1584 (S.D. Fla. 1992).

95   40 F.3d 1155 (11th Cir. 1994).

96   No. 88-2406 (S.D. Fla. Apr. 7, 1995).

97   76 F.3d 1154 (11th Cir. 1996).

it.[98] Plaintiff appealed to the U.S. Court of Appeals for the Eleventh Circuit. However, while the appeal was pending, the city revised the challenged ordinance.

### Church v. City of Huntsville, 30 F.3d 1332 (11th Cir. 1994)

A class of homeless plaintiffs alleged that Huntsville, AL had a custom, policy, and practice of arresting and harassing plaintiffs for performing essential activities in public places, seizing and destroying their personal property, and using zoning and building codes to close or condemn private shelters for homeless people. In 1993, the U.S. District Court for the Northern District of Alabama issued a preliminary injunction prohibiting the City of Huntsville from removing homeless people from city property, and also from harassing, intimidating, detaining, or arresting them for walking, talking, sleeping or gathering in public places solely because of their status as homeless persons, and finally, from using zoning or building codes to close or condemn private shelters in the absence of a clearly demonstrable threat to health or safety. On appeal, the Eleventh Circuit vacated the injunction, holding that the plaintiffs had not demonstrated that the actions they sought to prevent were part of an official city policy nor had they shown that there was a pervasive practice or custom of violating plaintiffs' rights. Thus they were unlikely to succeed on the merits. Furthermore, the Eleventh Circuit held that the plaintiffs did not have standing to challenge the city's application of its zoning and building codes. On remand, the district court, finding that plaintiffs could not prevail under the burden of proof established by the court of appeals, granted summary judgment for the defendant, City of Huntsville.

### Hershey v. City of Clearwater, 834 F.2d 937 (11th Cir. 1987)

A motorist challenged the constitutionality of Clearwater's town ordinance prohibiting "lodg[ing] or sleep[ing] in, or about any" motor vehicle. The U.S. Court of Appeals for the Eleventh Circuit held that the ordinance's prohibition on sleeping in a motor vehicle was unconstitutionally vague and overbroad. In upholding the prohibition on lodging, the court found that it was a reasonable restriction within the police power of the city and gave proper notice of the conduct prohibited, and thus survived a void for vagueness challenge.

### State Court Cases

#### Alaska

### Engle v. Anchorage, Case No. 3AN-10-7047CI (Alaska Super. Ct. filed Apr. 28, 2010)

A class of homeless people sued the City of Anchorage in state court alleging that an ordinance governing the abatement of homeless camps violated due process and equal protection rights, and also constituted an unreasonable search and seizure. The ordinance permitted city officials to clean up or "abate" illegal homeless camps after providing residents of the camps with twelve hours' notice. Individuals remaining in the camps at the time of

abatement were given twenty minutes to gather their belongings, after which their property was considered abandoned and could be disposed of by city officials as waste. The Municipality amended its ordinance in June 2010 extending the twelve-hour notice period to five business days.

In July, 2010, the court entered a preliminary injunction preventing the city from enforcing the ordinance. Plaintiffs then moved for summary judgment, asserting that the ordinance violates due process by providing an inadequate notice period and allowing for the seizure and destruction of personal property instead of storage and the opportunity for retrieval. The court found that the ordinance's notice period, administrative appeals process, and the destruction of property violate due process.

#### California

### Allen v. City of Sacramento, 183 Cal.Rptr.3d 654, 234 Cal.App.4th 41 (2015)

This case arose after a private property owner allowed twenty homeless individuals and two people providing services to the homeless to camp on a vacated lot that he owned in an industrial area of the City of Sacramento. City police informed the homeless individuals that camping in the lot violated a city ordinance prohibiting extended camping on public or private property without a city permit. When the individuals continued to camp on the lot, the police cited them on two separate occasions and eventually removed their camping supplies. When the individuals continued to bring in other camping supplies and camp in the lot, they were arrested for refusing to comply with the no-camping ordinance.

The homeless individuals sued the city, claiming that the camping ordinance was unconstitutional on its face and as applied to the homeless. Specifically, the plaintiffs argued that the ordinance illegally discriminated against the homeless, criminalized the status of homelessness, was selectively enforced by police against the homeless, interfered with the freedom to travel, deprived the homeless of due process, contained terms that were constitutionally vague, and deprived homeless individuals of equal protection.

The Court of Appeals in the Third District of California affirmed the trial court's decision to dismiss all causes of action except for the equal protection argument. Specifically, the court rejected plaintiffs' arguments that the ordinance was unconstitutionally vague as the ordinance clearly applied to the plaintiffs' conduct. Further, the court found that the ordinance did not punish the state of being homelessness but rather the act of camping and therefore did not violate the Eighth Amendment's prohibition against cruel and unusual punishment, because "Sacramento's ordinance punishes the acts of camping, occupying camp facilities, and using camp paraphernalia, not homelessness." Finally, the court found that the ordinance did not violate the right to travel, because it only indirectly affected the plaintiffs' right to travel, which was not constitutionally impermissible under the circumstances.

---

98    *Williams v. City of Atlanta*, No. 1:94-CV-2018 (N.D. Ga. Mar. 28, 1995).

However, the court held that plaintiff's allegations were sufficient to state a cause of action for declaratory relief for a violation of the equal protection standards of the Fourteenth Amendment. Reading the allegation that the city selectively enforced the camping ordinance against the homeless as true on demurrer, the court held that such allegations sufficiently state a cause of action. The appeals court did not determine whether plaintiffs could ultimately prevail on their equal protection cause of action.

### Raiser v. City of Los Angeles, No. B255525 (Cal. Ct. App. Sept. 24, 2015)

The plaintiff, a homeless individual that lives in his car and keeps all his personal belongings there, brought suit against the city of Los Angeles regarding an ordinance prohibiting individuals from living in cars on the city's public streets and parking lots. The plaintiff was questioned in his car by police on suspicion of violating the ordinance on three different occasions between 2009 and 2011 before later receiving a citation from police for violating the ordinance in 2013. The plaintiff's suit challenged the constitutionality of the city's ordinance and alleged that his Fourth Amendment rights were violated during the three incidents in which police questioned him in his car. The trial court granted the city of Los Angeles's request for summary judgment on the plaintiff's claims.

On appeal, the Court of Appeals of California, Second District, First Division, affirmed the trial court's grant of summary judgment, though on different grounds than those relied on by the trial court . First, the court affirmed the trial court's holding that the plaintiff lacked standing to challenge the constitutionality of the ordinance. While the trial court held that the plaintiff lacked standing because he had never been arrested under the ordinance, the Court held that the plaintiff could satisfy the injury-in-fact requirement by showing an intent to engage in the conduct prohibited by the ordinance and the existence of a credible threat of prosecution. However, the court held that the plaintiff still lacked standing because he challenged the ordinance as unconstitutionally vague, and his admission that he committed the precise conduct prohibited by the ordinance prevents him from challenging it for vagueness. Second, the court affirmed the trial court's holding that the officers acted within the bounds of the Fourth Amendment, not because (as the trial court held) the plaintiff admitted to violating the ordinance, but because Plaintiff's presence overnight in a car containing all of his personal possessions created reasonable suspicion that he was violating the ordinance.

### Homes on Wheels v. City of Santa Barbara, 119 Cal. App. 4th 1173 (Cal. App. 2 Dist. 2004); 2005 WL 2951480 (Cal. App. 2 Dist. Nov. 7, 2005) (not reported in Cal. Rptr. 3d)

A homeless advocacy group and 3 homeless individuals brought suit in March 2003 challenging the newly enacted Santa Barbara Vehicle Code Sections 22507 and 22507.5, which prohibited the parking of trailers, semis, RV's, and buses on all city streets between the hours of 2:00 and 6:00 a.m. This ordinance had the effect of requiring homeless persons living in vehicles to park in a designated area of the city or on private property. The city posted 33 signs throughout the city stating: "No Parking Trailers, Semis, Buses, RV's or Vehicles Over 3/4 Ton Capacity Over 2 Hours or from 2 am to 6 am SBMC 10.44.200 A & B Violator subject to fine and/or tow-away...." The city did not post signs at all the entrances into the city. The plaintiffs filed a complaint for injunctive, declaratory, and mandamus relief seeking to enjoin enforcement of the ordinance. The plaintiffs then moved for a preliminary injunction alleging, inter alia, that the ordinance exceeded the city's authority under Vehicle Code Sections 22507 and 22507.5 and that the signs did not provide sufficient notice for the ordinance to be effective under Vehicle Code Section 22507.

On March 27, 2003, the Santa Barbara Superior Court granted a temporary restraining order for the plaintiffs, halting all ticketing under the ordinance until April 11, 2003. The trial court later denied the plaintiff's motion for a preliminary injunction. The appellate court affirmed the city's power to enact the ordinance, but reversed and remanded for a factual determination as to whether the city's signs provided adequate notice of the parking restriction.

On remand, the trial court determined that the city did not provide adequate notice of the parking restriction and issued a preliminary injunction to enjoy in the city from enforcing the law. The city appealed.

In November 2005, the appellate court affirmed the lower court's decision in an unpublished opinion. The court found that there was no conclusive evidence regarding whether posting "perimeters" was as effective as "posting each block." Therefore, the court concluded that substantial evidence supported the trial court's finding that the city did not provide adequate notice to motorists of the parking restrictions required by the provision at issue.

### Cervantes v. International Services, Inc., Case No. BC220226 (Cal. Super. Ct. 2002)

In November 1999, the ACLU filed a class action on behalf of a group of homeless individuals in downtown Los Angeles. The class action sought relief from conduct carried out by private security guards. Local merchants and businesses, pursuant to state law, had formed Business Improvement Districts (BIDs) and used the guards to supplement regular municipal police efforts. The lawsuit alleged that the guards intimidated and harassed homeless individuals through illegal searches, seizures, detentions, and threats in an effort to coerce the individuals into leaving the BID. The complaint, based entirely on state law, alleged violations of the California Constitution and Civil Code, as well as numerous intentional torts.

The plaintiffs have since reached settlement agreements with some of the defendants. At least one of the final settlements included protocols establishing behavioral guidelines for the security guards, as well as agreements by the private security agencies that they would train their employees to comply with the settlement. The defendants agreed to compensate the Los Angeles Inner City Law Center for monitoring the conduct of the security guards for

a period of two years. The plaintiffs also obtained a preliminary injunction prohibiting the confiscation of personal property left on public sidewalks. The case settled before the class was certified.

### People v. McManus, Case No. 02M09109 (Cal. Super. Ct. 2002)

Police arrested the defendant for violating an anti-camping ordinance by sleeping on public property. The defendant, relying upon In re Eichorn, 69 Cal. App. Fourth 382 (2000), planned to raise the necessity defense, arguing that he could not gain admission to a shelter because he owned three dogs. However, at trial, the judge refused to let the defendant argue that he slept in the park because he had no other place to go. A jury convicted McManus of two misdemeanor counts of illegal camping.

### In re Eichorn, 81 Cal. Rptr. 2d 535 (Cal. App. Dep't. Super. Ct. 2000)

Police officers arrested James Eichorn for sleeping in a sleeping bag on the ground outside a county office building in the civic center. Eichorn was convicted of violating a City of Santa Ana, California ordinance that banned sleeping in certain public areas. Prior to Eichorn's trial, the California Supreme Court found the ordinance to be facially neutral and therefore constitutional. At trial, Eichorn had to argue the necessity defense and he attempted to prove that on the night of his arrest, there were no shelter beds available.

The court found Eichorn had not made a sufficient enough showing to allow a jury to consider the defense. After objecting to the judge's ruling, Eichorn's lawyer decided to go forward without a jury on the constitutionality of the ordinance. The trial judge convicted Eichorn of violating the city ordinance and Eichorn lost an appeal to the Appellate Department. Eichorn then filed a writ of habeas corpus. In the habeas decision, the Appeals Court found Eichorn was entitled to raise the necessity defense, granted the writ and remanded to the municipal court with instructions to set aside judgment of conviction. Ultimately, the municipal court set aside Eichorn's misdemeanor conviction for illegal camping and his sentence of forty hours of community service. The District Attorney also decided not to retry him.[99]

### Tobe v. City of Santa Ana, 9 Cal. 4th 1069, 892 P.2d 1145 (1995)

Homeless persons in Santa Ana, California filed suit in state court against the City of Santa Ana facially challenging the constitutionality of a city ordinance prohibiting (1) the use of "camp paraphernalia"—including cots, sleeping bags, or non-designated cooking facilities; (2) pitching, occupying, or using "camp facilities" including tents, huts, or temporary shelters; (3) storing personal property on any public land within the city; or (4) living temporarily in a "camp facility" or outdoors in public within Santa Ana. The California Court of Appeals overturned the ruling of the lower court in which the lower court upheld the ordinances with the exception of the provision prohibiting living temporarily in a camp facility or outdoors. The Court of Appeals held that the anti- camping ordinance violates Appellants' right to travel, which "includes

the 'right to live or stay where one will,'" and, by punishing them for their status as homeless people, violates their right to be free from cruel and unusual punishment. The court also held that the ordinance was unconstitutionally vague and overbroad.[100]

In 1995, the California Supreme Court reversed the judgment of the Court of Appeals. The court held that the challenged ordinance, which may have an incidental impact on travel, does not violate the right to travel as it has a purpose other than the restriction of travel and does not discriminate among classes of persons by penalizing the exercise of the right to travel for some. In addition, the court found that the ordinance penalized particular conduct as opposed to status and thus did not violate plaintiffs' rights under the Eighth Amendment, and was not unconstitutionally vague or overbroad. However, the Court noted that the result might be different in an as-applied, as opposed to a facial, challenge.

*The Law Center filed an amicus brief in support of plaintiffs-appellees, as did the U.S. Department of Justice.*

### Connecticut

### State of Connecticut v. Mooney, 218 Conn. 85, 588 A.2d 145 (1991)

A homeless man who was convicted of murder challenged the legality of a search that had been conducted of his duffel bag and a closed cardboard box in an area under a highway bridge that he had made his home. The search, which was conducted without a warrant after the defendant had been arrested, had uncovered items that were used as evidence to link him to the crime. At trial, the court denied defendant's motion to have the items excluded from evidence at his trial on the ground that they had been obtained in the context of an unreasonable search of his belongings—in which he had a reasonable expectation of privacy—in violation of his Fourth Amendment right to be free from unreasonable searches and seizures.

The Connecticut Supreme Court overturned the defendant's conviction, finding that he had a reasonable expectation of privacy in the interior of the duffel bag and the cardboard box, which "represented, in effect, the defendant's last shred of privacy from the prying eyes of outsiders."[101] The court found that he had an actual, subjective expectation of privacy, and that this expectation was reasonable under the circumstances of the case.

### Florida

### City of Sarasota v. McGinnis, No. 2005 MO 16411 NC (Fla. Cir. Ct. 2005), cert. denied, 947 So. 2d 1173 (Fla. App. 2 Dist. Jan. 24, 2007)

After two Sarasota ordinances aimed at prohibiting sleeping outside were overturned by state courts, the City of Sarasota passed a third ordinance that prohibits lodging out-of- doors. Under

---

99   Sanchez, Felix, "Vietnam Veteran's convictions set aside after long legal odyssey," THE ORANGE COUNTY REGISTER, April 1, 1999, at B4.

100   *Tobe v. City of Santa Ana,* 22 Cal App. 4th 228, 27 Cal. Rptr. 2d 386 (1994).
101   588 A.2d 145, 161 (Conn. 1991).

this ordinance, it is illegal to use any public or private property for sleeping without the consent of the city manager or property owner. The ordinance requires that one or more of the following conditions exist in order for police to make an arrest: numerous personal items are present; the person is engaged in cooking; the person has built or is maintaining a fire; the person has engaged in digging; or the person states that he or she has no other place to live. A homeless individual who was charged for violating the ordinance moved to find the ordinance unconstitutional in violation of substantive due process for criminalizing innocent conduct and void for vagueness, since the ordinance does not give sufficient notice of what conduct is prohibited or sufficient guidelines for law enforcement. In December 2005, the court denied the defendant's motion to find the law unconstitutional. The court determined that the law was constitutional, was not void for vagueness, and did not violate substantive due process. Further, the court found the law did not violate equal protection rights. The plaintiff's petition for writ of certiorari was denied by the Court of Appeal of Florida in January 2007.

### City of Sarasota v. Nipper, No. 2005 MO 4369 NC (Fla. Cir. Ct. 2005)

Homeless individuals were charged with violation of Section 34-41 of the Sarasota City Code, which prohibited lodging out-of-doors in a wide variety of situations. They defended the charges on the ground that Section 34-41 was unconstitutional as applied because it offends substantive due process by penalizing otherwise innocent conduct and did not establish sufficient guidelines for enforcement.

In June 2005, the Sarasota County Court found that Section 34-41 was unconstitutional as written, because the ordinance punished innocent conduct and because it left too much discretion in the hands of the individual law enforcement officer.

### City of Sarasota v. Tillman, No. 2003 CA 15645 NC (Fla. Cir. Ct. 2004)

Five homeless individuals were charged with violating Section 34-40 of the Sarasota City Code, which was an anti-sleeping ordinance that prohibited camping on public or private property between sunset and sunrise. The public defender who represented the defendants challenged the constitutionality of the anti-camping ordinance in the context of the criminal case, arguing that the ordinance violated substantive due process and was void for vagueness and overbroad because it penalized innocent conduct. The lowest level county trial court upheld the constitutionality of the city ordinance, finding it was constitutional because it served a valid public purpose, was not vague in that a person of ordinary intelligence was on notice of the prohibited conduct, and there were sufficient guidelines to prevent selective enforcement of the ordinance. The homeless defendants appealed.

The Circuit Court for the Twelfth Judicial Circuit for the State of Florida reviewed the case in its appellate capacity and found the ordinance unconstitutional on the grounds that the ordinance was void for vagueness and violated substantive due process

by effectively making criminal the non-criminal act of sleeping. The city then petitioned the Second District Court of Appeal for certiorari review and the court denied the petition. Instead of asking for rehearing, the city enacted a criminal lodging ordinance. However, the lodging ordinance was subsequently struck down in *City of Sarasota v. Nipper.*

### Delacruz v. City of Sarasota, No. 2D06-5419 (Fla. Dist. Ct. App. Nov. 2, 2006), cert. denied No. 2D06-5419 (Fla. Dist. Ct. App. April 20, 2007)

Felix Delacruz, David M. Brezger and Dennis E. Smith were defendants in criminal cases for allegedly violating Sarasota City Ordinance No. 05-4640 by engaging in "illegal lodging." Each defendant entered a plea of nolo contendere, and reserved the right to appeal the constitutionality of the law under which he was arrested. The defendants challenged the constitutionality of the ordinance in a consolidated appeal. The defendants argued that the ordinance was void for vagueness, encouraged arbitrary and discriminatory enforcement, penalized innocent conduct, and impermissibly criminalized homelessness. The defendants argued that the ordinance failed to give a person of ordinary intelligence fair notice of what constituted forbidden conduct because the ordinance used the term "materials" and failed to define what length of time using a temporary shelter as a place of abode would constitute a violation of the ordinance.

The Circuit Court entered an order affirming the judgment of the county court in each case and finding the ordinance to be constitutional. In denying the defendants' void for vagueness argument, the court cited *Betancourt v. Bloomberg* and noted that an ordinance does not have to achieve "meticulous specificity" which would come at the cost of "flexibility and reasonable breadth," and that words of common usage (such as "materials") are construed in their plain and ordinary sense.

The court also rejected the defendants' argument that the language of the ordinance gives police too much discretion and would lead to discriminatory enforcement. The court cited *Joel v. City of Orlando*, noting that officers may "exercise some ordinary level of discretion as to what constitutes prohibited conduct" if they must also "abide by certain guidelines" such as the list of activities in the Sarasota ordinance at issue. In addition, the court rejected the defendants' argument that a list of factors, of which an officer must find at least one to exist in order to establish probable cause, are vague because it is unclear whether the factors are actually elements of the offense of "lodging", or merely meant to limit prosecution for the offense to a particular group of people.

With respect to the defendants' argument that the ordinance as written penalizes innocent conduct, the court held that homeless persons are not a suspect class, and sleeping outside is not a fundamental right. Therefore, the ordinance passed the rational basis test. Lastly, regarding the defendants' argument that the ordinance impermissibly criminalizes homelessness, the court held that the ordinance "is a legitimate and rational attempt to promote the public health, sanitation, safety and welfare of the city," again

citing *Joel v. City of Orlando*.

The defendants filed a petition for writ of certiorari, elaborating on these claims, which was denied in April 2007.

### State v. Folks, No. 96-19569 MM (Fla. Cir. Ct. Nov. 21, 1996)

A Florida county court invalidated a City of Jacksonville ordinance prohibiting individuals from "sleep[ing], lodg[ing] or lying on any public or semipublic area."[102] The ordinance requires that prior to an arrest or charge, police must first warn the individual that his conduct violates the ordinance, notify him of at least one shelter the officer believes to be accessible to him, and give him a reasonable opportunity to go to the shelter. In dismissing a charge based on the ordinance against Warren Folks, the County court determined that the challenged section of the ordinance violated both the Florida and U.S. Constitutions.

The court found the ordinance to be overbroad as well as unconstitutionally vague in that it did not specify exactly what must be done to satisfy its requirements. The court opined that "if in fact the ordinance requires a person to remain in a shelter for an unspecified period of time or be arrested, this amounts to incarceration in the shelter without a violation of law having been committed." In addition, the court found that the ordinance violated defendant's rights to be free from cruel and unusual punishment by punishing innocent conduct, and his right to due process in that it allowed for arbitrary enforcement.

