# CAN I GET SOME REMEDY?: CRIMINALIZATION OF HOMELESSNESS AND THE OBLIGATION TO PROVIDE AN EFFECTIVE REMEDY

Eric S. Tars, Heather Maria Johnson, Tristia Bauman, and Maria Foscarinis[*]

*Many communities across the country continue to pass ordinances criminally punishing homeless persons for engaging in necessary, life-sustaining activities such as sleeping in public places in the absence of an indoor alternative. Courts have struck down a number of these ordinances, but the practical impact of these rulings has been limited both by the form of the remedy ordered to correct these constitutional violations—generally narrow injunctive and declaratory relief and small monetary damage awards—and by the persistence of local governments in taking the minimum necessary steps to be legally compliant while allowing the underlying problem of homelessness to persist. This Article reviews the types of remedies available and those ordered by federal and state courts in both criminalization and non-criminalization cases, and evaluates courts' reluctance to provide greater, more effective relief for homeless plaintiffs. Not only do U.S. courts have the ability to fashion comprehensive equitable remedies such as providing housing when traditional ones have been proven ineffective, but evolving standards among international human rights courts and national constitutional courts may eventually obligate them to do so in order to protect the human rights of vulnerable populations.*

* Eric S. Tars is Director of Human Rights & Children's Rights Programs, Tristia Bauman is Housing Program Director, and Maria Foscarinis is Executive Director at the National Law Center on Homelessness & Poverty (Law Center). Heather Maria Johnson was Director of Civil Rights Programs at the Law Center during the majority of the drafting of this Article, though she is now with the American Civil Liberties Union of Southern California. Law Center interns Samuel Halpert and Kirsten Blume also provided invaluable assistance in the research and drafting of this Article.

I. INTRODUCTION ...................................................................................739
II. LIMITED EFFECTIVENESS OF REMEDIES IN U.S. CRIMINALIZATION
CASES..................................................................................................742
III. BROAD AS NECESSARY: DEFINING THE BOUNDARIES OF EQUITABLE
REMEDIES ..........................................................................................750
IV. INTERNATIONAL STANDARDS AND COMPARISONS: THE EVOLVING
RIGHT TO AN EFFECTIVE REMEDY ......................................................756
    A. International Authorities....................................................757
    B. Regional Human Rights Courts..............................................759
        1. The Inter-American Court of Human Rights.......................759
        2. The European Court of Human Rights ...............................761
    C. National High Courts ..............................................................765
V. CONCLUSION.....................................................................................767

## I. INTRODUCTION

Every day across the country, hundreds of thousands of persons experiencing homelessness are forced to live in public spaces because of a severe lack of affordable housing, permanent supportive housing, and emergency shelter in most American communities.[1] In addition to contending with the arduous task of seeking housing, employment, and basic necessities, and the inherent danger of living outdoors, many face criminal penalties and harassment by law enforcement officials as a direct result of their unsheltered, homeless status. Such criminalization of homelessness is pervasive and takes many forms. Frequently these include prohibitions on sleeping, sitting, or storing belongings in public spaces when housing or shelter is inaccessible; law enforcement sweeps of areas in which homeless persons are living, resulting in arrests and destruction of property; and selective enforcement of public space restrictions such as loitering laws, park closure rules, and open container ordinances.[2] Driven by business interests or not-in-my-backyard attitudes, the

---

1. Based on data released by the U.S. Department of Housing and Urban Development (HUD), over 235,000 homeless persons were found living outdoors during a single night in January 2011. Office of Cmty. Planning & Dev., HUD, The 2011 Annual Homeless Assessment Report to Congress 14 (2012). Of these, over 100,000 persons were deemed to be chronically homeless, that is, they had been continuously homeless for over a year or had experienced at least four episodes of homelessness in the previous three years. *Id.* at 6, 10.

2. Nat'l Law Ctr. on Homelessness & Poverty, Criminalizing Crisis: The Criminalization of Homelessness in U.S. Cities 6–7, 17–20 (2011) [hereinafter Criminalizing Crisis]; Nat'l Law Ctr. on Homelessness & Poverty, Criminalizing Crisis: Advocacy Manual 42–56 (2011) [hereinafter Advocacy Manual].

ultimate goal of such measures is often to remove the visible *effects* of homelessness and poverty from downtowns, tourist destinations, residential areas, and even entire communities while doing nothing to resolve the underlying *causes*.

Criminalization violates homeless persons' constitutional and human rights and offends basic human dignity.[3] Some U.S. courts have recognized that enforcement of criminalization ordinances in the absence of available shelter violates homeless persons' constitutional rights.[4] Advocates have successfully argued that it is cruel and unusual punishment to penalize people for involuntary conduct, that is, engaging in necessary, life-sustaining conduct in public places when shelter or housing is unavailable, and that prohibiting a "necessity of life," such as a place to sleep, impedes homeless persons' freedom of travel or movement.[5] Courts have also found that sweeps of areas where homeless people are living, and the resulting confiscation and destruction of property, violate due process and protections against unreasonable search and seizure.[6] This reasoning

---

3.   This Article uses the terms "constitutional" and "civil" rights to discuss rights in the U.S. domestic legal system while using "human" rights to discuss rights in the international legal system. These terms are to some extent overlapping in the actual content of the rights—indeed, part of our argument is that our domestic system of civil and constitutional rights should become even more consistent with the international human rights system—but we include both separately as appropriate to our current context.

4.   Criminalizing Crisis, supra note 2, at 10; U.S. Interagency Council on Homelessness, Searching Out Solutions: Constructive Alternatives to the Criminalization of Homelessness 7–8 (2012), *available at* http://www.usich.gov/resources/uploads/asset_library/RPT_SoS_March2012.pdf [hereinafter Searching Out Solutions].

5.   *See, e.g.*, Jones v. City of L.A., 444 F.3d 1118, 1132 (9th Cir. 2006) ("Los Angeles encroached upon Appellants' Eighth Amendment protections by criminalizing the unavoidable act of sitting, lying, or sleeping at night while being involuntarily homeless."), *vacated as moot*, 505 F.3d 1006 (9th Cir. 2007); Pottinger v. City of Miami, 40 F.3d 1155, 1156 (11th Cir. 1994) (remanding case to the district court to clarify terms of injunction issued upon a finding that "the city's practice of arresting homeless individuals for harmless life sustaining activities that they are forced to perform in public is unconstitutional"); Anderson v. City of Portland, No. 08-1447-AA, 2009 WL 2386056, at *7 (D. Or. July 31, 2009) ("[P]laintiffs adequately state a claim under the Eighth Amendment, in that they allege that the City's enforcement of the anti-camping and temporary structure ordinances criminalizes them for being homeless and engaging in the involuntary and innocent conduct of sleeping on public property.").

6.   *See, e.g.*, Kincaid v. City of Fresno, No. 1:06-cv-1445, 2006 WL 3542732, at *37 (E.D. Cal. Dec. 8, 2006) (finding that city sweeps of encampments and subsequent destruction of property of homeless individuals violates the Fourth Amendment).

has been adopted by the U.S. Interagency Council on Homelessness (USICH) in its 2012 report *Searching Out Solutions*, which is critical of criminalization.[7] USICH goes on to note that "[i]n addition to violating domestic law, criminalization measures may also violate international human rights law, specifically the Convention Against Torture and the International Covenant on Civil and Political Rights."[8] Despite these victories, the criminalization of homelessness continues almost unabated and has become more prevalent in the years following the recent economic crisis. This is due to local governments' persistent adherence to a criminalization approach, limited legal resources to monitor and challenge recurring violations of the same or similar measures, and courts' reluctance to order remedies beyond the narrow injunctive or declaratory relief and small monetary damages awards typical in these cases.[9]

This criminalization of necessary, life-sustaining activities in public spaces does nothing to prevent or end homelessness. Rather, it fuels a *de facto* system of "managing" homelessness wherein homeless persons are cycled through the criminal justice system for a wide array of minor violations—often spending time in jail or receiving fines they cannot afford to pay—or are forced to move back and forth between neighboring communities to avoid citation or arrest. The frequent interaction with law enforcement and the criminal justice system, as well as the destabilizing effects of moving in and out of custody or between cities, perpetuates homelessness by making it even more difficult for homeless persons to secure or maintain housing, employment, and benefits.[10] Persons experiencing homelessness, then, are often subjected to multiple, recurring violations of their constitutional and human rights. While specific violations may be effectively halted through injunctive relief, they are likely to recur absent relief that addresses the underlying problems of homelessness. Prolonged homelessness and the collateral consequences of criminalization further limit their ability to exercise rights critical to participation in society.

---

7.    *See* Searching Out Solutions, *supra* note 4, at 6–8.
8.    *Id*. at 8.
9.    *See* Criminalizing Crisis, *supra* note 2, at 3; Advocacy Manual, *supra* note 2, at 42–55; *infra* Section II.
10.    *See generally* Criminalizing Crisis, *supra* note 2, at 21 (showing prevalence of barriers to accessing employment, housing, public benefits, and healthcare due to criminalization); *id*. at 28–45 (describing the consequences of criminalization, including stories from homeless individuals who have experienced criminalization first-hand).

This Article examines the remedies used to combat criminalization and argues that we must develop law supporting the use of the broader remedies needed to redress violations of homeless persons' civil and human rights. Section II reviews the treatment of criminalization by U.S. courts with a focus on the ordered relief and the inadequacy of this relief in redressing homeless persons' civil rights violations. Section III examines lines of domestic cases involving repeated, unaddressed civil rights violations in education and prison contexts in which courts have granted broader relief and argues that such remedies should be available in the context of criminalization. In Section IV, we chart the development of a customary international law (CIL) right to an effective remedy and argue that this developing CIL norm will ultimately strengthen the legal position of domestic advocates seeking broader remedies. Finally, in Section V, we distill lessons from the domestic and international case law for advocates challenging criminalization and argue that only housing remedies will ultimately prevent criminalization and allow homeless persons to fully participate in our democratic society in accordance with their full human rights.

