**BROOKE WEITZMAN** SBN 301037
**WILLIAM WISE** SBN 109468
**ELDER LAW AND DISABILITY**
    **RIGHTS CENTER**
1535 E 17th Street
Santa Ana, California 92705
t. 714-617–5353
e. bweitzman@eldrcenter.org
e. bwise@eldrcenter.org

**CAROL A. SOBEL** SBN 84483
**MONIQUE ALARCON** SBN 31165
**AVNEET CHATTHA** SBN 316545
**LAW OFFICE OF CAROL SOBEL**
725 Arizona Avenue, Suite 300
Santa Monica, California 90401
t. 310-393-3055
e. carolsobellaw@gmail.com
e. Monique.alarcon8@gmail.com
e. avneet.chattha7@gmail.com

**PAUL L. HOFFMAN** SBN  71244
**CATHERINE SWEETSER** SBN 271142
**COLLEEN M. MULLEN** SBN 299059
**SCHONBRUN, SEPLOW, HARRIS &**
    **& HOFFMAN**
11543 W. Olympic Blvd.
Los Angeles, California   90064
t.  310-396-0731
e. hoffpaul@aol.com
e. csweetser@sshhlaw.com
e. cmullen@sshhlaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| ORANGE COUNTY CATHOLIC WORKER, an unincorporated association; Lisa Bell, as an individual and a representative of the class; Melissa Fields as an individual, a representative of the class and a taxpayer; Gloria Shoemake, as an individual and a representative of the class; Richie Thomas, as an individual and a representative of the class; Shawn Carroll, Larry Ford, Cameron Ralston, Kathy Schuler, all as individuals; | Case No.:  18-cv-00155 DOC KES<br><br>FIRST AMENDED COMPLAINT<br><br>CLASS ACTION: FRCP 23(b)(2)<br><br>42 U.S.C. § 1983: 1st, 4th, 5th, 8th and 14th Amendments; 42 U.S.C. § 3604 (Fair Housing Act); 42 U.S.C. § 12132 *et seq.* (ADA); 29 U.S.C. § 794 (§504 Rehabilitation Act) |

| | |
|---|---|
| Plaintiffs, | Cal. Const. Article I, §§7,13; Cal. |
| v. | Civ. Code §52.1; Cal. Gov. Code |
| | §11135; Cal. Gov. Code |
| ORANGE COUNTY, the CITY OF | § 12955 et seq. (FEHA); |
| ANAHEIM, the CITY OF COSTA MESA, | Cal. Gov. Code § 65583 *et seq.*; |
| the CITY OF ORANGE; | Cal. Civ. Code § 815.6 |
| | |
| Defendants. | |

2

## JURISDICTION AND VENUE

1.      This is an action for injunctive and declaratory relief for the class pursuant to 28 U.S.C. § 23(b)(2), and injunctive relief and damages for the individual plaintiffs pursuant to 42 U.S.C. § 1983 for violations of Plaintiffs' rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as the Federal Fair Housing Act and the Rehabilitation Act.  Jurisdiction exists pursuant to 28 U.S.C. § 1331 and 1343 based on questions of federal statutory and constitutional law, and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.  Jurisdiction for Plaintiffs' supplemental state law claims based on 28 U.S.C. § 1367(a).

2.      Venue is proper in the Southern Division of the Central District in that the events and conduct complained of herein all occurred in Orange County.

## PRELIMINARY STATEMENT

3.      This action was filed six months ago.  In February, in response to the Court's directive that the Riverbed encampment would be closed in a humane and safe manner, the County approved initial motel placements of 30 days for more than half of the Riverbed residents, with most people moved abruptly after 27 days to avoid creating a tenancy interest.  Other Riverbed persons were placed in recuperative care and sober living facilities.  Still others were placed at the County's only emergency shelter, the Courtyard, and transitional shelter, Bridges. In April, people at the Civic Center encampment were included in this process. This was the first time a health care team came in to provide assessment and placement for all people in those encampments and the first time many of them were considered for a mental health housing program.

4.      This brief respite provided many people the opportunity to reestablish their lives in a supportive environment.  For veterans, it meant the assistance they had earned by their service to the nation.  For women, it meant not living with the vulnerability of sexual assault on the streets.  For others, it meant the opportunity

to get some sleep and a shower, medical and social services, a job, a modicum of stability and, in some instances, reunite with family.  In all, hundreds benefitted from the County's efforts.  But the placements were short term, with no plan beyond the 30-day motel stay and inadequate supportive services.  With no plan, as each type of placement came to an end, many people returned to the streets. Many were worse off than before the Riverbed evictions because they lost the stability and survival items they had used in the encampments and were separated from the community that helped keep them safe.

5.      In mid-August, the lease with the Baymont, the largest of the County's contracts for placement, ends.  Persons housed at the Baymont were all assessed as severely and persistently mentally ill ("SPMI") and qualified for Full Service Partnership (FSP) services.  In addition, the two emergency winter shelters at the Santa Ana and Fullerton armories closed last week after an initial three-month extension by the Governor.  Hundreds of people are, once again, without a place to sleep at night other than on the streets, in the parks and in other public places, where they are experiencing harassment and arrest by law enforcement. All of this underscores the failure of the County to have an adequate system of care in place that meets the needs of the client population.

6.      In recent weeks, with the imminent end of the Baymont contract, some people assessed as SPMI and FSP were summarily downgraded by Telecare, the County's contract agent, and transferred to new programs the County contracted with Illumination Foundation ("IF"), even though the IF programs do not adequately support SPMI diagnoses.  In turn, IF exited people from its "bridge" housing programs as the County re-purposed that space for a new transitional program.  Others were told by Telecare that they need to find a place to live for $650 a month and that, if they cannot, their only option will be a "room-and-board" facility, with no institutional support and a ban on caretaker partners and emotional support animals, even though the money used to pay for the room is

from the Mental Health Services Act ("MHSA") and application of these policies violates the Fair Housing Act and state and federal law disability laws.

7.     The County's actions are all the more incredible because, with all of the capricious downgrading that has occurred in the past several weeks, Orange County now has a population of homeless individuals, almost none of whom are SPMI.  That defies credulity in view of earlier County reports on the percentage of homeless persons with serious mental illness and the national number of 20 percent of the general population suffering from some mental illness.

8.     In addition to the downgrading of those previously assessed as SPMI, people in sober living were involuntarily exited without a discharge plan as the 90-day funding ended. And people in recuperative care exhausted their 90-day stays. For those who still have some time left on their placements and have witnesses this process with their community, they live with constant fear about the lack of options in the County, generally, and when they will be returned to the street. The fear impedes their recovery.

## STATEMENT OF FACTS

9.     The Baymont was master leased by the County for six months, with the goal of housing individuals assessed as SPMI and qualified for FSP care.  The FSP program provides funding for a person, and when appropriate their family, to reduce their risk of homelessness and need for additional benefits by providing wrap around services with housing.  Almost 100 people stayed there at any one time.  The sole contact with the County at the Baymont is through Telecare.

10.    The Baymont and the services provided by Telecare fail to meet even minimum standards of care.  Only the Baymont, operating out of fear and ignorance, stripped the rooms of all amenities, even sheets and shower curtains at the outset, treating people as if they were in a locked-down facility even though they were guilty of no crime.  The phones were removed from all of the rooms, leaving people unable to call for emergency assistance.  Once individuals were

assessed as SPMI and placed at the Baymont, they did not receive supportive treatment.  Except for one day when a nurse practitioner came to the motel, no other medical support was provided.  On that day, so many residents sought to see the nurse practitioner that they were told to go back to their rooms and they would be called in turn.  Few were called and no medical personnel returned any other day despite the critical need for care and treatment for persons diagnosed as SPMI.

11.     Telecare asked clients to sign an onerous "contract," with conditions that violated fundamental constitutional and statutory rights, including an agreement in advance to excuse Telecare from any liability for anything and everything that might occur at the placement.  The contract was extracted in exchange for what can only be characterized as inhumane treatment.  Initially, people at the Baymont were left without food for weeks.  Their General Relief (GR) was abruptly cut-off by the County, leaving most with no financial resources.  The termination of GR occurred without any prior notice, on the unsupported assumption that the FSP provider would cover all basic needs.  But in this instance, that did not happen.  On information and belief, Plaintiffs allege that Telecare's deficient care was the result of a profit motive, County cost-cutting, and deliberate indifference to Plaintiff's fundamental rights and needs.

12.     Without GR, people had no money to get food to eat, pay for transportation to social service and medical appointments, or get to work and job interviews.  Prescriptions for serious conditions ran out and were not filled. After weeks of complaints about conditions at the Belmont, Telecare began providing a wholly inadequate diet of packaged pastries in the morning and, usually, a sandwich of two pieces of bread and a slice of meat at lunch, but still no dinner.  Residents were provided with a card with a small balance to buy food, but those at the Baymont could not readily get to the grocery store to use the cards and, even when they could, had no place to store, cook or heat food because the mini-refrigerators and microwaves were removed from each room.

13.     Almost three months after initial placements, and after increasing complaints, Telecare began providing a cooked meal for dinner.  When residents of the Baymont complained about the quality of the food, Telecare stopped providing any food on the pretext that there would be no Telecare personnel at the Baymont that day.  Whether in retaliation for grievances or just indifference, the result was the same: no food was provided because no Telecare staff went to the Baymont.  At the same time, the County and Baymont set up almost impenetrable barriers to volunteers who tried to bring food to the residents and also blocked counsel for the residents from contacting them to provide assistance.

14.     Other people from the Riverbed were enrolled in 90-day recuperative care and residential treatment programs.  For them, the 90 days largely ended several weeks ago, with inadequate or no discharge plans.  Many of those who found success initially in these placements and improved their health were told the only option now was to go to the Courtyard, Bridges or the streets, with no support.  For others with more serious ongoing medical conditions or permanent disabilities, no appropriate placement options were offered.

15.     Most of the people who are now at the Baymont or who slept at the armories this winter are part of two communities of homeless individuals who lived at the Santa Ana Riverbed or in the Santa Ana Civic Center.  Several years ago, Defendants Orange County, Anaheim, Orange, and Costa Mesa started directing unhoused people into the area of the Santa Ana Riverbed between the Santa Ana Freeway and Ball Road.  In early 2017, a group of Riverbed residents sued to enjoin an earlier attempt to close the encampment and the Court issued an order preventing the County from seizing their property and removing over a thousand individuals then living at the Santa Ana Riverbed because there was no other place for them to sleep at night without risking arrest.

16.     At the beginning of 2018, the County announced the intent to close the Riverbed trail, evict the encampment and force people back into the

surrounding cities without a plan for housing, shelter, or other critical services.  .
At the same time, the Defendant Cities announced their intent to increase
criminalization and drive unhoused people from their streets.  The failure, if not the
outright refusal, of Orange County and its cities to adopt positive measures to
address the housing crisis and the willingness to criminalize the mere act of
existing in public spaces takes a toll on the County's most vulnerable people. At
every opportunity the County and its cities invested in enforcement instead of
housing, blaming other entities for the problem, and leaving unhoused people
nowhere to turn, nowhere to live, and nowhere to sleep.

17.     The consequences of the county and municipal governments'
abdication of responsibility are significant.  Deaths of homeless people in Orange
County reached an all-time annual high of 210 in 2017.[1]  These deaths come after
a decade of indifference by government officials. In 2008, Orange County
recognized the desperate need to address these issues and formed the Orange
County Ten-Year Plan to End Homelessness Working Group "to serve and protect
the homeless . . ."[2] With no serious effort to implement an actual plan, the
homeless population in the County continued to grow.  In the 2017 Point-in-Time
Count, the County estimated that there were 4,792 homeless people, 2,584 of
whom were unsheltered and could find no shelter space.  This number included
357 veterans, a quarter of whom have vouchers but cannot find a landlord who will
rent to them.[2]  More than half of the 2017 sheltered population was in emergency

_____

[1] https://www.ocregister.com/2017/12/19/210-homeless-people-who-died-in-
orange-county-the-past-year-will-be-remembered-at-an-interfaith-service-here-are-
their-names/

[2] http://ochmis.org/wp-content/uploads/2012/10/PIT-Final-Report-2017-
07.24.17.pdf

shelters with the remainder in "transitional shelter."  By the county's own estimates, the homeless population has increased between 5 and 7 percent annually over the last five years.  On information and belief, Plaintiffs allege that the current homeless population exceeds 5,000 individuals.

18.     In 2017, with an increasing homeless population and no investment in solutions, the County abruptly renamed the Commission to End Homelessness and ended all reference to ending homelessness by 2020.  As a part of that change, critical stakeholders, including homeless people and service providers, were removed from the Commission.

19.     This re-focus away from ending homelessness came at a time when affordable housing in Orange County was increasingly rapidly disappearing. According to the homeless assessment completed in October 2016 by Susan Price, the Orange County Care Coordinator, 64% of jobs available in Orange County in 2016 did not pay enough for a person to afford a one-bedroom apartment, rents increased dramatically in 2016, and the Orange County affordable housing stock declined in the face of gentrification in formerly low-income neighborhoods across Orange County. The report issued by the federal Housing and Urban Development ("HUD") department on June 1, 2017, found that the vacancy rate in Anaheim, Santa Ana, and Irvine declined from 2010 to 2017 from 5.9 % to 3.6%, and average rents rose 3% in May 2017.[3]  Almost 90,000 people are on the housing authority waiting lists hoping for access to affordable housing.[4]

_____

[3] U.S. Dept. of Housing and Urban Development, Office of Policy Development and Research, *Comprehensive Housing Market Analysis Anaheim-Santa Ana- Irvine, California*, https://www.huduser.gov/portal/publications/pdf/AnaheimCA-comp-17.
[4] Susan Price, An Assessment of Homeless Services in Orange County, http://bos.ocgov.com/ceo/care/HOMELESS%20ASSESSMENT%20DCC%20REPORT_10.18.2016.pdf, pg. 21

20.     The lack of adequate and appropriate resources was reinforced in a 2017 report issued by United Way, prepared with the University of California Irvine and the Association of California Cities.   The report, "Homelessness in Orange County: The Costs to Our Community," found that 75 percent of homeless individuals surveyed lived in Orange County for at least six years, with most more than 10 years.[5]  Cutting against the stereotypes that homeless individuals are substance abusers or mentally ill, the United Way report found that the single greatest factor leading to homelessness in Orange County, by far, is "the gap between the availability of affordable housing and work that pays a wage sufficient to enable the economically marginal to access that housing."[6]

21.     Most recently, the National Low-Income Housing Coalition published a 2018 report, "Out of Reach: The High Cost of Housing."  According to the report, the Santa Ana-Anaheim-Irvine Metropolitan Area is the tenth most expensive market in the country, requiring an hourly wage of $36.08 for a market rate rental of a modest two-bedroom home.[7]  Those earning the minimum wage would have to work 93 hours a week to afford a one bedroom rental at market rate in this metropolitan area.[8]

22.     All three reports agree that economic disparity is the primary cause of homelessness in the region.  Despite the fact that the vast majority of the unhoused population in the County is in this situation through no fault of their own, the response of the government entities has been to punish poverty.  Nearly every City in the County criminalizes homelessness through ordinances that make it unlawful to be present, sit or sleep in a public place even if a person is without a home.

