**BROOKE WEITZMAN** SBN 301037
**WILLIAM WISE** SBN 109468
**ELDER LAW AND DISABILITY RIGHTS CENTER**
1535 E 17th Street
Santa Ana, California 92705
t. 714-617–5353
e. bweitzman@eldrcenter.org
e. bwise@eldrcenter.org

**CAROL A. SOBEL** SBN 84483
**MONIQUE ALARCON** SBN 311650
**AVNEET CHATTHA** SBN 316545
**LAW OFFICE OF CAROL A. SOBEL**
725 Arizona Avenue, Suite 300
Santa Monica, California 90401
t. 310-393-3055
e. carolsobellaw@gmail.com
e. monique.alarcon8@gmail.com
e. avneet.chattha7@gmail.com

[Additional Counsel on Next Page]
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| ORANGE COUNTY CATHOLIC WORKER, et al.;<br><br>            Plaintiffs,<br><br>      v.<br><br>ORANGE COUNTY, the City of Anaheim, the City of Costa Mesa, the City of Orange, the City of Tustin<br><br>            Defendants. | Case No.:  18-cv-00155 DOC KES<br><br>SUPPLEMENTAL COMPLAINT<br><br>42 U.S.C. §1983: First, Fourth, Fifth, and Fourteenth Amendments; 42 U.S.C. §3604 (Fair Housing Act); 42 U.S.C. § 12132 (ADA); 29 U.S.C. § 794 (§504 Rehabilitation Act)<br>Cal. Const. Article I, §§7,13; Cal. Civ. Code §§51, 52.1, 54; Cal. Gov. Code §11135; Cal. Gov. Code §§ 12955 et seq. (FEHA) |

**PAUL L. HOFFMAN** SBN  71244
**CATHERINE SWEETSER** SBN 271142
**COLLEEN M. MULLEN** SBN 299059
SCHONBRUN, SEPLOW, HARRIS & HOFFMAN
11543 W. Olympic Blvd.
Los Angeles, California   90064
t.  310-396-0731
e. hoffpaul@aol.com
e. csweetser@sshhlaw.com
e. cmullen@sshhlaw.com

**JURISDICTION AND VENUE**

1.      This is an action for injunctive and declaratory relief and damages pursuant to 42 U.S.C. § 1983 based upon the violations of Plaintiffs' rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as various federal statutory provisions. Jurisdiction exists pursuant to 28 U.S.C. § 1331 and 1343 based on federal statutes and questions of federal constitutional law.  Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.  The Court has jurisdiction over Plaintiffs' supplemental state law claims for declaratory and injunctive relief pursuant to 28 U.S.C. § 1367(a).

2.      Venue is proper in the Southern Division of the Central District in that the events and conduct complained of herein all occurred in Orange County.

**PRELIMINARY STATEMENT**

3.      This Supplemental Complaint addresses facts relating to the City of Tustin, which was not named by Plaintiffs originally, but which is a party to this action as a result of the cross-complaint filed by Intervenor City of Santa Ana. Plaintiffs incorporate all relevant facts from the First Amended Complaint as though fully set forth herein.

4.      The initial phase of this case was brought against Orange County, Anaheim, Orange, and Costa Mesa.  The City defendants took actions to force unhoused people into the area of the Santa Ana Riverbed between the Santa Ana Freeway and Ball Road.  The County announced the intent to push those people back into the surrounding cities without a plan for housing or shelter.

5.      The Court acted to halt the proposed Riverbed evictions and required the County to provide a plan to relocate the unsheltered community living in the Riverbed in a manner that would not result in moving people to other encampments and would not produce an influx on Santa Ana, the City within the Defendant County that currently bears the brunt of caring for the unhoused

population in the County because of the concentration of County services in Santa Ana.  Santa Ana is the location of a variety of County services, including General Relief, the courts and, significantly, the jail.

6.     Approximately 700 people from the Riverbed were temporarily placed in motels and at various shelters, Full Service Partnership placements for those diagnosed as severely and persistently mentally ill, recuperative care facilities, residential substance abuse facilities and other resources that provided them a safe place to sleep, shower and begin reclaiming their lives.

7.     Subsequently, the Court directed that several hundred individuals in the homeless community at the Santa Ana Civic Center end and the individuals staying there as of the end of March be provided with appropriate alternatives.

8.     The closure of these two encampments, which displaced between 1,000 and 1,500 people total, placed the focus on the lack of adequate facilities and programs to respond to the housing and homeless crisis the County faces.  It also brought to the fore the failure of the cities and County to provide sufficient resources in their own communities.

9.     In the 2017 Point-in-Time Count, the County estimated that there were 4,792 homeless people, 2,584 of whom were unsheltered.  This number included 357 veterans.[1]  More than half of the 2017 sheltered population was in emergency shelters with the remainder in "transitional shelter."  By the county's own estimates, the homeless numbers increased between 5 and 7 percent annually over five years.

