**BROOKE WEITZMAN** SBN 301037
**WILLIAM WISE** SBN 109468
**ELDER LAW AND DISABILITY RIGHTS CENTER**
1535 E 17th Street
Santa Ana, California 92705
t. 714-617–5353
e. bweitzman@eldrcenter.org
e. bwise@eldrcenter.org

**CAROL A. SOBEL** SBN 84483
**MONIQUE ALARCON** SBN 311650
**LAW OFFICE OF CAROL A. SOBEL**
725 Arizona Avenue, Suite 300
Santa Monica, California 90401
t. 310-393-3055
e. carolsobellaw@gmail.com
e. monique.alarcon8@gmail.com
e. avneet.chattha7@gmail.com

[Additional Counsel on Next Page]
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| ORANGE COUNTY CATHOLIC WORKER, <br><br>       Plaintiff, <br><br>   v. <br><br> The City of BREA, the City of BUENA PARK, the City of CYPRESS, the City of FULLERTON, the City of LA HABRA, the City of LA PALMA, the City of LOS ALAMITOS, the City of PLACENTIA, the City of STANTON, the City of VILLA PARK, the City of YORBA LINDA, <br><br>      Defendants. | Case No.:  18-cv-00155 DOC KES <br><br> AMENDED SUPPLEMENTAL COMPLAINT <br><br> 42 U.S.C. §1983: First, Fourth, Fifth, and Fourteenth Amendments; 42 U.S.C. § 12132 (ADA); Cal. Const. Article I, §§7,13; Cal. Civ. Code §§51, 52.1, 54; Cal. Gov. Code §11135 |

**PAUL L. HOFFMAN** SBN  71244
**CATHERINE SWEETSER** SBN 271142
SCHONBRUN, SEPLOW, HARRIS & HOFFMAN
11543 W. Olympic Blvd.
Los Angeles, California   90064
t.  310-396-0731
e. hoffpaul@aol.com
e. csweetser@sshhlaw.com
e. cmullen@sshhlaw.com

## JURISDICTION AND VENUE

1.      As to the Supplemental Complaint, this is an action for injunctive and declaratory relief pursuant to 42 U.S.C. § 1983 based upon the violations of Plaintiffs' rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as various federal statutory provisions. Jurisdiction exists pursuant to 28 U.S.C. § 1331 and 1343 based on federal statutes and questions of federal constitutional law.   Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.   The Court has jurisdiction over Plaintiffs' supplemental state law claims for declaratory and injunctive relief pursuant to 28 U.S.C. § 1367(a).

2.      Venue is proper in the Southern Division of the Central District in that the events and conduct complained of herein all occurred in Orange County.

## PRELIMINARY STATEMENT

3.      This Supplemental Complaint addresses facts relating to the CITY OF BREA, CITY OF BUENA PARK, CITY OF CYPRESS, CITY OF FULLERTON, CITY OF LA HABRA, CITY OF LOS ALAMITOS, CITY OF LA PALMA, CITY OF PLACENTIA, CITY OF STANTON, CITY OF VILLA PARK, AND CITY OF YORBA LINDA "THE CITIES"), none of which were named by Plaintiffs originally, but all of which were named as cross-defendants in this action as a result of the cross-complaint filed by Intervenor CITY OF SANTA ANA.   Plaintiffs incorporate all relevant facts from the First Amended Complaint as though fully set forth herein.

4.      The initial phase of this case was brought against Orange County, and the City of Anaheim, the City of Orange, and the City of Costa Mesa.   Plaintiffs alleged that these City defendants took actions to force unhoused people into the area of the Santa Ana Riverbed between the Santa Ana Freeway and Ball Road. The County announced the intent to push those people back into the surrounding cities without a plan for housing or shelter.

5.     The Court acted to halt the proposed Riverbed evictions and required the County to provide a plan to relocate the unsheltered community living in the Riverbed in a manner that would not result in moving people to other encampments and would not produce an influx on Santa Ana, the City within the Defendant County that currently bears the brunt of caring for the unhoused population in the County because of the concentration of County services in Santa Ana.  Santa Ana is the primary location of a variety of County services, including General Relief, the courts and, significantly, the jail.

6.     Approximately 700 people from the Riverbed were temporarily placed in motels and at various shelters, Full Service Partnership placements for those diagnosed as severely and persistently mentally ill, recuperative care facilities, residential substance abuse facilities and other resources that provided them a safe place to sleep, shower and begin reclaiming their lives.  Some of the 700 were placed in THE CITIES.

7.     Subsequently, the Court directed that several hundred individuals in the homeless community at the Santa Ana Civic Center end and the individuals staying there as of the end of March be provided with appropriate alternatives.

8.     The closure of these two encampments, which displaced between 1,000 and 1,500 people total, placed the focus on the lack of adequate facilities and programs to respond to the housing and homeless crisis the County faces.  It also brought to the fore the failure of the cities and County to provide sufficient resources in their own communities.

9.     In the 2019 Point-in-Time Count ("PIT") , 6,860 people experiencing homelessness were identified, of which 3,961 individuals are unsheltered.  About 40 percent (1,596) people are unsheltered in the North SPA cities.  *See* "Everyone Counts," at   *www.ocgov.com/civicax/filebank/blobdload.aspx?BlobID=92093*. The 2017 Point-in-Time Count reported 4,792 homeless individuals in Orange

4

County.  The 2019 Point-in-Time Count is an increase of approximately 30 percent over the 2017 PIT.  The portion of unsheltered people rose to 35 percent in 2019.

