LEON J. PAGE, COUNTY COUNSEL
MARIANNE VAN RIPER, Sr. Assistant (CA SBN 136688)
marianne.vanriper@coco.ocgov.com
LAURA D. KNAPP, Supervising. Deputy (CA SBN 162800)
laura.knapp@coco.ocgov.com
333 West Santa Ana Boulevard, Suite 407
Santa Ana, California  92701
Telephone:  (714) 834-6020
Facsimile:  (714) 834-2359

Attorneys for Defendants, County of Orange,

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION – SANTA ANA

| | |
|---|---|
| ORANGE COUNTY CATHOLIC WORKER, an unincorporated association; LISA BELL; SHAWN CARROLL; MELISSA FIELDS; LARRY FORD; CAMERON RALSTON; KATHY SCHULER; GLORIA SHOEMAKE, as individuals,<br><br>Plaintiffs,<br><br>v.<br><br>ORANGE COUNTY; THE CITY OF ANAHEIM; THE CITY OF COSTA MESA; and THE CITY OF ORANGE,<br><br>Defendants. | Case No. 8:18-cv-00155 DOC-KES<br><br>**REVISED JULY 23, 2019 SETTLEMENT AGREEMENT PURSUANT TO COURT'S AUGUST 25, 2020 ORDER** |

Pursuant to the Court's August 25, 2020 Order [Document No. 375], attached hereto is the July 23, 2019 Settlement Agreement with a revised Attachment A, Standards of Care.

DATED:  August 27, 2020

Respectfully submitted,
LEON J. PAGE, COUNTY COUNSEL
MARIANNE VAN RIPER, Senior Assistant
LAURA D. KNAPP, Supervising Deputy

By ___s/Marianne Van Riper_____
MARIANNE VAN RIPER,
Senior Assistant County Counsel

Attorneys for Defendant, County of Orange

OFFICE OF THE COUNTY COUNSEL
COUNTY OF ORANGE

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into by and between, on the one hand, County of Orange ("County") and, on the other hand, the following plaintiffs:

(1) Orange County Catholic Worker ("OCCW") (an unincorporated association, acting by and through its designated representatives), and the following individuals, who enter into this agreement on their individual behalf, as defined herein: Lisa Bell, Melissa Fields, Gloria Shoemake, Richie Thomas, Shawn Carroll, Larry Ford, Cameron Ralston, and Kathy Schuler (collectively, "Individual OCCW Plaintiffs") (together with OCCW, "OCCW Plaintiffs");

(2) People's Homeless Task Force, an unincorporated association (the "Ramirez Plaintiff"); and,

The OCCW Plaintiffs and the Ramirez Plaintiff are collectively referred to herein as "Plaintiffs." The parties to this Agreement are referred to herein individually as a "Party" and collectively as the "Parties."

## Class Certification and Notice

The parties stipulate to the conditional certification for settlement purposes of a Class of Plaintiffs defined as: all current and future homeless individuals located in the Northern and Central SPA of the County.  Upon final approval of the Agreement, the Class shall be certified as described above.

Promptly upon execution of this Agreement by all parties, Plaintiffs shall apply to the Court by application and/or motion for approval of the Settlement.  Plaintiffs shall

1

apply to the Court for entry certifying a class pursuant to Federal Rules of Civil Procedure 23(b)(2).

The Parties agree that the damages in this action to the individual Plaintiffs are incidental to the benefits of the structural relief provided by the Settlement. Accordingly, the Parties agree to seek an Order by the District Court that the class may be certified pursuant to F.R.Civ.P. 23(b)(2) without notice to putative class members.

Individual plaintiffs – David Ramirez, Sharon Sweat, Stephenie Saint Vincent, Raya Ives, Derek MacArthur, Kim Gray and Erik Teasley – ("Individual Ramirez Plaintiffs") are not considered part of this class certification and settlement agreement. The parties acknowledge that Individual Ramirez Plaintiffs' damages are not included in this injunctive settlement agreement. The parties agree to negotiate Individual Ramirez Plaintiffs' damages separate and apart from this settlement agreement.

## RECITALS

A.     WHEREAS, on January 29, 2018, OCCW Plaintiffs filed an action, entitled *Orange County Catholic Worker vs. Orange County,* United States District Court, Central District of California Case No. 8:18-cv-00155-DOC-KES (the "OC Catholic Worker Action"), against the County, the City of Anaheim, the City of Costa Mesa, and the City of Orange.

B.     WHEREAS, on March 13, 2018, the City of Santa Ana intervened in the OC Catholic Worker Action.

C.     WHEREAS, on April 26, 2018, the City of Santa Ana filed a cross-

2

complaint in the OC Catholic Worker Action against the County and all other cities in the County alleging: (1) violation of the Eighth Amendment (cruel and unusual punishment), (2) violation of the Fourteenth Amendment (equal protection), and (3) violation of the Fourteenth Amendment (due process).

**D.**     WHEREAS, on July 26, 2018, the OCCW Plaintiffs filed a First Amended Complaint ("OCCW FAC"), against all Defendants, which included, among other changes, added Richie Thomas as a named Plaintiff and pleaded a potential class action against the County.

**E.**     WHEREAS, on November 13, 2018, the OCCW Plaintiffs filed a Supplemental Complaint adding the City of Tustin as a Defendant.

**F.**     WHEREAS, on June 28, 2019, the OCCW Plaintiffs filed a Supplemental Complaint adding the cities of Brea, Buena Park, Cypress, Fullerton, La Habra, La Palma, Placentia, Stanton, Villa Park and Yorba Linda as defendants.

**G.**     WHEREAS, the OCCW FAC as well as the Supplemental Complaint alleges that OCCW is an unincorporated association dedicated to the service and care of the poor in Orange County, and that the Individual OCCW Plaintiffs are homeless individuals residing in Orange County.  The OCCW FAC alleges, inter alia, that Defendants, and each of them, have violated the Individual OCCW Plaintiffs' rights by enforcing various laws against them, including trespass, loitering, and/or anti-camping ordinances, at times when, according to OCCW Plaintiffs, there were no immediately accessible and appropriate beds available to them in Orange County.  The County

disputes the factual allegations and legal contentions made by OCCW Plaintiffs in the OCCW FAC and the Supplemental Complaint.

**H.** WHEREAS, the OCCW FAC alleges the following claims for relief against the County: (1) violation of the Eighth and Fourteenth Amendments to the U.S. Constitution, and Article VII, sec. 17, of the California Constitution for alleged "cruel and unusual punishment"; (2) violation of the First and Fourth Amendments to the U.S. Constitution; (3) violation of the right to due process of law under the Fourteenth Amendment to the U.S. Constitution; (4) violation of Fair Housing Act, 42 U.S.C. § 3604 and California Government Code §12955 et seq.; (5) violation of the 14th Amendment; Art. 1 §13; (6) violation of the Americans with Disabilities Act; (7) violation of California Civil Code § 52.1; (8) violation of California Government Code § 815.6; (9) violation of California Government Code § 11135; and (10) taxpayers' and class members suit for declaratory and injunctive relief, California Code of Civil Procedure § 526a. The County disputes each of these claims for relief in their entirety, and disputes OCCW Plaintiff's underlying legal contentions and theories.

**I.** WHEREAS, on February 7, 2018, the Ramirez Plaintiffs filed an action against the County of Orange in the United State District Court, Central District of California under Case No. 2:18-cv-01027 entitled David Ramirez, Sharon Sweat, Stephenie Saint Vincent, Raya Ives, Derek Macarthur, Kim Gray, and Erik Teasley as individuals; People's Homeless Task Force, an unincorporated association vs. the County of Orange (the "Ramirez Action").

4

**J.** WHEREAS, the Ramirez Action alleges, inter alia, that the Ramirez Individual Plaintiffs are homeless individuals with various disabilities who lived on the Riverbed, since their disabilities made it nearly impossible for them to live in any emergency shelter, and that the County has violated their rights by failing to provide housing, homelessness services, or programs that accommodate their disabilities. The County disputes the factual allegations and legal contentions made by the Ramirez Plaintiffs.

**K.** WHEREAS, on March 23, 2018, the Ramirez Plaintiffs filed a FAC ("Ramirez FAC") alleging: (1) Violations of the Americans with Disabilities Act; (2) Violations of the Americans with Disabilities Act – Intentional Discrimination; (3) Violation of Section 504 of the Rehabilitation Act of 1973; (4) Violation of Substantive Due Process; State Created Danger/Reckless Endangerment; (5) Violation of Equal Protection; (6) Violation of the Bane Act (California Civil Code § 52.1); (7) Violation of Procedural Due Process; (8) Interference with Right to Petition the Government; (9) Interference with Right to Seek and Associate With Counsel; (10) Right to Be Secure From Unreasonable Seizures; (11) Right to Due Process of Law-Seizure of Property; (12) Violation of the Fair Housing Act; (13) Violation of the Duty to Affirmatively Further Fair Housing; Violation of FEHA-Disability and Source of Income Discrimination; and, (14) Breach of Fiduciary Duty of Care. The County disputes each of these claims for relief in their entirety, and disputes Plaintiff's underlying legal contentions and theories. The County disputes the factual allegations and legal

5

contentions made by Plaintiffs in the Ramirez FAC.

L.     WHEREAS, without admitting any wrongdoing, liability, or legal violations on the part of the County, without conceding the validity of any of Plaintiffs' legal theories or claims, and for the sole purpose of resolving the OCCW Action and the Ramirez Action and any claims relating thereto in an economic and efficient manner, the Parties now desire to enter into this Agreement on the terms set forth herein.

## TERMS

**NOW, THEREFORE**, for full and valuable consideration, the sufficiency of which is hereby acknowledged, and based upon the foregoing Recitals, and the terms, conditions, covenants, and agreements herein, the Parties agree as follows:

1.     **Order Regarding Continuing Jurisdiction and Effective Date**

Following the full execution of this Agreement by all Parties, the Parties shall file with the Court in the OC Catholic Worker Action and in the Ramirez Action proposed order(s) regarding settlement and continuing jurisdiction and incorporating the terms of this Agreement ("Order(s)"). The obligations of the Parties in the remaining sections of this Agreement, and the releases contained herein, shall become effective and operative on the date(s) on which the respective Order is fully executed in each of the cases and entered by the Court, and shall be contingent upon the Court's signing and entry of the respective Order(s) (hereinafter, the "Effective Date").

2.     **Incorporation of Recitals**

The representations in the above-section of this Agreement, entitled "RECITALS,"

6

are hereby incorporated into and made a material part of the terms and representations of this Agreement.