### State v. Penley, 276 So. 2d 180 (2 D.C.A. Fla. 1973)

This case is the result of the September 1972 arrest of Earl Penley for sleeping on a bench in a St. Petersburg city bus stop, in violation of St. Petersburg City Ordinance 22.57. The ordinance held that "[n]o person shall sleep upon or in any street, park, wharf or other public place." Upholding the lower court's finding, the second circuit of the Florida appellate court held that the statute was unconstitutional, as it "draws no distinction between conduct that is calculated to harm and that which is essentially innocent," is "void due to its vagueness in that it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute," and "may result in arbitrary and erratic arrest and convictions."

### *Maryland*

### Archer v. Town of Elkton, Case No. 1:2007-CV-01991 (Md. Dist. Ct. July 27, 2007)

Eight homeless individuals sued the town of Elkton, Maryland challenging the August 23, 2006 seizure and destruction of their personal property that they had stored on public property, and the constitutionality of a city ordinance enacted on June 6, 2007 prohibiting loitering in public places.

On August 23, 2006 the town of Elkton, its police department and its Department of Public Works conducted a raid on a homeless encampment in a wooded area on public property behind a shopping center. During the raid, the plaintiffs were allegedly threatened with arrest and a $2,000 fine if they attempted to retrieve their belongings from the site. Following the incident, personal property owned by the plaintiffs was removed and destroyed. As a result of these events, the plaintiffs sought actual and consequential damages based on a claim that the town's actions violated the plaintiffs' right to (1) be free from unreasonable search and seizure (under the Fourth Amendment), (2) due process (under the Fourteenth Amendment), and (3) equal protection under the Fourteenth Amendment, as the town's actions singled out homeless persons with the goal of driving them from the town. Further, the plaintiffs argued that the seizure and destruction of property violates state constitution and statutory provisions and also constitutes common law conversion, among other claims.

Following the 2006 seizure of plaintiffs' property, the town of Elkton passed an ordinance prohibiting loitering in public places. Specifically, the ordinance defines loitering as "loiter[ing], remain[ing] or wander[ing] about in a public place for the purpose of begging."[103] In addition to challenging the 2006 seizure of their property, the plaintiffs challenged the validity and enforcement of this ordinance. They argued in their complaint that the ordinance violates the First Amendment by prohibiting seeking charitable contributions in public places – an activity that has been held to be protected speech under the First Amendment. Further, among other constitutional arguments, the plaintiffs contend that the ordinance, by not defining key terms therein, is void for vagueness.

As part of their complaint, the plaintiffs sought to enjoin enforcement of the loitering ordinance, in order to prohibit the town from charging, arresting or threatening to arrest anyone under the ordinance. Although the injunction was denied by the circuit court, the plaintiffs succeeded in obtaining an injunction from the Maryland Court of Special Appeals, pending appeal of the circuit court decision. In September 2007, the Elkton Town Commission voted unanimously to rescind the loitering ordinance. In December 2008, the city settled the lawsuit with respect to the property destruction. The city agreed to provide each plaintiff with $7,500 in compensation for the property destruction.

### *New York*

### Miller-Jacobson v. City of Rochester, 941 N.Y.S.2d 475 (2012)

Members of Occupy Rochester brought an action against the city, seeking a preliminary injunction to prevent the city from removing the group's encampment from a park or requiring it to cease use of the park after hours. The plaintiffs asserted that Rochester City Code § 79–2(C) was unconstitutional because it was an unlawful prior restraint on expressive activity in a public forum, that it contained no standards to limit or guide the Commissioner, and that it provided no opportunity for judicial review of an adverse decision. The plaintiffs further asserted that it was overbroad both on its face and as applied, was under inclusive, and was not

---

102   Jacksonville, Fla., Ordinance Code § 614.138(h) (1994).

103   Town of Elkton, Md. Code § 9.12.010(3) (2007).

narrowly tailored to advance a significant governmental interest.

The court found that the plaintiffs' assertion was without merit, because the city ordinance did not grant unlimited or impermissible discretion to the Commissioner to grant or deny permission for after-hours use of the city parks or for camping in the parks. Holding that the subject law narrowly focused on the substantial government interest in regulating the safe use and enjoyment of the parks, the court granted the city's motion to dismiss.

### Oregon

### Oregon v. Kurylowicz, No. 03-07-50223 (Or. Cir. Ct. 2004)

Defendants, homeless individuals, were charged with violating a Portland "obstructions as nuisances" ordinance. In short, the ordinance made it unlawful and declared it a public nuisance to block any street or sidewalk or to place, permit to be placed, or permit to remain on the sidewalk or street any object that obstructs or interferes with the passage of pedestrians or vehicles. On defendants' demurrer, they asserted that the ordinance was unconstitutionally vague and overbroad, infringed upon constitutional guarantees of equal protection and due process, and violated Oregon's constitutional prohibition against disproportionate sentences.

The court sustained defendants' demurrer and held that the ordinance was unconstitutionally vague and overbroad. Because the ordinance made no exceptions to avoid infringing on the right to assemble peacefully, or to exclude conduct that "merely causes others to step around a person who happens to be standing on any part of a sidewalk in a manner that is not causing any harmful effect," the ordinance was unconstitutionally overbroad. Furthermore, the court held that the ordinance's terms were indefinite, allowing officers leeway in determining, for example, whether a person or an object is "obstructing" a sidewalk, or whether "normal flow" of traffic is "interfer[ed]" with. In addition, the ordinance lacked a mental state requirement and contained no guidelines for police officers, giving a violator no opportunity to abate his or her behavior and failing to provide fair notice of prohibited conduct.

### Voeller v. The City of The Dalles, No. CC02155 (Or. Cir. Ct. 2003)

A homeless individual challenged an anti-camping ordinance under which he had been convicted and fined, alleging that it violated an Oregon State law, ORS 203.077, which requires municipalities and counties to develop a camping policy that recognizes the social problem of homelessness, and contains certain other explicit elements. The case was dismissed at plaintiff's request in 2003 when the City of The Dalles repealed the anti-camping ordinance, expunged plaintiff's convictions, and refunded the fines he had paid. The ordinance had been modeled on a similar Portland ordinance, which was found to be unconstitutional in *State of Oregon v. Wicks*.[104]

### State v. Wicks, Nos. 2711742 & 2711743, (Ore. Cir. Ct. Multnomah County 2000)

Police officers arrested the Wicks, a homeless father and his son, for violating Portland City Code, Title 14, 14.08.250, which prohibits "camping" in any place where the public has access on or under any bridgeway or viaduct. The Wicks claimed the ordinance violated their right to be free of cruel and unusual punishment, the right to equal protection under the Fourteenth Amendment, and their right to travel. The court agreed and found the ordinance as applied to homeless people violated Article I § 16 of the Oregon Constitution and the Eighth Amendment to the U.S. Constitution. The court reasoned that one must not confuse "status" with an immutable characteristic such as age or gender as the State of Oregon did in its arguments.

The court held that, although certain decisions a homeless person makes may be voluntary, these decisions do not strip away the status of being homeless. Citing the Supreme Court's decision in *Robinson v. California*, 370 U.S. 660 (1962) holding that drug addiction is a status, the Wicks court held that homelessness is also a status. Furthermore, the court determined it impossible to separate the status of homelessness and the necessary acts that go along with that status, such as sleeping and eating in public when those are "the only locations available to them." Because the ordinance punished necessary behavior due to a person's status, the court reasoned it was cruel and unusual. Moreover, the court found the ordinance in violation of both equal protection and the right to travel on the basis that the ordinance denied homeless people the fundamental right to travel. The court rejected the state's argument that it had a legitimate state interest in protecting the health and safety of its citizens, noting that there were less restrictive means available to address these interests, such as providing sufficient housing for homeless people and adequate services. According to a newspaper report, the state attorney general's office has dismissed its appeal, citing its inability to appeal from an order of acquittal.[105]

### Washington

### City of Everett v. Bluhm, Case Nos. 7000, 7005, 7006, 1112997 (Everett Muni. Ct. Jan. 5, 2016)

Four homeless people were charged with violating the City of Everett's camping ban. In their defense of the charges, the defendants argued that application to the homeless population of the ordinance, which prohibits camping in "any park, on any street, or in any publicly owned parking lot or publicly owned area",[106] violates their constitutional rights to travel and to be free from cruel and unusual punishment. The court agreed, noting that the city lacks alternative locations where homeless people in the city can engage in life-sustaining activity.

---

104   *State v. Wicks*, Nos. 2711742 & 2711743, (Ore. Cir. Ct. Multnomah County 2000).

105   Wade Nkrumah, "Portland Anti-Camping Ordinance in Legal Limbo," THE OREGONIAN, Oct. 19, 2001, available at http://www.oregonlive.com/portland/oregonian.

106   Everett Municipal Code Section 8.56.010.

**City of North Bend v. Bradshaw, Case No. Yl 32426A (North Bend Muni. Ct. Jan. 13, 2015)**

Mr. Bradshaw was charged with camping in violation of the City of North Bend Municipal Code 9.60.030, which defines camping to include merely sleeping on any public property. He moved to dismiss the charge, and also asked the court to declare the camping ban unconstitutional. The court dismissed the charge and also held that the ordinance was unconstitutional because it violated the fundamental right to travel and the Eighth Amennndment prohibition on cruel and unusual punishment.

## II. Challenges to Bans on Loitering, Loafing, and Vagrancy

### Federal Court Cases

*U.S. Supreme Court*

**City of Chicago v. Morales, 527 U.S. 41 (1999)**

The City of Chicago challenged the Supreme Court of Illinois' decision that a Gang Congregation Ordinance was unconstitutional for violation of the due process clause of the Fourteenth Amendment of the U.S. Constitution for impermissible vagueness and lack of notice of proscribed conduct. The ordinance prohibited criminal street gang members from loitering in a public place. The ordinance allowed a police officer to order persons to disperse if the officer observed any person loitering that the officer reasonably believed to be a gang member.

The Supreme Court affirmed the judgment of the Illinois Supreme Court and ruled the ordinance violated the due process clause of the fourteenth amendment to the U.S. Constitution for vagueness. Specifically, the court ruled that the ordinance violated the requirement that a legislature establish guidelines to govern law enforcement. Additionally, the ordinance failed to give the ordinary citizen adequate notice of what constituted the prohibited conduct – loitering. The ordinance defined "loitering" as "to remain in any one place with no apparent purpose." The vagueness the Court found was not uncertainty as to the normal meaning of "loitering" but to the ordinance's definition of that term. The court reasoned that the ordinary person would find it difficult to state an "apparent purpose" for why they were standing in a public place with a group of people. "[F]reedom to loiter for innocent purposes," the court reiterated, is part of the liberty protected by the due process clause of the Fourteenth Amendment.

*The Law Center filed an amicus brief in support of plaintiffs appellees.*

**Kolender v. Lawson, 461 U.S. 352 (1983)**

The plaintiff challenged the constitutionality of a California state statute that required persons who loiter or wander on the streets to provide "credible and reliable" identification and account for their presence when asked to do so by a police officer. The Supreme Court found that the statute failed to adequately explain what a suspect must do to satisfy its requirements, and thus vested

complete discretion in the hands of the police officers enforcing it, encouraging arbitrary enforcement. The court held that the statute was unconstitutionally vague in violation of the due process clause of the Fourteenth Amendment.

**Papachristou v. City of Jacksonville, 405 U.S. 156 (1972)**

Eight individuals convicted under Jacksonville's vagrancy ordinance challenged the constitutionality of the law. The Supreme Court overturned the decision of the Florida Circuit Court and found that the ordinance was void for vagueness under the due process clause of the Fourteenth Amendment on the ground that the ordinance "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute" and "encourages arbitrary and erratic arrests and convictions."

*Second Circuit*

**Ramos v. Town of Vernon, 353 F.3d 171 (2d Cir. 2003)**

The plaintiffs sought a preliminary injunction against the enforcement of Vernon, Connecticut's juvenile curfew ordinance on First Amendment, Fourth Amendment, equal protection, vagueness, due process, and state constitutional grounds. The district court denied the injunction.[107] The court found that the ordinance's exception for First Amendment activities saved it from an overbreadth challenge. The ordinance, it was found, did not authorize unconstitutional searches and seizures. In analyzing the equal protection claim, the court applied intermediate scrutiny to the statute and found that the history and perception of crime in Vernon and some evidence that the ordinance was effective indicated that it was substantially related to its goals. Further, the ordinance adequately described the conduct it prohibited, and provided police with reasonable guidelines for its enforcement. Finally, since the ordinance contained an exception for minors accompanied by their parents, it did not unduly burden parents' liberty interest in raising their children. The court certified the state constitutional claims to the Connecticut Supreme Court.[108]

The plaintiffs appealed, and the Second Circuit reversed, applying intermediate scrutiny to hold that the city ordinance infringes on minors' equal protection rights. The court noted that although the curfew ordinance sought to reduce nighttime juvenile crime and victimization, the city did not consider nighttime aspects of the ordinance in its drafting process. Furthermore, the ordinance's age limit is not targeted at those who were likely to cause trouble or to be victimized. Indeed, one of the city's expert witnesses stated that "the adoption of the curfew itself probably could be considered a knee jerk reaction."

---

107   48 F. Supp. 2d 176 (D. Conn. 1999).
108   The Connecticut Supreme Court upheld the ordinance against each of the plaintiffs' state constitutional claims. See *Ramos v. Town of Vernon*, 254 Conn. 799 (2000).

**Streetwatch v. National R.R. Passenger Corp., 875 F. Supp. 1055 (S.D.N.Y. 1995)**

Streetwatch challenged the Amtrak Police's policy of arresting or ejecting persons who appeared to be homeless or appeared to be loitering in the public areas of Penn Station in the absence of evidence that such persons had committed or were committing crimes. The district court issued a preliminary injunction prohibiting Amtrak police from continuing to engage in the practice, finding that in light of Amtrak's invitation to the public, the practice implicated the due process clause. The court held that Amtrak's Rules of Conduct were void for vagueness, and that their enforcement impinged on plaintiffs' right to freedom of movement and due process.

### Third Circuit

**Kreimer v. State of New Jersey, No. 05-1416 (DRD) (D.N.J. 2005)**

A homeless man filed a suit against the State of New Jersey, the Governor of New Jersey, the City of Summit, New Jersey Transit, nine police officers and others, claiming that he and other homeless people have been unlawfully thrown out of train stations since August 2004. Several times the plaintiff had a train ticket, but was asked to either leave the station or a train by various New Jersey Transit employees or face arrest for trespassing and/or loitering. The plaintiff contends that those actions violated his federal constitutional rights, including his rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution, as well as his rights under the New Jersey constitution and various state statutes. The City of Summit has filed 15 defenses against the lawsuit, including an invocation of the U.S. Patriot Act. The Justice Department opposed use of the Patriot Act, claiming that "to apply it to this case is . . . an overreaching application of the law." The plaintiff voluntarily dismissed his complaint in February 2006 and the case was terminated in April 2006.

**Gaffney v. City of Allentown, 1997 U.S. Dist. LEXIS 14565 (D. Pa. 1997)**

The plaintiffs challenged a juvenile curfew ordinance on due process and equal protection grounds. The court applied strict scrutiny and found the ordinance unconstitutional. The court held that the statute burdened a minor's right to move freely and that the case did not present factors justifying differential treatment of minors that would allow the court to employ a lesser standard of review. Although the parties agreed that the city had a compelling interest in passing the ordinance, i.e., the protection of minors from nighttime crime and the prevention of the same, it nevertheless failed because it was not narrowly tailored to advance that interest. The statistical evidence the city presented to the court showed no correlation between the passage of the ordinance and the incidence of juvenile crime, and the city did not present evidence that comparatively more juveniles were victims of nighttime crime.

**Kreimer v. City of Newark, Case No. 08-cv-2364 (D.N.J.)**

Plaintiff Richard Kreimer, a homeless individual, brought a § 1983 action against the City of Newark, New Jersey Transit, and members of the New Jersey Transit police for attempted enforcement of an anti-loitering ordinance that had been ruled unconstitutional in 1982 and for denying him access to a train even though he was a ticketed passenger. The court granted the defendants' motion to dismiss, finding that the individual defendants were protected by qualified immunity and that the plaintiff had failed to adequately allege constitutional violations.

### Fourth Circuit

**Schleifer v. City of Charlottesville, 159 F.3d 843 (4th Cir. 1998), cert. denied, 1999 U.S. LEXIS 1908 (1999)**

The plaintiffs challenged a juvenile curfew ordinance on due process and equal protection grounds. The district court upheld the ordinance, and the Fourth Circuit affirmed. Recognizing the greater state latitude in regulating the conduct of minors, the court applied intermediate scrutiny to the statute. The ordinance sought to advance compelling state interests, i.e., the reduction of juvenile crime, the protection of juveniles from crime, and the strengthening of parental responsibility for children. The court found that the ordinance was substantially related to these interests, as the city had before it adequate information that the ordinance would create a safer community and protect juveniles from crime. Further, the court found the ordinance narrow enough to survive strict scrutiny, were it to be applied. Nor did the ordinance burden parents' privacy interests in raising their children. The Fourth Circuit also rejected the plaintiffs' vagueness claim, citing the ordinance's exceptions for First Amendment activities.

**NAACP Anne Arundel County Branch v. City of Annapolis, 133 F. Supp. 2d 795 (D. Md. 2001)**

The NAACP brought a facial challenge on federal and state constitutional grounds to an Annapolis ordinance prohibiting loitering within certain posted drug-loitering free zones. The ordinance made it a misdemeanor for a person observed, inter alia, "making hand signals associated with drug related activity" or "engaging in a pattern of any other conduct normally associated by law enforcement with the illegal distribution, purchase or possession of drugs" within a designated drug-loitering free zone to disobey the order of a police officer to move on. After finding that both the individual members of the NAACP and the NAACP itself had standing to bring the lawsuit, the district court ruled that the ordinance was unconstitutionally vague and overbroad. The court held that the plain language of the ordinance contained no mens rea requirement, and that, as it was interpreting a state law, the court had no authority to read a specific intent requirement into the ordinance. Without the narrowing device of the mens rea requirement, the ordinance was void for vagueness since it failed to provide adequate warning to the ordinary citizen to enable her to conform her conduct to the law and it vested unbridled discretion in police officers enforcing the ordinance. The ordinance was also

unconstitutionally overbroad since without the specific intent requirement it reached a host of activities ordinarily protected by the constitution, such as selling lawful goods, communicating to motorists, and soliciting contributions.

*Fifth Circuit*

**Qutb v. Strauss, 11 F.3d 488 (5th Cir. 1993), cert. denied, 511 U.S. 1127 (1994)**

The district court permanently enjoined the operation of a juvenile curfew ordinance on grounds that it violated the First Amendment and the equal protection clause. The Fifth Circuit reversed. The court assumed that the ordinance burdened a fundamental right of minors to travel, and applied strict scrutiny. The statute survived because the city provided sufficient data to establish that the ordinance was narrowly tailored and the defenses in the ordinance ensured that it employed the least restrictive means available. The court also rejected the parental plaintiffs' argument that it burdened their fundamental right to make decisions concerning their children.

*Sixth Circuit*

**Johnson v. City of Cincinnati, 310 F.3d 484, 2002 WL 31119105 (6th Cir. 2002)**

Two plaintiffs, including a homeless man, successfully challenged a Cincinnati ordinance creating "drug-exclusion zones." The ordinance prohibited an individual from entering a drug-exclusion zone for up to ninety days if the individual was arrested or taken into custody within such a zone for any number of enumerated drug offenses. If the individual was thereafter convicted of the offense, the ordinance extended the exclusion to a year. People who violated the ordinance could be prosecuted for criminal trespass. The ordinance empowered the chief of police to grant variances to individuals who were bona fide residents of the zone, or whose occupation was located in the zone. The homeless plaintiff claimed that he had been prohibited from entering the drug-exclusion zone in question for four years for drug-related offenses and spent four hundred days in jail for violating the ordinance. He regularly sought food, clothing, and shelter from organizations located in the zone, and his attorney's office was located in the zone. The district court held the ordinance unconstitutional on its face and as applied to the plaintiffs, finding that it violated their rights to free association, to travel within a state, and, as to the homeless plaintiff, to be free from double jeopardy.

The Sixth Circuit affirmed.[109] The court held that the ordinance burdened the plaintiffs' fundamental right to intrastate travel and the homeless plaintiff's First Amendment associational right to see his attorney. Applying strict scrutiny, the court found the ordinance was not narrowly tailored to advance the compelling state interest in enhancing the quality of life of its citizens. The ordinance swept

so broadly as it forbade innocent conduct within the zones. In addition, it did not provide for any particularized finding that an individual was likely to engage in recidivist drug activity within the zones. Nor had the city adequately demonstrated that there were no less restrictive alternatives to the ordinance.

In discussing the homeless plaintiff's interest in his relationship with his attorney, the court noted that since he was homeless he had "no readily available, realistic alternative to communicate with his attorney" other than meeting him at his office in the drug-exclusion zone. His attorney could not visit him anywhere, and he had no phone available for a private conversation. "An urban street corner simply does not provide a sufficient guarantee of privacy and a realistically effective guard against disclosure of privileged and confidential information to be considered a viable alternative. … [the plaintiff] is a homeless man, existing at the margin of our society, where he is uniquely vulnerable and in particular need of unobstructed access to legal representation and a buffer against the power of the State."

*Seventh Circuit*

**Hodgkins v. Peterson, 355 F.3d 1048 (7th Cir. 2004)**

A parent and her minor children brought a class action to seek a preliminary injunction against the enforcement of Indiana's juvenile curfew ordinance on First Amendment and due process grounds.[110] The district court maintained that a First Amendment exception was necessary in a juvenile curfew ordinance to ensure that it was not overly broad. The plaintiffs argued that since a minor arrested under the ordinance could use the First Amendment only as an affirmative defense, the ordinance unduly chilled a minor's First Amendment rights. The district court found no evidence, however, that the threat of arrest actually chilled minors' exercise of their First Amendment rights. The court also found that the ordinance left ample alternative channels for minors' communication. The court went on to find that the right of a parent to allow her minor children to be in public during curfew hours was not a fundamental right, and accordingly applied intermediate scrutiny to the statute. The ordinance survived intermediate scrutiny, because of its limited hours of operation and numerous exceptions.