## II. LIMITED EFFECTIVENESS OF REMEDIES IN U.S. CRIMINALIZATION CASES

U.S. courts have recognized that, in areas where available shelter space is inadequate to meet the need, homelessness is an involuntary condition.[11] Without access to housing, homeless people are left with no option but to perform life's necessary activities, such as sleeping and eating, in public spaces.[12] In this context, courts have found that the criminalization of homelessness violates homeless persons' rights under the Fifth, Eighth, and Fourteenth Amendments of the U.S. Constitution, as well as analogous rights enshrined in state law.[13]

---

11.    *See* Pottinger v. City of Miami, 810 F. Supp. 1551, 1564 (S.D. Fla. 1992) ("Because of the unavailability of low-income housing or alternative shelter, plaintiffs have no choice but to conduct involuntary, life-sustaining activities in public places. The harmless conduct for which they are arrested is inseparable from their involuntary condition of being homeless.").

12.    *Id.*

13.    *See id.* at 1584 (holding that arresting homeless individuals for necessary conduct is "cruel and unusual in violation of the eighth amendment, reach innocent and inoffensive conduct in violation of the due process clause of the fourteenth amendment and burden the fundamental right to travel in violation of the equal protection clause."); *see also* Jones v. City of L.A., 444 F.3d 1118, 1138

Though the significance of these court victories cannot be denied, their practical impact has fallen short of the remedies needed to protect homeless people against the egregious and widespread nature of criminalization. As evidenced by four leading cases discussed in this section, despite rulings holding cities liable for violating homeless persons' constitutional rights, courts have offered only limited remedies. Rather than the broader protection that is within their power to offer, courts have provided narrow injunctive relief or small monetary damage awards. These limited remedies do not address the causes of homelessness directly and prove inadequate in stopping municipalities' efforts to "solve" problems with homelessness through harassing homeless persons out of the jurisdiction.

In *Pottinger v. City of Miami*, a class of homeless plaintiffs brought suit against the City of Miami, challenging its police practice of conducting systematic arrests of homeless persons to remove them from tourist and business areas.[14] At trial, the U.S. District Court for the Southern District of Florida found that there were nearly ten times as many homeless individuals as available shelter beds in the city,[15] leaving the plaintiffs with no choice but to conduct involuntary, life-sustaining activities in public places.[16] Relying on this finding of involuntariness, the court held that punishing homeless people for "sleeping, eating, and other innocent conduct" violated their Eighth Amendment right to be free from cruel and unusual punishment.[17] The *Pottinger* court further held that the City's policing practice was unconstitutionally overbroad and burdened homeless persons' fundamental right to travel, violating the due process and equal protection clauses of the Fourteenth Amendment.[18] Lastly, the court held the destruction of homeless persons' property during or following

---

(9th Cir. 2006) (holding that the Eighth Amendment prohibits the city from punishing involuntary sitting, lying, or sleeping on public sidewalks that is an unavoidable consequence of being human and homeless without shelter in the Los Angeles), *vacated as moot*, 505 F.3d 1006 (9th Cir. 2007).

14.    *Pottinger*, 810 F.Supp. at 1564.

15.    *Id.* at 1558, 1564 (finding that there were fewer than 700 beds available in shelters to serve Miami's homeless population of approximately 6,000 people).

16.    *Id*. at 1565.

17.    *Id.* ("As long as the homeless plaintiffs do not have a single place where they can lawfully be, the challenged ordinances, as applied to them, effectively punish them for something for which they may not be convicted under the eighth amendment—sleeping, eating, and other innocent conduct.").

18.    *Id.* at 1583.

744        *COLUMBIA HUMAN RIGHTS LAW REVIEW*        [45.3:732

arrest violated the Fourth Amendment protection against unreasonable search and seizure.[19]

Despite the *Pottinger* court's strong condemnation of the city's illegal practices and its recognition that "provid[ing] housing and services to the homeless" was "the ideal solution," the court hesitated to order this remedy because, "assembling and allocating such resources is a matter for the government—at all levels—to address, not for the court to decide." [20] Instead, the court enjoined the City of Miami from continuing its practice of arresting homeless people throughout the city and ordered that the city designate "safe zones" where homeless people could engage in necessary activities without risk of arrest.[21]

Following an appeal by the City of Miami, the case was settled by consent decree in 1998.[22] As part of the settlement, the City of Miami agreed to change its police training policies, and police officers were barred from arresting homeless people for harmless, involuntary conduct without first offering them placement in an available shelter.[23] These changes in police practices, which likely would not have occurred without the court's intervention, were undoubtedly a step in the right direction. At best, however, the end result has been a tenuous truce between the parties. Homeless people are still targeted for arrest and remain without adequate housing, while the city chafes under the consent decree. Indeed, in April 2013, City of Miami Commissioners voted unanimously to ask the court to undo many of the decree's provisions.[24] The parties were able to come to a new settlement in December 2013 with a two-year window for more constructive solutions to work,[25] but the city's predilection for a criminalization approach remains barely restrained.

Similarly, in *Jones v. City of Los Angeles*, though homeless plaintiffs won an immediate court victory, the court's limited relief

---

19.        *Id.*

20.        *Id.*

21.        *Id*. at 1584.

22.        Pottinger v. City of Miami, 76 F.3d 1154 (11th Cir. 1996).

23.        Settlement Agreement at 7–13, Pottinger v. City of Miami, No. 88-2406-CIV-ATKINS (S.D. Fla. Oct. 1, 1998).

24.        Charles Rabin & Andres Viglucci, *Miami to Go to Federal Court to Undo Homeless Protection Act*, Miami Herald (Apr. 11, 2013), http://www.miamiherald.com/2013/04/11/3339297/miami-to-go-to-federal-court-to.html.

25.        Addendum to Settlement Agreement at 8, Pottinger v. City of Miami, No. 88-2406-CIV-MORENO (S.D. Fla. Dec. 12, 2013).

left the homeless residents of Los Angeles to face other ongoing rights violations.[26] In *Jones*, the ACLU successfully challenged a Los Angeles ordinance prohibiting sleeping, sitting, or lying down in public on behalf of six homeless plaintiffs, arguing that the law unconstitutionally criminalized a person's homeless status.[27] Plaintiffs sought to permanently enjoin the City of Los Angeles from enforcing the law in Skid Row, a central gathering place for many of the city's homeless population, between the hours of 9:00 p.m. and 6:30 a.m.[28]

Finding that the available shelter space in Los Angeles was woefully inadequate to house its tens of thousands of homeless residents, a divided panel of the Ninth Circuit enjoined enforcement of the ordinance pursuant to the Eighth Amendment's prohibition against cruel and unusual punishment.[29] In criminalizing the "unavoidable act of sitting, lying, or sleeping at night while being involuntarily homeless," the City of Los Angeles unconstitutionally punished people for conduct that was "involuntary and inseparable" from their homeless status.[30]

The court was careful, though, to clarify the narrow scope of its holding and to state explicitly that it was not ordering the City of Los Angeles to do anything more than to cease unconstitutional enforcement of the law.[31] The court went on to add that, while it recognized an obvious "'homeless problem' in the City of Los Angeles," the city was free to address that problem "in any way that it sees fit."[32]

---

26.     Jones v. City of L.A., 444 F.3d 1118, 1138 (9th Cir. 2006), *vacated as moot*, 505 F.3d 1006 (9th Cir. 2007).

27.     *Id.* at 1123. The ordinance stated, "[n]o person shall sit, lie or sleep in or upon any street, sidewalk or other public way," with limited exceptions. L.A., Cal., Mun. Code § 41.18(d) (2005).

28.     *Jones*, 444 F.3d at 1120.

29.     *Id.* at 1132 ("Because . . . the number of homeless persons in Los Angeles far exceeds the number of available shelter beds at all times . . . Los Angeles has encroached upon Appellants' Eighth Amendment protections by criminalizing the unavoidable act of sitting, lying, or sleeping at night while being involuntarily homeless.").

30.     *Id*. at 1132, 1136.

31.     *Id.* at 1138 ("We hold only that . . . the Eighth Amendment prohibits the City from punishing involuntary sitting, lying, or sleeping on public sidewalks that is an unavoidable consequence of being human and homeless without shelter in the City of Los Angeles.").

32.     *Id.*

Following the city's motion for rehearing, the court ordered mediation and the parties ultimately reached a settlement agreement.[33] Under the terms of the settlement, the Los Angeles Police Department is barred from enforcing the challenged law between the hours of 9:00 p.m. and 6:30 a.m. Additionally, the Police Department may only enforce the law after an officer has first given a verbal warning and reasonable time for the person to move locations. Unlike in *Pottinger*, the settlement required that the city provide some additional housing, mandating that restrictions on law enforcement remain in effect until "an additional 1250 units of permanent supportive housing are constructed" within the city, with at least half of them located in the Skid Row and downtown areas.[34] This housing relief is miniscule, however, in comparison with the number of homeless people forced to live on the streets of Los Angeles.[35]

Demonstrating the ease with which a city can circumvent narrowly crafted injunctive relief, shortly after *Jones*, the City of Los Angeles launched its "Safer City Initiative" in 2006.[36] This policy has sent dozens more police officers to Skid Row, but rather than addressing violent crime, the officers have been targeting homeless and poor African Americans for minor violations such as jaywalking and littering at staggering rates of forty-eight to sixty-five times the rate in the rest of the city.[37] These citations can lead to arrest and incarceration, placing further barriers between homeless persons and permanent housing.[38] As in *Pottinger*, the city's failure to provide affordable, permanent housing has allowed the criminalization of homelessness to continue, despite studies showing that providing housing is cheaper and more effective than a policing approach.[39] The

---

33.     Jones v. City of L.A., 505 F.3d 1006 (9th Cir. 2007) (vacating judgment based on settlement agreement).

34.     *Id.*

35.     *See Jones,* 444 F.3d at 1121 (noting that there are more than 80,000 homeless individuals in Los Angeles County and that Los Angeles' Skid Row has the highest concentration of homeless individuals in the United States).