---

[5] Homelessness in Orange County: The Costs to Our Community, *available at* unitedwayoc.org/wp-content/uploads/2017/08/united-way, p. 31.
[6] *Id.*, p. 34.
[7] nlihc.org/oor, pg. 14
[8] *Id.* at pg. 35

Many people moved to locations such as the Santa Ana Riverbed, hoping that law enforcement would not interfere or harass them while they try to survive.

23.     In addition to the Riverbed encampment, another 200 people were unsheltered and living in an encampment at the Santa Ana Civic Center earlier this year.  The unhoused population at this location was nearly 500 people until late 2016 when the joint City and County authorities incrementally evicted each smaller encampment in the Civic Center and fenced off large areas, forcing everyone into degrading and inhumane conditions at the concrete Plaza of the Flags.  This action followed Santa Ana and Orange County blaming each other for the failure to address this crisis and calling for the County's first year-round emergency shelter,[9] the Courtyard.  Although some of the 500 people at the Civic Center moved to the Courtyard when it opened, approximately half of the 500 people who occupied the Civic Center in 2016 moved to the Santa Ana Riverbed.

24.     The need to respond to the increasing numbers of unsheltered individuals in Orange County is hardly new and neither is the disfavored approach of criminalizing - rather than housing - people who are homeless.  More than a decade ago, the Orange County Grand Jury issued a report on "The Homeless Crisis in Orange County."  The report noted then that "[h]omelessness is on the rise, often misunderstood, and is inextricably linked to poverty."  From 1990 to 2005 the homeless population increased at a far greater rate than the overall increase in population in the County.  The Grand Jury report concluded that addressing the problem "does not appear to be a priority with the Board of Supervisors."  The Grand Jury listed a series of measures to address the crisis then being considered by various municipal entities in the County, including plans to add housing for homeless individuals at the former El Toro Marine Air Station;

---

[9] https://www.ocregister.com/2016/09/08/santa-ana-declares-homeless-camp-at-civic-center-a-public-health-crisis-wants-more-security/

shelters in San Clemente, Buena Park, Westminster, La Habra and Cypress, and a
very "humanistic" outreach approach by the Santa Ana Police Department and
Orange County Sheriff's Department.  A dozen years later, few, if any, of these
intentions have been realized.

25.     The 2005 Grand Jury Report also reviewed the history of
recommendations in similar reports, going back to 1988.  The Report concluded
that few of the earlier recommendations were implemented. The Report proves
that, over the past 25 years, the primary response of the County and the Cities has
been to treat the visible presence of homeless people as a blight, without
significantly reducing the number of residents on the street each night.  These
approaches include criminalizing homelessness by arresting homeless individuals
for loitering, making it illegal to sleep in public places at night, seizing and
destroying homeless people's property, and engaging in a pattern of warrantless
stops and interrogations.  The identical practices have been repeatedly challenged
and enjoined by judges of the Central District in Los Angeles and the Ninth
Circuit, uniformly rejecting these practices criminalizing homelessness as a
violation of the First, Fourth, Eighth and Fourteenth Amendments.

26.     The 2017-2018 Grand Jury Report, "Where There's Will, There's a
Way Housing Orange County's Chronically Homeless," issued in late May, 2018,
echoed the conclusions reached in the 2005 Grand Jury Report.  It identified the
lack of political will and cooperation between the County and the cities as a
significant factor contributing to the inability to develop and implement a
comprehensive plan to address the unhoused population in the County,
emphasizing the extraordinary cost benefits to providing housing and services as a
proactive measure.  Beyond dollars and cents, the Grand Jury underscored the dire
consequences for people left to survive on the streets, with an average life
expectancy for an unhoused person in the United States of only 50 years, almost 50
percent less than the 78-year life expectancy for the housed population.  In the time

since the riverbed community was relocated, several people temporarily housed by the County died of staph infections, late diagnosed cancer and heart disease.

27.     The County's and Cities' approach is even more indefensible when viewed against the directives by the United States Interagency Council on Homelessness ("USICH"), composed of nineteen federal cabinet and agency heads to organize federal efforts to end homelessness. The most recent USICH report, "Ending Homelessness for People Living in Encampments," is directly on point and counter to the approach taken by the County to homeless individuals forced to live along the river, in the Civic Center and now back to the streets and parks in large part because of the government entities' failures over decades.

28.     Specifically, the USICH underscored that "forced dispersal" of homeless encampments is inappropriate and undermines the goal of providing services to homeless individuals.  While the USICH emphasized the importance of "intensive and persistent outreach and engagement," the County instead opted to disperse the encampment first by telling homeless people that they are no longer permitted to camp in the riverbed and will be cited or arrested for trespass if they remain, forcing them to move out into the streets of nearby cities including Anaheim, Orange, and Costa Mesa, then housing many of the people on a temporary basis, only to provide no alternative other than the sidewalks and parks as the temporary housing in motels, recuperative care, sober living and similar facilities expired.  Similarly, the Cities dispersed encampments, telling people that they are not welcome in the city, their mere presence is a crime, and they will be ticketed or arrested if they remain.  Before February of this year, the Cities usually coupled their threats with a directive to relocate to the area along the river, or the Santa Ana Civic Center.  Since those two possibilities are no longer available, no alternative locations are offered as the harassment continues.

29.     When the County announced through posted signs that the Riverbed trail would be closed and anyone remaining would be arrested for trespass, few

services were offered other than the threat of criminal proceedings.  Several individuals with disabilities, such as plaintiff Gloria Shoemake, who was first qualified in 2016 for housing services by the County's earlier outreach through a contract with City Net, were relocated to motels several weeks before the County's original closure date for the Riverbed trail.

30.    In February, with the Court's involvement, the County was compelled to provide temporary shelter for about 750 people who still in the riverbed when the trail closure began.  This number represents slightly less than half of the total unhoused population in that area after the injunction in the *Schuler* action.  Several hundred members of the community left in the weeks before the 2018 relocation as local law enforcement personnel blanketed the riverbed and ran wants and warrants for nearly everyone on the fictional premise that those living in the riverbed were trespassing and, therefore, could be compelled to provide identification.  Some individuals were arrested on outstanding warrants for the failure to appear on a citation or arrest related to homelessness.  Still others, who had no warrants and were not on probation, including Plaintiff Cameron Ralston, feared that they would be arrested for trespass as announced in the County's posted notices, so they left voluntarily just before the 30-day motel, recuperative care and residential substance abuse treatment placements were made available.  Many of those who left the Riverbed went to the winter shelters at the armories.

31.    This action was not the first against the County.  In February 2017, an action was filed in the District Court concerning the County's earlier enforcement actions against approximately 1,000 individuals then living in the Santa Ana Riverbed.  *See Schuler v. County of Orange*, No. 8:17-cv-00259 DOC KES, (C.D. Ca. 2017) [Dkt. #1].  On March 7, 2017, the parties stipulated to, and the Court granted, a preliminary injunction to prevent the County from violating individuals' constitutional rights in a designated area of the Riverbed just north of the Santa Ana Freeway and south of Ball Road ("the Injunction Area.") [Dkt. #30].

32.     After the settlement in *Schuler*, the County contracted with City Net to provide outreach to people in the Injunction Area.  In July 2017, City Net surveyed 422 people living there.  Of those interviewed, 81.2% were interested in having City Net become their case managers to seek housing and services for them.  When asked where they lived previously, 25% reported they were from Anaheim, approximately 11% were from Santa Ana, and 9.7% were from Orange. Since this survey was done, the population in the Santa Ana Riverbed increased as people were moved from other areas into the Injunction Area at the direction of the County and adjoining local law enforcement agencies.

33.     In the year since the *Schuler* injunction issued, the County failed to take steps to provide a safe environment for the unsheltered community in the Riverbed or to find alternatives where they could safely live.  In August 2017, Orange County Public Works made public a plan to change the topography of the Riverbed to make it "less desirable for occupation."  The Plan showed how the use of rocks in the Santa Ana Riverbed effectively made the area impossible for a person to lie down and sleep.  Again, the County chose to invest in harassment instead of solutions.[10]  The primary reason for the Riverbed project was to use rocks and large boulders to exclude homeless persons.

34.     In September 2017, Supervisor Nelson drafted a plan to use County land in Irvine as a temporary shelter.  The Board of Supervisors rejected that plan and instead voted to develop that site into a massive new project containing luxury condominiums and upscale retail shops.[11]

---

[10] https://voiceofoc.org/2017/08/county-used-rock-riprap-sand-to-make-santa-ana-riverbank-less-desirable-for-occupation/

[11] https://www.ocregister.com/2017/11/06/orange-county-to-finalize-plan-for-great-park-condo-retail-development-as-irvine-threatens-lawsuit/

15

35.     At the same time, the Cities were taking actions targeted at homeless communities.  In August 2017, Anaheim City Council considered community requests to install restrooms near the Santa Ana Riverbed and offers of organizers to provide and maintain those restrooms.  Anaheim rejected the proposal, stating that the County should take responsibility for the needs of the people sleeping on County property.[12]  Since then, Anaheim has gone a step further and shut down the property check in center that used to operate for people who needed to place their belonging while they visited doctors, went to work, or sought other services.

36.     In September 2017, the Anaheim City Council passed "Operation Home Safe," promoted as a comprehensive program to address homelessness along the Santa Ana Riverbed.  A main goal of the program was to identify sites for at least 500 shelter beds or other housing options. Additionally, Anaheim committed to expediting the availability of 100 more beds at the Bridges shelter. To date, only the beds at Bridges were added.  The only other part of the plan implemented over the last four months involved significantly increased police enforcement.[13]

37.     In September 2017, Orange Council Member Alvarez announced that the City would be reviewing its loitering, vagrancy, and panhandling laws to strengthen them to provide the police with more tools to combat homelessness.[14]

38.     There is no question that the Defendants coordinated enforcement actions against unhoused individuals living in the Riverbed.  On September 5, 2017, Anaheim Police Chief Quezada met with command staff from the Fountain Valley, Orange and Santa Ana Police Departments, along with the Orange County

---

[12] http://www.scpr.org/news/2017/08/29/75117/anaheim-to-consider-portable-toilets-for-homeless/

[13] https://www.ocregister.com/2017/09/13/after-anaheim-declares-a-state-of-emergency-homeless-along-river-bed-ponder-whats-next/

[14] https://www.ocregister.com/2017/09/13/after-anaheim-declares-a-state-of-emergency-homeless-along-river-bed-ponder-whats-next/

Sheriff's Department.  Representatives from these law enforcement groups met again a few days later to discuss coordination of deployment schedules for enforcement in the Riverbed.  As part of this plan, the Anaheim Police Department implemented bike patrols on the Riverbed and assigned additional officers to patrol in the Injunction Area.  On information and belief, the Orange County Sheriff's Department was the lead agency for this coordinated enforcement action.

39.    On October 26, 2017, the County Flood Control District announced restricted hours for bike trail access in Fountain Valley and complete closure of public access to the west side of the Riverbed in Fountain Valley.  More than 100 unhoused residents of Fountain Valley were then living along the West bank of the Riverbed next to a public storage facility and a location where they would not be impeding traffic, to avoid harassment by law enforcement. The majority of this group came to the Riverbed after being forced out of nearby cities, including Costa Mesa, and then slowly moved north in the Riverbed as the County closed sequential parts of the Riverbed for purported maintenance projects.[15]

40.    The Orange County Sheriff and Public Works employees began clearing the Fountain Valley area on November 3, 2017 by announcing that residents would not be allowed to remain, and threatening people with citation. County employees said the Injunction Area would not be impacted by the change in hours or closure.  At that time, one Public Works employee told a local activist to hurry and move people from the Fountain Valley area to the Injunction Area because the Fountain Valley bike trail was now closed to the public at night, but people could continue to stay in the Injunction Area.  With this in mind, a large

---

[15] https://voiceofoc.org/wp-content/uploads/2017/10/County-Announces-Active-Enforcement-of-Public-Hours-Along-Santa-Ana-River-Trail-FINAL.pdf

17

group of people from Fountain Valley relocated to an area near Katella Road by the bike trail.

41.     The relocation of persons from Fountain Valley and other areas of the Riverbed sequentially closed by Defendants increased the number present in the Injunction Area significantly.  At the time of the filing of this action, an estimated 800 to 1,200 people were living in the Riverbed.

42.     At about the same time, the County contracted with private security to prevent homeless people from entering the Santa Ana Riverbed outside the Injunction Area during the newly-restricted hours.[16]  The City of Orange hired private security to patrol its parks in the evenings to prevent homeless individuals from sleeping there.  By January 2018, Anaheim also hired private security to police the homeless.[17]

43.     On January 8, 2018, two months after Public Works relocated nearly 100 people from the Fountain Valley area to the Injunction Area, the agency announced that it would clear the Injunction Area as well.[18]  In truth, the County decided on this plan long before January; however, less than two weeks' notice was given for people to relocate with no plans for their relocation options.

44.     The "Work Notice" posted by the Orange County Public Works Department on January 8, during the year's first rain, stated that the bike trail would be closed to public access beginning January 22, 2018 at 6:00 a.m.  It warned that unauthorized persons remaining in the "Work Area" would be "subject to citation and prosecution for trespass."

---

[16] https://www.ocregister.com/2017/11/14/orange-county-to-hire-private-guards-to-help-enforce-riverbed-curfew-that-displaced-homeless/
[17] https://www.ocregister.com/2018/01/23/anaheim-adds-security-as-officials-brace-for-homeless-exodus/
[18] https://www.ocregister.com/2018/01/04/orange-county-plans-to-clear-entire-riverbed-homeless-encampment-within-weeks-officials-say/

45.     The "Work notice" stated that persons remaining in the "Work Area"— the Injunction Area—would be subject to citation and prosecution for trespass under California Penal Code Sections 603 and 555.  The notice further indicated that people who placed personal property in the Work Area could be subject to citation and prosecution Penal Code §§370 and 372.

46.     As explained in the Notice, the Work Area included the entire "Injunction Area" agreed to in *Schuler*.  Area #1 includes the West Bank of the Santa Ana River Channel, between the Santa Ana Freeway and Katella Avenue. Area #2 includes the East Bank of the Santa Ana River Channel, between Katella Avenue and Ball Road/Taft Avenue.  County memoranda made clear that homeless persons would not be permitted to return to the Riverbed to live after the project was completed, even if they could find a flat piece of ground.  Without any public hearing, the County changed the hours for the bike path and closed it at night.