10.     The need to respond to the increasing numbers of unsheltered individuals in Orange County is hardly new and neither is the approach of criminalizing - rather than housing - people who are homeless.  More than a decade

_____

[2]http://ochmis.org/wp-content/uploads/2012/10/PIT-Final-Report-2017-07.24.17.pdf

4

ago, the Orange County Grand Jury issued a report on "The Homeless Crisis in Orange County." The report noted then that "[h]omelessness is on the rise, often misunderstood, and is inextricably linked to poverty." From 1990 to 2005 the homeless population increased at a far greater rate than the overall increase in population in the County. The Grand Jury report concluded that addressing the problem "does not appear to be a priority with the Board of Supervisors." The Grand Jury listed a series of measures to address the crisis then being considered by various municipal entities in the County, including plans to add housing for homeless individuals at the former El Toro Marine Air Station; shelters in San Clemente, Buena Park, Westminster, La Habra and Cypress, and a very "humanistic" outreach approach by the Santa Ana Police Department and Orange County Sheriff's Department. A dozen years later, few, if any, of these intentions have been realized.

11.     The 2005 Grand Jury Report also reviewed the history of recommendations in similar reports, going back to 1988. The 2005 Report concluded that few of the earlier recommendations had been implemented. The Grand Jury report demonstrates that, over the past 25 years, the primary response of the County and the Cities has been to invest in approaches that address the visible presence of homeless people as a blight, without significantly reducing the number of residents on the street each night. These approaches include criminalizing homelessness by arresting homeless individuals for loitering, making it illegal to sleep in public places at night, seizing and destroying homeless people's property, and engaging in a pattern of warrantless stops and interrogations. The identical practices have been repeatedly challenged and enjoined by judges of the Central District in Los Angeles and the Ninth Circuit, uniformly rejecting these practices criminalizing homelessness as a violation of the First, Fourth, Eighth and Fourteenth Amendments. There is no credible reason why Orange County and local cities' officials would not be aware of the judicial

rulings on these issues because they have been highly publicized throughout the region, if not the nation, and discussed at public meetings of these entities.

12.     The County and Cities' approach is even more indefensible when viewed against the directives issued by the United States Interagency Council on Homelessness ("USICH"), composed of nineteen federal cabinet and agency heads to organize federal efforts to end homelessness. The most recent USICH report, "Ending Homelessness for People Living in Encampments," is directly on point and counter to the approach taken by the County to the Plaintiffs and other homeless individuals forced to live along the river in large part because of the government's failures over decades.

13.     Specifically, the USICH underscored that "forced dispersal" of homeless encampments is inappropriate and undermines the goal of providing services to homeless individuals.  While the USICH underscored the importance of "intensive and persistent outreach and engagement," the County and the Cities instead opted to disperse the encampment with threats of citation and arrest  if they remain, forcing them to migrate to neighboring jurisdictions.  Similarly, the Cities dispersed encampments, telling people that they are not welcome in the city, their mere presence is a crime, and they will be ticketed or arrested if they remain.  Until early 2018, the Cities coupled their threats with a direction to relocate to the area along the river.

## FACTS

14.     In February 2017, an action was filed in the U.S. District Court concerning the County's earlier enforcement actions against approximately 1,000 individuals living in the Riverbed. *See Schuler v. County of Orange*, No. 8:17-cv-00259 DOC KES, (C.D. Ca. 2017) [Dkt. #1].  On March 7, 2017, the parties stipulated to, and the Court granted, a preliminary injunction to prevent the County from violating individuals' constitutional rights in a designated area of the

6

Riverbed just north of the Santa Ana Freeway and south of Ball Road ("the Injunction Area."). [Dkt. #30] The area designated in the preliminary injunction and in the settlement subsequently reached by the parties is the same area at issue in this action.

15.     After the settlement in *Schuler*, the County contracted with City Net to provide services to people in the Injunction Area. In July 2017, City Net surveyed 422 people, little more than a third of those then living there.  Of those interviewed, 81.2% were interested in having City Net become their case managers and seek housing and services for them.  When asked where they lived previously, 25% reported they were from Anaheim, approximately 11% were from Santa Ana, and 9.7% were from Orange.  After this survey was done, the population in the Santa Ana Riverbed increased as people have been moved from other areas into the Injunction Area at the direction of the County.

16.     In the year after the injunction issued in *Schuler*, little, if anything, was done by the County or the cities in Orange County to provide a safe environment for the unsheltered population in the Riverbed or  to find alternative locations.  In June 2017, the County began to discuss providing basic necessities in the Injunction Area of drinking water, mobile showers, and even night access to the one public restroom in the area.  Ultimately, the County determined not to provide any of these.

17.     In August 2017, Orange County Public Works made public a plan to change the topography of the Riverbed in order to make it "less desirable for occupation."  The Public Works presentation showed how the use of rocks in the Santa Ana Riverbed effectively made the area impossible for a person to lie down and sleep.  Again, the County chose to invest in harassment instead of solutions.[2]

---

[2] https://voiceofoc.org/2017/08/county-used-rock-riprap-sand-to-make-santa-ana-riverbank-less-desirable-for-occupation/

The County made clear that the primary reason for the Riverbed project was to use rocks and large boulders to exclude the flat land from use by homeless persons.