10.    The North SPA is composed of THE CITIES, together with Orange and Anaheim.  Plaintiffs previously executed and entered with the Court a separate settlement with the City of Orange and are in the process of finalizing a separate settlement with the City of Anaheim.   The preliminary settlement with Anaheim was entered by the Court.

11.    The need to respond to the increasing numbers of unsheltered individuals in Orange County is hardly new.  More than a decade ago, the Orange County Grand Jury issued a report on "The Homeless Crisis in Orange County." The report noted then that "[h]omelessness is on the rise, often misunderstood, and is inextricably linked to poverty."  From 1990 to 2005 the homeless population increased at a far greater rate than the overall increase in population in the County. The Grand Jury report concluded that addressing the problem "does not appear to be a priority with the Board of Supervisors."   The Grand Jury listed a series of measures to address the crisis then being considered by various municipal entities in the County, including plans to add housing for homeless individuals at the former El Toro Marine Air Station; shelters in San Clemente, Buena Park, Westminster, La Habra and Cypress, and a very "humanistic" outreach approach by the Santa Ana Police Department and Orange County Sheriff's Department.  A dozen years later, most of these measures remain illusive.

12.    The 2005 Grand Jury Report also reviewed the history of recommendations in similar reports, going back to 1988.  The 2005 Report concluded that few of the earlier recommendations had been implemented. The Grand Jury report demonstrates that, over the past 25 years, the primary response of the County and the Cities has been to invest in approaches that address the visible presence of homeless people as a blight, without significantly reducing the number of residents on the street each night.   These approaches include criminalizing

homelessness by arresting homeless individuals for loitering, making it illegal to sleep in public places at night, seizing and destroying homeless people's property, and engaging in a pattern of warrantless stops and interrogations.  The identical practices have been repeatedly challenged and enjoined by judges of the Central District in Los Angeles and the Ninth Circuit, uniformly rejecting these practices criminalizing homelessness as a violation of the First, Fourth, Eighth and Fourteenth Amendments.  There is no credible reason why Orange County and local cities' officials would not be aware of the judicial rulings on these issues because they have been highly publicized throughout the region, if not the nation, and discussed at public meetings of these entities.

13.    The County and Cities' approach is even more indefensible when viewed against the directives issued by the United States Interagency Council on Homelessness ("USICH"), composed of nineteen federal cabinet and agency heads to organize federal efforts to end homelessness. The most recent USICH report, "Ending Homelessness for People Living in Encampments," is directly on point and counter to the approach taken by THE CITIES with the Plaintiffs and other homeless individuals who lack nightly shelter.

14.    Specifically, the USICH underscored that "forced dispersal" of homeless encampments is inappropriate and undermines the goal of providing services to homeless individuals.  While the USICH underscored the importance of "intensive and persistent outreach and engagement," the County and the Cities instead opted to disperse encampments with threats of citation and arrest  if they remain, forcing them to migrate to neighboring cities.  Until the Court's issuance of injunctive relief in these case, the Cities coupled their threats with a direction to relocate to the area along the river.

**FACTS**

15.    In February 2017, an action was filed in the U.S. District Court concerning the County's earlier enforcement actions against approximately 1,000

individuals living in the Riverbed.  *See Schuler v. County of Orange*, No. 8:17-cv-00259 DOC KES, (C.D. Ca. 2017) [Dkt. #1].  On March 7, 2017, the parties stipulated to, and the Court granted, a preliminary injunction to prevent the County from violating individuals' constitutional rights in a designated area of the Riverbed just north of the Santa Ana Freeway and south of Ball Road ("the Injunction Area."). [Dkt. #30]

16.     After the settlement in *Schuler*, the County contracted with City Net to provide services to people in the Injunction Area. In July 2017, City Net surveyed 422 people, about a third of those then living there.  Of this number, 81.2% agreed to City Net as their case managers to seek housing and services for them.  When asked where they lived previously, 25% said Anaheim, about 11% said Santa Ana, and 9.7% identified Orange.  After this survey was done, the population in the Santa Ana Riverbed increased as people moved from other areas into the Injunction Area at the direction of the County.

17.     In the year after the injunction issued in *Schuler*, little, if anything, was done by the County or the cities in the County to provide a safe environment for those living in the Riverbed. or to find alternative locations.  In August 2017, Orange County Public Works released a plan to change the topography of the Riverbed to make it "less desirable for occupation."  The Public Works plan showed how the use of rocks in the Riverbed effectively made it impossible for a person to lie down and sleep.[1]  The County made clear that the project goal was to use rocks and large boulders to eliminate flat land used by homeless persons.

18.     In September 2017, Supervisor Nelson drafted a plan to use County land in Irvine as a temporary shelter.  The Board of Supervisors rejected that plan

---

[1] https://voiceofoc.org/2017/08/county-used-rock-riprap-sand-to-make-santa-ana-riverbank-less-desirable-for-occupation/

and instead voted to develop that land into a massive new project containing luxury condominiums and upscale retail shops.[2]

19.     The Cities were taking similar actions.  In August 2017, Anaheim City Council considered community requests to install restrooms near the Santa Ana Riverbed and offers of organizers to provide and maintain those restrooms. Anaheim rejected the proposal and stated that the County should take responsibility for the needs of the people sleeping on County property.[3]

20.     In September 2017, the Anaheim City Council passed "Operation Home Safe," put forward as a comprehensive program to address homelessness along the Santa Ana Riverbed.  A main goal of the program was to identify locations for at least 500 shelter beds or other housing options. Additionally, the City of Anaheim committed to expediting the availability of 100 more beds at the Bridges shelter. Initially, the only part of the plan that was implemented involved significantly increased police enforcement.[4]