### 3. Definitions

The following definitions of key terms used in this Agreement, are hereby incorporated into and made a material part of the terms and representation of this Agreement:

a. "Clinical Assessment" is an evaluative process conducted by Specially Trained clinical personnel to evaluate and diagnose an individual's mental health condition for the purpose of developing an appropriate treatment plan and determine appropriate level of care.

b. "County-Controlled Properties" shall include (1) all County unincorporated areas; (2) all County-owned property; (3), County properties that the County is leasing or occupying from a third party (e.g. branch library); and (3) the channels and other facilities of the Orange County Flood Control District.

c. "Field Screening" is the initial contact between the client and the County or County contracted provider for the purpose of conducting a preliminary evaluation of an individual's treatment, mental health, and shelter needs.

d. "Homeless Services" refers to the County's emergency shelter system.

e. "Restricted Areas" shall include (1) Orange County Flood Control District Property; (2) John Wayne Airport Property; (3) the interior spaces of County libraries outside of the posted hours of operation; (4) custody facilities or other

7

areas where in-custody subjects are taken; (5) contracted right-of-way railroad areas; (6) special use properties as approved by the Court; and (7) any County property or facilities not open to the general public.

f. "Specially Trained" means training (in areas referenced in the ADA Compliance in Shelters section of the "Standards of Care for County Contracted Shelter Providers," attached to this agreement as Attachment "A,"), provided to personnel working in programs or services benefitting or supporting homeless individuals enabling these personnel to recognize when a homeless person may be struggling with a mental health issues or conditions; and to sensitively communicate with homeless individuals who have mental health issues/conditions.

g. "Standards of Care" are formal guidelines for operation and service provision by County-contracted shelter operators, and are attached to this Agreement as Attachment "A".

h. "System of Care personnel" shall include representatives from the County's Health Care Agency, Orange County Community Resources or its contracted provider, Social Services Agency, County-contracted providers, or any other organization the County contracts with for outreach and engagement services. The term "System of Care Personnel" also includes OCSD staff who have been Specially Trained for interactions with the homeless population including, but not limited to, the Homeless Outreach Team, or the "HOT" team.

i.   Service Planning Area ("SPA"):  Refers to the designated North, Central and South geographical areas of the County as set forth in the attached SPA map, Attachment "B" to this Agreement.

## 4.   <u>Enforcement of Anti-Camping and Anti-Loitering Provisions</u>

The Orange County Sheriff's Department ("OCSD") shall establish the following policies and procedures relating to the enforcement of the Anti-Camping and Anti-Loitering provisions of the Orange County Codified Ordinances ("OCCO") on County-Controlled Properties, with the exception of those County-Controlled Areas that are also "Restricted Areas," as defined in Section 3 of this Agreement.  The OCSD shall also use the following policies and procedures relating to the enforcement of the anti-camping and anti-loitering provisions of the municipal ordinances where OCSD provides contract law enforcement services and the city has met the requirements of *Martin v. Boise*.

4.1   Absent exigent circumstances, any enforcement of the Anti-Camping or Anti-Loitering ordinances against a homeless person (including any of the named individual Plaintiffs) will first be preceded by contacts with System of Care personnel for a Field Screening to determine appropriate placement for the individual in question, per the procedures outlined herein.

4.2   In implementation of the above-section 4.1, prior to enforcement of Anti-Camping or Anti-Loitering ordinances against any homeless person in the County Controlled Properties, OCSD will work with Specially Trained System of Care personnel to locate and offer an appropriate shelter placement for the individual within his or her

9

respective Service Planning Area ("SPA").  OCSD will not transport homeless

individuals across SPAs for the purposes of shelter placement.

  4.3 To any individual who declines the offered placement, OCSD will, where

feasible, give the person a warning and an opportunity to immediately relocate to a

location where the person may lawfully be present before issuing a citation and/or

effecting an arrest.  If the individual declines the offered placement, OCSD may proceed

with enforcement of the applicable Anti-Camping, Anti-Loitering or comparable

ordinance in its discretion.

  4.4 <u>Restricted Areas and County Parks:</u>  If the alleged violation arises from an

individual's presence in a Restricted Area, at any time, or on park property outside of the

established operational hours, and if there is no appropriate and immediately available

placement for the person, OCSD will advise the individual that they may move to any

public area outside the Restricted Area or park property as allowed by *Martin v. City of

Boise*.  If the individual does not then leave the Restricted Area or park property after

receiving both a warning and a reasonable opportunity to gather his or her belongings,

OCSD, or other applicable law enforcement agency may issue a citation or arrest the

individual, as appropriate.

  4.5 Nothing in this Agreement constitutes an admission by the County that its

current policies and procedures for enforcement of Anti-Camping or Anti-loitering

ordinances and/or other laws based on an individual's status as homeless are either (a)

different than those set forth above, or (b) in any way legally inadequate, or a concession

by Plaintiffs that it is legally adequate.

4.6 Except as explicitly provided in this Agreement, nothing in this agreement shall impact the authority of the OCSD to enforce any law not based on the individual's unsheltered status against a person believed to be homeless, including issuing citations and arresting the person for an alleged violation of the law.

## 5. Referrals to Collaborative Courts

The Parties acknowledge that the issuance of citations and arrests may create impediments to unsheltered individuals qualifying for certain public benefits and services and may also create barriers to housing and employment. OCSD agrees that when issuing a citation or making an arrest for a violation of an Anti-Camping or Anti-Loitering ordinance, OCSD shall inform the homeless person that they can request acceptance into the Collaborative Court.

## 6. County Maintenance, Remediation and/or Cleaning Projects

Nothing herein shall be construed to prevent the County from performing routine maintenance, remediation, or cleaning projects, as determined to be necessary by the County ("County Project"). However, the County will advise Plaintiffs' counsel when a County Project is expected to be submitted to the Board of Supervisors (or appropriate County department) for approval if said County Project is expected to result in the displacement of an unsheltered community and, if necessary, submit the proposal for the County Project to the Court's dispute resolution process pursuant to this agreement. Nothing in this section shall preclude the County from implementing an emergency

11

project that does not allow sufficient time for the notice outlined herein. Absent exigent circumstances or an emergency, the County shall provide at least 24-hours' notice to affected homeless persons and shall provide storage, at no charge, for their personal property in an area that is accessible for individuals to reclaim their property and that is reasonably accessible for individuals with disabilities. The parties agree to meet and confer regarding the extent of the County's obligation to store essential personal property seized during such projects.

## 7.    **Development of Standards of Care for Homeless Shelters**

7.1.   The County will adopt "Standards of Care" for its Homeless Services to ensure that program eligibility, rights and responsibilities, grievance process, ADA accommodations, and services are clearly communicated to County-contracted service providers/shelter operators and program participants. Any disputes will be submitted to the Court for resolution. All City-only and private facilities, programs or services for people experiencing homelessness that receive funding distributed through the County will be provided with the "Standards of Care" and all related notices and forms and will be required to implement the "Standards of Care," to the extent applicable, as a condition of receiving public monies.

7.2.   The County and Plaintiffs' counsel will develop a set of rights and responsibilities in line with best practices concerning appropriate behavior for participants in the program to be incorporated into the Standards of Care. Any disputes that arise during the Parties' meet-and-confer efforts will be submitted to the Court for

12

resolution.   The proposed "Standards of Care for County Contracted Shelter Providers" is attached to this Agreement as Attachment "A".

## 8.   Clinical Assessments

The County will post a notice in each facility subject to this Agreement, advising of the availability of clinical assessments, and will provide such an assessment to those who request it.  These clinical assessments will be made available to all homeless persons within the County of Orange who may be eligible for County-funded treatment programs and resources.  When appropriate, the County will provide linkage to appropriate services and programs, through Specially Trained case managers, for those requiring higher levels of care for mental health conditions.

For participants in County programs assisting homeless individuals, each participant will be reassessed by an appropriate clinical professional, as selected by the County, prior to moving that participant to a different level of care, program, or facility.

When conducting clinical assessments of homeless persons, the County agrees to consider and, where feasible, utilize evidence-based and trauma-informed practices, including but not limited to, the following:

a.   Participants reporting a history of trauma during screening should, with their consent, undergo a comprehensive mental health assessment.

b.   The participant will be provided information about the process, the treatment plan and timeline for services, as appropriate.

c.   As part of the treatment plan development, the County will endeavor to

13

include participant choice, control, and collaboration in service and

treatment options, recognizing the participant's strengths and skills.

The County will negotiate in good faith with Plaintiffs' counsel regarding how to

implement the assessment principles described above.  Any disputes will be submitted to

the Court for resolution.

9.    **ADA/Reasonable Accommodation Procedure at All Stages**

The County will establish a formal, uniform process whereby individuals with

disabilities can request reasonable accommodations or modifications to gain equal access

to facilities, programs, services, and activities.  Notice of the availability of the process

shall be posted in each facility and at the office of any County program, services or

activities relating to individuals experiencing homelessness and resources for Homeless

Services. The Parties agree to negotiate in good faith regarding the content of the

County's formal, uniform processes to be established, and the Parties shall submit any

disputes that arise during these meet-and-confer efforts to the Court for resolution.  The

Parties agree to abide by the Court's determination with respect to such submitted

disputes.

The County will identify an ADA Coordinator responsible for ensuring that the

County's programs, services, and activities relating to individuals experiencing

homelessness are ADA-compliant, including requests for reasonable accommodations

and appeals of reasonable accommodation denials.  The County shall provide

individuals with disabilities with reasonable written notice of changes affecting their

shelter or access to services.  Such changes shall include any modifications to services or the termination of services.  Individuals will have a right to an appeal process if they disagree with the County's terms in the written notice subject to the Dispute Resolution Procedure to be agreed to by the parties.

The County will designate and train an ADA Coordinator to be available for every County-run site to ensure the County's compliance with the ADA through all of the County's programs, services, and activities relating to individuals experiencing homelessness. Additionally, all staff at facilities will be trained to recognize when they need to call upon the ADA Coordinator to consider accommodations or modifications that are either requested, or that the staff reasonably understand to be needed because of a disability.

## 10.    **Due Process Protections**

The County will ensure appropriate due process protocols, including a timely and effective administrative appeals process, for homeless individuals being denied access to, or being terminated from, County-administered shelters.  This procedure shall be included in the Standards of Care.  Due process procedures may vary by the provider, program and shelter, but all such due process procedures shall comply and be otherwise consistent with local, state, and federal laws.  The County, however, is not prohibited from exiting an individual immediately from a placement if a concern arises regarding the safety and/or security of the program operations.

The County will post notice at each facility of the legal counsel monitoring this Settlement Agreement and contact information for assistance.  The parties will meet and confer on procedures for Plaintiffs' counsel to access their clients who reside in County-operated facilities subject to this Agreement.  The procedures will provide that counsel shall not impact program operations.

## 11.    **Dispute-Resolution Process**

The Parties hereby agree that any and all disputes concerning the adequacy of any placement offered to a homeless individual pursuant to any portion of this Agreement including, but not limited to, whether the offered placement sufficiently accommodates the individual's disabilities, will be resolved via the "Dispute-Resolution Process," as defined below.