The plaintiffs appealed, and the Seventh Circuit reversed. While the court recognized that the curfew ordinance did not have a disproportionate impact on First Amendment rights, it did regulate the ability of minors to participate in a range of traditionally protected forms of speech and expression, including political rallies and various evening religious services. Applying the "no more restrictive than necessary" standard, the court found that even

---

109   The Sixth Circuit agreed to hear the appeal even though the Ohio Supreme Court had already found that the ordinance violated both the state and federal constitutions. See State v. Burnett, 93 Ohio St. 3d 419 (2001) infra.

110   The district court had struck down a previous version of the Indianapolis juvenile curfew ordinance on overbreadth grounds because it lacked an exception for First Amendment activities. See *Hodgkins v. Peterson*, 2000 U.S. Dist. LEXIS 11801 (S.D. Ind. 2000), amended by 2000 U.S. Dist. LEXIS 11758 (S.D. Ind. 2000). Subsequently, the plaintiff challenged an amended version of the ordinance on grounds that it violated her liberty interest in raising her children without undue government interference. The court denied a preliminary injunction on those grounds. See *Hodgkins v. Peterson*, 2000 U.S. Dist. LEXIS 20850 (S.D. Ind. 2000).

with the First Amendment affirmative defense, whereby arrest is avoided based on the facts and circumstances in a police officer's actual knowledge, the ordinance did not pass intermediate scrutiny because it violated minors' free expression rights.

**Leal v. Town of Cicero, 2000 WL 343232 (N.D. Ill. March 31, 2000)**

The plaintiff was arrested for violating a Cicero ordinance prohibiting loitering on a street corner after a police officer has made a request that the individual move on. The officer had observed the plaintiff doing no more than remaining in a certain area for a short period of time. The plaintiff challenged the ordinance on vagueness grounds, and the court agreed that the law was unconstitutionally vague. The fact that the ordinance made the police officer's request to move on the basis for any potential arrest, as opposed to the loitering per se, did not save it from constitutional scrutiny. As in *City of Chicago v. Morales*, if the loitering is harmless or justified, then the dispersal order itself is an unjustified impairment of liberty. Additionally, the ordinance invited uneven police enforcement, as it contained no guidelines for the exercise of official discretion.

### Ninth Circuit

**Langi v. City and County of Honolulu, Civil No. 06-428 DAE/LEK (D. Haw. Aug. 6, 2006)**

In March 2006, defendants Julia Matsui Estrella and Utu Langi, homeless advocates, along with fifty to sixty others, marched to the city hall grounds to protest the nightly closure of Ala Moana Beach Park. The closure displaced more than 200 homeless individuals; no adequate living alternatives were provided. Estrella and Langi were cited for simple trespass on city property and ultimately arrested for criminal trespass in the second degree. In August 2007, the ACLU filed a motion in criminal court on behalf of Estrella and Langi, alleging that the city conduct unlawfully interfered with Estrella and Langi's First Amendment rights to free expression and assembly and subjected them to unlawful arrest. The motion also alleged violations of the Fourth Amendment right to be free from unlawful seizure and arrest and the Fourteenth Amendment right to equal protection, and alleged claims of false arrest / false imprisonment, battery and negligent infliction of emotional distress. Shortly after the ACLU filed its motion, the prosecution dropped all criminal charges against Langi and Estrella. In January 2007, the parties entered into a settlement and mutual release agreement, in conjunction with and simultaneous to the settlement of *Nakata v. City and County of Honolulu*. Under the terms of the agreement, the city agreed to pay $65,250 to settle claims of damages, attorneys' fees and other costs. The majority of this money was designated for one or more non- profit organizations, including H-5 Project (Hawaii Helping the Hungry Have Hope), whose mission is to assist Honolulu's homeless population. In addition, the city will implement training for Honolulu law enforcement personnel on the use of trespass laws on public property and recent changes in the law. Lastly, the city agreed to notify and consult with the ACLU of Hawaii in the future concerning the public's right of access to the grounds of City Hall.

**Nakata v. City and County of Honolulu, Civil No. CV 06 004 36 SOM BMK (D. Haw. Aug. 10, 2006)**

In a case related to and settled simultaneously with *Langi v. City and County of Honolulu* , Reverend Robert Nakata and other homeless advocates sued the city and county of Honolulu alleging that they had been harassed and unlawfully threatened with arrest during the course of March and April 2006 protests against the nightly closure of Ala Moana Beach Park, where over 200 homeless individuals regularly slept. The lawsuit specifically charged that the city unlawfully restrained free speech by subjecting protests by people experiencing homelessness and their advocates to more restrictive conditions than other members of the public.

In January 2007, in conjunction with the settlement of the Langi case, the Nakata parties entered into a settlement agreement. Under the terms of the settlements of the cases, the city agreed to pay $65,250 to settle claims of damages, attorneys' fees and other costs, with the majority of the money designated for one or more non-profit organizations, including H-5 Project (Hawaii Helping the Hungry Have Hope), whose mission is to assist Honolulu's homeless population. In addition, the city agreed to implement training for Honolulu law enforcement personnel on the use of trespass laws on public property and recent changes in the law. Lastly, the city agreed to notify and consult with the ACLU of Hawaii in the future concerning the public's right of access to the grounds of City Hall.

**Justin v. City of Los Angeles, No. CV-00-12352 LGB, 2000 U.S. Dist. LEXIS 17881 (C.D. Cal. Dec. 5, 2000)**

A group of homeless people living on the streets and in shelters of Los Angeles filed suit alleging a violation of their First and Fourth Amendment rights and then filed for a temporary restraining order (TRO) in federal district court. The plaintiffs were ultimately seeking only injunctive relief. The plaintiffs sought the TRO to stop defendants from using two anti-loitering statutes, California Penal Code § 647(e) and Los Angeles Municipal Code § 41.18(a), to harass plaintiffs. The court denied the TRO as to preventing the authorities from using the codes to ask homeless individuals to "move along." However, the court granted the TRO as to all other acts because plaintiffs established that they had shown a substantial likelihood of prevailing on the merits, would suffer irreparable harm if the TRO was not granted, and that the balance of equities tipped in their favor.

The case was settled with a permanent injunction in force for forty-eight months and the possibility of a court-granted extension for up to an additional forty-eight months. The defendants did not admit liability but were "enjoined as follows with respect to all members of the Class, when such Class members are in the Skid Row area described in plaintiffs' complaint: (1) Officers will not conduct detentions or 'Terry' stops without reasonable suspicion. However, officers may continue to engage in consensual encounters with persons in the Skid Row area, including members of the Class; (2) Officers will not demand identification upon threat of arrest or arrest individuals solely due to their failure to produce identification in circumstances where there is no reasonable

suspicion to stop or probable cause to arrest; (3) Officers will not conduct searches without probable cause to do so, except by consent or for officer safety reasons as permitted by law; (4) Officers will not order individuals to move from their position on the sidewalk on the basis of loitering unless they are obstructing or unreasonably interfering with the free passage of pedestrians on the sidewalk or 'loitering' for a legally independent unlawful purpose as specified in California Penal Code section 647; (5) the defendants will not confiscate personal property that does not appear abandoned and destroy it without notice. However, defendants may continue to clean streets and sidewalks, remove trash and debris from them, and immediately dispose of such trash and debris. Where applicable, defendants will give notice in compliance with the temporary restraining order issued in *Bennion v. City of Los Angeles*. Any personal property that does not appear intentionally abandoned collected by defendants will be retained for ninety days as provided by California Civil Code section 2080.2; (6) Officers will not cite individuals for violation of either Penal Code section 647(e) (loitering) or that portion of Los Angeles Municipal Code section 41.18 which makes it unlawful to "annoy or molest" a pedestrian on any sidewalk. However, officers may cite for obstructing or unreasonably interfering with the free passage of pedestrians on the sidewalk."[111]

### Nunez by Nunez v. City of San Diego, 114 F.3d 935 (9th Cir. 1997)

Minors and parents brought an appeal challenging constitutionality of San Diego's juvenile curfew ordinance. The Court of Appeals for the Ninth Circuit held that the statute was unconstitutionally vague, that it violated the First and Fourteenth Amendments, and that it violated the right of parents to rear their children. The phrase "loiter, idle, wander, stroll or play" did not provide reasonable notice of what conduct was illegal and allowed the police excessive discretion in stopping and arresting juveniles. While the court found that the city had a compelling interest in protecting children and preventing crime, the city failed to provide exceptions in the statute allowing for the rights of free movement and expression, and thus struck down the statute as not narrowly tailored to meet the city's interest.

### Richard v. Nevada, No. CV-S-90-51 (D. Nev. Apr. 25, 1991)

Four Franciscan clergymen and four homeless individuals challenged Nevada's statute prohibiting criminal loitering and vagrancy and related provisions of the Las Vegas Municipal Code alleging that they were unconstitutionally vague and/or overbroad. The U.S. District Court for the District of Nevada held that the section of the Nevada statute defining vagrancy was unconstitutionally vague in violation of the due process clause of the Fourteenth Amendment. However, the court abstained from making a decision on the other challenged section of the Nevada statute or sections of the Las Vegas Municipal Code. The court certified those matters to the Nevada Supreme Court, which subsequently held that both

provisions were unconstitutionally vague.[112]

### Eleventh Circuit

### Williams v. DeKalb County, 327 Fed. Appx. 156, 2009 WL 1215961 (11th Cir. 2009)

Plaintiff Robert Williams, a homeless man, filed suit in state court against the county, an individual police officer, and the police chief asserting § 1983 claims for failure to adequately train or supervise the officer and for negligently hiring the officer. Williams also asserted state law claims for false imprisonment, kidnapping, and aggravated assault. The action was removed to federal court.

The underlying incident occurred in the fall of 2004, when Williams was arrested for loitering. He had been sitting at a bus stop in the early morning hours, but after being told to move by police office Ronald Jones he went to a nearby restaurant to lie down. Office Jones again approached him and told him to find somewhere else to sleep or else be taken to jail. Williams opted for jail, but rather than being taken there, Office Jones drove him to a neighboring county where he beat Williams with a baton and stabbed him repeatedly with a knife.

Williams presented one theory of § 1983 liability that his injuries were caused by the County's policy of solving its homelessness problem by having police officers take homeless people to neighboring counties. He presented evidence in the form of testimony from at least five members of the DeKalb County Police Department who testified of a homeless relocation policy. The district court found "little direct evidence, other than the belief of a few police officers, that these types of removals were actually carried out," and granted summary judgment for the county. The appellate court reversed and remanded on this point saying that this was a factual issue for the jury.

Before the case could be retried, the county settled with Williams for $165,000.

### District of Columbia Circuit

### Hutchins v. District of Columbia, 188 F.3d 531 (D.C. Cir. 1999)

The district court granted summary judgment to plaintiff's challenge of a juvenile curfew ordinance and found it unconstitutional on due process and vagueness grounds. A divided panel of the D.C. Circuit initially affirmed, but upon a rehearing en banc, the ordinance was upheld. The court refused to recognize a fundamental right for juveniles to be in a public place without adult supervision during curfew hours, nor was it willing to acknowledge a fundamental right for parents to allow their children to be in public places at night. The court applied intermediate scrutiny to the ordinance and held that the District had adequate factual bases to support its passage of the ordinance. In addition, the court found the ordinance enhanced parental authority as opposed to challenging

---

111  *Justin v. City of Los Angeles*, No. CV 00-12352 LGB (AIJx) (C.D. Cal. Nov. 5, 2001).

112  *State v. Richard*, 108 Nev. 626, 836 P.2d 622 (Nev. 1992).

it, owing to the ordinance's exceptions for activities where parents were supervising their children. The court dismissed plaintiffs' vagueness and Fourth Amendment claims.

**State Court Cases**

*Colorado*

**City of Salida v. Edelstein, Case No. 97CR62 (Colo. Dist. Ct. 1998)**

The defendants were arrested for violating a Salida ordinance prohibiting anyone from loitering in one place for more than five minutes after 11:00 p.m. at night. One defendant had been speaking with friends on the sidewalk outside his home, while another defendant had been observing a police officer issue loitering citations to other individuals. The defendants challenged the ordinance on First Amendment, due process, and vagueness grounds. The municipal court found the ordinance unconstitutional, and the district court affirmed. The court held that the ordinance interfered with citizens' fundamental rights to stand and walk about in public places. The ordinance was not narrowly drawn to regulate that right, and the city failed to convince the court that any plausible safety concerns existed to justify the ordinance. Additionally, the court found the ordinance void for vagueness, since it failed to provide law enforcement with proper standards to prevent its arbitrary and discriminatory enforcement.

*Georgia*

**Johnson v. Athens - Clarke County, 529 S.E.2d 613 (Ga. 2000)**

The plaintiff was arrested for violating an Athens municipal ordinance prohibiting loitering or prowling. A policeman had observed Johnson at a particular intersection four times over a two-day period. At trial, the policeman testified that the location where he arrested Johnson was a known drug area, although the state presented no evidence of drug activity. The Georgia Supreme Court found the ordinance void for vagueness, since there was nothing in the ordinance's language that would put an innocent person on notice that particular behavior was forbidden. There was no way a person of average intelligence could be aware of what locations were known drug areas and what innocent-seeming conduct could seem to be drug-related in the opinion of a police officer. The ordinance also failed scrutiny because it did not provide adequate safeguards against arbitrary or discriminatory enforcement.

*Ohio*

**State v. Burnett, 755 N.E.2d 857 (Ohio 2001)**

The defendant successfully challenged a Cincinnati ordinance creating "drug-exclusion zones."[113] The defendant was arrested for one of the designated drug offenses and given a ninety-day exclusion notice from the Over-the-Rhine exclusion zone, which the city extended to one year. He was subsequently arrested for criminal trespass for being present in the zone.

The Ohio Supreme Court denied the defendant's freedom of association claim, but found that the ordinance impermissibly burdened his fundamental right to travel and that it violated the Ohio state constitution. As to the first amendment claim, the court found that the ordinance did not, on its face, interfere with the defendant's fundamental, personal relationships. However, the court went on to hold that the due process clause of the federal constitution included the fundamental right to intrastate travel. Under the required compelling interest analysis, the ordinance failed because it was not narrowly tailored to serve Ohio's compelling interest in protecting the health, safety, and welfare of its citizens. The ordinance reached a host of innocent conduct, including visiting an attorney, attending church, and receiving emergency medical care. Finally, the court found the ordinance violated the Ohio state constitutional provision forbidding municipalities from adopting laws that conflicted with the "general laws" because it added a criminal penalty for a drug offense that was not imposed by a court or authorized by a statute.[114]

*Pennsylvania*

**Commonwealth v. Asamoah, 2002 Pa. Super. LEXIS 2896 (Pa. Super. Ct. 2002)**

The defendant was convicted for loitering pursuant to a York, Pennsylvania ordinance. Police observed Asamoah near a man they believed to be carrying drugs, although Asamoah himself did no more than stand on the sidewalk with money in one of his hands. Police arrested him for violating that part of the ordinance forbidding "acts that demonstrate an intent or desire to enter into a drug transaction." The Superior Court overturned his conviction, finding the ordinance was unconstitutionally vague and overbroad. The ordinance's language provided inadequate guidance as to what constituted illegal behavior and left police free to enforce it in an ad hoc and subjective manner. The ordinance also proscribed and punished protected activities such as "hanging around" and "sauntering."

**III. Challenges to Bans on Sitting or Lying Down in Public**

**Federal Court Cases**

*Fifth Circuit*

**Henry v. City of New Orleans, No. 03-2493 (E.D. La. 2005)**

In September 2003, five homeless plaintiffs filed a § 1983 action against New Orleans and the New Orleans Police Department alleging violations of their First, Fourth, Ninth, and Fourteenth Amendment rights because the plaintiffs were arrested or given citations for sitting on the sidewalk outside their employer's door waiting for their paychecks. Approximately two months after the suit was filed, the police department made an announcement that

---

113  *See Johnson v. City of Cincinnati*, 310 F.3d 484, 2002 WL 31119105 (6th Cir. 2002).

114  One justice concurred only in the state constitutional holding, arguing that no fundamental right to intrastate travel existed under the federal due process clause. See 93 Ohio St. 3d at 869.

it was changing its policy in dealing with homeless persons on the streets. The police department's new policy included discontinuing mass round-ups and arrests for obstructing the sidewalk. Under the new policy, police had to call for a homeless assistance unit when encountering homeless people on the street, instead of arresting people. Federal and local funds were dedicated to the new outreach program and to the construction of a new shelter. The program also included the creation of more shelter beds in an existing shelter, the expansion of shelter hours, subsidies by the city for shelter fees and homeless contact sheets for all officers.

In April 2005, the claims of three of the plaintiffs settled, with the two individuals who were issued citations receiving $500 each and the individual who spent 12 hours in jail receiving $1,000. The claims of the remaining plaintiffs were withdrawn and dismissed after those plaintiffs could not be reached.

### Ninth Circuit

### Roulette v. City of Seattle, 78 F.3d 1425 (9th Cir. 1996)

Homeless residents of Seattle challenged the city's ordinances that prohibited sitting or lying on downtown sidewalks during certain hours and aggressive begging. The plaintiffs alleged violations of their rights of freedom of speech, due process, equal protection, and the right to travel. The district court granted the city's motion for summary judgment, rejecting plaintiffs' vagueness, substantive due process, equal protection, right to travel, and First Amendment challenges to the sidewalk ordinance. In addition, the court also dismissed plaintiffs' challenge to the aggressive begging ordinance on vagueness and overbreadth grounds. However, the court did limit the construction of the ordinance to prohibit only threats that would make a reasonable person fearful of harm, and struck down the section of the ordinance that listed criteria for determining whether or not there was the intent to intimidate.[115]

On appeal, the Ninth Circuit affirmed the district court's decision, upholding the sidewalk ordinance. The Court of Appeals rejected plaintiffs' facial substantive due process and First Amendment challenges, holding that sitting or lying on the sidewalk is not integral to, or commonly associated with, expression.[116] In dissent, Judge Pregerson asserted that Seattle's time, place, and manner restrictions on expressive content are not narrowly tailored to serve a significant government interest and do not leave open ample alternative channels of expression, and thus constitute a violation of plaintiffs' First Amendment rights.[117] The Ninth Circuit denied plaintiffs' petition for rehearing en banc. The Law Center filed an amicus brief on behalf of plaintiffs-appellants.

### State Court Cases

### Washington

### City of Seattle v. McConahy, 937 P.2d 1133 (Wash. Ct. App. 1997)

Plaintiffs challenged the constitutionality of an ordinance prohibiting sitting on sidewalks in Seattle's downtown area during business hours. The plaintiffs claimed that the ordinance violated their substantive due process and free expression rights and infringed upon their right to travel. They also alleged the ordinance was contrary to the Privileges and Immunities Clause of the Washington State Constitution and Washington's ban on discriminating against persons with disabilities. In rejecting plaintiffs' arguments, the court held that the ordinance furthered the legitimate police power interest of promoting pedestrians' safety and reducing crime and infringed only minimally upon the freedoms of movement and expression. The court reasoned that sitting is mere conduct and has no inherent expressive value and that the Privileges and Immunities Clause was not implicated because homelessness was not a protected class. Further, the right to travel was not implicated by the statute, as the statute did not exact a penalty for moving within a state or prohibit homeless people from living on streets. In *City of Seattle v. McConahy*, 133 Wn. 2d 1018, 948 P.2d 388 (1997), the Supreme Court of Washington denied a petition for review of this Appellate Court decision.

### IV. Challenges to Bans or Restrictions on Panhandling

### Federal Court Cases

### First Circuit

### Thayer v. City of Worcester, 755 F.3d 60 (1st Cir. 2014) and Thayer v. City of Worcester, 144 F. Supp. 3d 218 (D. Mass. 2015)

Plaintiffs sought a preliminary injunction against enforcement of two City of Worcester ordinances restricting panhandling. The plaintiffs alleged that the ordinances, which prohibited aggressive panhandling and walking on traffic medians for purposes of soliciting donations, were content based restrictions on speech and unconstitutionally vague. The plaintiffs also alleged that the ordinance discriminated against the poor and homeless.

The district court denied the plaintiffs' motion, concluding that the restrictions on speech applied with equal force without regard to message, that the city had a legitimate interest in promoting the safety and convenience of its citizens, and that the ordinances were narrowly tailored to achieve their intended purposes. The plaintiffs' argument that the ordinances discriminate against the poor and homeless was also rejected because there was no likelihood of establishing the city's discriminatory intent.

The Court of Appeals for the First Circuit affirmed, noting that the text of the ordinances did not identify or affect speech except by reference to the behavior, time or location of its delivery. Further, the Court held that the plaintiffs were unable to prove that the

---

115   *Roulette v. City of Seattle*, 850 F. Supp. 1442 (W.D. Wash. 1994), aff'd, 78 F.3d 1425 (9th Cir. 1996).

116   78 F.3d 1425, amended, 97 F.3d 300 (9th Cir. 1996). Plaintiffs did not appeal the district court's ruling on the aggressive begging ordinance.

117   97 F.3d 300, 308 (Pregerson, J., dissenting).

laws were overbroad or vague. In addition, the First Circuit stated that the fact that the enforcement of the ordinance was thus far solely against the poor was not in itself probative of discrimination.

The judgment of the First Circuit was vacated by the United States Supreme Court and the matter remanded for further consideration in light of *Reed v. Town of Gilbert,* 135 S.Ct. 2218 (2015).