36.     Skid Row's Safer City Initiative is an intensive policing effort launched in 2006, adding 50 cops to Skid Row's one-mile radius. Ina Jaffe, *Can Los Angeles Make Skid Row Safer?*, Nat'l Pub. Radio (Apr. 21, 2009, 12:57 AM), http://www.npr.org/templates/story/story.php?storyId=103289221.

37.     Gary Blasi & Univ. of Cal. L.A. Sch. of Law Fact Investigation Clinic, Policing Our Way Out of Homelessness? The First Year of the Safer Cities Initiative on Skid Row 29 (2007), *available at* http://www.lafla.org/pdf/policinghomelessness.pdf.

38.     *See id.* at 45.

39.     *See* Criminalizing Crisis, *supra* note 2, at 9.

court's failure to exercise its power to order such impactful remedies, moreover, further enables the underlying problems to persist.

*Kincaid v. City of Fresno* serves as an example of how even the award of monetary damages in addition to injunctive relief has proven to be inadequate in preventing ongoing violations.[40] In *Kincaid*, plaintiffs brought suit against the City of Fresno and the California Department of Transportation for their policy of confiscating and immediately destroying the property of homeless people during "clean ups" intended to remove homeless persons and their possessions from homeless encampments on city property.[41]

The U.S. District Court of the Eastern District of California heard evidence that the city, without constitutionally adequate notice, periodically performed as many as twenty-five cleanups each year.[42] As part of the cleanup effort, homeless persons' property was seized and destroyed on the spot, regardless of the items' apparent utility,[43] irreplaceable value,[44] or obvious necessity.[45] Indeed, even where homeless people had permission to store their belongings on private property, the city treated the items as abandoned trash.[46] The court condemned that policy, advising that it was impractical for homeless people to guard their belongings twenty-four hours a day.[47]

Because it failed to provide adequate notice and provided no post-deprivation remedy, the court held the city's practice ran afoul of

---

40.     Kincaid v. City of Fresno, 244 F.R.D. 597 (E.D. Cal. 2007).

41.     *Id.* at 597.

42.     *Id.* at 601.

43.     Kincaid v. City of Fresno, No. 1:06-cv-1445, 2006 WL 3542732, at *9 (E.D. Cal. 2004) (finding that an unattended bicycle in good condition was destroyed as "trash" merely because it was unattended).

44.     *Id.* at *9 (finding that the city destroyed one homeless woman's urn containing the ashes of her granddaughter).

45.     *Id.* at *11 (finding that the city destroyed a cart containing one woman's identification papers, asthma medication, and nebulizer machine, resulting in an extended stay in the emergency room).

46.     *Id.* at *6 ("[T]he City's policy is that any property that is not physically attended to by its owner is considered abandoned and is defined by the City as 'trash.' All such property will be destroyed with no chance for the owner to reclaim it.").

47.     The court explained that homeless people must conduct a variety of necessary daily activities, work, or other activities and, therefore, cannot practically stay with their property 24 hours a day. The court further stated that homeless people "have an expectation of continued ownership of their property and do not intend to abandon their property because they leave it in a cart or similar device, which is covered by or wrapped in a blanket, tarp, or tent, unattended for a period of time." *Id.* at *5.

homeless persons' right to due process under the Fourteenth Amendment.[48] As a remedy, the court granted the plaintiffs motion for preliminary injunctive relief, which ultimately led to a settlement between the parties.[49] This settlement was distinguishable from those reached in *Pottinger* and *Jones* in that it included an award of monetary damages to the plaintiffs to assist them in obtaining housing. Although the final settlement for $2.3 million was the largest of its kind in the United States, the amounts to each plaintiff were minimal.[50] Ultimately, while giving homeless persons better notice and procedural protections, the City of Fresno continued sweeps of homeless encampments, and further lawsuits on behalf of homeless plaintiffs were filed three years later.[51]

The most positive remedy to date can be found in the case of *Lakewood v. Steve Brigham, et al., Ocean County, et al.* which involved a challenge to the forced emptying of a homeless encampment known as Tent City.[52] On the positive side, the court denied the city's motion to forcibly vacate Tent City, stating, "there is a governmental responsibility here to care for the poor at some level."[53] However, the court also questioned its authority to order the township to provide shelter, declining to advise policymakers on the matter.[54]

In an April 10, 2013 consent order settling the case, the court directed a census of Tent City residents and ordered that all campers who were eligible to move into a "viable housing option," defined as at least one year in safe and adequate indoor housing in Ocean County, were required to accept the governmental assistance. [55] Those who

---

48.    *Id.* at *38–39.

49.    *Id.* at *41–42.

50.    Settlement Agreement at 4, Kincaid v. City of Fresno, No. 06-cv-1445-OWW (E.D. Cal. June 5, 2008).

51.    *See Articles on the Homeless Issue in Fresno*, Community Alliance, http://fresnoalliance.com/wordpress/?p=1313 (last updated Nov. 11, 2013); Mike Rhodes, *Lawsuits Filed in Response to the City of Fresno's Treatment of the Homeless*, Community Alliance (Apr. 1, 2012), http://fresnoalliance.com/wordpress/?p=4647.

52.    Twp. of Lakewood v. Brigham, No. L-2462-10 (N.J. Super. Ct. 2013).

53.    Transcript of Motion for Summary Judgment Hearing at 19, Twp. of Lakewood v. Brigham, No. L-2462-10 (N.J. Super. Ct. 2013).

54.    *Id.* at 23.

55.    Consent Order at 4, Twp. of Lakewood v. Brigham, No. L-2462-10 (N.J. Super. Ct. 2013).

were not eligible for such alternative housing had the continued right
to remain in Tent City until other arrangements could be made.[56]

The *Lakewood* case is notable for its final order to require the
government to provide housing to *all* the persons directly affected by
the town's proposed action or, in the absence of housing, to permit
those affected people to remain camping on public property. As the
plaintiff's attorney, Jeffery Wild, said, "We're not here to defend Tent
Cities; no one should have to live in the woods. This is about the right
of everyone to have housing."[57] The significance of the outcome is
somewhat tempered by the fact that the court merely sanctioned the
provision of housing assistance, rather than directing it. In addition,
the remedy provided is temporary, limiting the government's
responsibility to provide housing to a single year.

Ultimately, these cases demonstrate that enforcing the
limited civil rights protections under the Constitution leaves the
violation of the human right to housing—recognized in international
treaties, but not recognized under domestic law—unaddressed, which
inevitably leads to further conflict between authorities and persons
whose rights are violated. As long as homelessness persists in a
community, businesses and residents will continue to pressure their
elected officials to "do something" about the homelessness problem.
Criminalizing homelessness appears at first blush to be a quick fix,
but it does nothing to solve the underlying problem and, in fact, often
makes it worse.[58] Only implementation of the human right to housing
will remove the pressure to criminalize homelessness and allow
homeless persons to fully participate in our democratic society. Yet,
courts remain reluctant to order housing solutions as relief, citing
federalism and separation of powers concerns.[59] As the next section

---

56.     *Id.* at 5.
57.     Associated Press, *Judge: Homeless at Lakewood's Tent City Will Be
Offered Indoor Housing Instead of Evicted*, NJ.com (Mar. 15, 2013),
http://www.nj.com/news/index.ssf/2013/03/judge_homeless_at_lakewoods_te.html.
58.     *See Criminalizing Crisis, supra* note 2, at 15.
59.     The court explained in *Jones v. City of L.A.* that it "do[es] not suggest
that Los Angeles adopt any particular social policy, plan, or law . . . [and] do[es]
not desire to encroach on the legislative and executive functions . . . ." The court
stated that the City could address the issue "in any way that it sees fit" and is not
compelling the City to "provide sufficient shelter for the homeless, or allow anyone
who wishes to sit, lie, or sleep on the streets . . . at any time and at any place
within the City." 444 F.3d 1118, 1138 (9th Cir. 2006). In *Kincaid v. City of Fresno*,
the court stated it would "not presume to tell elected officials of the City of Fresno
how to address and resolve problems presented by the homeless." No. 106-cv-1445
OWW, 2006 WL 3542732, at *34 (E.D. Cal. Dec. 8, 2006).

discusses, even if courts fail to find the right to housing itself directly enforceable, they should find the ability to order its enforcement as part of a broad and effective remedy that ensures enjoyment of the other constitutional rights persistently violated by cities in attempting, ineffectively, to address homelessness through narrow policing practices.

### III. BROAD AS NECESSARY: DEFINING THE BOUNDARIES OF EQUITABLE REMEDIES

Despite the concerns expressed by the courts in *Pottinger*, *Jones,* and *Kincaid* that they cannot order substantial changes to other branches of government or expenditure of funds,[60] federal courts have employed broader remedies, particularly in the areas of education and prison reform. While the *Pottinger* court felt it would overstep its judicial authority if it were to assemble and allocate welfare-related resources, in numerous cases courts have fashioned remedies doing just that, even against the express will of other branches of government.[61] Such remedies, commonly called "structural" remedies, are directed to other branches of government to solve the underlying problem that creates the violation at issue.

Consistent with the concerns noted by the *Pottinger* court, federalism and separation of powers concerns play a role in defining the boundaries of such remedies. In a number of opinions concerning lower courts' use of structural remedies, discussed below, the Supreme Court has provided principles indicating the proper targets and purposes of equitable relief. Typically, federal courts' remedial powers are limited by the nature of the constitutional violation at issue. Courts must avoid remedies which aim either to eliminate a condition that does not violate the Constitution or does not "directly flow" from such a violation.[62] Similarly, courts should typically extend their remedial powers over other institutions only so far as necessary to restore parties to the position they occupied before those institutions violated their fundamental rights. The Supreme Court has expected lower courts to determine—even in cases dealing with

---

60.     *See supra* Section II.

61.     *See, e.g.*, Missouri v. Jenkins (*Jenkins I*), 495 U.S. 33, 56–57 (1990) (directing lower court to order Kansas City school district to levy taxes in excess of its state law authority to tax); Bylinski v. City of Allen Park, 8 F. Supp. 2d 965, 975 (E.D. Mich. 1998) (directing city to levy taxes sufficient to remedy its Clean Water Act violations, even if those taxes violated the Michigan Constitution).