47.     After the County announced the impending closure of the Injunction Area, several surrounding cities took steps to prevent homeless individuals from coming into their communities.  The City of Orange quickly distributed flyers and visited local housing and business facilities to request that they notify law enforcement if they see homeless individuals in the City.  Anaheim also announced that people from the Santa Ana Riverbed could not move into their city.[19]

48.     As of January 19, 2018, City Net had 171 clients in the Riverbed who were actively seeking services from City Net but were not yet placed in any housing or shelter.[20]  This included Plaintiff Gloria Shoemake, who had been

---

[19] https://www.ocregister.com/2018/01/21/orange-county-is-ready-to-clear-out-the-santa-ana-riverbed-homeless-encampment-but-where-and-exactly-when-will-they-go/ ("In Anaheim, officials bracing for an influx of homeless people have reiterated that their city – like 32 others in Orange County – . . .  has an anti-camping ordinance that forbids pitching tents on sidewalks or in public parks.")

[20] http://www.ocgov.com/civicax/filebank/blobdload.aspx?BlobID=71640 pg. 5

waiting for promised housing since approximately October 2016, when she was first qualified as disabled and eligible by City Net.

49.     Plaintiffs filed this action and sought a temporary restraining order against the closure of the riverbed without a plan for relocating those living there. The Court initially denied Plaintiffs' request for a temporary restraining order but set a hearing on February 13, 2018.  After the temporary restraining order was denied, the County announced plans to go forward immediately with the closure of the Riverbed and to arrest anyone still present.

50.     Plaintiffs then sought an emergency order from the Court to stay the Riverbed closure until the matter was heard by the Court on February 13, 2018. The Court issued the requested relief.

51.     At the hearing on February 13, 2018, County elected officials spoke and informed the Court of plans to locate additional emergency shelters on County property.  In addition, the County committed to a process to assess the needs of persons living on the riverbed and place people at shelters, veterans' facilities, recuperative care, residential substance abuse programs and similar facilities, as well as time-limited motel stays, depending upon individual situations.

52.     More than 400 people were placed at area motels.  At most, there were very successful results, with individuals able to get rest, a shower and a job or other services, even though the County was and is not now adequately prepared to accommodate the complex needs – often compound disabilities – of unsheltered individuals.  Motel staff lacked training to deal with individuals with disabilities and understand what was required for a reasonable accommodation.  As a result, many people fell through the cracks without adequate structure to evaluate whether their involuntary exit from a program or facility was related to a disability and required a reasonable accommodation that did not occur and, in fact, was not taken into account at all.  For example, one person housed at a motel suffered a seizure and was hospitalized, after which he was not allowed to return to the motel.

53.     In another instance, the partner of a schizophrenic woman asked motel staff to call for help when she had an acute event.  The couple lived at the Baymont without incident for weeks.  Instead of calling trained emergency responders, as requested, the manager came to the room and entered without permission.  The disabled woman was initially in the shower.  When she exited the shower, she was startled by the manager's presence and pushed her to leave the room.  The manager than evicted the couple from the room despite the fact that there was no violation of any reasonable residence rule, no accommodation of the resident's disability, and no due process before or after the eviction.

54.     After this litigation was filed, the County offered to board assistance animals of Riverbed residents for 90 days while the people went to placements. This was not a reasonable accommodation for those who rely on the support of their assistance animals.  People were given a Hobson's choice: give up their assistance animals, if even for 90 days, or stay on the streets.  Ultimately, and as a result of telephone calls made by activists with Housing is a Human Right, more motel placements were found that accepted assistance animals.  The Court also directed the County to allow some assistance animals at both Bridges and the Courtyard.  But, as the County's efforts decrease, FSP assessments are downgraded and private facilities violate federal and state laws that place the burden on the facility to show why a specific emotional support animal should be excluded, many people are again being presented with the same impossible choice. Since then, the County has ended the 90-day animal boarding. In fact, the OC Animal Care no longer accepts animal surrenders at all. That means if there is not an available assistance animal space at a shelter, a person is left to choose between remaining outside or abandoning the animal in the street.

**The Courtyard and Bridges:**

55.     The Courtyard in Santa Ana is the only full-time, low-barrier emergency shelter in the County.  It has a high-density population, which is not

conducive to accommodating the needs of individuals with physical and mental impairments.  A significant number of people relocated from the Riverbed suffered anxiety episodes at the emergency shelter.  There are regular reports of bed bugs, untrained staff harassing residents, and unsafe conditions or inadequate food. The only other County facility is the Bridges at Kraemer.  It was intended as a transitional facility with the expectation that clients would work with a housing navigator and find appropriate long-term housing, leaving Bridges within six months.  Even before the ending of the Riverbed and Civic Center encampments, clients at Bridges had difficulty meeting this requirement because of a severe lack of affordable housing in the area, which led to a change in this requirement to find housing or leave in six months.  Plaintiff Kathy Schuler's experience is typical. After about four months, she is still waiting for that help at Bridges.  She was denied GR.  She has had no help to apply for supplemental security income.  The little progress she made with her original housing navigator at Bridges abruptly ended when the employee left and she has not been assigned to a someone else.

56.    The staff at Bridges are not equipped to respond to persons with significant disabilities.  They often mischaracterize manifestations of a disability as unacceptable behavior, summarily ejecting persons for whom the Courtyard is the last resort.  Similar situations occurred at Bridges, which was at double capacity for several months before the new wing opened last month.  Extreme crowding at both facilities exacerbated the trauma of many individuals who lived in the Riverbed for years.

57.    After Plaintiffs' counsel repeatedly raised objections based on disability laws, the Courtyard now provides a limited number of beds for couples and individuals with assistance animals.  For individuals with medical conditions and weakened immune systems, the Courtyard is an environment that poses serious risks to health.  For those with vision disabilities, it is an unnavigable space.  For those with physical or emotional disabilities that require the assistance of a partner

to get through daily life activities, it is unworkable because it does not provide an appropriate space for couples.  The lack of privacy for anyone within the facility, outside of the bathrooms and showers, is particularly key because many unsheltered women are the victims of domestic violence and sexual assault. Bridges suffers from similar deficiencies, although it, too, now allows a few people to stay with their emotional support animals but still has no space for couples.

58.     Both the Courtyard and Bridges lack appropriate and explicit guidelines and standards that take into consideration the need to provide reasonable accommodations for persons with disabilities.  Consequently, individuals are often ejected and banned for at least a month when, as a direct manifestation of a disability, they say or do something to which staff takes offense.  These ejections occur without notice or an opportunity to appeal the decision and are not made on objective standards but, rather, on the capricious and uninformed biases of the facility staff.  This is a special hardship because there is nowhere to go after the Courtyard.

59.     The first year-round transitional shelter, Bridges at Kraemer Place, started operating with approximately 100 beds and recently expanded to 200 beds.[21]  Under immense pressure with the growing homeless population, the County opened the first 100 beds months earlier than originally anticipated in a warehouse in May 2017.  The second hundred beds were to be ready by the end of May but became available only recently.  Like the Courtyard, and even with additional temporary beds added and tents for people with assistance animals, Bridges is routinely at or over a reasonable capacity.  Often there are no beds available at Bridges, especially for women.  At one point, eight cots for women were placed in the middle of the men's section.  The cots were up against each

_____

[21] https://www.ocregister.com/2016/09/15/mercy-house-to-operate-year-round-anaheim-homeless-shelter/

other, making some of them inaccessible to those with physical disabilities.  All of these additional women's beds were fully visible to men in adjoining bunk beds.

60.     Originally, access to Bridges was limited to homeless persons in nine North County cities. To stay at Bridges, a person must be referred by a non-profit partner social services agency and must be staying within the northern cities of Orange County, which include Anaheim and Orange, but not Costa Mesa.  Now, the approval has expanded to include County Counsel.  The usual admission process is daunting: a person must call a number to start the intake process.  That telephone number is usually busy and it can take hours, if not days, to get through to the shelter.  The first step is to submit to a background check that must be completed before admission.  The homeless person must wait to receive a call back if they are approved and meet at a pickup location at a specific time. The admission process is often so discouraging that people give up after a few days of calling.  If a person gains admission, they can only stay at Bridges for a limited amount of time.  After six months, if they are unable to find regular housing, they are usually required to leave, although the County has now relaxed this rule on a case-by-case basis because of the lack of affordable and appropriate housing.

61.     At Bridges, as with the Courtyard, the staff does not have the training or expertise to interact with individuals with severe mental illness.  Bridges was not originally envisioned to provide for these needs.  The consequence of packing Bridges with individuals never intended for the facility is that people are routinely banned because of "conduct" deemed inappropriate by shelter staff, but directly related to the person's disability, requiring a reasonable accommodation by law.

**The Lack of Shelter in the County:**

62.     The available shelter spaces in the County are woefully inadequate both in number and accessibility to meet the needs of the unsheltered population. By the County's own estimates, more than 2,500 people lacked any shelter nightly in the 2017 Point-in-Time Count.  The first and only year-round emergency

facility, the Courtyard, was opened by the County in 2016. Now, it is regularly at more than double its original announced capacity, making it extremely crowded and creating barriers for disabled individuals. On a typical night, over 400 people sleep in very close quarters in the repurposed bus terminal without walls. On many nights, there are no beds for men. On other nights, there are no beds for couples or individuals with emotional support animals. On most nights, people camp on the sidewalk outside the Courtyard because they cannot get a bed inside.

63.   Because of the lack of shelter in the County and the increased demand from the closures of the riverbed and Civic Center encampments and now the armories, the Courtyard recently implemented a referral system for admission, limited the length of time someone can stay there to 30 days and added a requirement for clients to create a housing and services plan. These changes resulted from the Court's directive in April 2018 to ensure that there was space for individuals being relocated from the nearby Santa Ana Civic Center. The Court limited the County from placing people at the Courtyard and also directed that other cities, acting through contract agencies such as CityNet, stop transporting people to the Courtyard to ensure that there was space for individuals being relocated from the nearby Santa Ana Civic Center encampment. Until the Court's directive, people were regularly dropped off there by hospitals, various cities' police, social workers contracted with other cities in the County, and others with nowhere else to bring homeless people.

64.   Santa Ana has the largest homeless population in part because all of the County social services are located there, the only GR office is there, the County jail is there. Moreover, the current policy in the County is that everyone who is arrested and taken into custody, other than in a few cities with their own jails, are taken to the County jail in Santa Ana and released into Santa Ana, without a discharge plan or other resources. This adds to the number of homeless individuals in the City. While the need to address these issues and ensure that Santa Ana has

access to the Courtyard for its unhoused residents is an understandable goal, increasing numbers of people sleep outside the facility because of a lack of space. The Courtyard is the shelter of last resort in the County. In addition, because it is not near any other shelter, a person who shows up without a referral from a County employee and is told that the Courtyard is full has no choice but to sleep outside because it is too late to find transportation and get to any other shelter before it closes for the night. Most of the year, there is no other shelter available.

65.     Sixty emergency beds for women were created at Safe Place in Santa Ana after this action was filed. Although this facility provides a safe respite for women who live on the street, the additional emergency beds are not appropriate for some women, particularly senior or disabled clients, so Safe Place staff must call the County to find alternative placements for these groups. To date, Safe Place is an open space because the facility has not received the partitions that would create privacy for clients and that were in the plan they presented the County. In addition, the emergency shelter contract with Safe Place is only 6 months with no indication of whether it will be renewed. Admission to the facility requires a referral by HCA. Santa Ana and the County are in some tension about who will get to use the limited beds. Safe Place filled the 60 emergency beds almost immediately upon opening and has continued to be full each night.

66.     The two emergency shelters at the local National Guard armories are now closed. They only operate during winter months, although Governor Brown recently approved a three-month extension this year until mid-July 2018. On information and belief, these two shelters were at about half capacity prior to the beginning of the Riverbed clearance. The Fullerton Armory had 237 total spots, while the Santa Ana Armory had 200 spots.

67.     Apart from the fact that they were open for only a few months a year, the armories were inadequate for other reasons, especially for homeless individuals with disabilities. Sleeping facilities at the armories were limited to thin mats on

26

the floor and largely inaccessible for people with wheelchairs or other mobility challenges because of the very close placement of the mats, making it difficult, if not impossible, to get down and up from the mats, especially if the shelter rules prevent a partner from being with them. Both emergency winter shelters prohibited couples from staying together, did not allow support animals, and limited possessions to small bags of belongings without a storage option for other property. Additionally, the Armories only accepted people who were able to come and go at the required hours. For people who work, need to attend court or school or meet with service providers, the restricted hours imposed an additional and often insurmountable hurdle.

68. The County has no system with established guidelines and standards, for assisting homeless individuals on a timely basis. For the Courtyard, Bridges and Safe Place, the three locations offering some emergency shelter space since the Court's intervention in the Riverbed evictions, an ad hoc system has developed. Many of those seeking to sleep inside each night have depended upon the attorneys for Plaintiffs urgently and repeatedly calling and emailing County lawyers to obtain referrals for former Riverbed and Civic Center residents who faced removal from placements and no alternative but the streets. On some occasions, the Court and Special Master have been drawn into ad hoc hearings to decide people's placements. On many occasions, Plaintiffs' counsel and volunteers assisting the Plaintiff class have paid for motel rooms so that people would not be left on the streets when no appropriate alternative was offered.

69. In addition to the Courtyard and Bridges, there are private facilities providing a continuum of options for unhoused persons. Most of these have strict limitations on eligibility for services. Nearly all have significant time constraints on how long a person may reside at the facility, ranging from one night to six months. Some require a referral and/or a background check for entry, some are restricted by gender, some are restricted to pregnant women, and some are

27

restricted to women or families with children.  Still others, such as the Rescue Mission, require that the individual engage in sectarian worship as a condition of receiving services. Most have a blanket prohibition on pets other than registered service animals despite the fact that the federal and state Fair Housing laws apply to public and private shelters and, with federal and state disability protections, require that assistance animals be allowed as a reasonable accommodation.

70.     For example, the Salvation Army runs the Hospitality House in Santa Ana with 25 beds for transitional housing and 25 beds for emergency shelter, all for men.  To stay there, you must be able-bodied and employable.  Service animals are admitted only with federal paperwork.  No other assistance animals are allowed.  Attendance is required at a meeting before dinner that includes a religious service with prayer.  Clients must arrive between 3:30 and 5:00 p.m.  A man must arrive by 3:30 in the afternoon to enter a lottery for any available emergency shelter beds. If not selected, he can wait until 5:00 to see if another man who is already approved missed curfew. There are almost always more applicants than beds. In January 2018, between 2 and 12 lottery beds were available nightly.

71.     Another shelter, Colette's House, is open only to women and children. In this six-month transitional program, women are required to have a job and work 32 hours per week.  No animals are allowed.  Colette's House is a small shelter and is usually at capacity.