18.     In September 2017, Supervisor Nelson drafted a plan to use County land in Irvine as a temporary shelter.  The Board of Supervisors rejected that plan and instead voted to develop that land into a massive new project containing luxury condominiums and upscale retail shops.[3]

19.     The Cities were taking similar actions.  In August 2017, Anaheim City Council considered community requests to install restrooms near the Santa Ana Riverbed and offers of organizers to provide and maintain those restrooms. Anaheim rejected the proposal and stated that the County should take responsibility for the needs of the people sleeping on County property.[4]

20.     In September 2017, the Anaheim City Council passed "Operation Home Safe," put forward as a comprehensive program to address homelessness along the Santa Ana Riverbed.  A main goal of the program was to identify locations for at least 500 shelter beds or other housing options. Additionally, the City of Anaheim committed to expediting the availability of 100 more beds at the Bridges shelter. To date, neither of those things has happened. The only part of the plan that was implemented over the last four months involved significantly increased police enforcement.[5]

---

[3] https://www.ocregister.com/2017/11/06/orange-county-to-finalize-plan-for-great-park-condo-retail-development-as-irvine-threatens-lawsuit/
https://www.youtube.com/watch?v=lx3CSQnIJsM
[4] http://www.scpr.org/news/2017/08/29/75117/anaheim-to-consider-portable-toilets-for-homeless/
[5] https://www.ocregister.com/2017/09/13/after-anaheim-declares-a-state-of-emergency-homeless-along-river-bed-ponder-whats-next/

21.     In September 2017, Orange Council Member Alvarez announced that the City would be reviewing its loitering, vagrancy, and panhandling laws to strengthen them to provide the police with more tools to combat homelessness.[6]

22.     There is no question that the previously named Defendants, along with other Cities, coordinated enforcement actions against unhoused individuals living in the Riverbed.  On September 5, 2017, Anaheim Police Chief Quezada met with command staff from the Fountain Valley, Orange and Santa Ana Police Departments, along with the Orange County Sheriff's Department. Representatives from these law enforcement groups met again a few days later to discuss coordination of deployment schedules for enforcement in the Riverbed.  On information and belief, the Orange County Sheriff's Department was the lead agency for this coordinated enforcement action.

23.     On October 26, 2017, the County Flood Control District announced that restricted hours for bike trail access in Fountain Valley and complete closure of public access to the west side of the Riverbed in the City.  More than 100 individuals were living along the West bank of the Riverbed at the time as the area was next to a public storage facility and not impeding traffic.  The majority of this community came to the Riverbed after being forced out of nearby cities including Costa Mesa, and then slowly moved north in the Riverbed as the County closed parts of the Riverbed for a series of maintenance projects.[7]

24.     The Orange County Sheriff and Public Works employees began clearing the Fountain Valley area on November 3, 2017,  announcing to people that

_____

[6] https://www.ocregister.com/2017/09/13/after-anaheim-declares-a-state-of-emergency-homeless-along-river-bed-ponder-whats-next/
[7] https://voiceofoc.org/wp-content/uploads/2017/10/County-Announces-Active-Enforcement-of-Public-Hours-Along-Santa-Ana-River-Trail-FINAL.pdf

they would not be allowed to remain and threatening citations.  County employees told people that the Injunction Area would not be impacted by the change in hours or closure.

25.     In fact, at that time, one of the Public Works employees told a local activist to hurry and move the people residing in the Fountain Valley area to the Injunction Area.  He stated that the Fountain Valley bike trail was now closed to the public at night, but that people could continue to reside in the Injunction Area. A large group of people from Fountain Valley then relocated and reconstituted their community near Katella Road by the bike trail.

26.     The relocation of persons from Fountain Valley and other areas of the Riverbed systematically closed by the County increased the number in the Injunction Area significantly.  By January, 2018, an estimated 800 to 1,200 people were living in the Riverbed.

27.     At about the same time, the County contracted with private security to prevent homeless people from entering the Santa Ana Riverbed during the newly-restricted hours outside the Injunction Area.[8]  At about the same time, the City of Orange hired private security to patrol its parks in the evenings to prevent homeless individuals from sleeping at those locations. By January 2018, Anaheim also hired private security to police the homeless.[9]

28.     On January 8, 2018, two months after Public Works relocated approximately 100 homeless individuals from the Fountain Valley area to the Injunction Area, the agency announced that it would clear the Injunction Area as

[8] https://www.ocregister.com/2017/11/14/orange-county-to-hire-private-guards-to-help-enforce-riverbed-curfew-that-displaced-homeless/
[9] https://www.ocregister.com/2018/01/23/anaheim-adds-security-as-officials-brace-for-homeless-exodus/

10

well.[10] The County decided on this plan long before January; however, less than two weeks' notice was given for people to relocate.

29.     The "Work Notice" posted by the Orange County Public Works Department on January 8th during the year's first rain, stated that the bike trail would be closed to public access beginning January 22, 2018 at 6:00 a.m.  It warned of "citation and prosecution for trespass" for those who did not leave.

30.     The Work Area, as explained by the Notice, encompassed the entire "Injunction Area" defined in *Schuler*.  Area #1 included the West Bank of the Santa Ana River Channel, between the Santa Ana Freeway (the 5 Freeway) and Katella Avenue.  Area #2 included the East Bank of the Santa Ana River Channel, between Katella Avenue and Ball Road/Taft Avenue.