21.     In September 2017, Orange Council Member Alvarez announced that the City would be reviewing its loitering, vagrancy, and panhandling laws to strengthen them to provide the police with more tools to combat homelessness.[5]

22.     There is no question that the previously named Defendants, along with other Cities, coordinated enforcement actions against unhoused individuals living

---

[2] https://www.ocregister.com/2017/11/06/orange-county-to-finalize-plan-for-great-park-condo-retail-development-as-irvine-threatens-lawsuit/
https://www.youtube.com/watch?v=lx3CSQnIJsM
[3] http://www.scpr.org/news/2017/08/29/75117/anaheim-to-consider-portable-toilets-for-homeless/
[4] https://www.ocregister.com/2017/09/13/after-anaheim-declares-a-state-of-emergency-homeless-along-river-bed-ponder-whats-next/
[5] https://www.ocregister.com/2017/09/13/after-anaheim-declares-a-state-of-emergency-homeless-along-river-bed-ponder-whats-next/

in the Riverbed.  On September 5, 2017, Anaheim Police Chief Quezada met with command staff from the Fountain Valley, Orange and Santa Ana Police Departments, along with the Orange County Sheriff's Department ("OCSD"). Representatives from these law enforcement groups met again a few days later to discuss coordination of deployment schedules for enforcement in the Riverbed.  On information and belief, the OCSD was the lead agency for this enforcement action.

23.    On October 26, 2017, the County Flood Control District announced restricted hours for bike trail access in Fountain Valley and complete closure of public access to the west side of the Riverbed in the City.  More than 100 people were living in this area at the time because it was next to a public storage facility and not impeding traffic.  The majority of this community came to the Riverbed after being forced out of nearby cities including Costa Mesa, and then slowly moved north as the County closed parts of the Riverbed for maintenance projects.[6]

24.    The OCSD and Public Works employees began clearing the Fountain Valley area on November 3, 2017, telling people that they would not be allowed to remain and threatening citations.  County employees told people to move to the Injunction Area, which would not be subject to the change in hours or closure.

25.    At that time, one of the Public Works employees told a local activist to hurry and move people from Fountain Valley to the Injunction Area.  He stated that the Fountain Valley bike trail was now closed to the public at night, but that people could continue to reside in the Injunction Area.  A large group of people from Fountain Valley then relocated near Katella Road by the bike trail.

---

[6] https://voiceofoc.org/wp-content/uploads/2017/10/County-Announces-Active-Enforcement-of-Public-Hours-Along-Santa-Ana-River-Trail-FINAL.pdf

26.     The relocation of persons from Fountain Valley and other areas of the Riverbed systematically closed by the County increased the population in the Injunction Area significantly.  By January 2018, an estimated 800 to 1,200 people were living in the Riverbed.

27.     At about the same time, the County hired private security to prevent homeless people from entering the Santa Ana Riverbed during the newly-restricted hours outside the Injunction Area.[7]  The City of Orange also hired private security to patrol its parks in the evenings to prevent homeless people from sleeping there. By January 2018, Anaheim also hired private security to police the homeless.[8]

28.     On January 8, 2018, two months after Public Works relocated approximately 100 homeless individuals from Fountain Valley to the Injunction Area, the agency announced that it would clear the Injunction Area as well.[9] The County decided on this plan long before January; however, less than two weeks' notice was given for people to relocate.

29.     The "Work Notice" posted by the Orange County Public Works Department on January 8th during the year's first rain, stated that the bike trail would be closed to public access beginning January 22, 2018 at 6:00 a.m.  It warned of "citation and prosecution for trespass" for those who did not leave.

30.     The Work Area, as explained by the Notice, encompassed the entire "Injunction Area" defined in *Schuler*.  Area #1 included the West Bank of the Santa Ana River Channel, between the Santa Ana Freeway (the 5 Freeway) and  Katella

---

[7] https://www.ocregister.com/2017/11/14/orange-county-to-hire-private-guards-to-help-enforce-riverbed-curfew-that-displaced-homeless/

[8] https://www.ocregister.com/2018/01/23/anaheim-adds-security-as-officials-brace-for-homeless-exodus/

[9] https://www.ocregister.com/2018/01/04/orange-county-plans-to-clear-entire-riverbed-homeless-encampment-within-weeks-officials-say/

Avenue.  Area #2 included the East Bank of the Santa Ana River Channel, between Katella Avenue and Ball Road/Taft Avenue.

31.     County memoranda made clear that after the work in the Riverbed was complete, homeless people would not be allowed to return, even if they could find a flat piece of ground. The new hours for the bike path, as set by the Director of the Flood Control District, are 7:00 AM to 6:00 PM in the winter and 7:00 AM to 9:00 PM in the summer. There was no public comment or hearing on this change.

32.     After the County announced in January that it would close the Injunction Area, several surrounding cities took steps to prevent homeless people from coming into their communities.  The City of Orange distributed flyers and visited local housing and business facilities asking that they notify law enforcement if they see homeless individuals in the City.  Anaheim similarly announced that people currently in the Santa Ana Riverbed cannot move into their city.[10]

33.     As of January 19, 2018, City Net had 171 clients in the Riverbed who were actively seeking services but were not yet placed in any housing or shelter.[11]

34.     The organizational Plaintiff Orange County Catholic Worker ("OCCW"), along with several individual plaintiffs, filed this action and sought a temporary restraining order against the closure of the riverbed without a plan for relocating those living there.  The Court initially denied the request but set a hearing on February 13, 2018.  Almost immediately after the Court's order issued, the County announced plans to immediately close the riverbed and arrest anyone there.