The Court shall retain jurisdiction over the OCCW and Ramirez Actions for a period of three (3) years from the Effective Date of this Agreement (hereinafter, the "Termination Date"), for the purposes of (a) overseeing the implementation of this Agreement, and (b) implementing and presiding over the dispute-resolution process (the "Dispute-Resolution Process") to be established by the Court and to which the Parties hereby consent and agree:

11.1.  Except as expressly identified in this Agreement, or as may be modified by the Court or the Parties, with the Court's consent, during the three-year period of the Court's continued jurisdiction, this Dispute Resolution Process shall apply to adjudicate any and all disputes between, on the one hand, the County and, on the other hand, any

homeless individual or individuals who consent, at the time of requesting the Dispute

Resolution Process, to be bound by said process and the provisions of this Agreement

applicable to the Plaintiffs including, but not limited to, any individual Plaintiff for (a) the

implementation of this Agreement, and/or (b) disputes regarding the availability or

adequacy of any shelter or shelter services offered to the individual pursuant to this

Agreement (collectively, the "Disputes," and individually, a "Dispute").  Any and all

Court hearings and/or mediated disputes shall be conducted in a closed setting to preserve

privacy and HIPAA protections.

11.2.   In the event of any Dispute arising during the pendency of the Court's

retained jurisdictions, the parties to that Dispute will first attempt to meet and confer

informally with the other side in an effort to resolve it.  In the case of a Dispute raised by

one or more homeless individuals (including, but not limited to, any individual Plaintiffs)

against the County or a Dispute raised by the County against one or more homeless

individuals who are known to be represented by counsel of record in the Action, this

attempt will at least involve (a) a communication from the party initiating the Dispute to

the other side's counsel describing in detail the Dispute and the requested remedy, and

providing any evidence in their possession in relation thereto, and (b) a discussion, either

in person or via telephone, seeking to resolve the Dispute.  County employees, as well as

the employees of the Shelter(s), shall give any affected individual notice of the Court's

Dispute-Resolution Process and the contact information for Plaintiffs' counsel, together

with a statement that Plaintiffs' counsel may be available to assist them.

11.3.   If the parties to a Dispute are unable to resolve it within two (2) court days after it is first raised informally by one of the parties to the Dispute, any party to the Dispute may request a hearing with the Court under the standards and processes to be set by the Court, and the Court will have jurisdiction to resolve that Dispute.  If the Dispute involves an emergency situation that presents a threat to the immediate health and safety of an individual, the parties may seek expedited review by the Court immediately.

11.4.   Except as provided for in Section 4 hereinabove, nothing in this agreement shall impact the OCSD's right to enforce any law not based on the individual's unsheltered status against a person believed to be homeless, including issuing citations and arresting the person for an alleged violation of the law.

## 12.   Release and Covenant Not to Sue

In consideration for the terms of this Agreement, Plaintiffs, and each of them, on their own behalf, and any other individual claiming rights under this Agreement including, but not limited to, those employing the dispute resolution procedures set forth herein (the "Releasing Parties"), and except as set forth above in this Agreement, hereby release and forever discharge the County, as well as its present and former employees, agents, managers, officers, directors, Board members, attorneys, departments including the OCSD, the County's Health Care Agency and Social Services Agency and divisions or affiliated entities, whether previously or hereafter affiliated in any manner (the "Released Parties"), from and against any and all claims, demands, causes of action, obligations, damages, attorneys' fees, costs, and liabilities, arising from or relating to the

events detailed in the lawsuit of any nature whatsoever, whether or not now known, suspected, or claimed, which the Releasing Parties, and/or any of them, have at the time of signing this agreement, as against the Released Parties, or any of them, whether directly or indirectly, relating to or arising out of (a) the OC Catholic Worker and Ramirez Actions, (b) any claims raised in, or that could have been raised in, the OC Catholic Worker or Ramirez Actions, (c) the availability of homeless shelters, shelter beds, and/or other homeless accommodations in Orange County, (d) the County's alleged obligation to provide and/or fund such accommodations, and/or (e) OCSD's alleged inability to enforce any of the County's Ordinances and any law that the Releasing Parties claim criminalizes a person's homeless status, against any person because of his or her homeless status (hereinafter, the "Release Claims"), conditional upon the provisions herein.

## 13.   Waiver of California Civil Code Section 1542

The Parties acknowledge that they are familiar with the provisions of California Civil Code section 1542 and, except as otherwise provided herein, expressly waive and relinquish any and all rights or benefits that they may have under said section to the fullest extent permitted by law concerning any matters relating to the Parties' Actions.

California Civil Code section 1542 states:

**A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her**

19

settlement with the debtor or released party.

The Parties declare that they understand the full nature, extent and import of section 1542 of the California Civil Code and have been so advised by their attorneys.

The Releasing Parties, and each of them, warrant that they have made no assignment, and will make no assignment, of any claim, chose in action, right of action, or any right, of any kind whatsoever, within the scope of the Released Claims, and that no other person or entity of any kind had or has any interest in any of the demands, obligations, actions, causes of action, debts, liabilities, rights, contracts, damages, attorneys' fees, costs, expenses, losses, or claims within the scope of the Released Claims.

### 14.   Dismissal of the Action

At the conclusion of the Court's retained jurisdiction, Plaintiffs will take all necessary actions and file all necessary documents to effectuate dismissal of the OC Catholic Worker Action with prejudice and the Ramirez Action with prejudice.

### 15.   Settlement Payments and Attorneys' Fees

The parties understand that the individual Plaintiffs claim damages and as a result will meet and confer in an attempt to resolve those claims.  The County agrees to pay Plaintiffs' reasonable attorneys' fees.  Should an agreement as to the amount of attorneys' fees not be reached by the Parties, Plaintiffs have the right to file a Motion for Attorneys' Fees in this Court in each of the actions included in this settlement.  County shall not object to the motion(s) on the basis that Plaintiffs are not entitled to attorneys' fees but may object to the amount of fees claimed.

Plaintiffs' counsel will be entitled to monitoring fees, upon proof of time spent, not to exceed $ 100,000  a year during the time that the Court retains jurisdiction to review and enforce the terms of the Agreement.

### 16.   **Non-Admission of Liability**

By entering into this Agreement, neither the County nor the OCSD admits any liability, and explicitly denies any liability or wrongdoing of any kind arising out of or relating to any of the claims alleged in the Action.  Nothing herein constitutes an admission by the County or the OCSD as to any interpretation of laws, or as to the merits, validity, or accuracy of any of the claims or legal contentions made against it in the Action.  The County and the OCSD have entered into this Agreement solely to avoid the time, expense, and risk of continued litigation.  The Parties agree that an express condition of this settlement is that there has been no finding of liability on the merits, and that this settlement and any document related to this settlement, including this Agreement and the Order, and the confidential negotiations leading up to this settlement, shall be inadmissible in evidence and shall not be used for any purpose in this or any other proceeding except in an action or proceeding to approve, interpret, or enforce the Agreement.

### 17.   **Knowing and Voluntary**

This Agreement is an important legal document that has been voluntarily and knowingly executed by the Parties.  The Parties, and each of them, specifically represent that, prior to signing this Agreement, (a) they have each been provided a reasonable

period of time within which to consider whether to accept this Agreement, (b) they have

each carefully read and fully understand all of the provisions of this Agreement, and (c)

they are voluntarily, knowingly, and without coercion entering into this Agreement based

upon their own judgment.  Plaintiffs, and each of them, further specifically represent that,

prior to signing this Agreement, they have conferred with counsel of their choice to the

extent desired concerning the legal effect of this Agreement, and that the legal effect of

this Agreement has been adequately explained to them.

## 18.   Entire Agreement

  This Agreement constitutes the entire agreement between the Releasing Parties, the

County and the OCSD regarding the matters discussed herein and supersedes any and all

other agreements, understandings, negotiations, or discussions, either oral or in writing,

express or implied, between the Releasing Parties, the County, and the OCSD relating to

the subject matter hereof.  The Releasing Parties, the County and the OCSD each

acknowledge that no representations, inducements, promises, agreements, or warranties,

oral or otherwise, have been made by them, or anyone acting on their behalf, which are

not embodied in the Agreement, that they have not executed this Agreement in reliance

on any such representation, inducement, promise, agreement, or warranty, and that no

representation, inducement, promise, agreement, or warranty not contained in this

Agreement including, but not limited to, any purported supplements, modifications,

waivers, or terminations of this Agreement, shall be valid or binding, unless executed in

writing by all of the Parties to this Agreement.  Any alteration, change, or modification of

or to this Agreement shall be made by written instrument executed by each party hereto in order to become effective.

## 19.   **Warranty of Authority**

Each individual or entity that executes this Agreement represents and warrants, in his, her, or its personal capacity, that he, she, or it is duly authorized and empowered to enter into this Agreement on behalf of the party it purports to represent.

## 20.   **Counterparts**

This Agreement may be executed in multiple counterparts, each of which shall be considered an original but all of which shall constitute one agreement.

## 21.   **Representation by Counsel and Understanding**

The Parties acknowledge that each of them has been represented in the settlement of the matter by its own counsel and represent that each of them has been fully advised of the nature of the Agreement and the possible rights and obligations released herein. The rule of construction that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of the Agreement.  The Parties further acknowledge that each of them has carefully read and fully understands all of the provisions of the Agreement, and that each of them is voluntarily entering into the Agreement.

## 22.   **No Waiver of Terms of Agreement**

The failure to insist upon compliance with any term, covenant or condition contained in the Agreement shall not be deemed a waiver of that term, covenant or

condition, nor shall any waiver or relinquishment of any right or power contained in the Agreement at any one time or more times be deemed a waiver or relinquishment of any right or power at any other time or times.

### 23.   Independent Legal Advice

The Parties each represent, warrant, and agree that each has received independent legal advice from their respective attorneys with respect to the terms of the settlement provided for in this Agreement and with respect to the advisability of entering into this Agreement.

### 24.   No Other Representation

The Parties each represent, warrant, and agree that, except for the statements expressly set forth in this Agreement, each has not relied upon any statement, representation, or promise of any other party hereto in entering into this Agreement, or in making the agreements provided for in this Agreement.

### 25.   Modification of Agreement

The enforcement terms of this Agreement may be vacated or modified, at the request of any party hereto, before the Termination Date (defined below) if: (a) the holding of *Martin v. City of Boise*, 920 F.3d 584, Case no. 15-35845 (9th Cir. April 1, 2019) ("*Martin v. Boise*") is reversed or modified, or is otherwise no longer good law; or, (b) the Court determines that the number of available and appropriate shelter placements in the County of Orange warrant termination or modification of the Agreement, or (c) upon petition by the County, the Court determines that other terms of the Agreement

have been met.

The parties shall meet and confer with each other concerning any modification of this Agreement or the dispute resolution process, and any continuing disagreements will ultimately be resolved by the Court.