On remand, the trial court found that the first ordinance banning "aggressive" panhandling was "content based" and therefore subject to strict scrutiny, meaning that the city would have to prove that the ordinance furthered a compelling government interest and was narrowly tailored to achieve that interest. The court found that the entirety of the ordinance failed constitutional muster because the city did not implement the least restrictive means available to protect the public interest. Thus, the ordinance did not satisfy strict scrutiny. The court also held that municipalities must define with particularity the threat to public safety they seek to address, and then enact laws that precisely and narrowly restrict only that conduct which would constitute such a threat. Regarding the second ordinance, the court found that the city failed to show that it seriously undertook to address the problem with less intrusive means, which were readily available to it. As such, the second ordinance also failed to pass constitutional muster. In both instances, the ordinances failed for not enacting more tailored means to address the public interests that the ordinances were purportedly designed to address.

### Cutting v. City of Portland, 2014 WL 580155 (D. Me. Feb. 12, 2014), aff'd, 802 F.3d 79 (1st Cir. 2015)

Plaintiffs sought an injunction preventing enforcement of an ordinance restricting people from standing or sitting on any traffic median. The plaintiffs, consisting of individuals who used the medians when panhandling or when holding political signs, argued that the restriction infringed on their rights under the First and Fourteenth Amendments.

The Court granted permanent injunctive relief in plaintiffs' favor, finding that the ordinance was a content based restriction on speech that unconstitutionally favored campaign signs over all other categories of speech. On appeal, the First Circuit affirmed, concluding that the ordinances prohibitions on standing, sitting, staying, driving, or parking on median strips violates First Amendment, because the ordinance indiscriminately bans virtually all expressive activity in all of the city's median strips and thus is not narrowly tailored to serve the city's interest in protecting public safety.

### *Second Circuit*

### Jefferson v. Rose, 869 F. Supp. 2d 312 (E.D.N.Y. 2012)

A plaintiff who was incarcerated for violating an anti-loitering statute that had previously been declared unconstitutional in *Loper v. N.Y.C. Police Dep't,* 802 F. Supp. 1029 (S.D.N.Y. 1992) brought suit alleging a violation of his rights under the First and Fourth Amendments.

The court granted the plaintiff's motion for a preliminary injunction and ordered the Suffolk County Police Department to cease enforcing the invalidated statute. The police were further enjoined from arresting, threatening to arrest, or attempting to arrest anyone for loitering or begging.

### Brown v. Kelly; Casale v. Kelly, No. 05-CV-5442, 2007 WL 1573957 (S.D.N.Y. May 31, 2007); 710 F. Supp. 2d 347 (S.D.N.Y. 2010)

An individual who panhandles, Eddie Wise, filed a suit on behalf of a class of individual panhandlers who had been charged with violations of a New York state law that prohibits begging. The case was consolidated with another case, *Casale v. Kelly,* which challenged the City of New York's enforcement of three unconstitutional subsections of New York's loitering statute-section 240.35 of the New York Penal Law. In three separate cases, the New York Court of Appeals previously declared all three challenged sections unconstitutional:

• Section 240.35(3) which provides that a person is guilty of loitering when he "loiters or remains in a public place for the purpose of engaging, or soliciting another person to engage, in oral sexual conduct, anal sexual conduct or other sexual behavior of a deviate nature." See *People v. Uplinger,* 58 N.Y.2d 936 (1983).

• Section 240.35(7) which provides that a person is guilty of loitering when he "loiters or remains in a transportation facility, or is found sleeping therein, and is unable to give a satisfactory explanation for his presence." See *People v. Bright,* 71 N.Y.2d 376 (1988).

• Section 240.35(1) which provides that a person is guilty of loitering when he "[l]oiters, remains or wanders about in a public place for the purpose of begging." See *Loper v. New York City Police Dept.,* 802 F.Supp. 1029, 1047 (S.D.N.Y. 1992).

Despite the statutes being declared unconstitutional, the NYPD has unlawfully enforced them tens of thousands of times. The plaintiffs alleged that arrests and prosecutions under the unconstitutional law violated their First Amendment rights. For relief, the plaintiffs sought a judgment declaring the defendants have violated the law, as well as an injunction to cease enforcement of the law, mandating trainings for police officers and district attorneys, and removing all arrest records for those convicted under the law. The plaintiffs also requested compensatory and punitive damages.

On June 11, 2005, the day after the suit was filed, the Bronx District Attorney's office admitted that they should not have prosecuted any arrests made under the unconstitutional part of the state penal code and issued a written agreement with the city and the police to stop arresting and prosecuting people under this statute. The court issued an order on June 24, 2005, requiring the city to halt enforcement of the statute. Meanwhile, according to the court, the New York Legislature's decades-long failure to rescind these unconstitutional laws is "but another example of that body's

notorious dysfunction."[118]

But the city did not stop the police from enforcing the unconstitutional statutes. Despite the June 2005 agreement to halt enforcement of the statutes, NYPD continued to make 772 further arrests under the statutes in nineteen months following the court order. In light of this failure to deliver on the city's promise, on December 14, 2006, the court ordered the city to take a number of additional remedial actions, including increased education of officers who had illegally enforced the statute.

In March 2008, plaintiffs filed *Casale v. Kelly*, a putative class action contending that the city of New York through the NYPD continued to enforce unconstitutional sections 3 and 7. This case was consolidated with *Brown v. Kelly* and, on May 1, 2008, the court issued a similar order requiring the city to take action to stop enforcement of the challenged statutory sections.

During discovery, the plaintiffs discovered that despite the fact that the city took some steps to comply with the court orders, the NYPD was still using "cheat sheets" or a list of punishable offenses that included the unconstitutional criminal statutes. Though the city claims they are making additional efforts to eliminate these cheat sheets and provide new and accurate written materials to the police officers, by April 2010 there were still summons being issued under all three statutory sections.

In April 2010, on motion of the plaintiffs, the court found the City of New York in civil contempt for failure to comply with the court orders. The court sanctioned the city for each future violation of the orders, with a fine beginning at $500 per instance to grow by $500 every three months with a maximum fine of $5,000 per incident. The court intended the sanctions to coerce compliance with the court orders. The court also granted punitive discovery sanctions and attorney's fees to plaintiffs.

**Loper v. New York City Police Department, 999 F.2d 699 (2d Cir. 1993)**

Plaintiffs challenged the New York City Police Department's enforcement of a New York statute prohibiting "'loiter[ing], remain[ing], or wander[ing] about in a public place for the purpose of begging.'" The Second Circuit affirmed the district court's order granting summary judgment to plaintiffs and invalidating the statute on First Amendment grounds. The Court of Appeals held that begging constitutes expressive conduct or communicative activity for the purposes of First Amendment analysis, and that there was no compelling government interest served by prohibiting those who beg peacefully from communicating with their fellow citizens. The court further held that even if the state had such an interest, a statute banning all begging was not narrowly tailored, not content-neutral, and left open no alternative channels of communication "by which beggars can convey their messages of indigency."

**Young v. New York City Transit Authority, 903 F.2d 146 (2d Cir. 1990)**

Plaintiffs challenged New York City Transit Authority regulations that prohibited begging on subway cars and platforms. The Second Circuit reversed the holding of the district court and vacated the lower court's order enjoining enforcement of the regulations holding that begging, which is "much more 'conduct' than 'speech,'" is not protected by the First Amendment. The court held that even if the First Amendment did apply, the regulation was reasonable because it was content-neutral, justified by a legitimate government interest, and allowed alternative channels of communication in that it did not ban begging in locations other than the subway.

*Fourth Circuit*

**Reynolds v. Middleton, 779 F.3d 222 (4th Cir. 2015)**

Robert Reynolds, a homeless resident of Henrico County, Virginia, brought a First Amendment challenge against a local ordinance prohibiting the solicitation of contributions of any nature from the drivers or passengers of motor vehicles on highways located within the county. The district court granted summary judgment in favor of the county, holding that the ordinance was content-neutral and a narrowly tailored time, place, and manner restriction on speech. Reynolds appealed.

On appeal, Reynolds argued that the county failed to prove that the ordinance was narrowly tailored to serve a significant government interest. The court noted that the ordinance burdened a wide range of protected speech, including all forms of leafletting in addition to prohibiting solicitations of any kind of contribution, whether political or charitable, or selling or attempting to sell goods or services. The court also found that there was no evidence of a county-wide problem that would justify the county-wide sweep of the statute, and thus the ordinance burdened more speech than necessary. Nor was there any evidence that the county ever tried to improve traffic safety by prosecuting any roadway solicitors who actually obstructed traffic, or that it ever considered prohibiting roadway solicitation only at those locations where it could not be done safely.

Based on this reasoning, the court held that the county could not carry its burden of demonstrating that the ordinance was narrowly tailored. Thus, the court vacated the district court's ruling granting summary judgment in favor of the county, and remanded for further factual development. In July 2015, the case was voluntarily dismissed based on an unspecified change in the plaintiff's circumstances.

**Clatterbuck v City of Charlottesville, 708 F.3d 549 (4th Cir. 2013) and Clatterbuck v City of Charlottesville, 92 F.Supp.3d 478 (W.D. Va. 2015)**

The plaintiffs, who regularly begged at a downtown mall in Charlottesville, filed an action under § 1983 challenging the constitutionality of an ordinance restricting panhandling in

---

118   710 F. Supp. 2d at 350 n.6.

the area. The district court dismissed the action, finding the ordinance to be a content neutral, permissible time, manner, place restriction. The plaintiffs appealed and the city cross-appealed the determination that the plaintiffs had standing.

The Court of Appeals for the Fourth Circuit reversed and remanded, finding that the plaintiffs had standing to challenge the law and that the district court had erred in dismissing the case. The court found that ordinance was not content neutral as it prohibited solicitations that requested immediate donations or things of value, yet allowed donations of things that have no "value." The Court also accepted plaintiffs' argument that the city enacted the ordinance to reduce the presence of impoverished people on the downtown mall in violation of the First Amendment, noting that the ordinance contained no statement of purpose and none of the evidence properly before the Court indicated the city's reasons for enacting it.

On remand, district court found that the City of Charlottesville failed to carry its burden of showing the content-neutrality of the ordinance, which "plainly distinguishes between types of solicitations on its face"; thus holding the ordinance to be content-based. Accordingly, the city's motion for summary judgment was denied and plaintiffs' motion for summary judgment was granted. The Court enjoined the city from enforcing the ordinance and plaintiffs were directed to submit petitions for damages and costs. The city appealed the decision, but parties reached an undisclosed settlement arrangement and the case was dismissed.

**Chase v. Town of Ocean City, 825 F. Supp. 2d 599 (D. Md. 2011)**

The plaintiff, a spray paint artist and street performer, challenged the constitutionality of ordinances that restricted "peddling, soliciting, hawking or street performing" on the boardwalk, prohibited all commercial activity on and near the boardwalk, and imposed licensing requirements. In a motion for a preliminary injunction, the plaintiff argued that the ordinances were content based restrictions that unconstitutionally infringed on his right to free expression under the First Amendment. The court granted the motion in part and denied the motion in part. In reaching its decision, the court found that the ordinance was a reasonable time, place, and manner restriction.

However, the Court found that the city had failed to demonstrate that the ordinance was narrowly tailored to serve a significant government interest and had failed to leave open an adequate alternative channel of communication. The court further found that the law's registration scheme broadly restricted speech and failed to strike a balance between the speech affected and governmental interests.

**Jones v. Wasileski, Case No. 09 CV 00032 (W.D. Va., filed Feb. 5, 2009)**

Plaintiff Reuben Jones, a homeless individual proceeding pro se, brought suit under § 1983 against five individual Roanoke police officers and the Roanoke police chief for arresting or citing the plaintiff for violating an ordinance prohibiting aggressive soliciting. Each citation or arrest occurred while Jones was standing on a highway on-ramp or street median holding a sign stating "If Jesus was right here, would you help him? God bless you!" The plaintiff alleged that these arrests and citations violated his First Amendment rights.

The court granted the defendants' motion for summary judgment finding they were subject to qualified immunity. The court further found that the ordinance prohibiting solicitation in certain areas, such as roadways, was content neutral and furthered the government's significant interest in ensuring safe and efficient roadways.

### Sixth Circuit

**Speet v. Schuette, 726 F.3d 867 (6th Cir. 2013)**

Homeless plaintiffs who were repeatedly arrested or ticketed under a Michigan anti-begging statute, which provided that begging in a public place amounted to disorderly conduct carrying a penalty of up to 90 days' jail, brought suit challenging the law as a violation of their First and Fourteenth Amendment rights.

The District Court for the Western District of Michigan found the law unconstitutional in violation of the First Amendment and the equal protection clause of the Fourteenth Amendment and granted the plaintiffs' motion for partial summary judgment. The Court of Appeals for the Sixth Circuit unanimously affirmed the district court's decision, holding that the statute was not narrowly tailored to achieve Michigan's interest in preventing fraud and thus violated the First Amendment, but did not decide the Fourteenth Amendment questions.

**Contributor v. City of Brentwood, 726 F.3d 861 (6th Cir. 2013)**

Vendors for The Contributor, a newspaper written and sold by homeless and formerly homeless persons, brought suit challenging the constitutionality of an ordinance that prohibited the sale or distribution of newspapers on public streets and to the occupants of motor vehicles. The plaintiffs argued that the ordinance violated their First Amendment right to free speech as it did not leave open adequate alternative channels of communication.

The District Court for the Middle District of Tennessee disagreed, finding that the ordinance did leave open adequate alternative channels of communication, and the Sixth Circuit affirmed on appeal, reasoning that it would be an onerous burden to require a municipality to prove the adequacy of alternative channels of communication.

**Eggleston v. City of Cincinnati, Case No. 1:10 CV 395 (S.D. Ohio)**

Paul Eggleston, a homeless individual, Greater Cincinnati Coalition for the Homeless, and Grace Place Catholic Worker House, challenged a city policy adopted on June 3, 2010, that conditions certification and funding of homeless shelters on the requirement that they discourage and punish panhandling. The policy would

not take effect until enacted as a city ordinance. The policy would also change the certification entity from the Greater Cincinnati Coalition for the Homeless to a city-funded agency. Plaintiff Eggleston alleged that he solicits money on the streets to support himself, plans to continue to do so, and as a result will no longer be able to reside at his current shelter or any other shelter in Cincinnati. The plaintiffs asserted that such a policy violates their First Amendment rights to free speech.

On November 11, 2010, the court dismissed the case without prejudice finding that, because the policy had not yet been adopted as a city ordinance and was therefore not yet effective, the claims were not ripe. No further action has been taken by the city to adopt the policy as a city ordinance.

**Henry v. City of Cincinnati, 2005 WL 1198814 (S.D. Ohio Apr. 28, 2005)**

Four homeless individuals and the CEO of the Homeless Hotline of Greater Cincinnati brought suit to challenge the constitutionality of a city ordinance that prohibits engagement in vocal solicitation without a valid registration. The city moved to dismiss on standing grounds. Because the plaintiffs asserted that they fear arrest due to their solicitation activities without registration, the court held that plaintiffs had alleged sufficient facts to overcome the motion to dismiss. Furthermore, because plaintiffs claimed that the registration scheme lacks the necessary procedural safeguards, they have standing to challenge the ordinance's allegedly overbroad registration requirements. The plaintiffs also alleged that the time, place, and manner restrictions are unconstitutionally vague and that the city ordinance is not narrowly tailored to serve a compelling government interest, but serves as a prior restraint on speech.

The court rejected the city's argument that the ordinance regulates only panhandling and that panhandling is merely commercial speech. However, the court held that the ordinance was content-neutral under the *Hill v. Colorado* standard. The court characterized the regulation as a time, place, and manner restriction and noted that the ordinance is not concerned with the message a solicitor communicates by requesting money. Lastly, the court found that the ordinance was justified by reference to the act of solicitation, not the content of the speech. Regarding constitutional review under intermediate scrutiny, the court held that the parties should be afforded an opportunity to present evidence. In addition, the court did not dismiss the registration requirement claim because it was not convinced by the city's argument that registration for solicitors is required to prevent fraud.

The parties settled in the fall of 2007. The settlement provided for a substantially revised solicitation ordinance that eliminated the registration requirement altogether and made the time, place, and manner restrictions on panhandling significantly less onerous. In addition, the city agreed to pay $10,000 in attorneys' fees.

**Northeast Ohio Coalition for the Homeless v. City of Cleveland, 105 F. 3d 1107 (6th Cir. 1997)**

The Northeast Ohio Coalition for the Homeless, which publishes a homeless street newspaper, The Homeless Grapevine, and a Mosque whose members sell the Nation of Islam newspaper, The Final Call, challenged a Cleveland city ordinance requiring distributors to apply and pay $50 for a peddler's license in order to distribute their papers in public places. The plaintiffs filed suit in U.S. District Court in 1994 alleging that imposition of a license requirement violated their rights to freedom of speech and press. On February 3, 1997, the U.S. Court of Appeals for the Sixth Circuit reversed the district court's decision and held that the licensing requirement and fee constituted permissible time, place, and manner restriction and were sufficiently narrowly tailored to further a legitimate government interest in preventing fraudulent solicitations.

Earlier, the district court had granted plaintiff's motion for summary judgment, holding that the licensing requirement violated their rights under the U.S. and Ohio Constitutions.[119] Noting that pursuant to the Supreme Court's decision in *Murdock v. Pennsylvania*, 319 U.S. 105 (1943), nominal fees are allowable to cover the costs associated with permissible regulation of speech, the district court stated that the city failed to claim that the fee was designed for such a purpose. Additionally, the district court stated that the license prevented some "speakers" from distributing their message since the fee was not tied to the peddler's ability to pay.

The Sixth Circuit subsequently denied plaintiffs' petition for a rehearing en banc,[120] and the Supreme Court denied plaintiff's petition for a writ of certiorari.[121]

**Greater Cincinnati Coalition for the Homeless v. City of Cincinnati, 56 F.3d 710 (6th Cir. 1995)**

The Greater Cincinnati Coalition for the Homeless (the "Coalition") and a homeless man originally filed a complaint against the City of Cincinnati in district court seeking injunctive, declaratory, and monetary relief for damages allegedly suffered as a result of a municipal ordinance which prohibited people from "recklessly interfere[ing] with pedestrian or vehicular traffic in a public place." Activities that were considered reckless interference included walking, sitting, lying down, and/or touching another person in a public place so as to interfere with the passage of any person or vehicle, or asking for money or anything else of value in a way that would "alarm" or "coerce" a reasonable person. The district court found that the plaintiffs lacked standing to challenge the ordinance and the plaintiffs appealed. The Court of Appeals for the Sixth Circuit found that neither the Coalition nor the homeless man had demonstrated a "direct injury-in-fact" or a threatened injury that could potentially result from enforcement of the ordinance,

---

119  *Northeast Ohio Coalition for the Homeless v. City of Cleveland*, 885 F. Supp. 1029 (N.D. Ohio 1995), rev'd on other grounds, 105 F.3d 1107 (6th Cir. 1997).
120  1997 U.S. App. LEXIS 9056 (6th Cir. Apr. 10, 1997).
121  *Northeast Ohio Coalition for the Homeless v. City of Cleveland*, 522 U.S. 931 (1997).

and that therefore plaintiffs did not have standing to challenge the ordinance. The Court of Appeals, however, did indicate that other potential challenges that demonstrated that the ordinance violated plaintiff's protected First Amendment rights under the U.S. Constitution might be successful.

### Seventh Circuit

### Norton v. City of Springfield, 768 F.3d 713 (7th Cir. 2014) and Norton v. City of Springfield 806 F.3d 411 (7th Cir. 2015)

The plaintiffs, two homeless persons who panhandled, sought a preliminary injunction barring the City of Springfield from enforcing an ordinance that prohibited vocal appeals, but not written requests, for immediate donations in the downtown historic district. The plaintiffs contended that the law was an unconstitutional content based restriction on speech in violation of the First Amendment.

The court denied the motion and found that the ordinance is a content neutral time, place, and manner restriction. The court further found that the restrictions were narrowly tailored to serve a significant government interest and that it left open sufficient alternative channels for communication.

The Seventh Circuit affirmed, holding that the ordinance was content neutral because the ordinance regulated only where a person may request money, not the marketplace of ideas implicated by the First Amendment.

The Seventh Circuit deferred consideration of a petition for rehearing until the Supreme Court decided *Reed v. Gilbert,* 135 S.Ct. 2218, (2015). In *Norton v. City of Springfield,* 806 F.3d 411 (7th Cir. 2015), the Seventh Circuit applied *Reed* to Springfield's ordinance.

Explaining that Reed describes content based discrimination as a "a law [that] applies to particular speech because of the topic discussed *or* the idea or message expressed." , the Seventh Circuit found that Springfield's ordinance regulates speech "because of the topic discussed" and "[a]ny law distinguishing one kind of speech from another by reference to its meaning now requires a compelling justification." The court noted Springfield has not contended that its ordinance is justified and therefore the Seventh Circuit reversed the judgment of the district court, and remanded for the entry of an injunction consistent with *Reed*.

### Pindak v. Cook County, No. 10 C 6237, 2013 WL 1222038 (N.D. Ill. March 25, 2013)

The plaintiff, who had routinely been ordered by security personnel to leave a public plaza where he was peacefully panhandling, filed suit against Cook County along with several public and private entities responsible for managing the property. The plaintiff argued that the uniform practice of removing panhandlers from the plaza violated the First Amendment both on its face and as applied to him, and sought declaratory, injunctive, and monetary relief.

The Court agreed that the plaintiff had adequately alleged a widespread practice of banning peaceful panhandling on the plaza and that the Cook County Sheriff knew that his deputies were violating the plaintiff's First Amendment rights by carrying out the ban. In January 2016, a jury found that the Cook County Sheriff's failure to adequately train defendant deputies caused a violation of plaintiffs' First Amendment rights and awarded the plaintiff compensatory damages in the amount of $1,500. In March 2016, the plaintiff settled with certain remaining defendants, but her suit against Cook County for attorneys' fees continued. Parties were able to finally resolve the matter in July 2016 and the case was dismissed in January 2017.