62.     *See* Milliken v. Bradley (*Milliken II*), 433 U.S. 267, 282 (1977).

unquantifiable values such as "quality of education"—the extent of
governmental institutions' harm and to fashion remedies narrowly
providing victims with exactly what they improperly lost.[63] Lower
courts have interpreted the Supreme Court's approach as "reflect[ing]
concern that the district court not go beyond the needs of the
plaintiffs."[64]

Where these principles apply, they prevent courts from
addressing a city's unconstitutional criminalization of homelessness
with structural remedies intended to address homelessness itself.
Homelessness is not a direct effect of governments' unconstitutional
criminalization of homeless individuals. Rather, widespread
homelessness is a catalyst; governments violate the Constitution as
they seek to drive unsightly poverty behind bars or beyond city
limits.[65] Moreover, while homeless individuals unquestionably suffer
a wide manner of harms when governments criminalize their
innocent, inevitable behavior,[66] the loss of their home is not among
them.

However, not all cases involving violations of constitutional
rights are typical. The Supreme Court has allowed lower courts to
fashion remedies unconstrained by its general principles governing
equitable relief when: (1) those courts have determined broader
structural changes are necessary to cure an ongoing constitutional
violation *and* (2) state and local authorities have demonstrated their

---

63.  *See* Missouri v. Jenkins (*Jenkins III*), 515 U.S. 70, 101 (1995) (holding
the Eighth Circuit's test expecting school desegregation remedy to maximally
integrate Kansas City's school system "clearly is not the appropriate test to be
applied").

64.  Morgan v. O'Bryant, 687 F.2d 510, 516 (2d Cir. 1982); *see also* United
States v. City of Yonkers, 197 F.3d 41, 56 (2d Cir. 1999) ("Absent a
focused . . . explanation of how each individual remedial component is tailored to
respond to one or another of [the vestiges of segregation], we can only conclude
that the sweeping remedy imposed here exceeded the admittedly broad power of
the district court.").

65.  For a summary of cases in which individuals have challenged
criminalization and related practices, see Advocacy Manual, *supra* note 2, at
57–149. *See, e.g.*, Anderson v. City of Portland, No. 08–1447–AA, 2009 WL
2386056, at *5–7 (D. Or. July 31, 2009) (denying the city's motion to dismiss
where plaintiffs stated a claim based on injuries that included exclusion from
public parks).

66.  *See, e.g.*, Advocacy Manual, *supra* note 2, at 57–149 (summarizing cases
challenging criminalization); Jones v. City of L.A., 444 F.3d 1118, 1127
("Appellants . . . have been and are likely to be fined, arrested, incarcerated,
prosecuted, and/or convicted for involuntarily violating [the ordinance that
prohibits sitting, lying, or sleeping on public streets].").

longstanding unwillingness or inability to cure that violation.[67] Where other branches or other levels of government fail to act effectively to protect individuals' fundamental rights, the federal judiciary has filled the gap. In such a situation, the *Pottinger* court's "ideal solution"—housing unsheltered homeless persons—would arguably be within a court's remedial powers.

The Sixth Circuit was the first court to hold that judicial remedies could expand to become broad enough to resolve a constitutional violation other branches had failed to address. *Bradley v. Milliken* considered a lower court's remedial authority in the context of school desegregation.[68] After extensive litigation, the lower court had determined that no desegregation plans solely aimed at the Detroit city school district would effectively end segregation and had thus ordered Detroit to consider desegregation plans spanning its entire metropolitan area.[69] The Sixth Circuit upheld the district court's order, emphasizing both that the court below had found more narrowly fashioned relief would be ineffective and that the legislature had failed to take action to resolve the issue itself.[70]

The Supreme Court reversed the Sixth Circuit, holding that the district court had violated the principles governing the scope of equitable relief.[71] In doing so, however, it failed to address the Sixth Circuit's holding—that the district court could fashion a broader remedy when the legislature was inactive and it had concluded narrowly fashioned remedies would be ineffective. Instead, the Court re-characterized the case. In the Supreme Court's view, the citywide remedies Detroit had proposed to the district court *were* capable of effectively desegregating Detroit city schools.[72] The Court did not directly address the lower court's conclusion that an inter-district remedy was the *only* relief capable of being effective—a deficiency in its opinion Justice Marshall noted in dissent.[73] It therefore did not

---

67.    *See infra* Section III.
68.    Bradley v. Milliken, 484 F.2d 215 (6th Cir. 1973), *rev'd*, Milliken v. Bradley (*Milliken I*), 418 U.S. 717 (1974).
69.    *See id.* at 244 (discussing district court opinion without citation).
70.    *Id.* at 245, 252.
71.    Milliken v. Bradley (*Milliken I*), 418 U.S. 717, 745 (1974).
72.    *See id.* at 747 n.22 ("The suggestion . . . that schools which have a majority of Negro students are not 'desegregated,' whatever the racial makeup of the school district's population and however neutrally the district lines have been drawn and administered, finds no support in our prior cases.").
73.    *Id.* at 784 ("Nowhere in the Court's opinion does the majority confront, let alone respond to, the District Court's conclusion that a remedy limited to the

address whether, under such circumstances, the district court's broader remedy would have been appropriate.

Addressing homelessness by providing housing, rather than simply enjoining the enforcement of criminalizing ordinances, would require reallocation of significant resources by other branches of government. The Sixth Circuit's holding in *Milliken,* consistent with a long line of desegregation cases before it, showed that where those other branches had failed in their constitutional duties, it was willing to overcome the principle of separation of powers and order just such a reallocation.[74] Busing tens of thousands of school children across city and county lines would have been a hugely expensive proposition, one that the legislative branches had as yet refused to do on their own. Providing adequate housing also requires investment of new resources, and though numerous studies have shown providing housing is a more cost-effective solution, many communities have not made the necessary investment, persisting instead in ineffective and illegal criminalization.[75] Courts should not shy away from this remedy when other remedies prove as ineffective as trying to desegregate schools in a city that is already segregated from its suburbs.

Justice Thomas, in a biting concurrence in *Missouri v. Jenkins,* another education case*,* attempted to mark the end of federal courts' innovative exercise of what he called "virtually unlimited equitable powers," which, in his view, "has trampled upon principles of federalism and the separation of powers and has freed courts to pursue other agendas unrelated to the narrow purpose of precisely remedying a constitutional harm."[76] While the Sixth Circuit's "broad-as-necessary remedies" holding has not governed or been

---

city of Detroit would not effectively desegregate the Detroit city schools.") (Marshall, J., dissenting).

74.    *See Milliken,* 484 F.2d at 244 (citing Green v. Cnty. Sch. Bd. of New Kent Cnty., Va., 391 U.S. 430, 439–41 (1968). The Sixth Circuit holding in *Milliken* builds on the Supreme Court's precedent in *Green,* where the Court ordered a lower court not to consider whether the school board's desegregation plan was merely an effective method for curing segregation, but whether it was the fastest, most effective method.

75.    *See, e.g.*, Criminalizing Crisis, *supra* note 2, at 9 (citing The Lewin Group, Costs of Serving Homeless Individuals in Nine Cities: Chart Book (2004)) ("In 2004, a study . . . found supportive housing to be the cheapest option in addressing the needs of homeless people when compared to jails, prisons, and mental hospitals. For several cities, supportive housing was also found to be cheaper than housing homeless individuals in shelters.").

76.    *See* Missouri v. Jenkins (*Jenkins III*), 515 U.S. 70, 100 (1995).

deemed persuasive in subsequent opinions,[77] the Supreme Court has returned to a more expansive view of equitable power in its cases involving prison reform.[78]

Most recently, in *Brown v. Plata*, the Court considered the validity of a lower court's order directing California to reduce overcrowding in its penal system to 137% of capacity in order to remedy the "unconstitutional medical and mental health care."[79] Under the Supreme Court's general principles governing equitable relief, the lower court's order in *Plata* was both improperly targeted *and* improperly purposed: It targeted overcrowding—the precursor to medical neglect—rather than medical neglect itself.[80] It also stood to place many inmates in a substantially better position: California pointed out that its prison system would likely need to release many inmates—including some whose rights had never been violated—early in order to comply with the court order.[81]

Despite these defects, the Supreme Court upheld the lower court's order.[82] Its opinion was exhaustive, but its reasoning succinct:

---

77.    The Sixth Circuit itself retreated from its reasoning the following year, ruling that a district court had not abused its discretion when it approved a desegregation plan for Chattanooga high schools which, due to city-to-suburb migration, had not actually resulted in an integrated school system. *See* Mapp v. Bd. of Ed. of Chattanooga, Tenn., 525 F.2d 169, 171–72 (6th Cir. 1975). The court did not even require the Chattanooga school board to propose a plan it believed would be effective. A dissent argued that "the Supreme Court has repeatedly held that ineffective freedom of choice plans are not a substitute for desegregation in fact [and] the defendant school board should be required to propose a new and realistic plan to meet its constitutional duty." *Id.* at 177 (Edwards, J., dissenting).

78.    *See* Hutto v. Finney, 437 U.S. 678, 687 (1978) (holding district court "had ample authority to go beyond earlier orders" after "taking the long and unhappy history of the litigation into account"); Inmates of Occoquan v. Barry, 844 F.2d 828, 842 (D.C. Cir. 1988) ("[T]he Supreme Court understands the equitable discretion of district courts to be at its zenith *after* prison authorities have abdicated their remedial responsibilities . . . .") (citing *Hutto*, 437 U.S. 678)).

79.    Brown v. Plata, 131 S. Ct. 1910, 1927 (2011).

80.    *See id.* at 1959 ("[T]he court's remedy is not narrowly tailored to address proven and ongoing constitutional violations.") (Alito, J., dissenting).

81.    *Id.* at 1939 ("Reducing overcrowding will also have positive effects beyond facilitating timely and adequate access to medical care . . . .").