72.     Friendship Shelter operates the Alternative Sleeping Location (ASL) in Laguna Beach in South County.  The shelter has only a few dozen beds, all of which are usually filled each night.  In addition to the ASL, Friendship Shelter operates a second facility in Laguna Beach that is a 60-day self-sufficiency program.  According to Friendship Shelter's website, the 32-person facility always has a waiting list and is only available to individuals who are able to work.

73.     The Rescue Mission in Tustin is one of the larger private shelters in the County, with approximately 200 beds available.  However, it requires persons

to accept an intensive Christian religious program as a condition of receiving services.  In addition, the Rescue Mission does not permit individuals to bring in certain prescriptions containing opioids which are commonly prescribed for mental health conditions, especially panic and anxiety disorders.  Individuals are not allowed to have assistance animals other than registered service animals.

**The Mandatory Duty to Provide Housing and Shelter**

74.    In 1982, the California Legislature passed the California Housing Accountability Act.  California Government Code § 65589.5.  Formerly known as the Anti-NIMBY law, the statute bans discrimination against housing for lower-income households.  The legislature declared that the provision of housing for all Californians is a "priority of the highest order." §65580.

75.    Under this provision, every city and county is required to adopt a General Plan governing the use of land and development projects in its jurisdiction. The General Plan includes a "housing element," one of seven mandatory components to the General Plan that must be addressed and approved by the State of California's Housing and Community Development Department ("HCD").  The Housing Element is prepared every 10 years.  Submission to, and approval of, the Housing Element by HCD is a necessary prerequisite for local governments to qualify for public funding for various development programs.

76.    Each local entity must act consistently with its General Plan and housing element.  All land use decisions, zoning codes, the General Plan and all other ordinances and policies affecting land use must be consistent with the housing element. §65580.5, §65860.  All local land-use decisions, including site specific plans, must be consistent with the adopted General Plan. §65454.

77.    In 2007, California passed Senate Bill 2 (SB2).  SB2 extended the protections of the Housing Accountability Act to emergency shelters and clarified that it also covers transitional and supportive housing.  This measure imposed increased requirements on cities and counties for low-income housing, emergency

29

shelters and transitional/supportive housing.   Each city and county must evaluate its need for shelters and provide a comparison to available facilities to address the identified need.   The need for emergency shelters must be assessed annually and seasonally.   §65583(a)(7).

78.    Each entity must also designate at least one location where a year-round shelter may be operated without further approval by the local government. The shelter must have sufficient capacity to meet the entity's entire local need for emergency shelter.   The designated location may then be used by right, subject only to reasonable zoning restrictions.

79.    The express legislative intent of SB2 was to expand the Housing Accountability Act to prevent local entities from denying a proposal to create an eligible facility if it is needed and otherwise consistent with the locality's zoning and development standards.   Recognizing the NIMBYism the statute was enacted to combat, the Legislature expressly prohibited the ability of local entities to impose hurdles such as "a conditional use permit or any discretionary" approval from the local government.   §65583(a)(4)(A).

80.    The statute enumerated factors that may be imposed on a proposed facility.   These include, but are not limited to, the number of beds or persons served, off-street parking restrictions, outside lighting, etc.   §65583(a)(4)(A)(i)-(viii).   However, the local entity has the burden to establish that any restrictions imposed on a proposed facility, as well as any permit processing standards applied, are objective and directly advance the creation of emergency shelters.   If the local entity has an existing shelter that satisfies the statute's intent, a conditional use permit or similar prerequisite may be required to open a new shelter in the same community.

81.    The Housing Accountability Act provides that an entity shall not "disapprove" a proposed emergency shelter unless it makes written findings, based on substantial evidence, that one of five exceptions are met. §65589.5(d). The

30

allowed exceptions are: (I) the jurisdiction has met or exceeded the need for emergency shelter identified in its housing element; (2) the project would adversely impact the public health or safety in a significant, quantifiable, direct and unavoidable way that cannot be mitigated; (3) denial is required to comply with specified state or federal law and there is no way to comply without rendering the shelter project infeasible; (4) the shelter is proposed on land zoned for agriculture or resource preservation; and, (5) the shelter is inconsistent with both the zoning ordinance and general plan land use designation (but this reason is not allowed if the city failed to identify the mandated "by right" zones, or that its zones have sufficient capacity to accommodate the need and failed to demonstrate that the zones can accommodate at least one emergency shelter). §65589.5(d)(l)-(5).

82.     Local entities may satisfy the mandate of SB2 in several ways. Jurisdictions that are successfully implementing a supportive housing program model under the entity's 10-year plan to End Chronic Homelessness are credited for supportive housing units created under the 10-year plan if the entity can demonstrate that the units are identified in the 10-year plan and are either currently vacant or have all funding needed to construct the units during the planning period.

83.     Local entities may also meet the requirements of SB2 by entering into a multi-jurisdiction agreement provided that any emergency shelter will be opened within two years of the start of the planning period.  Gov. Code §65583(d)(1). Entities involved in a joint project must adopt an agreement which, among other conditions, assigns a portion of the new shelter to each jurisdiction.  Specifically, the agreement "shall allocate a portion of the new shelter capacity to each jurisdiction as credit toward its emergency shelter need …"  §65583(d)(1)(2). Also, the housing element for each participating local government must set out the following: the method for allocating bed capacity for the shelter; how the jurisdiction's emergency shelter need is met by the proposed facility; the amount of the financial contribution each entity will make for the development, operation

31

and ongoing management of the shelter; the amount and source of money to be contributed to the shelter; and, finally, that the aggregate total capacity claimed by each participating entity in its housing element is not greater than the total beds available at the shelter.  § 65583(d)(1)(3)(A)-(C).  In other words, if several cities enter in a multi-jurisdiction agreement for a 200-bed shelter, they may not each claim all 200 beds as evidence that they have complied with the mandate to provide shelter resources.

84.     Nearly every city in the County and the County currently rely on the same shelters to demonstrate that the they are meeting the need for emergency shelter identified in each entity's housing element.  Because each housing element lists the same facilities, many of which are in Santa Ana, there is no way that most local entities in Orange County can show they meet the need for emergency shelter identified in its housing element.  Thus, most, if not all, of the local entities in Orange County are in violation of the requirements of the Housing Accountability Act, as amended by SB2.

**The County's Efforts to Open Additional Shelters**

85.     In its General Plan, the Defendant County states it is proactive in responding to the needs of the homeless population.  When the County prepared its 2013-2021 General Plan, there was only one small emergency shelter located in the unincorporated area of the County – American Family Housing in Midway City, with a maximum capacity of 20 persons.  Recognizing the significant shortfall between available and needed emergency shelter, and to encourage additional shelter facilities, the County amended its Zoning Code to allow shelters by-right in the commercial and industrial portions of the Housing Opportunities Overlay Zone. This added 177 acres that meet the requirements of SB2 as locations that are served by transit and other critical resources and available for additional emergency shelters.

86.     Over the course of the past several years, multiple cities in the
County, including Fullerton, Irvine, Huntington Beach and Laguna Niguel, have
blocked the County's plans to locate new emergency shelters in their communities
for reasons other than those allowed by the Housing Accountability Act.  In each
instance, the cities acted based on NIMBYism and failed, completely, to provide
any justification for the denial that complies with the requirements of SB2.

87.     In 2013, the County identified two locations as potential sites for
emergency shelters.  The first was in Santa Ana.  Although the city originally
approved the County's proposal, Anaheim rescinded its approval after community
objections. The County then identified a location in Fullerton in a commercial site.
The County BOS approved the purchase of the site in early January 2013.  Two
years earlier, following the killing by Fullerton Police of Kelly Thomas, a mentally
ill homeless man, Fullerton created a homelessness task force.  The task force
issued a report in 2012 with eight recommendations, one of which was to establish
a year-round emergency shelter in the City in partnership with the County.

88.     Despite the task force report, when the County proposed a location in
the city for the first emergency shelter in the area, Fullerton asked that the project
be delayed to allow the City to review it further.  Ultimately, based on objections
by the community, the City blocked the shelter, resulting in a lawsuit against the
City by non-profit groups.  The lawsuit alleged that the City's actions violated
Government Code § 65589.5.  Within the past few weeks, the Fullerton City
Council has again rejected a proposal to create a shelter in the city, concluding first
that it was "too soon" to make the decision and then, after a local election was
completed, rejecting the proposal.

89.     After losing out on the initial Santa Ana and Fullerton sites, the
County then identified the former bus terminal in Santa Ana as the location for the
first – and only – year-round, low-barrier emergency shelter in the County.  The
shelter opened in 2016 with approximately 250 beds, but soon reached almost 400

33

individuals sleeping there each night.  The Courtyard shelter continues to operate
at or slightly above that number on a nightly basis.

90.     One goal of the Courtyard was to provide a place where people
encamped in the nearby Santa Ana Civic Center could go.  Because of the
desperate need throughout the County for emergency shelter space, people from
other communities soon filled the beds and the Civic Center encampment
continued for nearly two more years, until the Court ordered it disbanded in March
2018.

91.     With the recent relocation of approximately 750 unsheltered people
living at the Riverbed and the Court's order to dismantle the Civic Center
encampment, the County Board of Supervisors voted to approve three additional
locations to establish emergency shelters while it developed and implemented a
long-term plan for addressing homelessness because the beds at the Courtyard and
Bridges were full.  The vote to approve additional sites occurred in late March.
Each proposed site was in an SB2 area zoned for a shelter on land owned by the
County.  Three locations were announced: Irvine, Huntington Beach and Laguna
Niguel, all in South County.

92.     Immediately after the County vote, the local communities in question
objected vigorously, ultimately forcing the BOS to rescind the vote.  Irvine
transported nearly 600 people by chartered bus to the BOS meeting.  The City sued
the County, raising claims of Brown Act violations in the site approval process and
characterizing the planned emergency shelter as a "public nuisance."  At the same
time, Irvine touted its affordable housing work.  But, affordable housing is not a
substitute for housing for homeless persons as required by State law by
Government Code § 65530 et seq., the Housing Accountability Act and SB2.
None of the three proposed cities has an emergency shelter in its geographic
boundary, as Irvine implicitly conceded in its lawsuit touting only its efforts to
include "affordable" housing.  The shelter resources each City lists in its Housing

34

Element are in other cities or restrict services based on gender, pregnancy status, families with minor children and similar categories.

93.     The November 2016 list of Emergency Shelters and Housing Programs available on the website of South County Outreach documents the lack of facilities in this region specifically and the County generally.[22]   Approximately three dozen resources offer housing for unsheltered families, women with children, pregnant women, single women and domestic violence survivors, and most of these are private facilities run by religious groups.  Some of these programs have prerequisites to admission, such as a $300 fee or a referral from an emergency shelter program.  There are only seven facilities that accept single men.  Of these, some allow only a one-night stay, others limit a stay to 14 days, while still others require that a person be employable.

94.     The South Coast Outreach list of Emergency Shelters and Housing Programs is the same list that nearly every entity puts forward.  Irvine's Housing Element illustrates this point.  In its most recent Housing Element Appendix D: SB2 Compliance Sites Inventory, Irvine reported that its share of the regional unsheltered homeless persons was estimated to be 2,280 people, which Plaintiffs believe may be an error in the Housing Element.  City of Irvine Housing Element, Appendix D-1.   At a minimum, Irvine has responsibility for more than 100 unsheltered persons.  Yet, there is no facility for homeless individuals in the city.

95.     Irvine advanced Families Forward as its primary provider.  On information and belief, based on a review of the Families Forward website, Plaintiffs allege that this organization cannot satisfy Irvine's SB2 mandate. Families Forward does not provide emergency services.  Applicants must include a minor child and go through a review process.  Families Forward's website

_____

[22] www.sco-oc.org/wp-content/uploads/2014/05/Shelters.pdf

acknowledges that it does not provide emergency aid and advises individuals in need of emergency shelter to contact OC 2-1-1.  In any event, Families Forward is a relatively small organization that maintains a few apartments throughout Orange County where it places families that meet all of its criteria.  Other than this organization, Irvine's July 2015 Housing Element update lists 13 resources in Santa Ana and other cities.[23]   These include the Salvation Army facilities in Santa Ana and Tustin, and a number of entities that only offer service referrals.

96.     The only actual significant *housing* listed which is located in Irvine is the Irvine Inn, categorized by the City as "Homeless Services Facilities Serving Irvine" and described as a "192-unit Single Room Occupancy (SRO) facility."[24] The Inn's website lists rent for a studio apartment as $548 to $731 a month.[25]   The website contains a cryptic caveat that "income restrictions apply on some apartments."  The marketing on the website is directed to students at UCI and Irvine Valley College.  It is highly unlikely that the Irvine Inn meets the City's obligations to provide shelter for homeless persons.

97.     Most of the "Homeless Facilities" listed in the Irvine Housing Element Supplement are the same resources on every city's list. Many of these are in Santa Ana, which is approximately seven miles from Irvine.  For a homeless person without a car, the bus ride is at least an hour, with multiple transfers.  For those without funds for a bus ticket, it is a very long walk.  Yet, Irvine residents who attended the BOS meeting were adamant that there is no appropriate place for a shelter in the entire City, despite the requirements of identifying such a site in the General Plan in compliance with Government Code §65583.

---

[23] "Homeless Facilities Serving Irvine."  City of Irvine 2015 Housing Element Supplement, C-66.
[24] *Id.*
[25] https://www.irvineinnapts.com/floorplans.aspx.

98.     In addition to its residents' views that their property values somehow exempt them from the Housing Element requirements, Irvine and Huntington Beach objected to the proposed BOS emergency shelter locations because they are toxic sites, unusable for human habitation.  Neither City offered any other SB2 site to the County.  The objections by the cities are all the more remarkable because, in filing their 2013 Housing Elements, each represented to the California Department of Housing and Community Development (HCD) that the general locations the County now sought to use were appropriate SB2 sites.

**Liability for Failure to Provide Housing and Shelter**

99.     California Government Code § 815.6 provides that:

> Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty.

100.    The requirement to provide for housing and shelter for low-income and homeless individuals in the General Plan and to adhere to the requirements of the government code is an "obligatory duty which a governmental entity is required to perform," not a permissive one.  Failure to meet this duty gives rise to liability whether the underlying enactment allows a private right of action or is self-executing.  The term "enactment" includes "a constitutional provision, statute, charter provision, ordinance or regulation." Cal. Govt. Code §810.6.  To date, the County and each Defendant City has failed to meet their mandatory duty created by California Government Code § 65583 *et seq.*, known as the California Housing Accountability Act.

101.    Anaheim's most recent Housing Element identified a number of non-profits located in Anaheim and Santa Ana to which it contributed funding through

the City's Emergency Shelter Grant program.  Not all provide living facilities.  Of those that do, almost all are limited to transitional programs for women with children, women who are victims of domestic abuse, families with children, or veterans.[26]

102.   The total capacity of the shelter and transitional living facilities located in Anaheim was 202 beds, but none were specifically reserved for Anaheim unhoused individuals.  The Bridges at Kraemer is located in Anaheim.  It now has 200 beds, but those beds are not reserved for the City of Anaheim, in whole or in part, so they may not be counted as a measure of Anaheim's compliance with its General Plan pursuant to Government Code § 65583(d)(1)(2) and (3)(A)-(C).  Even so, the number is far short of the approximately 900 homeless individuals in the city.