31.     County memoranda made clear that after the work in the Riverbed was complete, homeless people would not be allowed to return, even if they could find a flat piece of ground. The new hours for the bike path, as set by the Director of the Flood Control District, are 7:00 AM to 6:00 PM in the winter and 7:00 AM to 9:00 PM in the summer. There was no public comment or hearing on this change.

32.     After the County announced in January that it would close the Injunction Area, several surrounding cities took steps to prevent homeless individuals from coming into their communities.  The City of Orange quickly distributed flyers and visited local housing and business facilities to request that they notify law enforcement if they see homeless individuals in the City. The City

---

[10] https://www.ocregister.com/2018/01/04/orange-county-plans-to-clear-entire-riverbed-homeless-encampment-within-weeks-officials-say/

of Anaheim similarly announced that people currently in the Santa Ana Riverbed cannot move into their city.[11]

33.    As of January 19, 2018, City Net had 171 people in the Riverbed who were actively seeking services from City Net but were not yet placed in any housing or shelter.[12]

34.    The organizational Plaintiff Orange County Catholic Worker ("OCCW"), along with several individual plaintiffs, filed this action and sought a temporary restraining order against the closure of the riverbed without a plan for relocating those living there.  The Court initially denied the temporary restraining order but set a hearing on February 13, 2018.  Almost immediately after the temporary restraining order was denied, the County announced plans to go forward with the closure of the riverbed and arrest anyone still present.

35.    Plaintiffs then sought an emergency order from the Court to stay the riverbed closure until the matter was heard by the Court on February 13, 2018. The Court issued the requested relief.  At the hearing on February 13, 2018, County elected officials spoke and informed the Court that they would now locate placements for additional emergency shelters on County property.  In addition, the County committed to a process to assess the needs of persons living on the riverbed and place people at shelters, veterans facilities, recuperative care, residential substance abuse programs and similar facilities, as well as time-limited motel stays, depending upon their individual situations.

---

[11] https://www.ocregister.com/2018/01/21/orange-county-is-ready-to-clear-out-the-santa-ana-riverbed-homeless-encampment-but-where-and-exactly-when-will-they-go/ ("In Anaheim, officials bracing for an influx of homeless people have reiterated that their city – like 32 others in Orange County – . . .  has an anti-camping ordinance that forbids pitching tents on sidewalks or in public parks.")
[12] http://www.ocgov.com/civicax/filebank/blobdload.aspx?BlobID=71640 pg. 5

36.     While this plan was largely successful in its initial implementation, many of those who were temporarily housed are now in facilities that are inadequate to address the level of services they need and a sizable percentage are back on the streets, without any reasonable option.  The County was and is not adequately prepared to accommodate the disability needs – often compound – of the individuals who were living at the riverbed and in the Santa Ana Civic Center. As a consequence, many individuals fell through the disability cracks without a structure to evaluate whether their exit from a program or facility was related to their disability and required an accommodation that did not occur and, in fact, was not offered.  For example, one person housed at a motel suffered a seizure and was taken to the hospital, after which he was not permitted to return to the motel and was offered no alternative other than an inappropriate shelter placement.  Others suffered anxiety episodes at the emergency shelter because of a history of trauma and the crowded conditions.  Many others were evicted for purported "behavioral" issues that were, in fact, a manifestation of a disability. Many of the issues depended not on objective standards for accommodating disabilities but, rather, on the uninformed biases of the facility operator.  At the same time, some of the motels with different management had very successful results, with individuals able to get rest, a shower and a job or other services.

**THE LACK OF AVAILABLE SHELTER**

37.     The available shelter space in the County is woefully inadequate both in number and accessibility to meet the needs of the unsheltered population.  By the County's own estimates, more than 2,500 people lacked any shelter in the 2017 Point-in-Time Count.  The first and only year-round emergency, the Courtyard, was opened by the County in 2016.  Now it is at more than double its original announced capacity, making it extremely crowded and creating barriers for disabled individuals. On a typical night, over 400 people sleep in very close quarters in the repurposed bus terminal without walls.  Until recently, the only way

to get into the Courtyard was to show up and see if a bed was available that night, and because it is not near any other shelter, a person who showed up and was told that the Courtyard was full had no choice but to sleep outside because it was too late to find transportation and get to any other shelter before it closed for the night.

38.   The first year-round transitional shelter, Bridges at Kraemer Place, started operating with approximately 100 beds, with plans for expansion to 200 beds.[13]  Under immense pressure with the growing homeless population, the County opened the first 100 beds months earlier than originally anticipated in an open warehouse in May 2017.  The second hundred beds also opened earlier than originally planned, at the start of the summer

39.   Neither the Courtyard nor Bridges are adequate to meet the needs of the unsheltered population on multiple bases.  Prior to the directives of the Court in this action, neither provided for individuals to keep their assistance animals with them and neither allowed a couple to stay together, even where one half of the couple was the caregiver for the other partner, who had a disability.  While both made some attempts to accommodate mobility disabilities, neither provided conditions that accommodated individuals with psychological disabilities and, in fact, created an environment that exacerbated the conditions of trauma.  The staff at the shelters are often contract staff from non-profits and do not have the necessary training or expertise to interact with individuals with significant disabilities.  As a consequence, people are arbitrarily exited or banned from these facilities because of "conduct" deemed inappropriate by shelter staff, but which is a direct manifestation of the individual's disability.The two emergency shelters at the local National Guard armories are similarly inadequate and usually only operate during winter months, although Governor Brown approved extending use