---

[10] https://www.ocregister.com/2018/01/21/orange-county-is-ready-to-clear-out-the-santa-ana-riverbed-homeless-encampment-but-where-and-exactly-when-will-they-go/ ("In Anaheim, officials bracing for an influx of homeless people have reiterated that their city – like 32 others in Orange County – . . .  has an anti-camping ordinance that forbids pitching tents on sidewalks or in public parks.")
[11] http://www.ocgov.com/civicax/filebank/blobdload.aspx?BlobID=71640 pg. 5

35.     Plaintiffs then sought an emergency order to stay the riverbed closure until the scheduled February 13, 2018 hearing.  The Court issued the requested relief.  At the hearing on February 13, County elected officials informed the Court that they would now locate placements for additional emergency shelters on County property.  In addition, the County committed to a process to assess the needs of persons living on the riverbed and place people at shelters, veterans facilities, recuperative care, residential substance abuse programs and similar facilities, as well as time-limited motel stays, depending upon individual situations.

36.     While this plan was largely successful in its initial implementation, many of those who were temporarily housed were transferred to facilities that were inadequate to address the level of services required and a sizable percentage were back on the streets, without any reasonable option.  The County was and is not adequately prepared to accommodate the disability needs – often compound – of the individuals who were living at the riverbed and in the Santa Ana Civic Center.  Many people fell through the disability cracks without a process to assess whether their exit from a program or facility was related to their disability and required an accommodation that did not occur and, in fact, was not offered.  For example, one person housed at a motel suffered a seizure and was taken to the hospital.  He was not permitted to return to the motel and was offered no alternative other than an inappropriate shelter placement.  Others suffered anxiety episodes at the emergency shelter because of trauma exacerbated by the crowded conditions.  Others were evicted for purported "behavioral" issues that were, in fact, a manifestation of a disability misunderstood because of uninformed biases of the facility operator.  At the same time, some motels with different management had very successful results, with people able to get rest, a shower, a job, or other services.

**THE LACK OF AVAILABLE SHELTER**

37.     The available shelter space in the County is woefully inadequate both in number and accessibility to meet the needs of the unsheltered population.  By

the County's own estimates, almost 4,000 people lacked any shelter in the 2019 PIT. The County opened the first and only year-round emergency shelter, the Courtyard, in 2016. Now it is at more than double its original announced capacity, creating barriers for disabled individuals. On a typical night, over 400 people sleep in very close quarters in the repurposed bus terminal without walls. Until recently, the only way to get into the Courtyard was to show up and see if a bed was available that night, and because it is not near any other shelter, a person who did so and found the Courtyard was full had no choice but to sleep outside because it was too late to find transportation and get to any other shelter before it closed for the night.

38.    The first year-round transitional shelter, Bridges at Kraemer Place, started operating with approximately 100 beds, and expanded to 200 beds in mid-2018.[12] Under immense pressure, the County opened the first 100 beds months earlier than originally anticipated in an open warehouse in May 2017. The second hundred beds also opened earlier than originally planned.

39.    Neither the Courtyard nor Bridges are adequate to meet the needs of the unsheltered population on multiple bases. Prior to the directives of the Court in this action, neither allowed people to keep their assistance animals with them and neither allowed a couple to stay together, even where one half of the couple was the caregiver for the other partner who had a disability. While both made some attempts to accommodate mobility disabilities, neither did anything to accommodate people with psychological disabilities and, in fact, created an environment that exacerbated the conditions of trauma. Many of the staff at the shelters are contract staff from non-profits and lack training or expertise to interact with individuals with significant disabilities. As a result, people are arbitrarily exited or banned from these facilities because of "conduct" deemed inappropriate

---

[12] https://www.ocregister.com/2016/09/15/mercy-house-to-operate-year-round-anaheim-homeless-shelter/

13

by shelter staff, but which is a direct manifestation of the individual's disability. The two emergency shelters at the local National Guard armories are similarly inadequate and usually only operate during winter months, although Governor Brown approved extending use of the armories for several additional months in 2018 to deal with the crisis created by the closure of the Riverbed and Civic Center encampments. In 2018, the Santa Ana Armory opened on October 30, 2017 and was scheduled to close on April 15, 2018; the Fullerton Armory Shelter opened December 1, 2017 and was also scheduled to close on April 15, 2018.  For 2018, the Santa Ana Armory is reported to open on December 1, 2018.  This past winter the Fullerton Armory opened with significant restrictions that make it less practical as an alternative. *See* Orange County Register, October 25, 2018: "Orange County's homeless shelter program expected to continue at armory sites this winter, with possible restrictions in Fullerton."

40.     While they provide shelter from the elements, the armories are not disability compliant.  The sleeping provisions are mats on the floor placed closely together.  They do not accommodate physical disabilities or provide separate space for individuals with emotional and psychological disabilities.  Assistance animals are not allowed other than certified "service" animals, despite the law requiring "support" animals.  Finally, there is no area where couples can stay together, even if one is the caregiver for the other.  The armories are not an option for people who work, need to go to court or medical appointments, or meet with service providers and who, as a result, cannot meet the early curfew at the armory.