## 26.  **Signatures**

On behalf of the County of Orange:

DATED:  July 23, 2019                                For the County of Orange:

Frank Kim
County Executive Officer
County of Orange

DATED:  July 23 , 2019                               For the County of Orange:

Leon Page
County Counsel
County of Orange

Approved as to Form:

DATED:  July  23, 2019

Carol Sobel
Attorney for *OCCW et al.*, Plaintiffs

DATED:  July 23, 2019

Lili Graham
Attorney for *People's Homeless Task Force,* Plaintiff

25

**[BLANK PAGE]**

*OCCW* Plaintiffs:

Orange County Catholic Workers
Plaintiff

Lisa Bell
Plaintiff

Melissa Fields
Plaintiff

Gloria Shoemake
Plaintiff

Richie Thomas
Plaintiff

Shawn Carroll
Plaintiff

Larry Ford
Plaintiff

Cameron Ralston
Plaintiff

Kathy Schuler
Plaintiff

*People's Homeless Task Force* Plaintiff:

Dave Duran
People's Homeless Task Force
Plaintiff

Jeanine Robbins
People's Homeless Task Force
Plaintiff

*OCCW* Plaintiffs:

_____
Orange County Catholic Workers
Plaintiff

_____
Larry Ford
Plaintiff

_____
Lisa Bell
Plaintiff

_____
Cameron Ralston
Plaintiff

_____
Melissa Fields
Plaintiff

_____
Kathy Schuler
Plaintiff

*People's Homeless Task Force* Plaintiff:

_____
Gloria Shoemake
Plaintiff

_____
Dave Duran
People's Homeless Task Force
Plaintiff

_____
Richie Thomas
Plaintiff

_____
Shawn Carroll
Plaintiff

_____
Jeanine Robbins
People's Homeless Task Force
Plaintiff

1

2   *OCCW* Plaintiffs:

3

4   _____
    Orange County Catholic Workers
5   Plaintiff

6

7

8   _____
    Lisa Bell
9   Plaintiff

10

11

12  _____
    Melissa Fields
13  Plaintiff

14

15

16  _____
    Gloria Shoemake
17  Plaintiff

18

19  _____
    Richie Thomas
20  Plaintiff

21

22

23  _____
    Shawn Carroll
24  Plaintiff

25

26

27

28

_____
Larry Ford
Plaintiff


_____
Cameron Ralston
Plaintiff


_____
Kathy Schuler
Plaintiff


*People's Homeless Task Force* Plaintiff:


_____
Dave Duran
People's Homeless Task Force
Plaintiff


_Jeanine Robbins_
Jeanine Robbins
People's Homeless Task Force
Plaintiff

# ATTACHMENT A

**ATTACHMENT A**



# County of Orange

# Standards of Care

# for Emergency Shelter Providers

# Table of Contents

1.1.     Standards of Care for Emergency Shelter Providers ............................................................4

1.2.     Emergency Shelter Providers' Operations ..........................................................................5

  1.2.1.    Admissions and Eligibility..............................................................................................5

  1.2.2.    Intake and Orientation...................................................................................................6

  1.2.3.    Participant's Rights and Responsibilities........................................................................6

  1.2.4.    Equal Access and Gender Identity .................................................................................7

  1.2.5.    Non-Discrimination .......................................................................................................7

  1.2.6.    Reasonable Accommodations........................................................................................8

  1.2.7.    Service Animals and Support Animals............................................................................8

  1.2.8.    Communication Accessibility ........................................................................................9

  1.2.9.    Participant Feedback......................................................................................................9

  1.2.10.   Incident Reporting.........................................................................................................9

  1.2.11.   Grievances ...................................................................................................................10

  1.2.12.   Program Exits ...............................................................................................................12

  1.2.13.   Hours of Operation and Curfew...................................................................................13

  1.2.14.   Coordinated Entry System Integration........................................................................13

  1.2.15.   Food Services................................................................................................................13

  1.2.16.   Medication Storage ......................................................................................................14

  1.2.17.   Storage and Personal Belongings ................................................................................14

  1.2.18.   Safety and Emergency Preparedness...........................................................................14

  1.2.19.   Communicable Diseases...............................................................................................15

2.   Supportive Services ...............................................................................................................15

  2.1.    Case Management Access............................................................................................15

  2.2.    Assessments .................................................................................................................15

  2.3.    Housing Plans ...............................................................................................................15

  2.4.    Housing Focused Services ............................................................................................16

  2.5.    Services, Referrals and Linkages ..................................................................................16

  2.6.    Transportation .............................................................................................................17

3.   Staff Training .........................................................................................................................17

4.   Facility Standards...................................................................................................................18

  4.1.    Facility Standards for Emergency Shelter ....................................................................18

  4.2.    ADA Facility Standards .................................................................................................19

4.3.    Hygiene Products .................................................................................................... 20

4.4.    Hazardous Materials ............................................................................................... 21

5.    Administration ............................................................................................................... 21

5.1.    Policies and Procedures .......................................................................................... 21

5.2.    Staffing ................................................................................................................... 21

5.3.    HMIS Participation and Documentation ................................................................ 22

5.4.    Document Storage and Retention........................................................................... 22

5.5.    Quality Assurance .................................................................................................. 22

5.6.    Program Monitoring................................................................................................ 22

5.7.    Reporting................................................................................................................ 22

5.8.    Waivers .................................................................................................................. 23

6.    Attachments ................................................................................................................... 24

## 1.1. Standards of Care for Emergency Shelter Providers

The County of Orange (County) has adopted the following Standards of Care for Emergency Shelter Providers (Shelter Providers) for Homeless Services.

The Standards of Care establish minimum standard requirements designed to promote an environment that is conducive under the following governing principles:

- Shelter Providers are trained, competent and equipped to support the complex needs presented by those experiencing homelessness within Orange County (OC).
- Participants are empowered to freely enter into a voluntary service partnership whereby their right to be treated with dignity and respect is mutually shared with support services staff.
- Facilities are maintained as accessible, clean, safe, secure and vector-free.
- Shelter Providers and participants have established processes to identify and resolve any concerns or conflicts that may arise during the administration and operation of the program.
- Shelter Providers actively work to engage participants in a person-centered approach and support the development of individualized participant housing plans.


The County will provide oversight of Shelter Providers that directly contract with the County with the goal of promoting quality assurance practices for their operations and remediation protocols in order to allow participants a meaningful opportunity to exercise their rights to due process for redress of their concerns.  To that effect, these Shelter Providers must develop policies and procedures to ensure the Standards of Care is implemented consistently, and must submit the policies and procedures to County for review and approval. County's review and approval will be in deference to and in conjunction with the requirements of all applicable funding sources and all state and federal guidelines including Housing and Urban Development (HUD) and the Centers for Disease Control and Prevention (CDC).

All city-only and private emergency shelter providers serving homeless individuals that receive funding distributed through the County, directly or indirectly, will be provided with the Standards of Care and must adopt and implement the minimum standards set forth in this document.

## 1.2.  Emergency Shelter Providers' Operations

### 1.2.1.    Admissions and Eligibility

Shelter Providers must develop policies and procedures for participant referral and admission. Admission policies and procedures must be clear, written and verbally explained to participants and referring entities at time of referral to ensure appropriate linkage prior to arrival at shelter.

Admission policies and procedures must at a minimum, provide information on admission parameters including referral process, eligibility, shelter program services, participant guidelines, the reasonable accommodation process, and reasons for admission denial.

Shelter Providers must ensure information is given to participants both verbally and in writing and in a manner which is preferred by participant, considering disability and limited English proficiency.  For individuals with communication disabilities, including people who are deaf and/or blind and people who have speech disabilities, Shelter Providers must provide auxiliary aids and services (such as sign language interpreters, information in braille or large print, video relay communications) when needed to communicate effectively with people who have communication disabilities. For participants with limited English proficiency, shelter providers must provide interpretation services. Interpretation may be provided by a family or friend if chosen by the participant. Shelter Providers must provide outside interpretation if the participant states that they are not comfortable having their family or friend interpret.

Shelter Providers at admission must assess, with input from the participant, the appropriateness of the shelter environment for referred participants to ensure that basic individualized needs of the participant can be met by the facility, shelter staff and programming.

Shelter Providers at admission must assess, with input from the participant, for diversion and prevention opportunities by evaluating participant's strengths and social support networks such as temporary and/or permanent housing options with family and friends. If it is determined that an individual may qualify for a medical or mental health placement with a higher level of care, the Shelter Provider shall request that evaluation from Orange County Health Care Agency (HCA) within 1 business day of the determination. HCA will facilitate that assessment at the shelter site within 5 business days, and will provide same day evaluation in exigent circumstances.

Shelter Providers must document within Homeless Management Information System (HMIS) any new bed placements or exits within 24 hours.

<u>Denial of Admission</u>

Denial to shelter is at the discretion of Shelter Providers, however, any denial must clearly explain to participant and referring entity denial of admission to the shelter.  If a denial is issued, shelter must issue a written notice with a Notice of Denial (NOD), reason for denial, and procedures for third-party appeal.

Reasons for denial may include any of the following:

- Referred participant does not meet basic admission eligibility criteria – status related to homelessness, domestic violence, veteran, etc.  Shelters that have designated beds based on funding sources may have additional eligibility criteria.

- Observed behavior that puts health and safety of staff and participants at risk. Such behavior may include, but is not limited to, violence, brandishing weapons, use of drugs or alcohol on premises, property damage.
- Any additional site specific contractual criteria.

## 1.2.2.    Intake and Orientation

Shelter Providers during intake must provide newly admitted participants with information both verbally and in writing, detailing participant guidelines, shelter programming and resources, and facility-based information. Shelters must also assess, with participant, for any reasonable accommodations needed during the intake process. Shelter Providers should be sensitive to participant's background and that it may create transference during the intake process. Intake staff must be trained to spot signs that a participant may be experiencing discomfort and if needed, respond by asking another staff to conduct the intake. Shelter Providers' interaction with participants must at all times take into account that many participants have experienced past trauma. It is important that Shelter Providers' intakes are designed and conducted in a trauma-informed-care-way.

Shelter Providers must provide an intake and orientation for referred participants within 3 business days of arrival absent exigent circumstances requiring additional time.

Shelter Providers during intake must obtain a referred participant's signature of acknowledgement that the shelter has provided to referred participant intake and orientation. Participant's signature is not a requirement for provision of shelter service, and intake paperwork must have a section documenting participant's refusal or inability to sign.

## 1.2.3.    Participant's Rights and Responsibilities

Participant's rights and responsibilities must be provided to participants upon intake and orientation evidenced by participant's signature of acknowledgement or document of participant's refusal or inability to sign. Participant's rights and responsibilities must also be posted in common areas of the shelter.