### Dellantonio v. City of Indianapolis, No. 1:08-cv-0780 (S.D. Ind., filed June 11, 2008)

A class of plaintiffs sued the city of Indianapolis, alleging that Indianapolis police were illegally prohibiting homeless individuals from passively soliciting contributions in public by holding out a cup. An existing city ordinance prohibits only the oral or written solicitation of contributions; passive solicitations are permissible. The complaint also alleged that, in connection with stops by the police for violations of the ordinance, the police have illegally seized homeless persons without cause or reasonable suspicion by detaining them until their identification was reviewed by the police, and have illegally seized their property.

The plaintiffs alleged that the police's actions related to the interference with lawful solicitations of contributions are violations of the First Amendment, and that the seizure of plaintiffs without cause or suspicion violates the Fourth Amendment. The plaintiffs also alleged that the seizure of property related to such police actions violates the Fourth and Fourteenth Amendments. The plaintiffs sought a permanent injunction against illegal enforcement of the existing anti-solicitation ordinance as well as an injunction against such illegal seizures of person and property.

The case was settled as to three of the plaintiffs. Two of the defendants lost touch with plaintiff's counsel and the court, and were dismissed from the case for failure to prosecute.

### Gresham v. Peterson, 225 F.3d 899 (7th Cir. 2000)

Jimmy Gresham, a homeless person, challenged an Indianapolis, Indiana ordinance that prohibited panhandling in public places from sunset to sunrise and also prohibited "aggressive panhandling." Gresham claimed the city ordinance violated his First Amendment right to free speech and his Fourteenth Amendment right to due process. The city argued the ordinance was a response to the public safety threat that panhandlers cause. The district court granted the city's motion for summary judgment and Gresham appealed to the Seventh Circuit. The Circuit Court affirmed the district court's opinion. The Court held Mr. Gresham's First Amendment right was not violated simply because it forbade him to panhandle at night. It found Mr. Gresham had many other feasible alternatives available to him during the day and during the night to reach Indianapolis crowds. Furthermore, the Court

affirmed the district court's opinion that a state court could not find the statute unconstitutionally vague.

### Thompson v. City of Chicago, 2002 WL 31115578 (N.D. Ill. Sept. 24, 2002)

Homeless plaintiffs, on behalf of themselves and a proposed class,[122] filed a § 1983 and First and Fourth Amendment claim against the city of Chicago for its enforcement of an ordinance prohibiting begging or soliciting money on public ways. The plaintiffs alleged that police officers had repeatedly ticketed and arrested them pursuant to the ordinance. The city moved to dismiss for failure to state a claim, and the court denied the motion. The court held that, although the plaintiffs' § 1983 claims were not exceedingly clear, they nevertheless met the bare pleading requirements necessary to state a claim for municipal liability under *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658 (1978). It next ruled that the plaintiffs had sufficiently stated a claim for municipal interference with their First Amendment interest in panhandling. Finally, the court found that the plaintiffs had stated a claim under the Fourth Amendment because police officials should have been aware that an ordinance similar to the Chicago ordinance had previously been held to violate the Constitution, and thus the police could not have had a good faith belief in the constitutionality of the ordinance.

The case settled with the city paying $99,000 in damages and an additional $375,000 in attorney's fees and other administrative costs. The city also repealed the panhandling ordinance as a result of the suit.

### Ninth Circuit

### Am. Civil Liberties Union of Idaho, Inc. v. City of Boise, 998 F. Supp. 2d 908 (D. Idaho 2014)

The ACLU of Idaho and local residents challenged a city ordinance prohibiting panhandling in public areas. The plaintiffs moved for a preliminary injunction, arguing that the restriction violated the plaintiff's free speech rights under the First Amendment.

The court granted the plaintiffs' motion with respect to certain portions of the panhandling law governing non-aggressive solicitations, finding that the ordinance was not content neutral, as it only restricted solicitation speech for donations of money or property, treating it differently from other solicitation speech.

The court further held that the ordinance was not narrowly tailored to meet a significant governmental interest. However,

the ordinance contained a severability clause and the court noted that the aggressive solicitation prohibition was likely to survive a constitutional challenge since it related to the safety and protection of its citizens, as was the section restricting solicitation of donations where the solicitor has to step into the roadway.

Pursuant to a settlement, the city repealed the enjoined portions of the ordinance.

*The Law Center served as co-counsel in this case, along with the ACLU of Idaho.*

### Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936 (9th Cir. 2011) (en banc)

Organizations representing the interests of day laborers challenged an ordinance barring individuals from standing on a street or highway and soliciting employment, business, or contributions from an occupant of any motor vehicle. The plaintiffs argued that the ordinance, on its face, was an unconstitutional restriction on protected speech in violation of the First Amendment.

The district court agreed with the plaintiffs and issued a preliminary injunction barring the city from enforcing the ordinance, which was affirmed on appeal. After the plaintiffs filed cross-motions for summary judgment, the district court issued final judgment for the plaintiffs. However, a panel of the Ninth Circuit reversed the district court's judgment, considering itself bound by the decision in *ACORN v. City of Phoenix*, 798 F.2d 1260, 1271 (9th Cir. 1986), in which a regulation designed to preclude solicitors from intruding upon occupants of vehicles temporarily stopped at traffic lights was upheld. In an *en banc* ruling, the Ninth Circuit affirmed the district court decision, overruling ACORN to the extent it was inconsistent with its ruling.

The Ninth Circuit disagreed with the city's argument that the ordinance only prohibited solicitation conduct and not solicitation speech, noting that the ordinance applies to more than an actual physical exchange and that 'solicitation' was broadly defined. Further, the court was not bound by the city's assurances that the ordinance had not and would not be enforced against anything other than solicitations causing motorists to stop in traffic. The Ninth Circuit found the restriction was not narrowly tailored to achieve the city's interest in promoting traffic flow and safety, as significantly more speech was restricted than was necessary, and the city could have employed various less restrictive alternatives to achieve its goals. While the Ninth Circuit accepted that the city need not necessarily employ the least restrictive alternative, it stated that the city may not select an option that unnecessarily imposes significant burdens on First Amendment protected speech.

### American Civil Liberties Union of Nevada v. City of Las Vegas, 333 F.3d 1092 (9th Cir. 2003)

Plaintiffs, including the American Civil Liberties Union of Nevada (ACLU), sued, among other defendants, the City of Las Vegas and Fremont Street Experience Limited Liability Corporation ("FSELLC"),

---

122  In *Thompson v. City of Chicago*, 2002 WL 1303138 (N.D. Ill. 2002), the magistrate judge dismissed as moot the plaintiffs motion for class certification for injunctive relief, but recommended that the court certify the proposed class for monetary relief. In assessing the requirements for class certification, the magistrate found the common question of the city's enforcement of the panhandling ordinance predominated over individual damages questions. He also found that the class action device was a superior method for resolving the dispute, because the potential class size was great, and there was a substantial likelihood that many members of the class were either unaware of the alleged violations of the ordinance or incapable of bringing their own actions.

challenging prohibitions on distributing written material and soliciting funds and restrictions on educational and protest activities at an open mall area. The plaintiffs sought a preliminary injunction against the enforcement of several Las Vegas Municipal Code sections and rules and policies of the FSELLC. The district court granted the preliminary injunction, barring enforcement of a section of the Las Vegas Municipal Code prohibiting leafleting and a "standardless licensing scheme," but did not grant a preliminary injunction regarding enforcement of a second section regarding solicitation.[123] The district court granted defendants' motion for summary judgment regarding plaintiff's challenge to the anti-solicitation ordinance. The court found that the ban on solicitation did not violate the First Amendment because (i) the mall in question was a non-public forum, (ii) the ban on solicitation was viewpoint neutral, and (iii) the ban was reasonable considering the commercial purposes of the mall.

The plaintiffs appealed to the Ninth Circuit. In its "forum analysis," the Ninth Circuit emphasized three factors: "the actual use and purposes of the property . . . the area's physical characteristics, including its location and the existence of clear boundaries delimiting the area . . . and traditional or historic use of both the property in question and other similar properties." Because the area at issue was used as a public thoroughfare, was open to the public and integrated into the city's downtown, and, like other "public pedestrian malls and commercial zones," was historically used as a public forum, the court held that the mall was a traditional public forum for purposes of the First Amendment. The court remanded the case regarding the anti-solicitation ordinance to the lower court, where, because the area is a public forum, the city must "show that the limitation is narrowly tailored to serve a significant government interest without 'burden[ing] substantially more speech than is necessary to further the government's legitimate interests."

The city petitioned for a writ of certiorari to the Supreme Court, arguing that the Ninth Circuit decision diverges from the public forum jurisprudence of the Supreme Court and the Seventh and Eleventh Circuits, which would allow the city to treat the property as a non-public forum by changing the property's primary use. The city also argued that the decision unduly constricts the government's ability to make optimal use of publicly owned property for commercial and entertainment purposes. Opposing the city's petition for writ of certiorari, the ACLU argued that the Ninth Circuit applied traditional forum analysis to the facts of the case, the city and businesses have always faced the Court's established view that streets and sidewalks are natural public fora, and the Ninth Circuit decision does not involve analysis with respect to when a city can close a public forum because Fremont Street remains open to public pedestrian traffic. The Supreme Court denied the petition for writ of certiorari.[124]

**Los Angeles Alliance for Survival v. City of Los Angeles, 224 F.3d 1076 (9th Cir. 2000)**

This suit challenged the city's ordinance banning aggressive solicitation. The ACLU and co-counsel argued that the ordinance was overbroad and violated the First Amendment to the United States Constitution and the Liberty of Speech Clause of the California Constitution. The federal district court issued a preliminary injunction in October 1997. The city appealed, and requested certification of three questions to the California Supreme Court. On September 15, 1998, the Ninth Circuit issued an order requesting the California Supreme Court to certify the question of whether an ordinance regulating the time, place, and manner of solicitation of money or other thing of value, or the sale of goods or service, is content-based, for purposes of the liberty of speech clause of the California Constitution.

The California Supreme Court accepted certification and issued an opinion concluding that regulations like the ordinance should be deemed content neutral for purposes of the California Constitution.[125] The Ninth Circuit affirmed the district court's decision that granted a preliminary injunction barring enforcement of Los Angeles Ordinance No. 171664. The Court ruled that even though, as the California Supreme Court certified, regulation of solicitation is content-neutral, Los Angeles' particular statute infringed upon the right to free speech under the U.S. Constitution, and when a statute regulating solicitation does that, it raises serious questions of hardship. The court found the "balance of hardships" tipped in favor of the appellees, who would be irreparably injured without the preliminary injunction. The case ultimately settled, resulting in the removal of ordinance language that had permitted persons to order panhandlers off property surrounding restaurants, bus stops and other places. The prohibition on solicitation within ten feet of an ATM remains in the ordinance.

*The Law Center filed an amicus brief in support of plaintiffs-appellees.*

**Blair v. Shanahan, 919 F. Supp. 1361 (N.D. Cal. 1996)**

In 1991, plaintiff challenged a California state statute that prohibited "accost[ing] other persons in any public place or in any place open to the public for the purpose of begging or soliciting alms."[126] The U.S. District Court for the Northern District of California held the California state anti-begging statute to be unconstitutional on its face, concluding that the statute violated the First Amendment because it was content-based, was aimed specifically at protected speech in a public forum, and was not narrowly tailored to meet a compelling state interest. The court also held that the statute violated the plaintiff's right to equal protection under the Fourteenth Amendment since it distinguished between lawful and unlawful conduct based on the content of the communication at issue.

---

123  13 F. Supp. 2d 1064, 1068 (D. Nev. 1998).

124  *City of Las Vegas v. American Civil Liberties Union of Nevada*, 540 U.S. 1110 (2004)

125  No. 97-06793 RAP (C.D. Cal. July 25, 2000).

126  *Blair v. Shanahan*, 775 F. Supp. 1315, 1327 (N.D. Cal. 1991), aff'd in part and dismissed in part on other grounds, 38 F.3d 1514 (9th Cir. 1994).

*Tenth Circuit*

The city settled its case with the plaintiff for damages, but then, joined by the State, moved to have the declaratory judgment modified or vacated. The district court rejected this motion.[127] On appeal, finding that the city had mooted its own appeal by settling the case, the Ninth Circuit refused to order the district court to vacate the declaratory judgment but remanded the case to the district court for a decision on whether to do so.[128] The district court then vacated its declaratory judgment on the ground that in light of the specific circumstances of the case, it would be inequitable to the state to permit the order invalidating a state statute to stand without the possibility of intervention by the state and appellate review of the constitutional issue involved.

**Sunn v. City and County of Honolulu, 852 F. Supp. 903 (D. Haw. 1994)**

A street musician was arrested nine times during 1991 and 1992 for peddling. The state court later found that the peddling ordinance did not cover Sunn's activity, and Sunn subsequently brought suit against the City and County of Honolulu and certain police officers for violation of Sunn's rights under § 1983 and for common law false arrest. On March 4, 1994, the court granted summary judgment regarding the §1983 claim in favor of the individual officers because they had demonstrated the requirements for qualified immunity—a "reasonable officer" could have "reasonably" believed that his or her conduct was lawful in light of clearly established law and the information that the officer had at the time. The City and County of Honolulu (the "City") subsequently moved for summary judgment based on the § 1983 claims arguing that if the officers had been found to be immune from liability under the statute, vicarious liability could not attach to the City for the officer's actions. The district court found that granting summary judgment in favor of the officers based on qualified immunity did not mean that the plaintiff did not possibly suffer a violation of his constitutional rights. The city argued that the test used to conclude that the officers had qualified immunity was the same as the test to determine if there had been probable cause for Sunn's arrests. The court indicated that the test to determine whether the officers had qualified immunity was not the same as the test for probable cause and that there were still pending issues of fact concerning probable cause. Therefore, the court concluded that the officers could potentially be found to have arrested Sunn without probable cause and the city could potentially be held liable for such a Constitutional violation. Accordingly, the city's motion for summary judgment of the § 1983 claims was denied. Subsequently, following a bench trial the court permanently enjoined the defendants from arresting Sunn for his musical performances and awarded him $45,220 in general and special damages.

**Browne v. City of Grand Junction, 27 F. Supp. 3d 1161 (D. Colo. 2014), 136 F.Supp.3d 1276 (D. Col. 2015) and 85 F.Supp.3d 1249 (2015)**

Panhandlers in the City of Grand Junction brought a First Amendment challenge to an ordinance prohibiting begging, the solicitation of employment, business contributions or sales and the collection of money from the occupant of a vehicle traveling on public streets, and sought a preliminary injunction and temporary restraining order.

The Court found that the provision constituted a content based restriction on speech that was not narrowly tailored to serve the city's interest in public safety and ordered a temporary restraining order pending a final ruling on the merits.

On April 2, 2014, the city adopted an emergency ordinance amending portions of the challenged panhandling ordinance. Although some of the challenged provisions were omitted in the amended ordinance, other provisions remained. The district court removed the temporary restraining order in light of the amended ordinance, but reserved ruling on plaintiffs' claim that the ordinance violated the First Amendment and their rights to equal protection and due process. In June 2015, the Court ruled that plaintiffs had stated valid First Amendment, equal protection, and due process claims, denying the city's Motion to Dismiss.

Both parties filed cross motions for summary judgment. In September 2015, relying on *Reed v. Town of Gilbert*, the district court held that that the ordinance was a content-based restriction that did not withstand a strict scrutiny analysis. Accordingly, the court struck down five subsections of the ordinance. The court granted summary judgment in favor of defendants on plaintiffs' equal protection and due process claims. The city was permanently enjoined from enforcing the stricken subsections of the ordinance, plaintiff was awarded $1.00 in nominal damages, and defendant was required to pay attorneys' fees and costs. Two months later, the parties reached a settlement with regard to the payment of attorneys' fees and costs.

**Wilkinson v. Utah, 860 F.Supp.2d 1284 (D. Utah 2012)**

Several plaintiffs who engaged in panhandling challenged the constitutionality of an ordinance prohibiting a person from sitting, standing, or loitering on or near a roadway for the purpose of soliciting contributions from the occupant of a vehicle.

The court granted summary judgment in plaintiffs' favor with respect to the plaintiffs' First Amendment claims against Utah, finding that the statute was unconstitutional even if construed as a content neutral time, place or manner restriction, because the regulation was not narrowly tailored to serve the government's legitimate interests of traffic and public safety as it was substantially broader than necessary.

---

127   795 F. Supp. 309 (N.D. Cal. 1992).
128   38 F.3d 1514, 1519-20 (9th Cir. 1994).

**Jones v. City of Denver, No. 96-WY-1751 (D. Colo. 1996)**

Four homeless individuals, along with two non-homeless individuals with an interest in the information communicated by those who beg, brought an action against the City and County of Denver, Denver Chief of Police, and two police officers challenging the constitutionality of Colorado's state law making it a crime to "loiter . . . for the purpose of begging."[129] The parties reached a settlement agreement in which defendants stipulated that the law violates the due process clause, and have agreed to a declaratory judgment and injunction prohibiting enforcement of the law in the City of Denver. The court approved the proposed settlement agreement and the state legislature subsequently repealed the suspect language.

### Eleventh Circuit

**Homeless Helping Homeless, Inc. v. City of Tampa, No. 8:15-CV-1219-T-23AAS, 2016 WL 4162882 (M.D. Fla. Aug. 5, 2016)**

Homeless Helping Homeless, a charity offering emergency shelter to the homeless, brought suit against the City of Tampa, Florida to challenge a city ordinance banning the solicitation of "donations or payment" in parts of downtown Tampa. The charity alleged that its staff and volunteers were no longer able to solicit money in parts of downtown Tampa following the city's ban, causing the charity to lose tens of thousands of dollars and forcing it to reduce services. The charity sued for an injunction against the City of Tampa's enforcement of the ordinance and for a declaration that the ordinance unconstitutionally infringes its right to free speech under the First Amendment of the U.S. Constitution and a similar provision in the Florida Constitution. It argued that the ordinance is a content-based regulation of speech that cannot withstand strict scrutiny under the First Amendment. In response, the City of Tampa argued that the ordinance is not subject to strict scrutiny because it "is not facially content based."

In a ruling on the pleadings, the court permanently enjoined the City of Tampa from enforcing its ordinance after determining that it unconstitutionally infringes the right of free speech protected by the First Amendment of the U.S. Constitution and by the Florida Constitution. The court agreed with Homeless Helping Homeless that soliciting "donations or payment" is a form of speech protected by the First Amendment, that Tampa's ordinance constituted a regulation of that speech in a traditional public forum, and that Tampa's ordinance is a content-based regulation of that speech. Since the city's ordinance imposes a content-based regulation of speech in a traditional public forum, the court held that is presumptively unconstitutional absent a demonstration from the City of Tampa that the ordinance constituted the least restrictive means of advancing a compelling government interest. After the City of Tampa admitted that no compelling government interest supports the ordinance, the court held that the ordinance failed the strict scrutiny test and did not pass constitutional muster.

the court's decision on the constitutionality of the ordinance turned on its application of the U.S. Supreme Court's decision in *Reed v. Town of Gilbert* an opinion which the court believed dealt with different and factually discrete issues but was "written in such sweeping terms that the opinion appears to govern" the dispute over Tampa's ordinance. The court noted that without *Reed*, which "governs for the moment (despite prominently featuring the badges of a transient reign)," it would have ruled to uphold Tampa's ordinance.

**Cosac Foundation Inc. v. City of Pembroke Pines, No. 12-62144, 2013 WL 5345817 (S.D. Fla. 2013)**

The plaintiff, who ran a street newspaper distributed by homeless persons entitled, The Homeless Voice, challenged the constitutionality of a permitting scheme governing roadway canvassing and the solicitation of charitable donations. The plaintiff argued that the ordinance was unconstitutionally overbroad, underinclusive, and impermissibly restricted speech based on its content. Alternatively, the plaintiff argued that, even if the ordinance was content neutral, it could not be upheld as a reasonable time, place, or manner regulation.

The district court granted the city's motion for partial summary judgment, finding that the ordinance was content neutral as it applied to people and organizations whether commercial or charitable and it did not distinguish speech on the basis of the views expressed. Further, the court concluded that the restriction was narrowly tailored to promote a substantial government interest in providing safe roadways and free-flow traffic.:

In November 2013, the court granted the city's Supplemental Motion for Summary Judgment, finding that plaintiff failed to demonstrate any injury in fact, particularly given that the city provided an affidavit attesting that the application of the ordinance did not apply to the plaintiff, and the facts did not suggest that there was any threat that the city would apply its permitting scheme to the plaintiff.

**Booher v. Marion County, No. 5:07-CV-282-Oc-10GRT (M.D. Fla. filed July 11, 2007)**

David Booher, a homeless individual living in Marion County, sued the county challenging the constitutionality of a county ordinance adopted in May 2006, that requires all persons who solicit, beg, or panhandle in public places to obtain a "panhandler's license."[130] In order to obtain such a license, an individual must pay a $100 application fee, pass a background check regarding past panhandling violations and felonies or misdemeanors, and complete an application (which includes a requirement that a permanent home address and description of the location and timing of solicitation activity be provided). Further, in deciding whether to grant the license, the county administrator must find that "the location and time of the [panhandling] activity will not substantially interfere with the safe and orderly movement of traffic."[131]

---

129   CO. REVISED STAT. ANN. tit. 18, art. 9, § 112(2)(a) (West 1996).

130   Marion County Code of Ordinances, Art. XIV, §10-403 (2007).

131   Id.

Following the adoption of the ordinance, plaintiff Booher was repeatedly arrested, fined and sentenced to jail in violation of the ordinance. In response, Booher filed suit against the county seeking compensatory damages and to enjoin the enforcement of the ordinance, based on claims that the ordinance violates his right to free speech, due process and equal protection. In September 2007, the court granted Booher's motion for a preliminary injunction prohibiting the county from enforcing the ordinance during the pendency of the action. In granting the preliminary injunction, the court found that there is a substantial likelihood that the ordinance is an unlawful prior restraint on speech, is a content based restriction on speech, violates the equal protection clause by impermissibly distinguishing between who can and cannot engage in charitable solicitation and is overbroad and void for vagueness by failing to sufficiently define prohibited conduct and providing the county administrator with excess discretion.