82.    It is arguable that the Supreme Court upheld the lower court's injunction on the basis of specific statutory provisions governing prison litigation since 1995, rather than on the basis of its precedents governing equitable relief. The Prison Litigation Reform Act of 1995 (PLRA) provides that "no court shall enter a prisoner release order" unless it finds that "crowding is the primary cause of the violation of a Federal right . . . ." 18 U.S.C. § 3626(a)(3)(E)(i) (2012). Arguably, it is the PLRA that allows courts to look to the causes of a

> The population reduction [is] of unprecedented sweep and extent. Yet so too is the continuing injury and harm . . . . For years . . . California's prisons [have] fallen short of minimum constitutional requirements . . . . Over the whole course of years during which this litigation has been pending, no other remedies have been found to be sufficient. Efforts to remedy the violation have been frustrated by severe overcrowding in California's prison system.[83]

*Plata* suggests that if a court were to determine a government had, over a prolonged period, failed effectively to cure its unconstitutional criminalization of its homeless citizens, that court would have the authority to fashion a remedy addressing homelessness directly. Under ordinary circumstances, neither homelessness nor prison overcrowding are appropriate targets for equitable remedies. Both homelessness and prison overcrowding are precursors to constitutional violations, not constitutional violations themselves or effects of violations. Both homeless individuals whom courts grant housing and prison inmates whom courts grant less crowded accommodations (or early release) would be placed in a better position than they would have been had their constitutional rights not been violated.[84] According to typical guidelines, neither

---

constitutional violation, rather than only to its effects. However, this interpretation of the statute is unlikely. In general, the PLRA narrowed courts' ability to restructure prisons, insisting that remedies may extend "no further than necessary" to correct the violation of rights of "a particular plaintiff or plaintiffs" and that prospective relief must be "narrowly drawn" to be "the least intrusive means necessary." 18 U.S.C. § 3626(a)(1)(A) (2012). This provision of the statute is better interpreted as intended to prevent courts from ordering prisoner release in cases such as *Hutto v. Finney*, where many interdependent factors rendered prisoners' conditions of confinement unconstitutional. 437 U.S. 678, 688 (1978). The Judicial Impact Statement prepared while Congress was considering the PLRA supports this interpretation, glossing the subsection as barring relief "'*unless* the plaintiff proves that crowding is the *primary* cause of the deprivation.'" Judicial Impact Office, Admin. Office of the U.S. Courts, Judicial Impact Statement: Violent Criminal Incarceration Act of 1995, at 4–5 (1995) (emphasis added) (quoting Violent Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994)).

    83.   *Plata,* 131 S. Ct. at 1923.

    84.   It can be argued that courts have greater obligation and latitude to fashion equitable relief in cases involving prisoners, due to their custodial relationship. However, at least the *Lakewood* court, operating under state law, noted the state has some duties toward homeless persons as well. *See* Twp. of Lakewood v. Brigham, No. L-2462-10 (N.J. Super. Ct. 2013). Finding such a

should be within the scope of equitable relief. Nonetheless, where homeless individuals, like the inmates in *Brown v. Plata*, have suffered for years while their homelessness has frustrated efforts to remedy their unconstitutional criminalization, a trial court could fashion a remedy aimed at homelessness itself, despite longstanding principles governing equitable relief.[85]

## IV. INTERNATIONAL STANDARDS AND COMPARISONS: THE EVOLVING RIGHT TO AN EFFECTIVE REMEDY

As discussed above, recent Supreme Court precedent suggests that courts have discretion over whether to grant equitable remedies to the parties before them and, in certain circumstances, the appropriate scope of those remedies.[86] Indeed, that remedial authority may reach beyond the underlying right in cases where violations are extensive and prolonged and no other remedy has proven effective. Under international law, however, judicial *discretion* concerning remedies is ripening into an *obligation* to provide remedies broad enough to guarantee the cessation of ongoing violations of fundamental rights.[87] These developments can serve to inform U.S. courts' exercise of their authority and may also serve as a source of additional authority.

The practices of the international community increasingly suggest that victims of fundamental rights violations have a *right* to remedies broad enough to prevent the harms they have suffered from recurring. International human rights documents, the U.N. Human Rights Committee, the U.N. General Assembly, regional human rights courts, foreign high courts, and scholars of international law have begun to recognize the affirmative obligation of courts to provide remedies on broad-as-necessary terms. All of these institutions recognize, to varying degrees, courts' duty to step outside their typical role and provide relief broad enough to ensure effective solutions

---

stand-alone *duty* may be challenging under domestic law, but finding the ability to provide services as a part of an effective remedy need not be.

85.    *Cf. id.* at 1923.

86.    *See* Russell L. Weaver et al., Principles of Remedies Law 16–17 (2d ed. 2007); 14A C.J.S. *Civil Rights* § 485 (2013).

87.    The international right to an effective remedy protects both individuals' international human rights and their constitutional rights within their domestic legal system. Universal Declaration of Human Rights, G.A. Res. 217(III)A, art. 8, U.N.Doc A/RES/217(III) (Dec. 10, 1948) [hereinafter UDHR]. Therefore, the international portion of this Article will refer generally to the concept of "fundamental rights."

where narrower remedies have proven ineffective and governments
have proven intransigent.

As these court practices continue to develop, they are
accumulating the characteristics of a norm of customary international
law (CIL). Customary international law results from consistent
practices undertaken by states out of a sense of legal obligation; it is
generally viewed by American courts as a sort of international
common law that is persuasive, if not binding. [88] Even before reaching
this status, however, such practices may serve as persuasive or
instructive authority for American courts. [89]

Currently, the practice of viewing the imposition of
broad-as-necessary remedies as courts' obligation is visible to one
degree or another within international, regional, and national
fundamental rights jurisprudence. What follows is an outline, within
each of these levels, of the jurisprudence, codifications, and other
practices contributing to this developing norm. [90]

## A. International Authorities

The individual right to an effective remedy is well established
in international law. The preponderance of multilateral human rights
treaties, including widely accepted documents such as the
International Covenant on Civil and Political Rights (ICCPR)[91] as

---

88.    *See, e.g.*, Restatement (Third) of Foreign Relations § 102(2) (1987)
(defining customary international law as law that "results from a general and
consistent practice of states followed by them from a sense of legal obligation").

89.    *See, e.g.*, Martha F. Davis, *The Spirit of Our Times: State Constitutions
and International Human Rights*, 30 N.Y.U. Rev. L. & Soc. Change 359, 366,
371–75 (2006) (discussing the responsibility states have to consider international
human rights and other transnational norms in making state constitutional
decisions and arguing that states may have an obligation under the Supremacy
Clause to implement CIL at a state level).

90.    Evidence of state practices may include widely accepted multilateral
agreements, Restatement (Third) of Foreign Relations § 102 cmt. i (1987), and
resolutions of the General Assembly of the United Nations, *id.* § 103(2)(d). *See
also* Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 719 (9th Cir.
1992) (citing Filartiga v. Pena-Irala, 630 F.2d 876, 882–84 (2d Cir. 1980)) (holding
that the UDHR, as a resolution from the U.N. General Assembly, was a "powerful
and authoritative statement of the customary international law of human rights");
the decisions of international and national high courts, Restatement (Third) of
Foreign Relations § 103(2)(a–b) (1987); and highly regarded secondary
scholarship, *id.* § 103(2)(c).

91.    International Covenant on Civil and Political Rights, *opened for
signature* Dec. 16, 1966, S. Exec. Doc. E, 95-2 (1978), 999 U.N.T.S. 171 (entered

well as the Universal Declaration of Human Rights (UDHR),[92] incorporate individuals' "right to an effective remedy" for violations of their fundamental rights.[93]

However, international authorities have yet to agree whether this right includes a right to substantive relief broad enough to address underlying causes of rights violations when such relief is necessary to ensure that ongoing violations cease.[94] The U.N. Human Rights Committee, the body of independent experts charged by the ICCPR with monitoring States Parties' implementation of the treaty,[95] believes "[c]essation of an ongoing violation is an essential element of the right to an effective remedy."[96] The U.N. General Assembly, guided by these international sources more generally, has taken a less normative view.[97] Its Basic Principles on victims' rights to remedies and reparations suggests that the right to an effective

into force Mar. 23, 1976) [hereinafter ICCPR]. The United States considers widely accepted multilateral agreements as evidence of customary international law. Restatement (Third) of Foreign Relations § 102(3) (1987).

92.    UDHR, *supra* note 87, art. 8. The United States considers the UDHR an authoritative statement of customary international law. *See Siderman de Blake*, 965 F.2d at 719.

93.    *See* Theo Van Boven, *Victim's Rights to a Remedy and Reparation: The New United Nations Principles and Guidelines*, *in* Reparations for Victims of Genocide, War Crimes, and Crimes Against Humanity: Systems in Place and Systems in the Making 19, 22 (Carla Ferstman et al. eds., 2009).

94.    The word "remedy" has both a procedural and a substantive dimension. Dinah Shelton, Remedies in International Human Rights Law 7 (2d ed. 2005). Procedurally, it refers to "processes by which arguable claims . . . are heard and decided." *Id.* Substantively, it refers to "the relief afforded the successful claimant." *Id.* In the international community, the word "reparation" is used most frequently to refer to the substantive dimension of remedies, *see id.*, while the European Court of Human Rights uses the term "redress," *see, e.g.*, Ananyev & Others v. Russia, App. Nos. 42525/07 & 60800/08, ¶¶ 108–09 (Eur. Ct. H.R. Jan. 10, 2012), *available at* http://www.echr.coe.int (using the term "redress" to refer to the substantive dimension of remedies). This Article will uniformly employ the term "relief."

95.    *See* ICCPR, *supra* note 91, art. 28–45 (establishing the Human Rights Committee, its procedures, and its competencies).

96.    U.N. Human Rights Comm., General Comment No. 31: The Nature of the General Legal Obligation Imposed on States Parties to the Covenant, ¶ 15, U.N. Doc. CCPR/C/21/Rev.1/Add.13 (May 26, 2004) [hereinafter General Comment No. 31].