103.   It is unlikely Anaheim will meet its mandatory duty absent a change in policy.  Since adoption of the 2014 Housing Element, the Bridges at Kraemer opened in Anaheim, but those beds are not reserved for homeless residents of Anaheim.  Currently, the City allows a maximum of 50 emergency shelter beds, whether in a single unit or a combination of smaller shelters.[27]   The City also requires that any emergency shelter must to implement a pre-entry screening process to determine eligibility to stay there.

104.   The City of Orange has also failed to meet its mandatory duty to provide housing for low-income and homeless individuals.  There are no emergency shelter beds in the City of Orange except for a 56-unit facility for families with children.

---

[26] Anaheim Housing Element, 2/4/2014, Chapter 3: Resources and Constraints, p. 3-27.
[27] *Id.*

105.   As additional resources, the City provides links to County sites but no specific City resources.[28]

106.   Other than this one location, Orange responded to the Crisis with increased police and enforcement, not a system of healthcare and housing.

107.   Costa Mesa's most recent five-year housing plan identified several places as emergency housing and services for homeless individuals, but some provide services only to families or domestic violence victims, some provide only meals, and some, like the HOPE Institute (YWCA of Central Orange County), no longer exist but were in the City of Orange before they closed.[29]  Orange Coast Interfaith Shelter is the only emergency shelter in Costa Mesa.  It offers transitional housing services only to homeless adults with children under 17 living with them.[30]  The companion shelter has 50 beds available for no more than three days.[31]  **Costa Mesa's number of homeless persons is 4% of the 2,584 unsheltered homeless people countywide, according to 2-1-1 Orange County, the nonprofit that managed the last PIT count.[32]**  Very low-income workers in Costa Mesa, like Lisa Fields, are left to commute to the shelters in Santa Ana. Despite intermittent support by the City for Ms. Fields with transportation or motel

---

[28]  https://www.cityoforange.org/1756/Information-on-Homelessness

[29]  https://www.yelp.com/biz/ywca-of-central-orange-county-orange; http://www.dnsrsearch.com/index.php?origURL=http%3A//ywcacoc.org/&r=&bc=

[30]  Shelter listings, Costa Mesa, Orange Coast Interfaith Center, (last visited Apr. 11, 2018, 12:52 PM) https://www.shelterlistings.org/details/22633.

[31]  Shelter listings, Costa Mesa, Orange Coast Interfaith Center, (last visited Apr. 11, 2018, 12:52 PM) https://www.shelterlistings.org/details/22633.

[32]  Luke Money, Fewer Homeless Counted in Costa Mesa in Latest Survey, L.A. Times, (OCT 20, 2017, 1:45 PM) http://www.latimes.com/socal/daily-pilot/news/tn-dpt-me-pit-count-results-20171020-story.html.

stays, she spends hours each day commuting to her employment and is unable to find shelter or housing in Costa Mesa.

108.   Future facilities to meet Costa Mesa's needs are unlikely.  The City's General Plan only allows shelters in planned development industrial zones (PDI) area.  CITY OF COSTA MESA, HOUSING ELEMENT FOR THE COSTA MESA PLAN 2013-2023, 42;45 (Jan. 21, 2013).  PDIs include 115 acres located north of the 405 Freeway and on the east side close to John Wayne Airport.  A satellite image of the area makes it clear that there are no undeveloped lots in the area.[33]  Moreover, the PDI site has a high density of California EPA regulated sites, making them unfit for human habitation.[34]

109.   The failure of the County and the cities to meet their obligations under the Housing Accountability Act falls particularly hard on disabled individuals. They face the additional burden of being required to travel considerable distances to obtain the most basic of social services because the local entities have failed to provide such services in their communities.  They must carry all of their possessions with them, more often making them a target of local law enforcement as they attempt to navigate the route to obtain services in the few areas of the County that offer it.

---

[33] https://www.google.com/maps/place/John+Wayne+Airport/@33.6911953,-117.8630146,2716m/data=!3m1!1e3!4m5!3m4!1s0x0:0xc941e8f5c31119e2!8m2!3d33.6761901!4d-117.8674759

[34] CAL-EPA, Web Portal Maps Data on Regulated Sites Statewide, (4/11/18, 12:52 PM) https://siteportal.calepa.ca.gov/nsite/#?tab=profile&h=668&w=1238&dh=0.04771207655397802&dw=0.10625839233861711&bbox%5B%5D=33.70210572880489&bbox%5B%5D=117.82175580382965&bbox%5B%5D=33.65439365225091&bbox%5B%5D=-117.92801419616826&tb=33.70210572880489&bb=33.65439365225091&rb=-117.82175580382965&lb=-117.92801419616826&z=13&c%5Bx%5D=-117.874885&c%5By%5D=33.678253&i=true&b=Bing+Hybrid&a=

## CLASS ALLEGATIONS

110.   The claims set forth in this action are brought by Plaintiffs Bell, Fields, Shoemake and Thomas on their own behalf and on behalf of all of those similarly situated putative class members pursuant to F.R.Civ.P 23(b)(2).

111.   The Class is defined as:

a.   All persons who lived in the Santa Ana Riverbed or the Santa Ana Civic Center between January 2018 and April 2018 and experienced arbitrary and capricious treatment by the Defendants on the basis of their actual or perceived status as a homeless person.

b.   All persons who were diagnosed as SPMI and provided FSP placements at the Baymont and were subsequently downgraded and removed from an FSP placement.

112.   The members of the class are so numerous that individual joinder of all members is impracticable, if not impossible.  Plaintiffs are informed and believe on that basis that members of the class will exceed 1,500 in number, including all those residing in the Santa Ana Riverbed prior to the early January 2018 posting of trespass and closure notices by the County, all those residing at the Santa Ana Civic Center prior to the dissemination of trespass and closure notice by the Santa Ana Police Department beginning in March 2018, and all those residing at the two emergency winter shelters at the armories.

113.   There are common questions of law and fact that predominate over any questions affecting only individual class members in this instance.

114.   Among the common questions of law and fact are the following:

a.   Whether the Defendant County has met its statutory duty to provide low-income housing and a continuum of shelter facilities as required by California Government Code § 65589.5;

b.   Whether Defendant County's policies, practices and conduct of assessing eligibility for government programs and services for

unhoused individuals violate and continue to violate the class members' state and federal constitutional due process rights;

c. Whether Defendant County's policies, practices and conduct of assessing the need for and providing reasonable accommodations for unhoused people with disabilities violates and continues to violate the members' state and federal statutory rights;

d. Whether injunctive relief restraining further unconstitutional and unlawful acts by Defendant County should be ordered by the Court and, if so, the nature of that injunctive relief;

115.   The Class Representatives will fairly and adequately protect the interests of the Class.  They have retained counsel who are experienced and competent in class-action and civil rights litigation.  The Class Representatives have no interests that are adverse or antagonistic to those of other Class members.

116.   A class action is superior to any other method to secure a fair and efficient adjudication of this controversy. As the primary relief sought is injunctive in nature, the burden and expense make it impractical for class members to seek redress individually for the wrongs done to them. The nature and amount of monetary damages sustained by each Class member is very similar in nature and may be established by common proof. Individual litigation by each class member would necessarily burden the judicial system and run the risk of inconsistent judgments.

117.   Plaintiffs are informed and believe and on that basis allege that Defendant County has acted on grounds generally applicable to the class, making injunctive or declaratory relief appropriate for the class as a whole.

**PARTIES:**

   **Plaintiffs**

118.   Plaintiff **ORANGE COUNTY CATHOLIC WORKER** ("OCCW") operates a community at Isaiah House in Santa Ana.  In furtherance of its mission,

42

Isaiah House of the Orange County Catholic Worker has served poor people with dignity since 1987, providing meals, shelter, food, clothing, showers, and emergency assistance to homeless persons.  At the request of County workers, OCCW has provided emergency housing to individuals without housing or shelter options, including women exited from Bridges when they exceeded the six-month limit to stay at the shelter while finding appropriate housing. OCCW currently has a woman living at their house who, despite working with a housing navigator at her last placement, was unable to find housing.  Her only alternative was to stay in a park, violating local laws against such conduct.

119.   Jordan Hoiberg is a member of the Orange County Catholic Worker. Since joining the Catholic Worker, Mr. Hoiberg has gone to encampments almost every day. He engages with each person he meets and helps them connect with available resources. On some days he delivers food and on others he brings books or tents.  On some occasions, Mr. Hoiberg organizes volunteers to go out with him. Through his work in the Santa Ana Riverbed in 2017, he observed an estimated 800 to1200 people in the area closed at the beginning of the year.

120.   Carrying out the mission of the Catholic Worker, Mr. Hoiberg organizes volunteers and resources to help people move their belongings when they are told by law enforcement to move from public spaces.  Last year, he was present and observed County employees direct people in other areas of the Riverbed to move into the Injunction Area.  With other volunteers, he then assisted these individuals to move their property to the Injunction Area.  As each adverse action is taken by the government, the Catholic Worker has had to shift priorities to respond to these measures and provide assistance to targeted homeless individuals.

121.   In 2017, he observed actions taken by the cities and county to exclude homeless people from their jurisdictions, including removal of benches that homeless individuals could lawfully sit on, restricting hours of parking to prevent people living in their vehicles in the area, increasing police and private security

presence, and other tactics to encourage people to leave the county.  Mr. Hoiberg is familiar with the area and available social services and does not know of any place homeless individuals can relocate without violating laws against camping on public places, placing property on public places, loitering and similar ordinances. Part of his job with the Catholic Worker is to help at Isaiah House. In that role, he has assisted women who came to Isaiah House from the Bridges shelter and the Courtyard shelter.  Based on his experience, he is aware that there is a time limit for those in the transitional shelter at Bridges and that once that time limit is reached, if an individual had not found other housing, she must leave Bridges.

122.    Since the start of the relocation of people from the Riverbed and now the Santa Ana Civic Center, Mr. Hoiberg and others from the Plaintiff OCCW have spent countless hours responding to the needs of unsheltered people who, as the result of the Defendant County's policies, practices and customs, and those of the County's agents and employees, have been left without any shelter or other placement that accommodates their disabilities, without adequate food, and without a means to get to critical appointments and similar service-related issues.

123.    Plaintiff **LISA BELL** is homeless and physically disabled.  She sues on her own behalf and on behalf of the class.  In August 2007, she sustained severe nerve damage in her arms and hand, which developed into a medical condition known as Complex Regional Pain Syndrome.  She lost her job and her sole source of income now is Social Security Disability Insurance (SSDI).  With limited income, she could not afford her rent.  She spent her savings, still hoping that she would be well enough to return to work soon.

124.    After she ran out of money and lost her home, Bell began living in her vehicle in Anaheim.  During that time, she had about 30 interactions with Anaheim Police officers.  She was repeatedly told that she could not live in her vehicle and that she "better not be seen in Anaheim again."  One day, her vehicle was towed for allegedly being parked on a public street for 72 hours.  In fact, her vehicle had

been parked there for only four hours, but Ms. Bell did not have money to pay the towing and impound fee, nor resources to challenge the seizure of her vehicle.

125.    With no alternative, Ms. Bell moved to a tent in the Riverbed.  When the cold-weather Armory in Fullerton opened, she tried to stay there but the setting and crowd exacerbated her anxieties and caused a severe panic attack, so she did not return there to sleep.

126.    Ms. Bell returned to the Riverbed and actively worked with City Net to secure affordable housing.  She completed the City Net assessment and provided the necessary paperwork to confirm she was homeless for more than one year. She did everything required to secure affordable housing to no avail. She lived in the Riverbed with fear that would be cited and arrested for violating local laws banning sleeping in public spaces even though she had no viable alternative.

127.    More than a year after she originally qualified for housing assistance, Ms. Bell remains unplaced.  She was temporarily at an Illumination Foundation facility but is no longer eligible for that program as it was recently reconstituted. She has worked diligently with City Net to find housing that she can afford with her disability income.  She was turned down for one place because of an eviction after she became disabled.

128.    Recently, she was told by the County that she would no longer receive assistance because she purportedly violated an unwritten rule about too many visitors and missed a meeting with City Net.  Both accusations are false.  Ms. Bell's partner died unexpectedly of an acute asthma attack a few months ago and people came by to give their condolences.  In addition, most days she needs help because her disabilities make it painful and difficult for her to lift and carry items.

129.    She was approved for in home supportive services before she was homeless.  She has continued to spend a great deal of time meeting with City Net without success in obtaining assistance for housing.

130.   Plaintiff **SHAWN CARROLL** was chronically homeless and suffers from multiple disabilities, including a serious heart condition that requires him to wear a life-saving medical alert device at all times.  He worked in the automotive industry until 2006, when he had to care full-time for his aging and mentally disabled parents.  In 2015, after his parents passed and their home was sold, he began living in his vehicle.  His efforts to regain employment were unsuccessful.  His current income is limited to General Relief in the amount of $355 a month.

131.   While living in his vehicle, Carroll was repeatedly questioned and told to move along by police in Anaheim and Garden Grove. He would often go days without sleeping because he could not find a place to park and avoid the police.  In April 2016, his vehicle was impounded.  Unable to pay the impound fees, he began sleeping on the streets.  He tried going to the Courtyard but it was always at capacity, with people sleeping outside, waiting to get in.  He went to the Riverbed, where he thought police were less likely to harass him, with only a backpack.

132.   In December 2016, Mr. Carroll's medical providers discovered that he was at risk of sudden cardiac arrest.  He wears a portable defibrillator at all times. The device digitally sends data to his medical providers who can administer a treatment shock if an abnormal heart rhythm is detected.  The device must remain powered at all times.  For months, he would walk to the UCI Medical Center lobby to charge the battery packs and wireless hotspot that power his defibrillator.  Then, a Huntington Beach church group donated a small generator to Mr. Carroll.

133.   On July 7, 2017, he was exiting the Riverbed when the Orange Police Department cited him for allegedly riding his bicycle in the opposite direction of traffic, even though he was riding on the sidewalk when he was cited.  During the stop, the Orange police officer explained that he was told by his superiors to have "zero tolerance for the homeless."

134.   On at least four occasions, Orange County Sheriff's Deputies stopped Mr. Carroll in the Riverbed and asked for his identification, social security number,

and what plans he had to leave the Riverbed.  The Deputies repeatedly told him that camping is prohibited in the Riverbed and he was fearful he would be cited and convicted for violating such laws because he had no alternative place to go. Mr. Carroll is now temporarily housed through the 24-month CHIP program in Anaheim.