---

[13] https://www.ocregister.com/2016/09/15/mercy-house-to-operate-year-round-anaheim-homeless-shelter/

of the armories for several additional months this year to deal with the crisis created by the closure of the Riverbed and Civic Center encampments. This season, the Santa Ana Armory opened on October 30, 2017 and was scheduled to close on April 15, 2018; the Fullerton Armory Shelter opened December 1, 2017 and was also scheduled to close on April 15, 2018. For 2018, the Santa Ana Armory is reported to open on December 1, 2018. There is currently no date for the Fullerton Armory to open and, if it does, it is likely to do so with significant restrictions that make it less practical as an alternative. *See* Orange County Register, October 25, 2018: "Orange County's homeless shelter program expected to continue at armory sites this winter, with possible restrictions in Fullerton."

40.    Although they provide shelter from the elements, the facilities at the armories are not disability compliant for multiple reasons. The sleeping provisions are mats on the floor placed closely together. They do not accommodate physical disabilities and do not provide separate space for individuals with emotional and psychological disabilities. The armories do not permit assistance animals other than certified "service" animals, despite the area that the law is not so restrictive on support animals. Finally, there is no area where couples can stay together, even if one person is the caregiver for the other partner  The armories are not an option for many unsheltered persons who work, need to attend court, go to medical appointments, or meet with service providers and who cannot meet the curfew to enter the armory.

41.    The Fullerton Armory has 237 total spots, while the Santa Ana Armory has only 200 spots. On information and belief, these two shelters were at about half capacity prior to the beginning of the Riverbed clearance, but added considerable population after the closure of the Riverbed and the Civic Center.

42.    In 2017, the County opened the Bridges shelter in Anaheim. To get into Bridges, a person must be referred by a non-profit partner social services agency and the individual must then be staying within the northern cities of Orange

County, which include Anaheim and Orange, but not Costa Mesa or Tustin. Before the riverbed closure, the admission process for Bridges was daunting: a person had to call a number to start the intake process.  That telephone number was usually busy and it took hours, if not days, to get through to the shelter.  The first step was to undergo a background check to be completed before admission.  The homeless individual then waited to receive a call back if approved and meet at a pickup location at a specific time. The admission process was often so discouraging that people gave up after a few days of calling.  If a person gained admission, they could only stay at the Bridges shelter for a limited amount of time. If they were unable to find regular housing at the end of six months, they were usually required to leave, although the County has now relaxed this requirement on a case-by-case basis because of the inability of individuals to find affordable and appropriate housing.

43.     In addition, because of the pressing demand for assistance from individuals who previously stayed in the riverbed or at the Civic Center, Bridges has changed its admission policy.  Now, many admissions are a result of County attorneys placing individuals who are exited from other programs without an alternative place to stay.

44.     Presently, the only other public shelter in the County is the Alternativei Sleeping Location (ASL) in the City of Laguna Beach, which opened in response to a lawsuit filed several years ago, challenging the City's enforcement of anti-camping laws.   The facility is operated by Friendship Shelter. The ASL prioritizes space for individuals who were residents of Laguna Beach prior to a specific date.  If additional space is available, non-residents may stay at the ASL for one night.  Out of 401 individuals who stayed at the ASL in 2017, only 12 percent identified Laguna Beach as their last known permanent address.

45.     In addition to the public shelters, there are private facilities in the County.  Most of the private facilities have restrictions on who is eligible to receive

their resources.  Many have gender restrictions – women only or men only.  Others only serve families with children or pregnant women.  Some require that an individual enrolled in the program be employable.  Still others limit the length of time a person can stay at the facility. Many of the faith-based programs have significant sectarian religious requirements as a condition of staying at the facility, or otherwise permeating the environment.

46.     As an example, the Salvation Army runs the Hospitality House in Santa Ana with 25 beds for transitional housing and 25 beds for emergency shelter, all for men.  A requirement of staying there is attendance at a meeting before dinner during which a religious service with prayer is held.  Clients must arrive between 3:30 and 5:00 p.m.  On almost all nights, the Hospitality House is at capacity. To enter this shelter, a man must arrive by 3:30 in the afternoon to put his name into a lottery. If he is not selected, he can wait until 5:00 to see if another man who has a reserved place misses curfew. There are almost always more applicants than beds. In January 2018, there were only between 2 and 12 beds available for the lottery each night.

47.     Gender is not the only restriction for the Salvation Army Hospitality House.  Significantly, to stay at the Hospitality House you must be able-bodied and employable.  Service animals will only be admitted with federal paperwork at the Hospitality House.  No other assistance animals are permitted.

48.     Another shelter, Colette's House, is located in Huntington Beach.  It is open only to women and children.  In this six-month transitional program, women are required to have a job and work 32 hours per week.  No animals are allowed. Colette's House is usually at capacity.