41.     The Fullerton Armory has 237 total spots, while the Santa Ana Armory has only 200 spots.  On information and belief, these two shelters were at about half capacity prior to the beginning of the Riverbed clearance, but added considerable population after the closure of the Riverbed and the Civic Center.

42.     In 2017, the County opened the Bridges shelter in Anaheim. Originally, to get into Bridges, a person must be staying in certain North SPA cities,

which include Anaheim and Orange. Before the riverbed closure, the admission process for Bridges was daunting: a person had to call a number to start the intake process. That telephone number was usually busy and it took hours, if not days, to get through to the shelter. A background check had to be completed before admission. The homeless person then waited to receive a call back if approved and meet at a pickup location at a specific time. The admission process was often so discouraging that people gave up after a few days of calling. If successful, they could only stay at the Bridges shelter for a limited time. If they were unable to find regular housing at the end of six months, they were usually required to leave, although the County relaxed this requirement on a case-by-case basis because of the inability of individuals to find affordable and appropriate housing.

43.    Because of the pressing demand for assistance from individuals who previously stayed in the riverbed or at the Civic Center, Bridges changed its admission policy. Now, many admissions are a result of County attorneys placing individuals who are exited from other programs without an alternative place to stay.

44.    At the time this action was filed, the only other public shelter in the County was the Alternative Sleeping Location (ASL) in the City of Laguna Beach. It opened in response to a lawsuit filed several years ago, challenging the City's enforcement of anti-camping laws. It is operated by Friendship Shelter. The ASL prioritizes space for people who were residents of Laguna Beach prior to a specific date. Non-residents may stay there if no Laguna Beach resident claims the beds. Of 401 people who stayed there in 2017, only 12 percent said Laguna Beach was their last permanent address.

45.    In addition to the public shelters, there are private facilities in the County. Most of the private facilities have restrictions on who is eligible to receive their resources. Many have gender restrictions – women only or men only. Others only serve families with children or pregnant women. Some require that an individual enrolled in the program be employable. Still others limit the length of

time a person can stay at the facility. Many of the faith-based programs have significant sectarian religious requirements as a condition of staying at the facility.

46.     As an example, the Salvation Army Hospitality House in Santa Ana has 25 beds for transitional housing and 25 beds for emergency shelter, all for men. Residents must attend a meeting before dinner where a religious service with prayer is held.  Clients must arrive between 3:30 and 5:00 p.m.  On most, it is at capacity. To stay here, a man must arrive by 3:30 in the afternoon to put his name into a lottery. If he is not selected, he can wait until 5:00 to see if someone who has a reserved place misses curfew.  There are almost always more applicants than beds. In January 2018, only 2 to 12 beds were available for the lottery each night.

47.     Gender is not the only restraint for Hospitality House.  Significantly, to stay at the there you must be able-bodied and employable.  Service animals will only be admitted with federal paperwork.  No support animals are permitted.

48.     Another shelter, Colette's House, is in Huntington Beach.  It is open only to women and children as a six-month transitional program. The women are required to have a job and work 32 hours per week.  No animals are allowed. Colette's House is usually at capacity.

49.     In addition to the ASL, Friendship Shelter operates a second facility in Laguna Beach that is structured as a 60-day self-sufficiency program.  According to Friendship Shelter's website, the 32-person facility always has a waiting list and is only available to individuals who are able to work.

50.     The Rescue Mission in Tustin is one of the larger private shelters in the County, with approximately 200 beds.  It is Christian facility that requires people to accept the intense sectarian religious program at the Mission to receive services.  Because the religious character of the Rescue Mission is so pervasive, it is impossible to avoid it.  In addition, the Mission does not permit individuals to bring in certain medications prescribed for a mental health condition, especially panic and anxiety disorders. On information and belief, Plaintiffs allege that the

16

Rescue Mission does not assist people in obtaining replacement medications to treat mental health conditions, which exacerbates the person's disability. Residents are not allowed to have assistance animals other than registered service animals.

## PARTIES

**PLAINTIFF:**

**Orange County Catholic Worker**

51.     Plaintiff Orange County Catholic Worker operates a community at Isaiah House in Santa Ana. In furtherance of its mission, Isaiah House of the Orange County Catholic Worker has served poor people with dignity since 1987, providing meals for the homeless, shelter, bags of food and clothing, showers, and emergency assistance. Jordan Hoiberg and Morgan Denges are members of the Orange County Catholic Worker. Their community with the Catholic Worker involves going to assist homeless communities in the parks and public areas of nearby cities almost every day. They engage with each person they meet and help them connect with available resources. On some days they deliver food and on others they bring books, tents and other basic necessities for an unsheltered person.

52.     Through their work in the Riverbed in 2017, they observed an estimated 800 to 1200 people in the Injunction Area that was closed.

53.     Beginning in 2017, members of OCCW attended several local city and county meetings where some of the named Defendant governments discussed the homelessness crisis and the need for housing.

54.     Carrying out the mission of the Catholic Worker, each time government entities relocate a homeless population, OCCW organizes volunteers and resources to help people move their belongings. As each such action is taken by the government, the Catholic Worker has had to shift priorities to respond to these measures and provide additional resources for homeless individuals targeted.

55.     OCCW members are familiar with the area and available social services and do not know of any place homeless individuals can relocate without

violating laws against camping on public places, placing property on public places, loitering and similar ordinances.   The OCCW assists women who come to Isaiah House from the Bridges shelter, the Courtyard shelter, and other facilities. Sometimes, OCCW can provide a bed for a person.  Other times, when all of the beds are already taken, unsheltered people sleep in tents on the OCCW property.