At a minimum, participant's rights must include:

- Participants have the right to be treated with dignity and respect;
- Participants have the right to be treated with cultural responsiveness;
- Participants have the right to privacy within the constrictions of the shelter environment;
- Participants have the right to self-determination in identifying and setting goals;
- Participants should be clearly informed, in understandable language, about the purpose of the services being delivered, including participants who are not literate and/or who have limited English proficiency;
- Participants have a right to reasonable accommodation and modifications based on a disability or limited English proficiency;
- Services should be provided to participants only in the context of a professional relationship based on valid, informed consent;
- Participants have the right to confidentiality and information about when confidential information will be disclosed, to whom and for what purpose, as well as the right to deny disclosure, unless disclosure is required by law; and

- Participants have the right to reasonable access to records concerning their involvement in the program.

Participant's responsibilities will include:

- Participants are expected to support an environment that promotes safety, toward staff and other participants;
- Participants are expected to follow participant guidelines reviewed at intake;
- Participants are expected to participate and be active in their care, to the degree possible, in developing and achieving mutually agreed upon service plan goals;
- Participants must provide, to the extent possible, accurate information needed by professional staff providing services to ensure thorough assessment, service planning, appropriate linkages and referrals; and
- Participants are expected to maintain confidentiality and privacy of others, just as theirs must be maintained.

### 1.2.4.    Equal Access and Gender Identity

Shelter Providers must have policies and procedures that provide equal access to transgender, intersex, gender fluid, and non-binary participants in accordance with their gender identity.

Shelter Providers must not request or require any form of proof of gender to validate eligibility, and are not to require that a person's gender match the sex listed on legal documentation.

The policies and procedures must incorporate all of the following practices:

- Participants must be assigned a bed at the shelter that serves the gender with which they identify or feel safest, which may include accommodating participant requests to relocate within the shelter. Accommodations to support safety for gender identity is the responsibility of the shelter staff. Accommodations must be developed mutually and determined by the participant.
- Participants must have access to bathrooms where they feel safest, regardless of biological or physical characteristics, or legally documented sex.
- Participant families are to receive services regardless of the gender identities within the family.
- Participants must be able to dictate the gender identity utilized in HMIS and data collection.
- Participants may dictate their preferred name for use in HMIS as HMIS does not require use of legal name.

### 1.2.5.    Non-Discrimination

Shelter Providers must have a non-discrimination policy in compliance with federal and state laws. Non-discrimination policy must ensure that Shelter Providers' programs and services do not discriminate based on the grounds of race, creed, color, sex, gender, gender identity, gender expression, sexual orientation, religion, ancestry, age, disability (including physical and mental disabilities), medical condition, genetic information, marital status, familial status, political affiliation, national origin, source of income, citizenship, primary language, immigration status, arbitrary characteristics as protected by the Unruh Civil Rights Act, and all other classes of individuals protected from discrimination under federal or state fair housing laws, individuals perceived to be a member of any of the preceding classes, or any individual or person associated with any of the preceding classes.

Shelter Providers must have public postings of the shelter's non-discrimination policy at the facility where they operate the shelter program.

## 1.2.6.    Reasonable Accommodations

Shelter Providers must have policies and procedures on reasonable accommodations, including reasonable modifications to premises, in compliance with federal and state law. Shelter Providers must make reasonable accommodations and modifications in their programs, facilities, activities and services when necessary, to ensure equal access to participants with disabilities, unless a fundamental alteration in the nature of their program, activities or services would result from the accommodation. Shelter Providers must track all reasonable accommodations requests and outcomes including the reasons for approval or denial.  All shelters must offer appeals based on a denial and will track appeal outcomes and make them available if requested.

Shelter Providers must have public postings of their shelter's reasonable accommodation and modification policy.  The postings must include contact information including the contact information for the Shelter's Americans with Disabilities Act (ADA) Coordinator.

Shelter Providers must receive and attend an annual training covering general accessibility provided by the County to ensure requirements under federal and state law (including but not limited to: the ADA Title II and Title III, Section 504, FHA, FEHA, Gov. Code Section 11135, Unruh Act, and California Disabled Persons Act) are addressed. Shelter Providers must also provide an annual training for staff relating to programmatic and facility based compliance with federal and state law requirements.

Shelter Providers must complete a Self-Evaluation Plan every 2 years to ensure that their shelters and all programs, services and activities therein are accessible for participants.

## 1.2.7.    Service Animals and Support Animals

Shelter Providers must have policies and procedures regarding access for participants with service animals and support animals, as well as pets.

Shelter Providers must admit participants and his/her/their service animal or support animal regardless of what documentation is present at the time of admission. Service Animals do not need to have any certification or documentation. Providers should support participant in acquiring any registration, licensing and vaccinations as needed.

Shelter Providers must not ask what disability a participant with a service animal may have to establish the need for the service animal. Shelter staff are only allowed to ask if the service animal supports a disability, and what function the service animal executes.

Support animals are protected under the California Fair Employment and Housing Act.  Support animals provide therapeutic support to the participant to support day-to-day functioning, and participants must be allowed to have support animals as a reasonable accommodation.  If necessary, shelters should support participants with obtaining information from a reliable third party who is in a position to know about the individual's disability or disability-related need for the support animal, or in obtaining necessary vaccinations.

The supervision of the service animals and support animals is the responsibility of the participant. The animal must be under the participant's control at all times and not pose a safety risk to other participants within the program. Shelter Providers may exit a participant without the assistance of his/her/their animal in the event the participant is unable to control his/her/their service animal or support animal, or the service animal or support animal becomes a safety risk or sanitary concern for the shelter, shelter's operations, participant, or other participants.  However, Shelter Providers must determine whether a reasonable accommodation would resolve the event from happening in the future or resolve any ongoing event and offer alternatives to exit including the option to board the animal temporarily.

## 1.2.8.    Communication Accessibility

Language Accessibility: Shelter Providers must have a Language Access Plan and accompanying guidance to ensure that participants with limited English proficiency can receive services in their desired language. Shelter Providers must provide training for all shelter staff on how to support limited English proficiency services.

Disability Communication Accessibility: Shelter Providers must have a Disability Communication Access Plan for participants with disabilities including people who are deaf and/or blind and people who have speech disabilities, to ensure access and effective communication when needed, by providing auxiliary aids and services (such as sign language interpreters, information in braille or large print, video relay communications) or other accommodations.  Shelter Providers must provide training for all shelter staff on how to support and access various interpretation services, as well as auxiliary aids and services.

Language Access Plan must be provided to participants at intake and provide information on the following:

- How to request services for language access.
- The contact information for the Shelter ADA Coordinator.
- How to request language access for effective communication.
- How to request auxiliary aids and other disability communication access accommodations.
- Procedures for requesting a reasonable accommodation based on disability.

## 1.2.9.    Participant Feedback

Shelter Providers must establish a participant feedback policy and develop a feedback process that provides for ongoing opportunities for participants to voice opinions and provide feedback confidentially to the person in charge of the shelter operations on program operations and programming, including participant guidelines. Methods for receiving participant feedback can include exit interviews, surveys, focus groups and program meetings.

Shelter Providers must solicit participant feedback annually and utilize the feedback to assess program operation changes to better support and meet the needs of the participants. A report must be created which summarizes feedback and any changes being implemented based on feedback.

## 1.2.10.    Incident Reporting

Shelter Providers must develop policies and procedures for the tracking and reporting of incidents involving:

- Abuse, suspected abuse, and reportable abuse including Adult Protective Services or Child Protective Services;
- Acts of violence or sexual misconduct;
- Death of participant and/or shelter staff;
- Emergency situations that prompt evacuation; and
- Substantial damage to the facility, or the discovery of hazardous material on shelter's premises.

Shelter Providers must report incidents to County within 24 hours of the incident occurring. The notification to the County should occur even if there is partial information at the required time of submission.

Shelter Providers must utilize the County Template (Attachment 1) when reporting incident reports and submit them to:

**Email:** OCShelterFeedback@ochca.com

**Address:** 405 W. 5th Street, Suite 658, Santa Ana, CA 92701

## 1.2.11.  Grievances

Shelter Providers must have policies and procedures for participants to submit their grievances. Shelter Providers must incorporate the County Template (Attachment 2) when creating grievance forms and related documents. The grievance policies and procedures are aimed for Shelter Providers to resolve participants' concerns as efficiently as possible.

Note: Orange County Health Care Agency, Behavioral Health Services programs and services are not subject to the grievance policies and procedures set forth in this Section 1.2.10. Behavioral Health Services programs and services have different formalized grievance and due process procedures which are prescribed by those funding sources and are considered independent of the minimum standards set forth in this Section 1.2.10.

To promote knowledge and understanding of the grievance policies and procedures, Shelter Providers must ensure the following:

- Review of grievance policy and procedures with participants during intake and orientation evidenced by participant signature of acknowledgement, or documentation of a participant's inability or refusal to sign.
- Copies of the grievance policies and procedures must be prominently posted in common areas, and must be readily available for participants upon request.  Postings must include the following:
  - o Where to obtain the grievance policies and procedures.
  - o Information and procedures for participants on how to notify shelter staff of a grievance, including access to the associated forms and how to submit.
  - o Timeframe and initial communication expectations participants can expect from shelter staff once grievance has been submitted. Absent a danger to health and safety, no action including exit shall be taken against the participant while the grievance or appeal is pending.
- Shelter Providers must provide information upon intake, and by request, how participants can contact the County Homeless Services Division.
- Annual training component for applicable shelter staff and subcontractors.

- Designate a management staff to oversee the administration of grievances, including an alternative staff to ensure participant access to grievances at any point in time.

The grievance policies and procedures shall include, but are not limited to, the following:

- Shelter Providers must ensure participant confidentiality.
- Shelter Providers must ensure an organized system of grievance documentation.
- Shelter Providers must provide opportunity for participants to present their grievance case before a neutral decision-maker (a supervisor or manager who was not directly involved in the incident or situation of the grievance).
- Accommodation of third-party advocates in the grievance process, if requested by the participant. Participant must give their permission for an advocate to be present evidenced by a signed release of information.
- Shelter Providers must work to create face-to-face meetings to support the resolution of a participant's grievance.
- Shelter Providers must ensure participants receive a written determination for the submitted grievance after the grievance process has concluded.
- Shelter Providers must have a procedure for an appeal review process for participants looking to dispute their written determination. The final determination should contain a clear statement of the outcomes that led to the decision of the appeal.
- Shelter Providers must provide any documentation related to the grievance to the participant upon request.
- Shelter Providers' policies and procedures must include information directing clients to the County Grievance Appeal Process.

The grievance policies and procedures must incorporate the following process and timeframes associated to respond promptly to participant's grievance:

- Shelter Providers' confirmation of grievance receipt not to exceed 3 business days, during which the Shelter Providers will acknowledge and review the grievance being received. A timeline to resolve the grievance should not exceed 10 business days, during which the participant will receive a written determination about the grievance that includes the factors that led to the final determination.
- The appeal process must afford participants an opportunity to present written and/or oral objections before a management/director staff member other than the staff person who made the prior grievance determination. Shelter Providers must provide a written determination for participant appeals within 10 business days.
- Absent an immediate health and safety risk to other participants or staff, the participant must be permitted to remain in the shelter during the appeal.