After Booher had filed a motion for partial summary judgment and a permanent injunction, the county repealed the ordinance. In August 2008, the parties submitted a settlement agreement. The county agreed not to re-enact the challenged version of the ordinance and to pay Booher $10,000 for settlement of his damages claims. The defendants agreed that Booher was the prevailing party in the action, and to pay reasonable litigation costs and attorneys' fees.

### Chase v. City of Gainesville, 1:2006-cv-00044; 2006 WL 2620260 (N.D. Fla. Sept. 11, 2006)

In March 2006, a group of homeless individuals brought suit to challenge the constitutionality of three anti-solicitation laws under which they had been cited and/or threatened with citations. Two of the laws prohibited holding signs on sidewalks or by the side of the road to solicit charitable contributions. The third law required anyone soliciting charitable contributions on sidewalks or by roadways to obtain a permit. The plaintiffs alleged that the laws were content-based, overbroad and vague, and that they constituted prior restraint on speech. The plaintiffs argued that charitable solicitation is protected speech activity; public streets and sidewalks are traditional public fora; and the permit requirements under the laws at issue were prior restraints on speech. Furthermore, the permit requirements were not subject to narrow, objective and definite standards and adequate procedural safeguards. The plaintiffs also argued that the laws were not reasonable time, place, and manner regulations; that the laws were overbroad to address the interests of public safety and vehicular safety; and that the laws were void for vagueness for failing to define core terms and phrases, such as "solicit" and "impeding, hindering, stifling, retarding, or restraining traffic."

The court found that plaintiffs had shown a substantial likelihood of success on the merits and granted plaintiffs' motion for a preliminary injunction. The court noted that the city code only allowed 501(c)(3) organizations, and not individuals, to qualify for a charitable solicitation permit. The court also found that plaintiffs' loss of their First Amendment freedoms constituted irreparable injury and that an injunction would not harm the public interest.

In September 2006, the parties agreed to a partial settlement, under which the city and all of its officers and employees would be subject to a permanent injunction enjoining enforcement of the three laws at issue. The parties agreed that "the activity of standing on a public sidewalk, peacefully holding a sign and not otherwise violating any lawful statute, ordinance, or order is a protected First Amendment activity." The city also agreed to pay reasonable damages to plaintiffs and reasonable litigation costs and attorney's fees to plaintiffs' counsel. In December 2006, the parties reached a full and complete settlement of the case against the defendant sheriff. The court granted plaintiffs' unopposed motion for a permanent injunction against the defendant sheriff and for a declaration that the challenged statutes were facially unconstitutional.

In July 2007, after the case had been dismissed, the city approved an ordinance prohibiting "[b]eggars, panhandlers, or solicitors . . . from begging, panhandling, or soliciting from any operator or occupant of a vehicle that is in traffic on a public street . . . ." The plaintiffs filed a motion for order to show cause why defendant should not be held in contempt for violating the court's order ratifying, approving and adopting the parties' settlement agreement and issuing a permanent injunction. Plaintiffs noted that an individual could violate the ordinance even if the individual did not "step into a public roadway, pose any risk to public safety, or impede traffic flow." Further, the ordinance would "necessarily include portions of the public sidewalk and would serve to prohibit Plaintiffs and other individuals from peacefully holding a sign and engaging in charitable solicitation on City sidewalks."

In March 2008, the court denied the motion for order to show cause. The court reasoned that for a person to violate the amended ordinance, "he would have to solicit charitable donations and accept the donation while the vehicle is in a public street currently in use;" which was not contemplated by the permanent injunction. The court also found no chilling effect on First Amendment protected speech that was the subject of the permanent injunction, on the ground that the amended ordinance does not prohibit the right to solicit charitable contributions from a sidewalk, but rather restricts transactions in traffic.

### Horton v. City of St. Augustine, 272 F.3d 1318 (11th Cir. 2001)

A "one-man band" street performer challenged an ordinance regulating street performances in a four-block area of St. Augustine on grounds of vagueness, overbreadth, and as an invalid time, place, and manner restriction. The district court granted a preliminary injunction against the enforcement of the ordinance, finding that it failed to give proper notice as to what conduct it prohibited, and it promoted arbitrary and discriminatory enforcement. On the city's appeal, the Eleventh Circuit first held that the case was not mooted by the city's amendment of the ordinance following entry of the preliminary injunction. The court then ruled that the district court had applied the wrong standard for facial challenges based on vagueness, and that under the proper standard, the ordinance did not suffer for vagueness. It precisely identified where in the city it applied and included a sufficiently precise definition of the

word "perform." The court distinguished the loitering ordinance invalidated in *City of Chicago v. Morales*, 527 U.S. 41 (1999). The ordinance also gave law enforcement adequate guidelines for what constitutes a street performance. The Eleventh Circuit also held that the ordinance was not unconstitutionally overbroad on its face, as it specified a limited area in which distinct means of expression and conduct could not take place. The ordinance left many types of speech untouched. As to the time, place, and manner challenge, the court found that the restriction was valid. It was viewpoint neutral and promoted justifiable enumerated municipal purposes.

### Smith v. City of Ft. Lauderdale, 177 F.3d 954 (11th Cir. 1999)

James Dale Smith, a homeless person, challenged a Ft. Lauderdale city regulation Rule 7.5(c) that proscribes begging on a certain five-mile strip of beach and two adjacent sidewalks on behalf of himself and a class of homeless persons. The plaintiff initially brought suit in the U.S. District Court for the Southern District of Florida; that court granted summary judgment in favor of the defendant city. The Court of Appeals affirmed the district court's decision. The Court ruled that, although begging is a form of speech and beaches and sidewalks are public forums, the city made a determination that begging negatively affected tourism. Furthermore, since tourism is a major contributor to the city's economy and begging can occur in other parts of the city, the court found the anti-begging ordinance "narrowly tailored to serve the City's interest in providing a safe, pleasant environment and eliminating nuisance activity on the beach."

### Chad v. City of Ft. Lauderdale, 66 F. Supp. 2d 1242 (S.D. Fla. 1998)

Plaintiffs challenged enforcement of Ft. Lauderdale's ordinance prohibiting soliciting, begging, or panhandling on the city's beach and adjacent sidewalk. The district court denied plaintiffs' motion for a preliminary injunction, and both parties filed motions for summary judgment. The district court granted the city's motion and denied plaintiffs' motion. The plaintiffs argued the ordinance violated the Fourteenth Amendment to the U.S. Constitution because it unconstitutionally limited free speech by prohibiting speech "asking for" something. The plaintiffs argued this prohibition was vague and therefore unconstitutional. The court rejected this argument, noting that the "asking for" behavior the statue covers is sufficiently clear as to what is being prohibited. The plaintiffs also argued the ordinance was overbroad because begging, panhandling, and solicitation are forms of protected expression. The court also rejected this contention holding that although the ordinance was broad enough to include protected speech, it satisfied the reasonable time, place, and manner restrictions on such speech, the ordinance was content neutral, and was narrowly tailored to promote the significant governmental interest of promoting a safe, healthful, and aesthetic environment.

### Atchison v. City of Atlanta, No 1:96-CV-1430 (N.D. Ga. July 17, 1996)

Seven homeless individuals filed suit in federal court one month prior to the opening of the Olympic Games in Atlanta, challenging Atlanta's ordinances prohibiting aggressive panhandling and loitering on parking lots, its enforcement of Georgia's criminal trespass law, and unlawful police harassment under § 1983. The U.S. District Court for the Northern District of Georgia granted a temporary restraining order barring enforcement of one provision of the parking lot ordinance, finding that the plaintiffs were likely to succeed on the merits of their claim that the provision was unconstitutionally vague.[132] In its ruling on plaintiffs' motion for a preliminary injunction, the court held that the provision of the anti-aggressive panhandling ordinance that prohibited "continuing to request, beg or solicit alms in close proximity to the individual addressed after the person to whom the request is directed has made a negative response" was unconstitutionally vague, and granted a preliminary injunction prohibiting enforcement of that specific provision. The court found that with the above exception, the ordinance "appears narrowly tailored to address the significant interests while affording panhandlers ample channels with which to communicate their message." The court also rejected the plaintiffs' equal protection claim, holding that they failed to show a city policy of violating their rights or failing to train police officers. Before the appeal was heard, the case was settled. As part of the settlement, the city agreed to redraft the panhandling and parking lot ordinances and require various forms of training for its law enforcement officers for the purpose of sensitizing them to the unique struggle and circumstances of homeless persons and to ensure that their legal rights be fully respected.

### District of Columbia Circuit

### Community for Creative Non-Violence v. Turner, 893 F.2d 1387 (D.C. Cir. 1990)

Community for Creative Non-Violence (CCNV) members challenged the constitutionality of Washington Metropolitan Area Transit Authority (WMATA) regulations requiring individuals to obtain permits to engage in free speech activities on WMATA property, permitting suspension of permits in emergencies, requiring that the speech be in a "conversational tone," and restricting the number of individuals who may engage in free speech at each station. The U.S. Court of Appeals for the D.C. Circuit affirmed the trial court ruling that struck down all of the provisions, finding that the above-ground free areas of the stations were public fora. The D.C. Circuit found that the permit requirement was an impermissible prior restraint, the suspension provision was not severable from the permit provision, the "conversational tone" provision was unconstitutionally vague, and the limit on the number of individuals burdened more speech than was necessary.

---

132   *Atchison v. City of Atlanta*, No 1:96-CV-1430 (N.D. Ga. June 21, 1996). The court later held that the plaintiffs lacked standing to challenge this ordinance.

## State Court Cases

### Arizona

**Baldwin v. D'Andrea, 13-cv-08161, 2013 WL 5823094 (Ariz. Oct. 4, 2013)**

An Arizona ordinance providing that, "[a] person commits loitering if such person intentionally [i]s present in a public place to beg, unless specifically authorized by law" was challenged on First Amendment grounds. Before responsive papers or motions were filed, the parties settled. Pursuant to the settlement, Arizona conceded that the statute was unconstitutional and subjected itself to an injunction preventing enforcement of the statute.

**State v. Boehler, 262 P.3d 637 (Ariz. App. 2011)**

The plaintiffs appealed their convictions under a section of the Phoenix City Code that made it unlawful to vocally panhandle after dark. The plaintiffs alleged that the ordinance infringed upon their free speech rights in violation of the First Amendment.

The court agreed, invalidated the challenged provision, and reversed the plaintiffs' convictions. The court stated that, even if the law could be construed as content neutral, it was unconstitutionally overbroad because the restriction applied to any cash solicitation after dark without regard to whether it was made in an offensive, aggressive or abusive manner and that the constitution does not permit government to restrict speech in a public forum merely because the speech may make listeners uncomfortable.

### District of Columbia

**McFarlin v. District of Columbia, 681 A.2d 440 (D.C. 1996)**

Two consolidated cases involved charges under the District of Columbia Panhandling Act.[133] Defendant Williams was arrested and charged with aggressive panhandling. Police discovered him panhandling and allegedly impeding the flow of pedestrian traffic at the top of a subway escalator. Defendants McFarlin and Taylor were arrested for panhandling at the top of a subway escalator. At the time, the two men had been giving a musical performance and had placed a bucket nearby where passersby could drop money. The court upheld Williams' conviction against his constitutional challenge while dismissing the charges against McFarlin and Taylor for insufficient evidence.

As to Williams, the court denied his First Amendment claim because the Act did not prohibit panhandling generally; instead, as interpreted by a transit authority regulation, the Act was limited to areas within fifteen feet of subway entrances. As such, the Act did not reach public fora, and was subject only to a reasonableness review. Since the Act did not target a specific viewpoint and served the significant government interest in promoting safety and convenience at a subway station, it did not violate the First Amendment. The court also denied Williams' vagueness claim, finding that the transit authority's construction of the Act as applying within fifteen feet of a subway station was a sufficiently definite description of the proscribed conduct.

As to McFarlin and Taylor, the court found that the Act was properly applied to them, since it reached broadly all attempts to solicit donations. However, due to the inexact testimony of the arresting officer, the court found the evidence insufficient to sustain the conviction.

### Florida

**State of Florida v. O'Daniels, 2005 WL 2373437 (Fla. App. 3 Dist. Sept. 28, 2005)**

Defendant O'Daniels was arrested and charged with violating a city ordinance requiring street performers and art vendors to have a permit. O'Daniels moved to dismiss the charge, claiming that the ordinance violated the First and Fourteenth Amendments of the U.S. Constitution and a provision of the Florida Constitution. The county court found the ordinance unconstitutional because it unnecessarily infringed on various constitutional rights.[134] First, the permit-issuing scheme lacked adequate procedural safeguards to avoid unconstitutional censorship. Second, the ordinance was not content-neutral, was not narrowly tailored to serve a significant government interest, and did not leave open ample alternative channels of communications. Third, the ordinance was void for vagueness because it failed to give fair notice of the conduct it prohibited and lacked guidelines for police to avoid arbitrary application. Fourth, the ordinance was facially invalid because it was overbroad. Finally, the ordinance violated substantive due process.

The city appealed, arguing that the ordinance was content neutral and was a reasonable time, place, and manner regulation. The city contended that the ordinance did not violate the First Amendment and was not overbroad in that it only restricted street performers and art vendors in certain areas. Furthermore, the city argued that it provided alternative channels of communication.

On appeal, the ACLU of Florida filed a brief amicus curiae supporting O'Daniels. The ACLU's argument focused on the First Amendment right to artistic expression. The ACLU contended that the ordinance has a chilling effect because of its permit requirements, criminal penalties, and provisions regarding indemnification. Moreover, the ordinance unconstitutionally delegates to the private sector the power of review. The appellate court affirmed the lower court's ruling. First, the court acknowledged that street performances and art vending are protected forms of expression under the First Amendment. Next, the court held that the ordinance was content neutral, noting that the city's principal justification for the ordinance was its "desire to preserve the 'reasonable expectations of residents to

---

133   See D.C. Code §§ 22-2301 to 2306 (2002).

134   Case No. B03-30046 (Miami-Dade County Ct. 2003).

the enjoyment of peace and quiet in their homes, the ability to conduct their businesses and serve their patrons uninterrupted, and the public's use of the City's rights-of-way.'" Therefore, the court applied the time, place, and manner test. Because the ordinance bans street performances and art vending throughout the city except for 11 specified locations, the court held that it is "substantially broader than necessary to address the City's stated traffic concerns." Lastly, while the city argued that the ordinance only prohibits performing and vending that takes place in a fixed location, the court held that "[i]t is up to the street performer to decide whether to stand in a fixed position rather than to perform on the move" and the alternative means of communication must not only exist but also be "ample." Accordingly, the court affirmed the holding that the ordinance violated the Constitutions of the United States and Florida.

**Ledford v. State, 652 So.2d 1254 (Fla. Dist. Ct. App. 1995)**

The defendant was arrested and charged with violating a St. Petersburg ordinance prohibiting begging for money upon any public way. On appeal, the court found that the ordinance could not survive strict scrutiny under a First Amendment analysis. The court held that begging was an expressive activity entitled to some First Amendment protection. The ordinance failed to distinguish between "aggressive" and "passive" begging. The city lacked a compelling reason for proscribing all begging in a traditional public forum, because protecting citizens from mere annoyance was not a compelling reason to deprive a citizen of a First Amendment right. The court also found the ordinance void for vagueness for its failure to define the terms "beg" or "begging."

**C.C.B. v. Florida, 458 So.2d 47 (Fla. Dist. Ct. App. 1984)**

The defendant was arrested and charged with violating a Jacksonville ordinance prohibiting all begging or solicitation of alms in public places. On appeal, the court struck the ordinance as facially unconstitutional under the First Amendment. The court found the ordinance represented an attempt to deprive individuals of a first amendment right, and it lacked a compelling justification, in that protecting citizens from mere annoyance was not a compelling reason for the ordinance.

*Indiana*

**Norred v. State, No. 82A01-1303-CR-94 (Oct. 29, 2013),** *aff'd* **996 N.E.2d 868; (Ind. App. 2013)**

The plaintiff was convicted of Class C misdemeanor panhandling, when a Sheriff's deputy saw him asking for money from motorists. The plaintiff appealed, arguing that the evidence was insufficient to support his conviction. In view of the deputy's testimony and the plaintiff's admission that he was trying to get money and had received some, the court concluded that the evidence was sufficient.

*Massachusetts*

**Benefit v. Cambridge, 424 Mass. 918 (1997)**

On May 14, 1997 the Massachusetts Supreme Judicial Court invalidated a state statute that prohibited "wandering abroad and begging," or "go[ing] about…in public or private ways… for the purpose of begging or to receive alms." The court found the prohibition to be a violation of plaintiff's right to freedom of speech.

This constitutional challenge was initiated in 1992 by Craig Benefit, a homeless man who had been arrested three times in Cambridge for begging in violation of the statute. In 1996, the Superior Court of Middlesex County ruled that the law was an unconstitutional restriction on speech in violation of the plaintiff's rights to freedom of speech and equal protection of the laws under the First and Fourteenth Amendments.

On appeal, in a strongly worded unanimous opinion the state's highest court held (1) that peaceful begging involves communicative activity protected by the First Amendment, (2) that the criminal sanction imposed was an improper viewpoint-based restriction on speech in a public forum, based on the content of the message conveyed, and (3) that the statute was not constitutionally viable when subjected to strict scrutiny. The court also emphasized that the prohibition on begging not only infringes upon the right of free communication, it also suppresses "an even broader right – the right to engage fellow human beings with the hope of receiving aid and compassion." The court soundly rejected the state's argument that the statute supports a compelling government interest in preventing crime and maintaining safe streets.

*The Law Center filed an amicus brief in support of the plaintiff-appellee.*

*Minnesota*

**State of Minnesota v. McDonald, No. 03085478 (Minn. Dist. Ct. 2004)**

A homeless man charged with violating a Minneapolis ordinance that prohibited begging in public or private areas challenged the ordinance. The defendant was holding a begging sign and had approached vehicles when the police ticketed him. He had been cited under the same ordinance several times before. The City of Minneapolis argued that the governmental interest behind the statute is to address the dangers of begging because the manner in which beggars ask for money can be intimidating, dangerous, can involve unwanted touching, and frighten people who are approached.

The court found that begging is free speech protected by the First Amendment and that the ordinance offers no alternatives for beggars to express themselves. The judge looked to *Loper v. New York City Police Department*,[135] in which the court found begging

---

135   999 F.2d 699 (2d Cir. 1990).

to be a protected right, and noted that there was little difference between those who solicit for themselves and those who solicit for organized charities. The court rejected the city's argument, saying that there are at least some beggars who are peaceful as well as charity workers who are aggressive or intimidating, and there also are other state statutes that address threatening behavior generally that would already cover the behavior the ordinance was trying to address.

### Nevada

**Heathcott v. Las Vegas Metropolitan Police Officers, No. CV-S-93-045 (D. Nev. Mar. 3, 1994)**

A homeless man challenged a Nevada state statute that prohibited loitering with the intent to beg. The district court found that the law effectively prohibited all begging, which is constitutionally protected speech, and that since the statute was not narrowly tailored to meet any compelling government interest it was constitutionally overbroad. The court also noted that there was no serious harm posed to the public by peaceful begging and that conduct that may require regulation – including fraud, intimidation, coercion, harassment, and assault – are all covered by separate statutes.

### New Mexico

**ACLU of New Mexico v. City of Albuquerque, No. 2004 00355 (N.M. Dist. Ct. Bernalillo County 2004)**

The ACLU of New Mexico and an individual panhandler requested a declaratory judgment and an injunction against the enforcement of a pending anti-panhandling ordinance, alleging that it violated both free speech and due process rights under the New Mexico Constitution. The state district court judge granted a temporary restraining order in January 2004, barring the implementation of the ordinance. The ACLU settled with the city for a watered-down version of the ordinance, which went into force in January 2005. Under the new ordinance, Section 12-2-28, a police officer must give a warning before a citation is issued. If the person is caught violating the ordinance a second time in a six month period, then a citation can be written. The city also agreed to limit panhandling at night only in downtown or Nob Hill, that "flying a sign" is legal anytime and anywhere, and to rewrite or delete some of the more oppressive restrictions that infringed on people's First Amendment rights. The ordinance still, however, contained a number of restrictions on panhandling.

### New York

**People v. Hoffstead, 905 N.Y.S.2d 736 (N.Y. App. Term, Second Dep't. 2010)**

A New Rochelle, New York police officer arrested a homeless man who had asked the officer for a dollar. The defendant was charged with violating the state's law forbidding all begging[136] and with possession of a controlled substance found on his person during a search incident to arrest. The trial court granted his motion to dismiss both charges on the ground that the blanket begging prohibition was unconstitutional, following the reasoning of the U.S. Court of Appeals for the Second Circuit, which invalidated the state law in *Loper v. New York City Police Dep't*, 999 F.2d 699 (2d Cir. 1993). Maintaining that the Second Circuit ruling was not binding outside of New York City, the District Attorney appealed.

The Appellate Term affirmed. Citing the United States Supreme Court's case law establishing a First Amendment right to charitable solicitation, the state court found "no significant difference between making a contribution that is funneled through the administrative process of a charitable organization before reaching its ultimate recipients, and making a contribution directly to a beggar." After the appellate court's ruling, the New York legislature repealed the begging prohibition, along with other provisions of the state loitering law that had been held invalid by the courts. The New York Court of Appeals then declined to review the Appellate Term's ruling.