97.    Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Gross Violations of International Human Rights Law and Serious Violations of International Humanitarian Law, G.A. Res. 60/147, Preamble, G.A. Res. 60/147, U.N. Doc. A/RES/60/147 (Mar. 21, 2006) [hereinafter Basic Principles].

remedy allows courts to exercise discretion as to whether to fashion relief intended to ensure that recurring violations cease.[98] The original drafter of the Basic Principles considers the right to effective remedies "not yet a firm *acquis* but an emerging duty," and in particular believes states have not yet reached any general consensus concerning courts' responsibility to provide specific forms of relief.[99]

## B. Regional Human Rights Courts

While the right to judicial measures broad enough to prevent recurring violations is not yet CIL, the evolving practices of regional human rights courts suggest that these courts do believe in a legal obligation for the judiciary to craft relief broad enough to ensure that states' violations of fundamental rights will not recur. The Inter-American Court of Human Rights (IACtHR) has taken it upon itself to craft such structural relief directly. The European Court of Human Rights (ECtHR), while more sensitive to concerns of state sovereignty and the limitations of its role, has recently indicated that domestic judiciaries may be obligated to fashion structural relief under certain circumstances in order to satisfy victims' right to effective relief. Both approaches suggest these courts feel some obligation to provide broad-as-necessary relief to victims.

### 1. The Inter-American Court of Human Rights

The IACtHR provides victims with a full-fledged individual right to structural relief as a component of the right to an effective remedy. Like the U.N. Human Rights Committee,[100] the Court considers guarantees of non-repetition to be a necessary part of

---

98.    The drafting history of the Basic Principles indicates that the word "shall" precedes obligatory provisions, whereas the word "should" indicates a provision that is less categorical. *See* Rep. of the Second Consultative Meeting on the Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Violations of International Human Rights and Humanitarian Law, U.N. Econ. & Soc. Council, Oct. 20–23, 2003, ¶ 45, U.N. Doc. E/CN.4/2004/57 (Nov. 10, 2003). While the Basic Principles provide that states "shall" make available "adequate, effective, prompt and appropriate remedies, including reparation," Basic Principles, *supra* note 97, at Principle 2(c), they also provide that victims "*should*, as appropriate . . . be provided with full and effective reparation," *id.* at Principle 18 (emphasis added), and that reparation "*should* include, where applicable, . . . [e]ffective measures aimed at the cessation of continuing violations," *id.* at Principle 22 (emphasis added).

99.    *See* van Boven, *supra* note 93, at 31.

100.    *See* General Comment No. 31, *supra* note 96, and accompanying text.

effective relief as a matter of customary international law.[101] Therefore, the Court has often issued "non-repetition measures" ordering offending states to make structural changes,[102] which a former Senior Attorney at the Court has expressly compared with the United States' structural remedies.[103] For example, when the Court found that Mexico had cultivated a culture of impunity for crimes against women in Ciudad Juárez, the Court issued fourteen affirmative injunctions.[104] These directed Mexico to undertake such tasks as establishing independent oversight of its justice department's investigations into gender-based violence and to "[a]mplify the participation of women in the design and implementation of public policy and decision-making at all levels and across all sectors of government."[105]

Unfortunately, despite the creative and progressive jurisprudence of the IACtHR itself, its judgments have,

---

101.     *See, e.g.*, Molina-Theissen v. Guatemala, Reparations and Costs, ¶¶ 39–40 (Inter-Am. Ct. H.R. July 3, 2004), *available at* http://www.corteidh.or.cr/docs/casos/articulos/seriec_108_ing.pdf (explaining that the responsibility to provide "adequate reparations" for violations of States' international obligations is a principle of CIL); The "Street Children" Case (Villagrán-Morales v. Guat.), Reparations, Inter-Am. Ct. H.R. (ser. C) No. 77, ¶ 98 (May 26, 2001) (finding that the American Convention on Human Rights obligates State parties to ensure non-repetition of rights violations). The right to an effective remedy is also incorporated into numerous treaties under which the Court adjudicates. *See, e.g.*, *American Declaration of the Rights and Duties of Man*, O.A.S. Res. XXX, 9th Int'l Conference of American States, art. 18, O.A.S. Official Record, OEA/Ser.L/V./II.23, doc.21 rev.6 (1948), *reprinted in* Basic Documents Pertaining to Human Rights in the Inter-American System, OEA/Ser.L.V/II.82 doc.6 rev.1, at 17 (1992); American Convention on Human Rights, *opened for signature* Nov. 22, 1969, art. 25, O.A.S.T.S. No. 36, 1144 U.N.T.S. 143 (entered into force July 18, 1978).

102.     Alexandra Huneeus, *Courts Resisting Courts: Lessons from the Inter-American Court's Struggle to Enforce Human Rights*, 44 Cornell Int'l L.J. 493, 506 (2011).

103.     *See* Thomas M. Antkowiak, *Remedial Approaches to Human Rights Violations: The Inter-American Court of Human Rights and Beyond*, 46 Colum. J. Transnat'l L. 351, 387 (2008).

104.     González et al. ("Cotton Field") v. Mexico, Merits, Reparations, and Costs, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 205, ¶ 602 (Nov. 16, 2009); Huneeus, *supra* note 102, at 501.

105.     *See* Inter-Am. Comm'n H.R., The Situation of the Rights of Women in Ciudad Juárez, Mexico: The Right to be Free from Violence and Discrimination, OEA/Ser.L./V/II.117, doc. 44 ¶ 169(4) (2003), *available at* http://www.cidh.org/annualrep/2002eng/chap.vi.juarez.htm (setting out "[g]eneral recommendations to enhance the efficacy of the right of the women of Ciudad Juárez to be free from violence").

unfortunately, been largely ignored and even resisted by domestic courts charged with implementing them.[106] Although the IACtHR has a well-developed monitoring system, because of the frequently contentious nature of the cases affecting countries with deeply ingrained problems of impunity, relatively few orders that involve structural remedies are actually complied with by states.[107] Thus, while these decisions may serve as useful guiding precedent for litigators in the United States to share with courts, examples of how these decisions have improved the enjoyment of human rights for victims in the Americas is sadly limited.[108]

## 2. The European Court of Human Rights

The ECtHR, in contrast, is only beginning to evolve toward the idea that the right to an effective remedy obligates courts to provide broad-as-necessary relief, including structural relief. Yet in cases where it awards such relief, compliance is more robust. While the ECtHR upholds applicants' right to an effective remedy under the European Convention,[109] its approach to relief has traditionally been more conservative. Typically, it awards successful claimants declaratory judgments that establish breaches of the Convention, sometimes coupled with monetary relief.[110] Where states have systemic issues that contribute to recurring rights violations, the Court may order those states to resolve their issues, but has stopped short of fashioning solutions itself.[111]

---

106.    *See* Huneeus, *supra* note 102, at 494–95.

107.    *See id.* at 503, 507–09.

108.    *See* David C. Baluarte & Christian M. De Vos, Open Soc'y Justice Initiative, From Judgment to Justice: Implementing International and Regional Human Rights Decisions 63–65 (2010), *available at* http://www.opensocietyfoundations.org/sites/default/files/from-judgment-to-justice-20101122.pdf (explaining that the IACtHR and the Commission "have struggled with low levels of implementation of their final recommendations and orders in contentious cases")

109.    [European] Convention for the Protection of Human Rights and Fundamental Freedoms, *opened for signature* Nov. 4, 1950, art. 13, Europ. T.S. No. 14, 213 U.N.T.S. 211, 232 (entered into force Sept. 3, 1953) [hereinafter European Convention].

110.    *See* Ingrid Nifosi-Sutton, *The Power of the European Court of Human Rights to Order Specific Non-Monetary Relief: A Critical Appraisal from a Right to Health Perspective*, 23 Harv. Hum. Rts. J. 51, 51 (2010).

111.    *See* European Court of Human Rights Press Unit, Factsheet–Pilot Judgments (2013), *available at* http://www.echr.coe.int/Documents/ FS_Pilot_judgments_ENG.pdf ("It is for the State, subject to the supervision of the Committee of Ministers of the Council of Europe, to choose how to meet its

However, in recent years the ECtHR has taken steps transforming its traditional practices in a manner that suggests its growing recognition of victims' right to broad-as-necessary relief. In its 2005 case, *Hirst v. United Kingdom*, the Court offered the applicants relief beyond a declaratory judgment, finding that the United Kingdom had violated the European Convention and leaving it up to the State party to affect the necessary and appropriate policy reforms.[112] Within the past two years, the Court has gone even further in situations where states have persistently violated the European Convention's Article 3 prohibition against inhumane or degrading treatment or punishment. For example, the Court fashioned relief restructuring Russia's domestic judicial system and strongly suggested states generally should provide structural relief in their own courts.

After its declaratory relief failed to effectively cure the United Kingdom's practice of denying suffrage to its prison inmates, the ECtHR provided unprecedented specific equitable relief. In *Hirst,* the Court held that the U.K.'s blanket ban denying suffrage to its prison inmates violated the European Convention.[113] However, it explicitly denied its capacity to provide guidance on how the United Kingdom should reform its voting laws, even though the U.K. government had requested such assistance.[114] In 2010, when U.K. inmates again challenged the not-yet-lifted ban, the United Kingdom argued the ECtHR lacked jurisdiction over their case because the inmates had failed to exhaust their appeals in its domestic judicial system.[115]

Faced with five years of government inaction, the ECtHR held that declaratory relief alone was, in this situation, ineffective. The Court was unwilling to rule—as the U.K. Equality and Human Rights Commission had urged[116]—that declaratory relief was inherently

---

obligation under Article 46 (binding for and execution of judgments) of the Convention."). This practice reflects the traditional CIL norm governing repetitive violations: states have a duty to ensure that violations cease, but victims do not have a corresponding right to demand specific orders accomplishing this end from courts. *See, e.g.*, LaGrand (Germany v. United States), Judgment, 2001 I.C.J. 466, 513 (June 27); Responsibility of States for Internationally Wrongful Acts, G.A. Res. 56/83, ¶ 3, U.N. Doc. A/RES/56/83 (Jan. 28, 2002).

    112.    Hirst v. United Kingdom (No. 2), 2005-XI Eur. Ct. H.R. 189, 216–17.

    113.    *Id.* at 217.

    114.    *See id.* at 216.