135.   Plaintiff **MELISSA FIELDS** has been homeless since January 2017. She is employed in Costa Mesa. She sues on her own behalf and on behalf of the class and as a taxpayer.

136.   She works between 25 and 30 hours a week at a minimum wage job and does not earn enough to afford housing in Orange County.  Before she moved to the Riverbed, she slept on the streets of Costa Mesa to be close to her job, using only a sleeping bag on the ground with no tent or structure and with a backpack full of clothing.  In the months before she moved to the Riverbed, Ms. Fields was stopped and cited by the Costa Mesa police multiple times for being unhoused. Some, but not all, of these tickets were dismissed when she went to court.  In February and March 2017, she received at least two tickets for camping in a public area or parking lot and one ticket for camping in a park. She was informed that if she continued to sleep outside in Costa Mesa, she would receive citations.

137.   After receiving those tickets, she moved to the Fountain Valley area of the Riverbed to avoid arrest in Costa Mesa because she feared losing her job if arrested.  She remained in this area until the County forced people to move in the first week of November 2017.   She relocated to the Anaheim/Orange Riverbed area to keep the support of the community she had gotten to know. As a woman alone and unhoused, she felt unsafe without nearby people she knows.

138.   Ms. Fields worked with a Community Outreach Worker to try and find housing.  She also engaged with County Health Care workers when she was in the Fountain Valley Riverbed.  Despite her efforts, no social service agencies

47

found suitable housing for her.  Because of her work schedule, she is unable to meet the curfew at the emergency shelters.

139.   Ms. Fields continues to work and recently received a promotion.  She works a shift that ends at night.  As a result of this action, the City of Costa Mesa is providing her an Uber ride to get from her job in Costa Mesa to Safe Place in Santa Ana, where she stayed after her motel placement ended in March.  Her partner was recently released from jail.  Ms. Fields tried staying at the Courtyard with him, but left because of the conditions there, including bed bugs.  Although Costa Mesa has now paid for a motel for Ms. Fields, this is a temporary respite for two weeks and she may be left with no option but the streets again soon.

140.   Plaintiff **LARRY FORD** is an Army veteran who served honorably and joined the reserves upon his discharge. He receives treatment at the Long Beach VA Hospital for service-related psychological disabilities.  About five years ago, he was laid off from his construction job in a staff reduction.  Around the same time, he had an injury that required surgery.  During the long wait for surgery at the VA hospital, he was unable to find additional employment and his unemployment ran out. Without income, he could not pay rent and became homeless, causing his mental state to deteriorate.

141.   When he initially became homeless, he stayed in his car but eventually it was towed and, with no money to pay the impound fees, he was left with no alternative to sleeping outside.   He tried to stay at the Armory but could not tolerate the crowded environment because of his disabilities.  He has had to move many times as different Riverbed maintenance projects were announced.  He moved a little north each time finally ending up just above Katella with others from the former Fountain Valley area. Each time, he lost more of his meager possessions and the stress of moving exacerbated his disabilities.

142.   Mr. Ford's disabilities are more serious than originally assessed.  He has not been placed in an appropriate environment and is back on the streets.  He is

fearful that he will be cited for violations of ordinances based on unavoidable life necessities resulting from his homelessness.

143.   Plaintiff **CAMERON RALSTON** slept outside for a year and was staying in the Injunction Area when the County announced its closure.  Almost four years ago, he was hit by a car and became physically disabled.  He has been diagnosed SPMI, as well.  Because of these conditions, Mr. Ralston requires an emotional support animal. He is unable to work and his only income is General Relief and CalFresh. Over the past year, he tried to stay in Orange but was repeatedly stopped and detained by the Orange Police based on his status as a homeless individual.  These contacts increased his disability expressed in large part as a paranoia about the police.  He tries to stay in areas or housing away from other homeless individuals in an attempt to avoid the police.

144.   On January 24, 2018, as the City of Orange increased its enforcement in preparation for the County closure of the Riverbed, Mr. Ralston moved to the city sidewalks of Orange, near the Riverbed.  He was again cited for blocking the sidewalk.  At the time, his belongings were packed and stacked off to the side on a strip of grass, leaving a clearance of more than three feet for passersby. After he received the ticket, Mr. Ralston left his neatly packed property briefly.  When he returned, he observed a notice of abandoned property from the Orange Police Department stating if it was not moved within 24 hours it would be seized.  He continues to be stopped, detained, searched, cited and arrested in and other nearby cities, including Anaheim, simply for being homeless.

145.   Plaintiff **KATHY SCHULER** is chronically homeless and slept in a makeshift shelter in the Riverbed.  Ms. Schuler and her deceased partner became homeless and stayed at various shelters in the months before his illness and subsequent death in 2015.  At the same time, they began caring for their then four-year-old grandson, who also lived with them at shelters.  Because her partner was

the sole wage earner, Ms. Schuler could not secure gainful employment with her very limited work experience.

146.   Initially, Ms. Schuler and her family tried staying at the two armories. The armories are only open a few months a year.  Ms. Schuler stayed there until it closed and she was referred to a shelter in Anaheim Hills.   She could not travel to the shelter by bike, her means of transportation, because of the distance and terrain. After her partner died in July 2015, she returned to the Riverbed with her grandson, who lived with her until he was placed in a foster home.

147.   After moving to the Riverbed, she received citations and threats of arrest by the City of Orange and the County.  On August 20, 2015, the Orange Police Department cited her in the Riverbed for allegedly violating Orange County Ordinance, Section 2-5-95, unlawful camping upon land owned by the County. Ms. Schuler was in the Riverbed at the time.

148.   Her adult children and granddaughter were also living in the Riverbed.  The Schulers have been on a subsidized housing waiting list for well more than year.  Kathy Schuler, her daughter, Tammy Schuler, and Tammy Schuler's daughter are currently staying at Bridges with their assistance animals. Their family is split up, with several members living on the streets.  They will soon reach the six-month limit on stays at Bridges and have no housing prospects.

149.   Plaintiff **GLORIA SHOEMAKE** sues on her own behalf and all similarly situated class members.  She has been homeless since October 2014 and lived in different parts of the Riverbed during that time. She has multiple disabilities that affect her ability to focus and complete tasks. To help with this disability, she has emotional support animals.   For about a year prior to the 2018 Riverbed closure, she engaged with County outreach workers to find housing. Although she qualified for housing in or about October 2016, she still has no appropriate placement.  Two weeks prior to the Riverbed closure, she was moved to a motel with the Illumination Foundation as a temporary measure.

150.   From that time until now, she has been in various motels, assessed as SPMI and qualified for FSP, then recently downgraded arbitrarily to a room-and-board for no reason other than cost-cutting.  A few months ago, she was left on the street by Telecare with no place to stay when she would not to go to a shelter after she was told she would have to give up her two small emotional support animals and her partner, who is also her caregiver.  Plaintiff's counsel paid for Ms. Shoemake to stay in a motel room pending a reasonable accommodation by the County.  The stress and fear of where to sleep without risk of being detained or arrested exacerbates her medical conditions.

151.   Only after weeks of emails from Plaintiff's counsel did the County finally agree that Ms. Shoemake could be placed at the Baymont, with her two small assistance animals and her partner.  However, the County's lease at the Baymont expires at the end of this month and the County recently exited more than a third of the FSP people housed at the Baymont to lower grade placements without any reassessment or significant interaction with the individuals during the time that they were at the Baymont.

152.   Ms. Shoemake is concerned and stressed by the instability of her situation, the multiple moves she has already been required to make in the past five months, and the prospect that she will be separated from her partner and her emotional support animals.  She is concerned and stressed that she is not receiving the medical support and other assistance she requires to address her disabilities.

153.   **RICHIE THOMAS** is a paraplegic as a result of an in-custody incident. Since he lost the use of his legs, he has been homeless.  He was in Bridge housing and worked with City Net; however, City Net never found him appropriate housing. Eventually he was dropped as a client by City Net and simply left outside the Motel 6 with no alternative.  A friend assisted him in getting to the Courtyard recently, but, as occurred on prior attempts to stay at the facility, he was barred admission   because of his medical condition.  With nowhere else to go, earlier in

the summer he slept in his wheelchair on the sidewalk outside the Courtyard. Plaintiffs' counsel paid for him to stay at a motel for a few nights until they persuaded the County to place him in an Illumination Foundation program, where he is now.  That program ends in a few months and Mr. Thomas has no idea what will happen to him then.  He sues on his own behalf and on behalf of all similarly situated class members.

**Defendants:**

154.   Defendant **ORANGE COUNTY** is a government entity with the capacity to sue and be sued.  The departments of the COUNTY include the Public Works, the Orange County Sheriff, and other departments.  Employees of the COUNTY have engaged in the acts complained of herein pursuant to the policies, practices and customs of the COUNTY.

155.   Defendant **ANAHEIM** is a government entity with the capacity to sue and be sued.  The departments of ANAHEIM include the Anaheim Police Department.  Employees of ANAHEIM have engaged in the acts complained of herein pursuant to the policies, practices and customs of ANAHEIM.

156.   Defendant **CITY OF ORANGE** is a government entity with the capacity to sue and be sued.  The departments of the CITY OF ORANGE include the Orange Police Department.  Employees of the ORANGE have engaged in the acts complained of herein pursuant to the policies, practices and customs of the CITY OF ORANGE.

157.   Defendant **COSTA MESA** is a government entity with the capacity to sue and be sued.  The departments of the CITY OF COSTA MESA include the Costa Mesa Police Department.  Employees of COSTA MESA have engaged in the acts complained of herein pursuant to the policies, practices and customs of the CITY OF COSTA MESA.

158.   The Defendants, their employees and agents, participated personally in the unlawful conduct challenged herein and, to the extent that they did not

personally participate, authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and the harm suffered by Plaintiffs.  Each acted in concert with each other.  The Defendants developed and implemented a coordinated plan to increase enforcement actions against the homeless community in the Riverbed and surrounding cities.  The challenged acts caused the violation of Plaintiffs' rights.

159.   The identities and capacities of defendants DOES 1 through 10 are presently unknown to plaintiffs, and on this basis, Plaintiffs sue them by fictitious names.  Plaintiffs will amend the Complaint to substitute the true names and capacities of the DOE defendants when ascertained.  Plaintiffs are informed, believe, and thereon allege that DOES 1 through 10 are, and at all times relevant herein were, employees and/or agents of the Defendant COUNTY and Defendant CITIES and are responsible for the acts and omissions complained of herein. Defendants DOES 1 through 10 are sued in their official and individual capacities.

## FACTS RELATING TO COUNTY OF ORANGE

160.   The County of Orange is responsible for the operation of the Courtyard, the only low-barrier emergency shelter in the County.  One agency within the County of Orange is the Health Care Agency ("HCA"), which is the entity responsible for addressing a variety of community needs, including mental health and medical services for low-income and indigent persons.  Employees of HCA, wearing identifying blue shirts, have been the frontline of interaction with the Plaintiff class when the Riverbed and Civic Center encampments were removed, at the Civic Center.  Employees of HCA assessed persons seeking assistance both in the field initially, and at mental health clinics operated by the County more recently.

161.   The Board of Supervisors is the governing entity for the County. The Board of Supervisors is responsible for developing and implementing the General

Plan, including addressing the need for housing and shelter for low-income and homeless individuals.

162.   The County is the government agency that contracted with City Net, Telecare and Illumination Foundation to interact with, and fulfill the responsibilities of the County to, the Plaintiff Class.  As discussed herein, the County has no system for addressing the needs of the Plaintiff class.  When the Riverbed relocations began in earnest in February, the County HCA employees became the interface with the Plaintiff class.  While the HCA employees were heroic under pressure, there were no systems in place to define how Riverbed residents would be assessed and assigned to motels or sent to a shelter.  On information and belief, Plaintiffs allege that in the six months since then, no adequate systems have been created with the HCA.  Decisions are still largely made on ad hoc basis or delegated to private contractors such as Telecare, who have acted in arbitrary and capricious ways with deliberate indifference to the needs of the Plaintiff class.

163.   The Orange County Sheriff's Department {"OCSD") is also an agency within the Defendant County.  The Sheriff's Department actively engaged in sweeps of the Riverbed in the weeks and days leading up to the Riverbed closure.  The premise upon which the OCSD did this was that everyone in the Riverbed was trespassing in violation of County law, despite the fact that the Court previously expressly allowed the encampment to remain in *Schuler.* The OCSD stopped, detained, questioned and arrested residents in the Riverbed.

164.   The OCSD is the contract law enforcement entity for 13 cities in the County, most of which are in South County.  As the unsheltered population in the County spreads out after the Riverbed, Civic Center and armories closures, the OCSD has engaged with homeless individuals in contract cities and enforced local ordinances in those jurisdictions that mirror the ordinances criminalizing homelessness in the Defendant County and cities.  The OCSD has also applied and

threatened to apply the County's "quality-of-life" ordinances to compel members
of the Plaintiff class to move from public spaces in the contract cities and in public
spaces owned and operated by the County when those homeless individuals have
no other place they can lawfully be.

165.   County of Orange Ordinance 2-5-95 makes it "unlawful for any
person to camp, occupy camp facilities, use camp paraphernalia, or store personal
property upon any lands or easements owned or managed by the County of
Orange."   "Camp" is defined as "to pitch or occupy camp facilities; to use camp
paraphernalia".  Ordinance 2-5-2.  "Camp facilities include but are not limited to,
tents, huts or temporary shelters".  Ordinance 2-5-2.  "Camp paraphernalia
[i]ncludes, but is not limited to, tarpaulins, cots, beds, sleeping bags, hammocks, or
non-County designated cooking facilities and similar equipment."

166.   The Orange Police Department and the Orange County Sheriff's
Department issued and threatened to issue tickets over the two years prior to the
closure of the Riverbed under this County ordinance to persons living in the
Riverbed.  The Sheriffs also threatened people with citation under trespassing laws.
They have issued citations, arrested or threatened plaintiffs with citations and
arrest in the months since the end of the Riverbed encampment.

### FACTS RELATING TO THE CITY OF ANAHEIM

167.   Anaheim Municipal Code §11.10 makes it "unlawful and a public
nuisance for any person to Camp in any Public Area."  § 11.10.030.  The ordinance
was enacted in 2013 in response to the rising homelessness community in the city.

168.   Anaheim Municipal Code 11.10 makes it a crime to camp, defined as
"residing in or using any Public Area for living accommodation or lodging
purposes with one's Personal Property or while storing one's Personal Property"
and/or "constructing, maintaining, occupying, inhabiting or using Camping
Facilities" and/or "constructing, using, or maintaining Camping Paraphenalia."
The only exception is "sleeping outside in a park . . . during the time the park is

open to the public." § 11.10.020. Camping Facilities are defined as "Tents, huts, or other temporary physical shelters." § 11.10.020.  Camping paraphernalia is defined as "tarpaulins, cots, beds, sleeping bags, bedrolls, bedding, luggage, hammocks, cooking equipment, and/or other similar articles of equipment or items that are accessory to Camping Facilities." § 11.10.020.