49.     In addition to the ASL, Friendship Shelter operates a second facility in Laguna Beach that is structured as a 60-day self-sufficiency program.  According to Friendship Shelter's website, the 32-person facility always has a waiting list and is only available to individuals who are able to work.

17

50.     The Rescue Mission in Tustin is one of the larger private shelters in
the County, with approximately 200 beds available.  However, it is Christian
facility that requires individuals to accept the extensive sectarian religious program
at the Rescue Mission as a condition of receiving services.  Because the religious
character of the Rescue Mission is so pervasive, it is impossible to avoid exposure
to it.  In addition, the Rescue Mission does not permit individuals to bring in
certain medications prescribed for a mental health condition, especially panic and
anxiety disorders. On information and belief, Plaintiffs allege that the Rescue
Mission does not assist people in obtaining replacement prescriptions for
medications to treat mental health conditions, which exacerbates the person's
disability.  Individuals are not allowed to have assistance animals other than
registered service animals.

## PARTIES

**PLAINTIFFS:**

**Orange County Catholic Worker**

51.     Plaintiff Orange County Catholic Worker operates a community at
Isaiah House in Santa Ana.  In furtherance of its mission, Isaiah House of the
Orange County Catholic Worker has served poor people with dignity since
1987, providing meals for the homeless, shelter, bags of food and clothing,
showers, and emergency assistance. Jordan Hoiberg and Morgan Denges are
members of the Orange County Catholic Worker.  Their community with the
Catholic Worker involves going to assist homeless communities in the parks and
public areas of nearby cities almost every day. They engage with each person they
meet and help them connect with available resources. On some days they deliver
food and on others they bring books, tents and other basic necessities for an
unsheltered person.

52.     Through their work in the Santa Ana Riverbed over the last year, they observed that an estimated 800 to1200 people were in the area that will be displaced by the planned action to close the Injunction Area.

53.     Over the past year, members of OCCW attended a number of local city and county meetings where some of the named Defendant governments discussed the homelessness crisis and the need for housing.

54.     Carrying out the mission of the Catholic Worker, each time government entities relocate a homeless population, OCCW organizes volunteers and resources to help people move their belongings.  As each such action is taken by the government, the Catholic Worker has had to shift priorities to respond to these measures and provide additional resources for homeless individuals targeted.

55.     OCCW members are familiar with the area and available social services and do not know of any place homeless individuals can relocate without violating laws against camping on public places, placing property on public places, loitering and similar ordinances.   At Isaiah House, the OCCW  assists women who come to Isaiah House from the Bridges shelter, the Courtyard shelter, and other facilities.  Sometimes, OCCW is able to provide a bed for the person to sleep in. Other times, when all of the beds are already taken, unsheltered individuals sleep in their tents on the OCCW property.

56.     With the relocation of people from the riverbed and then the Santa Ana Civic Center, the Plaintiff OCCW spent countless hours responding to the needs of unsheltered individuals who, as the result of the Defendant County's policies, practices and customs, and those of the County's agents and employees, were left without a placement that accommodates their disabilities, without adequate food, without a means to get to critical appointments and similar service-related issues.

57.     The work of Plaintiff OCCW is significantly impacted by the enforcement of anti-camping and related laws throughout Orange County.

Individuals charged with violation of municipal laws based on the status of being homeless are usually transported to Santa Ana to the County jail, no matter where they are arrested in the County.  Tustin is one of the cities in the County that takes its arrestees to the County jail in Santa.

58.     When individuals are released from custody, they walk out the door of the jail with no discharge plan, no resources and no means to get back to the locale where they were arrested.  These individuals often wind up in the parks and other public places in Santa Ana where there only resource is the volunteers from the OCCW.  For the OCCW, it means increased need to buy food and assign community members and volunteers to meet the needs of the unsheltered community.

**DEFENDANTS:**

59.     Defendant ORANGE COUNTY is a government entity with the capacity to sue and be sued.  The departments of the COUNTY include the Public Works, the Orange County Sheriff, and other departments.  Employees of the COUNTY have engaged in the acts complained of herein pursuant to the policies, practices and customs of the COUNTY.

60.     Defendant TUSTIN is a municipal entity duly organized under the laws of the State of California and with the capacity to sue and be sued. Employees of TUSTIN have engaged in acts complained of herein pursuant to the policies, practices and customs of the CITY OF TUSTIN, included but not limited to the City Code sections identified herein that have the effect of criminalizing the status of homelessness in the city.

61.     The Defendants, their employees and agents, participated personally in the unlawful conduct challenged herein and, to the extent that they did not personally participate, authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and

the harm suffered by Plaintiffs.  Each acted in concert with each other.  The Defendant developed and implemented a coordinated plan to increase enforcement actions against the homeless community in the Riverbed and surrounding cities. The challenged acts caused the violation of Plaintiff's rights.

62.     The identities and capacities of defendants DOES 1 through 10 are presently unknown to plaintiffs, and on this basis, Plaintiffs sue these defendants by fictitious names.  Plaintiffs will amend the Complaint to substitute the true names and capacities of the DOE defendants when ascertained.  Plaintiffs are informed, believe, and thereon allege that DOES 1 through 10 are, and were at all times relevant herein, employees and/or agents of the Defendant COUNTY and Defendant CITIES in the First Amended Complaint and are responsible for the acts and omissions complained of herein.  Defendants DOES 1 through 10 are sued in both their official and individual capacities.