56.    With the relocation of people from the riverbed and then the Santa Ana Civic Center, the OCCW spent countless hours responding to the needs of unsheltered individuals who, as the result of the County's policies, practices and customs, and those of the County's agents and employees, were left without a placement that accommodated their disabilities, without adequate food, without a means to get to critical appointments and similar service-related issues.

57.    The work of Plaintiff OCCW is significantly impacted by enforcement of anti-camping and related laws throughout the County.  People charged with violating municipal laws based on their homeless status are usually transported to Santa Ana to the County jail, no matter where they are arrested in the County. Many of the North SPA cities contract with the County and use the County jail.

58.    When individuals are released from custody, they walk out the door of the jail with no discharge plan, no resources and no means to get back to the city where they were arrested.  They often wind up in the parks and other public places in Santa Ana and Anaheim where there only resource is volunteers from the OCCW. For the OCCW, it means increased need to buy food and assign community members and volunteers to meet the needs of the unsheltered community.

**DEFENDANTS:**

59.    Defendant BREA is a municipal entity duly organized under the laws of the State of California and with the capacity to sue and be sued.  The policies, of the City of BREA, included but not limited to the City Code section(s) identified hereinbelow, have the effect of criminalizing the status of homelessness in the city.

60.     Defendant BUENA PARK is a municipal entity duly organized under the laws of the State of California and with the capacity to sue and be sued.  The policies of the City of BUENA PARK, included but not limited to the City Code section(s) identified hereinbelow, have the effect of criminalizing the status of homelessness in the city.

61.     Defendant CYPRESS is a municipal entity duly organized under the laws of the State of California and with the capacity to sue and be sued.  The policies of the City of BUENA PARK, included but not limited to the City Code section(s) identified hereinbelow, have the effect of criminalizing the status of homelessness in the city.

62.     Defendant FULLERTON is a municipal entity duly organized under the laws of the State of California and with the capacity to sue and be sued.  The policies of the City of FULLERTON, included but not limited to the City Code section(s) identified hereinbelow, have the effect of criminalizing the status of homelessness in the city.

63.     Defendant LA HABRA is a municipal entity duly organized under the laws of the State of California and with the capacity to sue and be sued.  The policies of the City of LA HABRA, included but not limited to the City Code section(s) identified hereinbelow, have the effect of criminalizing the status of homelessness in the city.

64.     Defendant LA PALMA is a municipal entity duly organized under the laws of the State of California and with the capacity to sue and be sued.  The policies of the City of LA PALMA, included but not limited to the City Code section(s) identified hereinbelow, have the effect of criminalizing the status of homelessness in the city.

65.     Defendant LOS ALAMITOS is a municipal entity duly organized under the laws of the State of California and with the capacity to sue and be sued. The policies of the City of LOS ALAMITOS, included but not limited to the City

Code section(s) identified hereinbelow, have the effect of criminalizing the status of homelessness in the city.

66.    Defendant PLACENTIA is a municipal entity duly organized under the laws of the State of California and with the capacity to sue and be sued.  The policies of the City of PLACENTIA, included but not limited to the City Code section(s) identified hereinbelow, have the effect of criminalizing the status of homelessness in the city.

67.    Defendant STANTON is a municipal entity duly organized under the laws of the State of California and with the capacity to sue and be sued.  The policies of the City of STANTON, included but not limited to the City Code section(s) identified hereinbelow, have the effect of criminalizing the status of homelessness in the city.

68.    Defendant VILLA PARK is a municipal entity duly organized under the laws of the State of California and with the capacity to sue and be sued.  The policies of the City of VILLA PARK, included but not limited to the City Code section(s) identified hereinbelow, have the effect of criminalizing the status of homelessness in the city.

69.    Defendant YORBA LINDA is a municipal entity duly organized under the laws of the State of California and with the capacity to sue and be sued. The policies of the City of YORBA LINDA, included but not limited to the City Code section(s) identified hereinbelow, have the effect of criminalizing the status of homelessness in the city.

70.    The Defendants, their employees and agents, participated personally in the unlawful conduct challenged herein and, to the extent that they did not personally participate, authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and the harm suffered by Plaintiffs.  Each acted in concert with each other.  The Defendant developed and implemented a coordinated plan to increase enforcement

actions against the homeless community in the Riverbed and surrounding cities. The challenged acts caused the violation of Plaintiff's rights.

**FACTS RELATING TO THE CITIES**

71.     The Brea Municipal Code contains several ordinances which criminalize public activities frequently engaged in by unsheltered individuals. Section 8.44.030 (STORAGE OF PERSONAL PROPERTY IN PUBLIC AREAS PROHIBITED), makes it "unlawful and a public nuisance for any person to store personal property in any public area, except as otherwise approved by the Chief of Police, the Community Services Director or by resolution of the City Council. Personal property stored in public areas in violation of this section shall be impounded pursuant to §§ 8.44.040 through 8.44.150 of this chapter. (Ord. 1185, passed 10-4-16)." The Brea Municipal Code § 12.00.050 ("PROHIBITED CONDUCT GENERALLY") makes it a crime to "camp or stay overnight without possessing written consent of the Community Services Department." Sec. 12.00.50 A(14).

72.     The Buena Park Municipal Code § 12.24.030 ("Unlawful Camping") provides that "It is unlawful for any person to camp, occupy camp facilities or use camp paraphernalia in or on any street, any public parking lot or public area, improved or unimproved, except as otherwise provided by law. (Ord. 1327 § 1, 1996).