<u>County Grievance Appeal Process</u>

The County Grievance Appeal Process is designed to review participant grievances that have completed the Shelter Providers' grievance process, including having gone through the Shelter Providers' appeal process (Attachment 3). The County Grievance Appeal Process (Attachment 4) reviews the administrative and operational compliance of Shelter Providers' grievance policy and procedure in addition to compliance to the Standards of Care.

<u>Dispute Resolution Services</u>

Dispute Resolution Services may be requested by the participant once the Shelter Providers' grievance process and the County Grievance Appeal Process have been completed and the outcome is not a satisfactory resolution for the Participant.

Shelter Providers' policies and procedures must include information on how to obtain dispute resolution services from the court. This may include notifying the chambers of Judge David O. Carter via email at [DOCchambers@cacd.uscourts.gov](mailto:DOCchambers@cacd.uscourts.gov) or contacting the Elder Law and Disability Rights Center at (714) 617-5353 or [info@eldrcenter.org](mailto:info@eldrcenter.org). Any hearings by the court must be conducted during regular business hours whenever feasible.

## 1.2.12.    Program Exits

Shelter Providers must provide the policy for program exits upon intake evidenced by a participant's signature of acknowledgement, or documentation of participant's refusal or inability to sign.

Policies and procedures developed regarding participant guideline violations must include an escalation continuum incorporating warnings and staff/participant problem solving methods prior to instituting shelter exits.

Shelter Providers must have policies and procedures for assessing, problem solving, and instituting participant exits from shelter.

Shelter Providers must ensure all escalation processes, including those resulting in shelter exits, are documented.  Shelter Providers must allow for participants to appeal their termination via the established process in Section 1.2.10 Grievances.  Participant exits may include the following reasons, however, Shelter Providers are encouraged to work towards behavioral contract agreements prior to exit:

- In possession or use of drugs on-site.
- Brandishing of weapons.
- Physical fighting/assault/battery.
- Theft that has been validated by shelter staff.

Shelter Providers must provide the reasons for a participant exit in writing. If the exit is immediate based on behavioral issues that create an immediate threat to the surrounding environment, notice in writing must be provided upon request within 24 hours.

Shelter Providers should work towards notifying participants of an exit ahead of time. Absent an immediate threat to health and safety, providers must facilitate the connection to another program. The length of time of exit should correlate with the actual recent behavior which is the reason for the exit, as opposed to the number of times the participant has exhibited the same or similar behavior.

Shelter Providers must work with participants to create an exit plan when possible. Exit plans must identify progress towards goals and resources that will assist the participant going forward with any housing needs. Exit plans should be reviewed with participants when possible.

Shelter Providers must have a policy for reinstatement for participants that have been exited from the shelter. If a participant is being exited to any location other than permanent housing, communication must be provided around the amount of time and/or process for returning. Practices around the length of time

before a participant can return should be commensurate to the severity of the behavior, and must not be progressive in length of time for repeat exits due to the same behavior. Shelter Providers are encouraged to have reinstatement policies that focus on conversations regarding behavior and mutual agreements to reduce the length of time before a participant can return.

If a participant self-exits for any reason other than to avoid an exit or write-up due to behavior, they are eligible to return based on bed availability with no wait period.  If there are negative circumstances associated with their self-exit, the Shelter Provider should follow their established process and wait times for re-entry.  Self-exit is inclusive of when a participant leaves the program without informing the Shelter Provider of their intent to exit from the program.

### 1.2.13.    Hours of Operation and Curfew

Shelter Providers must notify participants of shelter hours of operation and any curfews. Shelter Providers must support reasonable accommodations for participants with disabilities, and provide accommodations to support employed participants and/or extenuating circumstances.

### 1.2.14.    Coordinated Entry System Integration

Shelter Providers must participate in the Orange County homeless services system of care, including the Orange County Coordinated Entry System (CES). The emergency shelter system serves as a key Access Point to the Coordinated Entry System to facilitate program participants' connection to available housing resources and programs.

Shelter Providers must coordinate with public benefits, employment services and Housing Navigators that will assist program participants in exploring all available employment, income and housing options, collecting required documentation and completing necessary assessments as required by the Coordinated Entry System.

### 1.2.15.    Food Services

Shelter Providers must provide three meals per day to each program participant: breakfast, lunch and a hot dinner, or meals on another schedule as defined by the funder contract. Shelter Providers may cater meals in and/or make arrangements to ensure food service compliance. Shelter Providers must ensure meals can accommodate clients who have special dietary needs due to a documented medical condition, or due to religious beliefs.

Meal schedules must be covered during intake and orientation with participants. Meal schedules must be updated weekly and posted in common areas for participants' access.

Meals must be served in an area specifically designated for meal consumption where adequate space for seated dining is available for each participant, including those with mobility devices.

Meals must be nutritionally adequate in accordance with United States Department of Agriculture.

Meal preparation and distribution will be in compliance with OC Health Care Agency Safe Food Handling Requirements.

## 1.2.16.    Medication Storage

Shelter Providers must develop and implement a policy regarding participant medication storage. The policy shall address medication storage, documentation, refrigeration, and shall include a secure and locked location for medication storage such as a medication cabinet, locker or drawer.

The Shelter Provider may not administer or dispense medication (provide dosage or ensure medication schedule adherence) for participants and may not require participants to turn over their medication.

## 1.2.17.    Storage and Personal Belongings

Shelter Providers must have a participant storage policy to be provided to participants upon intake. At a minimum, shelter operators must allow for at least 90 days after a participant's exit to gather her/his/their personal belongings or facilitate relocating those belonging to participant sooner.

Shelter Providers must maintain a log of personal belongings that are discarded. The log will at minimum include the name of the participant, the date when belongings were discarded and the staff member who updated the log.

Shelter Providers will allow for individuals to regularly access their storage and personal belongings, and not restrict volume of belongings that would exclude essential items and disability related items.

## 1.2.18.    Safety and Emergency Preparedness

Shelter Providers must develop written policies and procedures for emergency situations with relation to staff and participant safety and security.

Policies and Procedures must include the following:

- Emergency preparedness drills;
- Emergency evacuations;
- Assisting participants with evacuations, including persons with disabilities and/or limited mobility;
- Stockpiling of appropriate quantities of water and food rations;
- Accounting for all individuals accessing the facility (including participants, shelter operator staff, supportive service partners and volunteers) for all entry and exits that include sign-in/out information;
- At least 1 staff member per shift that has been trained in emergency response and has an up-to-date certification for CPR (cardiopulmonary resuscitation) and emergency first aid procedures;
- Staff and participant first aid kits on-site for non-emergency first aid;[1]
- Crisis Intervention for emergency situations requiring staff to access emergency services such as 911 calls, police reports, or for performing other non-violent interventions; and
- Critical incident documentation and reporting.

Shelter Providers procuring security must provide training to the security staff on agency safety protocols, and policies and procedures for escalations requiring security intervention.

---

[1] For list of minimally acceptable number and type of first-aid supplies, please follow this link: https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.266AppA.

### 1.2.19.    Communicable Diseases

Shelter Providers must develop written policies and procedures that address universal precautions, tuberculosis control, disease prevention, epidemic response, and biohazard practices, which are in compliance with Health Care Agency guidelines.

Shelter Providers must comply with universal precautions, proper sharps disposal, provide personal protective equipment (PPE) and provide training to staff.  Shelter providers must ensure that shelter services, bed location, and common space comply with minimum standards for health and safety as provided by the CDC, California Department of Public Health, and the OC Health Care Agency.

## 2.    Supportive Services

### 2.1.   Case Management Access

Shelter Providers are required to have case management available to participants on site.

Participation within case management is voluntary to program participants, however all participants must be offered case management and must be engaged on an ongoing basis to encourage participation.  Shelter Providers should recognize that it may take multiple contacts before a participant is ready to engage.

Shelter Providers must ensure case management services are participant-centered to individual needs. Programs must provide space for the provision of case management that works to create as much privacy and confidentiality as possible.

### 2.2.   Assessments

Shelter Providers must provide a standard assessment which includes an evaluation of the participant's service needs, including information about past and current service needs. Assessments must provide opportunity to identify any barriers or issues that may impact the participant's ability to successfully engage in services, including barriers arising from trauma and/or disabilities. Assessments must also be designed to identify additional supports and resources that participants should be referred/aligned with.

Shelter Providers must work with the Health Care Agency to inform participants of the availability of additional clinical assessments/screenings. Providers may also request additional screenings by the behavioral health team, or by the Comprehensive Health Assessment Team-Homeless (CHAT-H) Public Health Nurse team to screen for increased care supports and resources. Programs must allow the County to post notice in each facility informing participants of these available additional assessments.

### 2.3.   Housing Plans

Shelter Providers must work with participants to create a housing plan within 30-days of admission to the shelter. Plans should focus on finding permanent housing for each participant and the staff and programs that will be supporting them in their goals. If a participant is unable or refuses to complete a housing plan, that must be documented.

Housing plans must identify the participant's needs, goals, actions to be taken, and progress towards goals. The housing plan must be focused on working with participants to have a positive shelter stay that is as

short as possible. The housing plan must be updated as the participant's needs and/or goals shift, and as progress is completed towards their goals.

Program staff must continue to engage participants who do not progress towards their housing goals. Engagement to participants not progressing must occur no less than once every two weeks, and must be documented.

## 2.4.   Housing Focused Services

Shelter Providers are expected to engage participants in a wide range of service needs, including, but not limited to: employment/benefits, health, substance use, mental health, legal issues and transportation. Program staff should regularly engage participants on how these various other service areas are in support of their overall housing goal and allow these providers to meet with participants on the shelter site. Housing must be the primary focus of shelter staff.

## 2.5.   Services, Referrals and Linkages

Case Management services should be available as needed for participants. Although services are voluntary within shelter programs, it is the responsibility of program staff to actively engage participants for case management services no less than once per month.

The purpose of the shelter system is to provide stable setting and supports that assist participants toward a permanent housing outcome.  The responsibility of engagement is held with the Shelter Provider, and progress towards service/housing plan goals must be evaluated individually based on a participant's unique circumstances.  Shelter Providers must operate in a participant-centered approach and work to engage participants that may be hesitant or resistant to actively participate in the services being offered.

If participants are not engaging in supportive services and are not able to express or demonstrate any progress towards service/housing goals, then shelter staff should engage with the participant in conversation around their needs and what changes could be reasonably made to assist the person with their needs. Engagement discussion should include all options that could benefit the participant including on-site services, alternative shelters or supportive services.