**People v. Schrader, 162 Misc. 2d 789, 617 N.Y.S. 2d 429 (Crim. Ct. 1994)**

The defendant was charged with unlawfully soliciting in a subway station in violation of a New York City Transit Authority rule. The defendant argued that the charge should be dismissed because the rule violated his right to free speech, which is protected by the New York State Constitution, and because the rule was broader than necessary to achieve a legitimate state objective. The court held that although begging in general was a form of protected speech under both the New York State and U.S. Constitutions, the subway system was not a public forum, and that a ban on begging in the subway system was a reasonable limitation on speech in the particular forum as a safety precaution. The court also found that the rule was not a viewpoint-based restriction on speech.

### Ohio

**City of Cleveland v. Ezell, 121 Ohio App.3d 570, 700 N.E.2d 621 (1997)**

The defendants in this case, who had been soliciting sales of newspapers to motorists stopped at red lights, were charged with violating a city ordinance which prohibited individuals from "standing on the street or highway and transferring any items to motorists or passengers in any vehicle or repeatedly stopping, beckoning to, or attempting to stop vehicular traffic through bodily gestures." The defendants appealed their lower court conviction, and argued that the ordinance was unconstitutional because it was overbroad and void for vagueness. On appeal, defendants argued that the ordinance at issue was impermissibly vague because it

---

136   N.Y. Penal Law §240.35(1) (repealed by L.2010, c. 232, §1, eff. July 30, 2010).

did not delineate specifically enough what type of conduct was prohibited. The Court of Appeals did not accept either argument and upheld the ordinance and defendants' convictions (however, one judge dissented asserting that the ordinance should have been found unconstitutional because it violated the free-speech public-forum doctrine).

### Texas

### State of Texas v. John Francis Curran, No. 553926 (Tex. Mun. Ct. City of Austin 2005)

In 2003, the Austin police issued John Curran, a homeless man, a $500 ticket for holding a sign asking for donations at a downtown intersection. The ordinance prohibited people from soliciting "services, employment, business or contributions from an occupant of a motor vehicle." The municipal court judge declared the city ordinance prohibiting panhandling to be unconstitutional because the law violates the First Amendment, explaining that it is not "narrowly tailored in time, place, and manner."

### Washington

### City of Lakewood v. Willis, 375 P.3d 1056 (Wash. 2016) (en banc)

Robert Willis, a homeless resident of Lakewood, Washington, was convicted of violating a municipal ordinance that prohibited "asking for money or goods as a charity, whether by words, bodily gestures, signs or other means . . . at on and off ramps leading to and from state intersections from any City roadway or overpass." Willis was issued a criminal citation for begging after a police officer saw him walk into the traffic lanes at an exit ramp off Interstate 5.

Willis appealed his conviction and raised several constitutional challenges to the anti-begging ordinance. Specifically, Willis argued that the entire ordinance violated his First Amendment free speech rights, was unconstitutionally vague in violation of the Fourteenth Amendment's due process clause, and violated the Fourteenth Amendment's equal protection clause by criminalizing poverty. The Court of Appeals affirmed Willis's conviction, and the Washington Supreme Court accepted his petition for review.

The Washington Supreme Court identified several errors with the lower appellate courts' analyses. First, both the superior court and the Court of Appeals rejected Willis' First Amendment challenge because they concluded that governments may restrict speech "in" a freeway ramp. In other words, because the trial record contained evidence that Willis entered the lane of vehicle travel in the ramp, the courts concluded that his speech occurred in a non-public forum and his constitutional challenge had to fail. In doing so, the Washington Supreme Court noted, the lower courts rewrote the ordinance so that it prohibited speech "in" free ramps instead of "at" both ramps and intersections. Thus, the Supreme Court held that the lower courts erred in rejecting Willis' facial First Amendment challenge, as his actual conduct was irrelevant as to whether the ordinance was constitutional.

Second, the Supreme Court reversed Willis' conviction because

the provisions of the ordinance under which Willis was convicted imposed content-based restrictions in a substantial number of locations that are traditional public forums (i.e., streets intersecting with freeway ramps). Accordingly, the Supreme Court concluded that those provisions were facially overbroad under the First Amendment.

### V. The Necessity Defense

### State Court Cases

### Iowa

### City of Des Moines v. Webster, 861 N.W.2d 878 (Iowa App. 2014)

After homeless individuals had been living under a bridge in the City of Des Moines for approximately ten months, the City of Des Moines posted a notice indicating they were illegally encroaching on the property of the City of Des Moines. The city gave them twelve days to either vacate the premises or be subject to immediate forcible removal or arrest. The only homeless shelter in Des Moines was often over-capacity in the cold weather months, and if the individuals took shelter there when it was over-capacity, they would be forced to sleep on a hard bench (no beds remaining) and abandon their possessions (no storage facility at the shelter). In order to prevent the city from evicting them from their encampments under the bridge, the plaintiffs asserted the necessity defense, which allows an individual to enter and remain on another's property without permission in an emergency situation when such entry is reasonably necessary to prevent serious harm. The privilege must be exercised at a reasonable time and in a reasonable manner. An administrative hearing was held and the administrative hearing officer found that the plaintiffs successfully asserted the "necessity defense" and concluded that the lack of available beds in the city shelter coupled with the cold weather created a necessity for the individuals to continue residing under the bridge. The city appealed.

The Court of Appeals for Iowa reversed and held that the necessity defense did not apply. The court held that the appellees' decision to remain in their encroachments under the bridge—endangering their lives and the lives of first responders—was not reasonably necessary to prevent the harm of staying in a crowded shelter and leaving their possessions unattended. Moreover, the court held that, unlike a "violent storm suddenly overtaking a ship," cold weather is not an "emergency" as anticipated under the relevant section of the Restatement of Torts. Rather, the court said that the homeless plaintiffs had constructed their encroachments in the warmer months, and in the colder months a 'warm and safe' shelter was available. Therefore, the court found that the plaintiff's decision to remain under the bridge was not reasonably necessary in light of all the circumstances.

**B. Challenges to Food Sharing Bans and Advocacy**

**Commonwealth of Massachusetts v. Magadini, 474 Mass. 593 (2016)**

The defendant was arrested in 2014 on seven counts of criminal trespass. In each instance, the police found the Magadini in privately-owned buildings where the he was the subject of no trespass orders. Four of the charges occurred during the evening, nighttime, or early morning hours of cold winter days. The defendant generally lived outside year-round, but during the winter months he tried to find sheltered areas to take refuge from the severe weather. The court noted that defendant had unsuccessfully attempted to rent an apartment, but did find lodgings at a local homeless shelter for three months. However, at the end of such three-month period, the homeless shelter refused him entry due to other issues.

Before trial and during the charge conference, the defendant requested a jury instruction on the defense of necessity, asserting that his conduct was justified as the only lawful alternative for a homeless person facing the "clear and imminent danger" of exposure to the elements. The trial judge denied the request, concluding that the defendant had legal alternatives to trespassing available. The defendant was convicted on all seven counts and the judge imposed concurrent sentences of thirty days in a house of correction as to each conviction.

On appeal, The Supreme Judicial Court of Massachusetts held that the defendant satisfied the foundational elements entitling him to the defense of necessity. The court reasoned that the common-law defense of necessity "exonerates one who commits a crime under the 'pressure of circumstances' if the harm that would have resulted from compliance with the law [...] exceeds the harm actually resulting from the defendant's violation of the law." As such, the necessity defense may excuse unlawful conduct "where the value protected by the law is, as a matter of public policy, eclipsed by a superseding value." While the Commonwealth argued the defendant did not present evidence that he was unable to rent an apartment or gain entry to a homeless shelter and thus did not satisfy the 'no legal alternative' requirement, the court held that the court does not require a defendant to show he or she exhausted all conceivable alternatives. Instead, a jury only needs to find that no alternatives were available. The court also held that a defendant need not show that he or she must leave his or her home town (an argument presented by the Commonwealth) in order to demonstrate no legal alternatives existed at the time of the incident. Ultimately, the court found that on all but one occasion, the extreme weather coupled with Magadini's inability to secure shelter entitled the defendant to a jury instruction on the defense of necessity. The court vacated those six convictions and remanded for a new trial.

**Federal Court Cases**

*Third Circuit*

**Chosen 300 Ministries, Inc. v. City of Philadelphia, 2012 WL 3235317 (E.D. Pa. Aug. 9, 2012)**

A collection of approximately fifteen religious organizations that had been providing food to hungry and homeless people in outdoor parks for up to twenty years sought a preliminary injunction to block enforcement of regulations banning outdoor feeding in all Philadelphia city parks. Plaintiffs argued that the regulations interfered with their free exercise of religion rights under the First Amendment and the Pennsylvania Religious Freedom Protection Act (PRFPA).

The district court granted the preliminary injunction and held that the policy violated the plaintiffs' rights under the PRFPA. The court also found that the regulations imposed a substantial burden on plaintiffs' exercise of religion by preventing them from sharing food with homeless people where they were found. The court did not address the First Amendment issue out of judicial restraint. In September 2012, the parties entered into an interim agreement whereby the city agreed to suspend enforcement of the food sharing ban, engage in discussions with plaintiffs regarding the city's outdoor food sharing issues, and pay the plaintiffs' attorneys' fees.

*Fourth Circuit*

**Stuart Circle Parish v. Board of Zoning Appeals of the City of Richmond, 946 F. Supp. 1225 (E.D. Va. 1996)**

Stuart Circle Parish, a partnership of six churches of different dominations in the Stuart Circle area of Richmond, Virginia, sought a temporary restraining order and permanent injunctive relief to bar enforcement against them of a zoning code limiting feeding and housing programs for homeless individuals. The ordinance limited feeding and housing programs to up to thirty homeless individuals for up to seven days between October and April. The plaintiffs conduct a "meal ministry" for forty-five minutes every Sunday, to provide "worship, hospitality, pastoral care, and a healthful meal to the urban poor of Richmond." Some, but not all, of the attendees are homeless. Neighbors of the host church complained to the city's zoning administrator, alleging unruly behavior by attendees of the meal ministry. The zoning administrator found that plaintiffs violated the city ordinance limiting feeding and housing programs. Although plaintiffs appealed, the Board of Zoning Appeals upheld the determination.

The plaintiffs then brought suit in federal district court. The plaintiffs alleged that their rights to free exercise of religion were protected by the First Amendment and the Religious Freedom of Restoration Act (the "RFRA")[137] and would be violated if the

---

[137]   In 1997, the RFRA was struck down as unconstitutional. See *City of Boerne v.*

ordinance were enforced against them. To plaintiffs, the meal ministry is "the physical embodiment of a central tenet of the Christian faith, ministering to the poor, the hungry and the homeless in the community." Furthermore, plaintiffs argued that injunctive relief would not work irreparable injury on the city and that the city failed to show a compelling state interest, especially given that there was no showing of unruly and disruptive behavior on more than one occasion.

The court granted plaintiffs' motion for a temporary restraining order. The court held that plaintiffs would suffer irreparable injury without such injunctive relief because they would otherwise be prevented from engaging in the free exercise of their religion. In addition, defendants failed to show that the injunctive relief would work irreparable injury on them; such injunctive relief would only "return the parties to their status quo ante positions." The court also found that plaintiffs were likely to succeed on the merits because the plaintiffs demonstrated that the meal ministry is a central tenet of their religious practice and that it is important that the meal ministry be provided in the church. On the other hand, the city failed to show a compelling state interest in prohibiting plaintiffs from continuing their meal ministry as currently conducted. Lastly, the court found that granting the temporary restraining order serves the public interest by providing a federal forum in which plaintiffs can vindicate their federal rights, which they were unable to do in the state process.

### Fifth Circuit

### Big Hart Ministries Ass'n, Inc. v. City of Dallas, 2011 WL 5346109 (N.D. Tex. Nov. 4, 2011)

Big Hart Ministries and Rip Parker Memorial Homeless Ministry, non-profit religious organizations that conduct food sharing programs for homeless individuals, jointly filed a suit challenging the enforcement of a Dallas ordinance restricting food sharing. The plaintiffs claimed the ordinance violates homeless persons' right to life, the plaintiffs' free exercise rights, free speech rights, right to travel, right to freedom of association, right to due process, and equal protection rights, as well as their rights under the Texas Religious Freedom Restoration Act.

The City of Dallas filed a motion to dismiss. The court granted the motion in part and denied it in part, allowing the plaintiffs' free exercise, due process, equal protection, and liberty claims to proceed, as well as the claim under the Texas Religious Freedom Restoration Act.

The parties both filed motions for summary judgment in October 2010, with the plaintiffs filing a motion for partial summary judgment that the ordinance is impermissibly vague and the City of Dallas filing a motion for summary judgment on all issues.

Following a trial in June 2012, the court ruled that the plaintiffs had standing to bring their claims as organizations because none of the plaintiffs' individual members needed to establish a burden

in their personal exercise of religion. The court also found that the ordinance placed a substantial burden on the plaintiffs' sincerely held religious beliefs in violation of Texas Religious Freedom Restoration Act. Because the ordinance violated Texas state law, the court did not reach the constitutional arguments. As a result, the court permanently enjoined defendants from enforcing the ordinance and awarded plaintiffs attorneys fees and costs. One month after the court's ruling, the city moved to alter or amend the judgment and for a new trial. The parties subsequently agreed to an amended judgment that outlined specific portions of the ordinance the city was enjoined from enforcing against plaintiffs and similarly situated organizations and individuals.

*The Law Center served as co-counsel in this case, along with Akin Gump Strauss Hauer & Feld, LLP[138]*

### Sixth Circuit

### Layman Lessons, Inc. v. City of Millersville, 2008 WL 686399 (M.D. Tenn. Mar. 7, 2008)

In 2005, Layman Lessons set up Blessingdales Charity Store, which was both a place to store donated clothing and personal items and distribute them to the needy, and a retail store to sell these items to raise money. Layman Lessons applied for a Certificate of Occupancy, but its application was placed on hold due to a then-pending ordinance that would have limited Layman Lessons' use of the property as planned. In addition, the city required the construction of a "buffer strip," such as a fence or landscaping to serve as a buffer between properties. Layman Lessons' property only abutted commercial properties, however, and buffer strips were typically only required on properties abutting residential property.

In 2006, Layman Lessons filed a complaint, alleging that the city's actions violated its rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and its constitutional rights under the First and Fourteenth Amendments and the Tennessee Constitution.

In March 2008, the court ruled on both parties' respective motions for summary judgment, granting in part and denying in part each motion. The court found Layman Lessons did not state a valid claim under RLUIPA for enforcement of the buffer strip requirement as it was not a substantial burden and was neutral. Because the city planner did not have authority to unilaterally deny an application for a Certificate of Occupancy, the court did not find the city liable under § 1983 for the city planner's actions. The court also found that Layman Lessons failed to prove its Equal Protection claim.

However, the court granted Layman Lessons' summary judgment motion on its claim that city actions (aside from the city planner's actions) that delayed issuance of a Certificate of Occupancy burdened Layman Lessons' free exercise rights in violation of the RLUIPA. In addition, the court found that the city's "arbitrary and irrational implementation and enforcement of [the buffer strip

---

*Flores*, 521 U.S. 507. However, a number of states have similar laws.

138   Howrey LLP served as the Law Center's lead counsel until April 2011.

ordinance]" violated Layman Lessons' right to Due Process.

*Seventh Circuit*

**Family Life Church v. City of Elgin, 2008 WL 2440658 (N.D. Ill. June 18, 2008)**

Family Life Church invited H.E.L.P.S., A Ministry of Caring ("HELPS") to operate a homeless shelter in its church and challenged the city's requirement to obtain a conditional use permit and the delays it encountered in obtaining the permit. Responding to a complaint that HELPS was operating the shelter without proper approval, a city code enforcement officer inspecting the premises found three violations, including the lack of a permit to run a shelter and the lack of an occupancy permit for the building. When HELPS applied for the permit in September 2006, a further inspection purportedly revealed 105 building, fire and life-safety code violations. In October 2006, the city insisted the shelter be shut down until the permits were obtained.

In November 2006, the City of Elgin zoning board recommended that the permit application be approved subject to certain conditions. When the matter was still not on the city council's agenda on January 11, 2007, Family Life and Frank Cherrye, a homeless individual, filed a lawsuit in federal court. The court denied plaintiffs' request for a temporary restraining order against the city. The permit was granted on May 9, 2007.

The court granted the city's motion for summary judgment, as it found that the permit application process and accompanying delays did not violate plaintiffs' rights under the First Amendment's free exercise clause and the "substantial burden" provision of the federal Religious Land Use and Institutionalized Persons Act (the "Act"). The court found that the permit requirement was facially neutral and that the eight-month permit process did not rise to the level of a substantial burden. Furthermore, the court found that much of the delay was self-imposed: Family Life prematurely opened the shelter before seeking a permit and then had to close down the shelter during the pending permit process. With the same reasoning, the court rejected Family Life's equal protection claim and claim of disparate treatment under the Act, as well as Family Life's state claim under the Illinois Religious Freedom Restoration Act. Finally, the court rejected Cherrye's individual equal protection claim regarding the city's requirement that homeless persons staying at a particular shelter for more than three days demonstrate a connection with the city prior to entering the shelter. Because this residency requirement did not require someone to live in Elgin for any particular period of time, the court applied a rational basis standard and found that the requirement did not violate Cherrye's fundamental right to travel.

*Ninth Circuit*

**Pacific Beach United Methodist Church v. City of San Diego, Docket No. 07-CV-2305- LAB-PCL (S. D. Cal. Dec. 7, 2007)**

Pacific Beach United Methodist Church, its pastor, and its congregation brought suit against the City of San Diego, alleging that the city had threatened to fine and punish them for sharing a meal and religious services with hungry, homeless, and other individuals. The plaintiffs argued that ministering to and caring for hungry, homeless and poor individuals is at the core of their religious and spiritual identities and, therefore, the city's actions violated the United States and California Constitutions and the Religious Land Use & Institutionalized Persons Act.

The plaintiffs alleged that, on October 31, 2007, while they were preparing for that evening's service, the defendants "raided" the plaintiffs' church property "without warning, in a show of authority designed to chill the Plaintiffs' exercise of their ministry and intimidate Plaintiffs." The defendants stated that they were acting on an anonymous complaint to perform an inspection to determine whether the plaintiffs' activities were violating any laws, ordinances or municipal codes. In November 2007, the defendants informed the plaintiffs that their religious activities were a violation of four San Diego municipal codes relating to residential multiple unit dwelling developments, use regulations of residential zones, and homeless facilities.

The plaintiffs argued in their complaint that these ordinances are facially inapplicable to the plaintiffs' activities. Further, the plaintiffs argued that the city's actions violated the Religious Land Use and Institutionalized Persons Act of 2000 and the First, Fourth, Fifth, Ninth and Fourteenth Amendments of the United States Constitution. The plaintiffs sought injunctive relief to protect their freedom to continue their ministries to the poor, hungry and homeless. In April 2008, the parties settled the case. Under the settlement agreement, the plaintiffs will be allowed to continue their Wednesday Night Ministry without a permit and without the threat of fines or citations from the City of San Diego. The city may conduct inspections at the church and enforce other laws and ordinances.

In January 2007, the federal district court granted a preliminary injunction enjoining enforcement of the ordinance prohibiting provision of food or meals to indigent persons. In August 2007, the court ruled on the plaintiffs' motion to make the injunction permanent and to approve the other measures being sought, including the challenges to the permit requirements and the children's parks and trespass laws (described above). Basing its decision on the plaintiff's equal protection and due process arguments, the court granted the motion for a permanent injunction against enforcement of the ordinance restricting food sharing with indigent persons, but denied the plaintiffs' other challenges. The city filed a notice of appeal but settled as to all plaintiffs before the appeal was heard.

Pursuant to the settlement agreement, the city enacted an ordinance (1) allowing for gatherings of up to 75 people in city parks without a permit, up from the previous limit of 25, (2) stating that city marshals cannot force a person to leave a park "under authority of any statute or ordinance relating to trespassing" and cannot ban a person from a park unless there is evidence of unlawful activity documented by an arrest or citation, and (3) repealing the ban on feeding indigent people at parks which the

court struck down.

### Santa Monica Food Not Bombs v. City of Santa Monica, 450 F.3d 1022 (9th Cir. 2006)

Santa Monica Food Not Bombs, an all-volunteer organization dedicated to nonviolent social change, and other organizations and individuals seeking to share food with homeless individuals brought suit against the City of Santa Monica, California, alleging that certain permit requirements and limitations on outdoor meal programs violated plaintiffs' rights under the First and Fourteenth Amendments of the U.S. Constitution, and various provisions of the California Constitution. The district court granted Santa Monica's motion for summary judgment, holding that the challenged ordinances were not facially unconstitutional. Food Not Bombs appealed to the Ninth Circuit.

The Ninth Circuit held that Food Not Bombs' challenges to an ordinance prohibiting banners outside of city-sponsored events and an ordinance prohibiting food distribution on sidewalks were moot because those ordinances had been amended after the suit was filed. The court held that the third ordinance being challenged, which required permits for parades, events drawing 150 people or more, and events involving setting up tents, was a content-neutral time, place, and manner regulation that did not violate the First Amendment. The court found the ordinance was not directed to communicative activity as such, and the object of the permitting scheme was "to coordinate multiple uses of limited space, to assure preservation of the park facilities, to prevent uses that are dangerous, unlawful, or impermissible" under the park district's rules, and to assure financial accountability for damage the event may cause. In addition, an instruction to the ordinance provided that "no consideration may be given to the message of the event, the content of speech, the identity or associational relationships of the applicant, or to any assumptions or predictions as to the amount of hostility which may be aroused in the public by the content of speech or message conveyed by the event."

Food Not Bombs also contended that the events ordinance was not sufficiently narrowly tailored. The court rejected this argument as applied to sidewalks and park paths because a limiting instruction limited the application of the ordinance to activities that are "likely to interfere" with traffic flow. However, the court held that the ordinance was insufficiently narrowly tailored with respect to all other city streets and public ways, to which the limiting instruction did not apply. The court also found that there were ample alternatives for speech.