    115.    Greens & M.T. v. United Kingdom, App. Nos. 60041/08 & 60054/08, ¶ 60 (Eur. Ct. H.R. Nov. 23, 2010), *available at* http://www.echr.coe.int.

    116.    *See id.* ¶ 89.

ineffective. However, it did hold that, because other victims of the violation had already received declaratory relief in the U.K. court system, the complainants had not failed to exhaust *effective* domestic remedies by foregoing their right to appeal for declaratory relief before domestic courts.[117]

On the basis of this argument, the Court proceeded to fashion injunctive relief and maintain oversight over the issue. Noting "the lengthy delay to date," the Court ordered the U.K. to introduce legislative proposals to amend its policy within six months of the Court's judgment.[118] The Court also made clear that it was retaining independent authority to revisit the question of the U.K.'s prisoner suffrage policy.[119] It suspended a large number of identical challenges to the U.K. policy, emphasizing that it would restore those challenges to its docket should the U.K. fail to comply with its legislative timeline.[120]

While the ECtHR stopped short in 2010 of restructuring the U.K.'s prison system itself in *Greens & M.T.*, it has recently asserted its authority to restructure states' domestic judiciaries in order to provide them with the means to offer broad-as-necessary remedies themselves, at least in cases involving violations of the Article 3 prohibition of inhuman or degrading treatment or punishment. In *Ananyev & Others v. Russia*, after eleven years and dozens of declaratory judgments finding Russia's penal system systematically violated individuals' Article 3 rights, the Court held that Russia had violated inmates' Article 13 right to an effective remedy as well.[121]

---

117.    *See id.* ¶ 68. Notably, U.K. courts issuing declaratory judgments on the issue had refused plaintiff's requests to fashion equitable relief on reasoning quite similar to the U.S. courts' typical limitations on equitable remedies. *See id.* ¶ 33 (quoting R. v. Sec'y of State, ex parte Toner & Walsh, [2007] NIQB 18 (N. Ir.)); *see also id.* ¶ 35 (quoting Chester v. Sec'y of State for Justice & Another, [2009] EWHC (Admin) 2923 (Eng.)).

118.    *Id.* ¶ 115.

119.    *Id.* ¶¶ 120–21.

120.    *Id.* ¶ 121. The Court granted the U.K. an extension pending its judgment in *Scoppola v. Italy (No. 3)*, App. No. 126/05, 56 Eur. H.R. Rep. 19 (2013), a case concerning the legitimacy of Italy's more tailored ban on inmate voting under the European Convention. Press Release, Registrar of the European Court of Human Rights, Court Adjourns 2,354 Prisoners' Voting Rights Cases (Mar. 26, 2013), *available at* http://hudoc.echr.coe.int/webservices/content/pdf/003-4306526-5151000. The Court has decided not to reconsider pending applications against the U.K. until, at the latest, September 30, 2013. *Id.*

121.    Ananyev & Others v. Russia, App. Nos. 42525/07 & 60800/08, ¶ 184 (Eur. Ct. H.R. Jan. 10, 2012), *available at* http://www.echr.coe.int. The ECtHR first held Russia's penal system violated its inmates' Article 3 rights in 2002. *See*

Specifically, Russia had failed to demonstrate that it provided any relief that effectively improved the complainants' situations.[122]

The relief the Court fashioned to resolve Russia's Article 13 violation was unprecedented. While the Court was unwilling to order specific changes to Russia's prison system in order to directly resolve the State's Article 3 violations, it *was* willing to order specific structural changes to Russia's domestic judicial system to ensure Russian courts would have the authority to provide effective relief.[123] The Court proceeded to issue several directives to Russia requiring it to establish a monitoring authority for its detention facilities.[124] Moreover, it strongly hinted that the State should equip its own court system with the power to provide structural relief to protect Article 3 rights.[125]

In the nineteen months since *Ananyev*, the Court has moved quickly to fortify and expand its new doctrines. Unlike its response to the United Kingdom, it did not adjourn similar cases from Russia[126] and has since moved quickly to reiterate *Ananyev*'s novel precedents in multiple opinions concerned with nearly identical allegations.[127] In one recent case, the Court went further in holding that remedies not including measures intended to prevent recurring violations are

---

*id.* ¶ 179 (noting that *Kalaashnikov v. Russia*, 2002-VI Eur. Ct. H.R. 93, was the first such finding by the Court). By January 2012, the Court had found that the Russian penal system's conditions of confinement violated Article 3 in more than 80 cases. *Id.* ¶ 184.

122.   *See id.* ¶ 106 (noting effective remedies should be "legally binding decision[s] that would be capable of bringing about an improvement in the complainant's situation or would serve as a basis for obtaining compensation"); *id.* ¶ 112 (finding that a theoretically effective remedy was ineffective where Russia could not demonstrate its practical effectiveness).

123.   *See id.* ¶ 212 ("[T]he Court's findings under this provision require clear and specific changes to the domestic legal system that would allow all people in the applicants' position to complain about alleged violations of Article 3 . . . and to obtain adequate and sufficient redress . . . at the domestic level.").

124.   *See id.* ¶¶ 215–16.

125.   *See id.* ¶ 219.

126.   *See id.* ¶ 236.

127.   *See, e.g.*, Dirdizov v. Russia, App. No. 41461/10, ¶ 88 (Eur. Ct. H.R. Nov. 27, 2012), *available at* http://www.echr.coe.int ("The remedy, which has not produced a substantial body of case-law or a plethora of successful claims in more than eighteen years of existence, leaves genuine doubts as to its practical effectiveness."); Reshetnyak v. Russia, App. No. 56027/10, ¶ 77 (Eur. Ct. H.R. Jan. 8, 2013), *available at* http://www.echr.coe.int (following the same procedure and reasoning).

inherently ineffective.[128] When applying *Ananyev* principles to Italy, the Court indicated its intention to carefully scrutinize the effectiveness of domestic remedies (as it did in *Ananyev*) specifically in situations involving structural violations of Article 3.[129] This most recent precedent signals to states that, while the European Court feels it cannot force them to provide their domestic courts with the power to fashion structural remedies, it will more carefully scrutinize the effectiveness of court systems without that power when it considers applicants' claims of inhuman or degrading treatment or punishment. As the ECtHR's jurisprudence concerning its authority to restructure domestic judiciaries in order to provide effective relief continues to develop, it contributes to the body of international practices supporting victims' right to broad-as-necessary relief.

## C. National High Courts

While structural injunctions are rare,[130] they exist in the jurisprudence of a significant number of countries.[131] At least two foreign high courts have considered themselves obligated to fashion structural relief—including comprehensive orders similar in scope to the order approved by the U.S. Supreme Court in *Plata*[132]—where necessary to resolve ongoing human rights violations.

---

128.    *Dirdizov*, App. No. 41461/10, ¶¶ 72–83 ("The State cannot escape its responsibility by purporting to erase a wrong by a mere grant of compensation in [cases where prisoners are suffering inhuman and degrading treatment].").

129.    *Cf.* Affaire Torreggianai et Autres c. Italie, Req. Nos. 43517/09, 55400/09, 57875/09, 61535/09, 35315/10 & 37818/10, ¶ 54 (Eur. Ct. H.R. Jan. 8, 2013) (citing Ananyev & Others v. Russia, App. Nos. 42525/07 & 60800/08 (Eur. Ct. H.R. Jan. 10, 2012), *available at* http://www.echr.coe.int), *available at* http://www.echr.coe.int (holding that the structural nature of the violations in conditions of confinement cases makes preventive remedies in those cases particularly difficult to effectuate); *Ananyev*, App. Nos. 42525/07 & 60800/08, ¶ 219 (suggesting structural remedies are highly desirable in such situations).

130.    *See* David Landau, *The Reality of Social Rights Enforcement*, 53 Harv. Int'l L.J. 189, 203 (2012) ("[S]tructural injunctions are very rare in the comparative context.").

131.    At least a handful of non-English-speaking countries employ structural injunctions. *See id.* at 222 (Colombia); *id.* at 230 (Brazil); *id.* at 235 n.246 (Argentina); *In Re: Certain Amicus Curiae Applications; Minister of Health & Others v. Treatment Action Campaign & Others* 2002 (5) SA 721 (CC), at ¶ 109 (S. Afr.) (citing *Second Abortion Case*, Bundesverfassungsgericht [BVerfG] [Federal Constitutional Court] May 28, 1993, 88 Entscheidungen des Bundesverfassungsgerichts [BVerfGE] 203 (208) (Ger.)).

132.    *See supra* notes 79–81 and accompanying text.

The South African Constitutional Court, bound by its constitution to provide parties with "appropriate relief,"[133] rejected an argument that its lower courts were limited to passing declaratory judgments. The Court upheld a lower court's orders directing the government to implement a specific national program to uphold individuals' right to health care.[134] Citing international precedents, including the United States' structural remedies jurisprudence, the Court recognized that "courts in other countries also accept that it may be appropriate . . . to issue injunctive relief against the state."[135] Then, in dicta, it noted that structural relief was likely obligatory where less drastic remedies had proven ineffective.[136]

The Supreme Court of India, to which the South African Constitutional Court referred when building its own ruling,[137] has gone even further. Like the lower court in *Brown v. Plata*,[138] the Indian Supreme Court has asserted its authority to look beyond the rights violation at issue and fashion a structural remedy aimed at the violation's underlying cause under a broad-as-necessary theory. Unlike most U.S. district courts, the Indian Supreme Court felt that providing such a remedy was its *obligation*.

Operating under both constitutional and international provisions concerning the right to an effective remedy,[139] the Indian Supreme Court considered the validity of Article 24 of the Indian Constitution, which forbids children under fourteen from working in factories, mines, or other "hazardous employment."[140] After surveying the multiplicity of international, constitutional, and domestic

---

133.    S. Afr. Const., 1996, art. 38.

134.    *In Re: Certain Amicus Curiae Applications; Minister of Health & Others*, (5) SA 721 (CC), at ¶¶ 113, 124–29.