169.   Public places include "any public streets, alleys, public parking lots, public parks, public rights-of-way, parkways, public sidewalks, recreational areas or other publicly-owned or controlled property." In other words, it is prohibited to be in *any* public place with luggage, bedrolls, or other "camping paraphernalia" that one is "maintaining".

170.   More than 900 people are unsheltered within its jurisdiction.  Of the people who were living on County property in the Santa Ana Riverbed, 25% of them were from Anaheim.[35] [36]

171.   Anaheim also has a separate provision criminalizing camping in parks.  §13.08.020.080.  It is a crime to "remain, stay, or loiter in any public park between 10:30 PM and 5:00 AM."  §13.08.020.190.  Violations of these two provisions may be charged as an infraction or as a misdemeanor.  §13.08.020.220.

172.   Anaheim also has an anti-loitering ordinance: "Any person who loiters, stands or sits in or upon any public highway, alley, sidewalk or crosswalk so as to in any manner hinder or obstruct the free passage therein or thereon of persons or vehicles passing along the same, or so as in any manner to annoy or molest persons passing along the same, is guilty of a misdemeanor."  §7.28.010. On information and belief, Anaheim disproportionately uses the loitering

---

[35] http://beta.latimes.com/local/lanow/la-me-ln-anaheim-homeless-emergency-20170913-story.html

[36] http://citynet.org/wp-content/uploads/2017/06/FCC-Data-Summary-FINAL_8.23.17.pdf

ordinance against persons who appear to be homeless by detaining and interrogating them without reasonable suspicion or probable cause based solely on their presence and perceived homelessness.  The Anaheim loitering ordinance is unconstitutionally overbroad and vague in violation of a long-line of Ninth Circuit and Supreme Court precedents.

## FACTS RELATING TO THE CITY OF ORANGE

173.   Orange Municipal Code §12.66.030 prohibits "encampments and camping on public streets and public property."  In particular, it prov ides that "no person shall: A. ... maintain, erect, or permit the erection of any hut, shanty, tent, tarpaulin, or any other type of temporary structure under his control upon any public street or public property.  B.  Use public street or public property for the purpose of camping ...."

174.   Public streets are defined as "streets, roads, highways, alleys, sidewalks, parkways, bridges ... and all other facilities and areas necessary for the construction, improvement, and maintenance of streets and roads." §12.66.020.

175.   Public property is defined as "the exterior of any building or structure, parking lot, plaza, or square, owned or controlled by the city of Orange." §12.66.020.

176.   Camping is defined of "the use of public streets or public property for living accommodation or habitation purposes such as sleeping activities, or making preparations to sleep, including the laying down of bedding for purposes of sleeping or using or storing personal belongings such as non-designated City cooking equipment, camping stoves, portable barbecues, sleeping bags, cots, beds, hammocks, extra clothing, or personal items when it reasonably appears, in light of all the circumstances, that the participants, in conducting these activities, are, in fact, using the public street or public property for living accommodation or habitation purposes."

177.   In other words, using "personal items" or "extra clothing" on the public streets can be a crime in Orange if it "reasonably appears" that the person using those items or using that clothing is living on the street.  Camping is also prohibited in parks under § 12.48.045.  The same definition as above is laid out again in § 12.48.015.

178.   The City of Orange has a history of giving Citations using the County anti-camping ordinance after pushing residents into areas of the Santa Ana Riverbed.  Plaintiff Kathy Schuler was cited for violating the Orange County ordinance against camping.  At the time, she was in the portion of the Riverbed that abuts Orange and that has concurrent jurisdiction with the Orange police.  It was the Orange Police Department who cited Ms. Schuler.

179.   After the Work Notice was issued in the Orange County Riverbed, the Orange Police Department issued a notice of their own.  The "Neighborhood Advisory" stated that "All occupants currently living in the Riverbed will be vacating the area."  It then states that "the City of Orange Police Department asks if you see a suspicious person or activity to please call 714-744-7444 for non-emergency matters."

180.   On January 24, 2018, officers in the City of Orange ticketed Cameron Ralston for blocking the sidewalk while he was stopped at a sidewalk near the Riverbed. At the time, Mr. Ralston's property was neatly packed and placed to the side of the sidewalk leaving a clearance of three feet.  Over the past year, Mr. Ralston has been regularly threatened with arrest and asked when he will leave the city by Orange Police Department.  Mr. Ralston has not been ticketed for camping but has been threatened with citation under the City of Orange camping ordinance.

181.   Mr. Ralston also left his property briefly to secure food after receiving the obstruction ticket.  When he returned, a notice had been posted near his property indicating that the City of Orange considered it to be abandoned and he had 24 hours to move it.  City of Orange police officers had that same day seen

him with the property and seen that it was his.  They did not have an objectively reasonable belief that the property was abandoned.

182.    Plaintiff Shawn Carroll was also cited by Orange Police officers when leaving the Riverbed, ostensibly for a bicycle offense.  On information and belief, Plaintiffs allege that the City of Orange instituted a specific plan to stop homeless individuals as they left the Riverbed and cite them for any purported violation of even a minor violation of the law under a policy of "zero tolerance for the homeless" aimed at forcing homeless individuals to leave the City.

## FACTS RELATING TO COSTA MESA

183.    Costa Mesa Municipal Code §11-304 makes it illegal for any person to "camp, occupy camp facilities or use camp paraphernalia" in "(1) Any street or alley; (2) Any public parking lot or public area, improved or unimproved; (3) Any park."  The Municipal Code further defines "camp" as "to pitch or occupy camp facilities; to use camp paraphernalia." §11-302.  Camp Paraphernalia "includes, but is not limited to, tarpaulins, cots, beds, sleeping bags, hammocks or non-city designated cooking facilities and similar equipment." §11-302.  Thus, under the Costa Mesa Municipal Code, any homeless person using a sleeping bag to stay warm is "camping" and is breaking the law.

184.    None of the homeless shelters listed by Behavioral and Health Services in the memorandum accompanying the notice of closure are located in Costa Mesa.  On information and belief, there are no homeless shelters available to the general public in Costa Mesa.  Plaintiff Melissa Fields was repeatedly cited for camping while attempting to sleep on the sidewalk in Costa Mesa.  Ms. Fields was not using a tent but was using a sleeping bag to stay warm.  She had a backpack and a bicycle with her as well.

## FIRST CAUSE OF ACTION
### Violation of Eighth and Fourteenth Amendments (42 U.S.C.§1983)
### Art. 7, §17 California Constitution (Cruel and Unusual Punishment)
### (Against All Defendants)

185.   Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

186.   The acts and omissions of Defendants, and each of them, as described herein, violate the constitutional rights of Plaintiffs to be free from actual or threatened cruel and unusual punishment.  By virtue of their status as homeless and disabled, and the absence and insufficiency of shelter or housing in the region, including the County and the cities of Anaheim, Orange, and Costa Mesa, the Plaintiffs have no way to comply with the laws Defendants have sought and continue to seek to enforce against them.

187.   Orange County told persons present in the Riverbed that they would be cited for trespassing if they remained on County-controlled land in the area. As people have been exited from shelters and temporary placements, with no place to sleep, Orange County has begun threatening and citing the Plaintiff class again.

188.   The Anaheim Police Department has a policy and practice of threatening and citing individuals who sleep in public places or exhibit other behaviors which Anaheim considers "camping" under Anaheim Municipal Code 11.10, the Anaheim anti-camping ordinance.

189.   The Orange Police Department has a policy and practice of threatening and citing individuals who sleep in public places or exhibit other behaviors which Orange considers "camping" under Orange Municipal Code §12.66.030 and under County of Orange Ordinance §2-5-95.  The Orange Police Department also has informed its officers that they should have "zero tolerance" for the homeless.

190.   The Costa Mesa Police Department has a policy and practice of threatening and citing individuals who sleep in public places or exhibit other behaviors which Costa Mesa considers "camping" under Costa Mesa Municipal Code §11-302 to §11-304.

191.   Plaintiffs further allege that it violates their substantive due process rights to threaten them with citation and arrest for being present on County property.  The County lacks adequate and appropriate shelters to provide a safe place for the Plaintiff class to sleep and simply be.  The County has not provided any other County land on which Plaintiffs can reside without trespassing.  Instead, it intends to enforce County "quality-of-life" violations and expects Plaintiffs and others to move out into surrounding cities such as Anaheim, Orange, and Costa Mesa, in which anti-camping ordinances prevent them from lawfully residing without shelter and loitering laws prohibit even their presence in these cities.

192.   The citation and threats of citation for behavior such as "the use of public streets or public property for living accommodation or habitation purposes" when there is inadequate shelter available violates the Eighth and Fourteenth Amendments of the United States Constitution and Article 7, §17 of the California Constitution.

193.   Each Defendant has a custom, policy, and/or practice of encouraging its officers to threaten to issue and to issue tickets to homeless persons for the unavoidable behavior of sleeping or having property in public based on their unhoused status.

194.   There is an actual controversy between Plaintiffs and the Defendants concerning the threat of citation if Plaintiffs remain and sleep on public property with their personal possessions when they have no alternative location to be that will not violate Defendants' laws.   Plaintiffs desire a judicial determination of their rights and duties and a declaration as to Defendants' obligations.

## SECOND CAUSE OF ACTION
## Violation of First and Fourth Amendment; 42 U.S.C. 1983
## (Against All Defendants)

195.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

196.    Prior to the initiation of this action, each of the Defendants repeatedly and consistently stopped, detained, interrogated and ordered individuals who appear to law enforcement to be homeless to move along from public places where they have a right to be pursuant to the First Amendment.  The stops and subsequent detentions and interrogations constitute an unlawful seizure as they were done without reasonable suspicion or probable cause to believe that the individual had or was about to commit a crime other than a purported violation of a law necessitated by their status as homeless individuals plus the lack of available shelter.  Plaintiffs, as everyone else, have a First Amendment right to be present in a public space, to "loiter" in a public space for no reason and to not be excluded from that space by threat, intimidation or coercion because they are homeless.Since the closure of the Riverbed and the Santa Ana Civic Center encampments, and since the expiration of the County's placements of the Plaintiff class in motels, recuperative care, FSP placements, sober living facilities and the closure of the armories, the Plaintiff class is, again, being stopped, detained, interrogated, ordered to move from public places and, in many instances, cited and  arrested by Defendants for crimes directly resulting from the fact that they have no place to live other than in public spaces.

197.    As a direct consequence of Defendants' past and threatened future actions, Plaintiffs have suffered and will continue to suffer a violation of their constitutional rights.   Plaintiffs have suffered damages in the form of pain and suffering as a result of Defendants' policies, practices and customs.

**THIRD CAUSE OF ACTION**
**Right To Due Process Of Law; 42 U.S.C. § 1983**
**Fourteenth Amendment**
**(Against All Defendants)**

198.   Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

199.   The due process clause of the Fourteenth Amendment prohibits government officials, and those acting in concert with them as their employees and agents, from depriving persons of their rights without due process of law.

200.   Defendant County lacks an adequate system of care with standards and guidelines for assessing and addressing the needs of homeless individuals in its jurisdiction.  As a consequence of this omission, Plaintiffs' rights to due process of law were violated in several ways, including denial of access to programs and placements for which they were qualified based on their disabilities and their status as unsheltered persons; summary removal from programs and placements based on purported violations of unannounced, arbitrary and capricious rules of personal conduct; imposition of ad hoc rules and conditions for participation in publicly funded programs based on the status of the Plaintiff class as homeless persons; termination of public assistance benefits without notice and an opportunity to appeal the decision based on the erroneous assumption that the Defendant County's FSP contractor, Telecare, would provide for the basic needs of Plaintiffs. The Plaintiff class has a property interest in these government benefits and programs and were entitled to a fair and equitable process for providing and denying access to such benefits and programs.

201.   In addition, Plaintiffs' right to due process of law was violated by each of the Defendants through the application of constitutionally vague laws used to threaten, intimidate, coerce, cite and arrest Plaintiffs for, *inter alia*, "camping" in public, loitering, and placing their possessions on public property when they have no other place to put it.  Defendants' laws violate the Fourteenth Amendment

63

because they are so vague as to be impossible to comply with.  The unlawful orders to the homeless to move along or be subject to arrest for camping or loitering are directed toward intimidating plaintiffs.  Similarly, under Orange Municipal Code §12.66.020, using "extra clothing" is a crime if the person using that clothing appears to be living outside without defining the terms.  Provisions similar to the Defendants' loitering ordinances listed above have been repeatedly found unconstitutionally vague and overbroad in the past.  For example, the Anaheim loitering ordinance makes it a crime to "annoy or molest" any person but does not define these terms.

202.   The acts and omissions of Orange County, Anaheim, Orange, and Costa Mesa, as described herein, violate the constitutional rights of Plaintiffs under the Due Process Clause of the United States Constitution.  The wrongful conduct complained of herein was the product of a policy and practice of the Defendants, and was not the product of accident or inadvertence, and was not random.  In so doing, Defendants were deliberately indifferent to the rights of Plaintiffs and the class they represent and acted in willful and reckless disregard of the rights of Plaintiffs and the class.

203.   Plaintiffs' rights to substantive due process have been violated as well.  As detained herein, numerous members of the Plaintiff class have been abandoned on the streets by Defendant County when its agents exited people from programs and motels and denied them appropriate alternative placements.  Time and again, Telecare and other County agents left people in this precarious and dangerous position, without a place to sleep, because they were unable to find a placement for the individual that accommodated their disabilities, including the need to keep their assistance animal and their caregiver partner with them in an appropriate facility.  Plaintiffs have alleged and continue to allege that the failure and refusal of the County to provide a safe place for the class members to stay puts

them in immediate danger and constitutes a state-created danger to a community that predominantly suffers from one or more significant disabilities.

204.   As a direct and proximate cause of the aforementioned acts of Defendants, Plaintiffs and the Plaintiff Class suffered injuries in that they were denied access to, or ejected from, existing facilities and programs on grounds that were arbitrary, capricious and discriminatory, were unable to obtain appropriate housing or shelter and were threatened, cited and, in some instances arrested, for living in public places when there was no available shelter or housing.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF FAIR HOUSING ACT**
**42 U.S.C. § 3604 and California Gov. Code § 12955 et seq.**
**(Against County Defendant)**

205.   Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

206.   Under the Fair Housing Act, a dwelling is "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families ...." 42 U.S.C. § 3602(b).  Emergency and bridge shelters, transitional housing, assisted living and recuperative care facilities, sober living facilities, room and board facilities are all subject to the Fair Housing Act ("FHA") whether publicly or privately owned and operated.
The Fair Housing Act requires that an entity not discriminate on a number of bases, including disability.  The Defendant County and its agents, including the operators of the Courtyard and Bridges and Telecare have violated the FHA in several ways.