## FACTS RELATING TO THE CITY OF TUSTIN

63.     In or about July 2017, the City started asking homeless individuals sleeping in the Civic Center to move to different area as the City systematically installed fences blocking off areas open to the public.  On information and belief, Plaintiffs allege that the fences were erected to restrict where homeless individuals could sleep in the Civic Center.

64.     In a letter to the Tustin City Council dated August 1, 2017, the coalition Orange County Homelessness Must End ("OCHoME"), reported their concern that many individuals with disabilities were adversely impacted by the fencing.  OCHome is a coalition of primarily non-profit legal groups in Orange County that work to protect the rights of indigent communities.  The group also alleged that many individuals were threatened with citation or arrest at the time if they did not leave the civic center and that their property was seized and summarily destroyed without adequate pre-or post-deprivation process.

21

65.     Tustin City Code §§ 7602 and 7113a(2) (collectively, "the Anti-Camping Ordinances") prohibit a variety of conduct on public property in the City. Section 7602 prohibits "Camping and Storage of Personal Property." Specifically, this section proscribes use of a "tent, tarpaulin, or any other type of temporary structure upon any public street or public area" without permission.

66.     Tustin City Code § 7601 defines these terms:

"Camp facilities" include, but are not limited to, tents, huts, or temporary shelters.

"Camp paraphernalia" includes, but is not limited to, tarpaulins, cots, beds, blankets, sleeping bags, hammocks or non-city designated cooking facilities and similar equipment.

"Public area" means and includes but is not limited to any public street, building, grounds, lot, parcel, park, plaza or parking lot dedicated to the authorized use and enjoyment of the public.

"Public street" means and includes but is not limited to any publicly owned street, road, highway, alley, sidewalk, parkway, bridge, culvert, drain, and other facilities or areas necessary for the construction, improvement, and maintenance of streets and roads.

67.     Tustin City Code § 7113(a)(7) requires a permit for the presence of an animal in a public park. For homeless individuals, who often have support animals, this provision means that they commit a crime if they sit in a public park with their dog, waiting to find out if they can get a shelter bed that night.

68.     Tustin City Code § 7603 makes a violation of § 7602 punishable as an infraction or a misdemeanor.

69.     In July 2017, the City of TUSTIN contracted with City Net to conduct a survey of the homeless population in the City. On one night, 47 people were counted and interviewed, 22 of whom were in the Civic Center. City officials noted that the number was probably low and did not include all of the unhoused population in the Defendant City. At about the same time, the Santa Ana contracted with City Net to

22

survey the homeless population in the Riverbed.  Of 461 individuals interviewed in that survey, five listed their last residence as Tustin.  Another four individuals sheltered at the ASL in Laguna Beach in 2017 reported their last permanent address in Tustin.  On information and belief, Plaintiffs allege that a larger number of people from Tustin stayed at the Courtyard in Santa Ana in that same time.

70.     The majority of those included in the Tustin Civic Center survey were male with a disability, mental health issues, or both.  Forty-two percent reported becoming homeless after the loss of a job or insufficient income from work.  Approximately 15 percent had military service.  According to a report to the City Council on July 18, 2017 by City Manager Jeffrey Parker, the total number of people living in the Civic Center doubled since mid-2016.   He also noted that the number of unsheltered people in the Central SPA had increased by nearly 1,000 since 2013.  Two-thirds of those interviewed in Tustin were 50 or older, with a third over the age of 60.  The majority are  "chronically homeless" – without a regular residence for one year -- with forty-five percent reporting that they were homeless for more than three years.

71.     At the same City Council meeting, Tustin Police Chief Celano presented additional information regarding the City's outreach to assist homeless individuals, especially those in the Civic Center.  While he reported a handful of successes in placing people, the effort was largely unproductive .

72.      As of mid-2017, Tustin identified a total of 410 emergency and transitional housing beds available, with half of that number at the Rescue Mission.  Other than the Rescue Mission and two four-plexes to house veterans, most of the sites identified as a resource for Tustin are not in the City.

73.     Tustin, like most of the other cities in Orange County, relies on the same private shelters to demonstrate that the local entity is meeting the need for emergency shelter identified in its state-mandated housing element.  Most of these private shelters have multiple restrictions for admission.  Some are time-limited;

some require a referral for entry, some are restricted by gender; some are restricted to pregnant women, some are restricted to women with children.  Still others, such as the Rescue Mission, require that the individual engage in sectarian worship as a condition of receiving services. Most have a blanket prohibition on pets other than registered service animals despite the fact that the federal and California Fair Housing Law and federal and state disability protections require that pets be allowed as a reasonable accommodation for individuals with assistance animals, whether certified service animals or non-certified emotional support animals.

74.    Because there is an extremely limited number of private shelter beds available, and because each City's housing element lists the same facilities, most of which are in Santa Ana, there is no way that a local entity can show it meets the need for emergency shelter as identified in its housing element.