73.     The Cypress Municipal Code § 17-71 ("Park Regulations"), provides that it shall be unlawful to "camp or lodge overnight. No person shall erect tents, shacks, or any other temporary shelter for the purpose of overnight camping, nor shall any person leave in a park after closing hours any movable structure or vehicle that could be used for such purpose. The provisions of this section shall not apply when in connection with a city-sanctioned event." Cypress Muni. Code § 17-71(c).

74.    The Fullerton Municipal Code, § 7.105.010 ("Trespassing unlawful"), prohibits "any person to be upon any publicly or privately-owned property at any time, except upon lawful business, or with permission of the owner or person entitled to the possession of such property. (Ord. 2799, 1992). Under the Fullerton Municipal Code, a violation of this section is a misdemeanor. (§ 7.105.030 "Penalty"). Section 7.105.020A ("Camping unlawful"), makes the proscription application to "1. Any public park; 2. Any public street; 3. Any public parking lot, parking structure, or public area, improved or unimproved."

75.    In the Fullerton Municipal Code, the term "'camp' means the use of an area for living accommodation purposes such as sleeping activities, or making preparations to sleep (including the laying down of bedding for the purpose of sleeping), or storing personal belongings, or making any fire, or using any tents or other structure for sleeping, or doing any digging or earth-breaking or carrying on cooking activities. Such activities constitute camping when it reasonably appears, in light of all the circumstances, that the participant, in conducting these activities, is in fact using the area as a living accommodation regardless of the intent of the participants or the nature of any other activities in which he or she may be engaging. (Ord. 2819 § 1, 1992; Ord. 2808 § 1, 1992).

76.    The La Habra Municipal Code § 12.06.030 ("Unlawful camping") makes it "unlawful for any person to camp, occupy camp facilities or use camp paraphernalia in the following areas, except as otherwise provided: A. Any street; B. Any off-street parking lot or structure that is maintained, owned or operated by the city. (Ord. 1489 § 1, 1995). The Municipal Code also makes it unlawful to "store" personal property in public places. This includes "camp facilities and camp paraphernalia" in any "park…street, [or[ any off-street parking lot or structure that is maintained, owned or operated by the city. (Ord. 1489 § 1, 1995)." La Habra Municipal Code § 12.06.040 "Storage of personal property in public places."

77.      La Palma Municipal Code § 30-2 ("Park curfew") makes it "unlawful to enter, remain, or loiter, including using or parking a vehicle, in or upon the grounds of any City park between the hours of 10:30 p.m. and 5:00 a.m. of the following day," without authorization from the City. Section 36-7 ("Sidewalk area") provides that "[t]he sidewalk area shall be used only for pedestrian walkway, utility or other uses authorized by the City."

78.      Los Alamitos Municipal Code §12.40.010 ("Use of parks after dark") makes it unlawful for any person to "enter, loiter or remain in or on any public park grounds when the park is posted as" closed after dark.

79.      The Placentia Municipal Code §14.08.040 ("Camping or lodging") prohibits all camping or lodging in public parks "without an approved permit issued by the RAHS department for special campouts, and/or other activities. (Ord. 93-O-112 § 1, 1993; prior code § 20-4)."

80.      The Stanton Municipal Code, §2.36.030, "Unlawful camping," provides: "A.  It is unlawful for any person to camp, occupy camp facilities, or use camp paraphernalia in any public area, except as otherwise designated by the parks, recreation and community services commission, and as permitted by the community services director.  B. It is unlawful for any person to sleep in the following public areas: 1. In any public park during the period from one-half hour after sunset to five a.m. of the following day; 2. On the grounds of city, redevelopment agency-owned or maintained, or housing authority-owned or maintained buildings, facilities or other improved city property, except as may be designated otherwise by the city council. (Ord. 1067 § 3, 2017; Ord. 990 § 2, 2011).

81.      Villa Park Municipal Code § 5-11.1 ("Sitting or Lying on Public Ways") makes it unlawful to "sit, lie or sleep in or upon any public way within the City," with four exceptions applicable only to sitting. Section 19-2.7 ("Camping in Vehicles Prohibited") provides that "[n]o person shall camp overnight in any

recreational vehicle, camper, trailer coach or vehicle of any type, upon any public highway or street, including any part of the right-of-way thereof."

79.     Yorba Park Municipal Code § 12.20.020 ("Conduct prohibited within public parks and trails") prohibits camping "within the boundary lines of any" public park or trail, except within designated camping sites. Section 10.28.090 ("Parking regulations and enforcement; Public property") also prohibits camping or lodging on any other "public property," including property not within the boundaries of a public park or trail.

82.     Until recently, the North SPA Defendants in this action, like most of the other cities in Orange County, relied on the same two public shelters, The Courtyard and Bridges at Kraemer, and a number of private shelters to demonstrate that the local entity is meeting the need for emergency shelter identified in its state-mandated housing element.    Most of these private shelters have multiple restrictions for admission.  Some are time-limited; some require a referral for entry, some are restricted by gender; some are restricted to pregnant women, some are restricted to women with children.  Still others, such as the Rescue Mission, require that the individual engage in sectarian worship as a condition of receiving services. Most have a blanket prohibition on pets other than registered service animals despite the fact that the federal and California Fair Housing Law and federal and state disability protections require that pets be allowed as a reasonable accommodation for individuals with assistance animals, whether certified service animals or non-certified emotional support animals.

83.     Because there is an extremely limited number of private shelter beds available, and because each City's housing element lists the same facilities, most of which are in Santa Ana or Anaheim, there is no way that a local entity can show it meets the need for emergency shelter as identified in its housing element.