Programs must be able to meet a wide range of needs for participants and must maintain a network of resources that they are able to refer and link participants to. Shelter operators must either provide the following services or have linkages to:

- Identification and vital document support
- Enrollment in to mainstream benefits (TANF, SSI/SSDI, health insurance, VA health care, etc.)
- Health services (physical health, mental health and substance use)
- Employment and vocational services
- Legal assistance
- Childcare
- Life skills and coaching

When a referral is made to an outside resource or service, program staff must provide a warm hand-off/connection and a follow-up inquiry to ensure the linkage has been made. If linkage is unsuccessful, staff must support in finding other possible resource options.

## 2.6.   Transportation

Shelter Provider must make reasonable efforts to address transportation needs for participants. Transportation needs can be met through direct transport, public transportation fare or through supporting participants with learning how to use and access public transportation.

Programs should be assisting participants who are eligible to access reduced public transportation fare.

Transportation provided by shelter operators must be ADA compliant and have the ability to support participants with mobility devices without staff physically providing the transfer.

# 3.   Staff Training

Shelter Providers must establish a policy and procedure for onboarding new staff, including documentation of all trainings, and ensure regular updates to the annualized training completed by staff.

Shelter Providers must complete mandatory staff trainings regarding safety, compliance and quality services provisions to best address the complex needs of the homeless populations served.

All shelter and/or specialized staff must receive training upon hire or upon request by the County, city and/or funder to ensure competency within the following core areas:

  A.  Program Operational Standards

  B.  Effective Communication

  C.  Evidence-Based Practices

  D.  Facility, Health and Safety Practices

  E.  Anti-discrimination, Equity Practices

  F.  ADA Compliance

Shelter Providers must ensure all new employees and/or specialized staff complete the following mandatory trainings:

- Mandated Child/Elder Abuse Reporting
- Privacy and Confidentiality
- Due Process/Grievance Process
- ADA Compliance/Reasonable Accommodation
- Emergency Evacuation/Incident Management
- First Aid/Universal Precautions/CPR
- Domestic Violence & Safety Planning
- Cultural Humility
- Harassment
- Equal Access and Gender Identity
- Mental Health First Aid

- Trauma-Informed Care
- Harm Reduction
- Motivational Interviewing
- Problem Solving and Diversion Intervention
- Crisis Intervention and De-escalation Training
- Housing First Principles

Certificates and other documentation that verify training attendance must be maintained for each employee and documented in the contracted agency files.

Shelter Providers must be able to provide proof that appropriate staff have been trained in the legal requirements of being a mandated reporter, reporting any suspicion of abuse or neglect to relevant authorities as required by law.

# 4.    Facility Standards

## 4.1.    Facility Standards for Emergency Shelter

**Structure and materials:**

- The shelter building is structurally sound to protect the participants from the elements and not pose any threat to the health and safety of the participants.
- Shelter Providers have site control demonstrated by either a fully executed lease, or proof of ownership.
- Shelter Provider can produce the most recent public health permit and fire department permit.

**Interior air quality:**

- Each room or space within the shelter has a natural or mechanical means of ventilation. The interior air is free of pollutants at a level that might threaten or harm the health of participants.

**Water supply:**

- The shelter's water supply is free of contamination and freely available for participants.

**Thermal environment:**

- The shelter has any necessary heating/cooling facilities in proper operating condition.

**Illumination and electricity:**

- The shelter has adequate natural or artificial illumination to permit normal indoor activities and support health and safety.
- There are sufficient electrical sources to permit the safe use of electrical appliances in the shelter.

**Sanitary facilities:**

- Each participant in the shelter has access to sanitary facilities, including sinks, showers, and toilets and accompanying items that are in proper operating condition, are private, and are adequate for personal cleanliness and the disposal of human waste.
- Programs must establish a housekeeping and maintenance plan that ensures a safe, sanitary, clean and comfortable environment.
- All sites must have an inspection for rodents and insects by a certified pest control company, at least twice annually, and as needed. If an infestation is found, the Shelter Provider must fumigate and make appropriate reasonable accommodations for the participants.
- The shelter provides trash receptacles throughout the facility and ensures trash is taken out of the facility at regular intervals.


**Food preparation:**

- Food preparation areas, if any, contain suitable space and equipment to store, prepare and serve food in a safe and sanitary manner.

**Fire safety:**

- There is at least one working smoke detector in each occupied unit of the shelter. Where possible, smoke detectors are located near sleeping areas.
- All public areas of the shelter have at least one working smoke detector.
- The fire alarm system is designed for hearing-impaired participants.
- There is a second means of exiting the building in the event of fire or other emergency.
- All fire extinguishers must be fully charged and labeled.
- Facilities must have an annual fire inspection conducted by the fire department.
- Fire drills must be conducted annually.
- Shelter Providers must keep a log of all inspections, approvals and fire drills.

**Emergency:**

- Emergency numbers and evacuation routes must be posted in all common areas in the facility in case of an emergency.
- Emergency exits are clear and operating.

## 4.2.   ADA Facility Standards

Shelter Providers must have operating facility standards and policies to ensure that facilities, inside and out, have been assessed for inaccessible facility-based areas and reasonable accommodations and physical modifications have been identified and developed to ensure participants with a disability have equal access and full inclusion of services.

Shelter Providers must work to ensure the following accessibility standards are met.  The County recognizes that not all existing shelters can reasonably accommodate all disability-related needs, however, shelter operators will be required to identify those areas where there is not adequate access and develop reasonable accommodation and modification plans and policies. Individuals denied access to a shelter

because of inaccessibility must be offered an indoor alternative within their service planning area. Alternatives may include motel/hotel, other shelters, or higher level of care facilities.

Some participants may require reasonable accommodations or reasonable modifications to the premises in addition to required accessible features.

- Facilities must be accessible to participants with disabilities.
- Facilities must not have areas, in or out of the property, with broken, raised, or uneven sidewalks or walkways, or stairs or steps with no identified accessible pathway to the entrance and/or curb cuts.
- Entry into the facility must be accessible to participants with limited mobility, including participants who use wheelchairs, scooters, or manually-powered mobility aids such as walkers, crutches or canes.
- The exterior of the facility must be accessible for participants with disabilities when approaching, entering or inside the location.
- Shelter Provider must provide at least one restroom with at least one stall with a 5-foot turning radius.
- All restrooms established under this section must have handles for an individual using a mobility device to move themselves without assistance.
- If parking is available at the facility, programs must provide at least one ADA accessible van parking space for every 25 non-accessible parking spaces. The accessible space must provide enough room for a van with a hydraulic lift to operate without any issue.
- All fire alarm systems and fire extinguishers must be no more than 48 inches from the ground for easy access in case of an emergency.
- All programmatic areas must be accessible for an individual with a mobility device.
- Shelter Provider must provide at least one shower accessible for those with a mobility device, regardless of gender.
- Shelter Provider sites must provide at least one accessible roll-in shower or at least two transfer ADA shower seats.
- Shelter Provider must provide accessible beds for persons with mobility disabilities designed for easy access to beds from common spaces and easy transfer from a mobility device.
- If there are common/communal areas located at the facility, they must be accessible for all participants, including those with mobility devices.
- If there is a dining area located in the facility, it must be accessible for all participants, including those with mobility devices.
- Doors within the facility must be equipped with a handle which can be opened with a closed fist rather than a knob.
- Accessibility postings must be posted in plain sight in a common area of the facility.
- Please use this link for further details on how to assess the site for ADA compliance: https://www.adachecklist.org/doc/fullchecklist/ada-checklist.pdf.

## 4.3.   Hygiene Products

Shelter Providers must provide participants access to sinks, showers toilets and accompanying items. Shelter operator must ensure that hygiene and toiletry items are given to participants, or given upon request, and at a minimum:

- Towels
- Soap
- Deodorant
- Toilet tissue
- Feminine hygiene products
- Disposable razors
- Toothpaste and toothbrush

Shelter Providers must ensure that all sheets, towels and blankets are laundered weekly or more frequently as needed.

If applicable, washers and dryers shall be provided free of charge to participants and include access to free detergent.  If laundry equipment is not provided on-site, shelter operator must support participants with accessing laundromat services.

ADA requirements for showers and restrooms can be found in Section: IV b. ADA Facility Standards.

## 4.4.   Hazardous Materials

Shelter Providers must have policies and procedures with regard to proper hazardous material clean-up and removal.  Shelter Providers must ensure that staff have the proper biohazard equipment for cleaning and disposal.

Shelter Providers must provide accommodations to participants in the event hazardous material poses a health and safety risk to participants and staff.

Shelter Providers must maintain a documentation log for hazardous material circumstances.

Shelter Providers will make available Safety Data Sheets (SDS) which provide information on chemicals, describing the hazards the chemicals present.

# 5.   Administration

## 5.1.   Policies and Procedures

Executive and administrative staff are responsible for ensuring that a comprehensive set of policies and procedures are updated at minimum on an annual basis; however, policies and procedures must be updated any time there is a significant change within program operations. Program and procedural updates must be shared with the County Administrative Entity for review to ensure that required policy and procedure areas have been adequately covered.

Shelter Providers are required to have a process for how staff are trained and access information within the policies and procedures.

## 5.2.   Staffing

Shelter Providers must maintain a clear and comprehensive job description for all positions working within or supporting the emergency shelter.

Shelter Providers must maintain an organizational chart which identifies positions attached to the emergency shelter and a supporting documentation to show where each position is being funded from.

Program staff must have a way of being identifiable to program participants. This can be done through uniform attire or identification badges. Programs that operate confidential locations serving participants fleeing domestic violence will be exempted from this requirement.

Programs must have a conflict of interest policy and make staffing adjustments as necessary to minimize the potential of circumstances that create a conflict of interest, including personal and familial relationships.  Conflict of Interest policies must have expectations for reporting and ways in which staff can alert program management of potential conflicts, and how program management will monitor and assess the conflict.

## 5.3.   HMIS Participation and Documentation

Shelter Providers must actively document within the HMIS and do so within accordance with the HMIS Policies and Procedures. Programs are required to document enrollments and exits in HMIS within a 24-hour period for the purpose of live bed management.

Shelter Providers must maintain participant records that include documentation of all participant intake paperwork, assessments, housing plans, referrals, interventions, placements or follow-up activities.

## 5.4.   Document Storage and Retention

Files containing participant information shall be stored in a locked and safe location that maintains participant confidentiality. Only authorized personnel can access the location where files are being kept.

Shelter Providers are required to have policies and procedures that detail the length of time and manner in which participant documents are retained.

Shelter Provider must have policies and procedures that detail how release of information requests are processed for participant information.

## 5.5.   Quality Assurance

Shelter Providers must have a quality assurance plan that assures adherence to the overall program policies and procedures. The quality assurance plan must outline a process for the integration of participant feedback on program operations and to any revisions to policies and procedures.

## 5.6.   Program Monitoring

Shelter Providers can expect the County to monitor their program annually to ensure adherence to the Standards of Care outlined in this document. Any findings identified by the County during program monitoring must be quickly resolved.