### Sacco v. City of Las Vegas, Docket No. 2:06-CV-0714-RCJ-LRL (D. Nev. June 12, 2006)

Several individuals who share food with homeless individuals as a component of their charity work and as a part of a broader political demonstration associated with Food Not Bombs, an all-volunteer organization dedicated to nonviolent social change, filed suit in federal court challenging the enforcement of Las Vegas Municipal Code § 13.36.055(A)(6), which prohibits "the providing of food or

meals to the indigent for free or a nominal fee" in public parks. The plaintiffs also challenged the permit requirement, the laws permitting the police to ban people who have committed crimes from entering public parks, and other park restrictions. The court rejected the plaintiffs' arguments and granted summary judgment in favor of the city.

### McHenry v. Agnos, 983 F.2d 1076 (9th Cir. 1993)

Keith McHenry is the co-founder of Food Not Bombs, an organization which distributes free food to, and advocates increased public assistance for, the homeless and hungry of San Francisco. McHenry filed suit against the city of San Francisco and various city officials after being enjoined from distributing food to members of the homeless community in San Francisco based on the organization's failure to comply with ordinances regarding the distribution of food in public. Specifically, the ordinances required that organizations which distribute food to more than twenty-five persons in public parks obtain a permit and meet certain sanitation standards.

McHenry's suit alleged that such city ordinances and the injunction violated his First Amendment rights and were facially invalid. The district court granted summary judgment in favor of the defendants, finding that McHenry's food distribution activity did not constitute protected expression, and that even if it did, the permit ordinances would constitute reasonable time, place, and manner restrictions on such expression. On appeal, the Ninth Circuit upheld the district court's decision, finding that the ordinances were constitutional, as the government interests behind the ordinances were substantial and the ordinances were sufficiently content neutral and narrowly tailored.

### *Eleventh Circuit*

### Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale, CASE NO. l5-60l85-CIV-ZLOCH (S.D. Fla. Sept. 30, 2016)

Fort Lauderdale Food Not Bombs and some of its individual members filed suit against the City of Ft. Lauderdale alleging that their First and Fourteenth Amendment rights had been violated by enacting an ordinance restricting food sharing in public. The plaintiffs, who publicly share food as part of their political protests, argued that the ordinance violates their First Amendment rights to expressive conduct and association. They also argued that the ordinance and associated rule restricting food sharing are unconstitutionally vague.

Both parties moved for summary judgment, and the court granted the City of Ft. Lauderdale's motion after finding that the plaintiffs' conduct is not expressive conduct under the First Amendment and that the plaintiff's expressive association rights are not implicated. Also, the court held that the challenged law was not unconstitutionally vague.

**Wright v. City of St. Petersburg, No. 15-10315, 2016 WL 4269796 (11th Cir. Aug. 15, 2016)**

An ordained minister and co-director of an addiction recovery program brought a §1983 action against the city of St. Petersburg, Florida regarding an ordinance that prevented him from entering a public park. Plaintiff, who frequently performed ministerial outreach and advocacy work for the poor and homeless in the park, was arrested and issued a "trespass warning" after interfering with a police investigation in the park. Under the city ordinance, the plaintiff's "trespass warning" prohibited him from re-entering the park for one year. The plaintiff filed a complaint against the city, alleging that the ordinance interfered with his ministerial outreach to the poor and homeless in the park and therefore violated the First and Fourteenth Amendments. The district court granted the city's motion for summary judgment, concluding that the ordinance was a reasonable regulation of the time, place, and manner of speech in the park.

On appeal, the Eleventh Circuit affirmed the district court's ruling. The Court held that the city ordinance does not violate the First Amendment on its face or as applied to the plaintiff because it did not inevitably single him out based on his expressive activity, and he did not receive his "trespass warning" because he was engaged in expressive conduct protected by the First Amendment. Likewise, the Court rejected the plaintiff's arguments that a portion of the ordinance violated the First and Fourteenth Amendment as a censorial prior restraint on speech.

**First Vagabonds Church of God v. City of Orlando, --- F.3d ----, 2011 WL 1366778 (11th Cir. April 12, 2011.), vacating 578 F.Supp.2d 1353 (M.D. Fla. filed Oct. 12, 2006); Case No. 6:2006-CV-1583**

First Vagabonds Church of God and Food Not Bombs, a homeless ministry and anti- poverty group, respectively, filed suit in federal court challenging a city ordinance that prohibits "large group feedings" in parks in downtown Orlando without a permit, and also limits the number of permits for each park to two per year per applicant.[139] "Large group feedings" are defined under the ordinance as events that intend to, actually or are likely to feed twenty-five or more people.

Prior to the enactment of the ordinance, the plaintiff organizations had been regularly distributing free food to homeless persons in certain Orlando parks for a long period of time. Following enactment of the ordinance, the organizations attempted to remain in compliance with the law by distributing food outside of or adjacent to city parks, but found such distribution to be impracticable. The plaintiffs' suit sought a declaration that the ordinance is unconstitutional (under the First Amendment's free speech and religious exercise clauses and Fourteenth Amendment's due process clause) and in violation of certain Florida statutes, including Florida's Religious Freedom Restoration Act. Further, the plaintiffs sought an injunction prohibiting enforcement of the ordinance and unspecified damages. In January 2008, the court

granted summary judgment in favor of the city on the claims under the due process and equal protection clauses. The court dismissed plaintiffs' facial challenge because the conduct regulated by the ordinance is not, on its face, an expressive activity. In contrast, however, the court found that the as-applied challenge was not entitled to summary judgment, because it is possible that, after examining the context, the conduct of feeding people could be expressive.

In September 2008, the court ruled in favor of the plaintiffs on their First Amendment claims that the food sharing restriction violated their rights to free speech and to freely exercise their religious beliefs. The court found that Orlando Food Not Bombs' food sharing activities was expressive conduct, the ordinance did not further a substantial interest of the city, and the ordinance placed too great a burden on plaintiffs' free speech rights. With respect to the free exercise claim, the court found that there was no rational basis for the ordinance, as none of the interests claimed by the city were served by the ordinance. Further, the ordinance was more than an incidental burden on First Vagabonds Church's free exercise rights.

The defendant appealed and plaintiffs filed a cross-appeal. An Eleventh Circuit panel vacated the permanent injunction and reversed the district court decision that the ordinance violated the First Amendment on freedom of speech and freedom to exercise grounds, finding that the feeding of homeless people is not expressive or religious conduct. The Eleventh Circuit also denied plaintiff's cross appeal, affirming the district court's judgment that the ordinance was constitutional under the Fourteenth Amendment.

On appeal en banc, the Eleventh circuit affirmed the panel's decision and specifically ruled on narrower grounds with respect to the free speech claim. Thus, the ordinance was ultimately found constitutional and the permanent injunction vacated. The en banc court held that there was no free speech violation because even if feeding of homeless persons is expressive conduct, the ordinance as applied to the organization was a reasonable time, place, or manner restriction, and a valid regulation of expressive conduct.

**VII. Right to Privacy**

**State Court Cases**

*Oregon*

**State v. Tegland, 344 P.3d 63 (Court of Appeals of Oregon, Feb. 11, 2015)**

Gregory Tegland lived in a shelter made out of a grocery cart, a wooden pallet, and multiple tarps, which extended about two feet onto the public sidewalk. On the morning of Tegland's arrest, two Portland officers approached the structure to see if there was anyone inside the structure. Because tarps covered the structure's sides, the officers could not see anything inside the structure, except for Tegland's feet and some bedding. One of the officers lifted one of the tarps to peer inside the structure and saw Tegland

---

139   Code of the City of Orlando § 18A.09-2 (2007).

with a glass methamphetamine pipe and a lighter. The officers arrested Tegland for violating the city's code against erecting a structure on a public right of way, and, in the process of that arrest, the officers found further evidence that led to Tegland's arrest for possession of methamphetamine. Tegland was eventually charged with one count of each offense. After being convicted at a bench trial, Tegland appealed to the Oregon Court of Appeals. Tegland argued that the police officer's actions constituted an unreasonable search under both Article I, section 9, of the Oregon Constitution and the Fourteenth Amendment of the United States Constitution.

The court ultimately held that defendant had no constitutionally protected privacy interest associated with the structure, and, therefore, the officer's action did not constitute an unlawful search. Further, the court stated that a person has no reasonable expectation of privacy interest in a temporary shelter erected on a public space unless the governmental entity controlling the space has either authorized the structure or, over an indeterminate period of time, acquiesced to its existence. As neither condition existed, the court found that the defendant had no reasonable expectation of privacy and the police conduct did not constitute an unlawful search.

## VIII. Miscellaneous

### Federal Court Cases

#### U.S. Supreme Court

**Hiibel v. Sixth Judicial District of Nevada, 542 U.S. 177 (2004)**

Larry Hiibel was arrested and convicted under Nevada's stop and identify statute for refusing to identify himself during an investigatory stop for a reported assault. Hiibel appealed the conviction, claiming that his arrest and conviction for refusing to identify himself violated his Fourth and Fifth Amendment rights. The appellate court and the Nevada Supreme Court affirmed his conviction. The Supreme Court granted Hiibel's petition for certiorari.

The Law Center, the National Coalition for the Homeless, and other homelessness advocacy groups filed an amicus brief supporting Hiibel in the Supreme Court. The advocacy groups contended that arresting people for failing to identify themselves violated their Fourth Amendment rights to be free from unreasonable searches and seizures, particularly in light of the difficulty homeless persons have maintaining and obtaining identification. The advocacy groups noted that police were more likely to stop homeless people and ask for identification, and homeless people were more likely not to have identification. The advocacy groups pointed to restrictive state documentation requirements as one reason many homeless persons did not have identification.

The Supreme Court ruled that Hiibel's arrest for refusing to identify himself did not violate either his Fourth or Fifth Amendment rights. However, the Court's holding merely applied to refusing to identify oneself in a situation where a police officer has reasonable suspicion to investigate, but did not reach the question whether a person could be arrested in the same circumstances for failure to produce an identification card.

#### Sixth Circuit

**Greater Cincinnati Coalition for the Homeless, et. al. v. City of Cincinnati, 2010 WL 3448085 (S.D. Ohio August 27, 2010)**

The Greater Cincinnati Coalition for the Homeless, The Mary Magdalen House, The Drop Inn Center, The Joseph House, Inc., Cincinnati Interfaith Workers' Center, and St. Francis-St. Joseph Catholic Worker House filed a § 1983 claim against the City of Cincinnati for violating their constitutionally protected rights by the adoption of City Resolution No. 41-2008. This resolution, passed in June 2008, states that "social service agencies and programming shall not be concentrated in a single geographic area and shall not locate in an area that is deemed impacted; and further directing the City Manager to use his authority to the extent permitted by law, to carry out any actions necessary to adhere to such policy." The plaintiffs alleged that the resolution violated their First Amendment rights. The plaintiffs also alleged that the resolution was an attempt to regulate land use without using the required process, which was a violation of their substantive due process rights.

The plaintiffs, which are all located in the neighborhood of Cincinnati called Over-the-Rhine, claimed that Resolution 41-2008 prohibited them from opening or expanding services and discouraged the delivery of social services in the community. The plaintiffs also alleged that the proposed changes were being implemented in such a way that contravened the City Charter, which required zoning code changes to be reviewed by the planning commission. The defendants filed a motion to dismiss alleging that the plaintiffs' claims were not yet ripe since no action had been taken that adversely affected plaintiffs and that the complaint otherwise fails to state a claim upon which relief can be granted.

The plaintiffs responded by filing a motion for leave to file a supplemental complaint, which alleged that Resolution 41-2008 had impacted a non-profit housing development corporation called Over-the-Rhine Community Housing ("OTRCH"). The plaintiffs alleged that OTRCH did not receive needed certification of a $145 million dollar project because the City Planning and Building Dept. interpreted Resolution 41-2008 to apply to the OTRCH project. The defendants renewed their motion to dismiss. After the filing of the supplemental complaint, the City approved and funded a 25-unit permanent housing project in Over-the-Rhine for long-term homeless individuals.

The Magistrate Judge found the plaintiffs' claims to be hypothetical and speculative, and therefore unripe based on the following reasons: (1) No social service agency had yet been deprived of a constitutionally protected right; (2) The Resolution was not an ordinance and did not have binding legal effect. Rather it merely instructed the city manager to act in the future "as permitted by law."

Following the recommendation of the Magistrate Judge (2010 WL 3448097), the court dismissed the case for lack of subject matter jurisdiction.

### Ninth Circuit

### Garber v. Heilman, 2009 WL 409957 (C.D. Cal. Feb. 18, 2009)

The plaintiff Robert Garber, acting pro se, filed a § 1983 complaint alleging that certain police officers engaged in "a quasi-official pattern and practice" involving "the deliberately indifferent training of [their] officers in the execution of arrests without probable cause, filing of false reports, the ratification of officer misconduct, deficient supervision, bias and discrimination against homeless and aliens" and that most recently, this conduct led to plaintiff's arrest and citation on June 3, 2007 for living in a vehicle on the streets in violation of Los Angeles Municipal Code § 85.02. The plaintiff alleged that he had been arrested five times, prosecuted four times and acquitted or had the cases dismissed all four times. He alleges that he has received multiple citations by the LAPD and Parking Enforcement, which, plaintiff alleged are part of the defendants' efforts to harass plaintiff and retaliate against him because of his homeless status.

The plaintiff, again without lawyer, attempted to allege seven separate causes of action against all defendants for violations of the First, Fourth, Fifth, and Fourteenth Amendments, and for retaliation, harassment, obstruction of justice, malicious prosecution, and personal injury in violation of state law. The court dismissed these pleadings for failure to state a claim for which relief can be granted and dismissed the complaint with prejudice.

### Fitzgerald v. City of Los Angeles, No. CV 03-1876 NM (C.D. Cal. 2003), 485 F. Supp. 2d 1137 (C.D. Cal. 2007)

Plaintiffs brought suit to challenge a police practice of taking homeless people from the Skid Row area of the city into custody and detaining them after performing warrantless searches without reasonable suspicion to believe such persons' parole or probation had been violated. The plaintiffs alleged that the Los Angeles Police Department (LAPD) had adopted a policy and practice of harassment, intimidation and threats against the residents of the Central City East area of Los Angeles, including homeless individuals in that area and residents of Skid Row's Single Room Occupancy (SRO) housing units. The plaintiffs claimed that the police's stated reason for such actions – that they were looking for parole violators and absconders – was a pretext.

The court certified the plaintiff class for settlement purposes and issued an injunction against such police practices, based on plaintiffs' Fourth Amendment claims as well as "Plaintiffs' rights under California Civil Code § 52.1 to be free from interference and attempts to interfere with Plaintiffs' Fourth Amendment rights by threats, intimidation, or coercion." In December 2003, the parties settled the case, agreeing to a stipulation to a permanent injunction limiting detentions, "Terry" stops and searches without the necessary reasonable suspicion, probable cause and/or search

warrants. The injunction would remain in effect for thirty-six months, and could be extended upon a showing of good cause for an additional thirty-six months.

In November 2006, plaintiffs learned of allegations that the police were violating the injunction. The court granted the plaintiffs' motion to extend the injunction. The parties settled the case in December 2008 and the court approved the settlement agreement in February 2009. The settlement agreement set forth specific rules officers must follow with respect to searches incident to arrest, searches of parolees and probationers, handcuffing and frisks and prolonged detention for the purpose of running warrants. Warrant checks may only be conducted "if the time required to complete the warrant check does not exceed the time reasonably required to complete the officer's other investigative duties." In addition, the settlement agreement requires that the LAPD develop and conduct training sessions covering these issues. All officers assigned to patrol the Skid Row area must attend the training sessions.

### Currier v. Potter, 379 F.3d 716 (9th Cir. 2004), cert. denied, 125 S. Ct. 2935 (2005)

Three homeless individuals in Seattle brought suit against the Postal Service for denying them certain types of mail service, such as no-fee post boxes available to other classes of individuals, and general delivery service at all postal branches. The plaintiffs alleged violations of postal service regulations, the Postal Reorganization Act, the Administrative Procedures Act, and the Constitution. The defendants moved to dismiss for lack of subject matter jurisdiction and failure to state a claim. The lower court dismissed the complaint in its entirety. It held that postal service regulations as well as the Administrative Procedure Act did not create a cause of action for the plaintiffs in this case. While the plaintiffs did establish the court's jurisdiction under a provision of the Postal Reorganization Act prohibiting discrimination among users of the mail, the court dismissed that claim sua sponte on the basis that the postal service regulations passed muster under an ordinary rational basis review.

The court also dismissed plaintiffs' constitutional claims. As to the First Amendment, the court agreed that the right to receive mail is fundamental, but refused to apply strict scrutiny because the Postal Service was not purporting to censor the content of any mail. Under a reasonableness review, the court found the regulations content-neutral and that they reasonably advanced "Congressionally-mandated goals of delivering mail efficiently and economically."[140] Turning to the equal protection claim, the court found that the Postal Service's distinctions among persons who could and could not receive no-fee post office boxes were reasonable. "The relevant postal regulations that govern the no-fee boxes make it clear that only residents who have a physical residence or a business location at a fixed delivery point are eligible for the [no-fee boxes]."[141] Moreover, providing general delivery service at all post office branches would increase costs and complicate investigations of illegally shipped material.

---

140   *Currier v. Henderson*, 109 F. Supp. 2d 1221, 1230 (W.D. Wash. 2002).
141   Id. at 1231.

The plaintiffs appealed the court's ruling. The Law Center filed an amicus brief on Currier's behalf, arguing that the postal service regulations provide a private right of action and that the Postal Service has waived its immunity with respect to claims under those regulations. The Law Center contended that the district court erred in finding it did not have subject matter jurisdiction over some of Currier's claims because the Postal Reorganization Act confers federal jurisdiction in actions involving the postal service, and the postal service regulations provide a substantive legal framework creating a cause of action. The court also had jurisdiction under the Administrative Procedure Act, which does not foreclose judicial review of Postal Service regulations. The Law Center also argued that the postal service regulations violate the First Amendment rights of homeless people by requiring them to pay for post office boxes and by limiting the locations and hours of operation of post offices that offer general delivery. Finally, The Law Center argued the regulations violate the equal protection clause by automatically denying homeless people no-fee post office boxes while simultaneously offering them to other customers who are ineligible for carrier delivery.

The Ninth Circuit affirmed the lower court decision. Regarding jurisdiction, the Ninth Circuit upheld both the lower court's dismissal of plaintiffs' claim regarding the no-fee box regulation, and the lower court's exercise of subject matter jurisdiction over plaintiffs' statutory claim. The court limited the relevant forum to the general delivery service and concluded that such forum is a nonpublic forum because the postal service's "provision of general delivery service is meant merely to facilitate temporary mail delivery to a limited class of users."[142] The court then ruled that the postal service acted reasonably in confining general delivery service to a single Seattle location. Furthermore, the court rejected plaintiff's First Amendment challenge to the no-fee postal box regulations, holding that such boxes are nonpublic fora and that the postal service is "not constitutionally obligated to provide no-fee boxes to homeless persons."[143] Because these First Amendment claims fail, the court also rejected plaintiffs' equal protection claims on rational-basis review.[144]

The plaintiffs filed a petition for a writ of certiorari, arguing that the Ninth Circuit erred in determining that the forum at issue was the general delivery service. Instead, because general delivery is the only means homeless people have to access the mail system, the plaintiffs argued the proper forum is the entire "mail system," which they argued is a public forum.[145] Alternatively, even if the entire mail system is not the relevant forum, plaintiffs contended that general delivery and no-fee boxes are public fora because they are modes of public communication.[146] In response, defendants argued that the Ninth Circuit was correct in evaluating general delivery and no-fee boxes as the relevant forum and determining that they were nonpublic fora.[147] The plaintiffs' petition for writ of certiorari was denied on June 20, 2005.

**Mason v. City of Tucson, No. CV 98-288 (D. Ariz. June 12, 1998)**

The plaintiff sought a preliminary injunction, damages, declaratory and injunctive relief against the City of Tucson and the Tucson City Police for engaging in a policy of "zoning" homeless people charged with misdemeanors in order to restrict them from the downtown areas. Plaintiff argued that such restrictions violated his constitutional right to travel, constituted a deprivation of liberty without due process of law in violation of the Fifth Amendment and implicated the equal protection clause of the Fourteenth Amendment. The zone restrictions placed on the plaintiff included a two-mile square area covering most of downtown Tucson. This area includes all of the local, state and federal courts, voter registration facilities, a soup kitchen, places of worship and many transportation and social service agencies.

On July 13, 1998, the district court granted a preliminary injunction stating that the plaintiff had demonstrated some probability of success on the merits in that the zone restrictions promulgated against the plaintiff were likely unconstitutionally broad as to geographical area.[148] The district court granted plaintiff's preliminary injunction to the extent that, as to the plaintiff, defendants were enjoined from enforcing the zone restrictions, from imposing or enforcing similarly overbroad zone restrictions, or from imposing or enforcing any zone restrictions unless such restriction is specifically authorized by a judge.

Subsequent to the court's ruling on the preliminary injunction, the parties settled.

---

142   379 F.3d at 729.

143   Id. at 731.

144   Judge Gould, in his concurring opinion, leaves open the possibility of a homeless person's as-applied challenge, in which case he "would hold that, although the Post Office need not routinely make general delivery available at all branch post offices to all persons who are homeless, the Postal Service's regulations, to comply with the First Amendment, must make due provision for general delivery to a homeless person at a branch office when that person has shown undue hardship in retrieving mail at the main post office." Id. at 733.

145   Brief of Petitioner-Appellant at 17, *Seattle Housing and Resource Effort (SHARE) v. Potter*, 2005 WL 415085 (Feb. 15, 2005).

146   Id. at 21.

147   Brief for Respondent-Appellee, *Seattle Housing and Resource Effort (SHARE) v. Potter*, 2005 WL 415085 (May 20, 2005).

148   *Mason v. City of Tucson*, No. CV 98-288 (D. Ariz. July 13, 1998).