135.    *Id.* ¶¶ 107–08 (discussing Brown v. Bd. of Educ. of Topeka, Kan. (*Brown II*), 349 U.S. 294 (1955); M.C. Mehta v. State of Tamil Nadu & Others, (1996) 6 S.C.C. 756 (India); and other cases).

136.    *See id.* ¶¶ 113, 129.

137.    *See id.* ¶ 108 ("Even a cursory perusal of the relevant Indian case law demonstrates a willingness on the part of the Indian courts to grant far-reaching remedial orders.").

138.    *See supra* notes 79–81 and accompanying text.

139.    The Indian Constitution provides a "right to Constitutional Remedies" and the Supreme Court has the power to issue affirmative injunctions where appropriate to enforce individual rights. India Const. art. 32, §§ 1–2. In *M.C. Mehta*, a case involving child labor, the Court was also bound to consider the Convention on the Rights of the Child (CRC). M.C. Mehta v. State of Tamil Nadu & Others, (1996) 6 S.C.C. 756 at ¶ 15 (India).

140.    *M.C. Mehta*, 6 S.C.C. 756, at ¶ 3A (citing India Const. art. 24).

provisions regulating child labor,[141] the Court concluded that illegal child labor persisted in spite of these measures because of an underlying structural cause: endemic poverty.[142] Confronting this structural problem, the Court ordered comprehensive structural relief, directing each state to attempt to relocate its children into non-hazardous employment and, where alternative employment was not possible, to pay the child's parents a monthly stipend, as long as that child attended school.[143]

The Right to an Effective Remedy Including Structural Relief is an Emerging Customary International Law Norm

The interpretation of the Human Rights Committee, combined court decisions from the Americas, South Africa, and India, and evolving human rights jurisprudence in Europe, all suggest a significant number of countries see themselves as obligated to provide relief sufficiently broad enough to ensure that states' ongoing violations of human rights, once identified, effectively end. Where governments have not effectively resolved the structural causes of ongoing rights violations, international bodies and domestic high courts are stepping in with broad structural remedies. Once a consistent practice of some recognizable group of states triggers courts' obligations under sufficiently similar circumstances, victims' right to sufficiently broad relief could become established as a binding norm of Customary International Law.[144]

## V. Conclusion

While U.S. Supreme Court rulings have swung back and forth between expansive and narrow interpretations of judicial authority to fashion "structural" relief that addresses the underlying cause of rights violations, including ordering other branches of government to

---

141.   *Id.* ¶¶ 15–24.
142.   *See id.* ¶ 26 ("[P]overty is the basic reason which compels parents of a child, despite their unwillingness, to get it employed.").
143.   *Id.* ¶ 31.
144.   *Cf.* Restatement (Third) of Foreign Relations § 102(2) (1987) ("Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation."). This Article covers state practice in Europe, the United States, Latin America, India, and South Africa. Speculatively, the earliest group of states to be bound by this developing norm might be democratic societies with independent judiciaries. *Cf. id.* § 102 cmt. (e) (discussing how customary law between states may develop as a result of regional grouping). A more exhaustive comparative legal study would be needed to confirm this hypothesis.

take corrective action, the recent *Plata* precedent indicates the pendulum may be swinging in the direction of greater ability to fashion these equitable remedies.[145] This authority is limited to cases where the violation is extensive and persists over time. Moreover, the authority appears to be discretionary, with no apparent obligation for courts to exercise it, even when these conditions are present.

International standards and court decisions go further in some cases and consensus seems to be moving towards the view that, where conditions warrant, structural remedies are a matter of right, not simply discretion. Significantly, some of this international authority is looking to U.S. jurisprudence on structural remedies, as well as to international legal principles. Recent Supreme Court cases,[146] as well as rulings by lower federal and state courts,[147] have relied on international standards and rulings as persuasive authority, particularly as sources of "evolving standards of decency" in interpreting the Eighth Amendment.[148] The role of U.S. jurisprudence in shaping this growing international consensus may bolster its persuasiveness to American courts. Even prior to a finding that this has solidified into a CIL norm, which would be binding in U.S. courts, advocates could use the above cases and standards as persuasive evidence of how domestic courts should approach these cases.[149]

---

145.    *See supra* Section III.

146.    *See, e.g.*, Roper v. Simmons, 543 U.S. 551, 575–79 (2005) (discussing negative international opinion regarding imposing the death penalty on juveniles); Lawrence v. Texas, 539 U.S. 558, 577 (2003) ("The right the petitioners seek in this case has been accepted as an integral part of human freedom in many other countries.").

147.    *See, e.g.*, Brennan v. Florida, 754 So.2d 1, 14 & n.18 (Fla. 1999) (Anstead, J., concurring) (considering the ICCPR in a case where the court struck down the juvenile death penalty under the Florida Constitution); Sterling v. Cupp, 290 Or. 611, 622 & n.21 (1981) (en banc) (discussing international standards for prisoner treatment); Bott v. Deland, 922 P.2d 732, 740–41 (Utah 1996) (discussing *Sterling*, 290 Or. 611, and its consideration of international standards), *abrogated on other grounds by* Spackman *ex rel.* Spackman v. Bd. of Box Elder Cnty. Sch. Dist., 2000 UT 87, 16 P.3d 533; Moore v. Ganim, 660 A.2d 742, 780 (Conn. 1995) (Peters, J., concurring) (arguing that international human rights treaty provisions support the interpretation that the Connecticut Constitution provides a social welfare requirement); Boehm v. Superior Court, 178 Cal. App. 3d 494, 502 (Cal. Ct. App. 1986) (citing to the UDHR to support interpreting California's welfare statute to include food, clothing, and housing allowances), *abrogated on other grounds by* Saldana v. Globe-Weis Sys. Co., 285 Cal. Rptr. 385 (Cal. Ct. App. 1991).

148.    *See Roper*, 543 U.S. at 563.

149.    Davis, *supra* note 89, at 366, 371–75.

In the criminalization context, which often involves interpretation of the Eighth Amendment's broad prohibition on cruel and unusual punishment, the willingness of courts to exercise such authority—and plaintiffs to demand it—could make a tremendous difference. Numerous court rulings have upheld homeless plaintiffs' constitutional rights in the face of laws or practices that make criminal their public performance of the ordinary activities of daily life, such as eating, sleeping, or sitting, in the absence of any private place to perform them.[150] However, these rights continue to be violated because the underlying issue remains unaddressed; only remedying the lack of adequate housing will eliminate the conflict between cities' desire to remove visible poverty from public places and the needs of people without access to a private place to perform necessary life activities. As demonstrated by cities' renewal and only slightly modified enforcement of criminalization policies following the *Jones* and *Kincaid* decisions, this conflict will continue in the absence of a substantive remedy.[151]

The *Pottinger* court, aware of this underlying problem, resorted to "safe zones" as a remedy. These zones, however, merely delay the conflict rather than resolve it. While homeless people may be able to perform daily life activities within such zones and rights violations may thus be avoided, it is likely that violations will nonetheless continue to occur. Given development trends, it is unlikely that cities will decide to designate areas as permanent "safe zones" or, even if they did so, that those zones would adequately address cities' concerns such that they would voluntarily end their efforts to remove visibly homeless people from public places.

The *Lakewood* settlement is a clear step in the right direction. It addressed the immediate violation by enjoining the eviction or punishment of the homeless individuals in Tent City, but also prevented recurrence, at least in the intermediate term, by providing housing for one year to all residents.[152] Similar positive approaches to addressing homelessness through constructive, rather than destructive, means have been achieved in a growing number of other cities.[153] Although these remedies have been achieved through negotiation, not court mandate, the *Lakewood* court's assertion that

---

150.    *See supra* Section II.
151.    *Id.*
152.    *See* Consent Order, *supra* note 55, at 5.
153.    *See* Julie Hunter et al., Nat'l Law Ctr. on Homelessness & Poverty, Welcome Home: The Rise of Tent Cities in the United States (forthcoming 2014); Searching Out Solutions, *supra* note 4.

"there is a governmental responsibility here to care for the poor at some level" perhaps indicates the emergence of an awareness of the underlying right to housing—not explicit in domestic law, but clear in international law—and the desire to address violations of that right.[154] The advantage of domestic courts using the emerging international norm on effective remedies is that courts need not develop the right to housing as an independent right, but may still ensure the enjoyment of that right as part of the remedy preventing further Eighth Amendment violations.

The domestic and international authority in favor of structural remedies is significant and provides a basis for courts confronting violations such as those in *Pottinger, Jones, Kincaid,* and *Lakewood* to order meaningful, substantive relief. Indeed, a 2012 report by the U.S. Interagency Council on Homelessness emphasized that criminalization measures may violate not only our domestic Constitution, but also our international human rights treaty obligations under the International Covenant on Civil and Political Rights and Convention Against Torture.[155] Thus, the report encourages communities to pursue constructive alternatives. In instances where ongoing violations can be documented and there is evidence of official resistance to the protection of homeless individuals' rights, a court may order remedies that address homelessness itself, not just its criminalization. Such remedies could include, for example, ordering officials to provide housing and social services to homeless persons who are targeted by criminalization.

Increased utilization of structural remedies offers the prospect of longer-lasting, meaningful solutions that address the concerns of cities as well as the needs of homeless individuals. These remedies are also cost effective: providing housing is less costly—often by substantial margins—than deploying the criminal justice system to "sweep" homeless people away.[156] Furthermore, such remedies would conserve judicial resources by breaking the repetitive cycle of litigation followed by revised city ordinances aimed at accomplishing the same goal of removing homeless individuals. In

---

154.   Transcript of Motion for Summary Judgment, *supra* note 53, at 14.

155.   Searching Out Solutions, *supra* note 4, at 8.

156.   *See* Criminalizing Crisis, *supra* note 2, at 9 (citing The Lewin Group, Costs of Serving Homeless Individuals in Nine Cities: Chart Book (2004) ("In 2004, a study . . . found supportive housing to be the cheapest option in addressing the needs of homeless people when compared to jails, prisons, and mental hospitals. For several cities, supportive housing was also found to be cheaper than housing homeless individuals in shelters.").

short, such structural remedies would provide true relief to all involved.