207.   The staff at the Courtyard and Bridges are not adequately trained to interact with people with significant mental illness.  As a result, time and again, individuals are ejected from the only two public shelters in Orange County because of a perceived violation of a rule or offense to the staff.  The ejection based on allegedly wrongful conduct directly related to a disability, without any opportunity

to challenge the decision, is a failure to consider a reasonable accommodation of a
disability.  People have no place to go ther than the streets.

208.   To the extent that there are other privately-operated shelters, nearly all
are restricted by gender, with most being available to women with children or
pregnant women.  None are low-barrier drop-in emergency shelters.  Some, such as
the Orange County Rescue Mission, require compliance with intensive Christian
religious practices as a condition of admission.  Still others require that a person be
employable, a difficult barrier for many unhoused individuals.

209.   The physical factors at the Courtyard and Bridges fail to provide
adequate accommodation of disabilities for many members of the plaintiff class.
For persons with a trauma-enhanced disability, the conditions in the Courtyard,
Bridges and the two County-run emergency winter shelters at the armories,
exacerbate their physical and mental health conditions.  The numbers at the
Courtyard are near or above 400 persons each night, sleeping in close quarters on
small cots with no privacy for women.  At the armories, people sleep on mats on
the floor that are difficult for anyone with a physical disability to accommodate to
as a matter of course.

210.   The County and its agent, Telecare, failed to develop and implement
adequate policies to ensure that Plaintiffs and others diagnosed as SPMI would not
be ejected from services or placements on arbitrary and capricious grounds for a
purported failure to follow some unidentified and unwritten "behavioral" rule that
directly impacts their disabilities, and without a pre- or post-deprivation process
for notice and a hearing before loss of a significant government benefit provided to
respond to their serious disability.

211.   At the time that the County initiated the relocation of unhoused
persons from the Riverbed in February 2018, the County had no appropriate
placements to accommodate assistance animals.  The County's proposal was to
separate people with emotional and physical disabilities from their animals and

board the animals for 90 days.  Under directives from the Court, the County created a number of "pet beds" at Bridges and the Courtyard to accommodate people with assistance animals.  Many of the temporary motel placements allowed accompanying assistance animals, while others did not.  Increasingly, as people were relocated from the initial 30-day motel says, many were pressed to separate from their animals, causing them emotional distress.   For those who refused to do so. and demanded a reasonable accommodation for their assistance animals, the response of Defendant County and its agent, Telecare, has been to throw up their hands and abandon people on the streets even though they knew they were SPMI.

212.   There was and is no process for a person to seek an accommodation for an emotional support animal under a provider's "no-pet" policy. Both the FHA and Section 504 of the Rehabilitation Act, require consideration of accommodation for an "assistance animal," including a certified service animal, an emotional support animal, or any other animal that "works, provides assistance, or performs tasks for the benefit of a person with a disability, or provides emotional support that alleviates one or more identified symptoms or effects of a person's disability." Providers may deny the accommodation only where they show that the specific assistance animal will cause a threat to the health and safety of others or damage the provider's property.

## FIFTH CAUSE OF ACTION
## VIOLATION OF THE 14TH AMENDMENT; ART. I, § 13
### (Against the Defendant County)

213.   Plaintiffs reallege and incorporate the allegations set forth in the proceeding paragraphs as through fully set forth hereat.

214.   Defendants' conduct, as described herein, constitutes a denial of equal protection to the Plaintiff class based on their status as homeless individuals coupled with their presence in public spaces and the lack of available appropriate housing options, from shelters to permanent and supportive housing.  The equal

protection clause prohibits the Defendants from making determinations about access to government programs on the basis of the Plaintiff class' indigent status.

215.   As individuals with disabilities and as homeless persons, they have been subjected to selective and discriminatory application of the laws and programs, which has had both a discriminatory intent and a discrimjnatory purpose.  As individuals with disabilities and as homeless persons, they have been the subject of selective and discriminatory application of the laws and programs as a result of bias, negative attitudes, animosity and fear directed at the unsheltered community and disabled persons, all done with the intent to harm a politically unpopular group.  Plaintiffs and the class that they represent have been intentionally treated differently from others similarly situations and with no rational basis for the difference in treatment as a result of Defendants' willful, malicious and unlawful acts.

216.   As a direct and proximate consequence of Defendants' actions, Plaintiffs have suffered and continue to suffer a loss of constitutional and statutory rights and pain and suffering.  The individual Plaintiffs are entitled to compensatory damages for injury to their person and the Plaintiff class is entitled to injunctive and declaratory relief.

## SIXTH CAUSE OF ACTION
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### (42 U.S.C. § 12132; 42 U.S. Code § 12133; 29 U.S.C § 794a)
### (Against Defendant County)

217.   Plaintiffs reallege and incorporate the allegations set forth in the proceeding paragraphs as through fully set forth hereat.

218.   The American with Disabilities Act protects individuals with disabilities against governmental action the constitutes intentional discrimination when the government entity knows or should know that its conduct is substantially likely to result in harm to an individual's federally protected right and, nonetheless, continues its unlawful action. In this instance, Defendant County engaged in

intentional discrimination against the Plaintiff class based on their disabilities by intentionally and arbitrarily denying them access to benefits and programs to which they were otherwise eligible.

219.   From the beginning of this litigation, through email, telephone calls, in-person meetings with the Court and the Special Master, Plaintiffs' counsel has repeatedly and daily informed Defendant County of the discriminatory treatment directed at the class as a whole and hundreds of individual members of the class and sought reasonable accommodations for the Plaintiffs' disabilities.

220.   While Defendant initially, and only after multiple demands, made some accommodations for assistance animals and in-home caregivers for those persons assessed as SPMI and placed in a FSP site, even that accommodation has now been rescinded for many individuals as the County has intentionally moved to cut costs, regardless of its obligations to the Plaintiff class as disabled individuals.

221.   In doing the acts complained of herein, Defendant has acted knowingly and with deliberate indifference to Plaintiffs' disabilities and the harm substantially likely to occur to them as the result of Defendant's unlawful policies and practices.  Defendant has accomplished these unlawful acts by using federal and state funds in ways that discriminate against qualified disabled persons.

## SEVENTH CAUSE OF ACTION
### Violation of California Civil Code § 52.1
### (Against All Defendants)

222.   Plaintiffs reallege and incorporate the allegations set forth in the proceeding paragraphs as through fully set forth hereat.

223.   The Defendants' conduct, as described herein, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise and enjoyment of Plaintiffs' rights as secured by the First, Fourth, Eighth, and Fourteenth Amendments to the United States

Constitution or laws of the United States, and of the rights secured by the Constitution or laws of the state of California.

224.    Defendants have engaged in concerted and repeated conduct to cite and arrest Plaintiffs under unconstitutional ordinances, on their face and as applied, and threatened to cite and arrest them repeatedly.  Defendants engaged in coercive and intimidating tactics by conducting unwarranted stops and collecting information on Plaintiffs to push them out of Defendants' respective jurisdictions.

225.    Defendants' actions are the proximate cause of the harm suffered by the individual Plaintiffs, who are entitled to compensation for their pain and suffering.

226.    Defendants' continued use of threats, intimidation, coercion against Plaintiffs and the class they represent is ongoing and will continue unless and until the Court enjoins this unlawful conduct.

## EIGHTH CAUSE OF ACTION
### Violation of California Government Code § 815.6
### (Against All Defendants)

227.    Plaintiffs reallege and incorporate the allegations set forth in the proceeding paragraphs as though fully set forth hereat.

228.    California Civil Code § 815.6 provides for liability against a public entity when: (1) the entity violates an enactment; (2) the plaintiffs are in the class of persons protected by the enactment; (3) the enactment is intended to protect the type of injury complained of by the plaintiffs; (4) the violation of the enactment is the proximate cause of the injury; and, (5) the public entity did not exercise reasonable diligence in discharging its duty established by the enactment.

229.    An enactment includes a federal or state constitutional provision, a statute, charter provision, ordinance or properly adopted regulation.

230.    The Fourteenth Amendment of the United States Constitution, Article I, § 7 of the California Constitution, California Civil Code § 52.1, and California

Government Code § 65583 *et seq.* are all enactments within the meaning of California Civil Code § 815.6. Plaintiffs and the Plaintiff Class are in the class of persons protected by these enactments.

231.  The aforementioned enactments, applied to Plaintiffs separately and together, constitute mandatory duties within the meaning of California Civil Code § 815.6 and were designed to protect against the kind of injuries alleged herein. As described hereinabove, Defendants did not exercise reasonable diligence in discharging their duty established by the enactments identified above to refrain from violating the constitutional and statutory rights of Plaintiffs and the Class.

232.  As a direct and proximate cause of the aforementioned acts of Defendants, Plaintiffs and the Plaintiff Class suffered injuries in that they were denied access to existing facilities on grounds that were arbitrary, capricious and discriminatory, were unable to obtain appropriate housing or shelter and were threatened, cited and, in some instances arrested, for living in public places when there was no available shelter or housing.

233.  Plaintiffs and the Plaintiff Class seek injunctive and declaratory relief and damages for the individual Plaintiffs.  The damages sought by the individual Plaintiffs are incidental to the injunctive relief sought in this action.

### NINTH CAUSE OF ACTION
### Violation of California Government Code § 11135
### (Against All Defendants)

234.  Plaintiffs reallege and incorporate the allegations set forth in the proceeding paragraphs as though fully set forth hereat.

235.  California Government Code section 11135 provides that:

No person … shall, on the basis of race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, genetic information, or disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program

71

or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state.

236.   The Defendant County of Orange is an entity subject to the requirements and prohibitions of section 11135 in that it receives more than 100 million dollars annually in the form of funding for MHSA, among other public monies and financial assistance from state agencies and other state funds.

237.   The term "disability" applies to both mental, medical and physical disabilities as defined in California Government Code section 12926.  The Defendant County, directly and through its contractors and agents, has discriminated against Plaintiffs on the basis of their disabilities and has denied them full and equal access to the programs and activities operated by the County for the benefit of unhoused persons.

238.   As a direct and proximate result of Defendant's actions, and those of its contractors and agents, Plaintiffs and the Plaintiff Class experienced and continue to experience direct injury, including pain and suffering.

## TENTH CAUSE OF ACTION
## TAXPAYER'S AND CLASS MEMBERS SUIT FOR DECLARATORY AND INJUNCTIVE RELIEF
### California Code of Civil Procedure § 526a
### (Against Defendant County)

239.   Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth here.

240.   Plaintiffs Orange County Catholic Worker and Melissa Fields have been assessed for and are liable to pay taxes in and to the County of Orange. Plaintiffs and the class they represent have suffered and, unless the Court restrains Defendant County, will continue to suffer irreparable harm.

241.   Plaintiffs are informed and believe, and on that basis allege, that the conduct of Defendant, and its employees, agents and contractors, has been and,

72

unless restrained, will continue to be deleterious to the constitutional and statutory rights of Plaintiffs and the general public.  Plaintiffs thereby seek to enforce important rights affecting the public interest within the meaning of California Code of Civil Procedure § 1021.5.

242.   Plaintiffs have no adequate remedy at law.

243.   Unless the Defendant is enjoined from continuing its course of conduct for engagement with the Plaintiff class, Plaintiffs will suffer ongoing and irreparable injury to their rights.  Plaintiffs seek injunctive relief pursuant to California Code of Civil Procedure § 526a and the substantive standards reflected in the claims stated above, for which injunctive and declaratory relief are appropriate remedies.

244.   Defendant has expended public monies and threatens and will continue to spend such monies to implement and engage in the illegal conduct described herein.

245.   Pursuant to California Code of Civil Procedure §§526 and 526a, and the constitutional and statutory provisions set forth above, the Plaintiffs and Plaintiff Class, as taxpayers and as injured parties entitled to relief, seek declaratory and injunctive relief, damages for the individual plaintiffs, and an accounting to prevent continued harm and to protect themselves and the public from the defendants' unlawful policies and practices.  Said damages to the individual plaintiffs is incidental to the injunctive relief sought for the class.


**WHEREFORE**, Plaintiffs pray as follows:

1.   For an order enjoining the Defendant County of Orange from removing or denying the Plaintiff class placements in emergency shelters, transitional programs, recuperative care and sober living facilities, or any other placements without due process of law;

2.      For an order directing the Defendant County of Orange to reassess those members of the Plaintiff class removed from, or denied access to, placements in emergency shelters, transitional programs, recuperative care and sober living facilities, or any other placements between February 1, 2018 and the present without due process of law;

3.      For an order enjoining and restraining the Defendant County of Orange from removing or denying the Plaintiff class from placements reasonable accommodations in emergency shelters, transitional programs, recuperative care and sober living facilities, or any other housing opportunities in violation of state and federal disability discrimination laws;

4.      For an order enjoining and restraining Defendants City of Anaheim, City of Costa Mesa, and City of Orange from citing or arresting individuals for violations of camping laws, including Anaheim Municipal Code 11.10, Orange Municipal Code §12.66.030, Costa Mesa Municipal Code §11-304, and/or County of Orange Ordinance §2-5-95.

5.      For an order enjoining and restraining Defendant City of Anaheim from enforcing its loitering ordinance, §7.28.010.

6.      For an order enjoining and restraining Defendants City of Anaheim, City of Costa Mesa, and City of Orange from stopping and detaining homeless individuals without probable cause and from threatening homeless persons with tickets or citations if they continue to be present in public space in that city.

7.       For a declaratory judgment that Defendants' policies, practices and conduct as alleged herein violate Plaintiffs' rights under the United States and California constitutions and federal and state statutory laws governing disability and fair housing;

8.      For a declaratory judgment that Defendants failed to meet their mandatory duty to provide for shelter and housing for homeless and low-income residents of their jurisdictions, as codified in Government Code §§65583 et seq.;

74

9.  For an order directing the Defendant County to establish locations in each SPA where members of the Plaintiff class may access services provided by the County, including, but not limited to, sites for General Relief and other government benefits;

10.  For an order requiring any law enforcement agency arresting an individual outside of Santa Ana and transporting the individual to the County jail in Santa Ana to provide a discharge plan for the person's release and to provide for transport to the discharge location;

11.  For an order enjoying the issuance of all development permits in the Defendant jurisdictions unless and until compliance with the Housing Accountability Act, as amended in 2008 by SB2, is met;

12.  For damages to the individual plaintiffs in an amount to be determined according to proof based on their federal claims only;

13.  For costs of suit and attorney fees as provided by law;

14.  For such other relief as the Court deems just and proper.


Dated: July 26, 2018          Respectfully submitted,

LAW OFFICE OF CAROL A. SOBEL
ELDER LAW & DISABILITY RIGHTS CENTER
SCHONBRUN SEPLOW HARRIS & HOFFMAN


_____/s/ Carol Sobel_____
By: CAROL A. SOBEL
Attorneys for Plaintiffs