75.    Not only are the cities all counting the same beds, but the facilities are quite distant from each other, presenting a significant accessibility issue for disabled homeless individuals who cannot readily travel to these various locations. For example, the closest place to Tustin is Human Options, and emergency shelter for women.  It is located in Irvine, almost four miles from Tustin Civic Center. The next closest facility os Grandma's House of Hope, a shelter for wmen and children, located in Santa Ana, approximately five miles from Tustin Civic Center.

**FIRST CAUSE OF ACTION**
**Violation of Eighth and Fourteenth Amendments (42 U.S.C. §1983)**
**Art. 7, §17 California Constitution (Cruel and Unusual Punishment)**
**(Against Defendant TUSTIN)**

76.    Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth hereat.

77.    The acts and omissions of Defendant, as described herein, violate the constitutional rights of homeless individuals to be free from actual or threatened cruel and unusual punishment.  By virtue of their status as homeless, and the

24

absence and insufficiency of shelter or housing in the region, including the City of Tustin, unsheltered persons have no way to comply with the laws Defendant has and threatens to enforce against them.

78.     Plaintiff OCCW further alleges that it violates the substantive due process rights of homeless individuals to threaten them with citation and arrest for being present on City property when the property is closed to the public. Enforcement of City anti-camping laws against homeless individuals, would result in migration of unsheltered persons into surrounding cities such as Santa Ana, and increasing the burden on Santa Ana to address homelessness throughout the region.

79.     The citation and threats of citation for behavior such as camping on public property when there is inadequate shelter available violates the Eighth and Fourteenth Amendments of the United States Constitution and Article 7, §17 of the California Constitution.

80.     The Defendant CITY OF TUSTIN has a custom, policy, and/or practice of enforcing its ordinances that punish homeless persons for the unavoidable behavior of sleeping or having property in public in violation of the City's camping ordinances.

81.     There is an actual controversy between Plaintiff and the City of Tustin concerning the threat of citation if homeless individuals remain on City property after being told that they may not "camp" there.  Plaintiff desires a judicial determination of the rights and duties and a declaration as to Defendant City of Tustin's constitutional obligations.

**SECOND CAUSE OF ACTION**
**Violation of First and Fourth Amendment; 42 U.S.C. 1983**
**(Against All Defendants)**

82.     Plaintiff OCCW realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth hereat.

25

83.     Defendant Tustin repeatedly and consistently questioned individuals who appear to law enforcement to be homeless and directed them to move along from public places where they have a right to be pursuant to the First Amendment. The stops and subsequent detentions and interrogations constitute an unlawful seizure as they were done without reasonable suspicion or probable cause to believe that the individual had or was about to commit a crime other than a purported violation of a law necessitated by their status as homeless individuals plus the lack of available shelter.

84.     Unsheltered persons, as everyone else, have a First Amendment right to be present in a public space, to "loiter" in a public space for no reason and to not be excluded from that space by threat, intimidation or coercion because they are homeless.  Without a reasonable alternative place where they can be during the day and sleep at night, homeless persons have no choice but to be on public property during the day with their property and to "camp" on the same property at night.

85.     As a direct consequence of Defendant's past and threatened future actions, Plaintiff OCCW has suffered and will continue to suffer a violation of its constitutional rights.   The individuals assisted by OCCW endured pain and suffering as a result of Defendant's policies, practices and customs.

### THIRD CAUSE OF ACTION
### Violation of California Civil Code § 52.1
### (Against All Defendants)

86.     Plaintiff OCCW realleges and incorporates the allegations set forth in the proceeding paragraphs as through fully set forth hereat.

87.     The Defendant's conduct, as described herein, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise and enjoyment of Plaintiffs' rights as secured by the First, Fourth, Eighth, and Fourteenth Amendments to the United States

Constitution or laws of the United States, and of the rights secured by the Constitution or laws of the state of California.

88.     Defendants engaged in concerted and repeated conduct to cite and arrest Plaintiffs under unconstitutional ordinances, on their face and as applied, and threatened to cite and arrest them repeatedly.  Defendants engaged in coercive and intimidating tactics by conducting unwarranted stops and collecting information on Plaintiffs to push them out of Defendants' respective jurisdictions.

**WHEREFORE**, Plaintiffs pray as follows:

1.     For an order enjoining and restraining Defendant City of Tustin from enforcing Tustin City Code §§ 7602 and 7113.

2.     For an order enjoining and restraining Defendant City of Tustin from threatening homeless persons with tickets or citations if they continue to be present in public space in that city.

3.     For a declaratory judgment that Defendant Tustin's policies, practices and conduct as alleged herein violate Plaintiffs' rights under the United States and California constitutions and the laws of California;

4.     For damages to the individual plaintiffs in an amount to be determined according to proof based on their federal claims only;

5.     For costs of suit and attorney fees as provided by law;

6.     For such other relief as the Court deems just and proper.

Dated: October 28, 2018          Respectfully submitted,

LAW OFFICE OF CAROL A. SOBEL
ELDER LAW & DISABILITY RIGHTS CENTER
SCHONBRUN SEPLOW HARRIS & HOFFMAN

_____ /s/ Carol Sobel _____
By: CAROL A. SOBEL
Attorneys for Plaintiffs

27