84.     Not only are the cities all counting the same beds, but the facilities are quite distant from each other, presenting a significant accessibility issue for

disabled homeless individuals who cannot readily travel to these various locations. Most of the CITIES have relied on the Bridges at Kraemer in Anaheim or The Courtyard in Santa Ana, both of which are quite distant from the various CITIES. For example, both Buena Park and Placentia are approximately five miles from Anaheim by car and 11 miles from Santa Ana. The Bridges at Kraemer does not accept walk-ins and The Courtyard is often closed to admission because it is at or over capacity.

## FIRST CAUSE OF ACTION
### Violation of Eighth and Fourteenth Amendments (42 U.S.C. §1983) Art. 7, §17 California Constitution (Cruel and Unusual Punishment)

85.    Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth hereat.

86.    The acts and omissions of Defendant CITIES, as described herein, violate the constitutional rights of homeless individuals to be free from actual or threatened cruel and unusual punishment. By virtue of their status as homeless, and the absence and insufficiency of shelter or housing in the region, including the individual CITIES, unsheltered persons have no way to comply with the laws Defendant has and threatens to enforce against them.

87.    Plaintiff OCCW further alleges that it violates the substantive due process rights of homeless individuals to threaten them with citation and arrest for being present on City property when the property is closed to the public. Enforcement of City anti-camping laws against homeless individuals, would result in migration of unsheltered persons into surrounding cities such as Santa Ana, and increasing the burden on Santa Ana to address homelessness throughout the region.

88.    The citation and threats of citation for behavior such as camping on public property when there is inadequate shelter available violates the Eighth and Fourteenth Amendments of the United States Constitution and Article 7, §17 of the California Constitution.

89.    The Defendant CITIES have a custom, policy, and/or practice of enforcing their ordinances, or threatening to enforce their ordinances, that punish homeless persons for the unavoidable behavior of sleeping or having property in public in violation of the City's camping ordinances.

90.    There is an actual controversy between Plaintiff and the CITIES regarding the threat of citation if homeless persons remain on public property after being told that they may not "camp" there.  Plaintiff desires a judicial determination of the rights and duties and a declaration as to Defendant CITIES' constitutional obligations.

**SECOND CAUSE OF ACTION**
**Violation of First and Fourth Amendment; 42 U.S.C. 1983**
**(Against All Defendants)**

91.    Plaintiff OCCW realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth hereat.

92.     Defendant CITIES repeatedly questioned individuals who appear to law enforcement to be homeless and directed them to move along from public places where they have a right to be pursuant to the First Amendment.  The stops and subsequent detentions and interrogations are unlawful seizures as they were done without reasonable suspicion or probable cause to believe that the individuals had or were about to commit a crime other than a purported violation of a law necessitated by their status as homeless individuals and lack of available shelter.

93.    Unsheltered persons, as everyone else, have a First Amendment right to be present in a public space, to "loiter" in a public space for no reason and not to be excluded from that space by threat, intimidation or coercion because they are homeless.  Without a reasonable alternative place where they can be during the day and sleep at night, homeless persons have no choice but to be on public property during the day with their property and to "camp" on the same property at night.

94.     As a direct consequence of Defendant's past and threatened future actions, Plaintiff OCCW has suffered and will continue to suffer a violation of its constitutional rights. The individuals assisted by OCCW endured pain and suffering as a result of Defendant's policies, practices and customs.

### THIRD CAUSE OF ACTION
### Violation of California Civil Code § 52.1
### (Against All Defendants)

95.     Plaintiff OCCW realleges and incorporates the allegations set forth in the proceeding paragraphs as through fully set forth hereat.

96.     The Defendant CITIES' conduct, as described herein, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise and enjoyment of Plaintiffs' rights as secured by the First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution or laws of the United States, and of the rights secured by the Constitution or laws of the state of California.

97.     Defendants engaged in concerted and repeated conduct to cite and/or arrest Plaintiffs under unconstitutional ordinances, on their face and as applied, and threatened to cite and arrest them repeatedly. Defendants engaged in coercive and intimidating tactics by conducting unwarranted stops and collecting information on Plaintiffs to push them out of Defendants' respective jurisdictions.

**WHEREFORE**, Plaintiffs pray as follows:

1.     For an order enjoining and restraining Defendant CITIES from enforcing their "Anti-Camping" and related municipal ordinances regarding park closures, loitering and other ordinances unless and until shelter beds are available equal to at least 60 percent of the unhoused individuals in the CITIES.

2.     For an order enjoining and restraining Defendant CITIES from threatening homeless persons with arrest or citations if they continue to be present

in public space in that city when there are not available shelter beds for at least 60 percent of the unhoused population.

3.    For a declaratory judgment that Defendant CITIES' policies, practices and conduct as alleged herein violate Plaintiffs' rights under the United States and California constitutions and the laws of California;

4.    For damages to the organizational plaintiff in an amount to be determined according to proof based on their federal claims only;

5.    For costs of suit and attorney fees as provided by law;

6.    For such other relief as the Court deems just and proper.


Dated: August 6, 2019          Respectfully submitted,

                               LAW OFFICE OF CAROL A. SOBEL
                               ELDER LAW & DISABILITY RIGHTS CENTER
                               SCHONBRUN SEPLOW HARRIS & HOFFMAN


                                    /s/ Carol Sobel
                               By: CAROL A. SOBEL
                               Attorneys for Plaintiffs