## 5.7.   Reporting

Programs are required to be timely on any required reporting, including but not limited to: program outcomes, program invoicing, incident reports and key staffing changes. If a program is not able to meet

the deadline for a required report, the program administration must provide notice and an estimated time frame of when they will be able to submit reporting.

## 5.8.    Waivers

Programs must follow all requirements within the Standards of Care, as well as those identified within their direct contract. If for any reason a program is unable to meet a standard of care, they may request a waiver. Waiver requests will consider the impact for participants receiving services and what reasonable program adjustments can be made to minimize that impact on program participants.

The County will work with programs to find ways in which to meet the Standards of Care or when not possible to find solutions that have minimal impact for participants. The County will provide written documentation on all waiver approvals and denials along with reasoning.

# 6.    Attachments

**Attachment 1**

**Critical Incident Report**
**County of Orange**
**Health Care Agency Office of Care Coordination**



| Today's Date: | Date & Time of Incident: | Date of Notification of the Incident *(if different from incident date):* | Date Incident Report Submitted: | *Was This Incident Reported Within 24 Hours of the Date of Incident* <br><br> **(Required):** ☐ Yes ☐ No   *If no, please explain circumstances:* <br> _____ <br> _____ |
|---|---|---|---|---|

| **Provider:** | **Staff Name:** |
|---|---|

| **Staff Telephone Number:** | **Staff Email Address:** |
|---|---|

| **Program Manager:** | **Program Manager Phone Number:** |
|---|---|

| **Address Where Incident Occurred:** | **Person to Contact Regarding the Incident:** <br> *Name:* _____ <br> *Title:* _____ |
|---|---|

**Name of people involved in incident. (For program participant(s) use HMIS unique identifier and initials.)**
_____
_____

**Type of Incident (*incidents occurring on premises*) – Check all that apply:**   *\*Requires additional and immediate telephone notification to County*

| | *Sexual Misconduct / Harassment / Inappropriate Touching (Including Allegations)* | *Reportable Abuse (Including Allegations):* | *Violence:* | *Evacuation:* | *Death:* |
|---|---|---|---|---|---|
| ☐ Medical Emergency Requiring Immediate Medical Attention *(EMT, ED and/or 911 Contacted)* | ☐ Client-to-Client <br> ☐ Staff / Provider-to-Client | ☐ APS Contacted <br> ☐ CPS Contacted | ☐ Destruction of Property <br> ☐ Physical Altercation Involving Another Client <br> ☐ Physical Altercation Involving Staff <br> ☐ Acts or Threats of Violence | ☐ Planned Evacuation <br> ☐ \*Facility-Related / Evacuation (i.e. water or electricity outages, etc.) <br> ☐ \*Weather-Related Evacuation (flood, wildfire, etc.) | ☐ \*Death on premises <br> ☐ Death reported past discharge |

**Description of Incident (facts, timelines, outcome) – List any necessary notifications made:**
_____
_____
_____
_____
_____
_____
_____
_____

**Did debriefing occur with shelter staff involved in the incident?** ☐ Yes ☐ No
**Brief description:**
_____
_____
_____

*PLEASE TURN OVER AND COMPLETE PAGE 2 OF THE CRITICAL INCIDENT REPORT*

**Critical Incident Report**
**County of Orange**
**Health Care Agency Office of Care Coordination**



| Are there any operational changes or managerial actions that may be considered to lessen the impact or likelihood of similar incidents occurring in the future?    ☐ Yes ☐ No<br>If yes, provide a description of the action |||
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| **Name / Title of Reporting Staff (Printed):** | **Staff Signature:** | **Date:** |

**Administrative Use Only**

| | Internal Log # _____ |
|---|---|
| **Has this Participant been involved in other incidents?**<br><br>☐ Yes        ☐ No | **If yes, please write additional Internal Log #'s involving this Participant below:** |
| **Incident Reviewed By:** | **Date:** |

| **Additional Notifications Needed:** | | |
|---|---|---|
| ☐ **Department Head** | ☐ **CEO's Office** | ☐ **Other:** _____ |

| **Outcome determined.** ☐ **Incident logged, no action required**    ☐ **Incident logged, remedial action required**<br>**Detail outcome conversation with Shelter Operator below:** |
|---|
| |
| |
| |
| |
| |

**Attachment 2**

**Shelter Grievance Form**
*PROVIDER NAME*
**County of Orange, Office of Care Coordination**

 

*SHELTER NAME* seeks to support participant grievances in a fair, transparent and efficient manner. Please complete the information below to the best of your ability and submit it to the shelter's designated grievance staff.  You may submit the completed form by email or in-person at the addresses listed below,

- Email:
- Address:

You will be contacted by *Shelter name/position* within three (3) business days to work towards a resolution of your grievance.

If you need support with completing this paperwork due to a disability or language barrier, please contact the shelter Americans with Disabilities Act (ADA) coordinator: _____

_____

## Identifying information

Full Name (Please Print): _____     Date: _____

Phone: _____     Email: _____

Other means of contact:

_____

I have a need for language translation or interpretation services?   ☐ Yes  ☐ No

## Grievance Information

Date of the grievance incident: _____

Type of Grievance.  Please check all that apply:

☐ Facility
☐ Program Services
☐ Shelter Staff
☐ Other Participants
☐ Reasonable Accommodations (Disability Related Need)
☐ Program Exit/Termination
☐ Other: _____

**This is the first time** I am submitting a grievance for this concern:   ☐ Yes  ☐ No
**I am submitting this as an appeal** to the result of a previous grievance:   ☐ Yes  ☐ No
(Please note, an appeal may not be considered if filed more than 30 days past the determination date of the grievance result you are appealing. Circumstances may allow for appeal to the County of Orange past the 30 days.)

**Shelter Grievance Form**
**PROVIDER NAME**
**County of Orange/Office of Care Coordination**



<div style="writing-mode: vertical">

**Grievance Description**

**Grievance Description**
*Briefly describe your grievance. Please Include a description of what occurred, who was involved and additional information relevant to the grievance. (Please include additional sheets if needed.)*

**Desired Outcome**
*State what you would like to see happen with regard to this grievance.*

</div>

Participant's Signature: _____   Date:_____

---

**Administrative Use Only**                                    Internal Log # _____

Date Received by Staff: _____

Staff Name and Position: _____

Grievance Type: ☐ Grievance  ☐ Appeal

**Attachment 3**

**County of Orange**
**Health Care Agency, Office of Care Coordination**
**Shelter Grievance Process**

 

The Shelter Grievance Process document is intended to provide Shelter Participants information on their grievance rights and an overview of the process. The County of Orange (County) appreciates feedback and takes grievances seriously.  The County will work to resolve Participant grievances in a transparent and efficient manner.

If you as a Shelter Participant are unsure of how to access the shelter grievance process within the shelter you are staying, you can reference the information provided during the intake process, ask a shelter staff member, or review grievance information posted in the common areas of the shelter.  If at any time during the process you experience difficulty with the shelter grievance process, please reference the Contact Information in Step 3 (below) to contact the County directly via telephone, email and/or mail.

| STEP 1: | Shelter Grievance Process |
|---|---|

Participants that have a grievance with a shelter must first start by filing their grievance direclty with the shelter operator and complete the shelter's grievance process .

The Shelter Operator has three (3) business days to contact the participant after submitting their grievance and (ten) 10 business days to supply a written response to the grievance.

| STEP 2: | Shelter Appeal Process |
|---|---|

Participants that have completed the shelter's grievance process and received a written response, but still have concerns with the shelter's response, have a right to request an appeal of that decision, and request a secondary review of the grievance from the Shelter Operator's leadership.

Leadership responsible for the appeal process have three (3) business days to contact the participant after submitting their grievance appeal, and (ten) 10 business days to provide the participant a written decision for the appeal.

| STEP 3: | County of Orange Grievance Appeal Process |
|---|---|

Participants have a right to contact the County for an additional appeal process, once participants have completed the shelter provider's grievance **AND** appeal process.

The County's grievance appeal process is designed to review the shelter's grievance and appeal process as well as review the Shelter Operator's written responses, and ensure that the Shelter Operator is adhering to their grievance policies, as well as their operations are in compliance with the County Standards of Care.

In order to begin this process please contact the County:

**By Telephone:**
Grievance Specialist

**By Email:**
OCshelterfeedback@ochca.com

**By mail:**
Orange County
Health Care Agency
Office of Care Coordination
405 W. 5th Street, Suite 658
Santa Ana, CA, 92701

**Attachment 4**

**County of Orange**
**Health Care Agency**
**Office of Care Coordination Grievance Appeal Form**

 

The County of Orange (County) is committed to supporting resolutions for participants that have grievances with County-funded shelter operators. The Grievance Appeal Form is designed for Participants that are looking to appeal a shelter operator's grievance and/or appeals determination and requesting the County's review to assess:

1. Shelter operator's receipt and process of your grievance was done in compliance with stated program policies and procedures.
2. The written decision by the shelter operator is not in conflict with the established County Standards of Care requirements or any other contractual requirement.

The County will contact participants within three (3) business days of receiving the completed Grievance Appeal Form.

Complete the following information to the best of your ability. Please print.

Full Name (First and Last Name)**: _____**   Date: **_____**

Phone: **_____**   Email: **_____**

Other means of contact**: _____**

Name of the Shelter Operator or Shelter Program:
_____

Have you completed the shelter operator's grievance process (please mark box)? ☐ Yes   ☐ No
Comments (if needed):_____

Have you completed the shelter operator's appeal process (please mark box)?   ☐ Yes   ☐ No
Comments (if needed):_____

| **Appeal Description** |
| :--- |
| *Please briefly explain what concerns you have with the shelter operator's grievance and appeal decision. If you need additional space, please utilize the back of the paper or attach additional pages.* |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |

**County of Orange**
**Health Care Agency**
**Office of Care Coordination Grievance Appeal Form**

 

| **Desired Outcome** |
| :--- |
| *State what you would like to see happen with regard to this appeal.* |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |

| **Additional Space** |
| :--- |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |

**Participant's Signature:** _____ **Date:** _____

**Please submit a completed form by email or mail at the addresses below:**
**Email:** OCshelterfeedback@ochca.com

**Mailing Address:** Orange County Health Care Agency
                             Office of Care Coordination
                             405 W. 5th Street, Suite 658 Santa Ana, CA, 92701

| *__Administrative Use Only__*                            **Internal Log #** _____ |
| :--- |
| Name of staff reviewing appeal: _____   Staff position: _____ |
| Date staff received form: _____ |
| **Actions:** |
| ☐ Referred participant back to shelter provider.   Reason: _____ |
| ☐ Grievance appeal review.   Due date: _____ |

# ATTACHMENT

# B

ATTACHMENT B



**SERVICE PLANNING AREAS**

munication, May 2017